# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, BRIAN NORMAN, HOOD'S GUNS & MORE, PRO GUN AND INDOOR RANGE, and NATIONAL SPORTS SHOOTING FOUNDATION, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> KWAME RAOUL, Attorney General of Illinois, and BRENDAN F. KELLY, Director of the Illinois State Police, <br><br> *Defendants*. | No. 3:23-cv-00209 |

**COMPLAINT**

1

Caleb Barnett, Brian Norman, Hood's Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc. (collectively, "Plaintiffs") hereby bring this complaint against Kwame Raoul, Attorney General of Illinois, and Brian F. Kelly, Director of the Illinois State Police (collectively, "Defendants").   Plaintiffs bring this complaint based on personal knowledge as to all Plaintiff facts, and on information and belief as to all other matters.

## INTRODUCTION

1.      "[T]he Second Amendment protects the possession and use of weapons that are 'in common use [today].'"  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)); *see Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (invalidating Massachusetts ban on stun guns).   "[A]ll instruments that constitute bearable arms, even those that were not in existence at the time of the founding," come within the ambit of the Second Amendment.  *Heller*, 554 U.S. at 582, 624-25. And if an arm is "typically possessed by law-abiding citizens for lawful purposes" today, then it may not be banned.  *Id.*  That is the irreducible minimum of the fundamental "right of the people to keep and bears Arms."  *See* U.S. Const. amend. II.  A state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose."  *Heller*, 554 U.S. at 628.

2.      Yet that is precisely what Illinois has just done.  On January 10, 2023, Illinois enacted HB 5741, the "Protect Illinois Communities Act."  Ill. Pub. Act 102-1116 §1; *see* Bill Status of HB5471, 102nd Gen. Assembly, https://bit.ly/3ZJCslX (last visited Jan. 24, 2023). HB 5741 takes the radical step of banning nearly every modern semiautomatic rifle—the single most popular type of rifle in the country, possessed by Americans in the tens of millions.  Indeed, Americans buy more of the most popular type of semiautomatic rifle (the AR-15) each year than the most popular type of automobile (the Ford F-150), and there are more AR-15-style rifles in

private hands in America today than subscribers to all daily newspapers nationwide combined.

3.    Almost no other state in the union has ever tried to adopt such an extreme measure—and for good reason, as no less an authority than the Supreme Court has already recognized that semiautomatic rifles "traditionally have been widely accepted as lawful." *Staples v. United States*, 511 U.S. 600, 612 (1994).

4.    All of that dooms any effort to claim that prohibiting these ubiquitous arms is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

5.    Not content with effectively banning the modern rifle, HB 5741 *also* bans many semiautomatic pistols, even though "semiautomatic pistols" are "the weapons most commonly used today for self-defense." *Caetano*, 577 U.S. at 417-18 (Alito, J., concurring in the judgment). And HB 5741 goes a step further still, banning all ammunition feeding devices (without which semiautomatic firearms cannot fire as designed) that are capable of holding "more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns," 720 ILCS 5/24-1.10(a)-(c), even though tens of millions of Americans own hundreds of millions of such arms, which account for half of all magazines in circulation today.

6.    None of that is consistent with the Second Amendment, which *protects* the right of law-abiding American to keep and bear arms that are "in 'common use' for self defense today." *Bruen*, 142 S.Ct. at 2143.  Because the arms that Illinois has banned unquestionably are in common use today by law-abiding Americans, its ban is unquestionably unconstitutional.

7.    Plaintiffs thus seek, among other things, declaratory and injunctive relief to prevent Illinois, including Defendants Raoul and Kelly, and all of their respective agents and assigns, from enforcing HB 5471 against Plaintiffs or any of their members.

## JURISDICTION AND VENUE

8.      Plaintiffs' causes of action arise under 42 U.S.C. §1983 and the United States Constitution, so this Court has jurisdiction pursuant to 28 U.S.C. §1331.

9.      This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

10.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendants are located and perform their official duties in the Southern District of Illinois and are therefore considered to reside within this District as a matter of law.

## PARTIES

11.     Plaintiff Caleb Barnett is a law-abiding, adult resident of Sparta, Illinois, and is legally eligible to possess and acquire firearms.  Barnett owns multiple firearms that are now defined as "assault weapons," and multiple magazines that are now defined as "large capacity ammunition feeding devices," under HB 5471.  But for HB 5471, he would buy more.

12.     Plaintiff Brian Norman is a law-abiding, adult resident of Marion, Illinois, and is legally eligible to possess and acquire firearms.  Norman owns multiple firearms that are now defined as "assault weapons," and multiple magazines that are now defined as "large capacity ammunition feeding devices," under HB 5471.  But for HB 5471, he would buy more.

13.     Plaintiff Hood's Guns & More is a retail firearms business located in Benton, Illinois, and is authorized by law to sell firearms as a Federal Firearms Licensee (FFL 01) licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives.  Before HB 5471 was enacted, Hood's Guns & More sold many of the semiautomatic firearms and magazines the state now prohibits.  But for HB 5471, Hood's Guns & More would continue to sell these products.  Hood's

4

Guns & More is a member of the National Shooting Sports Foundation.

14.     Plaintiff Pro Gun and Indoor Range is a retail firearms business located in Benton, Illinois, and is authorized by law to sell firearms as a Federal Firearms Licensee (FFL 01) licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives.  Before HB 5471 was enacted, Pro Gun and Indoor Range sold many of the semiautomatic firearms and magazines the state now prohibits.  But for HB 5471, Pro Gun and Indoor Range would continue to sell these products.  Pro Gun and Indoor Range is a member of the National Shooting Sports Foundation.

15.     Plaintiff National Shooting Sports Foundation, Inc. ("NSSF") is a Connecticut nonprofit, tax-exempt, non-stock corporation with its principal place of business in Connecticut. It is the trade association for the firearm, ammunition, and hunting and shooting sports industry. It has a membership of more than 10,000 throughout the United States (including more than 290 in Illinois), including manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members.  NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage.  NSSF is authorized to bring this action on its members' behalf, in light of the injuries HB 5471 is causing and will cause NSSF members if allowed to take effect.

16.     Defendant Kwame Raoul is the Attorney General of Illinois.  Attorney General Raoul is "the legal officer of the State," and he has the duty to "institute and prosecute all actions and proceedings in favor of … the State," as well as to "defend all actions and proceedings against any State officer."  Ill. Const. art. V, §15; 15 Ill. Comp. Stat. 205/4; *see* 20 Ill. Comp. Stat. 2610/1,

2610/16.  He is a resident of Illinois, and his principal places of business are 100 W. Randolph St., Chicago, IL 60601; 500 S. Second St., Springfield, IL 62701; and 601 S. University Ave., Carbondale, IL 62901.  At all relevant times, Attorney General Raoul, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

17.     Defendant Brendan F. Kelly is the Illinois State Police Director.  As Director, Kelly is "responsible for the management and control of the Illinois State Police."  20 Ill. Comp. Stat. Ann. 2610/2.  The State Police are responsible for enforcing HB 5471.  720 ILCS 5/24-1.9(g); *see* 720 ILCS 5/24-1.9(d); 720 ILCS 5/24-1.10(d), (h).  Director Kelly is a resident of Illinois, and his principal place of business is 801 S. Seventh Street, Springfield, IL, 62703.  At all relevant times, he, as well as those subject to his supervision, direction, or control, are and will be acting under color of law.

## FACTS

### I.     Semiautomatic Firearms Are The Modern Standard—And For Good Reason.

18.     A "semiautomatic" firearm is a firearm that discharges a single projectile with each pull of the trigger, no matter how long the trigger is depressed.  The "automatic" part of this term refers to the fact that the chamber will automatically reload and be ready for the next trigger pull; semiautomatic firearms remain only "*semi*-automatic" because the trigger must still be depressed each time the shooter wishes to fire.  By contrast, a *fully* automatic firearm, often known as a "machine gun," will discharge rounds for as long as the trigger is depressed.  *Staples*, 511 U.S. at 602.

19.     Semiautomatic rifles and pistols have been in safe and effective use by civilians in this country—including in Illinois—for more than a century, and they "traditionally have been

widely accepted as lawful." *Id.* at 603, 612.[1]

20.  The history of the advancement of firearms technology unsurprisingly reflects a persistent trend of trying to increase firing capacity and speed—and thus utility for self-defense—without sacrificing accuracy or functionality.

21.  "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such handguns and long guns "pre-date the American Revolution." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S.Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).  "British soldiers were issued magazine-fed repeaters as early as 1658," while the Pepperbox-style pistol, with multiple barrels, was popular on both sides of the Atlantic for a century before the founding.  *Id.*

22.  A major breakthrough in modern firearms came around the time of the Civil War, when a combination of new technologies produced rifles that could be fed self-contained metallic cartridges, which contained both powder and bullet, from a magazine.  *See* David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849, 854 (2015).  Using a lever action, arms such as the Spencer repeating rifle or the Henry rifle enabled users to fire as fast as their hands could work the lever and pull the trigger—a rate of 28 rounds per minute for the Henry, even accounting for the need to reload.  Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403 (2d ed. 2018).

---

[1] Fully automatic firearms, by contrast, have long been heavily regulated, *see* National Firearms Act, ch. 757, 48 Stat. 1236 (1934), and any commerce in them has been explicitly banned since 1986, *see* Pub. L. No. 99-308, 100 Stat. 449 (1986).  Illinois bans all fully automatic firearms, a law that Plaintiffs do not challenge.  *See* 720 Ill. Comp. Stat. 5/24-1(a)(7)(i).

23.    By the end of the Civil War, "repeating, cartridge-fed firearms" were ubiquitous, and many of the most popular models had magazines that held more than 10 rounds.  *Id.* at 1148. For example, the Winchester 66 had a 17-round magazine and could fire all 17 rounds, plus the one in the chamber, in under nine seconds.  *Id.*  Later Winchester repeater models, including the famed Winchester 73 ("the gun that won the West"), likewise had magazines that held more than 10 rounds, and sold a combined "over 1.7 million total copies" between 1873 and 1941.  *Id.*

24.    The flintlocks of the Revolutionary War era had taken 26 steps to reload; the lever action rifles of the Civil War reduced this to two (or four for the new bolt action).  *Id.* at 463.  In 1885, the invention of the semiautomatic action dropped this down to zero.  *Id.*  In a semiautomatic, the gas that is released by the gunpowder explosion when the arm is fired is harnessed "to eject the empty case, and then move a fresh cartridge from the magazine into the firing chamber."  *Id.* Thus, while the user must still pull the trigger to fire each bullet—just as with bolt-action, lever-action, pump-action, or flintlock arms—the chamber reloads automatically, making the firearm "semiautomatic."

25.    Semiautomatics were marketed as personal-defense and sport firearms for half a century before they were deployed in significant numbers by the United States military—or any military, for that matter, as the United States was the first nation to do so.  *See id.* at 463, 519.

26.    Hand-in-hand with the development of the semiautomatic firearm came the development of the detachable box magazine, a device that holds the ammunition in a stack typically underneath the firearm and can be replaced with a new magazine when needed.  *See id.* at 520.  The first such firearm was the Jarre harmonica pistol of 1862, but its horizontal-feeding magazine made it awkward to use; the modern detachable box magazine, which sits in the grip of the pistol, first enjoyed commercial success with the "broomhandle" Mauser in 1896.  By 1911,

8

the Colt M1911 semiautomatic pistol—which many still regard as one of the finest available handguns today—came with a detachable magazine. *Id.* at 518. And as the twentieth century wore on, many citizens purchased rifles and handguns with box magazines capable of holding more than 10 rounds, such as Auto Ordnance Company's semiautomatic rifle (1927, 30 rounds) and the Browning Hi-Power pistol (1935, 13 rounds). *Id.* Indeed, the U.S. government subsidized the spread of these popular arms: In 1963, the federal government sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount, chiefly through the congressionally established Civilian Marksmanship Program. *Duncan*, 970 F.3d at 1148.

27. That same year, the first AR-15, Colt Sporter, rifle was released commercially.[2] *See id.* ("The ultimate successor to the M-1 was the M-16, with a civilian version dubbed the Armalite Model 15, or AR-15.").

28. Made with modern materials such as plastic polymers rather than wood, the AR-15 was lighter and more durable than traditional rifles. Moreover, the AR-15 is a "platform," not just a single model of semiautomatic rifle. It has an "open source" design that can be modified with "countless variations and adaptations," with "ready-made retail parts" "made by numerous manufacturers under different product names," thus making it accessible to the needs of many different types of users. *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022).

29. These modern semiautomatic rifles quickly became—and have remained— extremely popular; indeed, the AR-15 is still the most popular type of rifle sold today. "Over the last three decades, 19,797,000 modern rifles"—i.e., "rifle[s] built on the AR-15 platform"—have

---

[2] "AR" stands for ArmaLite Rifle; ArmaLite was the company that originally designed the platform. AR does not stand for "assault rifle." An "assault rifle" is a *fully* automatic firearm that has a selector switch enabling it to fire multiple rounds automatically. Johnson, *supra*, at 1136.

been manufactured or imported into the United States and the numbers have been steadily increasing."[3]  *Miller*, 542 F.Supp.3d at 1022; *accord Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (similar), *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc).

30.    The most recent sales and ATF data available indicate that, in 2020 alone, 2,798,000 AR-15-style rifles were produced or imported into the United States.  *See* National Shooting Sports Foundation, Inc., *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3CRHhQl (citing data).  And AR-15-style rifles accounted for "one-half of all rifles (48%) produced in 2018."  *Miller*, 542 F.Supp.3d at 1022.

31.    Recent data showed that approximately 24,446,000 AR-15-style rifles are currently owned nationwide.  NSSF, *Commonly Owned*, *supra*.  A recent survey of gun owners found the same:  approximately 24,600,000 Americans have owned or continue to own one or more AR-15-style rifles.  *See* William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 2 (May 13, 2022), https://bit.ly/3HaqmKv.

32.    To put that in perspective, that dwarfs sales of the most popular automobile in the country, the Ford F-150:  In 2020, Ford sold 787,442 F-Series pickup trucks (including, but not limited to, the F-150, the most popular model).  *Fourth-Quarter 2020 Sales* at 2, Ford (Dec. 2020), https://ford.to/3H87Y5T; *see Kolbe*, 813 F.3d at 174 (finding the difference between F-150 sales and AR-15 sales telling in the commonality inquiry); *Miller*, 542 F.Supp.3d at 1022-23 (same).  As opposed to the 24 million-plus AR-15-style rifles in circulation, there are approximately 16 million F-150s on the road.  Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Authority (Apr. 9, 2021), https://bit.ly/3GLUtaB.  Similarly, the number of AR-15-

---

[3] As "used in th[at] opinion," "the term 'modern rifle' … principally refers to a rifle built on the AR-15 platform."  *Miller*, 542 F.Supp.3d at 1020.  That term makes sense given the ubiquity of AR-15-types in modern America.

style rifles sold per year (more than 2 million) is significantly more than the number of *New York Times* print subscribers (761,000).  *See* Kate Robertson, *New York Times Reports a Gain of 180,000 Digital Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T.  And the total number in circulation is slightly more than the "*total* U.S. daily newspaper circulation (print and digital combined) in 2020… 24.3 million for weekday[s]," and only slightly less than the "25.8 million for Sunday[s]."  *Newspapers Fact Sheet*, Pew Research Center (June 29, 2021), https://pewrsr.ch/3CNXFS0 (emphasis added).

33.     Purchasers consistently report that one of the most important reasons they purchase semiautomatic rifles is for self-defense.  "In 2018, … 34% of buyers purchased a modern rifle [predominantly] for personal protection, while 36% purchased [predominantly] for target practice or informal shooting,[4] and 29% purchased [predominantly] for hunting."  *Miller*, 542 F.Supp.3d at 1022.  Contrast that with non-semiautomatic rifles, "only 5% of [which] were bought for personal protection."  *Id.*

34.     In addition to the benefits of the semiautomatic technology itself, semiautomatic rifles and pistols offer several features that make them popular for self-defense and other lawful uses.

35.     ***Detachable magazines.***  Most models accept detachable magazines, making it easier to reload the firearm, which can be critical in the stressful circumstance of being forced to defend self, family, or home.  Many of the most popular models of rifles, including every AR-15-style rifle, come standard with magazines with a capacity of 15, 20, or 30 rounds.  Many popular semiautomatic pistols likewise come standard issue with capacities of 15 or more rounds.  To take

---

[4] "During 2018, approximately 18,327,314 people participated nationally in target and sport shooting specifically with [AR-15-style] rifles."  *Miller*, 542 F.Supp.3d at 1022.

just one of numerous examples, the Beretta Model 92, "a popular handgun used for self-defense" "which entered the market in 1976," "comes standard with a sixteen-round magazine." *Duncan*, 970 F.3d at 1142.

36.    Like semiautomatic firearms, detachable magazines are ubiquitously owned throughout the United States.  Millions of law-abiding American men and women own tens (if not hundreds) of millions of such magazines.  In fact, "approximately half of all privately owned magazines in the United States"—roughly 115 million in total—are capable of holding "more than 10 rounds of ammunition."  *Id.* at 1147; *accord Duncan*, 19 F.4th at 1097.

37.    ***Pistol grips.***  Many semiautomatic rifles are fitted with pistol grips, which improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396 (1994).  "By holding the pistol grip, the shooter keeps the barrel from rising after the first shot, and thereby stays on target for a follow-up shot.  The defensive application is obvious, as is the public safety advantage in preventing stray shots."  *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting).

38.    ***Thumbhole, folding, or telescoping stocks.***  Many semiautomatic rifles have the capacity to accept thumbhole, folding, and/or telescoping stocks.  Thumbhole stocks give the user a more comfortable and stable grip, which provides for greater accuracy and decreases the risk of dropping the firearm or firing stray shots.  Folding stocks make a rifle more maneuverable in confined spaces and facilitate safe storage in easily accessible spaces.  And a telescoping stock allows a firearm to be better fitted to an individual shooter's arm length, thereby enhancing the ability to use the firearm safely and effectively, particularly if multiple people of different sizes may need to use the same rifle.

39.    ***Flash suppressors.***   Many semiautomatic rifles and pistols can be fitted with a flash suppressor, which is a device designed to reduce or redirect muzzle flash—the sudden flash of light caused by the explosion of gunpowder when a rifle user fires a shot—from the shooter's field of vision.   Flash suppressors prevent users from being blinded in low lighting conditions, such as at dusk or dawn, or during the nighttime.   They also reduce recoil and muzzle movement, increasing accuracy and making the firearm less painful to use—crucial in self-defense situations. Kopel, *supra*, 20 J. Contemp. L. at 397-99.

40.    ***Threaded barrels.***   Many pistol models come standard with a threaded barrel.   *See* Wm. Alan Bartley & Geoffrey Fain Williams, *What Is an Assault Weapon? Definitions, Attributes, and Implications Regarding Legislation*, 57 Gonz. L. Rev. 515, 534 (2022) (citing statistics showing that "threaded barrels/flash suppressors are … common features").   That is particularly true of so-called "AR-type pistols," which, as the ATF recently noted, are "popular large handgun[s]" among law-abiding Americans.   86 Fed. Reg. 30,826, 30,831 (June 10, 2021).   A threaded barrel allows users to attach, e.g., a muzzle brake to a firearm, which "reduces the gun's recoil and makes it easier to control."   Kopel, *supra*, 20 J. Contemp. L. at 396.   Muzzle brakes are designed to redirect propellant gases to counter recoil and its resultant poor accuracy, and for that reason are often used in competitive shooting.

41.    ***Arm braces***.   Many popular semiautomatic pistols, including AR-type pistols, come standard with stabilizing braces.   A stabilizing brace (or "arm brace") "help[s] a shooter 'stabilize' his or her arm to support single-handed firing."   86 Fed. Reg. at 30,827.   In general, "the intent of the brace [is] to facilitate onehanded firing of the AR-15 pistol for those with limited strength or mobility due to a disability, and to reduce bruising to the forearm when firing with one hand."   *Id.*

42.    None of these features increases a firearm's rate of fire or capacity for firepower.

By making the firearm more comfortable and/or easier to operate, they simply "make rifles [and pistols] easier to control and more accurate—making them safer to use" for lawful purposes such as self-defense.  *Murphy v. Guerrero*, 2016 WL 5508998, at *18 (N.D. Marian Isl. Sept. 28, 2016).

43.     It is little surprise, then, that there is no tradition in this country—historical or otherwise—of prohibiting firearms with these common features.  To the contrary, the vast majority of states place no special restrictions on semiautomatic, centerfire rifles with a detachable magazine and a pistol grip, thumbhole stock, flash suppressor, or adjustable stock.  Indeed, until two weeks ago, only seven states other than California (plus the District of Columbia) singled out such arms for special restrictions, and all those restrictions are of recent vintage.[5]

## II.     Illinois Enacts A Ban On Ubiquitous Firearms And Magazines.

44.     On January 10, 2023, Illinois enacted HB 5471, making it the eighth state to impose severe restrictions on some of the most commonly owned firearms in America.  Indeed, HB 5471 goes even farther than most of the handful of so-called "assault weapon" bans that have cropped up over the past few decades, banning nearly *all* semiautomatic rifles and prohibiting many common semiautomatic pistols and nearly half the magazines in the country for good measure.

45.     Under HB 5471, "it is unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon."  720 ILCS 5/24-1.9(b).

46.     That blanket prohibition has already taken effect.  And come "January 1, 2024," it will be unlawful even just to "*possess* an assault weapon."  720 ILCS 5/24-1.9(c) (emphasis added).

---

[5] California first enacted its restrictions in 1989, and D.C. enacted its restrictions in 2009.  The other seven states that restrict such arms are New Jersey (first enacted in 1990), Hawaii (1992), Connecticut (1993), Massachusetts (1994), Maryland (2002), New York (2013), and Delaware (2022).  Hawaii bans "assault pistols" only.

47.     Unlike the term "assault *rifle*," *see supra* n.2, "assault *weapon*" is not a term with any historical pedigree or fixed meaning.  Indeed, "the term 'assault *weapon*' did not exist in the lexicon of firearms" until "anti-gun publicists" coined it in 1989 "to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance."  *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (emphasis added; citation omitted).

48.     HB 5471 defines "assault weapon" extremely broadly.

49.     First, under HB 5471, *any* "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "a pistol grip" is a prohibited "assault weapon."  720 ILCS 5/24-1.9(a)(1)(A)(i).  That alone captures approximately 20% of all firearms sold in the U.S. in 2020, the most recent year for which data is available, as the most popular class of modern semiautomatic rifles—the AR platform—has both the capacity to accept a detachable magazine and a pistol grip.  *See* National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report* at 9, https://bit.ly/3CXJwC1 (last visited Jan. 24, 2023).

50.     Lest there be any doubt about the breadth of its prohibitions, HB 5471 goes on to ban "*all* AR type[]" rifles ("including" 43 named variants, such as the AR-15) explicitly, and further prohibits all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon."  720 ILCS 5/24-1.9(a)(1)(J)(ii) (emphasis added).  And HB 5471 lists approximately 100 more semiautomatic rifles by name and deems all of them—again plus all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon"— banned "assault weapons."  720 ILCS 5/24-1.9(a)(1)(J).

51.     Not content with wiping out the single most popular class of rifles in America, HB 5471 also includes within its sweeping definition of prohibited "assault weapons" any

"semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "any feature capable of functioning as a protruding grip that can be held by the non-trigger hand." 720 ILCS 5/24-1.9(a)(1)(A)(ii).

52.     HB 5471 further includes within its definition of prohibited "assault weapons" any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "one or more of" a "thumbhole stock," "a folding, telescoping, thumbhole, or detachable stock," "a flash suppressor," "a shroud attached to the barrel or that partially or completely encircles the barrel," or "a grenade launcher." 720 ILCS 5/24-1.9(a)(1)(A). As explained, most of these features (with the notable, one-of-these-things-is-not-like-the-other exception of "grenade launcher"[6]) increase the ability to use rifles safely and effectively for lawful purposes like self-defense. *See supra* ¶¶ 37-42.

53.     That definition captures nearly *any* modern rifle, as most modern rifles come standard with a "feature capable of functioning as a protruding grip" and/or a forend "that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand," to which the statute refers as a "shroud." 720 ILCS 5/24-1.9(a)(1)(A)(ii), (vi).

54.     HB 5471 then goes on to prohibit any semiautomatic rifle with a fixed (i.e., non-detachable) magazine that has "the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition." 720 ILCS 5/24-1.9(a)(1)(B). Under this provision, firearms such as the 15- or 30-round M-1s that the U.S. government sold in the hundreds of thousands to civilians a half-century ago are also banned.

---

[6] "Grenade launchers" are very rare and already illegal, as are grenades themselves. *See* Kopel, *supra*, 20 J. Contemp. L. at 399-400; *Staples*, 511 U.S. at 608. Plaintiffs do not challenge this redundant prohibition.

55.    All in all, combining the features-based restrictions and the extraordinarily broad "copies, duplicates, variants, or altered facsimiles" language in 720 ILCS 5/24-1.9(a)(1)(J), HB 5471 bans hundreds of models of rifle, including all of the most popular models in circulation.

56.    And Illinois did not stop there.   In addition to effectively banning all modern semiautomatic *rifles*, HB 5471 deems prohibited "assault weapons" any semiautomatic *pistol* "that has the capacity to accept a detachable magazine" if it has "one or more of the following":   "a threaded barrel"; "a second pistol grip"; "another feature capable of functioning as a protruding grip that can be held by the non-trigger hand"; a barrel shroud that "allow[s] the bearer to hold the firearm with the non-trigger hand"; "a flash suppressor"; "the capacity to accept a detachable magazine at some location outside of the pistol grip"; or "a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip and is designed or redesigned to allow or facilitate a firearm to be fired from the shoulder."   720 ILCS 5/24-1.9(a)(1)(C).   The statute also bans any "semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." 720 ILCS 5/24-1.9(a)(1)(D).

57.    Again, some of these features, e.g., a threaded barrel and a buffer tube, are common in modern semiautomatic pistols, including AR-type and other, similar heavy pistols.

58.    As with its prohibitions on semiautomatic rifles, after banning these pistols once over via the feature, HB 5471 goes on to ban them once (and twice) more:   first banning "all AR type[]" pistols ("including" 13 named variants) and approximately 40 more models by name; and second by banning all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon."   720 ILCS 5/24-1.9(a)(1)(K).

59.    In one final catchall, "[a]ny firearm that has been modified to be operable as an assault weapon as defined in this Section," as well as parts that can convert any firearm into a

17

prohibited "assault weapon," are swept up in the new ban on "assault weapons."  720 ILCS 5/24-1.9(a)(1)(H)-(*I*).

60.     HB 5471 criminalizes the possession of all of these firearms, which include some of the most common firearms in the United States, in the following ways:  Possession of an "assault weapon" aside from the grandfathered firearms is punishable as a Class A misdemeanor, with subsequent violations a Class 3 felony, *see* 720 ILCS 5/24-1(a)(15), (b), while sale is classified variously as a Class 3 or Class 2 felony, *see* 720 ILCS 5/24-1(a)(11), (14), (16), (b).  Each firearm is a "single and separate violation."  720 ILCS 5/24-1(b).

61.     The prohibition applies to "any person with in [the State of Illinois]," except peace officers, current and retired law enforcement officers, government agencies, prison officials, members of the military, and certain private security contractors.  720 ILCS 5/24-1.9(e)(1)(7).

62.     HB 5471 does not retroactively confiscate these constitutionally protected arms from those who already hold them.  It does, however, require that they register their possession under oath, including providing their Firearm Owner's Identification Card, 720 ILCS 5/24-1.9(d), and it restricts their ability to gift or otherwise dispose of their property.  Specifically, current lawful owners of these firearms may now transfer them "only to an heir, an individual residing in another state maintaining it in another state, or a dealer licensed as a federal firearms dealer under Section 923 of the federal Gun Control Act of 1968."  720 ILCS 5/24-1.9(d).

63.     Moreover, while present owners may remain in possession of their firearms if they register them, they are severely restricted in how they may use them.  HB 5471 provides that current owners "shall possess such items only" "on private property owned or immediately controlled by the person;" "on private property that is not open to the public with the express permission of the person who owns or immediately controls such property"; "while on the

premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair"; "at a properly licensed firing range or sport shooting competition venue"; or  "while traveling to or from these locations," provided that the firearm is unloaded and placed in a container.  720 ILCS 5/24-1.9(d).

64.    Finally, in addition to banning many of the most common firearms in America, HB 5471 bans any magazine "that has a capacity of … more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns," which HB 5471 defines as a "large capacity ammunition feeding device."  720 ILCS 5/24-1.10(a)(1).

65.    Illinois bans the sale, manufacture, purchase, or possession of these exceedingly common magazines. and imposes a $1,000 fine for each violation of this new restriction.  720 ILCS 5/24-1.10(b)-(d).

66.    HB 5471 permits current owners of such magazine to continue to possess them but imposes the same restrictions on their use and disposal as it does on semiautomatic rifles.  *See* 720 ILCS 5/24-1.10(d).

## **CLAIMS FOR RELIEF**

### **COUNT ONE**
(Second Amendment – Firearms Ban)

67.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

68.    "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125.

69.    The Supreme Court has made clear that when a court confronts a flat ban on possession of a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.  If the answer is "yes," then the ban is unconstitutional, because a state cannot prohibit ordinary law-abiding Americans from

possessing what the Constitution explicitly entitles them to "keep."  *See* U.S. Const. amend. II.

70.     The multitude of semiautomatic firearms that HB 5471 prohibits are indisputably "arms" within the meaning of the Second Amendment.  Indeed, "[p]ractically all modern rifles, pistols, and shotguns are semiautomatics." Jacobs, *supra*, at 686.  And a state cannot "prohibit[]… an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628.

71.     The semiautomatic firearms that HB 5471 prohibits are indisputably in "common use."  *See Heller*, 553 U.S. at 624-25 (the "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens for lawful purposes" today).  That is not a close call.  As noted, the ownership of even one type of the thousands of firearms covered by this ban—those on the AR-15 platform—dwarfs ownership of the most popular car on the road and of all newspaper subscriptions in the United States.  Indeed, if the 200,000 stun guns in circulation in *Caetano* were sufficiently numerous to qualify as commonly possessed, then the 24+ million AR-15-style rifles in circulation do *a fortiori*.  *Caetano*, 577 U.S. at 420 (Alito, J., and Thomas, J., concurring).  Millions of Americans own these arms for lawful purposes, including self-defense, sporting, and hunting.

72.     Because modern semiautomatic rifles and the hundreds of other arms banned under HB 5471 are arms in common use today, they are protected by the Second Amendment, full stop, rendering Illinois' effort to flatly ban them flatly unconstitutional.  *Bruen*, 142 S.Ct. at 2134.

73.     At a minimum, these arms are "presumptively protect[ed]" by the Second Amendment, so Illinois would have to "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126.

74.     Illinois cannot make that showing.  There were no restrictions on firing capacity,

reloading mechanisms, or the kinds of attachments the state has singled out, when either the Second Amendment or the Fourteenth Amendment was ratified. Although many states and the federal government began restricting *fully* automatic firearms in the 1920s and 1930s, only three states and the District of Columbia imposed restrictions on *semi*automatic firearms. *Duncan,* 970 F.3d at 1150 & n.10. Moreover, most of those laws were repealed within a few decades, and none took the extreme approach of banning semiautomatic firearms (whether rifles or pistols) entirely.[7]

75.     Even if the handful of less extreme variants of "assault weapon" bans that mostly target only smaller subsets of rifles and pistols could serve as an analog for Illinois' draconian approach, those laws date back only to 1989, which is far too late to serve as an indicator of a "historical tradition." *Bruen*, 142 S.Ct at 2126; *see id.* at 2138 (rejecting reliance on "late-19th-century [laws]"). As for the federal government, it did not restrict "assault weapons" until 1994—and Congress allowed that law to expire in 2004 after a study by the Department of Justice revealed that the law had produced "no discernable reduction" in gun violence. Koper et al., *supra*, at 96. In short: "Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers, or barrel shrouds." *Miller*, 542 F.Supp.3d at 1024. And even now, such laws remain exceedingly rare.

76.     That is not owing to some "dramatic technological change[]" that came about in the

---

[7] *See* 1927 Mich. Pub. Acts 887, §3 (prohibiting "any … firearm which can be fired sixteen times without reloading"), *repealed via* 1959 Mich. Pub. Acts 249,250; 1927 R.I. Pub. Laws 256 §§1, 3 (prohibiting firearms "which shoot[] more than twelve shots semi-automatically without reloading"), *repealed via* 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975); 1933 Ohio Laws 189, §§12819-3, -4 (prohibiting "any firearm which shoots more than eighteen shots semi-automatically without reloading"), *repealed via* 1972 Ohio Laws 1866, 1963 (setting 32-round limit); *see also* 2013-2014 Leg., H.R. 234 (Ohio) (fully repealing magazine ban) (codified at Ohio Rev. Code Ann. §2923.11); 47 Stat. 650, §§1, 14 (1932) (prohibiting "any firearm which shoots … semiautomatically more than twelve shots without reloading" in the District of Columbia), *repealed via* 48 Stat. 1236 (1934), *currently codified as amended* at 26 U.S.C. §§5801-72.

past few decades or some "unprecedented societal concern[]" that did not exist until 1989. *Bruen*, 142 S.Ct. at 2132. As detailed above, semiautomatic firearms have been around for more than a century and were popular with civilians long before they were issued in serious numbers to any military. *See supra*. And soon after that, the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market. *Duncan*, 970 F.3d at 1148. Small wonder that the Supreme Court has explicitly recognized that these arms are "civilian" in nature and "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612.

77.    In short, there is no "enduring American tradition of state regulation" forbidding the purchase and/or possession of semiautomatic rifles and pistols by law-abiding citizens for lawful purposes. *Bruen*, 142 S.Ct. at 2135. To the contrary, the enduring American tradition is one of *protecting* the right of the people to possess firearms that, like semiautomatic rifles and pistols, are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25. Because Illinois cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S.Ct. at 2127, HB 5471 unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.

78.    To be sure, the Seventh Circuit held in 2015 that a similar, local-level ban on semiautomatic arms and standard-capacity magazines did not violate the Second Amendment, *see Friedman v. City of Highland Park*, 487 F.3d 406 (7th Cir. 2015), and it reaffirmed that decision four years later, *see Wilson v. Cook Cnty.*, 937 F.3d 1028, 1035-37 (7th Cir. 2019). But *Friedman* and *Wilson* have since been abrogated by the Supreme Court.

79.    Each of those cases analyzed the constitutionality of firearm bans by "ask[ing] whether a regulation [1][a] bans weapons that were common at the time of ratification or [b] those

that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,'" and "[2] whether law-abiding citizens retain adequate means of self-defense." *Friedman*, 487 F.3d at 410; *Wilson*, 937 F.3d at 1034-35.  The Supreme Court has now made clear, however, that those are the wrong questions to ask.

80.     Whereas *Friedman* and *Wilson* applied a two-step framework, "first ask[ing] whether the restricted activity is protected by the Second Amendment," then "inquir[ing] whether the strength of the government's reasons justifies the restriction of rights at issue," *Wilson*, 937 F.3d at 1036, the Supreme Court explicitly repudiated that mode of analysis in *Bruen*, holding that "this two-step approach[] … is one step too many."  *Bruen*, 142 S.Ct. at 2127.  "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.*

81.     *Bruen* made equally clear, moreover, what the "historical traditional" establishes when it comes to efforts to ban a type of arm entirely:  The government many not ban "weapons 'in common use' today for self-defense."  *Id.* at 2134.

82.     Indeed, even before *Bruen*, the Supreme Court emphasized in *Caetano*, a per curiam summary reversal, that it is irrelevant to the constitutional inquiry that a certain type of arm was "not in common use at the time of the Second Amendment's enactment" or is not "readily adaptable to use in the military."  *Caetano*, 577 U.S. at 411-12.  If a "weapon belongs to a class of arms commonly used for lawful purposes," then it cannot be banned, regardless of its "relative dangerousness."  *Id.* at 418 (Alito, J., concurring in the judgment); *accord Bruen*, 142 S.Ct. at 2143 ("[E]ven if [certain] colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.").

83.     In short, what matters under unambiguous Supreme Court precedent is whether an arm is "in 'common use' for self defense today." *Bruen*, 142 S.Ct. at 2143.  Because the wide swathe of semiautomatic rifles and pistols that Illinois has banned unquestionably are, the ban violates the Second Amendment.

## COUNT TWO
(Second Amendment – Magazine Ban)

84.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

85.     Like the semiautomatic rifles and pistols that Illinois has banned, the magazines that 720 ILCS 5/24-1.10 bans are indisputably "arms" within the meaning of the Second Amendment.  The right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate.  *See Miller*, 307 U.S. at 180 (citing seventeenth-century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition").  As the Ninth Circuit has put it, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

86.     The magazines that 720 ILCS 5/24-1.10 bans are also indisputably in "common use" today.  *See Heller*, 553 U.S. at 624-25 (the "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens for lawful purposes" today).  Again, that is not a close call.  As noted, magazines capable of holding more than 10 rounds come standard with many of the most popular handguns and long guns on the market; Americans own roughly 115 million of them; and they account today for "approximately half of all privately owned magazines in the United States." *Duncan*, 19 F.4th at 1097.  Millions of Americans own tens of millions of these magazines for lawful purposes, including self-defense, sporting, and hunting.

87.     Because magazines capable of holding more than 10 rounds are arms in common use, they are protected by the Second Amendment, full stop, rendering Illinois' effort to ban them blatantly unconstitutional.  *Bruen*, 142 S.Ct. at 2134.  For the reasons already explained, the contrary holdings of *Friedman* and *Wilson* are no longer good law.

88.     At a bare minimum, such arms are "presumptively protect[ed]" by the Second Amendment, so Illinois would have to "affirmatively prove that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 2126.

89.     Illinois cannot come close to making that showing.  There were no restrictions on firing or magazine capacity when either the Second Amendment or the Fourteenth Amendment was ratified.  Only three states and the District of Columbia ever imposed restrictions on *firing* capacity (and most of those laws were repealed), *see supra* n.7, and the first state to restrict *magazine* capacity did not do so until *1990*.  Again, laws enacted for the first time in the twentieth century "come too late to provide insight into the meaning of [the Constitution]."  *Id.* at 2137 (alteration in original) (quoting *Sprint*, 554 U.S. at 312 (Roberts, C.J., dissenting)); *see also id.* at 2138 (rejecting reliance on "late-19th-century [laws]").

90.     Indeed, Illinois cannot even identify a "well-established" tradition of restricting magazine capacity *today*.  *Id.* at 2133.  As with so-called "assault weapon" bans, only a handful of jurisdictions have laws analogous to Illinois' ban on possessing rifle magazines capable of holding more than 10 rounds or handgun magazines capable holding more than 15 rounds.  The federal government did not restrict magazine capacity until 1994—and Congress likewise allowed that law to expire in 2004 after the DOJ study revealed that it had produced "no discernable reduction" in gun violence.  Koper et al., *supra*, at 96.

91.     The absence of historical laws restricting firing capacity is not the result of some

"dramatic technological change[]" that came about in the past few decades or some "unprecedented societal concern[]" that did not exist until 1990. *Bruen*, 142 S.Ct. at 2132. Firearms capable of firing more than 10 rounds long predate the Founding. *See Duncan*, 970 F.3d at 1147. They were marketed to and bought by civilians from the start. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. of N.J.*, 974 F.3d 237, 255 (3d Cir. 2020) (Matey, C.J. dissenting). Indeed, the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market. *Duncan*, 970 F.3d at 1148. In short, "magazines of more than ten rounds ha[ve] been well established in the mainstream of American gun ownership" for a very long time. Kopel, *History of Firearm Magazines*, *supra*, at 862.

92.    In sum, once again, there is no "enduring American tradition of state regulation" forbidding the purchase and/or possession of magazines capable of holding more than 10 rounds by law-abiding citizens for lawful purposes. *Bruen*, 142 S.Ct. at 2135. To the contrary, the enduring American tradition is one of *protecting* the right of the people to possess arms that, like these ubiquitous magazines, are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25. Because Illinois cannot "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S.Ct. at 2127, the magazine ban unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.

## PRAYER FOR RELIEF

Plaintiffs pray for the following relief from the Court:

1.    a declaratory judgment under 28 U.S.C. §2201 that HB 5471 is unconstitutional;

2.    a temporary injunction enjoining Defendants and their officers, agents, and employees from enforcing HB 5471 against Plaintiffs and their members;

3.     a permanent injunction enjoining Defendants and their officers, agents, and employees from enforcing HB 5471 against Plaintiffs and their members;

4.     any attorneys' fees, costs, and expenses to which Plaintiffs may be entitled by law;

5.     nominal damages; and

6.     any further relief the Court deems just and proper.

Respectfully submitted,

s/ *Gary C. Pinter*
GARY C. PINTER #6293560
SWANSON, MARTIN & BELL, LLP
103 W. Vandalia Street
Suite 215
Edwardsville, IL 62025
(618) 655-3131
gpinter@smbtrials.com

ANDREW A. LOTHSON[*]
SWANSON, MARTIN & BELL, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611

PAUL D. CLEMENT[*]
ERIN E. MURPHY[*]
MATTHEW D. ROWEN[*]
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314

[*] *pro hac vice* application forthcoming

*Counsel for Plaintiffs*

January 24, 2023

27