IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, BRIAN NORMAN, HOOD'S GUNS & MORE, PRO GUN AND INDOOR RANGE, and NATIONAL SPORTS SHOOTING FOUNDATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> KWAME RAOUL, Attorney General of Illinois, and BRENDAN F. KELLY, Director of the Illinois State Police, <br><br> Defendants. | Case No. 3:23-cv-00209 |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

There are many difficult constitutional questions surrounding the regulation of firearms. Whether Illinois may ban firearms and magazines owned by millions of law-abiding Americans for lawful purposes, including self-defense, is not one of them. The Supreme Court made crystal clear just last Term that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). The firearms and magazines that Illinois has banned are more common than the most popular truck in the United States and among the most commonly owned products, period. And they are no newfangled innovations that demand novel government intervention. Semiautomatic rifles and pistols have been around for generations. And as recently as just a few decades ago, it was common ground that these common arms are "lawful." *Staples v. United States*, 511 U.S. 600, 612 (1994). Slapping the term "assault

weapon" on firearms owned by millions of Americans does not take them outside of the Second Amendment's protection.  Nor does labeling standard-issue magazines "large capacity ammunition feeding devices" change the fact that tens of millions of Americans own hundreds of millions of them as integral components of personal self-defense and other lawful purposes like target shooting and hunting.  The arms Illinois has banned are not just in common use; they are ubiquitous.  Simply put, HB 5471 is profoundly out of step with our Nation's history of regulating firearms.  Plaintiffs are therefore likely to succeed on the merits of their claims.  The balance of equities and public interest support injunctive relief too, as enforcing unconstitutional laws is always contrary to the public interest, and a state and its officers suffer no cognizable harm by being enjoined from enforcing them.  The Court should enjoin enforcement of HB 5471 forthwith and ensure that law-abiding Illinoisans will not be precluded from exercising their Second Amendment rights on account of a law unlikely to survive in the final analysis.

## BACKGROUND

### A.    Illinois Now Bans Law-Abiding Americans' First Choice of Rifles—and More.

On January 10, 2023, Illinois became the eighth state in the Union to impose a flat ban on some of the most commonly owned firearms in America.  Under HB 5471, "it is unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon."  720 ILCS 5/24-1.9(b).  That blanket prohibition has already taken effect—and come "January 1, 2024," it will be unlawful even just to "possess an assault weapon."  720 ILCS 5/24-1.9(c).

Illinois defines "assault weapons" exceedingly broadly—even more broadly than most of the small minority of states that have enacted so-called "assault weapon bans."  First, HB 5471 defines "assault weapon" to include any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "a pistol grip."  720 ILCS 5/24-1.9(a)(1)(A)(i).  That alone captures

approximately 20% of all firearms sold in the U.S. in 2020, because it sweeps in all rifles on the AR platform.  *See* NSSF, *2021 Firearms Retailer Survey Report* at 9, https://bit.ly/3CXJwC1.  And lest there be any doubt about the breadth of its prohibitions, HB 5471 goes on not only to ban "all AR type[]" rifles ("including" 43 named variants, such as the AR 15) explicitly, but also to prohibit all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon."  720 ILCS 5/24-1.9(a)(1)(J)(ii).  HB 5471 lists nearly 100 more rifles by name, and deems them all— and any "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon"—to be "assault weapons."  720 ILCS 5/24-1.9(a)(1)(J).

HB 5471 then goes on to prohibit any semiautomatic rifle with a fixed (i.e., non-detachable) magazine that has "the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition."  720 ILCS 5/24-1.9(a)(1)(B).  Under this provision, firearms such as the M-1s the U.S. government sold at a discount in the hundreds of thousands to civilians a half-century ago are also banned.

Not content with banning the most popular class of rifle, HB 5471 also includes within its definition of "assault weapons" any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "any feature capable of functioning as a protruding grip that can be held by the non-trigger hand."  720 ILCS 5/24-1.9(a)(1)(A)(ii).  It further includes any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "one or more of" a "thumbhole stock," "a folding, telescoping, thumbhole, or detachable stock," "a flash suppressor," or "a shroud attached to the barrel or that partially or completely encircles the barrel."  720 ILCS 5/24-1.9(a)(1)(A).  That sweeping definition captures nearly all modern semiautomatic rifles, which typically come standard with a "feature capable of functioning as a protruding grip" and/or a "shroud attached to the barrel" (i.e., a forend "that partially or completely encircles the barrel,

allowing the bearer to hold the firearm with the non-trigger hand").[1]

Most of these features simply increase the ability to safely and effectively use rifles for lawful purposes like self-defense.  *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396-99 (1994).  Thumbhole stocks create a more comfortable and stable grip, which provides for greater accuracy and decreases the risk of dropping the firearm or firing stray shots.  Pistol grips serve a similar function.  "The defensive application is obvious, as is the public safety advantage in preventing stray shots."  *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting).  And flash suppressors help prevent users from being blinded in low lighting conditions, and help reduce recoil and muzzle movement, thereby making the rifle less painful to use—crucial in self-defense situations.

All in all, combining the features-based restrictions and the extraordinarily broad "copies, duplicates, variants, or altered facsimiles" language in 720 ILCS 5/24-1.9(a)(1)(J), HB 5471 bans hundreds and hundreds of models of rifles, including all of the most popular models in circulation.

And Illinois did not stop there.  In addition to banning all modern semiautomatic *rifles*, HB 5471 includes in its definition of prohibited "assault weapons" any semiautomatic *pistol* "that has the capacity to accept a detachable magazine," if it has "one or more of the following":  "a threaded barrel"; "a second pistol grip"; "another feature capable of functioning as a protruding grip that can be held by the non-trigger hand"; a barrel shroud that "allow[s] the bearer to hold the firearm with the non-trigger hand"; "a flash suppressor"; "the capacity to accept a detachable magazine at some location outside of the pistol grip"; or "a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip and is designed or redesigned to allow or facilitate

---

[1] The statute includes "grenade launcher" as a final prohibited feature.  720 ILCS 5/24-1.9(a)(1)(A)(v).  "Grenade launchers" are very rare and already illegal, as are grenades themselves.

a firearm to be fired from the shoulder." 720 ILCS 5/24-1.9(a)(1)(C). The statute also bans any "semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." 720 ILCS 5/24-1.9(a)(1)(D). And, as with its prohibitions on semiautomatic rifles, after banning these pistols once over via their features, HB 5471 goes on to ban them two more times: first banning "all AR type[]" pistols ("including" 13 named variants) and approximately 40 more semiautomatic pistol models by name; and second by banning all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon." 720 ILCS 5/24-1.9(a)(1)(K).

In one final catchall, "[a]ny firearm that has been modified to be operable as an assault weapon as defined in this Section," as well as any part that can convert any firearm into the above, is swept up in the new "assault weapons" ban. 720 ILCS 5/24-1.9(a)(1)(H)-(I). And the list of banned firearms is not static: The State Police can add to it each year. 720 ILCS 5/24-1.9(d)(3).

HB 5471 criminalizes the possession of all of these firearms, which include some of the most common firearms in the United States, in the following ways: Possession of an "assault weapon" aside from the grandfathered firearms is punishable as a Class A misdemeanor, with subsequent violations a Class 3 felony, *see* 720 ILCS 5/24-1(a)(15), (b), while sale is classified variously as a Class 3 or Class 2 felony, *see* 720 ILCS 5/24-1(a)(11), (14), (16), (b). Each firearm is a "single and separate violation." 720 ILCS 5/24-1(b). The prohibition applies to "any person with in [the State]," except peace officers, law enforcement officers, prison officials, active-duty members of the military, and certain private security contractors. 720 ILCS 5/24-1.9(e)(1)(7).

While present owners may remain in possession of their firearms if they register them, they are severely restricted in how and where they may possess and use them. HB 5471 provides that current owners "shall possess such items only" "on private property owned or immediately controlled by the person;" "on private property that is not open to the public with the express

5

permission of the person who owns or immediately controls such property"; "while on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair"; "at a properly licensed firing range or sport shooting competition venue"; or "while traveling to or from these locations," provided that the firearm is unloaded and placed in a container.  720 ILCS 5/24-1.9(d).

**B.    Illinois Now Bans Magazines Owned by Millions of Law-Abiding Americans.**

In addition to banning many of the most common firearms in America, HB 5471 bans any magazine "that has a capacity of … more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns," which HB 5471 dubs a "large capacity ammunition feeding device."[2]  720 ILCS 5/24-1.10(a)(1).  HB 5471 bans the sale, manufacture, and purchase of such magazines and imposes a $1,000 fine for each violation of this new restriction.  720 ILCS 5/24-1.10(b)-(d).  Possession of these magazines is tightly controlled.  Current owners of such magazine may continue to possess them, but only subject to the same restrictions on their use and disposal placed on semiautomatic rifles.  *See* 720 ILCS 5/24-1.10(d).

## ARGUMENT

"To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits."  *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011).  "If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied."  *Id.*  Each of those factors is readily satisfied here.  The unconstitutionality of HB 5471 follows

---

[2] Like the term "assault weapon," *see* n.3, *infra*, "large capacity" is "a regulatory term created by the State, meaning no more than the maximum amount of ammunition the State has decided may be loaded into any firearm at one time."  Order, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, No. 19-3142 (3d Cir. Aug. 25, 2022), Dkt. 147-1 (Matey, J., dissenting).

directly from the Supreme Court's holding in *Bruen* that the Second Amendment fully protects arms in "common use" today.  142 S.Ct. at 2134.  The remaining factors follow as a matter of course.  Precluding law-abiding citizens from exercising constitutional rights inflicts irreparable injury per se for which there is no adequate remedy at law; the haste with which the state rushed to enact HB 5471 and put it into effect confirm the imminence of Plaintiffs' injuries; and the public interest does not favor enforcing unconstitutional laws.  The Court, which has jurisdiction over this case pursuant to 28 U.S.C. §§1331 & 1343(a)(3), should enjoin HB 5471.

**I.      Plaintiffs Are Likely To Succeed On The Merits.**

**A.      The "Assault Weapon" Ban Is Unconstitutional.**

"[T]he Second Amendment protects the possession and use of weapons that are 'in common use [today].'"  *Bruen*, 142 S.Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *see Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (invalidating stun gun ban); *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (incorporating Second Amendment).  "[A]ll instruments that constitute bearable arms, even those that were not in existence at the time of the founding," come within the ambit of the Second Amendment.  *Heller*, 554 U.S. at 582, 624-25.  If an arm is "typically possessed by law-abiding citizens for lawful purposes" today, then it may not be banned.  *Id.*  That is the irreducible minimum of the fundamental "right of the people to keep and bears Arms."  *See* U.S. Const. amend. II.  A state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose."  *Heller*, 554 U.S. at 628.

Yet that is precisely what Illinois has just done.  Under HB 5471, it is now "unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase … an assault weapon."  720 ILCS 5/24-1.9(b).  And come "January 1, 2024," it will be unlawful even just to "possess an assault weapon," subject to certain limited exceptions.  720 ILCS 5/24-1.9(c).  Such a sweeping prohibition might make sense (or at least be defensible) if, by "assault weapon,"

Illinois meant some class of "dangerous and unusual weapons" that has long been restricted in the United States and that few law-abiding Americans own for lawful purposes.  *See Heller*, 554 U.S., at 627 (referring to "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'").  But that is not what Illinois has done.  In fact, Illinois has gone almost as far in the opposite direction as possible.  HB 5471 defines "assault weapon" extremely broadly, capturing—and thus banning—nearly all modern semiautomatic rifles on the market today.[3]

That makes this an easy case.  The Supreme Court has made clear that when a court confronts a flat ban on the possession of a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 625.  If the answer is yes, then the ban is unconstitutional, because a state cannot prohibit ordinary law-abiding Americans from possessing what the Constitution explicitly entitles them to "keep."

The answer here is unequivocally yes.  "Practically all modern rifles, pistols, and shotguns are semiautomatics."  James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 Cardozo L. Rev. 681, 685-87 (2015).  And, looking at just rifles, practically all rifles manufactured today come standard with features that render them verboten under HB 5471.  Every single rifle on the AR-15 platform, for instance, comes standard with "the capacity to accept a detachable magazine" and "one or more of the following": "a pistol grip"; a "feature capable of functioning as a protruding grip that can be held by the non-trigger hand"; "a folding, telescoping, thumbhole, or detachable stock"; and/or

---

[3] This should come as little surprise.  The term "assault weapon" has no analytic content.  "It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance."  *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).  "Many attribute its popularization to a 1988 paper written by gun-control activist and Violence Policy Center founder Josh Sugarmann," Aaron Blake, *Is it fair to call them 'assault weapons'?*, Wash. Post (Jan. 17, 2013), https://wapo.st/3JixwPq, which admitted to using it to exploit "the public's confusion over fully automatic machine guns versus semiautomatic[s]," Josh Sugarman, *Assault Weapons and Accessories in America*, http://goo.gl/i9r8Nn (last visited Jan. 26, 2023).

a forend "that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand" (which the statute calls a "shroud").  720 ILCS 5/24-1.9(a)(1)(A).  That means that every rifle on the AR-15 platform, even if not specifically called out by name in 720 ILCS 5/24-1.9(a)(1)(J)(ii) or swept up by the "copies, duplicates, [and] variants" catchall, is now prohibited in Illinois.  Yet rifles on the AR-15 platform are among the most commonly owned products in America across not just firearms, but any class of product.  "Over the last three decades, 19,797,000 … rifle[s] built on the AR-15 platform have been manufactured or imported into the United States."  *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022).  And "the numbers have been steadily increasing."  *Id.*  AR-15-style rifles accounted for "one-half of all rifles (48%) produced in 2018."  *Id.* at 1022.  In 2020, another 2,798,000 AR-15-style rifles were produced in or imported into the United States.  *See* National Shooting Sports Foundation, Inc., *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3CRHhQl (citing data).  Altogether, recent data showed that more than 24 million AR-15-style rifles are currently owned nationwide.  *Id.*; *accord* William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, at 2 (May 13, 2022), https://bit.ly/3HaqmKv.

Those figures dwarf sales of the most popular automobile in the country, the Ford F-150.  *See Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (finding the difference between F-150 sales and AR-15 sales telling in the commonality inquiry), *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc); *Miller*, 542 F.Supp.3d at 1022-23 (same).  In 2020, Ford sold 787,442 F-Series pickup trucks (including, but not limited to, the F-150, the most popular model).  *Fourth-Quarter 2020 Sales* at 2, Ford (Dec. 2020), https://ford.to/3H87Y5T.  That is less than a third of the number of AR-style rifles sold that year.  And as compared to the 24 million-plus AR-15-style rifles in circulation, there

are approximately 16 million F-150s on the road.  Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Authority (Apr. 9, 2021), https://bit.ly/3GLUtaB.

To take another example, the number of AR-15-style rifles sold per year (over 2 million) is significantly more than the number of *New York Times* print subscribers (761,000).  *See* Kate Robertson, *New York Times Reports a Gain of 180,000 Digital Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T.  And the total number of these rifles in circulation is slightly more than the "*total* U.S. daily newspaper circulation (print and digital combined) in 2020 … 24.3 million for weekday[s]," and only slightly less than the "25.8 million for Sunday[s]." *Newspapers Fact Sheet*, Pew Research Center (June 29, 2021), https://pewrsr.ch/3CNXFS0 (emphasis added).  Indeed, rifles built on the AR-15 platform are so common that courts, commentators, and industry members alike often refer to them simply as "modern rifles" (or "modern sporting rifles").

To say these rifles are in common use is thus to understate things by a considerable degree.  After all, if the 200,000 stun guns in circulation in *Caetano* were sufficiently numerous to qualify as commonly possessed, then the 24+ million AR-15-style rifles in circulation are not just common, but ubiquitous.  *See Caetano*, 577 U.S. at 420 (Alito, J., concurring).

Nor is there any question that these rifles are "typically possessed by law-abiding citizens *for lawful purposes*." *See Heller*, 553 U.S. at 624-25 (emphasis added).  Purchasers consistently report that one of the most important reasons they purchase modern rifles is for self-defense (and the others are lawful purposes like hunting and sport shooting). *See Miller*, 542 F.Supp.3d at 1022.  And despite being slapped with the demonizing "assault" moniker, the features that Illinois has singled out as problematic are, in reality, beneficial for personal self-defense.  The capacity to accept detachable magazines makes it easier for a citizen to reload her firearm, which can be critical in the stressful circumstance of being forced to defend self, family, or home.  A pistol grip

improves accuracy and reduces the risk of stray shots by stabilizing the firearm while firing from the shoulder.  Kopel, *supra*, 20 J. Contemp. L. at 396.  "By holding the pistol grip, the shooter keeps the barrel from rising after the first shot, and thereby stays on target for a follow-up shot. The defensive application is obvious, as is the public safety advantage in preventing stray shots." *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting).  Thumbhole stocks likewise give the user a more comfortable and stable grip, which provides for greater accuracy and decreases the risk of dropping the firearm or firing stray shots.  And flash suppressors not only prevent users from being blinded in low lighting conditions, such as at dusk or dawn, or during the nighttime, but also reduce recoil and muzzle movement, making the firearm less painful to use—crucial in self-defense situations.  Kopel, *supra*, 20 J. Contemp. L. at 397-99.  It is thus no small wonder that the Supreme Court has explicitly recognized that semiautomatic rifles built on the AR-15 platform, all of which share these features, "traditionally have been widely accepted as lawful possessions."  *Staples*, 511 U.S. at 612; *see also Heller v. Dist. of Columbia*, 670 F.3d 1244, 1269-70 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("There is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles.").

That is (or at least should be) the end of the inquiry, because it is that "tradition[]" that matters most to the constitutional analysis.  As the Supreme Court made clear in *Bruen*, it is not twenty-first-century legislation, but "the traditions of the American people [] that demands our unqualified deference."  142 S.Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).

Of course, HB 5471 does not stop with AR-15-style rifles.  It goes on to prohibit any semiautomatic rifle with a fixed (i.e., non-detachable) magazine that has "the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition."  720 ILCS 5/24-1.9(a)(1)(B).  That provision

is so broad as to sweep in the 15- and 30-round M-1s that the U.S. government sold to civilians a half-century ago.  *See Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020).[4]  It cannot be the case that arms the federal government saw fit to sell to civilians *in the hundreds of thousands* can now be banned by Illinois consistent with our Nation's historical tradition of firearms regulation.

Nor is HB 5471 even limited to rifles.  It also bans common semiautomatic pistols, 720 ILCS 5/24-1.9(a)(1)(C), (D), (K), even though "semiautomatic pistols" are among "the weapons most commonly used today for self-defense."  *Caetano*, 577 U.S at 416-17 (Alito, J., concurring).

Because modern semiautomatic rifles and the hundreds of other arms banned under HB 5471 are arms in common use today, they are protected by the Second Amendment, full stop, rendering Illinois' effort to ban them flatly unconstitutional.  *Bruen*, 142 S.Ct. at 2134.

At a minimum, these arms are "presumptively protect[ed]" by the Second Amendment, so Illinois would have to "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 2126.  Illinois cannot make that showing.  There were no restrictions on firing capacity, reloading mechanisms, or the kinds of attachments the state has singled out, when either the Second Amendment or the Fourteenth Amendment was ratified.  Although many states and the federal government began restricting fully automatic firearms in the 1920s and 1930s, only three states and the District of Columbia imposed restrictions on semiautomatic firearms.  *Duncan*, 970 F.3d at 1150 & n.10.  Moreover, most of those laws were repealed within a few decades, and none took the extreme approach of banning semiautomatic firearms (whether rifles or pistols) entirely.[5]

---

[4] All orders and opinions in *Duncan* have since been vacated.  *See* 49 F.4th 1228 (9th Cir. 2022).
[5] *See* 1927 Mich. Pub. Acts 887, §3 (prohibiting "any … firearm which can be fired sixteen times without reloading"), repealed via 1959 Mich. Pub. Acts 249,250; 1927 R.I. Pub. Laws 256 §§1, 3 (prohibiting firearms "which shoot[] more than twelve shots semi-automatically without

Even if the handful of less extreme variants of "assault weapon" bans that mostly target only smaller subsets of rifles and pistols could serve as an analog for Illinois' draconian approach, those laws date back only to 1989, which is far too late to serve as an indicator of a "historical tradition." *Bruen*, 142 S.Ct at 2126; *see id.* at 2138 (rejecting reliance on "late-19th-century [laws]").  As for the federal government, it did not restrict "assault weapons" until 1994—and Congress allowed that law to expire in 2004 after a DOJ study revealed that the law had produced "no discernable reduction" in gun violence.  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice* 96 (2004), https://bit.ly/3wUdGRE.  In short: "Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers, or barrel shrouds." *Miller*, 542 F.Supp.3d at 1024.  And even now, such laws remain exceedingly rare.

That is not owing to some "dramatic technological change[]" that came about in the past few decades or some "unprecedented societal concern[]" that did not exist until 1989.  *See Bruen*, 142 S.Ct. at 2132.  Semiautomatic firearms have been around for more than a century and were popular with civilians long before they were issued in serious numbers to any military.  *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 463, 519 (2d ed. 2018).

In short, there is no "enduring American tradition of state regulation" forbidding the purchase and/or possession of semiautomatic rifles and pistols by law-abiding citizens for lawful

---

reloading"), repealed via 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975); 1933 Ohio Laws 189, §§12819-3, -4 (prohibiting "any firearm which shoots more than eighteen shots semi-automatically without reloading"), repealed via 1972 Ohio Laws 1866, 1963 (setting 32-round limit); see also 2013-2014 Leg., H.R. 234 (Ohio) (fully repealing magazine ban) (codified at Ohio Rev. Code Ann. §2923.11); 47 Stat. 650, §§1, 14 (1932) (prohibiting "any firearm which shoots … semiautomatically more than twelve shots without reloading" in the District of Columbia), repealed via 48 Stat. 1236 (1934), currently codified as amended at 26 U.S.C. §§5801-72.

purposes. *Bruen*, 142 S.Ct. at 2135.  To the contrary, the enduring American tradition is one of protecting the right of the people to possess firearms that, like semiautomatic rifles and pistols, are "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 624-25. Because Illinois cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S.Ct. at 2127, HB 5471 unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.

It makes no difference whether the firearms HB 5471 dubs "assault weapons" are strictly "necessary" to self-defense.  The unstated theory underlying HB 5471 is that the state's interest in keeping such arms out of the hands of criminals outweighs the constitutional rights of law-abiding individuals because the state thinks that people can, in most cases, adequately defend themselves with less effective firearms.  But that sort of means-ends scrutiny is verboten under *Bruen*.  "[T]he very enumeration of the right takes it out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."  *Bruen*, 142 S.Ct. at 2129 (quoting *Heller*, 554 U.S. at 634).  Means-ends scrutiny may not be smuggled into the analysis under the new label of "necessity."  *See id.* at 2133 n.7 (courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry").  Indeed, *Heller* itself made that clear.  In *Heller*, it was "no answer" to say that District of Columbia residents could possess rifles instead of handguns when "the American people have considered the handgun to be the quintessential self-defense weapon."  554 U.S. at 629.  While the Court identified many reasons handguns may be preferred, ultimately the "why" did not matter; "*whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home," *id.*, (emphasis added), and that was enough to entitle people to keep them.

Finally, the Seventh Circuit's cases upholding local-level bans on semiautomatic arms,

namely *Friedman v. City of Highland Park*, 487 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), pose no obstacle to invalidating HB 5471, because they are no longer good law.  Each of those cases analyzed the constitutionality of firearm bans by "ask[ing] whether a regulation [1][a] bans weapons that were common at the time of ratification or [b] those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,'" and "[2] whether law-abiding citizens retain adequate means of self-defense." *Friedman*, 487 F.3d at 410; *Wilson*, 937 F.3d at 1034-35.  The Supreme Court has now made clear, however, that those are the wrong questions to ask.  Whereas *Friedman* and *Wilson* applied a two-step framework, "first ask[ing] whether the restricted activity is protected by the Second Amendment," then "inquir[ing] whether the strength of the government's reasons justifies the restriction of rights at issue," *Wilson*, 937 F.3d at 1036, the Supreme Court explicitly repudiated that mode of analysis in *Bruen*, holding that "this two-step approach[] … is one step too many."  142 S.Ct. at 2127. "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

In short, what matters under Supreme Court precedent is whether an arm is "in 'common use' for self defense today." *Bruen*, 142 S.Ct. at 2143.  Because the wide swathe of semiautomatic rifles and pistols Illinois has banned unquestionably are, its ban violates the Second Amendment.

### B.    The Magazine Ban Is Unconstitutional.

The analysis for HB 5471's magazine ban is equally straightforward.  At the outset, magazines are plainly "arms" within the meaning of the Second Amendment.  The textual right to keep and bear arms necessarily includes the right to keep and bear ammunition and related products that render ammunition capable of being fired.  After all, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *see also United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century

sources recognizing that "[t]he possession of arms also implied the possession of ammunition"). And without the requisite feeding devices, firearms could not operate as intended. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey* ("*ANJRPC*"), 910 F.3d 106, 116 (3d Cir. 2018) ("Because ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."). Magazines are arms protected by the Second Amendment.

Second, the specific types of magazines that HB 5471 bans are plainly in "common use" today. *See Heller*, 553 U.S. at 624-25 (the "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens for lawful purposes" today). This is not even a close call. Magazines and other feeding devices capable of holding more than 10 rounds for long guns and 15 rounds for handguns come standard with many of the most popular firearms on the market; millions of Americans (including Illinoisans) collectively own tens of millions of these magazines; and these magazines account today for "approximately half of all privately owned magazines in the United States." *Duncan*, 970 F.3d at 1142; *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021). The numbers speak for themselves. A recent survey of gun owners found that nearly half of gun owners have owned magazines that hold more than 10 rounds. English, *supra*, at 22. In fact, the survey found that Americans have owned as many as 269 million handgun magazines that hold over 10 rounds and an additional 273 million rifle magazines over that threshold, for a total of 542 million. *Id.* at 24. And while figures for 15-round handgun magazines are harder to come by, the same survey found that magazines capable of accepting more than 15 rounds were *more* commonly owned than magazines capable of accepting 10 rounds or less. *Id.* In all events, whatever the exact numbers, it is beyond debate that millions of Americans own tens of millions of these now-banned magazines for lawful purposes, including self-defense, sport, and hunting.

There is nothing surprising about these numbers.  Many of the most popular semiautomatic rifles come standard with a capacity of greater than 10 rounds.  *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds.").  In fact, industry data indicates that more than 75% of modern rifle magazines in the country have a standard capacity of more than 10 rounds.  *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report*, https://bit.ly/3GLmErS (last visited Jan. 26, 2023).  Likewise, most handguns in the country are manufactured with magazines holding more than 15 rounds.  *See, e.g*., *Gun Digest* 2018 386-88 (Jerry Lee and Chris Berens, ed. 2017) (multiple Glock pistols); *id.* at 408 (multiple Smith & Wesson and Sig Sauer pistols).

These magazines, moreover, are typically possessed *for lawful purposes*.  According to the National Firearms Survey, the most common reasons cited for owning these magazines are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%).  English, *supra*, at 23.  And they may be lawfully owned in nearly all states.

The data conclusively demonstrates that the magazines Illinois has banned are in common use for lawful purposes.  Indeed, "courts throughout the country … agree that large-capacity magazines are commonly used for lawful purposes."  *Duncan*, 19 F.4th at 1155-56 (Bumatay, J., dissenting); *see, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *ANJRPC*, 910 F.3d at 116-17 *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the … large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately

4.7 million more such magazines were imported into the United States between 1995 and 2000").

Because magazines capable of holding more than 10 rounds (for rifles) and 15 rounds (for handguns) are arms typically owned by law-abiding Americans for lawful purposes, they are protected by the Second Amendment. *Bruen*, 142 S.Ct. at 2134. The state's flat ban on their use, manufacture, sell, or possession therefore violates the Second Amendment, full stop.

At a bare minimum, such arms are "presumptively protect[ed]" by the Second Amendment, so Illinois would bear the burden to "affirmatively prove that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126. Once again, Illinois cannot come close to making that showing. There were no restrictions on firing or magazine capacity when either the Second Amendment or the Fourteenth Amendment was ratified. The first state to restrict magazine capacity did not do so until *1990*, and laws enacted for the first time in the twentieth century "come too late to provide insight into the meaning of [the Constitution]." *Id.* at 2137 (alteration in original) (quoting *Sprint*, 554 U.S. at 312 (Roberts, C.J., dissenting)); *see id.* at 2138 (rejecting reliance on "late-19th-century [laws]" analogous to the challenged law). Indeed, Illinois cannot even identify a "well-established" tradition of restricting magazine capacity *today*. *See id.* at 2133. Only a handful of jurisdictions have laws analogous to HB 5471's sweeping ban on commonplace magazines and other ammunition feeding devices.

The absence of historical laws restricting firing capacity is not owing to some "dramatic technological change[]" in the past few decades or "unprecedented societal concern[]" that did not exist until 1990. *Bruen*, 142 S.Ct. at 2132. Firearms capable of firing more than 10 or 15 rounds long predate the Founding. *See Duncan*, 970 F.3d at 1147. They were marketed to and bought by civilians from the start. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty Gen. of N.J.*, 974 F.3d 237, 255 (3d Cir. 2020) (Matey, C.J., dissenting). Indeed, as noted, the federal government sold

hundreds of thousands of 15- and 30-round M-1 carbines to civilians at a discount just as the AR-15 (and its standard 30-round magazine) came on the market. *Duncan*, 970 F.3d at 1148. In short, "magazines of more than ten [and 15] rounds ha[ve] been well established in the mainstream of American gun ownership" for a very long time. Kopel, *supra*, 78 Alb. L. Rev. at 862.

In short, defendants cannot identify any "enduring American tradition of state regulation" forbidding magazines capable of holding more than 10 or 15 rounds by law-abiding citizens for lawful purposes because no such tradition exists. *Bruen*, 142 S.Ct. at 2135. Because Illinois cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127, the state's sweeping magazine ban unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.[6]

## II.    The Remaining Factors All Favor Injunctive Relief.

There is no question that the constitutional injuries HB 5471 will inflict on Plaintiffs and their members are imminent; the law has already taken effect. And those injuries are irreparable by definition. *See Ezell*, 651 F.3d at 699 ("The Second Amendment protects … intangible and unquantifiable interests.… Infringements of th[e] right [to keep and bear arms] cannot be compensated by damages."). Nor does it make a difference that Illinois has not sought to dispossess Illinoisans of these commonplace arms, or that Illinoisans may bear these arms in other states that take a less dim view of the Second Amendment. As the Seventh Circuit has made clear, it is "profoundly mistaken" to "assume[] that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction." *Id.* at 697.

Those injuries are enough in and of themselves to satisfy the second injunctive relief factor.

---

[6] For the same reasons that the Seventh Circuit's pre-*Bruen* decisions in *Friedman* and *Wilson* pose no obstacle to invalidating Illinois' "assault weapons" ban, *see* pp.14-15, *supra*, those cases pose no obstacle to invalidating Illinois' "large capacity ammunition feeding devices" ban.

But they do not stand alone.  It is indisputable that Plaintiff Hood's Guns & More and Plaintiff Pro Gun and Indoor Range (and all other Illinois retailers among Plaintiff NSSF's 10,000+ members) will lose revenue if HB 5471 remains in effect.  It has already resulted in "the constriction of [Plaintiffs'] buyers' market," which is a textbook economic "injury," and it will only get worse as time drags on.  *Craig v. Boren*, 429 U.S. 190, 194 (1976); *see Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 205 (4th Cir. 2020) (applying *Craig*'s logic to a gun dealer challenging a Maryland handgun licensing law).  And while economic injuries typically are not irreparable because they can be remedied after the fact, economic injuries *are* irreparable when—as here—the defendants are cloaked in Eleventh Amendment immunity.  *See, e.g.*, *Cmty. Pharms. of Ind., Inc. v. Indiana Fam. & Soc. Servs. Admin.*, 801 F.Supp.2d 802, 806-07 (S.D. Ind. 2011).  Every single cent lost as a result of HB 5471 is unrecoverable as a matter of law, thanks to the Eleventh Amendment.

The equities and the public interest favor an injunction as well.  *See Faust v. Vilsack*, 519 F.Supp.3d 470, 478 (E.D. Wis. June 10, 2021) ("These factors 'merge when the Government is the opposing party.'" (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009))).  HB 5471 tramples on fundamental constitutional rights—and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Mitchell v. Baker*, 2015 WL 278852, at *7 (S.D. Ill. Jan. 21, 2015) (citation omitted).  Nor can Defendants make any serious argument that they (or the state) will suffer harm as a result of an injunction.  Government defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns."  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction.  And because none of the material facts can be reasonably disputed—the arms at issue are in common use—and the issues are purely legal, there is no reason to delay entering judgment in Plaintiffs' favor.

Respectfully submitted,

s/ *Gary C. Pinter*

PAUL D. CLEMENT[*]                             GARY C. PINTER
ERIN E. MURPHY[*]                              SWANSON, MARTIN & BELL, LLP
MATTHEW D. ROWEN[*]                            103 W. Vandalia Street
NICHOLAS M. GALLAGHER[*]                       Suite 215
706 Duke Street                                Edwardsville, IL 62025
Alexandria, VA 22314                           (618) 655-3131
                                               gpinter@smbtrials.com

[*] *pro hac vice* application forthcoming     ANDREW A. LOTHSON[*]
                                               SWANSON, MARTIN & BELL, LLP
                                               330 N. Wabash
                                               Suite 3300
                                               Chicago, IL 60611

January 26, 2023