**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CALEB BARNETT et al., | |
| *Plaintiffs,* | Case No. 3:23-cv-209-SPM |
| v. | ** designated Lead Case |
| KWAME RAOUL et al., | |
| *Defendants.* | |
| DANE HARREL et al., | |
| *Plaintiffs,* | Case No. 3:23-cv-141-SPM |
| v. | |
| KWAME RAOUL et al., | |
| *Defendants.* | |
| JEREMY W. LANGLEY et al., | Case No. 3:23-cv-192-SPM |
| *Plaintiffs,* | |
| v. | |
| BRENDAN KELLY et al., | |
| *Defendants.* | |
| FEDERAL FIREARMS LICENSEES OF ILLINOIS et al., | |
| *Plaintiffs,* | Case No. 3:23-cv-215-SPM |
| v. | |
| JAY ROBERT "JB" PRITZKER et al., | |
| *Defendants.* | |

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY**
**IN SUPPORT OF DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 2

ARGUMENT ........................................................................................................... 3

    I.      Plaintiffs Have Not Met Their Burden To Establish that the Second
            Amendment's Plain Text Covers Their Conduct .................................... 3

    II.     The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ......... 6

    III.   This Court Should Reject Any Effort To Dismiss the State's Historical
            Analogues as "Outliers" or "Anomalous" ........................................... 14

CONCLUSION ....................................................................................................... 16

# TABLE OF AUTHORITIES

*Cases*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
    910 F.3d 106 (3d Cir. 2018) ................................................................................ 1

*Bevis v. City of Naperville, Ill.*,
    No. 1:22-cv-4775, 2023 WL 2077392,
    *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023) ...................................... 12

*Davenport v. Wash. Educ. Ass'n*,
    551 U.S. 177 (2007) ............................................................................................ 15

*Defense Distributed v. Bonta*,
    No. 2:22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted by* 2022 WL
    15524983 (C.D. Cal. Oct. 24, 2022) ...................................................................... 5

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ....................................................................................... *passim*

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ........................................................................................ 16

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) ..................................................................................... 6

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ........................................................................... 6, 10

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ............................................................................... 15

*Gould v. Morgan*,
    907 F.3d 659 (1st Cir. 2018) .................................................................................. 6

*Heller v. District of Columbia* (*Heller II*),
    670 F.3d 1244 (D.C. Cir. 2011) ........................................................................... 11

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ...................................................................................... 3, 4

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ........................................................................... 5, 6, 10, 15

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ................................................................................. 6

**TABLE OF AUTHORITIES—Continued**

*Nat'l Rifle Ass'n of Am., Inc. v. Comm'r, Fla. Dep't of Law Enf't,*
   No. 23-12314, slip op. (11th Cir. Mar. 9, 2023) .................................................................. 6, 7

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ..................................................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island,*
   No. 1:22-cv-00246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-
   1072 (1st Cir. Jan. 18, 2023) ................................................................................. 4, 5

*Or. Firearms Fed'n v. Brown,*
   No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ............................... 4, 5, 12, 13

*Rehaif v. United States,*
   139 S. Ct. 2191 (2019) ....................................................................................... 2

*Rupp v. Becerra,*
   401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022 WL
   2382319 (9th Cir. June 28, 2022) .............................................................................. 2

*Teter v. Connors,*
   460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020)
   ................................................................................................................... 2

*United States v. Greeno,*
   679 F.3d 510 (6th Cir. 2012) .................................................................................. 6

*United States v. Tilotta,*
   No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) .............................................. 5

***Other Authorities***

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998)................................. 9

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*,
   No. 20-843 (U.S.) ........................................................................................... 10, 14

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on
   the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ............................................... 10, 14

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021),
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ............................................... 9

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439

**TABLE OF AUTHORITIES—Continued**

(2022) .................................................................................................................................. 8


Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.
    Nov. 3, 2021)................................................................................................................... 11

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 370,000 in Illinois. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 27 cities and localities in Illinois are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Miller v. Smith*, No. 22-1482, Dkt. 42 (7th Cir. Oct. 13, 2022); *Antonyuk v. Nigrelli*, No. 22-908, Dkt. 193 (2d Cir. Jan. 17, 2023); *Nat'l Ass'n for Gun Rts. v. City of Highland Park, Ill.*, No. 1:22-cv-04774, Dkt. 70 (N.D. Ill. Feb. 1, 2023). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and*

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

*remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F.

Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020);

*see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Illinois's newly-enacted law restricting the sale, purchase,  manufacture, delivery,

importation, and possession of assault weapons and large-capacity magazines is constitutional

under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v.

Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the State Defendants' Response in

Opposition to Plaintiffs' Motions for Preliminary Injunction.[2] Dkt. 37 (Mar. 2, 2023) ("State

Mem.").[3] Everytown submits this amicus brief to address three methodological points. *First*, on

the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to establish that

assault weapons and large-capacity magazines are protected "arms" within the meaning of the

Second Amendment, and they have not met that burden. *Second*, in applying the historical inquiry

of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical

tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868,

when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is not a cutoff; examining

"legal and other sources to determine *the public understanding* of a legal text in the period *after*

its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of

Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). And, as *Bruen* instructs,

this is particularly so where, as here, the challenged ordinance implicates "unprecedented societal

---

[2] As the State Defendants explain (at 7-8), those who possessed assault weapons and large-capacity magazines as of the law's effective date may continue to do so on their own property, at other specified locations, and while traveling to and from these locations.

[3] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claim. The Court should deny Plaintiffs' motions for a preliminary injunction in their entirety for the reasons the State Defendants set out.

concerns or dramatic technological changes." 142 S. Ct. at 2132. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although not directly implicated here, given the State Defendants' robust historical record, we highlight that point in case the Court chooses to address it.

## ARGUMENT

I.   **Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct**

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

As the State Defendants note, *see* State Mem. at 12-13, Plaintiffs have the burden on the initial, textual inquiry. This is so for at least two reasons. First, *Bruen* itself makes clear that the burden is on plaintiffs on the textual inquiry, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of litigation—the Court would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement

of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421. Accordingly, multiple courts have correctly read *Bruen* to place the burden on the plaintiff challenging a regulation to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, State Mem. at 13; *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) ("Plaintiffs *have not shown* that large-capacity magazines are weapons in common use for lawful purposes like self-defense such that they fall within the plain text of the Second Amendment." (cleaned up) (emphasis added)); *Ocean State Tactical, LLC v. Rhode Island*, No. 1:22-cv-00246, 2022 WL 17721175, at *2 (D.R.I. Dec. 14, 2022) ("[T]he plaintiffs have failed in *their burden* to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text.") (emphasis added), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

Plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry, because they have failed to establish that assault weapons and large-capacity magazines are among the "arms" that the Second Amendment protects. To fall within the Second Amendment's text, *Heller* established that a weapon must not only be a "bearable arm" or "[w]eapon[] of offence," but must also be one "in common use" and "typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Heller*, 554 U.S. at 581-82, 625-27.[4] *Bruen* further confirmed that the

---

[4] Specifically, *Heller* began with dictionary definitions of "arms," including as "[w]eapons of offence, or armour of defence" and observed that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 581-82. But it then made clear that the Second Amendment applies only to weapons "in common use" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625-27; *see also id.* at 627 (noting that "M-16 rifles and the like" may be banned).

inquiry should focus on common use for the lawful purpose of self-defense.[5] As the State Defendants explain, *see* State Mem. at 15-39, Plaintiffs have not carried this burden here, as to either assault weapons or large-capacity magazines. That alone is enough to defeat Plaintiffs' motion. *See Ocean State Tactical*, 2022 WL 17721175, at *2, *11-15 (denying motion for preliminary injunction in challenge to large-capacity magazine law because "plaintiffs have failed in their burden to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text" and "have failed to prove that LCMs are weapons relating to self-defense"); *Or. Firearms Fed'n*, 2022 WL 17454829, at *9-12 (making similar findings in denying motion for a temporary restraining order as to Oregon large-capacity magazine law).[6]

In sum, because Plaintiffs have failed to establish that the conduct in which they seek to engage is protected by the Second Amendment's text, they are not entitled to relief.

---

[5] *Bruen* did not spell out the textual inquiry with respect to "arms" in detail, because New York did not dispute either that the "people" in that case ("two ordinary, law-abiding, adult citizens") or the arms they sought to use ("handguns") fell within the Second Amendment's text. *See* 142 S. Ct. at 2134. But in applying that test, the Court's articulation—"[n]or does any party dispute that handguns are *weapons 'in common use' today for self-defense*," *id.* (emphasis added)—indicated that the "arms" the Second Amendment covers are those commonly used for self-defense. This limitation coheres with the Supreme Court's repeated emphasis that "individual self-defense is the central component of the Second Amendment right." 142 S. Ct. at 2133 (cleaned up) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599)); *see also id.* at 2132 (explaining that "the Second Amendment's definition of 'arms' … covers modern instruments that facilitate armed self-defense"); *Ocean State Tactical*, 2022 WL 17721175, at *11 (noting, in a Second Amendment challenge to a state law prohibiting large-capacity magazines, that the focus under *Bruen*'s plain-text inquiry "must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense").

[6] With respect to Plaintiffs' challenge to the ordinance's prohibitions on the sale, purchase, manufacture, delivery, or importation of assault weapons and large-capacity magazines, the textual arguments here fall even further from the mark. *Cf. United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (explaining that, "textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer'"); *Defense Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (concluding that the Second Amendment's plain text "quite-clearly" does not include any "implicit[]" right to "acquire and manufacture firearms" or "to purchase arms" (internal quotation marks omitted)), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

## II.     The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. As the Eleventh Circuit recently explained, "because the Fourteenth Amendment is what caused the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters." *Nat'l Rifle Ass'n of Am., Inc. v. Comm'r, Fla. Dep't of Law Enf't*, No. 21-12314, slip op. at 8 (11th Cir. Mar. 9, 2023).

Several circuits, including the Seventh Circuit, reached that same conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[7] *See Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v.*

---

[7] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

*Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).[8]

*Bruen* does not alter that conclusion.[9] The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the State Defendants' brief, this Court can uphold the challenged law under a historical analysis without deciding whether it should focus that analysis on the period

---

[8] *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), is not to the contrary. There, the Seventh Circuit referred to 1791, but did not hold that 1791 is the only relevant time period for historical inquiry. Moreover, *Moore* did not acknowledge the implications for originalism of the fact that the Second Amendment did not apply against the states until the 1868 ratification of the Fourteenth Amendment (which is mentioned nowhere in the opinion). Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See* 702 F.3d at 935 (citing *McDonald*, 561 U.S. at 765-66, 766 n.14). But that merely flags the issue that *Bruen* acknowledged, *see* 142 S. Ct. at 2137, before leaving open the question whether the 1868 or 1791 understanding should control, *see* 142 S. Ct. at 2138. Accordingly, *Moore*'s observation has no remaining force after *Bruen*, whereas *Ezell*'s observation remains a faithful application of originalist principles, as well as being the one the Seventh Circuit followed in pre-*Bruen* Second Amendment cases.

[9] To the contrary, as noted, the Eleventh Circuit has expressly affirmed this Reconstruction-era understanding since *Bruen*. *See Nat'l Rifle Ass'n*, slip op. at 8-13.

around 1791 or the period around 1868.[10] *See* State Mem. at 39-63.[11] But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the correct focus.

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a stat, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind.

---

[10] The *FFL* Plaintiffs contend that "the most relevant period for the historical analysis is the founding era," and they assert that *Bruen* "questioned whether [Fourteenth Amendment] ratification-era history had any role at all to play in interpreting the Second Amendment." Dkt. 28 at 15. This is a gross misreading of Supreme Court precedent. As a matter of basic logic, the Court could not already have resolved the issue it expressly left open in *Bruen*. And to the extent the *Bruen* majority put a thumb on the scale, it was in favor of 1868, not 1791. *See infra* pp. 9-10 (explaining that majority cited scholarship arguing for 1868 and none arguing for 1791, and approvingly cited consideration of 19th-century laws in sensitive places analysis).

[11] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century and 20th-century history to clarify that meaning. *See, e.g.*, State Mem. at 45-51; *infra* pp. 11-13.

L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[12] More recently, Professor Lash wrote—

---

[12] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into

as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against states and localities does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate

---

the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[13]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[14] *Bruen*

---

[13] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

[14] Nor is 1868 a starting line for the inquiry. Both *Heller* and *Bruen* examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. And the State Defendants correctly point to such history in their brief. *See* State Mem. at 43-44.

clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison).

Furthermore, *Bruen* recognized that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period. That is precisely the situation in this case. As the State Defendants explain, *see* State Mem. at 6-7, 40-43, Illinois enacted the challenged law in response to the exponential increase in the lethality of firearms and magazines—*i.e.*, "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See Or. Firearms Fed'n*, 2022 WL 17454829, at *12-13 (similarly finding, in denying plaintiffs' motion for a temporary restraining order, that large-capacity magazines "implicate a dramatic change in firearms technology" and "also implicate unprecedented societal concerns" arising from mass shootings). A "more nuanced approach" to history is thus fully warranted.

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of Illinois's law. *See* State Mem. at 43-51 (discussing late 19th-century- and early 20th-century laws regulating particularly dangerous weapons and weapon features soon after they emerged in the commercial market, including prohibitions and restrictions of multi-shot guns and automatic and semiautomatic firearms capable of firing a large number of rounds without reloading, which were consistent with earlier laws restricting access to weapons and weapon features that demonstrably threaten public safety but have no legitimate use for self-defense, such as blunt weapons and Bowie knives); *see also, e.g.*, *Bevis v. City of Naperville, Ill.*, No. 1:22-cv-4775, 2023 WL 2077392, at *9-16 (N.D. Ill. Feb. 17, 2023) (holding, in denying plaintiffs' motion for temporary restraining order and preliminary injunction, that Illinois's law and similar local ordinance restricting assault weapons and large-capacity magazines are "constitutionally sound" because "history and tradition demonstrate that particularly 'dangerous' weapons are unprotected" under Second Amendment), *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023); *Or. Firearms Fed'n*, 2022 WL 17454829, at *12-14 (finding, in denying plaintiffs' motion for a temporary restraining order, that large-capacity magazine prohibitions are "consistent with the Nation's historical tradition of firearm regulation").[15] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider this later

---

[15] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like Illinois's law.

### III.    This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers" or "Anomalous"

Challengers in recent Second Amendment cases have sought to dismiss historical regulations as "outliers" insufficient to establish a historical tradition under *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers"). Plaintiffs assert that what they refer to as "anomalous laws" from a "few" jurisdictions are insufficient to establish a historical tradition under *Bruen*. Plaintiffs' Motion for Preliminary Injunction ("Pl. Mot.") at 23.[16] Even if that assertion were correct, it is not implicated in this case, given the State Defendants' robust and extensive record of historical laws. *See* State Mem. at 43-51. But to the extent this Court chooses to address the issue here, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as

---

[16] The *FFL* Plaintiffs similarly suggest that "one or two [historically analogous] laws would be outliers that do not satisfy *Bruen*'s demand for a broad and enduring historical tradition." Dkt. 28 at 18.

Amicus Curiae at 11-12, *Bruen* (No. 20-843).[17] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[18] Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[19]

Concluding that a small number of state and local laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people,

---

[17] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

[18] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 15-16 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

[19] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to sell, purchase, manufacture, deliver, import, or possess assault weapons or large-capacity magazines.

or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[20]

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: March 9, 2023                Respectfully submitted,

                           /s/ Bhavani K. Raveendran
                           **ROMANUCCI & BLANDIN, LLC**
                           Antonio R. Romanucci
                           Bhavani K. Raveendran

---

[20] Indeed, any such inference would be untenable in light of the Court's statement, in a decision issued the day after *Bruen* was decided, that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

David A. Neiman
321 North Clark Street, Suite 900
Chicago, IL 60654
Phone: (312) 458-1000
Fax: (312) 458-1004
dneiman@rblaw.net

*Counsel for Amicus Curiae*