## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DANE HARREL, an individual and resident of )
St. Clair County, Illinois; C4 GUN STORE, LLC, )
an Illinois limited liability company; MARENGO )
GUNS, INC., an Illinois corporation; ILLINOIS )
STATE RIFLE ASSOCIATION; FIREARMS )
POLICY COALITION, INC.; and SECOND )
AMENDMENT FOUNDATION, )
                                        )      Case No.  3:23-cv-141-SPM
          Plaintiffs, )
                        )
          v. )
                        )
KWAME RAOUL, in his official capacity as )
Attorney General of Illinois;  BRENDAN F. )
KELLY, in his official capacity as Director of the )
Illinois State Police; JAMES GOMRIC, in his )
official capacity as State's Attorney of St. Clair )
County, Illinois; JEREMY WALKER, in his )
official capacity as State's Attorney of Randolph )
County, Illinois; PATRICK D. KENNEALLY, in )
his official capacity as State's Attorney of McHenry )
County, Illinois; RICHARD WATSON, in his )
official capacity as Sheriff of St. Clair County, )
Illinois; JARROD PETERS, in his official capacity )
as Sheriff of Randolph County, Illinois; ROBB )
TADELMAN, in his official capacity as Sheriff of )
McHenry County, Illinois; )
                        )
          Defendants. )

## DEFENDANTS RAOUL AND KELLY'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendants Kwame Raoul and Brendan Kelly (the "State Defendants"), by and through their attorney, Kwame Raoul, the Illinois Attorney General, for their Answer to Plaintiff's Complaint, Affirmative Defenses, and Jury Demand states as follows:

## INTRODUCTION

1

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. Under this constitutional provision, Plaintiff Harrel, and all other law-abiding, responsible Illinoisans have a fundamental, constitutionally guaranteed right to keep and bear common firearms for defense of self and family and for other lawful pursuits.

**ANSWER: State Defendants admit that the above paragraph contains a partial quote of the Second Amendment and that the Supreme Court has held that under the Second Amendment that law abiding and responsible citizens have a right to keep and bear firearms for self-defense, subject to certain limitations. Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations that Plaintiff Harrel is law-abiding and responsible.**

2.      But the State has enacted, and Defendants have authority to enforce, a flat prohibition on the manufacture, delivery, sale, import, purchase, and possession of many common firearms—tendentiously labeled "assault weapons"—by ordinary citizens, making it a crime for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* 720 ILL. COMP. STAT. 5/24-1.9(b) & (c); 5/24-1(a)(15) & (a)16.

**ANSWER: State Defendants admit that the State has enacted 720 ILCS 5/24-1.9 and 720 ILCS 5/24-1. State Defendants admit that they have authority to enforce these statutes. State Defendants deny the remaining factual allegations of this paragraph.**

3.      Defendants also have enacted and enforced a flat prohibition on the manufacture, delivery, sale, purchase, and possession of common ammunition feeding devices—arbitrarily deemed to have "large capacity"—by ordinary citizens, making it a crime for law-abiding citizens to exercise their fundamental right to keep and bear such arms. See 720 ILL. COMP. STAT.  5/24-1.10(b) and (c).

**ANSWER: State Defendants admit that the State has enacted 720 ILCS 5/24-1.10. State Defendants admit that they have authority to enforce this statute. State Defendants deny the remaining factual allegations of this paragraph.**

4.      The State's highly limited set of exemptions for certain persons and purposes from its blanket ban do not allow typical law-abiding citizens to keep and bear these common firearms. *See* 720 ILL. COMP. STAT. 5/24-1.9(d) and (e) and id. at 1.10(d) and (e).

**ANSWER: State Defendants deny the allegations of this paragraph.**

5.      The State's enactment, and Defendants' enforcement, of the prohibition on common semiautomatic firearms, tendentiously and inaccurately labeled assault weapons, and on certain magazines arbitrarily deemed to be of "large capacity," denies individuals who reside in

the State, including individual Plaintiffs, their customers, and other members of ISRA, FPC, and SAF, their fundamental, individual right to keep and bear common arms.

**ANSWER: State Defendants deny the allegations of this paragraph.**

6.       While Plaintiffs acknowledge that their sought result is contrary to *Wilson v. Cook Cnty.*, 937 F.3d 1028 (7th Cir. 2019), and *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015), those cases have been abrogated by *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 597 U.S.    , 142 S. Ct. 2111 (2022). In particular, *Bruen* displaced *Friedman's* inquiry in Second Amendment cases into "whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense," *Friedman*, 784 F.3d at 410 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 622 (2008)) (citations omitted). *Bruen's* replacement test: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2127, 2129–30.

**ANSWER: State Defendants admit that this paragraph contains quotes from *Friedman* and *Bruen*. State Defendants deny the remaining factual allegations of this paragraph.**

7.       The plain text of the Second Amendment covers the conduct the Plaintiffs wish to engage in because it "extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 2132 (quoting *Heller*, 554 U.S. 582). By prohibiting Plaintiffs from possessing and carrying popular semiautomatic firearms and common ammunition magazines, Illinois has prevented them from "keeping and bearing Arms" within the meaning of the Amendment's text. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." 142 S. Ct. at 2126.

**ANSWER: State Defendants admit that this paragraph contains quotes from *Bruen*. State Defendants deny that firearms and magazines regulated by the challenged statutes fall within the plain text of the Second Amendment and further deny the remaining factual allegations of this paragraph.**

8.       Here, Defendants will not be able to demonstrate any such thing. *Heller* and *Bruen* have already established the *only* historical tradition can remove a firearm from the Second Amendment's protective scope—the tradition of banning dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2143. But to be banned, a firearm must be both dangerous *and* unusual. *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). Arms that are in common use—as the firearms and magazines Illinois has banned unquestionably are—*cannot* be unusual or dangerous. Therefore, they cannot be banned, and the Illinois laws challenged herein must be declared unconstitutional.

**ANSWER: State Defendants deny the allegations of this paragraph.**

<h2 style="text-align:center"><u>JURISDICTION & VENUE</u></h2>

9.     This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

**ANSWER: State Defendants admit the allegations of this paragraph.**

10.     Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988.

**ANSWER: State Defendants admit that Plaintiffs purport to seek remedies under the aforementioned statutes. State Defendants deny that Plaintiffs are entitled to any remedies.**

11.     Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

**ANSWER: State Defendants admit the allegations of this paragraph.**

<h2 style="text-align:center"><u>PARTIES</u></h2>

<u>**Plaintiffs**</u>

12.     Plaintiff Dane Harrel is a natural person, a resident of St. Clair County, Illinois, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Harrel is a member of Plaintiffs ISRA, FPC, and SAF.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

13.     Plaintiff C4 Gun Store, LLC is an Illinois limited liability company with its principal place of business located in Sparta, Randolph County, Illinois. C4 Gun Store sells the semiautomatic firearms prohibited by the State's ban, and also sells standard capacity magazines, both as standard equipment for many of the firearms it sells and also as standalone products. Since Illinois's semiautomatic rifle and standard capacity magazine bans have gone into effect, C4 Gun Store has been forced to stop selling such semiautomatic firearms and standard capacity magazines to civilians and to limit its sales to those specifically exempted from the state-wide ban.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations this paragraph.**

14.     Plaintiff Marengo Guns, Inc. is an Illinois corporation with its principal place of business located in Marengo, McHenry County, Illinois. Marengo Guns sells the semiautomatic firearms prohibited by the State's ban, and also sells standard capacity magazines, both as standard equipment for many of the firearms it sells and also as standalone products. Since Illinois's semiautomatic rifle and standard capacity magazine bans have gone into effect, Marengo Guns has been forced to stop selling such semiautomatic firearms and standard capacity magazines to civilians and to limit its sales to those specifically exempted from the state-wide ban.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations this paragraph.**

15.     Plaintiff Illinois State Rifle Association ("ISRA") is a nonprofit membership organization incorporated under the laws of Illinois with its principal place of business in Chatsworth, Illinois. The purposes of ISRA include securing the constitutional right to privately own, possess, and carry firearms in Illinois, through education, outreach, and litigation. ISRA has thousands of members and supporters in Illinois, and many members outside the State of Illinois. ISRA brings this action on behalf of its members, including the named Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations this paragraph.**

16.     Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a nonprofit organization incorporated under the laws of Delaware with a place of business in Sacramento, California. The purposes of FPC include defending and promoting the People's rights, especially, but not limited to, the Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC brings this action on behalf of its members, including the named Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations this paragraph.**

17.     Plaintiff Second Amendment Foundation ("SAF") is a nonprofit educational foundation incorporated in 1974 under the laws of Washington with its principal place of business in Bellevue, Washington. SAF is a 501(c)(3) organization under Title 26 of the United States Code. SAF's mission is to preserve the individual constitutional right to keep and bear arms through public education, judicial, historical, and economic research, publishing, and legal- action programs focused on the civil right guaranteed by the Second Amendment to the United States Constitution. SAF has members nationwide, including in the State of Illinois. SAF brings this

action on behalf of its members, including the named Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations this paragraph.**

**Defendants**

18.     Defendant Kwame Raoul is sued in his official capacity as the Attorney General of Illinois. As Attorney General, he is responsible for enforcing the State's laws and has concurrent authority with State's Attorney's to initiate prosecutions on behalf of the People of Illinois. *See People v. Buffalo Confectionary Co.*, 401 N.E.2d 546, 549 (Ill. 1980). This authority includes the authority to enforce the State's general prohibition on the manufacture, delivery, sale, purchase, and possession of common semiautomatic firearms and ammunition magazines.

**ANSWER: State Defendants admit the allegations in the first sentence of this paragraph. State Defendants admit that the second sentence is a partially accurate paraphrase of a portion of the *Buffalo Confectionary* opinion, and that the Attorney General has concurrent authority with State's Attorney's to initiate prosecutions on behalf of the People of Illinois in some circumstances and with some limitations. State Defendants admit that this authority includes, in some circumstances and with some limitations, the authority to enforce the State's general prohibition on the manufacture, delivery, sale, purchase, and possession of common semiautomatic firearms and ammunition magazines.**

19.     Defendant Brendan F. Kelly is sued in his official capacity as the Director of the Illinois Department of State Police. As Director, Kelly is responsible for managing and controlling enforcement of the State's criminal laws by the State Police, *see* 20 ILL. COMP. STAT. 2610/2, 2610/16, including the State's general prohibition on the manufacture, delivery, sale, import, purchase, and possession of common semiautomatic firearms and ammunition magazines.

**ANSWER: State Defendants admit the allegations of this paragraph.**

20.     Defendant James Gomric is sued in his official capacity as State's Attorney for St. Clair County, Illinois. As State's Attorney, he has a duty "[t]o commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for [his] county, in which the people of the State or county may be concerned," including violations of Illinois' ban on common firearms and ammunition magazines. 55 ILL. COMP. STAT. 5/3-9005.

**ANSWER: State Defendants admit that James Gomric is the State's Attorney for St. Clair County, Illinois and that Plaintiffs purport to sue Defendant Gomric in his official capacity. State Defendants admit that Defendant Gomric has statutory powers and duties under 55 ILCS 5/3-9005.**

21.     Defendant Jeremy Walker is sued in his official capacity as State's Attorney for Randolph County, Illinois. As State's Attorney, he has a duty "[t]o commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for [his] county, in which the people of the State or county may be concerned," including violations of Illinois' ban on common firearms and ammunition magazines. 55 ILL. COMP. STAT. 5/3-9005.

**ANSWER: State Defendants admit that Jeremy Walker was the State's Attorney for Randolph County, Illinois, but deny that he is currently the Randolph County State's Attorney. State Defendants admit that Plaintiffs purport to sue Defendant Walker in his official capacity. State Defendants admit that State's Attorneys have statutory powers and duties under 55 ILCS 5/3-9005.**

22.     Defendant Patrick D. Kennealy is sued in his official capacity as State's Attorney for McHenry County, Illinois. As State's Attorney, he has a duty "[t]o commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for [his] county, in which the people of the State or county may be concerned," including violations of Illinois' ban on common firearms and ammunition magazines. 55 ILL. COMP. STAT. 5/3-9005.

**ANSWER: State Defendants admit that Patrick D. Kenneally is the State's Attorney for McHenry County, Illinois and that Plaintiffs purport to sue Defendant Kenneally in his official capacity. State Defendants admit that Defendant Kenneally has statutory powers and duties under 55 ILCS 5/3-9005.**

23.     Defendant Richard Watson is sued in his official capacity as Sheriff of St. Clair County, Illinois. As sheriff, "he has the duty to prevent crime and keep the peace and order in his county, and he has the authority to arrest offenders and bring them to the proper court." *Gibbs v. Madison Cnty. Sheriff's Dep't*, 326 Ill. App. 3d 473, 478 (2001)

**ANSWER: State Defendants admit that Richard Watson is the Sheriff for St. Clair County, Illinois and that Plaintiffs purport to sue Defendant Watson in his official capacity. State Defendants admit that Defendant Watson has statutory and common law powers and duties.**

24.     Defendant Jarrod Peters is sued in his official capacity as Sheriff of Randolph County, Illinois. As sheriff, "he has the duty to prevent crime and keep the peace and order in his county, and he has the authority to arrest offenders and bring them to the proper court." *Id.*

**ANSWER: State Defendants admit that Jarrod Peters is the Sheriff for Randolph County, Illinois and that Plaintiffs purport to sue Defendant Peters in his official capacity. State Defendants admit that Defendant Peter has statutory and common law powers and duties.**

25.     Defendant Robb Tadelman is sued in his official capacity as Sheriff of McHenry County, Illinois. As sheriff, "he has the duty to prevent crime and keep the peace and order in his county, and he has the authority to arrest offenders and bring them to the proper court." *Id.*

**ANSWER: State Defendants admit that Robb Tadelman is the Sheriff for McHenry County, Illinois and that Plaintiffs purport to sue Defendant Tadelman in his official capacity. State Defendants admit that Defendant Tadelman has statutory and common law powers and duties.**

<u>**FACTUAL ALLEGATIONS**</u>

I.      **ILLINOIS' UNCONSTITUTIONAL SEMIAUTOMATIC FIREARM BAN.**

26.     On January 10, 2023, Illinois enacted a ban on so-called "assault weapons," [FN1] which are in fact common semiautomatic firearms, and criminalized any act to "manufacture, deliver, sell, import, [] purchase," or "possess" such firearms in Illinois. 720 ILL. COMP. STAT. 5/24-1.9(b) and (c) ("the Firearm Ban").

[FN1] 720 ILL. COMP. STAT. 5/24-1.9(a)(1).

**ANSWER: State Defendants admit that Illinois enacted 720 ILCS 5/24-1.9 on January 10, 2023, and that this provision generally makes it unlawful for any person within the State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge, subject to certain exceptions. State Defendants deny the remaining factual allegations of this paragraph.**

27.     This criminal prohibition applies to "any person within [the State of Illinois]" and excepts from its ambit only peace officers, current and retired law enforcement officers, government agencies, prison officials, members of the military, and certain private security contractors. 720 ILL. COMP. STAT. 5/24-1.9(e)(1)-(7).

**ANSWER: State Defendants admit 720 ILCS 5/24-1.9 does not apply to certain persons and entities under certain circumstances set forth in 720 ILCS 5/24-1.9(e), including certain law enforcement officers, government agencies, prison officials, members of the military, and private security contractors. State Defendants deny that the exception "only" applies to those listed in paragraph 27 because additional persons are listed at 720 ILCS 5/24-1.9(e).**

28.     Any ordinary person in Illinois who legally possessed a so-called assault weapon before the law's enactment now must register the firearm with the Illinois State Police, can only possess it on a very limited set of locations, and may transport them only to and from those locations, unloaded and in a case. 720 ILL. COMP. STAT. 5/24-1.9(d).

**ANSWER: State Defendants deny the allegations of this paragraph.**

29. A first-time violation of the prohibition on possession constitutes a Class A misdemeanor, while a first-time violation of the prohibition on manufacture, sale, deliver, import, and purchase constitutes a Class 3 felony. 720 ILL. COMP. STAT. 5/24-1(b). Class A misdemeanors carry "a determinate sentence of less than one year" and "[a] fine not to exceed $2,500". 730 ILL. COMP. STAT. 5/5-4.5-55(a) and (e). Class 3 felonies carry "a determinate sentence of not less than 2 years and not more than 5 years," 730 ILL. COMP. STAT. 5/5-4.5-40(a), and "a fine not to exceed, for each offense, $25,000." 730 ILL. COMP. STAT. 5/5-4.5-50(b).

**ANSWER: State Defendants admit the allegations of this paragraph.**

### A. The Firearm Ban Bans Firearms in Common Use.

30. Among other things, the Firearm Ban defines as an "assault weapon" and bans any semiautomatic rifle with the capacity to accept a magazine holding more than ten rounds of ammunition, if it has any one of the following features:

(i) a pistol grip or thumbhole stock;
(ii) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
(iii) a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;
(iv) a flash suppressor;
(v) a grenade launcher;
(vi) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.

720 ILL. COMP. STAT. 5/24-1.9(a)(1)(A).

**ANSWER: State Defendants admit that (i)–(vi) in this paragraph quote part of the definition of "assault weapon" set forth in 720 ILCS 5/24-1.9(a)(1). State Defendants deny the remaining allegations in this paragraph.**

31. Further, the Statute bans "[a]ny part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person." 720 ILL. COMP. STAT. 5/24-1.9(a)(1)(I).

**ANSWER: State Defendants admit the allegations of this paragraph quote part of the definition of "assault weapon" set forth in 720 ILCS 5/24-1.9(a)(1).**

32.    Finally, the Statute lists specific banned "assault weapons models," the "copies, duplicates, variants, [and] altered facsimiles" of which are also banned:

(i)    All AK types, including the following:
    (I)    AK, AK47, AK47S, AK–74, AKM, AKS, ARM, MAK90, MISR, NHM90, NHM91, SA85, SA93, Vector Arms AK–47, VEPR, WASR–10, and WUM.
    (II)    IZHMASH Saiga AK.
    (III)    MAADI AK47 and ARM.
    (IV)    Norinco 56S, 56S2, 84S, and 86S.
    (V)    Poly Technologies AK47 and AKS.
    (VI)    SKS with a detachable magazine.

(ii)    all AR types, including the following:

    (II)    AR–10.
    (II)    AR–15.
    (III)    Alexander Arms Overmatch Plus 16.
    (IV)    Armalite M15 22LR Carbine.
    (V)    Armalite M15–T.
    (VI)    Barrett REC7.
    (VII)    Beretta AR–70.
    (VIII)    Black Rain Ordnance Recon Scout.
    (IX)    Bushmaster ACR.
    (X)    Bushmaster Carbon 15.
    (XI)    Bushmaster MOE series.
    (XII)    Bushmaster XM15.
    (XIII)    Chiappa Firearms MFour rifles.
    (XIV)    Colt Match Target rifles.
    (XV)    CORE Rifle Systems CORE15 rifles.
    (XVI)    Daniel Defense M4A1 rifles.
    (XVII)    Devil Dog Arms 15 Series rifles.
    (XVIII)    Diamondback DB15 rifles.
    (XIX)    DoubleStar AR rifles.
    (XX)    DPMS Tactical rifles.
    (XXI)    DSA Inc. ZM–4 Carbine.
    (XXII)    Heckler & Koch MR556.
    (XXIII)    High Standard HSA–15 rifles.
    (XXIV)    Jesse James Nomad AR–15 rifle.
    (XXV)    Knight's Armament SR–15.
    (XXVI)    Lancer L15 rifles.

10

(XXVII)        MGI Hydra Series rifles.
(XXVIII)       Mossberg MMR Tactical rifles.
(XXIX)         Noreen Firearms BN 36 rifle.
(XXX)          Olympic Arms.
(XXXI)         POF USA P415.
(XXXII)        Precision Firearms AR rifles.
(XXXIII)       Remington R–15 rifles.
(XXXIV)        Rhino Arms AR rifles.
(XXXV)         Rock River Arms LAR–15 or Rock River Arms LAR–47.
(XXXVI)        Sig Sauer SIG516 rifles and MCX rifles.
(XXXVII)       Smith & Wesson M&P15 rifles.
(XXXVIII)      Stag Arms AR rifles.
(XXXIX)        Sturm, Ruger & Co. SR556 and AR–556 rifles.
(XL)            Uselton Arms Air-Lite M–4 rifles.
(XLI)          Windham Weaponry AR rifles. (XLII) WMD Guns Big Beast.
(XLIII)        Yankee Hill Machine Company, Inc. YHM–15 rifles.

(iii)   Barrett M107A1.
(iv)    Barrett M82A1.
(v)     Beretta CX4 Storm.
(vi)    Calico Liberty Series.
(vii)   CETME Sporter.
(viii)  Daewoo K–1, K–2, Max 1, Max 2, AR 100, and AR 110C.
(ix)    Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000.
(x)     Feather Industries AT–9.
(xi)    Galil Model AR and Model ARM.
(xii)   Hi-Point Carbine.
(xiii)  HK–91, HK–93, HK–94, HK–PSG–1, and HK USC.
(xiv)   IWI TAVOR, Galil ACE rifle.
(xv)    Kel-Tec Sub-2000, SU–16, and RFB.
(xvi)   SIG AMT, SIG PE–57, Sig Sauer SG 550, Sig Sauer SG 551, and SIG MCX.
(xvii)  Springfield Armory SAR–48.
(xviii) Steyr AUG.
(xix)   Sturm, Ruger & Co. Mini-14 Tactical Rifle M–14/20CF.

(xx)    All Thompson rifles, including the following:

(I)     Thompson M1SB.
(II)    Thompson T1100D.
(III)   Thompson T150D.
(IV)    Thompson T1B.
(V)     Thompson T1B100D.

(VI)   Thompson T1B50D.
(VII)   Thompson T1BSB.
(VIII)  Thompson T1–C.
(IX)   Thompson T1D.
(X)   Thompson T1SB.
(XI)   Thompson T5.
(XII)   Thompson T5100D.
(XIII)  Thompson TM1.
(XIV)  Thompson TM1C.

(xxi)   UMAREX UZI rifle.
(xxii)  UZI Mini Carbine, UZI Model A Carbine, and UZI Model B Carbine.
(xxiii) Valmet M62S, M71S, and M78.
(xxiv) Vector Arms UZI Type.
(xxv)  Weaver Arms Nighthawk.
(xxvi) Wilkinson Arms Linda Carbine.

720 ILL. COMP. STAT. 5/24-1.9(a)(1)(J).

**ANSWER:** **State Defendants admit 720 ILCS 5/24-1.9(a)(1) lists specific assault weapons models as set forth in (i)–(xxvi) in this paragraph, and includes copies, duplicates, variants, or altered facsimiles. State Defendants deny the remaining allegations in this paragraph.**

33.    Semiautomatic rifles "traditionally have been widely accepted as lawful possessions," *see Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle), and they are in common use, *see Heller v. Dist. of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("Heller II") ("We think it clear enough in the record that semi- automatic rifles . . . are indeed in 'common use' as the plaintiffs contend.").

**ANSWER:** **State Defendants deny the allegations in this paragraph.**

34.    Rifles built on an "AR-style" platform are a paradigmatic example of the type of arm Illinois bans ("AR" is short for ArmaLite Rifle; ArmaLite originally designed the platform).

**ANSWER:** **State Defendants admit that rifles built on an "AR-style" platform are regulated by 720 ILCS 5/24-1.9. State Defendants also admit that AR is short for ArmaLite Rifle and that Armalite originally designed the platform. State Defendants deny the remaining allegations in this paragraph.**

35.    AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans. A recent survey of gun owners indicates that about 24.6 million Americans have owned AR-15 or similar modern semiautomatic rifles, with the "median owner" identified as owning a single rifle. William English, PhD, *2021 National Firearms Survey:*

*Updated Analysis Including Types of Firearms Owned* at 2, 33 (May 13, 2022), https://bit.ly/3yPfoHw. A recent publication similarly estimated that over 24 million AR-15 or similar rifles have been produced for the U.S. market. NAT'L SHOOTING SPORTS FOUND., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*, (July 20, 2022), https://bit.ly/3QBXiyv.

**ANSWER:** **State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining factual allegations of this paragraph.**

36.     Approximately 20% of all firearms sold in recent years were rifles of the type banned by Illinois. NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report, 2021* at 9, *available* at https://bit.ly/3gWhI8E. And in 2020, more than 20 million adults participated in target or sport shooting with semiautomatic rifles like those banned by Illinois. NAT'L SHOOTING SPORTS FOUND., INC., *Sport Shooting Participation in the U.S. in 2020 at iii, available at* https://bit.ly/3sPuEQl (last accessed Jan. 12, 2023).

**ANSWER:** **State Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.**

37.     The banned semiautomatic firearms, like all other semiautomatic firearms, fire only one round for each pull of the trigger. They are not machine guns. *Staples*, 511 U.S. at 620 n.1. What is more, the designation "assault weapons" is a misnomer, "developed by anti-gun publicists" in their crusade against lawful firearm ownership. *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

**ANSWER:** **State Defendants admit that the restricted semiautomatic firearms are designed to fire only one round for each pull of the trigger, but deny that they may only fire one round for each trigger pull because they may be modified to fire more than one round per trigger pull. State Defendants admit that 720 ILCS 5/24-1.9(a)(1) defines assault weapons differently than how state law defines "machine gun" and federal law defines "machinegun." State Defendants deny the remaining factual allegations of this paragraph.**

38.     A comparison to firearms used by the military demonstrates just how disingenuous the "assault weapon" moniker is. While an AR-15 can only fire as often as a person can pull its trigger, an M249 light machine gun, commonly used by the U.S. military, can fire between 750 and 1,000 rounds per minute, MILITARY ANALYSIS NETWORK, *Squad Automatic Weapon (SAW), M249 Light Machine Gun, available* at https://bit.ly/3tsQGtd (last accessed Jan. 12, 2023). "Heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute), MILITARY ANALYSIS NETWORK, *GAU-4mm Vulcan M61A1/M61A2 20mm Automatic Gun, available at* https://bit.ly/3ttnemV (last accessed Jan. 12, 2023).

**ANSWER: State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

39.     Central among the common uses of semiautomatic firearms banned in Illinois is self-defense. A majority of owners of AR-style rifles said that they owned their firearms for self-defense. English, *2021 National Firearms Survey, supra*, at 34 (61.9% owned for home defense; 34.6% owned for defense outside the home). Owners of AR-15s and other similar rifles rated "Home/self-defense" as over 8 out of 10 in importance for owning them, the second-highest rating after recreational target shooting. NAT'L SHOOTING SPORTS FOUND., INC., *Modern Sporting Rifle: Comprehensive Consumer Report* 18 (July 14, 2022), available at https://bit.ly/3SSrVjM.

**ANSWER: State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

40.     An AR-15 rifle is an optimal firearm to rely on in a self-defense encounter. Most AR-style firearms are chambered for 5.56x45mm NATO, which is similar to .223 Remington ammunition. This is a relatively inexpensive and common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event of a home intrusion, but quickly loses velocity after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. Although most pistol rounds have less muzzle velocity than a 5.56x45mm NATO round, they have greater mass, maintain velocity after passing through walls and other objects, and pose substantially greater risks to unintended targets in, or even outside, the home.

**ANSWER: State Defendants deny the allegations of this paragraph.**

41.     Like the AR-15 generally, many of the specific features banned by Illinois aid home defense. A flash suppressor, for example, not only reduces the chances that a home- invader will identify his victim's position but also protects a homeowner against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 397 (1994).

**ANSWER: State Defendants admit that the cited source contains the assertion set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

42.     Folding and telescoping stocks increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces. *Id*. at 398–99. A telescoping stock also allows a firearm to be

better fitted to an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively.

**ANSWER: State Defendants admit that the cited source contains the assertion set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

43.    Pistol grips improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id*. at 396.

**ANSWER: State Defendants admit pistol grips improve accuracy and deny the remaining allegations of this paragraph.**

44.    Most common semiautomatic rifles, including those banned under Illinois law, can accept a detachable magazine. Detachable magazines not only assist law-abiding shooters in reloading their firearm in stressful defense circumstances, but in the case of some platforms, including the common AR-15, they are required to safely and quickly remedy malfunctions.

**ANSWER: State Defendants deny the allegations of this paragraph.**

45.    Encounters with criminal intruders in the home, where the AR-style rifle may be most useful, are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995); *see also* English, *National Firearms Survey, supra* at 9 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year). Both Kleck and English found that over 100,000 of these annual defensive gun uses were with rifles. *See* Kleck, Armed Resistance to Crime, supra, at 185, English, *2021 National Firearms Survey, supra*, at 11.

**ANSWER: State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

46.    Other common, lawful uses of the banned firearms are hunting and sport. At least a third of all gun-owners use a firearm for hunting or sport shooting, and recreational target shooting is a top reason for owning semiautomatic rifles like those banned by Illinois.

**ANSWER: State Defendants admit that semiautomatic rifles are used for hunting, sport shooting, and recreational target shooting. State Defendants deny the remaining allegations of this paragraph.**

47.    Here, again, the banned features of semiautomatic firearms—mischaracterized as assault weapons—serve lawful purposes. Folding and telescoping stocks, for example, allow for safe transportation, including in a hiking pack, an ATV, or a boat. These stocks also ease carriage over long distances while hunting.

**ANSWER: State Defendants deny the allegations of this paragraph.**

48.    Both telescoping stocks and protruding grips open hunting and sport-shooting to those for whom recoil poses a challenge. Detachable magazines have the same benefits in hunting and sport-shooting as they do in home defense—improved reloading and remedying of malfunctions. And flash suppressors promote accuracy in target-shooting and hunting (especially at dawn).

**ANSWER: Defendants admit that flash suppressors promote accuracy in target-shooting and hunting in low-light. State Defendants deny the remaining allegations of this paragraph.**

49.    By contrast, one use that is not common for so-called assault weapons is crime. According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes." Christopher Koper, et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004), U.S. DEP'T OF JUST., *available at* https://bit.ly/3hZiy5v. This has long been true. Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'"). Indeed, according to FBI statistics in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects. U.S. *Expanded Homicide Table 8, Crime in the United States*, DEP'T OF JUST. (FBI 2019), *available at* https://bit.ly/3HdolNd.

**ANSWER: State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

50.    The rifles that Illinois bans as "assault weapons" are, in all respects, ordinary semiautomatic rifles. To the extent they are different from other semiautomatic rifles, their distinguishing features make them safer and easier to use. But even if they are considered as a separate group of "assault weapons," they cannot be banned because they are not dangerous and unusual.

**ANSWER: State Defendants deny the allegations of this paragraph.**

51.     The arms banned as "assault weapons" by Illinois are common by all counts: (1) They are common categorically, as they are all semiautomatic in their function and operation; (2) they are common characteristically, as they are all popular configurations of arms (e.g., rifles) with varying barrel lengths and common characteristics like pistol grips; and (3) they are common jurisdictionally, lawful to possess and use in the vast majority of states now and throughout relevant history, for a wide variety of lawful purposes that include self-defense, proficiency training, competition, recreation, hunting, and collecting.

**ANSWER: State Defendants deny the allegations of this paragraph.**

52.     The Statute's ban on manufacturing, delivering, selling, importing, or purchasing an "assault weapon" is, therefore, a ban on keeping and bearing semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

**ANSWER: State Defendants deny the allegations of this paragraph.**

## II.     ILLINOIS' UNCONSTITUTIONAL BAN ON MAGAZINES.

53.     On January 10, 2023, the State of Illinois also made it a crime to "manufacture, deliver, sell, purchase," or "possess" magazines it considers "large capacity ammunition feeding devices." 720 ILL. COMP. STAT. 5/24-1.10(b) and (c) (the "Magazine Ban").

**ANSWER: State Defendants admit that 720 ILCS 5/24-1.10 generally makes it unlawful for any person within the State to knowingly manufacture, deliver, sell, or purchase or cause to be manufactured, delivered, sold, or purchased by another, a large capacity ammunition feeding device, subject to certain exceptions. State Defendants deny the remaining factual allegations of this paragraph.**

54.     The Statute defines "large capacity ammunition devices" as "(1) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns; or (2) any combination of parts from which a device described in paragraph (1) can be assembled." 720 ILL. COMP. STAT. 5/24-1.10(a)(1)-(2).

**ANSWER: State Defendants admit the allegations of this paragraph.**

55.     The Magazine Ban applies to "any person within [the State of Illinois]" and excepts from its ambit only peace officers, current and retired law enforcement officers, government agencies, prison officials, members of the military, and certain private security contractors. 720 ILL. COMP. STAT. 5/24-1.10(e)(1)-(7).

**ANSWER**: **State Defendants admit 720 ILCS 5/24-1.10 does not apply to certain persons and entities under certain circumstances set forth in 720 ILCS 5/24-1.10(e), including certain law enforcement officers, government agencies, prison officials, members of the military, and private security contractors.**

56.     Any ordinary person in Illinois who legally possessed a banned magazine before the law's enactment now can only possess that magazine on a very limited set of premises and must transport it only to and from those locations, unloaded and in a case. 720 ILL. COMP. STAT. 5/24-1.10(d).

**ANSWER**: **State Defendants admit 720 ILCS 5/24-1.10(d) provides in part: "Subsection (c) does not apply to a person's possession of a large capacity ammunition feeding device if the person lawfully possessed that large capacity ammunition feeding device before the effective date of this amendatory Act of the 102nd General Assembly, provided that the person shall possess such device only: (1) on private property owned or immediately controlled by the person; (2) on private property that is not open to the public with the express permission of the person who owns or immediately controls such property; (3) while on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair; (4) while engaged in the legal use of the large capacity ammunition feeding device at a properly licensed firing range or sport shooting competition venue; or (5) while traveling to or from these locations, provided that the large capacity ammunition feeding device is stored unloaded and enclosed in a case, firearm carrying box, shipping box, or other container." Defendants deny the remaining allegations of this paragraph.**

57.     A violation of the Magazine Ban carries "a fine of $1,000 for each violation." 720 ILL. COMP. STAT. 5/24-1.10(g).

**ANSWER**: **State Defendants admit the allegations of this paragraph.**

A.     **Illinois Has Criminalized a Common and Important Means of Self-Defense.**

58.     Although the State of Illinois describes magazines that can accept more than 10 rounds of ammunition for long guns and those that can accept more than 15 rounds for handguns as "large capacity magazines," this is a misnomer. Magazines capable of holding more than 10 or 15 rounds of ammunition are normal features of firearms in the United States and are more accurately described as "standard capacity magazines."

**ANSWER**: **State Defendants deny the allegations of this paragraph.**

59.     As many as *half a billion* standard capacity magazines holding over 10 rounds have been owned by Americans throughout the United States.

**ANSWER**: **State Defendants deny the allegations of this paragraph.**

60.     According to the 2021 National Firearms Survey, 48% of gun owners have owned magazines that hold more than 10 rounds. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned, supra*, at 22. Given the survey's estimate that 81.4 million Americans own firearms, approximately 39 million Americans have owned at least one magazine that holds more than 10 rounds. And that is a conservative estimate since only current gun owners were polled. Those individuals frequently owned more than one such magazine. In fact, Professor English found that American gun owners have owned as many as 269 million handgun magazines that hold over 10 rounds and an additional 273 million rifle magazines over that threshold for a total of 542 million such magazines. *Id*. at 24.

**ANSWER: State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

61.     Professor English's study also found that the average respondent who had owned a magazine over 10 rounds owned 4.4 handgun magazines capable of holding more than 15 rounds. In fact, handgun magazines of over 15 rounds were almost twice as popular as those with 11 to 15 rounds. *Id*. at 24. As a result, using Professor English's calculations, of the handgun magazines holding over 10 rounds of ammunition, as many as 170 million are capable of holding over 15 rounds.

**ANSWER: State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

62.     The prevalence of these magazines should not come as a surprise. Many popular handguns are typically sold with magazines holding more than 15 rounds of ammunition, and standard issue magazines for many popular rifles—including the most popular semiautomatic rifles in the country—have a capacity of more than 10 rounds.

**ANSWER: State Defendants deny the allegations of this paragraph.**

63.     Magazines such as these are common throughout the country. Indeed, a majority of states do not impose any restrictions on magazine capacity.

**ANSWER: State Defendants deny the allegations of this paragraph.**

64.     The ubiquity of standard capacity magazines among law-abiding Americans demonstrates that they are useful for lawful purposes such as self-defense and hunting. In fact, Professor English found that recreational target shooting (64.3%), home defense (62.4%), hunting (47%), and defense outside the home (41.7%) are the most common reasons cited by individuals who own standard capacity magazines that hold more than 10 rounds. *Id*. at 23.

19

**ANSWER: State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

65.     For some purposes, magazines over 10 rounds are in fact the overwhelming choice. According to the Firearm Industry Trade Association, over three-quarters of all magazines used with modern sporting rifles have a capacity of more than 10 rounds. *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report, supra*.

**ANSWER: State Defendants admit that the cited sources contain the assertions set forth in the sentence immediately preceding the citation. State Defendants deny the remaining factual allegations of this paragraph.**

66.     There is no historical tradition of prohibiting the manufacture, importation, or sale of magazines capable of holding more than ten rounds. Magazine bans were unknown in the United States before the 20th century. Bans like Illinois' are recent phenomena—indeed, until enactment of the Magazine Ban, Illinois did not restrict manufacturing, transferring, possessing, or using magazines of any capacity.

**ANSWER: State Defendants deny the allegations of this paragraph.**

67.     This is true even though firearms capable of holding multiple rounds have existed since the late 15th century, and firearms capable of firing more than ten rounds without reloading have existed at least since the late 16th century. *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 852–53 (2015) ("The first known firearm that was able to fire more than ten rounds without reloading was a sixteen-shooter created around 1580, using 'superposed' loads (each round stacked on top of the other.)").

**ANSWER: State Defendants admit that the cited source states that firearms capable of holding multiple rounds existed in the late 15th century, and firearms capable of firing more than 10 rounds without reloading have existed since the late 16th century. State Defendants deny the remaining factual allegations of this paragraph.**

68.     Multiple round firearm technology quickly developed from multi-shot wheel lock rifles to repeating, magazine-fed rifles, with the English military employing magazine-fed repeating firearms as early as 1658. Clayton E. Cramer & Joseph E. Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008) (citing A. V. B. Norman & Don Pottinger, ENGLISH WEAPONS & WARFARE: 449–1660 206–07 (1979)). The now famous "Puckle Gun," or "Defence Gun," was patented by James Puckle in 1718 in England and operated using "a Sett of Chambers ready Charg'd to be Slip'd on when the first Sett are pull'd off to be recharg'd." U.K. Patent No. 418 (filed May 15, 1718), *available at* https://bit.ly/3t5UGzu; Charles Foulkes, THE GUN-FOUNDERS OF ENGLAND: WITH A LIST

OF ENGLISH AND CONTINENTAL GUN-FOUNDERS FROM THE XIV TO THE XIX CENTURIES 32–33 (1937).

**ANSWER:** State Defendants admit that the cited sources contain the assertions set forth in this paragraph. State Defendants deny the remaining factual allegations of this paragraph.

69. Firearms capable of firing multiple rounds without reloading were well known to the founding generation. In 1777, Joseph Belton demonstrated a repeating rifle that could hold 16 rounds of ammunition to members of the Continental Congress. Robert Held, THE BELTON SYSTEMS, 1758 & 1784–86: AMERICA'S FIRST REPEATING FIREARMS 37 (1986). Belton also informed Congress that he could equip his rifle with as many as 20 rounds at a time. Id. at 17. And Meriwether Lewis carried a Girandoni air rifle, with a 22-round tubular, spring-loaded magazine on his expedition with William Clark. James B. Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

**ANSWER:** State Defendants lack sufficient knowledge or information to form a belief as to whether the cited sources contains the assertions set forth in this paragraph. State Defendants deny the remaining factual allegations of this paragraph.

70. "Repeater" firearms were extremely popular in the 19th century and came in many forms. The *New York Evening Post* in 1821 lauded Isaiah Jennings for inventing a repeater "important[t] for both public and private use," whose "number of charges may be extended to fifteen or even twenty." *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, in 59 Alexander Tilloch, THE PHILOSOPHICAL MAGAZINE AND JOURNAL COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE 467-68 (Richard Taylor ed., 1822).

**ANSWER:** State Defendants lack sufficient knowledge or information to form a belief as to whether the cited sources contains the assertions set forth in this paragraph. State Defendants deny the remaining factual allegations of this paragraph.

71. Around the time of the Civil War, multi-round rifles became commonplace. The 16-shot Henry Rifle, invented in 1861, was very popular. Soon after, the first Winchester rifle was produced and it could hold 17 rounds in the magazine with one more in the chamber. See Norm Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE FIREARMS AND THEIR VALUES 268 (6th ed. 1994). As a result, magazines holding over 10 rounds were commonly possessed already in the 1860s, 130 years before attempts to strictly regulate them would come along. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions, supra*, at 871.

**ANSWER:** State Defendants lack sufficient knowledge or information to form a belief as to whether the citations in this paragraph to the Norm Flayderman book accurately reflect the information contained in this source. State Defendants admit that this paragraph contains

an accurate citation to the David Kopel article. State Defendants deny the remaining factual allegations of this paragraph.

72.     Magazine capacity is important for average citizens seeking to defend themselves because most shots fired in armed altercations miss their target. Professional police, who are trained and must regularly practice with their firearms, miss their targets more often than not. In a fourteen-year study of the Dallas Police Department, for example, officers achieved an accuracy rate of just 35%, and half of all Dallas officers missed every shot they fired. Christopher M. Donner and Nicole Popovich, *Hitting (or missing) the mark: An examination of police shooting accuracy in officer-involved shooting incidents*, POLICING: AN INTERNATIONAL JOURNAL 42, no. 3 (2019), *available at* https://bit.ly/3LrpoJC. An average citizen forced to defend herself suddenly is not likely to have a higher accuracy rate than professional police officers would.

**ANSWER: State Defendants admit that the cited source in this paragraph contains the assertions set forth in the sentence immediately preceding the citation and further admit that most shots fired in armed altercations miss their target and that an average citizen is not likely to have a higher accuracy rate than professional police. State Defendants deny the remaining factual allegations of this paragraph.**

73.     In 2020, 14% of New York City police officers involved in incidents in which they fired their weapons to defend themselves and others fired more than 10 rounds. NEW YORK POLICE DEP'T, 2020 *Use of Force Report* at 27, *available at* https://on.nyc.gov/3GlxAKH (last accessed Jan. 12, 2023). Likely for this reason, the Magazine Ban exempts from its prohibitions manufacture, import, and sale to law enforcement agencies. 720 ILL. COMP. STAT. 5/24-1.10. But the average Illinoisan has just as much right as a police officer to defend herself with standard capacity magazines.

**ANSWER: State Defendants admit that the Use of Force Report contains the assertion set forth in the sentence immediately preceding the citation and further admit that 720 ILCS 5/24-1.10 exempts law enforcement officers from its prohibition on the manufacture, import, and sale of large capacity magazines. State Defendants deny the remaining factual allegations of this paragraph.**

74.     Unlike law-abiding citizens, violent criminals will not be meaningfully constrained by the State's Magazine Ban. Given the hundreds of millions of such magazines in circulation in the country (including in Illinois, where they remain widely possessed), it will not be difficult for violent criminals to acquire them through illegal sales or importation despite the State's ban. And unlike law-abiding citizens, violent criminals will have no compunction about violating Illinois' Magazine Ban. Even if violent criminals were effectively prevented from acquiring banned magazines, they could easily compensate by bringing multiple firearms or magazines with them to the scene of the crime. Their ability to do so is made possible by the fact that violent criminals, and not their law-abiding victims, choose the time and place of crimes and can plan accordingly.

**ANSWER: State Defendants deny the allegations of this paragraph.**

### III.   THE EFFECT ON PLAINTIFFS.

**Dane Harrel**

75.     Dane Harrel is a law-abiding, responsible, adult resident of St. Clair County, Illinois.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

76.     Harrel is a retired Lieutenant Colonel in the United States Air Force, and is currently employed as a civil servant for the USAF Air Mobility Command Headquarters in the Operations Directorate.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

77.     Harrel is a member of Plaintiffs ISRA, SAF and FPC.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

78.     Harrel owns semiautomatic firearms subject to the Firearms Ban, and also owns magazines that are subject to the Magazine Ban.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

79.     Since the Firearms Ban and Magazine Ban have gone into effect, Harrel is subject to the use restrictions and registration requirement associated with his grandfathered firearms and magazines and will be unable to replace them in kind as they wear out from normal use.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

80.     It is Harrel's present intention and desire to purchase semiautomatic firearms subject to the Firearms Ban, including a Ruger Mini-14 and a Springfield Armory M1A, and also to purchase additional standard capacity magazines subject to the Magazine Ban for use with the firearms he currently owns and to purchase additional firearms equipped with standard capacity magazines of that size. However, since the Firearms Ban and Magazine Ban has gone into effect, he is unable to purchase semiautomatic firearms subject to the Firearms Ban, or additional

magazines or firearms equipped with standard capacity magazines subject to the Magazine Ban lawfully, both for fear of prosecution and because the existence of the Firearms Ban and Magazine Ban, and Defendants' enforcement of them, will extinguish the legal market for those items in Illinois, and make it impossible for Harrel to acquire them. But for the Firearm and Magazine Bans and Defendants' enforcement thereof, Harrel would acquire semiautomatic rifles described in the Firearms Ban, and additional standard capacity magazines subject to the Magazine Ban.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

### C4 Gun Store

81.     C4 Gun Store, LLC, is an Illinois limited liability company with its principal place of business in Sparta, Randolph County, Illinois. C4 is owned and managed by Christopher A. Brooks, a member of Plaintiffs ISRA, SAF and FPC.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

82.     C4 Gun Store is a federally licensed firearms dealer. Until recently, it sold semiautomatic firearms of the type prohibited under the Firearms Ban, and standard capacity magazines capable of holding more than the limits allowed under the Magazine Ban.

**ANSWER: State Defendants admit that C4 Gun Store is a federally licensed firearms dealer. State Defendants lack sufficient information or knowledge to form a belief as to the truth of the remaining allegations of this paragraph.**

83.     It is C4 Gun Store's present intention and desire to continue to transfer, accept, and sell standard capacity magazines and firearms equipped with standard capacity magazines. However, since the Firearms Ban and Magazine Ban became effective on January 10, 2023, C4 Gun Store is no longer be able to sell semiautomatic firearms subject to the Firearms Ban, or standard capacity magazines, to customers without facing prosecution. As a result, it will lose profits from sales of subject semiautomatic firearms and standard capacity magazines as a direct result of the Firearms Ban and Magazine Ban, and its customers will be unable to purchase such firearms and magazines for self-defense and other lawful uses.

**ANSWER: State Defendants deny that semiautomatic firearms can no longer be sold to all customers. State Defendants lack sufficient information or knowledge to form a belief as to the truth of the remaining allegations of this paragraph.**

84.     In addition to risking prosecution, C4 Gun Store could also lose its federal firearms license if it were to violate the Firearms Ban and Magazine Ban.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

**Marengo Guns**

85.     Marengo Guns, Inc. is an Illinois corporation with its principal place of business in Marengo, McHenry County, Illinois. The President and owner of Marengo Guns is Dominic DeBock, a member of Plaintiffs ISRA, SAF and FPC.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

86.     Marengo Guns is a federally licensed firearms dealer. Until recently, it sold semiautomatic firearms of the type prohibited under the Firearms Ban, and standard capacity magazines capable of holding more than the limits allowed under the Magazine Ban.

**ANSWER: State Defendants admit that Marengo Guns is a federally licensed firearms dealer. State Defendants lack sufficient information or knowledge to form a belief as to the truth of the remaining allegations of this paragraph.**

87.     It is Marengo Guns's present intention and desire to continue to transfer, accept, and sell standard capacity magazines and firearms equipped with standard capacity magazines. However, since the Firearms Ban and Magazine Ban became effective on January 10, 2023, Marengo Guns is no longer be able to sell semiautomatic firearms subject to the Firearms Ban, or standard capacity magazines, to customers without facing prosecution. As a result, it will lose profits from sales of subject semiautomatic firearms and standard capacity magazines as a direct result of the Firearms Ban and Magazine Ban, and its customers will be unable to purchase such firearms and magazines for self-defense and other lawful uses.

**ANSWER: State Defendants deny that semiautomatic firearms can no longer be sold to all customers. State Defendants lack sufficient information or knowledge to form a belief as to the truth of the remaining allegations of this paragraph.**

88.     In addition to risking prosecution, Marengo Guns, Inc. could also lose its federal firearms license if it were to violate the Firearms Ban and Magazine Ban.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

## COUNT ONE

**42 U.S.C. § 1983 - Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the United States Constitution.**

89.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

**ANSWER: State Defendants incorporate by reference their answers to the foregoing paragraphs as if fully set forth herein.**

90.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

**ANSWER: State Defendants admit the allegations of this paragraph.**

91.     The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring).

**ANSWER: State Defendants admit the allegations of this paragraph.**

92.     "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (citations omitted).

**ANSWER: State Defendants admit that this paragraph contains a quote from *Heller*.**

93.     The firearms and magazines at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. They are, therefore, neither dangerous nor unusual and they cannot be banned.

**ANSWER: State Defendants deny the allegations of this paragraph.**

94.     42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

**ANSWER: State Defendants admit the allegations of this paragraph. State Defendants deny that they have deprived any of the Plaintiffs of their constitutional rights.**

95.     Plaintiffs Harrel, and C4 Gun Store and Marengo Guns on behalf of their customers, along with similarly situated members of ISRA, FPC, and SAF, are law-abiding, peaceable citizens of Illinois and the United States who wish to purchase and possess firearms that have been banned as "assault weapons" by Illinois, as well as ammunition magazines that have been banned as "large capacity" by Illinois.

**ANSWER: State Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations of this paragraph.**

96.    Defendants have violated Plaintiffs' right to keep and bear arms by precluding them from being able to manufacture, deliver, sell, import, purchase, or possess such rifles or being able to manufacture, deliver, sell, purchase, or possess such magazines, because Defendants enforce 720 ILL. COMP. STAT. 5/24-1.9(b) & (c); 5/24-1.10(b) & (c).

**ANSWER: State Defendants deny the allegations of this paragraph.**

97.    Defendants' enforcement of 720 ILL. COMP. STAT. 5/24-1.9(b) & (c); 5/24-1.10(b) & (c), and the statutes, regulations, customs, policies, and practices related thereto, is an infringement and an impermissible burden on Plaintiffs' right to keep and bear arms pursuant to the Second and Fourteenth Amendments to the United States Constitution.

**ANSWER: State Defendants deny the allegations of this paragraph.**

98.    Defendants' enforcement of 720 ILL. COMP. STAT. 5/24-1.9(b) & (c); 5/24-1.10(b) & (c), and the statutes, regulations, customs, policies, and practices related thereto forces Plaintiffs either to comply with the unconstitutional mandate—thereby being prevented from exercising their rights under the Second and Fourteenth Amendments to the United States Constitution—or be subjected to criminal prosecution.

**ANSWER: State Defendants deny the allegations of this paragraph.**

99.    Therefore, as a direct and proximate result of the above infringement and impermissible burden on Plaintiffs' Second and Fourteenth Amendment rights, Plaintiffs have suffered—and continue to suffer—from an unlawful and irreparable deprivation of their and, in the case of C4 Gun Store and Marengo Guns, their customers' fundamental constitutional right to keep and bear arms.

**ANSWER: State Defendants deny the allegations of this paragraph.**

## PRAYER FOR RELIEF

100.    WHEREFORE, Plaintiffs respectfully pray for the following relief:

    a.    Declare that the bans on commonly possessed semiautomatic firearms and ammunition magazines consisting of 720 ILL. COMP. STAT. 5/24-1.9(b) & (c); 5/24- 1.10(b) & (c), and all related laws, regulations, policies, and procedures, violates the right to keep and bear arms, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

b. Preliminarily and permanently enjoin each Defendant, each Defendant's respective employees, officers, agents, and representatives, and all those acting in concert  or participation with him or her, from enforcing the Illinois ban on semiautomatic firearms and standard capacity magazines, consisting of 720 ILL. COMP. STAT. 5/24- 1.9(b) & (c); 5/24-1.10(b) & (c) and all related regulations, policies, and/or customs designed to enforce or implement the same;

c. Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and,

d. Grant any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

**ANSWER: State Defendants deny that Plaintiffs are entitled to any relief and respectfully request that judgment be entered in their favor and against Plaintiffs including the costs of defending this suit, and any other relief this Court deems necessary and proper.**

**State Defendants deny all headings, unnumbered paragraphs, and each and every allegation in Plaintiffs' Complaint not previously admitted or otherwise qualified.**

## JURY DEMAND

**State Defendants demand a trial by jury in this matter for any and all claims that can be tried by jury.**

## AFFIRMATIVE DEFENSES

State Defendants Kwame Raoul, in his official capacity, and Brendan F. Kelly, in his official capacity, by and through their attorney, Illinois Attorney General Kwame Raoul, assert the following affirmative defenses to Plaintiffs' complaint:

1. Plaintiffs lack standing. The individual Plaintiffs lack standing because they have not alleged that they suffered an injury in fact from any of Defendant's alleged acts, including allegations of any actual, impending, or threatened criminal enforcement actions against Plaintiffs. The organizational Plaintiffs lack standing because they have not identified even a single member of each organizational Plaintiff who has standing in his or her own right and for whom the organizational Plaintiffs could assert associational standing.

2. Plaintiffs have failed to carry their burden of demonstrating the challenged portions of the Act regulate conduct covered by the "plain text" of the Second Amendment. *Bruen*, 142 S. Ct. at 2131. The weapons and accessories regulated by the Act are not "arms" in common use for self-defense and, as a result, are not covered by Second Amendment's "plain text". *Id.*; *McDonald*, 561 U.S. at 749–50 ("the Second Amendment protects the right to keep and bear arms for the purpose of self-defense"). In addition, Plaintiffs have not shown that

they intend to engage in conduct that is both regulated by the Act and covered by the "plain text" of the Second Amendment. *Bruen*, 142 S. Ct. at 2131.

3. In the alternative, even if Plaintiffs can meet their textual burden under *Bruen*'s first step, the Act fits well within the Nation's historical tradition of regulating "dangerous or unusual weapons." *Id.* The Act is relevantly similar to historical analogues from this tradition in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. As a result, Plaintiff's claim that the Act infringes the Second Amendment fails.

Dated: March 16, 2023

Respectfully submitted,

Kathryn Hunt Muse                                 /s/ *Laura K. Bautista*
Christopher G. Wells                              Laura K. Bautista
Hal Dworkin                                       *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General           Office of the Illinois Attorney General
100 W. Randolph Street, 12th Floor                500 S. Second Street
Chicago, IL 60601                                 Springfield, IL 62701
312-814-3000                                      217-782-5819
                                                  Laura.Bautista@ilag.gov

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on March 16, 2023, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

/s/ *Laura K. Bautista*
Laura K. Bautista
Assistant Chief Deputy Attorney General