## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CALEB BARNETT, *et al*,                )
                                        )
      Plaintiffs,                   )
vs.                                     )     Case No. 3:23-cv-209-SPM
                                        )
KWAME RAOUL, *et al.*,                  )     ** designated Lead Case
                                        )
      Defendants.                   )
_____ )
**DANE HARREL, *et al*,**               )
                                        )
      **Plaintiffs,**               )
                                        )     **Case No. 3:23-cv-141-SPM**
**vs.**                                 )
                                        )
**KWAME RAOUL, *et al*,**               )
                                        )
      **Defendants.**               )
_____ )
JEREMY W. LANGLEY, *et al*,             )
                                        )
      Plaintiffs,                   )
                                        )
vs.                                     )     Case No. 3:23-cv-192-SPM
                                        )
BRENDAN KELLY, *et al*,                 )
                                        )
      Defendants.                   )
_____ )
FEDERAL FIREARMS LICENSEES              )
OF ILLINOIS, *et al*,                   )
                                        )
      Plaintiffs,                   )
                                        )
vs.                                     )     Case No. 3:23-cv-215-SPM
                                        )
JAY ROBERT "J.B." PRITZKER, *et al*,    )
                                        )
      Defendants.                   )

**PLAINTIFFS DANE HARREL, C4 GUN STORE, LLC, MARENGO GUNS, INC.,
ILLINOIS STATE RIFLE ASSOCIATION, FIREARMS POLICY COALITION, INC.,
and SECOND AMENDMENT FOUNDATION'S REPLY TO DEFENDANTS RAOUL
AND KELLY'S RESPONSE
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ..........................................................................................................1

ARGUMENT ...................................................................................................................1

   I.   The Firearm Ban is unconstitutional under *Bruen*. ...............................................1

         a.   The banned firearms are "Arms" within the plain text of the
              Second Amendment. ....................................................................................2

         b.   The State has not historically justified the Firearms Ban. .......................3

             i.   The banned firearms are in common use for lawful purposes. ...................4

            ii.   Historical restrictions on dangerous weapons do not support the
                Firearms Ban..............................................................................................7

           iii.   The State's additional policy arguments are irrelevant to the
                historical analysis of the Firearms Ban.....................................................11

   II.   The Magazine Ban is unconstitutional under *Bruen*.......................................13

   III.   The other factors justify entry of an injunction. .........................................14

   IV.   Final judgment is appropriate. .......................................................................15

CONCLUSION.................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page**

*ANJRPC v. Att'y Gen. N.J.*, 910 F.3d 106 (3d. Cir. 2018) ..............................................14

*Bliss v. Commw.*, 12 Ky. 90 (1822) ...................................................................................9

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)....................................3, 4, 5, 6, 8, 12

*Cockrum v. State*, 24 Tex. 394 (1859) ...............................................................................9

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................. *passim*

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) ...........................................11

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) ..........................................................5

*Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022) ........................................................5, 11

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..............................................6, 15

*Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015)............................2

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ........................................................ 14

*Heller v. Dist. of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ...................................5, 14

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)...........................................................15

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ......................................................................................... *passim*

*Nunn v. State*, 1 Ga. 243 (1846)........................................................................................ 8

*People v. Webb*, 131 N.E.3d 93 (Ill. 2019)........................................................................5

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018).................................................5

*Staples v. United States*, 511 U.S. 600 (1994) ...........................................................7, 11

*Wilson v. Cook Cnty.*, 937 F.3d 1028 (7th Cir. 2019)........................................................2

**Constitution**

U.S. CONST. amend. II .........................................................................................................2

**Statutes**

1933 S.D. Sess. Laws 245–47, ch. 206, §§ 1–8................................................................11

**Other Authorities**

Elyssa Cherney, *Sheriff: Man who witnessed stabbing used 'threat' of AR-15-style rifle to
    stop Oswego attack*, CHICAGO TRIBUNE, (Feb. 27, 2018), https://bit.ly/3Na7zRP.............6

James Alan Fox & Monica J. DeLateur, Mass Shootings in America: Moving Beyond
    Newtown, 18 HOMICIDE STUD. 127 (2014), *available at* http://goo.gl/Ji7Yyp.................12

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue:* Stenberg *Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285 (2009)........................................................................................ 13

RANDOLPH ROTH, AMERICAN HOMICIDE (2012)..........................................................................12

## INTRODUCTION

Following *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), this Court's task is a straightforward one. The Court need only assess whether the firearms and magazines recently banned by Illinois are in "common use" for lawful purposes and, therefore, are protected by the Second Amendment's "unqualified command." *Id.* at 2126, 2128. The record evidence establishes a dispositive fact—there can be no reasonable dispute that the firearms and magazines banned by Illinois are among the most popular firearms and magazines in the country and their owners use them in overwhelming numbers for self-defense.

The State's response is largely a policy position paper devoid of relevance to the framework established by *Heller* and *Bruen* to assess the constitutionality of state laws. No matter how many policy justifications the State may summon, the Second Amendment, by its "enshrinement" in the Constitution "necessarily takes certain policy choices off the table." *Dist. of Columbia v. Heller*, 554 U.S. 570, 636 (2008). The only constitutionally acceptable justification for banning certain types of arms is if the State demonstrates that such arms are both "dangerous and unusual." *Bruen*, 142 S. Ct. at 2128. The State has failed to do so. Instead, the State searches for other historical traditions, but it cannot identify any tradition of banning the most popular rifles or magazines in contemporary society. "The Second Amendment protects the possession and use of weapons that are 'in common use at the time.' " *Id.* (quoting *Heller*, 554 U.S. at 627). As the banned firearms and magazines are indisputably that, this Court should enter judgment for Plaintiffs.

## ARGUMENT

### I.  The Firearm Ban is unconstitutional under *Bruen*.

*Bruen* clarified the governing framework for the Second Amendment. There is no room

left for the "means-end scrutiny" of other appellate courts or the "different framework," Defendants' Resp. in Opp'n to Pls.' Mots. For Prelim. Inj. at 14–15 (S.D. Ill. March 2, 2023) ("State Br."), that the Seventh Circuit embraced in *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015) and in *Wilson v. Cook Cnty.*, 937 F.3d 1028 (7th Cir. 2019). For example, in *Friedman* and *Wilson*, the Seventh Circuit *did not* consider whether the banned firearms were in common use for lawful purposes. Instead, the court thought "it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense." *Friedman*, 784 F.3d at 410 (quoting *Heller*, 554 U.S. at 622–25). Each of these factors has been rejected by the Supreme Court in *Bruen*. *See* 142 S. Ct. at 2143 (noting that weapons that are protected are those "in common use *today*" (emphasis added)); *id.* at 2127 (reiterating the Second Amendment "does not depend on service in the militia"); *id.* at 2129 (rejecting "case-by-case" assessment of burden on right to self-defense). Each are therefore irrelevant. And each case is thus no longer controlling nor even persuasive.

### a. The banned firearms are "Arms" within the plain text of the Second Amendment.

In *Bruen*, the Supreme Court articulated a framework for determining if firearms regulations are constitutional. It begins with the text. If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then that conduct is presumptively protected. *Bruen*, 142 S. Ct. at 2126. The plain text of the Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court has defined the plain meaning of all of the key terms in *Heller* and *Bruen*. "The people" means "all Americans," to bear simply means to "carry," and most relevant here, "Arms" includes "all instruments that constitute

bearable arms." *Heller*, 554 U.S. at 580–82, 584 (2008); *see also id.* at 581 ("Samuel Johnson's dictionary defined 'arms' as '[w]eapons of offence, or armour of defence' " (quoting 1 Dictionary of the English Language 106 (4th ed.))). *Bruen* reaffirmed that the word "Arms" as a "prima facie" matter extends to modern firearms "even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).

The State attempts to squeeze in a variety of inapposite arguments into this textual inquiry. *See* State Br. 22–39. But *none* of these arguments are relevant to interpreting the *text* of the Second Amendment. There is nothing in the *text* of the Second Amendment that makes any distinction amongst types of "Arms." The text simply protects bearable arms. *Heller*, *Caetano*, and *Bruen* all establish that the State's ability to restrict "dangerous and unusual weapons" is a matter of "historical tradition." *Heller*, 554 U.S. at 627; *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016); *Bruen*, 142 S. Ct. at 2128. In fact, when *Bruen* articulated "*Heller*'s methodology," the Court used the historical regulation of "dangerous and unusual weapons" as the very exemplar of the proper analysis. Text first, then "historical understanding . . . to demark the limits on the exercise" of the Second Amendment right. *Bruen*, 142 S. Ct. at 2128. From this "historical tradition," *Bruen* reaffirmed that States may prohibit "dangerous and unusual weapons" and also "that the Second Amendment protects the possession and use of weapons that are in common use at the time." *Id.* (quoting *Heller*, 554 U.S. at 627). This Court must consider the State's purported justifications for its firearms ban in the context of history where the State bears the burden.

**b.  The State has not historically justified the Firearms Ban.**

The historical analysis required under *Heller* and *Bruen* "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's . . . historical understanding" as demonstrated by "an enduring American tradition of state regulation." *Bruen*,

142 S. Ct. at 2131, 2155. In the context of bans on bearable arms, the Supreme Court has already done the historical spadework by identifying the only relevant enduring tradition: a State may justify its ban only by demonstrating the banned arms are "dangerous and unusual weapons." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). A firearm that is in "common use today" is, by definition, outside of this historical tradition and may not be banned. *Bruen*, 142 S. Ct. at 2143; *see also Heller*, 554 U.S. at 627; *Caetano*, 577 U.S. at 411–12.

### i. The banned firearms are in common use for lawful purposes.

The State does not contest the validity of three figures, and these are dispositive. The State does not contest that "over 24 million AR-15 or similar rifles have been produced for the U.S. market." Compl. ¶ 35 (Jan. 17, 2023); State Br. at 36. The State does not contest that, in recent years, these firearms have been the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. Pls.' Mot. for Prelim. Inj. at 12, Doc. 16 (Jan. 25, 2023) ("Opening Br."). And less than "1% [of crime guns] are assault rifles," with less than .8 percent of state and federal prisoners reporting the using of *any* kind of rifle during the offense for which they were serving time. Opening Br. at 13. These are incredibly common arms sold in lawful commerce with which almost *no* crimes are committed.

To argue otherwise, the State makes several unavailing arguments. First, the State spends several pages on an argument that *Heller* announced was "bordering on the frivolous": the State asserts that the banned firearms were not in common use in 1791 or 1868, thus they can be banned now. State Br. 22–26. *Heller*, *Caetano*, and *Bruen* all rejected such an argument—this Court must do the same. Opening Br. at 8–9. The Second Amendment extends to "thoroughly modern

invention[s]." *Caetano*, 577 U.S. at 412. What matters is whether the firearms sought to be banned are in "common use *today*." *Bruen*, 142 S. Ct. at 2143 (emphasis added).

Second, the State argues that "sales and ownership numbers do not show commonality or use." State Br. at 34. But the weight of authority (and common sense) says otherwise. In *Caetano*, the Supreme Court remanded for further proceedings a case involving stun guns. As Justice Alito noted, there were "hundreds of thousands of Tasers and stun guns"; they were thus "widely owned and accepted as a legitimate means of self-defense across the country" despite being "less popular than handguns." *Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment). The Massachusetts Supreme Judicial Court invalidated the ban on these common arms on remand. *Ramirez v. Commonwealth*, 94 N.E.3d 809, 814 (Mass. 2018). The Illinois Supreme Court followed suit finding it "futile" for the State to argue that such arms—held in the hundreds of thousands—were "uncommon." *People v. Webb*, 131 N.E.3d 93, 96 (Ill. 2019). This is because "[c]ommonaltiy is determined largely by statistics." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), vacated and remanded sub nom. *Duncan v. Bonta*, 49 F.4th 1228, 1232 (9th Cir. 2022); *see also* Opening Br. at 11 (collecting cases). And, the State cannot deny that the AR-15 is America's "most popular semi-automatic rifle," *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller II*"). Such arms are in common use.

Third, the State makes the related argument that these arms have not been *used* in self-defense situations, therefore they are not *used* for lawful purposes. Yet the right enshrined by the Second Amendment is not limited to discharging a firearm for self-defense, rather it is the right "of being armed and ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 584). In this way, a firearm possessed for self-defense is used for self-defense without ever being fired for that specific

purpose. *See* Opening Br. at 12 (collecting statistics). After all, as the Seventh Circuit explained in *Ezell*, the Second Amendment protects conduct by individuals "who own firearms and want to maintain proficiency in their use via target practice at a firing range." *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011). Their right to possess firearms does not evaporate if owners never (fortunately) have to test their marksmanship in a self-defense situation. The same is true here— the State cannot ban firearms that are possessed by law-abiding citizens to be ready for self-defense. In all events, it is easy to find examples of banned rifles actually being used for self-defense. *See, e.g.*, Elyssa Cherney, *Sheriff: Man who witnessed stabbing used 'threat' of AR-15-style rifle to stop Oswego attack*, CHICAGO TRIBUNE, (Feb. 27, 2018), https://bit.ly/3Na7zRP. It does not matter whether, in fact, AR-15s are frequently or infrequently discharged for self-defense. What matters is that the American people have adopted the AR-15 or other semiautomatic rifle as a favored tool for self-defense and other lawful purposes, and it is not up to the State, or anyone else, to demand proof that that choice was wise. *See, e.g.*, *Heller*, 554 U.S. at 628; *Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment); *see also* Opening Br. 11–12 (collecting statistics).

Fourth, the State makes an argument that the banned firearms should not be considered common and possessed for lawful use because they "are for war—not individual self-defense." State Br. 27–34. This argument is a policy proposal dressed up as legal analysis. The fact that the banned firearms are in common use ends the inquiry. And there are material differences between the banned firearms and the fully automatic firearms used in the military. *See* Opening Br. at 14–15. But even if this Court were to credit the State's claims about the relative dangerousness of the banned firearms in contrast to other firearms, this is only half the requisite analysis. It is not enough for firearms to be dangerous; they must also be *unusual* based on the practices of Americans

6

nationwide. *Heller*, 554 U.S. at 628; Opening Br. at 8–9. As discussed above, the most popular rifles in America are the opposite of unusual.

In sum, as the Supreme Court has long recognized, semiautomatic firearms, including those banned by the State, "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994). Banning possession of such common firearms is not constitutionally permissible.

### ii. Historical restrictions on dangerous weapons do not support the Firearms Ban.

Retreating from contesting the commonality of the firearms it has banned, the State argues that it can nevertheless justify its ban because of a tradition of "regulating dangerous and unusual weapons associated with increased criminality and violence." State Br. at 43. But none of the State's purported analogues are "relevantly similar." Two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a "modern-day regulation" is "analogous enough" to "historical precursors" that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id.*

To begin with, the State's analogues fail because the State has not identified a single law that would permit the State to outlaw possession of a "dangerous" weapon that was among the most popular contemporary choices of citizens lawfully seeking to exercise their Second Amendment rights. As noted, there is no tradition of banning "dangerous" and common weapons. In full acknowledgment that it lacks such evidence is the State's half-hearted argument, relegated to a footnote, that it only needs to prove the weapons it bans are dangerous *or* unusual. State Br. 43–44 n.34. Regardless of the State's erroneous historical evidence, this Court is bound by *Heller*,

*Caetano*, and *Bruen* which establish that the test is conjunctive. *Heller*, 554 U.S. at 627; *Caetano*, 577 U.S. at 412; *id.* at 417 (Alito, J., concurring in the judgment); *Bruen*, 142 S. Ct. at 2128; *id.* at 2143; *id.* at 2162 (Kavanaugh, J., concurring). Even if the test were disjunctive, the State would still fail. That is because the firearms would need to be unusually dangerous *compared to commonly possessed arms*. Since these arms are commonly possessed, that plainly is not the case.

Even setting aside this critical distinction, the State's examples of regulatory responses are inapposite. The State places great weight on nineteenth century restrictions regulating Bowie knives "and the widespread regulatory response" to those and similar weapons. State Br. at 45. The State points to 39 jurisdictions that enacted restrictions on Bowie knives in some manner at some point in the nineteenth century. State Br. at 46. But notably the State presents exactly *zero* antebellum statutes that completely banned possession of Bowie knives. *See* Decl. of Robert J. Spitzer, Doc. 37–12 at Page ID #1466–67 (March 2, 2023) ("Spitzer Decl.").[1] Instead, the antebellum jurisdictions banned only one form of carry (concealed), taxed them, or increased the punishments related to crimes committed with such weapons. The State here has chosen none of those regulatory paths with its Firearms Ban.

Contrary to the State's argument, there is evidence that a "categorical restriction[]" on Bowie knives was understood to be barred by the right to bear arms for self-defense. In *Nunn v. State*, 1 Ga. 243 (1846), the Georgia Supreme Court addressed the State's 1837 law banning, *inter alia*, the concealed carry of pistols and Bowie knives. The Court explained that "[w]e are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of

---

[1] The State cites Indiana's 1859 law as an example of a "no carry" law, but this is a misreading of the statute as it banned concealed carry generally, but open carry *only if* "with the intent or avowed purpose of injuring his fellow man." *See* 1859 Ind. Acts 129, Doc. 37-15 at Page ID #1618 (March 2, 2023).

self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly,* is in conflict with the Constitution." *Id*. at 251. In other words, to the extent the act purported to *entirely* ban the carry of the listed arms, it was unconstitutional. In *Heller*, the Supreme Court repeatedly cited *Nunn* as an exemplar of the Second Amendment's original meaning, 554 U.S. at 612, 626, 629, and *Bruen* explained that *Nunn* "is particularly instructive," 142 S. Ct. at 2147.

Other antebellum courts held similarly. The Kentucky Supreme Court held that the State's ban on concealed carry of arms, including large knives, was unconstitutional. *Bliss v. Commw.*, 12 Ky. 90, 93 (1822). The Texas Supreme Court in 1859 held that "[t]he right to carry a bowie-knife for lawful defense is secured, and *must be admitted.*" *Cockrum v. State*, 24 Tex. 394, 402 (1859) (emphasis added). The court explained this was so, despite the fact that it was "an exceeding[ly] destructive weapon" and an "instrument of almost certain death." *Id*. at 402–03. Instead of banning possession, the court held that Texas was permitted to increase the penalty for *crimes* committed with Bowie knives, but it could not ban possession by law-abiding citizens altogether. *Id.* This contemporary evidence of the "perceived [il]legality" of complete bans of such weapons renders such restrictions disanalogous to the modern prohibition. *Bruen*, 142 S. Ct. at 2155.

Lacking any "relevantly similar" analogues from the antebellum era and the decades when the Bowie knife was an "emergent weapon," State Br. at 46, the rest of the State's Bowie-knife-related evidence comes much later during the latter-half of the nineteenth century, most coming near the dawn of the twentieth century. This evidence comes too late to be informative of the Second Amendment's scope. *Bruen*, 142 S. Ct. at 2137. What is more, the State lacks any evidence that Bowie knives were commonly possessed at the times the statutes in question were enacted.

The State next turns to bans on the concealed carry of pistols and revolvers. The State

claims that these are evidence of how "legislatures responded" to the "advancements in firearms technology" that "coincided with escalating violence." State Br. at 47–48. If so, this evidence is hardly analogous to the Firearms Ban. The State concedes that these were *concealed carry* restrictions—not outright bans. As explained in *Bruen*, these laws "reveal[] a consensus that States could *not* ban public carry altogether." 142 S. Ct. at 2146. If states cannot ban all forms of carry, they could not ban possession entirely—one must possess an arm in order to carry it in some form.

Perhaps recognizing that reliance on concealed carry restrictions undermines, rather than supports, the Firearms Ban, the State attempts to claim that it is proper for a State to "mov[e] from carry-related regulations to sale and possession bans" because states began to do so for certain classes of weapons in a "regulatory shift" in the "early 20th century." State Br. at 61–62. The State seemingly asserts that the historical "how" and "why" are irrelevant because of the State's alleged regulatory police power. But, of course, *Bruen* rejects that very kind of reasoning. *Bruen* held unconstitutional New York's licensing regime dating to 1911. 142 S. Ct. at 2122. This "early 20th century" regulatory shift was unconstitutional as it was disanalogous to what came before: it neither burdened the right to bear arms in a similar manner nor for similar reasons. So too here. Innovations from the 20th century are not accorded any weight unless they are consistent with the original public meaning of the Second Amendment. *Id.* at 2154 n.28.

The State's early twentieth century evidence falls short for another reason: to the extent bans on fully automatic machine guns are consistent with the Second Amendment it is because those were (and remain) dangerous and unusual weapons; they were not in common use. *See Heller*, 554 U.S. at 627. By contrast, as discussed, the banned firearms at issue here *are* in "common use *today*." *Bruen*, 142 S. Ct. at 2143 (emphasis added). Furthermore, the historical tradition from the twentieth century shows that the vast majority of regulations targeted *automatic*

10

weapons. In the eight jurisdictions the State claims to have also regulated "semiautomatic" firearms, those restrictions are disanalogous as these generally did not ban these firearms outright.[2] For instance, South Dakota only restricted possession when a machine gun was used during a crime of violence or for "offensive or aggressive purpose." 1933 S.D. Sess. Laws 245–47, ch. 206, §§ 1–8. Virginia similarly limited its regulation. Doc. 37-15, Page ID #1673–74. Massachusetts only required that a "license" be issued to possess a "machine gun." *Id.* at Page ID #1659–60. Congress (legislating for the District of Columbia), Rhode Island, Michigan, Ohio, and Virginia only banned semiautomatic firearms *if, and only if* there was a magazine capacity in excess of at least 12 rounds. *See id.* at Page ID #1661–74. Such magazine restrictions cannot support an outright ban on possession of these firearms (and do not support the magazine ban either). This leaves the State with a single law from a single jurisdiction (Minnesota) banning possession of semiautomatic firearms. This Court may not "stake [its] interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence" that semiautomatic firearms were simply not banned in the early twentieth century. *See Bruen*, 142 S. Ct. at 2153. What is more, even if semiautomatic firearms were uncommon when that statute was enacted nearly 100 years ago, they unquestionably are not today.

### iii. The State's additional policy arguments are irrelevant to the historical analysis of the Firearms Ban.

---

[2] It is not even clear these statutes used "semiautomatic" in way in which the banned firearms are "semiautomatic." Virginia used the term "semiautomatically" when referring to both a firearm discharged "by *a single function of the firing device*" and a firearm that fired more than "sixteen shots or bullets" "rapidly, automatically, semi-automatically." Doc. 37-15, Page ID #1674. South Dakota similarly used the word "semiautomatic" by reference to a single function of the firing device. 1933 S.D. Sess. Laws 245. But firing multiple shots with a single trigger pull is, by definition, automatic, not semiautomatic action. *See Staples*, 511 U.S. at 602 n.1. It would seem to suggest that these terms of art have not always been used carefully, or with the same meaning, in these statutes, and perhaps more of the laws identified by the State were intended only to target automatic weapons. This is why the State apparently disagrees with its own purported expert by correctly acknowledging that Illinois, Louisiana, and South Carolina's regulations did not apply to semiautomatic weapons. *Compare* State Br. 50 with Ex. B. to Spitzer Decl. at Page ID #1312–1314; *see also Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1152 (S.D. Cal. 2019) ("These three statutes are examples of machine gun bans that are prohibited because of their ability to continuously fire rounds with a single trigger pull, rather than their overall firing-capacity."), vacated and remanded sub nom. *Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022).

The State asserts a few additional policy grounds to justify its firearms ban. None is relevant to this case. First, the State argues that the Firearms Ban "has not deprived the Individual Plaintiffs of the means to defend themselves. Having slightly fewer options at the gun store is not a meaningful Second Amendment burden." State Br. at 54. Despite years of erroneous court of appeals decisions, the Supreme Court squarely foreclosed such a burden analysis that explicitly or implicitly asks "whether the right is *really worth* insisting upon." *Bruen*, 142 S. Ct. at 2129 (emphasis in original). Notably, the District of Columbia made a similar argument in *Heller*, arguing that its ban wasn't so bad (and thus constitutional) because other firearms, such as long guns, were allowed to be possessed. *Heller*, 554 U.S. at 629. This was "no answer," the Supreme Court said. *Id*.; *see also Caetano*, 577 U.S. at 421 (Alito, J., concurring in the judgment). The Supreme Court concluded that "whatever the reason" individuals preferred to use the banned firearms, these handguns were in common use, "the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629. That the banned firearms in this case are, by some measures, the *second* most popular arms for self-defense does not change the analysis. These weapons are in common use and the Second Amendment does not permit their complete prohibition.

Second, the State makes the claim that the Firearms Ban may be justified because of the modern rise of mass shootings. *See, e.g.,* State Br. 40–42. This argument is wrong on the facts and wrong on the law. First, gun violence—even mass gun violence—is not a new problem. James Alan Fox & Monica J. DeLateur, Mass Shootings in America: Moving Beyond Newtown, 18 HOMICIDE STUD. 127, 129 (2014), available at http://goo.gl/Ji7Yyp (showing a consistent rate of mass shootings from 1976-2011); see also RANDOLPH ROTH, AMERICAN HOMICIDE 162, 171, 185 (2012) (giving examples of high rates of homicide in the latter half of the 1700s). Second, the

banned firearms do not have greater firepower than many legal firearms—in fact, they have significantly less than many legal hunting rifles. The energy of a bullet is a function of both its mass and velocity, and shots from an AR-15, which typically fires relatively light .223 ammunition, are actually three or four times less powerful than shots from many common deer hunting rifles that use .30-06 caliber ammunition. *See* Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue:* Stenberg *Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1303–04 (2009). Third, contrary to the State's claims, the banned rifles are almost never used in crime generally and only a small fraction of mass shooters (an exceedingly rare form of crime) use them. *See supra*; *see also* Opening Br. at 10–12.

This argument is wrong on the law because the State asks this Court to "engage in independent means-end scrutiny under the guise of an analogical inquiry." 142 S. Ct. at 2133 n.7. *Bruen* forbids it. While the State attempts to turn the Court's focus to the problems Illinois's legislature was concerned with when it passed the ban in the hope that the Court will defer to the State's "difficult empirical judgment[], . . . it is not deference that the Constitution demands here." *Bruen*, 142 S. Ct. at 2131. Instead, it is the "balance—struck by the traditions of the American people—that demands [the Court's] unqualified deference." *Id*. The American people have selected the banned arms as their favored tools for self-defense, and that controls this case.

## II.    The Magazine Ban is unconstitutional under *Bruen*.

The State's briefing largely ignores the separate analysis of the Magazine Ban. *See* Opening Br. 16–19. To the extent the State makes Magazine Ban-specific arguments, these are fundamentally flawed. First, the State argues that accessories like magazines are not protected by the Second Amendment's text. Yet when interpreting "Arms," the Supreme Court in *Heller* explained that "[j]ust as the First Amendment protects modern forms of communications, and the

Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, *to all instruments that constitute bearable arms.*" *Heller*, 554 U.S. at 582 (citations omitted) (emphasis added); *see also Bruen*, 142 S. Ct. at 2132. The State's only argument is that magazines *above a certain capacity* are not *really* necessary. *See* State Br. 17–22. But in the textual analysis, that is irrelevant. What matters is whether "magazines," like bullets and barrels are "necessary to render those firearms operable." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). Because magazines in general are integral components of bearable arms, they fall within the scope of the Amendment. *See ANJRPC v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018). The question of *limitations* on magazines is, like all limitations on the Second Amendment, a question of history.

Second, the only historical tradition of regulation competent to justify a ban on certain magazines would be if such magazines are not in common use. But the State presents *zero* evidence to contradict that the magazines it has banned are in common use. *See* Opening Br. 16–19. As the D.C. Circuit once explained, "[t]here may well be some capacity above which magazines are not in common use but, if so . . . that capacity surely is not ten." *Heller II*, 670 F.3d at 1261.

Third, the State's search for analogues for its Firearms Ban turned up empty, so too is its evidence to justify its Magazine Ban. Indeed, throughout the long history of semiautomatic firearms, the State can only point to a handful of laws that implemented restrictions based on capacity of a semiautomatic firearms and *not one* reduced capacity down to 10 rounds. And it points to *zero* handgun capacity restrictions from *any* relevant time period. "[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

## III.   The other factors justify entry of an injunction.

The remaining factors favor entry of an injunction. Despite the State's attempts to

undermine *Ezell*, it remains the case that a violation of Plaintiffs' Second Amendment rights is presumptively irreparable. The State's argument otherwise boils down to a merits dispute about whether the banned arms are possessed "for protection." State Br. at 64. As discussed above, they are. Plaintiffs' harm is properly regarded as irreparable and having no adequate remedy at law. *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011). "The remaining consideration for preliminary injunctive relief is the balance of harms." *Id.* at 710. The State argues that the injunction should not issue because of "public safety." State Br. at 68–69. But the State has no interest in enforcing an unconstitutional law. Moreover, "[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications." *Bruen*, 142 S. Ct. at 2126 n.3 (internal quotation marks omitted). The Court should not permit violations of the right to continue as a reaction to those implications because to do so would be to impermissibly treat the Second Amendment as a "second-class right." *Id.* at 2156.

## IV.    Final judgment is appropriate.

Plaintiffs have requested that this court should advance the trial on the merits and consolidate it with the preliminary injunction, or, in the alternative, grant summary judgment to Plaintiffs. The State only half-heartedly argues to the contrary; the State does not identify *a single fact* that it has not presented that it would find necessary for resolution of this case. *See* State Br. at 69. Nor could it—"the constitutionality of the challenged statutory provisions does not present factual questions." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' preliminary injunction, or alternatively either advance the trial on the merits and consolidate it with the preliminary injunction or grant summary judgment to Plaintiffs.

Respectfully submitted, this 23rd day of March 2023.


/s/ David G. Sigale
Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

*Attorney for Plaintiffs*