**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

CALEB BARNETT, BRIAN NORMAN,
HOOD'S GUNS & MORE, PRO GUN &
INDOOR RANGE, and NATIONAL
SPORTS SHOOTING FOUNDATION,
INC.,

        *Plaintiffs*,

    v.

KWAME RAOUL, Attorney General of
Illinois, and BRENDAN F. KELLY,
Director of the Illinois State Police,

        *Defendants*.

No. 3:23-cv-00209

**REPLY IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Under *Bruen* and *Heller*, the irreducible minimum of the Second Amendment is this:  States may not ban arms that millions of Americans possess for lawful purposes.  That most basic of principles dooms HB 5471.  The Court should grant Plaintiffs' motion for a preliminary injunction.

**I.        Plaintiffs Are Likely To Succeed On The Merits.**

The Second Amendment secures "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  And as the Supreme Court made clear last year, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022).  The first question this Court must ask in analyzing HB 5471 is thus whether the firearms and magazines the statute bans fit within "the Second Amendment's definition of 'arms.'"  *Id.* at 2132.  After all, one can neither "keep" nor "bear" what one cannot acquire or possess in the first place.  If the answer to that first question is yes (which it plainly is, *see infra* pp.1-6), the Court must then ask whether the firearms and magazines HB 5471 bans are "highly unusual in society at large" today.  *Id.* at 2143 (quoting *Heller v. Dist. of Columbia*, 554 U.S. 570, 627 (2008)).  If the answer to *that* question is no (which it plainly is, *see infra* pp.6-11), then the inquiry is over and the statute is invalid, because a state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose."  *Heller*, 554 U.S. at 628; *see also Bruen*, 142 S.Ct. at 2128, 2143 ("[T]he Second Amendment protects … weapons that are unquestionably in common use today.").

**1.        The firearms and magazines HB 5471 bans are "Arms."**

*Bruen* and *Heller* leave no doubt about the meaning of "Arms":  "The 18th-century meaning is no different from the meaning today…. '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"  *Heller*, 554 U.S. at 581.  "[T]he Second Amendment's definition of 'arms'" thus presumptively covers all "modern instruments that facilitate armed self-defense."  *Bruen*, 142 S.Ct. at 2132.

(a) The rifles, pistols, and shotguns that HB 5471 flatly bans, *see* 720 ILCS 5/24-1.9(a)(1), (b)-(c), obviously fit that bill.  Indeed, if the most ubiquitous firearms in America do not even fall within the ambit of the Second Amendment, then *Bruen*, *Heller*, and the Amendment itself mean nothing.  The AG nonetheless contends that the firearms HB 5471 bans are not "Arms" covered by the Second Amendment because (he says) "they are not commonly used for self-defense" today and were not "in common use at the time the Second or Fourteenth Amendments were ratified." AG.Br.2, 16.  The first argument is analytically confused; as for the second, the Supreme Court has *twice* "rejected" it as "'bordering on the frivolous.'"  *Caetano v. Massachusetts*, 577 U.S. 411, 414 (2016) (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 582); *see id.* at 411-12 (per curiam).

***Whether something is an "Arm" is different from whether it is in common use today.*** The AG's first argument mixes up the order of operations *Bruen* clearly sets out.  Under *Bruen*, whether something is an "Arm" and thus covered by the Amendment's "plain text" is the opening question.  *See Bruen*, 142 S.Ct. at 2126, 2129-30, 2143.  Whether that thing is "in common use today" (*i.e.*, is "typically possessed by law-abiding citizens for lawful purposes") is the second question under *Bruen*.  *Id.* at 2143; *Heller*, 554 U.S. at 625.  The two questions are analytically distinct.  The answer to the first question depends on whether the firearm or other implement is "a[] thing that a man wears for his defence, *or* takes into his hands, *or* useth in wrath to cast at or strike another."  *Heller*, 554 U.S. at 625 (emphases added).  The answer to the second question, by contrast, depends on whether the American people have chosen to keep and bear the "Arm" in question for lawful purposes like self-defense and hunting, or instead if it is "highly unusual in society at large."  *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

The AG does not contest that the myriad semiautomatic rifles, pistols, and shotguns that HB 5471 bans are "thing[s] that a man wears for his defence, *or* takes into his hands, *or* useth in

wrath to cast at or strike another," *Heller*, 554 U.S. at 625 (emphases added), or that they are "modern instruments that facilitate armed self-defense," *Bruen*, 142 S.Ct. at 2132. Nor could he. The firearms that HB 5471 bans fit within the Second Amendment's definition of "Arms."

***Whether something was in common use in 1789 or 1865 makes exactly zero difference.*** In addition to lumping together two distinct questions (Is the banned implement a bearable arm? If so, is it in common use today?), the AG shifts the goalposts. According to the AG, what matters is whether something was "in common use when the Second and Fourteenth Amendments were ratified." AG.Br.22. According to the Supreme Court, however, that question matters not at all.

"[T]he Second Amendment's … reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.'" *Bruen*, 142 S.Ct. at 2132 (final alteration in original; quoting *Heller*, 554 U.S. at 582). "Just as the First Amendment protects modern forms of communications, … and the Fourth Amendment applies to modern forms of search, … the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding.*" *Heller*, 554 U.S. at 582 (emphasis added). Indeed, this principle was so well settled even before *Bruen* that, when a Massachusetts court held in 2015 that "stun guns are not protected because they 'were not in common use at the time of the Second Amendment's enactment,'" the Supreme Court *summarily reversed* that decision as contrary to *Heller*'s teaching "that the Second Amendment 'extends … to … arms … that were not in existence at the time of the founding.'" *Caetano*, 577 U.S. at 411-12 (per curiam) (quoting *Heller*, 554 U.S. at 582). Since then, the principle has only become more well-settled: "[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132.

*Whether a particular type of bearable arm is "necessary for self-defense" is irrelevant.*
Finally, the AG argues that the hundreds of models of firearms HB 5471 bans are not "Arms" because they are not "necessary for self-defense." AG.Br.2. That is not the test. As *Bruen* made clear, the Second Amendment covers all "modern instruments that *facilitate* armed self-defense," not just what is necessary for self-defense. 142 S.Ct. at 2132 (emphasis added). Nor could it be otherwise: The Second Amendment guarantees an individual right "to keep and bear arms," not a right to keep and bear only those arms that the government deems "necessary" for individuals.

**(b)** The magazines HB 5471 bans are "Arms" as well. As explained, more than just firearms are protected; all "modern instruments that facilitate armed self-defense," or "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" are covered by the plain text. *Bruen*, 142 S.Ct. at 2132; *Heller*, 554 U.S. at 581. That clearly includes ammunition feeding devices, without which firearms cannot operate as intended.

First of all, "fixed magazines"—which are "permanently attached to a firearm, or contained in and not removable from a firearm," 720 ILCS 5/24-1.9(a)(8); *see* 720 ILCS 5/24-1.9(a)(1)(B) (banning fixed magazines)—are obviously "Arms" covered by the Second Amendment's text. These are no more "accessories" or "accoutrements," *see* AG.Br.16-17, than a steering wheel is to a car. As the AG's own witnesses confirm, fixed magazines cannot be removed from a firearm without rendering the firearm inoperable as a firearm. *See, e.g.*, ECF 37-7 (Busse Decl.) ¶22.

Detachable magazines are no less "Arms." To be sure, they can be removed from a firearm; that is why they are called "detachable." But they are indisputably "thing[s]" that citizens carry for use in self-defense, whether the use is mere brandishing or actual firing; indeed, it is not the gun, but bullets *fed by the magazine*, that "strike another." *See Heller*, 554 U.S. at 581. The record confirms that common-sense point. As another witness for the AG explains, all modern "pistol[s]"

4

and most rifles "utilize[] a 'box' magazine" that "is inserted into the firearm" "to contain and feed multiple rounds of ammunition" and then is detached and reloaded when spent.   ECF 37-9 (Yurgealitis Decl) ¶10.   This is how semiautomatic firearms operate:   When the user pulls the trigger, the round in the chamber fires, and the magazine and semiautomatic action combine to feed a new round into the firing chamber.  *Id.*   Without magazines, modern semiautomatic firearms are little more than overengineered clubs.   It should therefore come as no surprise that, when responding to this Court's order to catalogue all the rifles that HB 5471 bans, the AG depicted them all *with magazines attached*.  *See* ECF 37-3.

That readily distinguishes magazines from true "accessories" to arms "like cartridge cases, boxes, [and] scabbards."  AG.Br.16-17.   And while magazines may not be "independently capable of … self-defense," AG.Br.2, the same could be said of just about every component that makes a modern firearm able to function.   Triggers, barrels, and firing pins by themselves are useless in self-defense situations.   Yet they are no less important to the functioning of a modern firearm than an engine or transmission is to a modern car—and they are no less "arms" independently than when combined into a finished product.   Indeed, in arguing that all of these integral components of firearms are "accessories, not arms," *see* AG.Br.16-17; *see also* ECF 37-8 (Baron Decl.) ¶10, the AG gives away the game.   If the AG's narrow conception of "Arms" were accepted, then a state could ban the whole by the sum of its parts (triggers, barrels, firing pins, ammunition, and other components that make a firearm work)—and the Second Amendment would be meaningless.

As a last-ditch effort, the AG argues that even if the Second Amendment protects some magazines, only those that are strictly "*necessary* to operate firearms" come within its ambit.   AG.Br.17.  Again, that is not the test.  As explained, *Bruen* made clear that the Second Amendment "covers modern instruments that *facilitate* armed self-defense," not just firearms or components

*necessary* to all firearms.  142 S.Ct. at 2132 (emphasis added).  And contrary to AG's *ipse dixit*, the magazines HB 5471 dubs "large-capacity" plainly fit the former bill.  In a stressful self-defense situation, having more than just a few rounds obviously improves one's prospects of surviving the encounter.  In short, the magazines HB 5471 bans, no less than the firearms it bans, are "Arms."

> **2.     The arms that HB 5471 bans are typically possessed by law-abiding citizens for lawful purposes, including self-defense and sporting.**

Because the firearms and magazines HB 5471 bans easily fit "the Second Amendment's definition of 'arms,'" the next question is whether they are "in common use today" *Bruen*, 142 S.Ct. at 2132, 2143.  If they are (and they are), then a state cannot ban them, full stop.  Indeed, even the *Heller* dissenters recognized that, under "[t]he majority" opinion, the "Amendment protects those weapons 'typically possessed by law-abiding citizens for lawful purposes.'"  554 U.S. at 720 (Breyer, J., dissenting).  And *Bruen* confirmed this understanding, reiterating that the only "arms" that fall outside the Second Amendment—and thus the only ones a state can ban—are those "highly unusual in society at large."  142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

The arms that HB 5471 bans are the furthest thing from "highly unusual."  For instance, HB 5471 bans all AR-platform rifles by name and/or by feature.  720 ILCS 5/24-1.9(a)(1)(A), (B), (J).  The Supreme Court has described "AR-15 rifle[s]" as "widely accepted as lawful possessions," *Staples v. United States*, 511 U.S. 600, 603, 612 (1994), which makes sense, as Americans own more than *24 million* of them, William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, at 2 (May 13, 2022), https://bit.ly/3HaqmKv.  Even accepting that a typical owner "own[s] 3.8 such rifles on average," AG.Br.35-36 n.29, that still means *at least 6 million* Americans own at least one AR-platform rifle.  That dwarfs the number ("approximately 200,000 civilians") that Justice Alito deemed sufficiently "widely owned and accepted" to come within the Second Amendment's protection against flat bans in *Caetano*.  577

U.S. at 420 (Alito, J., concurring in the judgment).  What is more, "the numbers have been steadily

increasing."  *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020 (S.D. Cal. 2021), *vacated and remanded*,

2022 WL 3095986 (9th Cir. Aug. 1, 2022).  AR-platform rifles accounted for nearly half of all

rifles produced in 2018 and nearly 20% of all firearms of any type sold in 2020.  NSSF, *Firearm*

*Production in the United States* 18 (2020), https://bit.ly/3LwJvKh; NSSF, *2021 Firearms Retailer*

*Survey Report* 9, https://bit.ly/3CXJwC1; *see also Miller*, 542 F.Supp.3d at 1022 ("In 2018 alone,

… 1,954,000 modern rifles were manufactured or imported into the United States.").  A product

lawfully owned by millions of Americans is obviously *not* "highly unusual in society at large."

Of course, HB 5471 does not stop with AR-platform rifles.  It goes on to prohibit any

semiautomatic rifle with a fixed (*i.e.*, non-detachable) magazine that has "the capacity to accept

more than 10 rounds, except for an attached tubular device designed to accept, and capable of

operating only with, .22 caliber rimfire ammunition," 720 ILCS 5/24-1.9(a)(1)(B), plus a number

of common semiautomatic pistols and shotguns, 720 ILCS 5/24-1.9(a)(1)(C), (D), (K), (L).  To

call these firearms "highly unusual in society at large," *Bruen*, 142 S.Ct. at 2143, is to deny reality.

That likely explains why the AG does not contest Plaintiffs' statistics showing their

commonality.  He instead argues that these arms are not "typically possessed by law-abiding

citizens *for lawful purposes*."  *Heller*, 553 U.S. at 624-25 (emphasis added).  But the AG's

emphasis on the obviously terrible crimes a small number of criminals have committed using

firearms the state now labels as "assault weapons" does not change who the *typical* owner of such

an arm is or how *they* typically use them.  Purchasers consistently report that self-defense, hunting,

sport shooting are the most important reasons why they buy the firearms and magazines Illinois

has now seen fit to ban.  *See Miller*, 542 F.Supp.3d at 1022 (citing sources); MPI.10-11 (explaining

that the features Illinois has singled out as problematic are, in reality, beneficial for personal self-

defense).  The sheer numbers also prove the point.  According to an amicus for the AG, "16%" of

the "301 mass shootings in the United States" between 2009 and 2021 "involved an assault

weapon."  Everytown, *Mass Shootings in America*, https://bit.ly/42u1LKu.  That means that, over

a 12-year period, fewer than 50 people—or 0.0008% of the 6 million who own at least one AR-

platform rifle (not to mention the many more who own a different model that Illinois now bans)—

used one of these firearms for such a heinous purpose.  And even if one assumes that some

additional number of Americans used such a firearm for some *other* unlawful purpose (despite the

AG's failure to try to quantify such misuse), the unassailable reality remains that AR-platform

rifles and the other firearms Illinois has seen fit to ban across the board are "*typically* possessed

by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 624-25 (emphasis added).

To say that is, again, not to deny that some people use these rifles for unlawful purposes.

But that was equally true—indeed, arguably more so—in *Heller*.  The *Heller* dissenters protested

that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly

favorite weapon of armed criminals."  554 U.S. at 682 (Breyer, J., dissenting).  The majority did

not dispute that.  It just found it irrelevant to whether they are constitutionally protected, as that

question does not turn on whether arms are misused by criminals.  It turns on whether *law-abiding*

citizens own and use them for *lawful* purposes.   So it was enough that handguns—the

overwhelming majority of which today are semiautomatic—are *typically* possessed for lawful

purposes.  *See id.* at 624-25 (majority op.).  What was true in *Heller* is no less true here given the

millions of Americans who own the arms HB 5471 bans.  *See Heller v. Dist. of Columbia*, 670 F.3d

1244, 1269-70 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("There is no meaningful or persuasive

constitutional distinction between semi-automatic handguns and semi-automatic rifles.").  Just as

in *Heller*, then, the flat ban here is flatly unconstitutional.  After all, blanket bans violate the

8

foundational principle that "a free society prefers to punish the few who abuse [their] rights …

after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v.

Conrad*, 420 U.S. 546, 559 (1975).

The same goes for the magazines HB 5471 bans. As multiple courts of appeals have

recognized, Americans own more than 100 million magazines that can hold more than 10 rounds

of ammunition. *See Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020); *Kolbe v. Hogan*, 849

F.3d 114, 129 (4th Cir. 2017) (en banc). More specifically, recent industry data indicates that 75%

of modern rifle magazines in the U.S. have a standard capacity of more than 10 rounds. NSSF,

*Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://bit.ly/3GLmErS.

Likewise, many of the most popular handguns come standard with 15+ round magazines. MPI.16-

17 (citing sources). Simply put, the magazines HB 5471 bans are ubiquitous in America.

The AG does not contest the ubiquity of the arms HB 5471 bans. Instead, he argues that

they are "not commonly *used* for self-defense," AG.Br.37, by which he means literally emptying

an entire magazine when confronted by an assailant. According to the AG, "the people" have no

right to own a particular type of firearm unless they often shoot attackers with it, and they likewise

have no right to own a magazine over a certain number of rounds unless they typically expend

more than that number in self-defense situations. *See* AG.Br.37. By that logic, the state could

seemingly ban arms entirely; after all, most people fortunately never have to fire their firearms for

self-defense at all. Thankfully, that is not the law. The Supreme Court has repeatedly "confirmed

that the right to 'bear arms' refers to the right to 'wear, bear, or carry … upon the person or in the

clothing or in a pocket, for the purpose … *of being armed and ready* for offensive or defensive

action in a case of conflict with another person.'" *Bruen*, 142 S.Ct. at 2134 (ellipses in original;

emphasis added) (quoting *Heller*, 554 U.S. at 584).  That right does not turn on how frequently people actually confront such situations or how many rounds they typically fire when they do.

The AG's claim that "common use" means something different from "typically possessed by law-abiding citizens for lawful purposes" is squarely foreclosed by precedent.  It also makes no sense.  The point of "being armed and ready" is to make it *less likely* that one will find oneself needing to fire one's weapon:  If a would-be assailant knows that his would-be victim is armed and ready to fight back, then the would-be confrontation may never occur.  Illinois thus gets it exactly backwards in claiming that "features [designed] to enable a shooter to stay on target … while firing large amounts of ammunition," AG.Br.33, turn something into a "weapon of war" rather than something highly effective for self-defense.  *See* AG.Br.27-34.  Who forced to defend against an armed assailant would not want "to stay on target—to be more lethal"?  AG.Br.33.

Finally, the AG's theory that the scope of the right to keep and bear arms depends on people's *need* to exercise it is inconsistent with the very notion that the Second Amendment protects a fundamental right.  The argument that free speech rights are reserved for only those with an unusually compelling need to criticize the government would be laughed out of court.  That is no less true when it comes to the Second Amendment.  Indeed, the Supreme Court has already held as much, explicitly rejecting the idea that a state may restrict the right to bear arms to those with a special "need" to exercise it.  *See Bruen*, 142 S.Ct. at 2156.  "[T]he very enumeration of the right takes [it] out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).

\* \* \*

The Court can and should end there.  The government may not flatly ban constitutionally protected items or activities, even if they are dangerous or capable of abuse.  *See, e.g.*, *Edenfield*

*v. Fane*, 507 U.S. 761, 770-71, 773 (1993) (state cannot "flat[ly] ban" solicitation by public accountants on the ground that solicitation "creates the dangers of fraud, overreaching, or compromised independence"); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002) (government cannot ban virtual child pornography on the ground that it might lead to child abuse because "[t]he prospect of crime" "does not justify laws suppressing protected speech").  What renders the firearms and magazines that HB 5471 bans constitutionally protected is that they are "bearable arms" (which means the plain text of the Second Amendment covers keeping and bearing them) that are "typically possessed by law-abiding citizens for lawful purposes" (which means a flat ban on their acquisition—and, come 2024, mere possession—is irreconcilable with our Nation's historical tradition of firearms regulation).  *See Bruen*, 142 S.Ct. at 2143; *Heller*, 554 U.S. at 625.  That is the end of the matter, as a state may not prohibit what the Constitution protects.

**B.      Insofar as the Burden Shifts, the Government Cannot Shoulder It.**

As just explained, in the context of a flat ban on classes of "Arms" like HB 5471, the historical test (*i.e.*, the key inquiry under *Bruen*) is whether the American people have overwhelmingly chosen the Arms in question.  After all, "the traditions of the American people … demand[] our unqualified deference," *Bruen*, 142 S.Ct. at 2131 (quoting *Heller*, 554 U.S. at 635), and the very fact that Americans have chosen these arms in the millions confirms that there is no tradition of banning them.  At a minimum, the arms HB 5471 bans are "presumptively protect[ed]," so Illinois would have to "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen*, 142 S.Ct. at 2127.  It cannot carry that burden, as *Heller* itself held that no historical tradition supports banning a class of arms "typically possessed by law-abiding citizens for lawful purposes."  554 U.S. at 625.

That likely explains why the AG tries so hard to rewrite *Heller* and *Bruen*.  The AG insists that states can ban weapons that are "dangerous *or* unusual."  AG.Br.3.  This is not a slip of the

pen:  The AG uses the disjunctive formulation "dangerous *or* unusual" more than a dozen times in his brief.  But the Supreme Court has recognized only a "historical tradition of prohibiting the carrying of 'dangerous *and* unusual weapons.'"  *Bruen*, 142 S.Ct. at 2128 (emphasis added) (quoting *Heller*, 554 U.S. at 627).  As Justice Alito has explained, "this is a conjunctive test:  A weapon may not be banned unless it is *both* dangerous *and* unusual."  *Caetano*, 577 U.S. at 417 (Alito, J., concurring).    That makes sense, as all firearms are (obviously) dangerous.  Dangerousness is therefore not enough; states may ban only those arms "highly unusual in society at large."  *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).  That AG is thus forced to argue that the Supreme Court simply got it wrong.  *See* AG.Br. 43-44 n.34.  But rejecting what the Supreme Court held is not an avenue open to this Court.  And what matters under Supreme Court precedent is whether the firearms and magazines HB 5471 bans "in common use today."  *Bruen*, 142 S.Ct. at 2143.  Because they "unquestionably" are, *id.*, it makes exactly zero difference that states banned the public carriage of various "dangerous weapons" in the eighteenth and nineteenth centuries due to their association with violent crimes.  *Bruen* could not be clearer about this: "[E]ven if … colonial laws prohibited [the public carriage of certain types of arms] because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting [those types of arms] that are unquestionably in common use today."  *Id.*

At any rate, the AG's historical narrative is revisionist in the extreme.  In reality, the very history on which he relies confirms that there is nothing revolutionary or menacing about the choice that millions already made about the types of arms they want to have at the ready for self-defense.  Centuries of history demonstrate that the people have *always* gravitated toward arms that offer improvements that do not compromise accuracy and functionality.  That explains why single-shot muskets gave way to multi-shot Pepperbox pistols, revolvers, and repeating rifles in the

decades after the Founding, Compl. ¶¶21-24, why Winchester rifles capable of firing more than 10 rounds quickly became the weapon of choice for many in the late-nineteenth century, *id*. ¶23, why semiautomatic models largely displaced models with more cumbersome, less efficient feeding devices in the twentieth century, *id*. ¶¶26-29, and why pistols and AR-platform rifles soared in popularity precisely when detachable magazines capable of holding more rounds became more compact and reliable, *id*. ¶28.  In the end, all the AG succeeds in doing is demonstrating why the arms Illinois has banned are so common among law-abiding citizens:  They make it easier to fire more rounds more quickly without sacrificing accuracy, functionality, or reliability.

The fact that modern firearms are more accurate, more reliable, more portable, and capable of quickly firing more rounds than their Founding-era predecessors thus does not make them any less linear descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Second Amendment was ratified.  *Heller*, 554 U.S. at 624-25; *see also Caetano*, 557 U.S. at 416-17 (Alito, J., concurring) (noting that "revolvers and semiautomatic pistols" are protected as descendants of arms in common use at the founding).  Indeed, much of what the AG says about why the magazines it deems too "large" or the rifles it deems too "accura[te]" and "eas[y to] reload[]" are "materially different" from firearms previously in common use, AG.Br.41, could be said equally of the handguns the Supreme Court held protected by the Second Amendment in *Heller*.  That is precisely why *Heller* eschewed a test focused on which arms are capable of doing the most damage in the hands of the small number of people bent on *mis*using them, in favor of a test focused on which arms *law-abiding* citizens believe best serve their self-defense needs.  The AG derides that test—as he must, since Illinois seeks to literally *confiscate* arms that millions of people have chosen for self-defense.  But the Second Amendment is more than a mere parchment barrier against massive government disarmament.

13

To the extent the AG tries to equate "semi-automatic and *automatic*" firearms, AG.Br.1-2 (emphasis added), that once again ignores the history. What supports bans on automatic weapons is not the bare fact that they fire more rounds more quickly. As explained, it is "the traditions of the American people" that "demand[] our unqualified deference." *Bruen*, 142 S.Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). And largely because fully automatic weapons are not particularly effective for close-range personal self-defense, Americans never adopted them en masse. The two also have very different developmental and regulatory histories. Semiautomatics were civilian arms from the start, "traditionally have been widely accepted as lawful possessions," *Staples*, 511 U.S. at 612, and were not subject to *any* bans until the past few decades; machine guns, by contrast, developed as specialized military arms, never found a legitimate civilian use, and were banned within a few years of first being sold, as one of the AG's own witnesses details, ECF 37-11 (Roth Decl.) ¶¶44-47, and as further explained by the *IFFL* and *Harrel* plaintiffs.

Finally, the AG cannot save HB 5471 by pointing to "unprecedented societal concerns or dramatic technological changes." *See Bruen*, 142 S.Ct. at 2132. The AG does not deny that firearms capable of firing more than 10 or 15 rounds long predate the founding, or that they were marketed to civilians from the start. Nor can he deny that semiautomatics of the sort HB 5471 bans were popular with civilians long before they gained traction militarily. *See* MPI.13, 18-19. As for the supposedly new phenomenon of mass shootings, "[m]ass murder has been a fact of life in the United States since the mid-nineteenth century" (as even one of the AG's witnesses admits), ECF 37-11 (Roth Decl.) ¶41, and the sort of events the AG focuses on predate the popularization of semiautomatics and so-called large capacity magazines.[1] Yet before "the 1990's, there was no

---

[1] *See, e.g., Family of Seven Killed by Father*, Kentucky Time-Star (1990) (1929 murder of farmer's wife and six children); *Maniac Death Toll Up To 5*, Youngstown Vindicator (Mar. 7, 1933),

national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds," *Miller*, 542 F.Supp.3d at 1024, and there were almost no efforts to restrict the firing capacity of semiautomatic arms, *see* Compl. ¶74.

## II.     The Remaining Factors All Favor Injunctive Relief.

Allowing HB 5471 to take effect would cause Plaintiffs imminent irreparable injury.[2]  As the Seventh Circuit held in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), "[i]nfringements of" "the right to possess firearms for protection" "cannot be compensated by damages." *Id.* at 699. The AG tries to brush aside *Ezell*, but his arguments are not just unavailing; they betray a simple unwillingness to accept *Bruen* and *Heller*.  For instance, the AG argues that HB 5471 does not injure Plaintiffs because they could use other weapons for self-defense. AG.Br.65.  But as *Heller* made perfectly clear, "[i]t is no answer to say … that it is permissible to ban the possession of [one type of protected firearm] so long as the possession of other firearms … is allowed." 554 U.S. at 629.  And while the AG insists that plaintiffs alleging economic injury in the face of a defendant immune from damages actions must show "certain, great and actual" losses, AG.Br.66 n.56 (emphasis omitted), he cannot bring himself to deny that a ban on arms that account for *a majority* of some of Plaintiffs' sales, *see* ECF 10-4 (Smith Decl.) ¶7, will obviously meet that threshold. Finally, the AG has no answer for the black-letter law that enforcing unconstitutional laws is never in the public interest, or that enjoining states from enforcing such laws causes no cognizable harm.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be granted.

---

https://bit.ly/3nfRWPQ (40-year-old man shot 11 people with .22-caliber rifle, killing five); *Suspect in historic mass murder dies at 88*, CNN (Oct. 20, 2009), https://cnn.it/3yW7POf (discussing 1949 "killing [of] more than a dozen people in a deadly shooting spree in New Jersey").

[2] While some state court decisions have granted temporary restraining orders against the enforcement of HB 5471 on state-law grounds, those orders are "limited to [the plaintiffs]" in those actions, as the AG notes.  AG.Br.9.  They thus do not affect the injury analysis in this case.

Respectfully submitted,

PAUL D. CLEMENT[*]
ERIN E. MURPHY[*]
MATTHEW D. ROWEN[*]
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

/s/ Gary C. Pinter
GARY C. PINTER
SWANSON, MARTIN & BELL, LLP
103 W. Vandalia Street
Suite 215
Edwardsville, IL 62025
(618) 655-3131
gpinter@smbtrials.com

ANDREW A. LOTHSON*
SWANSON, MARTIN & BELL, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611

*Counsel for Plaintiffs*

March 23, 2023

16