**IN THE UNITED STATES DSITRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CALEB BARNETT, et al., | ) | Case No. 3:23-cv-209-SPM |
|     Plaintiffs, | ) | **designated Lead Case |
| | ) | |
| v. | ) | |
| | ) | |
| KWAME RAOUL, et al., | ) | |
|     Defendants, | ) | |
| | ) | |
| DANE HARREL, et al., | ) | Case No. 3:23-cv-141-SPM |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KWAME RAOUL, et al., | ) | |
|     Defendants, | ) | |
| | ) | |
| JEREMY W. LANGLEY, et al., | ) | Case No. 3:23-cv-192-SPM |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRENDAN KELLY, et al., | ) | |
|     Defendants, | ) | |
| | ) | |
| **FEDERAL FIREARMS LICENSEES OF ILLINOIS, et al.,** | ) | Case No. 3:23-CV-215-SPM |
|     **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JAY ROBERT "J.B." PRITZKER, et al.,** | ) | |
|     **Defendants.** | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

I.   **Introduction**

In response to the State's omnibus opposition to the motions for preliminary injunction filed in this and related cases, Plaintiffs FFL-IL, et al., join the *Barnett* reply brief in full.

They submit this brief to provide this Court with more detail about the relevant historical tradition. In short, while arms that could rapidly fire more than 10 or 15 rounds without reloading would by no means have been "unforeseen inventions to the Founders," *Duncan v. Becerra* ("*Duncan IV*"), 970 F.3d 1133, 1147 (9th Cir. 2020), laws prohibiting their possession certainly would have been. Indeed, while there is a long historical tradition of law-abiding citizens possessing such firearms for lawful purposes, there is no similar tradition of government regulation. There were *no* restrictions on the possession of types of arms that were not "dangerous and unusual" when the Second and Fourteenth Amendments were ratified. Nor were there any restrictions on magazine capacity.

To the contrary, the first such laws did not come until the Prohibition Era and, even then, they were rare. Although many states and the federal government began regulating *automatic* weapons (i.e., machine guns) in the 1920s, only three states and the District of Columbia restricted the firing capacity of *semi*-automatic firearms—and most of those laws were repealed within a few decades. *Id*. at 1150 & n.10 Such laws are extreme outliers that provide no insight into the original meaning of the Second Amendment.

II.   **The State Misreads *Heller* and the Act in Defending its Rifle Ban**

The State argues that the arms it bans as "assault weapons" "are not protected 'arms' because 'arms' do not include 'weapons that are most useful in military service—M-16 rifles and the like.'" AG.Br.16 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). But this misreads *Heller*. And, in any event, the State's reasoning for treating *semiautomatic* rifles "like" the *fully*-automatic M-16 relies on firearm attributes not even contemplated by the Act.

    A.   ***Heller*'s reference to "M-16s and the like" Is Irrelevant**

*Heller*'s reference to M-16 rifles cannot be the sort of test the State makes it out to be. It is far too vague and amorphous a standard to be extended to any arm beyond the fully-automatic M-

16. Moreover, reason dictates that to be considered a weapon "most useful in military service," it must at least be in use by an actual military. Yet the State does not point to a single military anywhere that employs semiautomatic-only rifles. That should be the end of this inquiry because we begin from the premise that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, __ U.S. __, 142 S. Ct. 2111, 2132 (2022) (quoting *Heller*, 554 U.S. at 582). Tellingly, *Heller*'s author did not share the State's interpretation that these rifles are so "like" the M-16 that they lack Second Amendment protection. Otherwise, Justice Scalia would not have dissented to the Supreme Court's refusal to review a Seventh Circuit opinion upholding a nearly identical law. *Friedman v. City of Highland Park*, 136 S. Ct. 447 (2015).

    **B.**    **The State's M-16 Comparison Misunderstands Firearms and Its Own Law**

The State targets the rifles it does based on their supposed "lethality." AG.Br.2, 26, 29, 31, 38, 41-42. While the State does not endeavor to define "lethality" it does note that "[t]he killing capacity of a firearm is primarily determined by the kinetic energy imparted by the bullet, its effective range, and the rate at which the weapon fires projectiles." *Id*. at 29. The State claims that the rifles it defines as "assault weapons" should be banned because they have each of those factors in common with the M-16. Yet, the Act bans rifles based on their external features, none of which has any effect whatsoever on any of those factors. Ex.5, Boone Decl. ¶ 73.

Indeed, except for barrel design, the rifle has no influence on a projectile's energy or range. *Id*. ¶¶ 47-48. Apart from the barrel, the cartridge size and its bullet-design are what affect energy transfer to a target. *Id*. Yet, the Act does not ban *any* rifle based on its barrel design or the ammunition it uses. The AR-15 subset of banned rifles alone comes chambered in various sized cartridges, each of which can have various types of bullets. *Id*. ¶¶ 50-52. The State's arguments about the "lethality" or wounding ability of so-called "assault weapon rounds" are thus irrelevant and should be ignored. A bullet from a non-"assault weapon" will act identically to one from an "assault weapon" assuming the same design and barrel length. *Id*. ¶ 48. The State's comparison of wounds from banned rifles to those from handguns should likewise be ignored. AG.Br.30. The

comparison is apples and oranges. Any difference in the resulting wounds applies to all rifles, not just ones that the Act bans. Ex.5, Boone Decl. ¶ 48.

Just as the features that make a rifle an "assault weapon" under the Act have no influence on what a projectile does, nor do they have any effect on how many bullets a rifle can fire or at what rate they are fired. To be clear, the M-16 fires *automatically*. The Act bans *semiautomatic* rifles. A semiautomatic rifle with a detachable magazine that lacks the "assault weapon" features—which the Act does not ban—can fire just as many rounds and at the identical rate as a banned rifle. *Id*. ¶¶ 48, 73. Because the Act does not limit rate of fire, the State's arguments about rate of fire are irrelevant.

To be sure, the M-16 generally has the external features that the Act uses to define "assault weapon" (pistol grip, barrel shroud, flash suppressor, and adjustable stock). But all the State can say about them is that they enhance the user's control of the rifle and thus accuracy. AG.Br.33. Why a person engaged in self-defense would not need control and accuracy, however, the State does not explain. Indeed, "it is certainly reasonable to believe that a person in a self-defense situation would have a need to fire 1 round every 1.3 seconds (e.g., 3 rounds in about 4 seconds or 45 rounds/minute). Ex.5, Boone Decl. ¶ 66.

### III. The State's Resort to a "More Nuanced Approach" to "Analogical Reasoning" Fails Because the Act Does Not Respond to Any "Dramatic Technological Advancement" or "Unprecedented Societal Concern"

As Plaintiffs' moving papers and the *Barnett* reply show, the Act bans the possession and acquisition of arms that are "typically possessed for lawful purposes"—conduct that the Constitution protects. Because the law is a flat ban on these arms, this case is simple. Indeed, *Heller* teaches us that there is no relevant historical tradition of banning arms unless they are "dangerous and unusual." 554 U.S. at 625-27.[1] No further analysis is thus necessary or required.

---

[1] The State claims that Plaintiffs misinterpret the phrase "dangerous and unusual." AG.Br.43-44 n.34. Not so. As much as the State may wish the phrase were "dangerous *or* unusual," it is not. The State's citation to Blackstone notwithstanding, the Second Amendment protects arms unless they "dangerous *and* unusual." As Justice Alito explained, this "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S.

At the very least, however, the State must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2130. The State comes nowhere near meeting this burden—*because it cannot*. So it shifts to arguing that its modern ban on semiautomatic firearms and standard magazines (1) "responds to an utterly modern concern borne of dramatic technological change," and (2) addresses the "new" societal problem of mass shootings, arguing that modern firearms empower individuals, acting alone, to commit such atrocities. AG.Br.22.

But both the technology about which Illinois complains and the general societal problem of mass killings (even with firearms) long predate the founding. And, of course, *Bruen* instructs that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131.

### A. The Banned Arms Do Not Represent a Dramatic Technological Advancement That Might Justify a "More Nuanced Approach"

Contrary to the popular refrain, the Founders did not ratify the Second Amendment with only single-shot, muzzle-loading muskets in mind. They were not unaware that firearms of the day could discharge multiple rounds quickly and accurately without the need to reload, nor were they ignorant of the potential for such technology to develop and become more popular. *Duncan IV*, 970 F.3d at 1147 ("Semi-automatic and multi-shot firearms were not novel or unforeseen inventions to the Founders."). Rather, the history of the advancement of firearms technology is marked by persistent innovation aimed at improving speed, firing capacity, accuracy, and functionality—a trend that long pre-dated the founding and was familiar to our forebears. *See* Kopel, *Colorado*, *supra*, at 852-56; *See also* Ex.2, Hlebinsky Decl. ¶¶ 17-45; Ex.4, Helsley Decl. ¶¶ 3-18.

---

411, 417 (2016) (Alito, J., concurring). All of the State's references to laws regulating "dangerous [or] unusual" weapons should thus be disregarded as misleading (or worse).

While "[t]he concept of a repeating firearm dates to the earliest technology of firearms," *Id.* ¶ 19, "the first firearm that could fire more than ten rounds without reloading was invented around 1580." *Duncan IV*, 970 F.3d at 1147. "By the 1630s, a Dutch gun-making family, Kalthoff …, began experimenting with a design that allowed up to fifteen shots to be fired in rapid succession." Ex.2, Hlebinsky Decl. ¶ 20. And contrary to the State's claim that repeaters were not commercially successful before 1791, AG.Br.26, Kalthoff repeating rifles were commercially successful throughout the seventeenth century; so too were Lorenzoni magazine-fed firearms, which found their way to America.[2] "British soldiers were issued magazine-fed repeaters as early as 1658," while the Pepperbox-style pistol—some of which could hold up to 24 shots—was popular for at least a century before the founding. *Duncan IV*, 970 F.3d at 1147.

In 1777, the Continental Congress resolved to order from Joseph Belton, an inventor and gunsmith, 100 muskets he claimed could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds."[3] Belton later wrote to the Congress that his musket could "discharge[e] sixteen rounds in less space than a minute, that shall do execution two hundred yards…." Halbrook, *America's Rifle*, *supra* note 3, at 106 (quoting, Held, *supra* note 3, at 37). While the deal fell through after Belton requested "an extraordinary allowance," this anecdote shows that the Founders not only knew such technology existed well before the ratification of the Bill of Rights, they also encouraged its further development.

By the ratification of the Second Amendment, the Girandoni air rifle, which Merriweather Lewis famously carried on the Lewis & Clark Expedition, had taken hold as the state-of-the-art

---

[2] David Kopel, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 2197-98 (3d ed. 2021) (citing Harold L. Peterson, *The Treasury of the Gun* 229, 232 (1962)), *available at* http://firearmsregulation.org/www/FRRP3d_CH23.pdf (last visited Mar. 22, 2023). As this citation shows, Kopel's opinion that the Kalthoff and Lorenzoni firearms were "successful" or a "success" derives from the writings of Harold Peterson, widely considered one of the leading American arms historians of all time. Wikipedia, Harold L. Peterson, https://en.wikipedia.org/w/index.php?title=Harold_L._Peterson&oldid=1091524127.

[3] Kopel, et al., *supra* note 2, at 2206 (quoting Joseph Belton, *Letter to the Continental Congress* (Apr. 11, 1777), in *Papers of the Continental Congress, Compiled 1774-1789*, vol. 1 A-B, at 123; 7 Journals of the Continental Congress 1774-1789, at 324 (1907)); *see also* Stephen P. Halbrook, *America's Rifle: The Case for the AR-15*, at 104 (citing Robert Held, *The Belton Systems, 1758 and 1784-86: Americas' First Repeating Firearms* 40, 77 (1986)).

repeater. Kopel, et al., *supra* note 2, at 2206. It "could shoot 21 or 22 rounds in .46 or .49 caliber," *id.*; it was "ballistically equal to a powder gun, and powerful enough to take an elk," *id.* The reason the Girandoni air rifle was sent along with Lewis and Clark was that using a standard-issue musket could easily get you killed. After all, even a well-trained musket user could only fire three rounds per minute—and "[a]fter they had fired their rifles, they were nearly helpless" against man or beast "until they reloaded." Steven Ambrose, *Undaunted Courage* 178 (1996) (buffalo attack while reloading); *see id*. at 238 (similar), 391 (Indian attack while unable to reload); *see also id.* at 170 (discussing differential rate of fire from rifles versus Indian arrows).

A breakthrough came around the time of the Civil War, when new technologies yielded mass-produced rifles that could be fed self-contained metallic cartridges from a magazine. David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849, 854 (2015). Using a lever action, arms like the Henry repeater allowed users to fire as fast as they could operate the lever and pull the trigger—a rate of 28 rounds per minute for the Henry, even when accounting for reloading time. Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403 (2d ed. 2018). By the end of the Civil War, "repeating, cartridge-fed firearms" were ubiquitous yet never regulated or banned. *Duncan IV*, 970 F.3d at 1148. And many of the most popular models had magazines that held more than 10 or 15 rounds. For example, "the Volcanic Arms lever-action rifle … contained a 30-round tubular magazine" and the Winchester Model 66 "was a full-size lever-action rifle capable of carrying 17 rounds." *Id*. These "[r]epeating rifles could fire 18 rounds in half as many seconds." *Id.*[4]

The development of these repeating arms was the relevant leap in firearms technology, and it occurred around the time the 14th Amendment incorporated the Bill of Rights. From there, the semiautomatic action and detachable box magazine were, while significant, comparatively less seminal inventions. And improvements in materials technology in the 20th century did not meaningfully alter the core technology here. "American firearms development in the twentieth

---

[4] "The Model 66 Winchester was succeeded by the Model 73 and Model 92, combined selling over 1.7 million total copies between 1873 and 1941." *Duncan IV*, 970 F.3d at 1148.

century was primarily about improving the types of guns. [Citation.] Even in the twenty-first century, the archetypical 'modern' gun is something that a consumer could have bought in the late 19th century: a breech-loading semi-automatic pistol using a detachable magazine to fire metal-cased ammunition with smokeless powder." Kopel, et al., *supra* note 2, at 2200. Indeed, the arms the State bans are simply the product of the natural and historical evolution of firearms technology. *See* Ex.2, Hlebinsky Decl. ¶¶ 17-45; Ex.4 , Helsley Decl. ¶¶ 3-18. They are the linear descendants of the arms of the founding generation.

Tragically, mass murder is not some new phenomenon. Even the State's own expert concedes that it "has been a fact of life in the United States since the mid-nineteenth century." AG.Ex.10, Roth Decl. ¶ 41; *see also id.* ("From the 1830s into the early twentieth century, mass killings were common.").[5] Even the use of firearms to commit mass murder is nothing new. Indeed, there were mass shootings in the United States dating to well before the invention of semiautomatic weapons, including the Wounded Knee Massacre, where soldiers murdered nearly 300 Lakota people in a botched attempt to disarm them.[6] The State thus contends that the "new" social problem is the very specific problem of "*single individual[s]* equipped with an assault weapon and large capacity magazines to murder dozens of people in a matter of minutes, if not seconds." AG.Br.41-42 (citing AG.Ex.4, Klarevas Decl. ¶ 18) (emphasis added). Certainly, every societal problem can *seem* unprecedented if one whittles it down to such specific criteria. Equipped with these arbitrary limitations, the State claims that historical mass killings were not as lethal as the mass public shootings of today. But, as the declaration of Clayton Cramer proves, individual mass murder is neither particularly modern nor dependent on technological advances. Ex.3, Cramer Decl. ¶ 48.

Cramer traces the history of mass murder committed by individuals with "primitive weapons" to the late 1600s, collecting incidents like the 1805 murder of a woman and her eight

---

[5] *See also, e.g.*, Benjamin Franklin, *A Narrative of the Late Massacres* (1764), *reprinted in* 4 The Writings of Benjamin Franklin 289-314 (1906).

[6] Myles Hudson, *Wounded Knew Massacre: United States History [1890]*, Britannica, https://www.britannica.com/event/Wounded-Knee-Massacre (last updated Dec. 22, 2022) (fact-checked by the editors of Encyclopedia Britannica).

children by her ax-wielding husband, and the 1806 murder by ax of a woman and seven of her children. *Id.* ¶¶ 11-17. His declaration also recounts some of the deadliest mass killings—those with dozens of fatalities—committed by a single person. For example, a dynamite explosion killed a "father, mother, and four young children" in 1900. *Id.* ¶ 74 (quoting *Whole Family Murdered*, Fair Play 1 (Oct. 20. 1900)). In 1927, the Bath School massacre took the lives of 37 elementary schoolchildren and six adults and injured 44 others. *Id.* ¶ 83 . And, as recently as 1990, the Happyland Social Club fire killed 87, leaving only three survivors. *Id.* ¶ 94. While these massacres often involved the use of explosives or simple arson,[7] such tragedies show that an individual bent on causing maximum suffering does not require (and has never required) sophisticated weapons to do so. It is also the case that arson remains a common method of mass murder in countries where firearms are heavily restricted: "In Australia, an arsonist burned the Childers, Queensland's Palace Backpackers Hostel in 2000, killing 15. The 2011 Quakers Hill Nursing Home fire killed eleven, …. [And] Japan had several arson mass murders in late 2021, killing 24, 17, and 33 in separate incidents." *Id.*

What's more, the State's premise that mass shootings, specifically, are so common today that they rise to the level of an "unprecedented societal concern" does not reflect findings that (even today) such crimes, though horrific, are rare. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1018 (S.D. Cal. 2021) (recognizing that mass shootings are, fortunately, very rare). And mass murders involving the types of firearms Illinois targets for banishment are even rarer. As the district court in *Miller* held, even taking the state's most favorable evidence, "78% of mass shooting events did not involve an assault weapon." *Id.* at 1048 (citing Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, Applied Economics Letters (2014), at 1). In fact, "according to a recent study, *handguns* were the most used type of firearm in mass shootings (32.99% of mass shootings); rifles were used in only 8.25% of mass shootings." *Id.* (emphasis

---

[7] By focusing only on double-digit mass *shootings*, the State makes it appear that high-fatality mass killings are a completely modern phenomenon, the first of which occurred in 1949. AG.Br.42 (citing Ex.4, Klarevas Decl. ¶ 18). But again, high-fatality mass *murder* is not a modern problem.

8

added). Yet as *Heller* makes clear, that handguns are so commonly used to commit mass murder is not grounds to ban law-abiding citizens from possessing them for lawful purposes, including self-defense. *See* 554 U.S. at 624-645. The same is true here as to the myriad semiautomatic firearms Illinois has seen fit to ban across the board.

### IV. The Relevant History and Tradition Does Not Support the State's Modern Ban on Protected Semiautomatic Firearms and Magazines

The State has not shown that it should be allowed to proceed to some "more nuanced approach" to analogical inquiry under *Bruen*. But even if it had, *Bruen*'s reference to a "more nuanced approach" is not a "get out of the *Bruen* analysis free" card. The State must still present an enduring American tradition of genuine analogues that are "relevantly similar" to the modern restrictions it seeks to defend. 142 S. Ct. at 2122. The *Bruen* Court pointed toward at least two metrics: how and why the regulations" govern facially protected conduct. *Id.* at 2133. All the State's proposed analogues ignore one or both of these metrics.

When looking at the "how," this Court should ask whether the challenged modern law and the proposed historical analogue impose a similar *type* of restriction, not just a similarly *severe* one.[8] When looking at the "why," this Court should consider whether the law is "comparably justified," mindful that historical laws enacted for one purpose cannot be used as a pretext to justify a modern law that was enacted for different reasons. *Id*. In short, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 22-0986, 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6, 2022). As discussed below, this is the sort of strained comparison-making on which all of the State's proposed historical analogues rely. In banning the sale and possession of common arms, the Act is without a single valid analogue. It violates the Second Amendment.

---

[8] The Court highlighted the importance of clarity when engaged in "analogical reasoning" when it observed that "'[e]verything is similar in infinite ways to everything else,' [Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 711, 774 (1993)], one needs 'some metric enabling the analogizer to assess which similarities are important and which are not,' F. Schauer & B. Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." [*Id.*] They are not relevantly similar if the applicable metric is 'things you can wear.'"

A.  **Nineteenth Century Laws Regulating "Dangerous and Unusual Weapons" Are Not "Relevantly Similar" to the State's Modern Ban on Firearms and Magazines in Common Use for Lawful Purposes**

Contrary to the State's claim that legislatures historically enacted "categorical" restrictions on dangerous and unusual weapons, AG.Br.43, the State does not cite a *single law* from the Founding Era to the 19th century that banned the possession of commonly owned firearms as the Act does. Nor could it—no such laws existed, despite the technological leap that occurred during this period. *See supra*, Part III.A. Even still, the State trots out several marginally relevant laws that the State claims provide sufficient historical support to save its modern ban on common semiautomatic rifles and magazines.

While page limitations prevent a comprehensive response to every law the State cites, several demonstrative examples reveal what is wrong with all the State's proposed analogues. First, the 1686 New Jersey law[9] (as well as six similar laws enacted between 1750 and 1799) regulated *carrying* "dangerous and unusual" weapons in public, but not mere possession. AG.Br.44. Under the Act, Illinois does not merely regulate the carry of the subject arms; it bans their mere *possession* even *in the home* and even for *self-defense* purposes. "The differences between how and why these laws burden a law-abiding citizen's right to armed self-defense is evident." *Boland v. Bonta*, No. 22-1421, at *14 (S.D. Cal. Mar. 20, 2023) (granting preliminary injunction motion).

Next, the State focuses on the restrictions on Bowie knives and similar blades that proliferated in the 1800s. These laws, by and large, regulated only the manner of carrying such arms, while four laws taxed their sale, three taxed their ownership, ten restricted sale *only* to certain groups, and four punished only brandishing. AG.Br.46. Though the State tries to avoid drawing attention to the omission, it is glaringly obvious that *no* state banned the mere possession of Bowie knives. In short, "[a]t the end of the 19th century, no state prohibited possession of Bowie knives."

---

[7] First, this law is too old to be an appropriate analogue. *Bruen* cautions that not all history is equal in evaluating traditions: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." 142 S. Ct at 2136.

David Kopel, *Bowie Knife Statutes 1837-1899*, Volokh Conspiracy (Nov. 20, 2022), https://bit.ly/3yZYzZx. *See also Harrel* Pls.' Reply 8-9. What's more, historical restrictions on Bowie knives and similar blades were far fewer than the number of bans on carrying handguns. Yet, the Court found those laws insufficient to justify New York's modern carry ban.

The State's proposed analogues related to concealable pistols, AG.Br.47-48, fare just as poorly. Again, the historical prohibitions the State relies on apply to *concealed carry* of pistols, not to open carry, let alone mere possession. Indeed, as the State has to admit, several such laws exempted larger pistols, which citizens carried openly. *Id*. A limited number of restrictions on the manner of carrying arms in public is no way similar to a ban on their acquisition and possession, so they are not "relevantly similar" under *Bruen*. 142 S. Ct. at 2122.

Perhaps the closest the State comes to identifying relevant historical analogues are two laws, adopted in the 1870s in Arkansas and Tennessee, that restricted not just public carry, but also prohibited the sale of pistols. AG.Br.47 (citing 1881 Ark. Acts 191; 1879 Tenn. Pub. Act 135-36). The State fails to mention, however, that within 10 years, both attempts to regulate pistols *were invalidated by the state courts* for being too broad in prohibiting the keeping and carrying of all pistols in public. *See Andrews v. Stat*e, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).[10] As *Bruen* teaches, "[i]f some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 142 S. Ct. at 2131.

In arguing these laws are "relevantly similar" analogues that justify its modern firearm ban, the State claims that "[n]either assault weapons nor large capacity magazines are necessary for self-defense"[11] and that "[w]hatever minimal burden may exist is justified by the same overriding

---

[10] Egregiously, the AG cites an 1837 Georgia law banning the carry and sale of pistols. AG.Br.47. But the AG should know that law was ruled unconstitutional in *Nunn v. State*, 1 Ga. 243 (1846), because its fate was discussed in *Bruen.* 142 S. Ct. at 2147.

[11] The Second Amendment does not only apply to self-defense, but all lawful purposes. While self-defense is central to the Second Amendment, "the [Supreme Court] also said the Second Amendment protects the right to keep and bear arms for other 'lawful purposes,' such as hunting." *Heller v. District of Columbia*, 399 U.S. App. D.C. 314, 330 (2011) (citing *District of Columbia*

11

interest that motivated prior generations to enact similar regulation." AG.Br.51; *see also* AG.Br.58 ("Whatever minimal burden the Act imposes is equally justified compared to regulations of 'dangerous and unusual' weapons from prior eras."). The argument fails for three reasons.

First, when the State claims that the "burden" on the right is minimal because the restricted arms are not "necessary for self-defense" and can be justified by some governmental interest, it is simply engaged in interest-balancing *disguised* as a history-based argument. In doing so, the State defies *Bruen*'s clear rejection of interest-balancing tests. *See* 142 S. Ct. at 2133 n.7 ("This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry."). And it thumbs its nose at *Heller*'s instruction that "[t]he right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano*, 577 U.S. at 421 (Alito, J., concurring) (paraphrasing *Heller*, 554 U.S. at 629).

Second, the State's claim that the Act is "relevantly similar" to the "dangerous and unusual weapons" regulations of the 17th, 18th, and 19th centuries is deeply rooted in the flawed analysis of the Northern District in *Bevis v. Naperville*, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (denial of preliminary injunction). AG.Br.55. There, the court held that "assault weapons and large capacity magazines fall under" the category of "dangerous *or* unusual" weapons that were, historically, subject to some level of regulation. *Bevis,* 2023 WL 2077392, at *10-14 (emphasis added). But the *Bevis* preliminary injunction order rests on highly dubious legal and factual findings.[12] Perhaps most importantly, the opinion "begins with the *fundamentally wrong* criterion that being particularly 'dangerous,' alone, justifies banning a type of firearm." Halbrook, *Judicial Salvo*, *supra* note 11 (emphasis added). In fact, it practically rewrites the

---

*v. Heller*, 554 U.S. 570, 630 (2008)). Target shooting, hunting, and competition shooting are all lawful uses of the banned arms.

[12] *See* Stephen Halbrook, *Second Amendment Roundup: An Opening Judicial Salvo in Defense of Illinois' New Rifle Ban*, Volokh Conspiracy (Mar. 13, 2023), https://reason.com/volokh/2023/03/13/second-amendment-roundup-an-opening-judicial-salvo-in-defense-of-illinois-new-rifle-ban/ (discussing the legal errors of the *Bevis* order); David Kopel, *How Powerful Are AR Rifles? About the Same as Other Rifles*, Volokh Conspiracy (Feb. 27, 2023, 2:37 PM), https://reason.com/volokh/2023/02/27/how-powerful-are-ar-rifles/ (explaining in detail the *Bevis* decision's countless erroneous claims about the purportedly "exceptional danger" that "assault weapons" pose).

*Heller* test for what arms come within the Constitution's grasp. While it *may* be true that there is some "historical tradition" of excluding "'dangerous *and* unusual' weapons," from the Amendment's protection, *Duncan v. Bonta* ("*Duncan V*"), 19 F.4th 1087, 1148 (9th Cir. 2021) (quoting *Heller*, 554 U.S. at 627), the Supreme Court does not speak in terms of "dangerous [*or*] unusual" weapons—no matter how many times the *Bevis* court (or the State) suggests it does.

And third, contrary to the State's claim that earlier generations "enact[ed] *similar* regulation[s]," AG.Br.51, the State's pre-20th century laws are not "similar" to the Act because not one of them banned the mere possession of arms in common use by law-abiding citizens (like the Act does). Instead, they focused on regulating just the *carry* of certain arms, a fact the State readily concedes. AG.Br.56 ("These historical regulations frequently took the form of bans on concealed carry, and sometimes prohibitions on any form of public carry, concealed or otherwise."); *see also id.* (identifying only 20th-century possession bans).[13] And the few 19th-century laws restricting the sale of certain arms, including pistols, that are most arguably "similar" to Illinois' modern ban on semiautomatic rifles and certain magazines were short-lived, having been invalidated by 19th-century courts soon after their adoption. *Compare* AG.Br.56 &n.47 (citing 1881 Ark. Acts 191; 1879 Tenn. Pub. Act 135-36; 1837 Ga. Acts 90), *with Andrews*, 50 Tenn. 165; *Wilson*, 33 Ark. 557; *Nunn*, 1 Ga. 243.

Given that its proposed analogues mostly applied only to the carrying of certain weapons, the most the State can muster to address this obvious disconnect is that *Bruen* does not require "historical twins," but rather just historical analogues. AG.Br.57. But again, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20.

---

[13] Ostensibly trying to downplay this fact, the State claims that 19th century laws regulated carry but not possession because laws generally did not ban mere possession until the 20th century. AG.Br.62. The argument is an odd one for the State to make because the lack of a tradition of similar restrictions pre-dating the 20th century is convincing evidence that such laws are *unconstitutional*. For the laws of the 20th century alone cannot establish a historical tradition; they can only confirm what came before. *See Bruen*, 142 S. Ct. at 2154, n.28.

Historical laws that banned just the carry of certain arms[14] are clearly more distinguishable than they are similar to the State's flat ban on the sale and possession of some of the most popular arms in the country. The State invokes *Bruen*'s guidance that it does not impose a "regulatory straightjacket," *Bruen*, 142 S. Ct. 2111 at 2133, but with its shoddy proposed analogues that bear no relevant similarity in either "how" or "why" the regulations operated, the State demands a "regulatory blank check." *Id.* This Court should not sign it.

### B. The State's Reliance on 20th Century Machine Gun Laws Is Unpersuasive and Factually Wrong

Recall the *Bruen* Court gave little weight to laws that long pre-dated the founding, *see supra*, Part IV.A., at n.7, finding them only relevant where evidence shows that they survived to become the laws of the Founders. 142 S. Ct at 2136 (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)). The Court considered 20th-century history even *less* important, relegating its discussion of the laws of the period to a mere footnote. *Id.* at 2154, n.28. Declining even to consider such evidence, the Court explained that, like laws of the late-19th-century, 20th-century evidence "does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*." *Id.* (emphasis added). This does not mean the State can rely on any law from the mid-to-late-19th or 20th centuries unless it *conflicts* with an 18th-century law. Rather, the State may only rely on laws enacted after 1868 when they *confirm* our understanding of the text and 1791 tradition. The *Bruen* analysis supports this reading. To be sure, *Bruen* left open the possibility of using 1800s sources. But when the *Bruen* Court discussed those laws, it was "as mere confirmation of what the Court thought already had been established." 142 S. Ct. at 2137; *see also* 142 S. Ct. at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.").[15] And, based on *Bruen*'s guidance, early post-*Bruen*

---

[14] None of which applied to rifles. Indeed, the State cited *no laws* that restricted the sale or possession of popular repeating rifles in the 19th century.

[15] There is other recent precedent supporting Plaintiffs' interpretation of the Court's use of 19th and 20th century evidence. *See, e.g.*, *Espinoza v. Montana*, __ U.S. __, 140 S. Ct. 2246 (2020) (reviewing 30 state statutes from the second half of the 19th century, the Court held that

14

decisions rebuked calls to rely on evidence of 20th-century laws. *See, e.g.*, *United States v. Nutter*, No. 21-00142, 2022 U.S. Dist. LEXIS 155038, at *9 (S.D. W.Va. Aug. 29, 2022) (laws originating in the 20th century cannot justify a law *unless similar laws existed at the founding*); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 21-1245, 2022 U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (22 state laws adopted in the 20th century was insufficient historical justification for a ban on firearms purchases for those under the age of 21).

Still, the State submits a collection of about 30 machine-gun bans adopted in 24 states between 1925 and 1933. AG.Br.49-50 (citing Ex.11, Spitzer Decl., Exs. B, D). But, as the district court in *Duncan* held, the "machine gun statutes cited by the Attorney General do not stand as proof of long-standing prohibitions on the firing-capacity of Second Amendment-protected commonly possessed firearms." *Duncan v. Becerra* ("*Duncan III*"), 366 F. Supp. 3d 1131, 1152 (S.D. Cal. 2019). Nor do they stand as proof of long-standing prohibitions on the type of popular semiautomatic rifles Illinois bans.

If any of the State's cited 20th-century laws restricted possession of *semiautomatic* firearms (instead of mistakenly equating automatic and semiautomatic firearms),[16] these outlier laws would contradict this country's long history of *not* banning classes of arms in common use for lawful purposes. The 20th-century semiautomatic restrictions the State cites thus contradict the relevant historical tradition rather than reaffirm it. Under *Bruen*, that makes them entirely irrelevant to the analysis.

## V. Conclusion

For these reasons, as well as those laid out in the Plaintiffs' moving papers and the *Barnett* reply, this Court should grant Plaintiffs' motion for a preliminary injunction.

---

"[s]uch a development, of course, cannot by itself establish an early American tradition ... such evidence may reinforce an early practice *but cannot create one*.") (emphasis added).

[16] *Compare* AG.Br.50 (citing Ex.11, Spitzer Decl. ¶ 28) (claiming that "7 states enacted laws restricting possession of semi-automatic weapons"), *with Duncan IV*, 970 F.3d at 1150 & n.10 (holding that only three states and D.C. restricted the firing capacity of semiautomatics).

Dated: March 23, 2023

Mark L. Shaw, Esq.
Jennifer Craigmile Neubauer, Esq.
Michael A. Danforth, Esq.
SHAW LAW LTD.
33 North County Street, Suite 300
Waukegan, Illinois 60085
(T): (847) 244-4696
(F): (847) 244-4673
(E-1): mlshaw@shawlawltd.com
(E-2): jcneubauer@shawlawltd.com
(E-3): michael@danforthlawgroup.com

Respectfully submitted,

By: */s/ C.D. Michel*
C.D. Michel, Esq. (pro hac vice)
Sean A. Brady, Esq. (pro hac vice)
Konstadinos T. Moros, Esq. (pro hac vice)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(T): (562) 216-4444
(F): (562) 216-4445
(E-1): cmichel@michellawyers.com
(E-2): sbrady@michellawyers.com
(E-3): kmoros@michellawyers.com

*Attorneys for Plaintiffs Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, Piasa Armory, Debra Clark, Jasmine Young, and Chris Moore*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on March 23, 2023, an electronic PDF of PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

Dated: March 23, 2023                                Respectfully submitted,

                                                             */s/ C.D. Michel*
                                                             C.D. Michel