# EXHIBIT 1

## <u>DECLARATION OF DONALD T. VANDERMYDE</u>

I, Donald T. Vandermyde, declare as follows:

1.      I am currently retired, but engage in consulting work on Second Amendment litigation matters.

2.       For 25 years I was the NRA's contract lobbyist in Illinois arguing all types of Second Amendment and firearms issues before the Illinois General Assembly on subjects ranging from federal firearms law, state law, technical aspects of firearms and ammunition.

3.      For the past 8 years I have held an 07 type Federal Firearms License (FFL) with a Special Occupation Tax (SOT) allowing for the manufacture, sale and disposal of firearms up to and including firearms covered under the National Firearms Act such as Short Barreled Rifles (SBR), Short Barreled Shotguns (SBS), suppressors and Machineguns.

4.      Under our FFL we have disposed of thousands of firearms for law enforcement agencies, where upon completion we provided a record of the disposition including a corrected record of firearms arms received. At times these corrections could be as much as 30% of the inventory taken in. These corrections could be from missing a serial number, to correctly identifying the type of firearm by make and model.

5.      I am a veteran of the US Army Reserve with over 18 years of service where I received training and experience with military small arms firearms ranging from .38 caliber revolvers to M2 .50 caliber Browning Machine Guns and 40MM grenade launchers.

6.      I have been a subject matter expert consulting for the Madison County states Attorney under former SA Tom Gibbons dealing with questions of NFA laws and definitions.

7.      I have been consulted by numerous law enforcement officials in interpreting Illinois' firearms laws.

8.      I have taught classes for Continuing Legal Education credits for the Illinois Bar Association on the subject of Illinois firearms laws.

9.      I have taken and completed Counter Vehicle Ambush classes taught by Chicago Police SWAT officer and Special Forces ODA team member Matt Little.

10.     I have successfully completed Shoot House Instructor Course by Paul Howe.

11.     For the past 6 years I have been an instructor for Aurora Sportsman's Club TASC program.

12.     Based upon my experience and having reviewed PA102-1116 I have come to the following opinions. The opinions refer to listed figures in the attached appendix, which includes photographs illustrating what I am referring to.

13.     Due to the features tests contained in 24-1.9, the parts ban in §(I) and the language contained in the magazine ban in 24-1.10, the scope of the ban is far wider than depicted by the State.

14.     The features test on rifles encompasses some of the most common style rifle stocks either getting caught up in thumbhole or pistol grip distinctions (figures 4-12). The barrel shroud in the features test 24-1.9(1)(A)(vi) "a shroud attached to the barrel *or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned*. . ." includes the standard rifle stock that has been around since the founding of our nation. It includes both single piece and two-piece rifles stocks (figures 4 – 12, 26, 27, 30, 33—42) Figures 44 & 45 show traditional use of rifles while in either the sitting or standing and supporting the rifle with the non-firing hand.

15.     While the State asserts that a Ruger 10/22 only comes into play when additional parts are added and "convert" the firearm into one banned by the features test (figure-46). The illustrations in Figures 44 & 45 show otherwise and apply to firearms like the Ruger 10/22 in its most plain and common configuration, of which as of 2015 over 7 million have been made.

16.     The classification of a Ruger 10/22 as an "assault weapon" due to the features test, impeaches any assertion that the ban applies only to high powered firearms, Ex. 13, Hargarten Decl. ¶ 14 n.5 (noting that assault weapons enable rounds to be fired at "high velocity,".) The Ruger 10/22 fires a .22 long rifle round, one of the lowest powered rounds manufactured. But this is just the tip on the iceberg. Figures 47 – 55 show replicas of some of the most iconic firearms in .22LR caliber.  While they may look similar to their counterparts that

2

have seen use throughout history, they are far less lethal being chambered in .22LR, the same as most squirrel hunting rifles. These types of historical replicas are in demand for collectors and history buffs. Their lower cost in acquisition and operation due to being chambered .22LR making them cheap to shoot.

17.     PA102-1116's features test for pistols begins with making a typical handgun an "assault weapon" for simply having a threaded barrel (C)(i). Threaded barrels do nothing to increase any lethality of a handgun. They are used either to add a "flash hider" or muzzle brake for competitive shooters (Figures 56, 57, 67 & 68). Forty-two states allow for the private possession of suppressors, and threaded barrels are the typical means of attaching such items, but that in no way makes them any more dangerous or lethal.

18.     Under the features test hand stops and even bi-pods can be considered features that can act as a protruding grip to be held by the non-firing hand. Those forward grips are often used as safety devices to prevent the shooter's hand from slipping past the front of the barrel and creating the possibility of shooting the non-firing hand (figures 58 – 61).

19.     In the broad items covered under the features test we again see the barrel shroud. On larger pistols this acts as a means for mounting things like lights, bi-pods or even hand-stops. As manufacturing technologies advance they run afoul of this test as Figures 63—65 illustrate, including .22 caliber Ruger pistols, MKIV & 22/45,  that utilize an aluminum upper that hold the barrel which is a steel sleave pressed into the aluminum upper. These types skelontonize part of the "barrel shroud" in efforts to cut down on weight. But they fit the definition of barrel shroud as defined by the Act.

20.     Going back to the 1900s manufacturers have been changing designs to increase efficiency of handguns to include magazines that attach outside of the pistol grip (figures 69 – 74).  Some of these offer novel innovations to change the balance of the firearm. With modern conventional handguns having detachable magazines, the location of the magazine makes little difference for the capacity and next to no difference in any lethality. The lethality of the firearm is determined mostly by the caliber of ammunition it uses.

21.     Pistol braces have come about as a safety device for disabled shooters to be able to hold and shoot larger pistols in a safe manner. The overwhelming majority of which have been applied to semi-automatic pistols. By the Congressional Research Authority, there are between 10 and 40 million of these types of devices in existence. Where the State has attempted to minimize the quantity of AR type firearms as being in common use, the addition of potentially 10 to 40 million firearms effected by the Act clearly shows how common these firearms are. Figure 76.

22.     The Features test affects a large number of shotguns. Pistol grips and thumbholes stocks exist on some of the most popular hunting shotguns (figure 77 – 82) like the Bennelli Super Black Eagle or Remington 11-87. The definition of pistol grip also catches some semi-auto shotguns that use a more traditional stock like a Stoeger M3K (figure 82). The only thing these grips do is facilitate more control over the firearm, making the shooter more accurate which is the goal of all shooters.

23.     Folding stocks, pistol grips, and forward grips all do nothing to change the lethality of a shotgun. Lethality is a function of the gauge/caliber and the type of ammunition being used. Larger gauges have more pellets for more weight and projectiles, with larger shells packing more powder. All of which contributes to the lethality of the ammunition – buckshot like 00 is more lethal for humans than birdshot is at a given distance. None of which is affected by any of the attachments listed above (figures 83 – 87).

24.     A large problem with the shotgun features test is its limitations on the number of rounds in a fixed magazine. The Act uses "5 rounds" as a limit. Yet it fails to address the type of ammunition. Shotguns chambered for 3 ½" shells can still use 3" or 2 ¾".  But there are 1 ¾" mini shells readily available (figure 109). A shotgun capable of holding 5 -- 2 ¾" will hold 8 mini shells calling all semi-auto shotguns into question. Under Illinois law, shotguns are not restricted when hunting upland game birds on private clubs nor during the snow goose season. But many shotgun manufacturers offer self-defense versions that hold more than 5 shots. Shotguns that hold more than 5 rounds are used routinely by competitors in 3-Gun competitions

and several major manufacturers offer shotguns holding more than 5 rounds catering to this. (figures 88-93)

25.     Included in the Act is a ban on magazines 24-1.10. This ban has a few different components. First is the hard number of 10 rounds for long guns and 15 rounds for handguns. This conflicts with the prohibition of semi-auto shotguns that hold more than 5 under §(F)(v). Notwithstanding that both limits also contain language that not only places a hard limit on the size of magazines, but also magazines "that can be readily restored or converted to accept, more than. . ." And this greatly expands the breadth of both the magazine ban and gun ban in 24-1.9.

26.     Unlike 24-1.9 that specifically exempts manually operated firearms, 24-1.10 has no such exemption. It clearly exempts tubular magazines on lever guns. But does not contain the same broad based type language as used in 24-1.9.  As such it implicates manually operated pump shotguns like the Bennelli Nova and Remington 870 (108).

27.     The Remington 870 is America's shotgun. With over 11 million having been manufactured, the Remington 870 uses a fixed tubular magazine mounted in the receiver. At the end of the magazine, a nut secures the barrel to the magazine completing the assembly of the shotgun. These magazines are readily converted to being capable of holding more than 5 rounds for semi-auto shotguns and more than 10 for either semi-auto or pump action shotguns (figure 99). These conversions are as simple as unscrewing the cap on the magazine, removing a retainer and magazine spring, then replacing the spring and screwing on the magazine extension. Without the explicit exemption for manually operated firearms and their ability to be readily converted to hold more than 10 rounds of standard ammunition, the magazine language in 24-1.10 becomes a ban on those firearms where the magazines can be converted like the Remington 870.

28.     The shotgun ban expands when all the major manufacturers utilize a similar design on their semi-auto shotguns. The Remington 1100 and 11-87 use the same design as the 870. The parts used to convert an 870 to more than 10 rounds are the exact same parts that convert the 1100 or 11-87 with the same ease.  All major shotgun manufacturers of semi-auto

shotguns use a similar design. A check of their shotguns at the 2023 SHOT Show showed the same ease of conversion as the Remington shotguns (Figure 99).

29.     I own Remington 870s, 11-87 and 1100 shotguns and have previously performed this exact conversion to several of them. Thus based upon the language of 24-1.10, the language turns 1.10 into a ban on those semi-auto shotguns and pump action shotguns that the state has not shown as banned due to their ability to be readily converted.

30.     Much like the ability of shotgun magazines to be converted, so too handgun magazines can be readily converted to hold more than 15 rounds. Most handgun magazines use removable base plates. These base plates can be swapped out in a matter of minutes with base plates that hold additional rounds.

31.     These base plate additions can contain as few as a single round to as many as 30 rounds added to the bottom of these magazines. The most popular handguns (like Glocks) have some of the most widely available conversions. Some need only a ball point pen to make the change. So while 1.10 says it's a limit on magazines for pistols that hold 15 or more rounds, the readily converted language changes that (figures 110 – 114). And giving the language that says any of these magazines cannot be carried in public on public property, it creates a very broad based ban on what types of magazines people may effectively carry with a concealed carry license (figure 115).

32.     Section 1.10 creates more confusion in that there are several long gun platforms that use Glock magazines due to their prevalence in the market place. Thus, the same magazine that might be legal in a pistol, becomes illegal if placed in a rifle (Figures 117 – 118).

33.     The law says of parts: "§(I) Any part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person." (figure 136 shows internal parts used to complete a stripped AR-15 lower receiver).

34.     The listed firearms are approximately 170 in number but each of those firearms contains dozens of parts. The AR type rifles typically has 104 parts. The State took a narrow approach to the parts section in their illustrations (Figure 119 – 123).

35.     Since the intent of the State is to prevent any further acquisitions of these firearms within the state, the only way to read the statute is a complete ban on ANY of the parts that go into either the listed firearms or those that qualify under the features test.

36.     It would be absurd to read the statute to say that if you are only acquiring a third of the parts, that would be allowed, for all a person would have to do is make 3 different purchases, each for a different third of the parts to be able to assemble a prohibited firearm, which is an act prohibited by section 1.9. Taking its plain meaning, 1.9 (I) bans ANY combination of parts that would go into one of the listed firearms or any part or combination of parts that would be used to assemble or restore/repair a firearm banned by the features test.

37.     The parts ban raises an interesting problem, what to do when firearms use common items one could find at a hardware store. Often time there are common screws or bolts such as the grip screw for an AR-15, or the roll pins used on the lower receiver. Those very pins are illegal for sale at a gun shop, but legal for sale at Home Depot (figure 137 – 138).

38.     Any right to own or possess a firearm and to train or practice with said firearm has to come with a right to repair that firearm and keep it in good working order. The ban in Subsection I prevents owners from repairing their firearm from minor breakdowns even in the event of a catastrophic failure.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on March 23, 2023.

Donald T. Vandermyde
Declarant

Appendix



## Rifles

In section 24-1.9 there are several bans. The four most prevalent are:

1. The ban of listed guns, to which the State Police by rule may add to each October 1st.

2. The features test where if the rifle has a single qualifying feature it is considered an "assault weapon"

3. The ban on "assault weapon" attachments.

4. The ban on parts.


Taking each of these in turn, this appendix will show how they impact firearms, components, attachments and parts.

**Features Test For Rifles:**

(A) A semiautomatic rifle that has the capacity to accept a detachable magazine or that may be readily modified to accept a detachable magazine, if the firearm has one or more of the following:

(i) a pistol grip or thumbhole stock;

(ii) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii) a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;

(iv) a flash suppressor;

(v) a grenade launcher;[1]

(vi) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.

---

[1] Grenade launchers per the ATF are considered destructive devices and require a Special Occupation Tax (SOT) to manufacture, sell or acquire. The most common are the M79 and M203 40mm. As they are already heavily regulated under the National Firearms Act and Plaintiffs do not challenge that particular restriction, no further discussion is relevant here.

## 1994 AR-15 PRE-Ban[2]



Flash Hider

Telescoping Stock          Pristol Grip          Bayonet Lug

Figure 1



No Flash Hider

No Bayonet Lug

Non Telescoping Stock          Pistol Grip

Figure 2

---

[2] Unlike the law at issue in this litigation the Federal Assault Weapons Ban in place from 1994 until 2004 used a *two* feature test, hence why AR-15s and other firearms could still be purchased with a pistol grip, as long as they didn't have a second prohibited feature.

### 24-1.9 (A)(i) Pistol Grip:

Pistol grips can take on several forms:

Traditional pistol grip is located behind and below the action of the firearm to make operation of the fire control components for the firearm (trigger, mag release or safety) easier to manipulate.



**Figure 3 FN-FAL with traditional Pistol Grip[3]**



**Figure  4     Ruger 10/22[4]**



**Figure 5    Ruger 10/22**

---

[3] The first pistol grip appeared on a rifle in 1840, and they are popular for ergonomic reasons.
[4] Several designs incorporate a dropped pistol grip with a more traditional style stock



**Figure 6   Ruger 10/22 by Clark Customs**



**Figure 7        Volquartsen Firearms lightweight .22[5]**



**Figure 8        Kahr Arms MLR .22LR Switchbolt**



**Figure 9  Kahr Arms MLR .22LR Switchbolt[6]**

---

[5] Still other designs incorporate a pistol grip into stocks designed with a "monte Carlo style cheek rest while skeletonizing the stock (removing material) to lighten it up.
[6] The rifles pictured above would all be illegal under the PA-102-1116 features test for semi-automatic rifles with detachable magazines and a "pistol grip"

4

## 24-1.9 (A)(i) Thumbhole Stocks

With a thumbhole rifle stock, the user can get more control over their firearm, better finger placement on the trigger, and improved trigger control, with a more solid grip on the rifle and less recoil felt on the shoulder. Thumbhole rifle stocks let the user have more grip on the rifle and keep it steadier, giving a sure shot.

Moreover, the thumb can move in a more natural position. For many shooters, in fact, holding their thumb over the top of the gunstock can become difficult and even painful over time. The presence of the hole in the wooden stock makes the rifle more comfortable, especially for those with small hands because they can reach the trigger correctly without putting their hand in an awkward position.



**Figure 10**        **Volquartsen's Red, White & Blue 22 Rifle**



**Figure 11**        **Ruger 10/22**



**Figure 12  Boyds laminated thumbhole stock**

## 24-1.9 (A)(ii) Forward Grip[7]

**Forward grips are used to help pull the rifle into the user's shoulder to maintain a better sight picture, and better accuracy.**



**Vertical Fore Grip**

**Figure 13**



**Angled Forward Grip**

**Figure 14**

---

[7] (ii) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

**Figure 15 other examples of forward grips**

## 24-1.9 (A)(iii) Stocks.[8]

Stocks for rifles have evolved over time to adapt to different needs and application.

## Folding Stocks



**Figure 16    AR style Folding Stock**



---

[8] (iii) a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;

**Figure 17   DSA FAL with folding stock**

**Upper image with Stock Extended**

**Lower Image with stock stowed.**



**Figure 18        AK Under-folder Extended**



**Figure 19        AK  Under-folder Stowed**



**Figure 20 Sterling L2A3  Stock stowed**

8



**Figure 21 Sterling L2A3   Stock Extended**

**Telescoping**



**Figure 22   HK94A3**

**Telescoping Stock – Closed**

9



**Figure 23   HK94A3**

**Telescoping Stock – Extended**



**Figure 24 Ruger 10/22**



**Figure 25 AR-15**

"*or adjustable in a manner* that operates to reduce *the length, size, or any other dimension*."



10

**Figure 26**[9]



**Figure 27**



**Figure 28**

**Figure 29**

[9] Adjustable stocks are designed to they can be customized by the user to fit them as precise as possible, without the expense of custom stocks by gunsmiths. The language in § (iii)say adjustable to reduce ANY dimension. Thus these competition type stocks make the below gun Illegal despite only reducing the overall size by 2" or less

## 24-1.9 (A)(iv)  Flash Suppressors[10]



**Figure 30**          **Ruger 10/22s with Flash suppressors**



**Figure 31**     **FN FAL w/ Flash Suppressor**



---

[10] Despite their name, flash suppressors are not primarily designed to reduce the flash "signature" of a shooter allowing them to remain hidden longer. Rather, flash hiders were designed primarily to prevent the shooter from being blinded from the flash of powder which became more significant as barrel lengths were reduced.

12

**Figure 32       AR-15 w/ Flash Suppressor**

**24-1.9 (A)(vi)   Barrel Shrouds[11]**



**Figure 33   Browning Automatic Rifle (BAR)**



**Figure 34   Remington 742**



**Figure 35     Remington Model 8 Circa 1900[12]**



[11]"(vi) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel."

[12] The Remington Model 8 has a handguard that acts as a barrel shroud as defined by the Act. It also has a shroud over the barrel that is part of the recoil system, allowing the barrel to move back and forth as part of the operation of the firearm. Designed in late 1890's and patented in 1900, it would be illegal under PA102-1116.

13

**Figure 36    Springfield armory M1A [13]**

**Figure 37   M1 Carbine**

**Figure 38    M1 Carbine[14]**

**Figure 39   SKS Type 56[15]**



[13] The Springfield Armory M1A uses a traditional styled stock design encompassing the underside of the barrel. It also uses a cover on the upper portion of the barrel to protect moving parts as part of the operation of the firearm. "(iii) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned,"

[14] The M1 Carbine uses a two-piece covering; 1 a traditional style stock and a cover to protect some of the operational components of the firearm. Some versions of the upper cover are wood, others are metal.

[15] The SKS uses a two-piece covering; 1 a traditional style stock and a cover to protect some of the operational components of the firearm. The SKS could be a rifle with a fixed magazine of 10 rounds and still be prohibited because of the stock & handguard

**Figure 40    SKS Type 56**



**Figure 41        Volquartsen Firearms lightweight .22[16]**



**Figure 42    Ruger 10/22[17]**



**Figure 43    Ruger 10/22[18]**

---

[16] Rifles use free floating barrels for improved accuracy anything touching the barrel can diminish the accuracy, therefore there must be a means for the non-firing hand to support the rifle.

[17] Rifles by their very nature are designed to be used with two hands, with one supporting the outstretched weight. Based upon 24-1.9(A)(vi) any semi-automatic magazine feed rifle would be banned.

[18] Under the plain language of the definition of a barrel shroud found in the challenged law, common firearms such as this Ruger 10/22 would be banned.



**Figure 44 Traditional sitting position
with rifle using non-firing hand for support**



**Figure 45 Traditional Standing position with Off-hand
support (non-firing hand) holding the forend of the
rifle by the stock with the non-firing hand**



**Figure 46 Ruger 10/22  Caliber .22 Long Rifle**



**Figure 47 American Tactical Imports ACR .22 Long Rifle**



**Figure 48 Walther UZI Caliber .22 Long Rifle**



**Figure 49 American Tactical Imports STG44**

## Caliber .22 Long Rifle[19]



**Figure 50 Israel Weapon Industries UZI Pistol Caliber .22 Long Rifle**

**Figure 51 German Sports Guns GSG-5 Pistol Caliber .22 Long Rifle**



**Figure 52 Walther HK G36 Caliber .22 Long Rifle**

---

[19] Collectors and enthusiasts have long wanted historical firearms no longer available like the Sturmgewehr 44. No longer in production and Illegal to own as a machinegun, firearms companies have taken to reproducing replicas in .22 long rifle to make them inexpensive rifle to shoot while retaining an aura of authenticity, giving gun owners a chance to own a piece of history.

**Figure 53 standard Manufacturing GS4 Caliber .22 Long Rifle**



**Figure 54 Kel Tec SU22 Caliber .22 Long Rifle**

**Figure 55 Standard Manufacturing 1922 Caliber .22 Long Rifle**

## Pistols

(C) A semiautomatic pistol that has the capacity to accept a detachable magazine or that may be readily modified to accept a detachable magazine, if the firearm has one or more of the following:

(i) a threaded barrel;

(ii) a second pistol grip or another feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

(iv) a flash suppressor;

(v) the capacity to accept a detachable magazine at some location outside of the pistol grip; or

(vi) a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip and is designed or redesigned to allow or facilitate a firearm to be fired from the shoulder.

19

(i)        a threaded barrel;



Figure 56        Sig Mosquito .22LR

Figure 57 Walther P22 .22LR

(ii) a second pistol grip or another feature capable of functioning as a protruding grip that can be held by the non-trigger hand;



Figure 58 Ruger Charger

20



Figure 59 Angle Grip                          Figure 60 Hand Stop



Figure 61 Ruger PC Charger w/hand stop

(iii) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;



Figure 62 AR Pistol

Figure 64 Ruger 22/45

Barrel Shroud

Figure 63 Ruger MK IV .22LR Barrel Shroud



Figure 65 Ruger 22/45 Barrel Shroud



Figure 66 HK SP89 Barrel Shroud

(iv) a flash suppressor;



22

Figure 67 Browning Buckmark w/ flash hider



Figure 68 Glock  w/flash hider

(v) the capacity to accept a detachable magazine at some location outside of the pistol grip



Figure 69 Ruger Charger .22LR



23

Figure 70 KelTec P50



Figure 71 The Benelli MP 95E Atlanta

Figure 72 Mauser C96 "Broomhandle"

Figure 73    Bergmann Simplex automatic pistol circa 1901

Figure 74 Bergman 1910/21 circa 1910[20]

---

[20] The challenged law also bans historic firearms from the early 1900s

(vi) a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip and is designed or redesigned to allow or facilitate a firearm to be fired from the shoulder.



Figure 75 AR pistol w/buffer tube



Figure 76 AR pistol w/brace[21]

## Shotguns

**(F) A semiautomatic shotgun that has one or more of the following:**

**(i) a pistol grip or thumbhole stock;**



**Figure 77 Remington 11-87 Turkey Gun – thumbhole stock**



---

[21] The exact number of braces already in circulation is unclear, but the number is well into the millions. The ATF itself estimates three to seven million of the devices exist. The Congressional Research Service puts the number much higher at somewhere between 10 and 40 million.

**Figure 78 Remington 11-87 Slug Gun (deer) – thumbshole/pistol grip**



**Figure 79 Benelli Super Black Eagle 3 Turkey Gun—pistol grip**



**Figure 80 Benelli M4 Tactical – pistol grip**



**Figure 81 Benelli M2 – pistol grip**



**Figure 82 Stoeger M3K – pistol grip**

**(ii) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;**



26

Figure 83



Figure 84

## (iii) a folding or thumbhole stock;



**Figure 85 Hasan Escort Side Folder**



Figure 86     **Hasan Escort Top Folder**



**Figure 87   Molot Vepr 12**

27

### (v) a fixed magazine with the capacity of more than 5 rounds[22]



**Figure 88 Remington 1100**



**Figure 89  Beretta 1301 Tactical – 7 Shot magazine**



---

[22] 24-1.9(F)(v) bans any semi-automatic shotgun with a fixed magazine of more than 5 rounds. The term "fixed" refers to a magazine that is not a box type detachable magazine capable of being removed and replace by another box magazine preloaded with ammo as illustrated §(vi). Section 24-1.10 of the act refers to long gun magazines of more than 10 rounds. But here the General Assembly intentionally and specifically singled out semi-automatic shotguns as having a 5 round limit. It therefore stands to reason that the limit to apply to semi-automatic shotguns without detachable box magazines is 5 rounds.

**Figure 90 Beretta 1301 COMP PRO – 10 Shot magazine**



**Figure 91 Stoeger MK3000 Freedom – 10 Shot Magazine**



**Figure 92 Benelli M4 Tactical – 7 Shot Magazine**



**Figure 93 Savage Arms Renegauge Competition – 9 Shot Magazine**

**(vi) the capacity to accept a detachable magazine**.



Figure 94 AK-Platform 12 Gauge



Figure 95 Monastor 102



Figure 96 AR-style 12 Gauge

Figure 97 AR-style 12 Gauge

**(E) Any shotgun with a revolving cylinder.**



Figure 98 Striker 12[23]

Number 5 on the list of features is a grenade launcher, that make a shotgun a so called "assault weapon" under the Act. Grenade launchers are generally considered destructive devices and fall under the National Firearms Act (NFA) and are treated like machineguns. For that reason we will not bother with dealing with them here.

## Magazines

The Court asked for items banned in 24-1.9 and the State included a depiction of magazines as banned under 24-1.10 in their appendix requested by the Court. This appendix covers magazines also restricted by the plain text of the law in addition to what the State already covered.

(1) a magazine, belt, drum, feed strip, or similar device that has a capacity of, ***or that can be readily restored or converted to accept, more than*** 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns; or

### Shotguns

Conventional repeating shotguns use a design of a tubular magazine under the barrel. These magazines are mounted in such a way into the receiver, that they are permanently attached to the receiver, only capable of being removed by professional gunsmiths.

---

[23] The Striker 12 and the Streetsweeper were two shotguns that used a revolving cylinder to hold and feed ammunition. They were declared destructive devices by the Clinton administration in 1994 and regulated under the National Firearms Act

Fig 99[24]
Tubular magazine conversions
From top to bottom
+9 Shot Extension
+8 Shot Extension
+7 Shot Extension
+6 Shot Extension
+5 Shot Extension
+4 Shot Extension
+3 Shot Extension
+2 Shot Extension



**MEASURING FOR MAXIMUM EXTENSION TUBE LENGTH**

MEASURE HERE

Measure the distance from the front of the barrel lug or forearm to the end of the barrel. This will help determine the approximate length of the extension you'll want to use. It's OK if the tube is slightly longer or shorter than the end of the barrel.

Examples of Semi-Auto Shotguns that can be converted to hold either more than 5 or more than 10 rounds

Fig 100 Remington 11-87 5 Shot



Fig 101 Remington 11-87 w/3 shot extension total 8 shots



---

[24]Magazine extensions are available for most popular brands of shotguns, Benelli, Beretta, Browning, FN, Franchi, Mossberg, Remington, Savage, Stevens, Stoeger, Weatherby, and Winchester. Since they are readily convertible, with magazines permanently fixed into the receiver from the factory, the magazine ban converts to a prohibition on these commonly used shotguns due to their ability to be readily converted to hold more than 5 or 10 rounds.

Fig 102 Benelli Super Black Eagle III 5 shot



Fig 103 Benelli Super Black Eagle III w/ 9 shot extension total 14 shots



Fig 104 Mossberg 930 5 shot

Fig 105 Mossberg 930 w/ 4 shot extension
24-1.10 "or that can be readily restored or converted to accept, more than. . .



Fig 106 Beretta 391 5 shot



Fig 107 Beretta 391 w/ 7 shot extension

33



**24-1.10 does not apply only to semi-auto firearms**[25]

24-1.10 "or that can be readily restored or converted to accept, more than. . .

---

[25] The limitations in 24-1.10 apply to any magazines. Where as in 24-1.9 the law exempts manually operated firearms from the "assault weapons" definitions, no such exemption was applied to 24-1.10. The only tubular magazines exempted were specifically for lever action firearms and those for use with .22 rimfire. Pump action shotguns like the Benelli Super Nova and Remington 870 suffer from the same permanently mounted magazines in their receivers with the ability to be converted to hold more than 10 rounds of ammunition. With the magazines being permanently affixed and at the same time being convertible to hold more than 1o rounds, the magazine ban in 24-1.10 effectively bans these firearms from being sold.

Fig 108 Benelli Nova w/+7 extension 12 shot capacity



Shotguns have an additional point of vagueness in that neither 24-1.9 or 1.10 define the 'round" or shell to be used for determining capacity.

Traditional shotgun shells come in 2 3/4", 3" or 3 ½" for target shooting, self defense, or hunting. But another type exists in the "mini" shell, which is a typically 1 ¾" length shotgun shell. This lack of specificity means that a semi-auto shotgun that typically holds 5 rounds of 2 ¾" can hold 8 mini shells. Pump shotguns magazine extensions can hold more than 10.

Fig 109



**Handguns.**

While 24-1.10 bans detachable handgun magazines that hold more than 15 rounds, the handgun limitations suffer from the same issue as shotguns do with "*or that can be readily restored or converted to accept, more than … 15 rounds of ammunition for handguns."*

35

Fig 110 removable base plate

Fig 111 Glock Magazine Base plate extensions +5 9mm (20 rounds total)





Fig 112 Smith & Wesson Magazine with conversion





Handgun magazines typically use removable or detachable base plates to hold the internal components of the magazine in place. Even magazines that comply with the state's limitation of 15 rounds or fewer can be readily converted to hold more by simply swapping out the base plates for extensions. Magazine base plate conversions exist from plus 1 round to plus 30 rounds.

Fig 113 Goalith + 20 magazine extension          Fig 114 Goalith +30 magazine extension.




Fig 115 Glock 19 Factory 15 round          Glock 19 +2 17 round conversion




Since handgun magazines with removable baseplates are or that can be readily restored or converted to accept, more than … 15 rounds of ammunition for handguns. They are illegal to carry in public. Any pistol magazine with a removable base plate would have to be modified in such a way as to permanently affix the base plate to prevent it from being capable of being converted to hold more than 15 rounds.[26]

**Rifles**

Fig 116 Colt Lightning



---

[26] 24-1.10(d)(1)&(2) make it illegal to possess a loaded or unloaded handgun magazine on a public way or private property open to the public, such as a restaurant or gas station, **"that can be readily restored or converted to accept, more than … 15 rounds of ammunition for handguns."** This negates the most common semi-auto handguns used for carry unless the owners modifies the magazines to comply with 1.10. =

Fig 117 Rock River LAR-BT9G 9mm (Left) Glock 19 (Below Right)

Fig 118 Beretta CX4 Storm rifle(left)  Beretta 92 pistol (Below right)



While long guns have a 10-round restriction, there are those rifles that have been built around pistol magazines platforms. The same 15 round magazine that would be legal in a Glock 19 then becomes Illegal if sold for a rifle. The Beretta CX4 Storm was built to use the Beretta 92 pistol magazines. Selling the normal magazine for the pistol would be legal, selling the same magazine for the rifle is not.

## Parts & Attachments

Section 1.9 has two bans, one on parts (1)(I), another on attachments (3)



38

**Figure 119 AR-15-1**  **Figure 120 AR-15-2**



**Figure 121 AR-15-3**



**Figure 122  AR-15-4**



**Figure 123 AR-15-5**[27]

Sub-section (I) contains two types of bans. The first the part of (I) has a strong relation to §(3) as those parts that would convert a firearm from one not on the list or defined by features to one that would primarily meet the features test in the first part of sub-section(I).



Figure 124 Stock with pistol grip

---

[27] The above schematics show the exploded view of an AR-15 which contains 104 separate parts. In an effort to "not paper the Court to death" with schematics of 170 plus firearms we will use this as a representation for firearms discussed.

Figure 125 rifle thumbhole stock



Figure 126 adjustable stock



Figure 127 telescoping stock



Figure 128 Adjustable stock



Figure 129 Remington 11-87 thumbhole stock



Figure 130 handguard

41



Figure 131 Flash Hiders



Figure 132 Forward Grips



Figure 133 threaded barrel



Figure 134 AR-style Receiver Extension/Buffer Tube



Figure 135 Pistol Braces



Figure 136
AR-15 lower parts kit

"§(I) Any part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person."[28]

Figure 137 Roll pins[29]                                          Figure 138 Grip Screws 1/4 - 28

          

Many firearm parts consist of common items one could find at a hardware store. Often time there are common screws or bolts such as the grip screw for an AR-15, or the roll pins used on the lower receiver. Those very pins are now illegal for sale at a gun shop, but legal for sale at Home Depot.

---

[28] By banning "any" part, of a person with an AR-15 had the disconnector break, allowing the firearm to fire in a fully automatic mode, Illegal under both state and federal law, that person could not obtain a new disconnector to repair the firearm to bring it into compliance.

[29] Firearms like AR-15s use common methods of assembly by example roll pins are used to fasten several components on the firearm. If sold by a gun shop or retailer marked for an AR-15 they are prohibited under §(I), yet they are readily available at Home Depot, Mendards or Rural King.



Figure 139[30]

Figure 140 Ergo Adaptor and prohibited parts[31]

Figure 141 mossberg 500 with stock & adaptor installed[32]

---

[30] On the left is a Glock 19. Right is a Glock 19 with a threaded barrel. The Glock 19 w/threaded barrel is considered an assualt weapon under 24-1.9 (C)(i) and illegal for sale post 1/10/23. The third piece is a slide for a Glock 19 **designed** to accomidate all manner of barrels. Under the first part of §(I) "Any part or combination of parts **designed** or intended to convert a firearm into an assault weapon…" Under §(I) it is illegal for a gun owner to get a slide either as a replacement or upgrade for the Glock above without a threaded barrel because it is designed to accomidate ALL barrels for that specific model of Glocks.

[31] Figure 140 is a conversion kit for a Mossberg 500 pump action shotgun. The gun even with a pistol grip, receiver extension and a collapsible stock is legal under PA102-116 section 24-1.9. A person could choose to modify their Mossberg 500 by changing out the stock and adding the pistol grip under the law. But the adaptor uses 3 components common to the AR-15. As parts for an AR-15 they are illegal under the Act. Yet as parts for a Mossberg 500 they could be legally obtained and installed leading to more confusion about the legality of such parts.

[32] 1.9 exempts "(C) A firearm that is manually operated by bolt, pump, lever or slide action, unless the firearm is a shotgun with a revolving cylinder."