# Exhibit A

2023 WL 2655150
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC.; Bridgeville Rifle & Pistol Club, Ltd.; Delaware Rifle and Pistol Club; Delaware Association of Federal Firearms Licensees; Madonna M. Nedza; Cecil Curtis Clements; James E. Hosfelt, Jr; Bruce C. Smith; Vickie Lynn Prickett; and Frank M. Nedza, Plaintiffs,
v.
DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY, et al., Defendants.

Civil Action No. 22-951-RGA (Consolidated)
|
Signed March 27, 2023

**Synopsis**
**Background:** Group of gun rights advocacy organizations brought action against Delaware Department of Homeland Security alleging that Delaware law prohibiting sale and limiting possession of assault weapons and large-capacity magazines (LCMs) violated the Second Amendment. Plaintiffs moved for a preliminary injunction.

**Holdings:** The District Court, Richard G. Andrews, J., held that:

[1] plaintiffs demonstrated likelihood of success on merits of claim that assault long guns were "in common use" for variety of lawful purposes;

[2] plaintiffs demonstrated likelihood of success on merits of claim that LCMs were "in common use" of self-defense;

[3] assault long guns and LCMs implicated dramatic technological change and unprecedented societal concerns for public safety;

[4] plaintiffs failed to demonstrate likelihood of success on merits on claim that Delaware law violated Second Amendment by imposing greater burden on right of armed self-defense than to historical analogs;

[5] plaintiffs failed to demonstrate likelihood of success on merits on claim that burden imposed by Delaware law was not comparably justified to burden traditionally imposed for historically analogous weapons; and

[6] plaintiffs failed to demonstrate irreparable harm.

Motions denied.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (18)

[1]  **Injunction**

A preliminary injunction is an extraordinary remedy, and should be granted only in limited circumstances.

[2]  **Injunction**

A movant seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.

[3]  **Injunction**

The first two factors of a preliminary injunction, likelihood to succeed on the merits and irreparable harm, are the most critical factors; if the movant meets these gateway factors, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.

[4]  **Injunction**

"Irreparable harm" in the absence of preliminary relief requires a showing that irreparable harm is more likely than not.

[5]  **Weapons**

If the Second Amendment's plain text covers an individual's conduct that a regulation targets, then the Second Amendment does not apply, and the regulation is constitutional, but if the answer is yes, then the Constitution presumptively protects that conduct, and it is the government's burden to then justify its regulation by demonstrating that it is consistent with the nation's historical tradition of firearm regulation; only after performing this second step may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command. U.S. Const. Amend. 2.

[6] Weapons

Like most rights, the right secured by the Second Amendment is not unlimited and is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. U.S. Const. Amend. 2.

[7] Weapons

Only if the Second Amendment's plain text covers an individual's conduct will the Constitution presumptively protect that conduct. U.S. Const. Amend. 2.

[8] Weapons

To meet the threshold burden of showing that the Second Amendment's plain text covers an individual's conduct, a plaintiff must demonstrate that the textual elements of the Second Amendment's operative clause apply to the conduct being restricted. U.S. Const. Amend. 2.

[9] Weapons

The Second Amendment extends, prima facie, to all instruments that constitute bearable arms. U.S. Const. Amend. 2.

[10] Weapons

The Second Amendment extends only to bearable arms that are in common use for self-defense today; whether a weapon is in common use depends on whether it is dangerous and unusual. U.S. Const. Amend. 2.

[11] Weapons

The Second Amendment does not create a right to keep and carry dangerous and unusual weapons. U.S. Const. Amend. 2.

[12] Injunction

Group of gun rights advocacy organizations demonstrated likelihood of success on merits, as required for issuance of preliminary injunction, of claim that assault long guns were "in common use" for variety of lawful purposes, and thus were presumptively protected by Second Amendment against regulation by Delaware law that sought to prohibit sale and limit possession of assault weapons; assault long guns, such as AR-15s, were owned by approximately 30 percent of gun owners, gun owners sought such rifles for variety of lawful uses including, self-defense, collecting, and professional use, and fact that long assault guns were arguably dangerous did not alone render them not in common use. U.S. Const. Amend. 2; 11 Del. Code § 1464 et seq.

[13] Weapons

Group of gun rights advocacy organizations demonstrated likelihood of success on merits, as required for issuance of preliminary injunction, of claim that large-capacity magazines (LCMs) were "in common use" of self-defense, and thus were presumptively protected by Second Amendment against regulation by Delaware law that sought to prohibit sale and limit possession of rifle magazines carrying more than 17 rounds of ammunition; tens of millions of rifle magazines with capacities of more than 17 rounds were lawfully possessed around the United States, 52% of modern sporting rifle magazines in the country had capacity of more than 30 rounds, and fact that LCMs were

arguably dangerous did not alone render them not in common use. U.S. Const. Amend. 2; 11 Del. Code § 1468(2).

[14] **Injunction**

Assault long guns and large-capacity magazines (LCMs) implicated dramatic technological change and unprecedented societal concerns for public safety, and thus court would reason by analogy when determining whether group of gun rights advocacy organizations demonstrated likelihood of success on merits, as required for issuance of preliminary injunction, of claim that Delaware law prohibiting sale and limiting possession of assault weapons and LCMs was not consistent with Nation's historical tradition of firearm regulation; law's preamble referenced frequency of mass shootings in last decade and exceptional dangers of "assault-style weapons," assault-style weapons did not enter circulation until after World War I, majority of mass shootings involved assault weapons and LCMs, and assault weapons imposed greater rates of lethality. U.S. Const. Amend. 2; 11 Del. Code §§ 1464, 1468.

[15] **Injunction**

Group of gun rights advocacy organizations failed to demonstrate likelihood of success on merits, as would be required for preliminary injunction, on claim that Delaware law prohibiting sale and limiting possession of assault weapons and large-capacity magazines (LCMs) violated Second Amendment by imposing greater burden on right of armed self-defense than to historical analogs; historically analogous weapons, such as Bowie knives, revolver pistols, and Thompson submachine guns, were subject to strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality, and historical regulations were relevantly similar to or more restrictive than Delaware law. U.S. Const. Amend. 2; 11 Del. Code §§ 1464, 1468.

[16] **Injunction**

Group of gun rights advocacy organizations failed to demonstrate likelihood of success on merits, as would be required for preliminary injunction, on claim that burden imposed on Second Amendment rights, by Delaware law prohibiting sale and limiting possession of assault weapons and large-capacity magazines (LCMs), was not comparably justified to burden traditionally imposed for historically analogous weapons, such as Bowie knives, revolver pistols, and Thompson submachine guns; regulations on historically analogous weapons were enacted to address pressing public safety concerns regarding weapons determined to be dangerous, and Delaware law responded to recent rise in mass shootings and their connection to assault weapons and LCMs. U.S. Const. Amend. 2; 11 Del. Code §§ 1464, 1468.

[17] **Injunction**

Group of gun rights advocacy organizations asserting Second Amendment claim failed to demonstrate irreparable harm in absence of preliminary injunction enjoining enforcement of Delaware law prohibiting sale and limiting possession of assault weapons and large-capacity magazines (LCMs); gun owners retained ample alternative weapons for self-defense purposes, assault weapons were ill-suited for self-defense purposes, available weapons could be operated with standard size capacity magazines, and plaintiffs did not show that they would incur significant business losses absent a preliminary injunction. U.S. Const. Amend. 2; 11 Del. Code §§ 1464, 1468.

[18] **Injunction**

An alleged deprivation of a Second Amendment right does not automatically constitute irreparable harm, for purposes of preliminary injunction. U.S. Const. Amend. 2.

**Attorneys and Law Firms**

Francis G.X. Pileggi (argued), Sean M. Brennecke, LEWIS BRISBOIS BISGAARD & SMITH LLP, Wilmington, DE; Alexander D. MacMullan, LEWIS BRISBOIS BISGAARD & SMITH LLP, Wayne, PA; Bradley P. Lehman (argued), GELLERT SCALI BUSENKELL & BROWN LLC, Wilmington, DE., Attorneys for Plaintiffs.

David E. Ross (argued), Bradley R. Aronstam, Garrett B. Moritz (argued), S. Reiko Rogozen, Roger S. Stronach, Holly Newell, Elizabeth M. Taylor, Thomas C. Mandracchia, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE; Kenneth L. Wan, Caneel Radinson-Blasucci, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE., Attorneys for Defendants.

**MEMORANDUM OPINION**

ANDREWS, UNITED STATES DISTRICT JUDGE:

**\*1** Before me are Plaintiffs' motions for a preliminary injunction. (D.I. 10; *Gabriel Gray et al. v. Kathy Jennings*, C.A. No. 1:22-cv-01500, D.I. 4). [1] The motions have been fully briefed. (D.I. 11, 37, 44; *Gabriel Gray et al. v. Kathy Jennings*, C.A. No. 1:22-cv-01500, D.I. 5). [2] I heard lengthy and helpful oral argument on February 24, 2023. (D.I. 54). For the reasons set forth below, the motions are DENIED.

**I. BACKGROUND**

**A. Nature and Stage of the Proceedings**

On June 30, 2022, the State of Delaware enacted a package of gun safety bills, two of which are challenged here. One of them, House Bill 450 ("HB 450"), regulates assault weapons. [3] An Act to Amend the Delaware Code Relating to Deadly Weapons, H.B. 450, 151st Gen. Assemb. (Del. 2022) (codified at 11 *Del. C.* §§ 1464-1467). The other, Senate Substitute 1 for Senate Bill 6 ("SS 1 for SB 6"), regulates large-capacity magazines ("LCMs"). An Act to Amend Title 11 of the Delaware Code Relating to Deadly Weapons, Senate Substitute 1 for Senate Bill 6, 151st Gen. Assemb. (Del. 2022) (codified at 11 *Del. C.* §§ 1441, 1468-1469A).

On July 20, 2022, Plaintiffs in *Delaware State Sportsmen's Association, Inc. et al. v. Delaware Department of Safety and Homeland Security et al.*, C.A. No. 1:22-cv-00951 (the "DSSA Action") filed suit challenging HB 450 under the Second, Fifth, and Fourteenth Amendments of the U.S. Constitution, the Commerce Clause, and the Delaware Constitution. [4] (D.I. 1). Plaintiffs also alleged preemption. (*Id.*). On September 9, 2022, Plaintiffs filed an Amended Complaint that added claims challenging SS 1 for SB 6. (D.I. 5). On November 15, 2022, Plaintiffs moved for a preliminary injunction barring the enforcement of the statutes, on the basis that the statutes violate their right to keep and bear arms under the Second and Fourteenth Amendments and Article I, § 20 of the Delaware Constitution. (D.I. 10 ("DSSA Br.")). On March 14, 2023, Plaintiffs voluntarily dismissed without prejudice the Delaware state law claims brought pursuant to Article I, § 20. (D.I. 56).

**\*2** On November 16, 2022, Plaintiffs in *Gabriel Gray et al. v. Kathy Jennings*, C.A. No. 1:22-cv-01500 (the "Gray Action") filed suit challenging HB 450 under the Second and Fourteenth Amendments. (Gray Action, D.I. 1). On November 22, 2022, Plaintiffs moved for a preliminary and permanent injunction barring the enforcement of the statute, on the basis that the statutes violate their right to keep and bear arms under the Second and Fourteenth Amendments. (Gray Action, D.I. 4 ("Gray Br.")).

On January 12, 2023, Plaintiffs in *Christopher Graham, et al. v. Kathy Jennings*, C.A. No. 1:23-00033 (the "Graham Action") filed suit challenging SS 1 for SB 6 under the Second and Fourteenth Amendments. (Graham Action, D.I. 1).

On December 20, 2022, the Gray Action was consolidated with the DSSA Action. (D.I. 24; Gray Action, D.I. 12). On March 6, 2023, the Graham Action was consolidated with the DSSA Action as well. (D.I. 52; Graham Action, D.I. 8). Trial has been set for November 13-17, 2023. (D.I. 25).

**B. The Challenged Statutes**

**1. HB 450**

HB 450 makes numerous "assault weapons" illegal, subject to certain exceptions. 11 *Del. C.* §§ 1464-1467. The list of prohibited firearms is long. It includes (1) forty-four enumerated semi-automatic "assault long gun[s]," including the AR-15, AK-47, and Uzi, 11 *Del. C.* § 1465(2), (2) nineteen specifically identified semi-automatic "assault pistol[s]," *id.* § 1465(3), and (3) "copycat weapon[s]," *id.* § 1465(4). "Copycat weapon[s]" include semi-automatic, centerfire

rifles that can accept a detachable magazine and which have one of five features, [5] semi-automatic pistols that can accept a detachable magazine and which have certain similar enhanced characteristics, and certain other semi-automatic weapons. *Id.* § 1465(6).

HB 450 prohibits the manufacture, sale, offer to sell, purchase, receipt, transfer, possession or transportation of these weapons, subject to certain exceptions, including for military and law-enforcement personnel (including qualified retired law-enforcement personnel). *Id.* §§ 1466(a), (b). People who possessed or purchased assault weapons before the statute became effective can continue to possess and transport them under certain conditions, including (i) at their residence and place of business, (ii) at a shooting range, (iii) at gun shows, and (iv) while traveling between any permitted places. *Id.* § 1466(c). They can also transfer them to family members. *Id.*

### 2. SS 1 for SB 6

SS 1 for SB 6 makes it illegal "to manufacture, sell, offer for sale, purchase, receive, transfer, or possess a large-capacity magazine." *Id.* § 1469(a). "Large-capacity magazine[s]" are those "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." *Id.* § 1468(2). The statute exempts many of the same individuals as HB 450, along with individuals who have a valid concealed carry permit. *Id.* § 1469(c). Unlike HB 450, SS 1 for SB 6 does not grandfather any magazines. It does, however, require the State to implement a buy-back program. *Id.* § 1469(d).

### II. LEGAL STANDARD

[1] [2] A preliminary injunction is "an extraordinary remedy," and "should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). A movant seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor, and" (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). As the Supreme Court has noted, a preliminary injunction is "a drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."

*Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (emphasis in original) (quoting 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2948 at 129-130 (2d ed. 1995)).

\*3 [3] [4] The first two factors are the "most critical" factors. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). The Third Circuit has explained that the first factor, likelihood of success on the merits, "requires a showing significantly better than negligible, but not necessarily more likely than not." *Id.* The second factor, irreparable harm in the absence of preliminary relief, requires a showing that irreparable harm is "more likely than not." *Id.* If the movant meets these "gateway factors," "a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

### III. DISCUSSION

For the following reasons, I conclude that Plaintiffs have failed to meet their burden of establishing the first two preliminary injunction factors: (1) likelihood of success on the merits, and (2) irreparable harm in the absence of a preliminary injunction. *Winter*, 555 U.S. at 20, 129 S.Ct. 365. I therefore deny Plaintiffs' motions. [6]

#### A. Likelihood of Success on the Merits

[5] The governing case is *New York State Rifle & Pistol Association, Inc. v. Bruen*, ––– U.S. ––––, 142 S. Ct. 2111, 213 L.Ed.2d 387 (2022). I must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129-30. If the answer is no, then the Second Amendment does not apply, and the regulation is constitutional. But if the answer is yes, then "the Constitution presumptively protects that conduct," and it is the government's burden to "then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Only after performing this second step "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up).

### 1. LCMs and Assault Weapons are Protected by the Second Amendment

 **[6]**  **[7]**  **[8]** The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S. Ct. at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)). Only if "the Second Amendment's plain text covers an individual's conduct, [will] the Constitution presumptively protect[ ] that conduct." *Id.* at 2129-30. To meet this threshold burden, which Plaintiffs concede is theirs (*e.g.*, D.I. 44 at 2), a plaintiff must demonstrate that the "textual elements" of the Second Amendment's operative clause apply to the conduct being restricted. See 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592, 128 S.Ct. 2783).

 **\*4** **[9]**  **[10]**  **[11]** Driving the analysis at this step are several key limitations to the scope of the Second Amendment's coverage. First, the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582, 128 S.Ct. 2783. Thus, Plaintiffs must show that the statutes at issue regulate weapons that fall under the Second Amendment's definition of "bearable arms." Second, the Second Amendment extends only to bearable arms that are "in 'common use' for self-defense today." *Bruen*, 142 S. Ct. at 2143. Thus, Plaintiffs must also show that the statutes at issue regulate such arms. Third, the Second Amendment does not create a right to keep and carry "dangerous and unusual weapons." *Heller*, 554 U.S. at 627, 128 S.Ct. 2783. This limitation shares considerable overlap with the "in common use" requirement. Whether a weapon is "in common use" depends on whether it is "dangerous and unusual." See *id.* at 627, 128 S.Ct. 2783 (cleaned up) ("[A]s we have explained ... the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons."); *Bruen*, 142 S. Ct. at 2143 ("[T]he Second Amendment protects only the carrying of weapons that are those in common use at the time, as opposed to those that are highly unusual in society at large." (cleaned up)).

As an initial matter, the parties dispute the scope of the "common use" limitation described above. Plaintiffs argue that they "only have to show that the restricted arms are ... in common use today for lawful purposes" (D.I. 44 at 2), "of which self-defense is but one of many" (*id.* at 3). Defendants counter that "the Second Amendment does not protect weapons simply because they are common." (D.I. 37 at 32). Instead, say Defendants, Plaintiffs must show "that assault weapons and LCMs are in 'common use' today for the lawful purpose of self-defense." (*Id.*).

Although the Supreme Court has not spoken on this question directly, it has repeatedly emphasized the centrality of self-defense to the Second Amendment right. *Heller* and *McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) stand for the proposition "that the Second and Fourteenth Amendments protect an individual right to keep and bear arms *for self-defense.*" *Bruen*, 142 S. Ct. at 2125 (emphasis added) (characterizing the holding of both cases). In *Bruen*, the Court held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun *for self-defense* outside the home." *Id.* at 2122 (emphasis added). The Court explained in *Heller* that self-defense is the "core" of the Second Amendment right, 554 U.S. at 630, 128 S.Ct. 2783, the right's "*central component*," *id.* at 599, 128 S.Ct. 2783 (emphasis in original), and the motivation for the Second Amendment's codification in a written Constitution. *Id.* Self-defense was no less essential in *Bruen*, which turned on the Court's conclusion that, "handguns ... are indisputably in 'common use' for self-defense today." 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 629, 128 S.Ct. 2783). Notably, *Bruen* tethered its "common use" analysis to self-defense. See 142 S. Ct. at 2134-35 (concluding that "[t]he Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense," *id.* at 2135); *see also id.* at 2134 ("Nor does any party dispute that handguns are weapons 'in common use' today for self-defense").

Plaintiffs point to various instances in which the Supreme Court addresses the "common use" requirement without mentioning self-defense. For example, Plaintiffs repeatedly highlight the Court's statement that the colonial laws at issue "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today," *id.* at 2143, arguing that this supports a broad reading of "in common use." (D.I. 44 at 7, 15). But in context, it seems that the Court was referring to "common use" for self-defense. Indeed, in the sentence immediately preceding the sentence that Plaintiffs cite, the Court concluded that "[handguns] are, in fact, 'the quintessential self-defense weapon.'" *Bruen,* 142 S. Ct. at 2143. Plaintiffs also point to an assertion by the D.C. Circuit that the Supreme Court "said the Second Amendment protects the right to keep and bear arms for other lawful purposes, such as hunting." *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) (citing *Heller*, 554 U.S. at 630, 128 S.Ct. 2783). The D.C. Circuit appeared to rely on the Court's statement in *Heller* that, in the colonial and revolutionary war era, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 630, 128 S.Ct. 2783. The statement, although certainly favorable to Plaintiffs' view, is far from a clear pronouncement on the scope of the right.

**\*5** As Defendants note, Plaintiffs' formulation would seem to "upend settled law." (*Id.* at 33). One such law is the National Firearms Act of 1934, 48 Stat. 1236, which restricts civilian acquisition and circulation of fully automatic weapons, such as machine guns. (D.I. 40 at 36). At oral argument, Defendants presented evidence that, as of 2016, there were nearly 176,000 legal civilian-owned machine guns in the United States.[7] (D.I. 50-1, Ex. A at 2). That number comes close to the quantity of weapons that Plaintiffs, in their reply brief, identify as sufficient for "common use." (*See* D.I. 44 at 9) (arguing that "the sale of approximately 200,000 stun guns was enough for them to be considered in common use by Justice Alito" in his concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 420, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (Alito, J., concurring)).[8] Thus, under Plaintiffs' logic, an unqualified "common use" rule could render the National Firearms Act's machine gun restrictions constitutionally suspect. The Supreme Court, however, has said that it would be "startling" to suggest that those restrictions might be unconstitutional. *Heller,* 554 U.S. at 624, 128 S.Ct. 2783. The Supreme Court's confidence in the constitutionality of the National Firearms Act therefore casts doubt on Plaintiffs' argument.

The question is a close one. My sense is that Defendants are correct, and the "in common use" inquiry turns on whether a regulated weapon is "in common use" for self-defense. For the purposes of this opinion, however, the rule I choose does not affect the outcome of the analysis, as I conclude that Plaintiffs have shown that at least some of the prohibited assault weapons and LCMs pass muster under both versions of the "in common use" requirement.

### a. Assault weapons

 **[12]**  The parties do not dispute that assault weapons belong to the broad category of weapons constituting "bearable arms." (*See* D.I. 54 at 111 (Defendants acknowledging that, for example, a bazooka would fall within this category); *id.* at 14 (Plaintiffs acknowledging the same)). The sole question, then, is whether assault weapons satisfy the "in common use" requirement and are therefore presumptively entitled to constitutional protection. I think that Defendants' narrower view of that requirement—that is, the view that a bearable arm must be "in common use" for self-defense—is the correct one. For the following reasons, however, I conclude that Plaintiffs have established that some—but not all—of the regulated assault weapons satisfy both Defendants' and Plaintiffs' formulations of the requirement.

I begin with "assault pistols." Plaintiffs do not devote much argument to these weapons. In fact, between Plaintiffs' opening briefs and joint reply brief, only a single paragraph specifically addresses whether the banned assault pistols are "in common use." In that paragraph, Plaintiffs assert that the "assault pistols" listed in HB 450 constitute "common handguns" that are, per *Bruen*, undisputedly in common use today for self-defense (DSSA Br. at 6 (citing *Bruen*'s recognition of handguns as "the quintessential defense weapon," 142 S. Ct. at 2119)). Plaintiffs do not, however, accompany this assertion with any support. This is not enough to satisfy Plaintiffs' burden at the preliminary injunction stage. *See Mazurek*, 520 U.S. at 972, 117 S.Ct. 1865 (emphasizing that the movant for a preliminary injunction carries a steep burden of persuasion). I therefore decline

to find that assault pistols are "in common use" and thus "presumptively protect[ed]" by the Second Amendment. *Bruen*, 142 S. Ct. at 2111.

**\*6** Next, I turn to "copycat weapons." Plaintiffs' argument on these weapons is scant as well. Although Plaintiffs assert that "[s]o-called 'copycat weapons' and their specific features ... are also in common use" (Gray Br. at 7), Plaintiffs do not go on to explain why this is so. Consequently, I find that Plaintiffs have failed to satisfy their burden of persuasion as to copycat weapons.

Finally, I turn to "assault long guns." Here, Plaintiffs provide ample support for their argument that such weapons are "in common use" for lawful purposes that include self-defense.[9] Plaintiffs show that AR-style rifles—one of the types of "assault long guns" that HB 450 prohibits—are popular. According to one recent survey of gun owners in the United States, 30.2 percent of gun owners (approximately 24.6 million Americans) have owned up to forty-four million AR-15 or similar rifles. (Gray Br. at 5 (citing William English, 2021 Nat'l Firearms Survey: Updated Analysis Including Types of Firearms Owned 1 (May 13, 2022) (Georgetown McDonough School of Business Research Paper No. 4109494), https://bit.ly/3yPfoHw)).[10] Plaintiffs assert that the number of assault rifles "in circulation" today "approaches twenty million."[11] (DSSA Br. at 7). Gun owners seek such rifles for a variety of lawful uses, including recreational target shooting, self-defense, collecting, hunting, competition shooting, and professional use. (*Id.* at 6 (citing NAT'L SHOOTING SPORTS FOUND., INC., Modern Sporting Rifle Comprehensive Consumer Report 18 (July 14, 2022), https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf)). Taken together, these data suggest that the banned assault long guns are indeed "in common use" for several lawful purposes, including self-defense.

Defendants disagree. They argue that the banned assault weapons, unlike handguns, are not well-suited for any of the lawful purposes that Plaintiffs identify. (D.I. 37 at 17-20 (explaining that assault weapons have limited utility for self-defense, hunting, and recreation)). Plaintiffs argue that, to the contrary, assault weapons are useful for each of those purposes. (*E.g.*, Gray Br. at 6-7 (contending that the AR-15 is "an optimal firearm to rely on in a self-defense encounter"); *id.* at 8 (contending that certain shared features of the prohibited assault weapons, such as flash suppressors and telescoping stocks, are helpful for hunting and sport shooting)). This dispute seems to me to be beside the point.[12] As Plaintiffs argued in their reply brief (D.I. 44 at 4) and at oral argument (D.I. 54 at 142), the relevant question here is "what the people choose" for lawful purposes, rather than a weapon's objective suitability for those purposes. (*Id.*). *See Heller*, 554 U.S. at 629, 128 S.Ct. 2783 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.").

**\*7** Defendants make the related argument that, because "assault weapons are rarely utilized in defense situations," they cannot be "in common use" for self-defense purposes. (*See* D.I. 37 at 19). Defendants cite data showing that assault weapons were used for self-defense in less than 1 percent of "active shooter" incidents over the last two decades (D.I. 38 at 15), and that rifles of any type are only used for self-defense in a small minority of incidents. (*Id.* at 18-19). This argument does not convince me either. I agree with Plaintiffs that the plain terms of the Second Amendment —which protects the right to "keep and bear Arms," U.S. CONST. amend. II—"contemplates ways of 'using' firearms other than just shooting them." (D.I. 44 at 8). For example, the Supreme Court stated that "bear arms" means to "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 582-84, 128 S.Ct. 2783 (alterations in original) (internal quotation marks omitted). *See also Bruen*, 142 S. Ct. at 2134 (noting that "individuals often 'keep' firearms in their home, at the ready for self-defense...."). Consequently, I do not think it matters, for the purposes of this analysis, that assault weapons are seldom fired in self-defense. What matters is that they are commonly owned for the purpose of self-defense, which, as explained, Plaintiff has sufficiently shown.

Next, Defendants argue that the listed assault long guns cannot be deemed to be "in common use" today, as they, along with the other prohibited weapons, are "dangerous and unusual." (D.I. 37 at 30-31). Defendants contend that the "dangerous and unusual" test is an inquiry into whether the regulated item is "unusually dangerous." Defendants' reasoning is as follows. In *Heller*, the Supreme Court cited Blackstone as support for the historical tradition of prohibiting the carrying of "dangerous and unusual" weapons.

554 U.S. at 627, 128 S.Ct. 2783. Defendants point to the originating text, in which Blackstone employed the phrase "dangerous *or* unusual weapons." (D.I. 37 at 31) (emphasis in original). They argue that this phrase is a figure of speech that means "unusually dangerous," and that, consequently, "unusually dangerous" is the proper interpretation of "dangerous and unusual." (*Id.*).

This argument, although interesting and perhaps meritorious as a historical matter, asks me to ignore the great weight of authority to the contrary. I decline to do so. The test is "dangerous and unusual," and to fall outside the Second Amendment's protection, a weapon must check both boxes. *See* Bruen, 142 S. Ct. at 2128; *see also* Caetano, 577 U.S. at 417, 136 S.Ct. 1027 (Alito, J., concurring) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are 'unusual,' it does not need to consider the lower court's conclusion that they are also 'dangerous.' " (emphasis in original)).

Defendants' trouble is that, although they thoroughly demonstrate that the prohibited assault long guns are "dangerous" (and probably "unusually dangerous"), *see infra* Section III.A.2, they cannot show that assault long guns are "unusual." As discussed, Plaintiffs have sufficiently demonstrated that assault long guns are numerous and "in common use" for a variety of lawful purposes. I therefore conclude that the prohibited assault long guns are in common use for self-defense, and therefore "presumptively protect[ed]" by the Second Amendment. Bruen, 142 S. Ct. at 2111.

### b. Large-Capacity Magazines

[13] First, I address the question of whether LCMs are "arms." The Third Circuit answered this question in the affirmative in Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey, 910 F.3d 106 (3d Cir. 2018) (hereinafter "ANJRPC"), a pre-Bruen case. There, the statute at issue limited the amount of ammunition that could be held in a single firearm magazine to no more than 10 rounds. Id. at 110. The Third Circuit held, "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." Id. at 116. Defendants argue that this decision is distinguishable in light of the difference between the restrictions at issue. (D.I. 37 at 29). In ANJRPC, 910 F.3d at 110, the upper limit was a capacity of 10 rounds; here, the upper limit is 17 rounds. 11 Del. C. § 1468(2). Defendants argue that the Third Circuit's decision "rested upon the conclusion that the ban on smaller magazines could 'make it impossible to use firearms for their core purpose.' " (D.I. 37 at 29). Defendants point out that Plaintiffs do not make any such claim here. (*Id.*). Indeed, Plaintiffs admit that they are not aware of any firearms that come with a magazine holding over 17 rounds that cannot also be operated using a smaller magazine. (D.I. 48 at 1).

**\*8** I am not convinced, however, that this makes a difference. The Third Circuit did not restrict its holding to magazines necessary for the operation of certain firearms; rather, it broadly held that "magazines are 'arms.' " *ANJRPC*, 910 F.3d at 106. I think that I am bound by its decision, notwithstanding Defendants' evidence regarding the historical definition of "arms" (D.I. 39), and the existence of decisions from district courts in other circuits that hold to the contrary. *E.g.*, Ocean State Tactical, LLC v. State of Rhode Island, 2022 WL 17721175, at \*13 (D.R.I. Dec. 14, 2022) (finding that plaintiffs failed to demonstrate that LCMs are "arms" within the meaning of the Second Amendment), *appeal docketed*, No. 23-01072 (1st Cir. Jan. 13, 2023). Magazines are arms, and so are LCMs.

Second, I address the question of whether LCMs are "in common use" for self-defense today. The Third Circuit addressed this question as well, although less definitively. Applying the now-defunct two-step approach under intermediate scrutiny, the Third Circuit "assume[d] without deciding that LCMs are typically possessed by law-abiding citizens for lawful purposes." ANJRPC, 910 F.3d at 116. It did, however, observe that "millions of magazines are owned, often come factory standard with semi-automatic weapons," and "are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense." Id.

Plaintiffs sufficiently demonstrate that this is so. They argue, "There are currently tens of millions of rifle magazines that are lawfully-possessed in the United States with capacities of more than seventeen rounds," including magazines for the AR-15 rifle (DSSA Br. at 9), which I have already found to be "in common use" for self-defense. The AR-15 platform is

capable of accepting standard magazines of 20 or 30 rounds (*id.* at 9) and is "typically sold with 30-round magazines." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019); (D.I. 54 at 69). Indeed, Plaintiffs point to evidence suggesting that "52% of modern sporting rifle magazines in the country have a capacity of 30 rounds." (D.I. 44 at 16). This is enough to show that LCMs are "in common use" for self-defense.

Defendants respond with the same suitability arguments they raised with respect to assault weapons. For example, Defendants argue that LCMs with more than 17 rounds are "unnecessary for self-defense" because self-defense situations "rarely, if ever, involve lengthy shootouts with extensive gunfire," and data suggest that individuals who use firearms for self-defense rarely fire even 10 rounds. (D.I. 37 at 19). They also contend that LCMs are ill-suited for hunting, which "prioritizes limited, precise shots over a high volume of shots" (*id.*), and recreation, as LCMs aren't necessary for the use of assault rifles in shooting competitions (*id.* at 20). I reject these arguments for the same reasons I rejected them with respect to assault long guns: suitability is immaterial here. Likewise, I reject Defendants' "dangerous and unusual" argument as to LCMs (D.I. 37 at 31-32) for the same reasons I did so with respect to assault long guns: LCMs, although "dangerous," *see* Section III.A.2 *infra*, are not "unusual."

For these reasons, I conclude that the prohibited LCMs, like the prohibited assault long guns, are in common use for self-defense and therefore "presumptively protect[ed]" by the Second Amendment. *Bruen*, 142 S. Ct. at 2111.

According to Plaintiffs, this is the end of the matter. Plaintiffs argue that, once a weapon is found to be "in common use" within the meaning of the Second Amendment, it cannot be regulated, and no historical analysis is necessary. (D.I. 54 at 29-30). I disagree. As the Supreme Court made clear in *Bruen*, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *The government must then justify its regulation* by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129-30 (emphasis added). If the standard were as Plaintiffs propose, then *Bruen* need not have proceeded beyond the first step of the analysis. Instead, however, after concluding that the Second Amendment's plain text "presumptively guarantee[d]" the plaintiffs a right to bear arms in public for self-defense, the Supreme Court turned to the question of historical tradition. *Id.* at 2135. Thus, so do I.

**2. Historical Tradition**

**\*9** At this step, the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. In conducting this historical inquiry, "[c]ourts are ... entitled to decide a case based on the historical record compiled by the parties." [13] *Id.* at 2130 n.6.

The parties dispute which historical periods are relevant. Plaintiffs argue that I may consider history from the late nineteenth century and the twentieth century. (D.I. 37 at 33). Plaintiffs disagree. (D.I. 44 at 18). In *Bruen*, the Supreme Court provided the following guidance:

> [W]hen it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller,* 554 U.S. at 634-35, 128 S.Ct. 2783. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right.

142 S. Ct. at 2119. Defendants concede that regulations that existed in temporal proximity to 1791 and 1868 are "the most relevant." (D.I. 54 at 132). Defendants are correct, however, that these are not the only relevant historical evidence. As the Court explained in *Bruen*, subsequent history may be relevant to the inquiry as " 'a regular course of practice' can 'liquidate & settle the meaning of disputed or indeterminate 'terms & phrases' in the Constitution." 142 S. Ct. at 2136 (quoting *Chiafalo v. Washington*, ––– U.S. ––––, 140 S. Ct. 2316, 207 L.Ed.2d 761 (2020)). However, "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137. Thus, I must afford later history little weight "when it contradicts earlier evidence." *Id.* at 2154 (citing *Heller*, 554 U.S. at 614, 128 S.Ct. 2783).

**[14]** Another question is which historical regulations count as analogous. The Court acknowledged, "[T]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Thus, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* "When confronting such present-day firearm regulations," the historical inquiry should be guided by "reasoning by analogy." *Id.* at 2133. A historical analogue need not be a "historical twin"; "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (emphasis omitted). Although the Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," the Court said that "central considerations" of the inquiry are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33 (cleaned up).

With these principles in mind, I begin by examining the regulations at issue here. HB 450 and SS 1 for SB 6 were enacted in the immediate aftermath of several mass shootings. On May 24, 2022, a gunman used an AR-15 style rifle and 30-round magazines to murder nineteen students and two teachers at an elementary school in Uvalde, Texas. (D.I. 37 at 2). This occurred only ten days after another mass shooting, in which a gunman used an AR-15 style rifle and 30-round magazines to murder ten people in a grocery store in Buffalo, New York. (*Id.*). Delaware enacted HB 450 and SS 1 for SB 6 approximately one month later, with the stated purpose of furthering Delaware's "compelling interest to ensure the safety of Delawareans." HB 450. The preamble to HB 450 references both tragedies, as well as "dozens more mass shootings during the last decade," and notes several exceptional dangers of "assault-style weapons," including their "immense killing power," military origins, and disproportionate use in mass shootings. *Id.*

**\*10** Defendants argue that the instant regulations implicate "unprecedented societal concerns" and "dramatic technological changes." (D.I. 37 at 33). I agree. First, Defendants show that assault long guns and LCMs represent recent advances in technology. Defendants offer evidence that semi-automatic weapons "did not become feasible and available until the beginning of the twentieth century, and the primary market was the military." (D.I. 40 at 24). Although multi-shot or repeating firearms existed in America during the colonial and founding eras, they "were rare and viewed as curiosities." (D.I. 37 at 7 (citing D.I. 40 at 20-24; D.I. 41 at 12; D.I. 39 at 1)). Neither were repeating rifles popular during the Civil War and Reconstruction; during these periods, they were used sparingly as military weapons and were available for civilian acquisition in limited numbers. (D.I. 40 at 26). It was only after World War I when semi-automatic and fully automatic long guns "began to circulate appreciably in society." (*Id.* at 28). Plaintiffs do not rebut Defendants' evidence with any comparable historical evidence of their own. [14]

Second, Defendants show that assault weapons and LCMs implicate unprecedented societal concerns. Defendants offer evidence that suggests a rise in the yearly rate of public mass shootings over the past four decades. (*See* D.I. 54 at 139 (citing D.I. 38-1, Ex. C)). They also show that, as noted in the preamble to HB 450, mass shootings often involve assault weapons equipped with LCMs. (D.I. 37 at 23-24). One analysis, which examined almost two hundred mass shootings across four databases, concluded that assault weapons were used in nearly a quarter of the incidents for which the type of weapon could be determined (D.I. 38 at 24), and that LCMs were involved in the majority of the incidents for which magazine capacity could be determined. (*Id.* at 24-25). The same analysis found that mass shootings involving assault weapons and LCMs result in more fatalities and injuries than those that do not. (*Id.* at 25-26). This result is consistent with the results of other studies on mass shootings. (*Id.* at 26-28).

In light of the current evidentiary record, it is not surprising that mass shootings involving assault weapons and LCMs result in increased casualties. As I have mentioned, *see supra* Section III.A.1, Defendants demonstrate that assault rifles and LCMs are exceptionally dangerous. Defendants offer evidence that both derive from weapons of war. (D.I. 42 at 18-28 (assault rifles); *id.* at 31-32 (LCMs)). This fact is insufficient, on its own, to show that these arms are particularly destructive; a weapon's origins do not say much about that weapon's destructiveness today. Defendants go further, however. They identify several "military" features that assault rifles share that "increase their lethality," such as "pistol grips and barrel shrouds for maneuverability, use of detachable magazines to fire many rounds rapidly, and the use of intermediate-caliber rounds fired at a high velocity, which

inflict severe wounds even over long distances." (D.I. 37 at 11-12).

This last characteristic is one that Defendants discuss at length. (*Id.* at 21-22). Because an assault rifle bullet travels at multiple times the velocity of a handgun bullet, it imparts an "exponentially greater" amount of energy upon impact. (D.I. 37-2, Ex. 12 at 3). Furthermore, as the result of its high speed, an assault rifle bullet typically "yaws" upon contact with tissue, meaning that the bullet turns sideways. (D.I. 42 at 26-27). The resulting wounds are "catastrophic." (D.I. 37 at 21). Upon passing through a target, the bullet's "blast wave" creates a temporary cavity that can be "up to 11-12.5 times" larger than the bullet itself. (D.I. 37-2, Ex. 12 at 4; D.I. 42 at 27). The yaw movement of the bullet can cause it to fragment upon striking bone, contributing to additional tissue damage extending beyond the cavity. (D.I. 42 at 27). Doctors who treat victims of assault rifles encounter "multiple organs shattered," bones "exploded," soft tissue "absolutely destroyed," and exit wounds "a foot wide." (D.I. 37-2, Ex. 12 at 2, 6). Due to their severity, these injuries often cannot be repaired. (*Id.* at 4). Handgun bullets, by contrast, only injure a structure by striking it directly; although they produce a small temporary cavity, that cavity "plays little or no role in the extent of wounding." (D.I. 42-1, Ex. 1 at p. 183). The power and velocity of assault rifle bullets pose a particularly high risk to law enforcement officers. (D.I. 37 at 22). Although the body armor typically issued to law enforcement officers protects against most handgun bullets, it is not designed to withstand the high-velocity bullets described above; assault rifles therefore "readily penetrate" such body armor. (D.I. 42 at 55).

**\*11** Other dangerous characteristics abound. One is rate of fire. Although it is true that, unlike a fully automatic weapon, an assault weapon can "only fire as often as a person can pull its trigger" (Gray Br. at 6), Defendants provide evidence of numerous, inexpensive products, available for purchase in most states, that allow AR-style rifles to fire at rates comparable to fully automatic weapons. (D.I. 37 at 14-15; D.I. 54 at 90 (describing one $49 trigger system that allows users to shoot at 900 rounds per minute)). Another is range. Assault rifles are designed for long-range use (D.I. 42 at 49), and therefore "allow criminals to effectively engage law enforcement officers from great distances." (D.I. 37 at 22 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017), *abrogated by Bruen*, ––– U.S. ––––, 142 S. Ct. 2111)). This feature, in combination with the exceptional lethality of assault rifle bullets described above, "has led to multiple incidents in which criminals outgun police." (*Id.*).

In sum, I find that Defendants have sufficiently established that assault long guns and LCMs implicate dramatic technological change and unprecedented societal concerns for public safety.

The next step is to review Defendants' evidence of historical regulations, determine whether the regulations at issue impose comparable burdens on the right to armed self-defense, and decide whether the burdens imposed are comparably justified.

[15] Defendants offer multiple historical analogues, including several from the Nation's early history. One notable example concerns the Bowie knife. The Bowie knife—a distinctive long-bladed knife popularized by the adventurer Jim Bowie after he supposedly used it in a brawl—proliferated beginning in the 1830s. (D.I. 40 at 11). The "craze" for these knives led to their widespread use in fights, duels, and other criminal activities, as single-shot pistols tended to be unreliable and inaccurate. (*Id.* at 11-12). Bowie knives became known for these nefarious uses (*id.* at 12-13), and as violent crime increased during the early nineteenth century, states responded with anti-knife legislation. (*Id.* at 13-14). These regulations were "extensive and ubiquitous." (*Id.* at 17). Between 1837 and 1925, twenty-nine states enacted laws to bar Bowie knife concealed carry. (*Id.* at 16). Fifteen states barred their carry altogether. (*Id.*).

Other melee weapons were subject to similar regulations during the nineteenth and early twentieth centuries. Starting in 1862, many states targeted the billy club—a heavy, hand-held club traditionally carried by police. (*Id.* at 8). Fourteen states enacted anti-billy club laws in the 1800s; eleven did so in the early 1900s. (*Id.*). Many states also regulated (and sometimes outlawed) the "slungshot," a weapon developed circa the 1840s that was widely used by criminals and as a fighting implement, and which had a "dubious reputation" on account of its ease of construction and ability to be used silently. (*Id.* at 9). Forty-three states enacted nearly eighty anti-slungshot laws between 1850 and 1900. (*Id.*).

After the Civil War, revolver pistols—which were used only sparingly during the war—entered the civilian market. (*Id.* at 25-26). The increased availability of these guns contributed to escalating interpersonal violence. (*Id.* at 27). States reacted with a "rapid spread" of concealed carry restrictions. (*Id.*). By

the end of the 1800s, nearly every state in the country had such laws (*id.*), and, by the early 1900s, at least six states barred possession of these weapons outright. (*Id.* at 28).

Fully automatic firearms entered the scene during World War I. (D.I. 40 at 29). After the war, one such firearm that had been developed for military use—the Thompson submachine gun, widely known as the Tommy gun—became available for civilian purchase. (*Id.*). Initially, it was unregulated. (*Id.*). Once the Tommy gun began to circulate in society, however, its "uniquely destructive capabilities" became clear, especially once it found favor among gangster organizations during Prohibition. (*Id.* at 31). Although the Tommy gun and like firearms "were actually used relatively infrequently by criminals, when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929." (*Id.*). States reacted by passing anti-machine gun laws (*id.* at 35), as well as laws restricting ammunition feeding devices, or guns that could accommodate them, based on set limits on the number of rounds. (*Id.* at 48). Finally, in 1934, Congress enacted the National Firearms Act, which imposed strict regulations on the civilian acquisition and circulation of fully automatic weapons. (*Id.* at 36). The National Firearms Act also imposed strict requirements on the acquisition and circulation of short-barreled shotguns—shotguns with barrels less than 18 inches long—as these weapons widened the spray of fire and caused "devastating" effects when used at close range. (*Id.*).

**\*12** Plaintiffs urge me to disregard machine gun regulations as irrelevant, as those regulations are temporally remote from the adoption of the Second and Fourteenth Amendments. (D.I. 44 at 18). Plaintiffs rely on the Court's statement in *Bruen* that such evidence isn't helpful "when it contradicts earlier evidence." 142 S. Ct. at 2154. But these later regulations are consistent with the earlier regulations that Defendants provide. As Defendants emphasized at oral argument (D.I. 54 at 129), the historical record that Defendants present, when viewed as a whole, illustrates a pattern: "[F]irearms and accessories, along with other dangerous weapons, were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality." (D.I. 40 at 4). The analogous twentieth-century regulations do not depart from this pattern, and, indeed, reinforce it. Therefore, I decline to disregard them. *See Bruen*, 142 S. Ct. at 2136-37 (recognizing that later history may be relevant where a practice has been "open, widespread, and unchallenged since the early days of the Republic....").

Even if I were to consider evidence from the twentieth century, argue Plaintiffs, none of the purported analogous regulations that Defendants offer are "relevantly similar." (D.I. 44 at 7-8). Plaintiffs' primary argument is that those regulations targeted weapons that are meaningfully different from those addressed by the statutes at issue here. (*See id.*). Specifically, Plaintiffs say that, in contrast to assault weapons and LCMs, the arms addressed by these historical regulations were "perceived at the time to be almost exclusively used by criminals." (*Id.* at 42). Plaintiffs provide no citation for this assertion, and I am not sure that the record supports it. Although the record reflects that criminality was an overriding concern driving historical weapons regulations (*e.g.*, D.I. 40 at 33-34 (Tommy guns); *id.* at 13 (Bowie knives)), the record also shows that some of the regulated weapons circulated appreciably before they were restricted. For instance, as Defendants stressed at oral argument (*see* D.I. 54 at 127), the record demonstrates that Bowie knives proliferated in civil society.[15] (D.I. 40 at 11-12). Furthermore, although Plaintiffs characterize Tommy guns as having been "overwhelmingly put to use by criminals and gangsters" (D.I. 54 at 19-20), this is not what the record reflects. The Tommy gun was rarely used by criminals. (D.I. 40 at 31). Its association with criminal activity was the product of the public's growing awareness of devastating, high-profile shooting incidents, as well as the rise of lurid and sensational news reports covering gun crime. (*Id.* at 33-34). I am therefore unconvinced that the historical regulations under discussion regulated weapons that are relevantly different than those at issue here by virtue of their criminality.

I think that, to the contrary, these historical regulations are "relevantly similar" to the regulations at issue in the two "central" respects identified by the Supreme Court: they impose comparable burdens on the right of armed self-defense, and those burdens are comparably justified. *Bruen*, 142 S. Ct. at 2132-33. First, both sets of regulations impose a "comparable burden." Indeed, the burden that the challenged regulations impose is slight. This is where Defendants' suitability arguments—which I dismissed in *supra* Section III.A.1—become relevant. As discussed, Defendants have shown that LCMs with more than 17 rounds are "unnecessary for self-defense," as individuals in self-defense situations rarely fire even 10 rounds (D.I. 37 at 19), and the record does not reflect that any firearms require LCMs to operate. (D.I. 48 at 1). Defendants have shown the

same with respect to assault weapons, which, too, are rarely used defensively. (D.I. 37 at 19). Furthermore, some of the historical regulations are broader than the challenged statutes. For example, multiple nineteenth-century laws regulating melee weapons were blanket restrictions on the carry of entire categories of weapons. (D.I. 40 at 13 (noting laws "barring the category or type of knife embodied by the Bowie knife but without mentioning them by name")). HB 450, by contrast, is not a categorical ban; the "assault long guns" it prohibits are specifically enumerated. 11 *Del. C.* § 1465(2). Accordingly, I find that the LCM and assault long gun restrictions of HB 450 and SS 1 for SB 6 do not impose a greater burden on the right of armed self-defense than did analogous historical regulations.

 *13  [16] Second, the burden imposed by both sets of regulations is "comparably justified." The modern regulations at issue, like the historical regulations discussed by Defendants, were enacted in response to pressing public safety concerns regarding weapons determined to be dangerous. HB 450 and SS 1 for SB 6 responded to a recent rise in mass shooting incidents, the connection between those incidents and assault weapons and LCMs, and the destructive nature of those weapons. *See* HB 450. Plaintiffs argue that these concerns are improper for me to consider, as they "implicate the sort of interest-balancing, means-end analysis" that the Supreme Court instructed lower courts not to undertake. (D.I. 44 at 8). I disagree. Although the *Bruen* Court rejected means-ends scrutiny, it nevertheless advised lower courts to, in determining whether modern and historical regulations are "relevantly similar," consider "how *and why* the regulations burden a law-abiding citizen's right to self-defense." 142 S. Ct. at 2132-33 (emphasis added). *See Oregon Firearms Fed'n, Inc. v. Brown*, ––– F.Supp.3d ––––, ––––, 2022 WL 17454829, at *14 (D. Or. Dec. 6, 2022) ("In considering whether Defendants are comparably justified in imposing Measure 114 as were this Nation's earlier legislatures in imposing historical regulations, this Court finds that it may consider the public safety concerns of today."), *appeal voluntarily dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022). [16] Accordingly, I find that Defendants are comparably justified in regulating assault long guns and LCMs "to ensure the safety of Delawareans." HB 450.

For these reasons, I find that the LCM and assault long gun prohibitions of HB 450 and SS 1 for SB 6 are consistent with the Nation's historical tradition of firearm regulation. Plaintiffs have therefore failed to demonstrate a likelihood of success on the merits of their Second Amendment claim.

**B. Irreparable Harm**

 [17]  [18] I proceed to the issue of irreparable harm. [17] In addition to demonstrating a likelihood of success on the merits, plaintiffs seeking a preliminary injunction must also demonstrate that they will suffer irreparable harm in the absence of preliminary relief. *Reilly*, 858 F.3d at 179. This requirement demands a showing that irreparable harm is "more likely than not." *Id.* Deprivations of constitutional rights often—but do not always—amount to "irreparable harm." *See* 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022) ("When an alleged deprivation of a constitutional right is involved ... most courts hold that no further showing of irreparable harm is necessary."). Although First Amendment deprivations, even for "minimal periods of time," are presumed to be irreparable injuries, *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), neither the Supreme Court nor the Third Circuit have explicitly extended that holding to the Second Amendment. *See Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."); *see also Lanin v. Borough of Tenafly*, 515 F. App'x 114, 118 (3d Cir. 2013) (reiterating *Hohe* holding with respect to irreparable harm). Thus, counter to Plaintiffs' assertions (Gray Br. at 11; DSSA Br. at 18), an alleged deprivation of a Second Amendment right does not automatically constitute irreparable harm. The two Third Circuit cases upon which Plaintiffs rely do not suggest otherwise. *See K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013) (First Amendment); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (search and seizure claim).

Plaintiffs have not satisfied their burden of proving irreparable harm in the absence of a preliminary injunction. Plaintiffs claim several injuries. (D.I. 21, 22, 26, 27). First, Plaintiffs say that they will suffer irreparable harm because HB 450 and SS 1 for SB 6 prevent Plaintiffs from possessing and obtaining assault weapons and LCMs "for self-defense and other lawful purposes," in violation of their Second Amendment rights. (D.I. 21 at pp. 2-3; D.I. 22 at pp.

2-3; D.I. 27 at p. 2). But Plaintiffs retain ample effective alternatives, especially with respect to the "core" purpose of self-defense. As Defendants said at oral argument (*e.g.*, D.I. 54 at 81-82), HB 450 regulates only a subset of semi-automatic weapons. These weapons are seldom used for self-defense (D.I. 38 at 15), perhaps because they are ill-suited to the task. (D.I. 42 at 49-54). Unaffected by HB 450 are numerous other firearms, including handguns—the "quintessential self-defense weapon." *Bruen*, 142 S. Ct. at 2143. LCMs are not useful for self-defense either. *See supra* Section III.A.1.b. Notably, Plaintiffs are not aware of any firearms that come with a magazine holding over 17 rounds that cannot also be operated using a smaller magazine.[18] (D.I. 48 at 1). Plaintiffs have furnished no evidence that that they cannot adequately defend themselves without the regulated weapons, or, indeed, that their ability to self-defend has been meaningfully diminished. Consequently, I am not convinced that an inability to possess or to obtain assault weapons or LCMs for self-defense and other lawful purposes constitutes irreparable harm.

**\*14** Second, Plaintiffs say that the challenged statutes are irreparably harming them because the statutes restrict their ability to sell assault weapons and LCMs, resulting in lost business opportunities. (D.I. 22 at pp. 3, 4; D.I. 26 at pp. 2-3). Defendant argues that these injuries are not irreparable. (D.I. 37 at 47). I agree. As the Third Circuit has recognized, no court has held "that the Second Amendment secures a standalone right to *sell* guns or range time."

*Drummond v. Robinson Township*, 9 F.4th 217, 230 (3d Cir. 2021). Furthermore, Plaintiffs have adduced no evidence that they are likely to incur significant business losses absent a preliminary injunction; Plaintiffs remain free to sell the multitude of firearms that are unaffected by the challenged statutes. Thus, I am not convinced by this argument either. I therefore conclude that Plaintiffs have failed to meet the irreparable harm requirement for a preliminary injunction.

I now turn to the remaining preliminary injunction factors: the balance of the equities and the public interest. I consider these two factors only if the movant "meet[s] the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits ... and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. As Plaintiffs have not met the threshold for either of the first two factors, I need not proceed to the second two.

Accordingly, Plaintiffs' motions for a preliminary injunction are DENIED.

**IV. CONCLUSION**
An appropriate order will issue.

**All Citations**

--- F.Supp.3d ----, 2023 WL 2655150

---

**Footnotes**

| | |
|---|---|
| 1 | Unless otherwise indicated, docket citations are to the docket in No. 22-951. |
| 2 | The evidentiary record is limited. Defendants present a robust evidentiary record, including declarations from five expert witnesses. (D.I. 38-42). Plaintiffs do not challenge Defendants' evidence with any testimonial evidence of their own. I note that nothing I find at this stage will bind my decisions that come later, once the parties have had more time to develop the evidentiary record. |
| 3 | Plaintiffs call the designation "assault weapons" a "complete misnomer" that anti-gun publicists developed "in their crusade against lawful firearm ownership." (DSSA Br. at 8; Gray Br. at 5-6). Defendants argue that, to the contrary, the term "assault weapon" derives from the name of the first assault weapon—the German "Strumgewehr," which translates to "storm rifle"—and that the term has long been used by the gun industry and government agencies. (D.I. 37 at 11). |

|   |   |
|---|---|
|   | As to who is right, I express no opinion. I will nevertheless refer to the semi-automatic firearms regulated under HB 450 as "assault weapons," as that is the term employed by the statute. |
| 4 | There is no doubt that some of the defendants in this action are properly named. Defendants have not raised the issue of whether this is true of all defendants. Therefore, I do not address it here. |
| 5 | The features include a folding or telescoping stock, a forward pistol grip, a flash suppressor, and a grenade launcher or flare launcher. 11 *Del. C.* § 1465(6)(a). Defendants refer to these features as "military features." (D.I. 37 at 6). |
| 6 | Other district courts have reached the same conclusion when faced with post-*Bruen* Second Amendment challenges to similar statutes. *See, e.g.*, *Bevis v. City of Naperville, Illinois*, ––– F.Supp.3d ––––, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (denying TRO and preliminary injunction where plaintiffs challenged legislation prohibiting sale of assault weapons and LCMs), *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023); *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) (denying preliminary injunction where plaintiffs challenged legislation prohibiting possession of LCMs), *appeal docketed*, No. 23-01072 (1st Cir. Jan. 13, 2023); *Oregon Firearms Fed'n, Inc. v. Brown*, ––– F.Supp.3d ––––, 2022 WL 17454829 (D. Or. Dec. 6, 2022) (denying TRO where plaintiffs challenged legislation prohibiting sale and restricting use of LCMs), *appeal voluntarily dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022). |
| 7 | Defendants assert in their opposition brief that "there are over 741,000 registered machine guns in the United States today. (D.I. 37 at 32). As Defendants acknowledged at oral argument (D.I. 54 at 99), the 176,000 figure is more precise, as it excludes, for example, machine guns in law enforcement. |
| 8 | Plaintiffs' characterization of Justice Alito's concurrence is slightly off the mark. The 200,000-figure was in reference to the number of civilians who owned stun guns, not the number of stun guns that had been sold. *Caetano*, 577 U.S. at 420, 136 S.Ct. 1027 (Alito, J., concurring). As Plaintiffs note (D.I. 44 at 9), in that concurrence, "the touchstone for 'common use' was ownership." See *Caetano*, 577 U.S. at 420, 136 S.Ct. 1027 (Alito, J., concurring) (concluding that stun gun ban violates Second Amendment because "stun guns are widely owned and accepted as a legitimate means of self-defense across the country"). |
| 9 | Several of the authorities relied upon by Plaintiffs do not appear to be publicly available. (*E.g.*, Gray Br. at iv ("NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report* (2013)")). As Plaintiffs did not attach those authorities to any of their briefs, I decline to consider them here. |
| 10 | Plaintiffs' source did not differentiate between guns used by civilians and guns used by law enforcement officers, who may have been represented in the survey. *Id.* at 19. The numbers that Plaintiffs report might therefore be imprecise—but not drastically so, as "the number of law enforcement officers in the U.S. is well under a million." *Id.* |
| 11 | At oral argument, Plaintiffs said that the total number of weapons in circulation that fall under HB 450's prohibitions is "perhaps 10 million," but, given the unreliability of survey data, "possibly quite a lot more." (D.I. 54 at 24-25). As Defendants note, even twenty million is only "a small fraction of the more than 470 million guns in the United States." (D.I. 37 at 15). The Supreme Court has not clarified the meaning of "common use," as the issue was undisputed in *Bruen*, 142 S. Ct. at 2119. I think that ten million in circulation is enough. |

12   As Defendants offer expert testimony on this point (*e.g.*, D.I. 42 at 49-54), and Plaintiffs have offered no comparable evidence in response, I am inclined to agree with Defendants that assault weapons are not the optimal firearms for self-defense.

13   I reiterate that the evidentiary record at this stage is limited to the extent that it is almost entirely supplied by Defendants. The analysis that follows is made on this limited record.

14   Plaintiffs argue that LCMs have been in common use "for centuries." (DSSA Br. at 9). They call attention to the Girandoni air rifle, a multi-shot gun with a 20 or 22-shot magazine capacity, one of which was carried by Meriwether Lewis on the Lewis and Clark expedition. (*Id.*). But as Defendants point out (D.I. 37 at 7-8 n.1), Plaintiffs' own source suggests that this rifle was rare. (*See* D.I. 37-1, Ex. 1 at pp. 3-6).

15   This evidence casts some doubt on Plaintiffs' argument—which is also unsupported—that none of the arms targeted by these historical regulations could have been considered in common use for lawful purposes. (D.I. 54 at 41). Indeed, it would be hard to imagine that there was a more useful weapon for self-defense in the 1830s than a Bowie knife. Those who carried such weapons claimed to do so for self-defense, although they weren't always believed. For instance, in 1834, a grand jury in Jasper County, Georgia bemoaned "the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of *protecting themselves against insult*, when in fact being so armed they frequently insult others with impunity...." (D.I. 40 at 12) (emphasis added).

16   I note that the public safety concerns motivating the challenged regulations are also relevant to determining whether the regulations "implicat[e] unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132.

17   I address this issue for thoroughness only. As Plaintiffs fail to meet their burden for likelihood of success on the merits, a finding of irreparable harm cannot help Plaintiffs here. Both factors are required for a preliminary injunction. *See Reilly*, 858 F.3d at 179.

18   Plaintiffs mention that "common arms that come equipped with standard-capacity magazines of 17 rounds of ammunition or below are still banned under SS 1 for SB 6," as "ammunition magazines can often be used for multiple calibers and the number of rounds they can hold depends on the caliber." (D.I. 48 at 1 n.1; *see also* DSSA Br. at 9-10; D.I. 44 at 16 (explaining same)). Plaintiffs do not, however, go on to explain how many weapons are thus affected. As I do not think that Plaintiffs have adequately developed this argument, I do not address it here.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.