IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
-------------------------------------------------------------------
DANE HARREL, et al.,              |
                                  |
                 Plaintiffs,      |
                                  |
v.                                | Case No. 23-cv-141-SPM
                                  |
KWAME RAOUL, et al.,              |
                                  |
                 Defendants.      |
-------------------------------------------------------------------
FEDERAL FIREARMS LICENSEES OF     |
ILLINOIS, et al.,                 |
                                  |
                 Plaintiffs,      |
                                  | Case No. 23-cv-215-SPM
v.                                |
                                  |
JAY ROBERT "J.B." PRITZKER, et al., |
                                  |
                 Defendants.      |
-------------------------------------------------------------------
CALEB BARNETT, et al.,            |
                                  |
                 Plaintiffs,      |
                                  |
v.                                | Case No. 23-cv-209-SPM
                                  |
KWAME RAOUL, et al.,              |
                                  |
                 Defendants.      |
-------------------------------------------------------------------
JEREMY W. LANGLEY, et al.,        |
                                  |
                 Plaintiffs,      |
                                  |
v.                                | Case No. 23-cv-192-SPM
                                  |
BRENDAN KELLY, et al.,            |
                                  |
                 Defendants.      |
-------------------------------------------------------------------
```

Transcript of Oral Argument - Volume I
April 12, 2023

```
-------------------------------------------------------------------
```

```
-----------------------------------------------------------------
            Transcript of Oral Argument - Volume I
                       April 12, 2023

              Proceedings held in person before
              the Honorable STEPHEN P. McGLYNN,
            United States District Judge Presiding

                    East St. Louis, Illinois
-----------------------------------------------------------------
```

**REPORTED BY:**          **HANNAH JAGLER**, RMR, CRR, FCRR
                     Official Court Reporter
                     750 Missouri Avenue
                     East St. Louis, Illinois 62201
                     618-482-9481
                     Hannah_Jagler@ilsd.uscourts.gov


          Following proceedings recorded by mechanical stenography;
            transcript produced by computer-aided transcription.

<u>**APPEARANCES**</u>:        (Case No. 23-cv-141-SPM)


FOR PLAINTIFFS:        **DAVID G. SIGALE**
                       Law Firm of David G. Sigale, P.C.
                       430 West Roosevelt Road
                       Wheaton, Illinois 60187
                       630-452-4547
                       Dsigale@sigalelaw.com


FOR DEFENDANTS:        **CHRISTOPHER GRAHAM WELLS**
                       Illinois Attorney General's Office
                       Public Interest Division
                       100 West Randolph Street
                       Chicago, Illinois 60601
                       312-814-1134
                       Christopher.wells@ilag.gov

                       **LAURA BAUTISTA**
                       Illinois Attorney General's Office
                       500 South Second Street
                       Springfield, Illinois 62701
                       217-557-0261
                       Laura.Bautista@ilag.gov

                       **THOMAS R. YSURSA**
                       Becker, Hoerner & Ysursa, P.C.
                       Generally Admitted
                       5111 West Main Street
                       Belleville, Illinois 62226
                       618-235-0020
                       Try@bhylaw.com

                       **TROY OWENS**
                       McHenry County State's Attorney's Office
                       2200 North Seminary Avenue, Suite 150
                       Woodstock, Illinois 60098
                       815-334-4159
                       Tcowens@mchenrycountyil.gov

1        **APPEARANCES**:       (Case No. 23-cv-215-SPM)

2

3        FOR PLAINTIFFS:        **CARL D. MICHEL**
                                Michel & Associates, P.C.
                                180 East Ocean Boulevard, Suite 200
4                               Long Beach, California 90802
                                562-216-4444
5                               Cmichel@michellawyers.com

6

7        FOR DEFENDANTS:        **CHRISTOPHER GRAHAM WELLS**
                                Illinois Attorney General's Office
                                Public Interest Division
8                               100 West Randolph Street
                                Chicago, Illinois 60601
9                               312-814-1134
                                Christopher.wells@ilag.gov

10

11                              **LAURA BAUTISTA**
                                Illinois Attorney General's Office
                                500 South Second Street
12                              Springfield, Illinois 62701
                                217-557-0261
13                              Laura.Bautista@ilag.gov

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        APPEARANCES:      (Case No. 23-cv-209-SPM)

 2
          FOR PLAINTIFFS:      ERIN E. MURPHY
 3                             Clement & Murphy, PLLC
                               706 Duke Street
 4                             Alexandria, Virginia 22314
                               202-742-8900
 5                             Erin.murphy@clementmurphy.com

 6                             ANDREW LOTHSON
                               Swanson, Martin & Bell, LLP
 7                             330 N. Wabash Avenue, Suite 3300
                               Chicago, Illinois 60611
 8                             312-321-9100
                               Alothson@smbtrials.com
 9
                               DAVID G. SIGALE
10                             Law Firm of David G. Sigale, P.C.
                               430 West Roosevelt Road
11                             Wheaton, Illinois 60187
                               630-452-4547
12                             Dsigale@sigalelaw.com

13                             THOMAS G. MAAG
                               Maag Law Firm, LLC
14                             22 West Lorena Avenue
                               Wood River, Illinois 62095
15                             618-216-5291
                               Tmaag@maaglaw.com
16
                               CARL D. MICHEL
17                             Michel & Associates, P.C.
                               180 East Ocean Boulevard, Suite 200
18                             Long Beach, California 90802
                               562-216-4444
19                             Cmichel@michellawyers.com

20
          FOR DEFENDANTS:      CHRISTOPHER GRAHAM WELLS
21                             Illinois Attorney General's Office
                               Public Interest Division
22                             100 West Randolph Street
                               Chicago, Illinois 60601
23                             312-814-1134
                               Christopher.wells@ilag.gov
24

25
```

```
1        APPEARANCES:        (Case No. 23-cv-209-SPM)

2        FOR DEFENDANTS:      KATHRYN HUNT MUSE
                              Illinois Attorney General's Office
3                             100 W. Randolph Street, 12th Floor
                              Chicago, Illinois 60601
4                             312-814-3000
                              Kathryn.Muse@ilag.gov
5
                              LAURA BAUTISTA
6                             Illinois Attorney General's Office
                              500 South Second Street
7                             Springfield, Illinois 62701
                              217-557-0261
8                             Laura.Bautista@ilag.gov

9                             THOMAS R. YSURSA
                              Becker, Hoerner & Ysursa, P.C.
10                            Generally Admitted
                              5111 West Main Street
11                            Belleville, Illinois 62226
                              618-235-0020
12                            Try@bhylaw.com

13                            SEAN P. DOLAN
                              Evans & Dixon, LLC
14                            211 North Broadway, Suite 2500
                              St. Louis, Missouri 63102
15                            314-552-4003
                              Sdolan@evans-dixon.com
16
                              TROY OWENS
17                            McHenry County State's Attorney's Office
                              2200 North Seminary Avenue, Suite 150
18                            Woodstock, Illinois 60098
                              815-334-4159
19                            Tcowens@mchenrycountyil.gov

20                            KEITH B. HILL
                              Heyl, Royster, Voelker & Allen, PC
21                            105 West Vandalia Street,
                              Mark Twain Plaza III, Suite 100
22                            Edwardsville, Illinois 62025
                              618-656-4646
23                            Khill@heylroyster.com

24

25
```

1

2      **APPEARANCES**:      (Case No. 23-cv-192-SPM)

3      FOR PLAINTIFFS:        **THOMAS G. MAAG**
                              Maag Law Firm, LLC
                              22 West Lorena Avenue
4                             Wood River, Illinois 62095
                              618-216-5291
5                             Tmaag@maaglaw.com

6      FOR DEFENDANTS:        **CHRISTOPHER GRAHAM WELLS**
                              Illinois Attorney General's Office
7                             Public Interest Division
                              100 West Randolph Street
8                             Chicago, Illinois 60601
                              312-814-1134
9                             Christopher.wells@ilag.gov

10                            **LAURA BAUTISTA**
                              Illinois Attorney General's Office
11                            500 South Second Street
                              Springfield, Illinois 62701
12                            217-557-0261
                              Laura.Bautista@ilag.gov

13
                              **KEITH B. HILL**
14                            Heyl, Royster, Voelker & Allen, PC
                              105 West Vandalia Street,
15                            Mark Twain Plaza III, Suite 100
                              Edwardsville, Illinois 62025
16                            618-656-4646
                              Khill@heylroyster.com

17

18

19

20

21

22

23

24

25

1   **<u>TRANSCRIPT OF PROCEEDINGS</u>**

2   (Proceedings commenced at 1:28 p.m.)

3   THE COURTROOM DEPUTY:  United States District

4   Court for the Southern District of Illinois is now in session,

5   the Honorable Stephen McGlynn presiding.  You may be seated.

6   Court calls Case Number 23-cv-209, Caleb Barnett,

7   et al., v. Kwame Raoul, et al.  Case is called for oral

8   arguments.  Parties, if you would please identify yourselves for

9   the record.

10   MS. MURPHY:  Erin Murphy on behalf of the Barnett

11   plaintiffs.

12   MR. MICHEL:  Chuck Michel on behalf of the

13   Illinois FFL plaintiffs.

14   MR. SIGALE:  Good afternoon, Your Honor.  David

15   Sigale, S-i-g-a-l-e, on behalf of the plaintiffs in the Harrel

16   case, 141.

17   MR. MAAG:  Thomas Maag on behalf of the Langley

18   plaintiffs.

19   MR. OWENS:  Your Honor, Troy Owens.  I represent

20   State's Attorney Patrick Kenneally and Sheriff Rob Tadelman as

21   part of the Harrel defendants.

22   MR. WELLS:  Good morning, Your Honor.  Good

23   afternoon, Your Honor.  Christopher Wells on behalf of the

24   state-level defendants, the attorney general, the governor, and

25   the director of the Illinois State Police.

1      MS. HUNT MUSE:  Good afternoon, Your Honor.

2 Katherine Hunt Muse on behalf of the state defendants.

3      MS. BAUTISTA:  Hello, Your Honor.  Laura Bautista

4 also on behalf of the state defendants.

5      MR. YSURSA:  Good afternoon, Your Honor.  Thomas

6 Ysursa on behalf of St. Clair County State's Attorney James

7 Gomric and St. Clair County Sheriff Richard Watson in the Harrel

8 case.

9      THE COURT:  Good afternoon to all of you.

10      MR. LOTHSON:  Your Honor, Andrew Lothson on

11 behalf of the Barnett plaintiffs.

12      MR. HILL:  Good afternoon, Your Honor.  Keith

13 Hill on behalf of Cole Shaner, Crawford County State's Attorney.

14      MR. DOLAN:  Your Honor, Sean Dolan on behalf of

15 Jarrod Peters and Jeremy Walker.

16      THE COURT:  Anybody else?

17      This is a very important case.  Julie, would you

18 put up that picture?  You can take it down.  How many of you saw

19 a duck?  How many of you saw a bunny rabbit?  Put up the other

20 one.  How many of you see a young woman?  How many of you see an

21 older woman?  Same picture, but we interpret it very much

22 differently.  Take it down.

23      In art, they call that aspect.  People refer to

24 that as optical illusions.  But what happens is, when we see

25 things, our mind immediately tries to make order out of the

1    chaos of what we're seeing, and so we are trying to group things

2    together logically in our own minds.  And so if you had a test,

3    half of you would say, well, that's a duck.  Why don't you put

4    the duck head back up?  So if you consider the bills of the duck

5    to be the ears of the rabbit, then it's very easy to tell, oh,

6    yeah, I could see -- or people could look at the very same

7    picture and see the head of a rabbit.

8         In my experience, these firearm cases -- you can

9    take it down -- have a lot of the same things.  People look at

10   mass shootings, they look at gun cases, and some people are

11   zeroed in and focused on the guns.  Other people might be

12   looking at victims.  They might be looking at the perpetrator.

13        We have people here and there's some people

14   downstairs watching, law-abiding citizens that own guns, guns

15   that these laws seek to forbid, and they've done nothing wrong

16   and nor will they.  And you have people watching who feel very

17   strongly that these guns represent a serious problem to society

18   and they need to be banned.

19        When you're looking at the same picture and we're

20   organizing in our own minds differently, it would be foolhardy

21   not to acknowledge that there are those who seek out these very

22   weapons to do senseless evil acts.  They select some of these

23   weapons in particular to secure a higher body count, carnage of

24   the innocent so as to appease some demanding demonic impulse or

25   some ghoulish trophy as part of some very troubled mind.

1    So I ask each of you -- and there may be people

2    here because they've lost loved ones to gun violence.  So I ask

3    each of you to look at the people around you and understand that

4    they may see things entirely different than you do.  Their minds

5    are trying to construct the same fragments of information that

6    we are.  And they may feel entirely different about things than

7    you do, but we are fellow citizens and we want to treat each

8    other with respect.

9    When you're a trial judge, people ask what it's

10   like to be a trial judge.  I say you get to meet the mothers.

11   You get to meet the widows of gun violence.  You get to meet the

12   mothers of those who are killed in gun violence.  And then you

13   get to meet the mothers of some young troubled kid who committed

14   terrible acts.  It's a very human -- it's a very human endeavor.

15   The higher we get up the food chain in cases, the

16   more the -- it becomes maybe less of a human drama, but make no

17   mistake about it, in the end, this is really about the people

18   involved.  My job is to keep an open mind, to listen to

19   everybody.  I've not made up my mind in this case, I look

20   forward to oral arguments.  It's not my job -- in fact, I cannot

21   make policy decisions with respect to guns.  My job is to make

22   sure that the policy decisions of the legislative branch and the

23   executive branch are consistent or permitted by the

24   Constitution, nothing more than that, but certainly nothing less

25   than that.

1          And so I'm going to ask both sides a series of

2    questions.  Don't try to read into my questions that I judge one

3    thing one way or the other.  I'm probing to test the strengths

4    of the various arguments.  I've had to read a lot of paperwork

5    in this case.  This is the submission of the state of Illinois.

6    I now know that I could take on Tolstoy in War and Peace and

7    make my way through it.  But there's a lot of really great legal

8    scholarship that has gone into the presentations by all the

9    parties in this case.

10          And so with that, we will start oral argument.

11    The plaintiffs, who are seeking to secure a temporary

12    restraining order, secure some injunctive relief to prevent the

13    enforcement of this statute, will have one hour of argument.

14    They've decided that they'll divide their time 45 minutes in

15    their initial address to the Court and reserve 15 minutes for

16    rebuttal.  Government will have one hour.

17          I understand there's a lot of lawyers here, and I

18    may ask a question that might be better answered by one of the

19    other lawyers that is not speaking.  I have no problem with

20    counsel deferring to co-counsel or other counsel in this case to

21    address specific questions that I have.

22          All right.  The -- I'd ask that you come to the

23    podium, but as long as I can hear you, I'm fine.  So if the

24    spirit moves you and you want to walk around and swing your arms

25    around, that's all right with me.  You're not frozen or affixed

1    to this podium.

2                    With that, counsel?

3                    MS. MURPHY:  Thank you, Your Honor.  Again, Erin

4    Murphy on behalf of the Barnett plaintiffs.  And while I

5    represent the Barnett plaintiffs, I will be presenting argument

6    on behalf of all the plaintiffs with the caveat, as Your Honor

7    suggested, that I may welcome the opportunity, if you have a

8    particular question that's a little more factual or outside of

9    what I am prepared to talk about, to invite one of my many

10   counsel at the table to jump in.

11                   So there are a lot of difficult policy questions

12   of course about firearms, but after the Supreme Court's decision

13   in *Bruen*, we think the legal analysis here of the

14   constitutionality of this law is quite straightforward.  We know

15   from *Bruen* how Courts are supposed to analyze challenges to laws

16   that implicate the Second Amendment.  First, Courts ask whether

17   the conduct in which the plaintiff seeks to engage is covered by

18   the plain text of the Second Amendment.  If it is, then it's

19   presumptively protected by the Second Amendment, not

20   necessarily -- that's not the end of the analysis, but it's

21   presumptively protected and the burden shifts to the government

22   to come forward and prove that the law that it wants to impose,

23   the restriction it wants to have, is consistent with our

24   nation's historical tradition.

25                   Now there are some aspects of Second Amendment

1     law where the Supreme Court has not yet spoken that much as to

2     exactly how that test works.  But when it comes to the question

3     of which arms are protected, that is not one of them.  The

4     Supreme Court has squarely answered the question both of what

5     the definition of arms means and of what the historical

6     tradition in this country is as to which types of arms that

7     presumptively fall within the scope of the Second Amendment are

8     protected.

9              So let's start with the textual question of

10    whether we're talking about something protected by the Second

11    Amendment.  The Supreme Court first articulated back in *Heller*

12    and reiterated in *Bruen* that the definition of arms is quite

13    straightforward and pretty capacious.  It simply means anything

14    that constitutes bearable arms.  The language the Court most

15    recently used in *Heller* is that it covers all instruments that

16    facilitate armed self-defense.  So by its terms, that

17    straightforward textual question simply asks, is what we're

18    talking about something that people would bear for the purpose

19    of engaging in self-defense.

20             When it comes to this case, I don't think that's

21    a particularly difficult question.  We have a law that, by its

22    terms, prohibits the possession of rifles, pistols, and shotguns

23    just because of particular features with which they are

24    equipped.  Now a rifle, a pistol, a shotgun doesn't become any

25    less of a bearable arm because it has a pistol grip or a

1  thumbhole stock or --

2              THE COURT:  What about a grenade launcher?

3              MS. MURPHY:  I think as a matter of whether it is

4  textually prima facie within the scope of the Second Amendment,

5  it's still a bearable arm.  We're going to have a very different

6  analysis when it comes to historical tradition on grenade

7  launchers, but as to that threshold question of simply whether

8  it's an arm, a firearm equipped with a grenade launcher is a

9  bearable arm for self-defense.  It's prima facie protected by

10 the Second Amendment.

11             THE COURT:  Well, it shoots an explosive or

12 launches an explosive instead of shoots a projectile, isn't that

13 different?

14             MS. MURPHY:  I don't think the Supreme Court has

15 really drawn a distinction based on exactly how the arm fires or

16 what it does for purposes of that threshold textual inquiry.

17 Again, once we get to historical tradition and the question of

18 whether it's something people commonly possess for lawful

19 purposes, that makes a huge difference.  You know, grenade

20 launchers have never been something -- that I'm aware of any

21 tradition of them being commonly possessed by law-abiding

22 citizens for lawful purposes, and that's why we're not here

23 challenging the provision of the law that says that you can't --

24 that prohibits arms that are equipped with grenade launchers.

25 Grenade launchers were already unlawful before this.

1       But I think it's really important as a legal

2   matter, you know, I think the state has tried to conflate these

3   two parts of the analysis and sneak into that threshold textual

4   question, things that the Supreme Court has told us really speak

5   more to the second part of the inquiry that focuses on

6   historical tradition.

7       So at that first part, when you're simply asking,

8   you know, does -- is this an arm, is this a bearable arm, it's

9   really just as simple as, is this something that people pick up

10  and use for the purpose of engaging in armed self-defense.  And

11  again, as to what we're talking about here, I just -- you know,

12  the first question, if you're focused on the so-called assault

13  weapon part of this, I don't see how there's really any argument

14  to be made that a rifle or a pistol or a shotgun is no longer a

15  bearable arm because it has the particular features that the

16  state has singled out.

17      And I don't think the analysis is any more

18  complicated when it comes to the aspect of the law that

19  prohibits the magazines, because magazines are not mere

20  accoutrements or accessories in the manner that the state has in

21  mind.  When you look historically at what was put into the

22  bucket of accoutrements or accessories, it's things like a

23  scabbard or cartridge box.  Those are things that you use to

24  store your arm or ammunition when you're not using it, when

25  you're not bearing it for self-defense.  Nobody kind of affixes

1    their cartridge box to the arm once they're utilizing it for

2    self-defense.

3                Magazines are of course quite different.  Sure,

4    they hold ammunition, but my clients and the many clients who

5    are being represented here today don't want to possess the

6    magazine just for the sake of possessing the magazine or having

7    somewhere where they can keep ammunition.  They want to possess

8    a magazine so that they can have arms that are equipped with the

9    magazine that they bear for self-defense and other lawful

10   purposes.

11               And I think when we're talking about that

12   threshold inquiry into what the text of the Second Amendment

13   protects, as long as you're talking about something that is an

14   operative part of the firearm -- it doesn't have to be

15   absolutely essential, critical, you could never have a firearm

16   that doesn't have this particular feature -- as long as you're

17   talking about something that is an aspect of what enables the

18   firearm to operate the way the user intends it to operate, then

19   whether you're talking about that as a fixed component or as a

20   detachable component really makes no difference.

21               And the state doesn't seem to really think it

22   makes a difference because they prohibit the magazines

23   regardless of whether they're detached or fixed, which just kind

24   of goes to show that the focus here is not on magazines qua

25   magazines.  You know, it's the state wants to regulate them

1      because people use the magazines as part of the firearms.  And

2      all of that for purposes of that textual threshold inquiry just

3      reenforces the conclusion that this isn't, you know, a tricky

4      question.  The part about whether this is an arm that is

5      presumptively protected is really answered by the mere fact that

6      this is a law that, by its terms, is designed to say there

7      are -- there are some types of arms that people can't carry.

8              THE COURT:  Do you think *Bruen* put into question

9      all of our laws, both state and federal, that regulate what

10     firearms can be possessed or used, or do you think that there

11     are, as Justice Kavanaugh put out, that stated, this doesn't

12     bring into question many of the arms -- many of the laws we

13     have, felon in possession, for instance?  So do you think it

14     changes what's already in place?

15             MS. MURPHY:  I think what it does -- I don't

16     think it calls into question every conceivable ban on a

17     particular type of arms, because there is of course a critical

18     second part of the analysis.  Once something is textually an

19     arm, that means it's presumptively protected.  It's prima facie

20     protected in the words that *Heller* used back when it articulated

21     the test.  But that doesn't end the inquiry.  It shifts the

22     burden to the state to demonstrate that the regulation is

23     consistent with historical tradition.

24             But *Bruen* has also answered the question of what

25     the historical tradition is, and it answered it in a way that I

think leaves room for, you know, some types of prohibitions are going to be permissible and some aren't, because what the test -- the historical tradition test asks is whether arms are in common use, whether they are commonly possessed by law-abiding citizens for lawful purposes, like self-defense.

Not everything that qualifies as an arm in the prima facie sense satisfies that test.  I think grenade launchers are a perfect example.  They may well be arms in the sense that you can pick one up and bear it, but they are not something that in the history of our country I'm aware of anything showing have ever been commonly possessed by law-abiding citizens for purposes like self-defense.

THE COURT:  How about a .50 caliber rifle? Nobody really -- nobody really picks that up and shoots it from their shoulder.  It's just massive.

MS. MURPHY:  We did not challenge the provision. I'm not --

THE COURT:  All right.

MS. MURPHY:  I can't speak -- I'm not sure if there's anybody at the table that did, but my clients didn't challenge the .50 caliber.  We didn't challenge it, so I'm not going to stand up here and say I've -- can tell you precisely what the statistics are.  But if we had, I think the right thing -- the state could come forward and say, here's our evidence that people don't possess those, and maybe they'd be

1  able to make a better showing in that case.  Maybe they would,

2  maybe they wouldn't.

3                THE COURT:  All right.  At the break, we'll see

4  if somebody -- I'll give one of the other lawyers a chance to

5  address .50 caliber.

6                So the right to bear arms under the Second

7  Amendment refers to the right to wear, bear, or carry upon the

8  person or in the clothing or in a pocket for purposes of being

9  armed and ready for offensive or defensive action in the case of

10  a conflict with another person, so says the Supreme Court.  And

11  also they refer to arms that are typically or commonly

12  possessed.

13                So what number are we looking for that moves the

14  firearm from being in some odd lot to being so widely held that

15  it's considered typically possessed?

16                MS. MURPHY:  So I think, you know -- I mean,

17  the -- from my standpoint, once you're in the millions, it's an

18  easy question.  If you go back to *Caetano*, Justice Alito

19  indicated that a couple hundred thousand individuals possessing

20  stun guns was sufficient to render those arms in common use.

21  But certainly when you're in the neighborhood of things that are

22  owned in the millions, or here, we're talking about tens of

23  millions or even hundreds of millions, when it comes to the

24  types of magazines the state has prohibited, you know, that

25  strikes me as, wherever the line is, we've far surpassed where

1      the line -- where you would draw the line of saying something

2      is, the language of the Supreme Court, highly unusual in society

3      today.   I mean, we offered some examples in our own briefing of

4      the number of, you know, AR platform rifles in existence exceeds

5      the number of F-Series trucks on the road, which I don't think

6      anyone thinks of as things that are highly unusual in society

7      today.

8              So commonality, you know, sure, they're less

9      common if your comparator is handguns, which are the most common

10     right now type of arms on the market.   But even if you take a

11     look at some of the statistics comparing the two, you know, the

12     recent statistics that my client NSSF gathered through the

13     research, and it regularly does with retailers, is that AR

14     platform rifles are the number 2 top seller at this point.   You

15     know, it's about 44 percent is handguns and second behind that

16     is about 20 percent of what is sold on the market, is purchased

17     on the market right now is AR platform rifles.   Yet they've been

18     completely --

19             THE COURT:   There's no question that AR platform

20     rifles are commonly held, typically held, but does that platform

21     allow in, say, AK-47s, which may not be typically or commonly

22     held?

23             MS. MURPHY:   So I think, you know, this is where

24     it's really critical that the burden shifts after we're past the

25     textual analysis.

1      THE COURT:  I'm asking that question too.

2      MS. MURPHY:  Sure.  And what I would say is, you

3 know, I think that the burden is on the state to -- if -- you

4 know, they had kind of a couple choices in how to defend this,

5 and one would have been to say, look, maybe we -- maybe we swept

6 a little too broadly by bringing in these AR-15 platform rifles,

7 given that they are just exceptionally common these days and

8 people choose them for all sorts of lawful purposes.  But let us

9 tell you, Your Honor, about, you know, how there are still some

10 things here that we think we can make our showing as to why

11 they're not common.

12      That is not how I understand them to have

13 defend -- tried to defend this case.  They want to defend this

14 law on an all-or-nothing basis, which is certainly their

15 prerogative to do, but their arguments have not been geared

16 towards saying, hey, on our list of a hundred firearms, you

17 know, maybe 95 of them we're wrong about, but let us tell you

18 about the five that we actually don't think people own.  You

19 know, this is the preliminary stage, if later in the case they

20 want to try and shift the record and focus on particular arms, I

21 suppose that's still their prerogative to do, but they haven't

22 come forward that way and this really is their burden.  Since

23 these are arms, it is their burden to demonstrate that what

24 they've banned is not something that's commonly possessed.

25      And the other problem they have is, you know,

1      because of the way this law operates, yes, you have this list

2      that identifies particular arms, you could have a conversation

3      about the arms on it, but you also have a features ban, and the

4      features ban identifies features that we certainly don't believe

5      there's any category there other -- with the exception of the

6      grenade launchers that you could say, as a categorical matter,

7      every arm that has that feature is unusual, dangerous and

8      unusual and not something that's commonly possessed.  By and

9      large, those are features that are common on things like an AR

10     platform rifle.

11             And so because of the nature of, you know, having

12     a features definition that sort of sweeps in a lot of stuff, I

13     don't think -- I think the state has to be able to defend the

14     features themselves as, that's a feature that any firearm that

15     possesses is highly unusual in society today, and that's just

16     not a showing that they've -- that I think -- I mean, we're the

17     ones who have come forward with evidence, not them, about

18     commonality.  But really, their arguments here have not been

19     like, you're wrong about the numbers.  I think most of our

20     disputes are really legal disputes about what it is that needs

21     to be shown, what -- you know, what qualifies as commonality as

22     sort of a legal matter, what qualifies as common use as a legal

23     matter, and what goes into which piece of the analysis.

24             THE COURT:  Well, let's talk about the -- the

25     magazines.  Is there a number -- I mean, I understand your

1    position about the government's burden.  Is there a limit to how

2    large a magazine can be for the AR-15 platform before it gets

3    into a realm where a government could regulate it and say,

4    that's just way too much?

5                    MS. MURPHY:  Sure.  So I wouldn't say there's

6    like a number I can tell you, this is -- you know, the

7    constitutional cutoff is X.  I think as a practical matter,

8    there ends up being a cutoff because --  as a consequence of the

9    constitutional test, which is, what things are actually commonly

10   owned by people for lawful purposes like self-defense.  And, you

11   know, while there's not a record amassed on this at this point,

12   you know, my understanding is, while hundred-round drums are

13   legal in many states, they are not something that is commonly

14   owned by a heck of a lot of people who are just possessing

15   weapons for self-defense purposes.  So there is -- the test the

16   Supreme Court has articulated that focuses on common use builds

17   in results that are going to impose limitations on what can be

18   used.

19                    And one good historical illustration of that is

20   the difference between the regulatory treatment of automatic and

21   semiautomatic firearms.  I mean, if you go back in time, you

22   know, the state has all of these concerns about, oh,

23   manufacturers just flood the market and that renders this test

24   meaningless.  That's pretty much what manufacturers tried to do

25   with machine guns in 1925 when they first came up with the

submachine gun that could actually be carried around the 1920s.
It was for the military.  The military didn't really want it and
they said, we'll sell it to civilians, we've got all these
firearms.  And it turned out, civilians didn't really want them
either.  They really found a home very quickly with people who
were misusing them in kind of gangster crimes and such.  And
within two years, the majority of states were prohibiting that
technology.

Now at the same time, the states were actually
being quite careful not to sweep in semiautomatic technology,
even though semiautomatic arms had been on the market for
several decades.  They had actually come on the civilian market
well before automatic technology did.  But I think it's a really
powerful illustration.  You know, there's this common critique
of, oh, if you have a test that focuses on common use, it's just
never -- it's completely indeterminate and it's controlled by
the manufacturers because they dictate the choices about what
people want to purchase.  That just hasn't proven true over
time.

We've seen things that come on to the market and
don't actually find much of a home with people who are
purchasing arms to keep and bear for self-defense, whether
that's because, you know, at a certain point, a firearm just
becomes sort of unwieldy, some of these types of devices that
get into much higher numbers of rounds are less reliable,

1    whatever the reason may be.  People actually do make choices and

2    they don't just let their lives be dictated by, you know, we put

3    something on the market and therefore you must need it.  So this

4    test is proven to be one where there are choices made by people

5    and there is content to it and you do end up with, there are

6    some things that, even though they're legal in many states, are

7    just not the types of things that find the same kind of home in

8    the civilian marketplace.  But the problem the state has here

9    is, that's just not the type of things we're talking about here.

10                THE COURT:  So the -- sticking with the machine

11   guns in the '20s, they were banned because they were principally

12   weapons of bootleggers and bank robbers as opposed to common

13   citizens as opposed to banning them because they could fire --

14   they were capable of firing large, powerful bullets and have

15   multiple impact capacity, so that in a very short period of

16   time, they could spread a lot of lead that hits a lot of people

17   in a very dangerous way?  You think it was just because of the

18   gangsters and the bootleggers using them as opposed to the fact

19   that they were shooting typically larger rounds with higher

20   capacity and causing multiple impacts per person?

21                MS. MURPHY:  I think it's predominantly what it

22   was.  And part of that to me -- the fact that you have states

23   drawing a distinction at the time between semiautomatic and

24   automatic technology, what they're focussing on, the things that

25   they're really focusing on in those laws, and if you look at the

1   laws, for instance, that the state has put in its Table 4 in its

2   appendice of trying to produce historical laws, when you look at

3   those laws, they're really almost -- most of them are regulating

4   almost automatic firearms.  And what they single out, the

5   defining feature is that they continue to fire with one pull of

6   the trigger.

7               And that's what, you know, I think people viewed

8   at the time.  And our regulatory scheme has since -- has since

9   treated that ever since differently.  And the Supreme Court

10   treated that differently in *Staples* and then again in *Heller*

11   when it was distinguishing the old *Miller* case that had upheld

12   the ban.  What the Court focused on is, you know, that's a

13   different type of technology.  And it's not just because it's a

14   different type of technology, it's a different -- the

15   preferences of the people followed from it being a different

16   type of technology, that instead of -- you know, typically what

17   we see people gravitating toward is arms that fire more

18   accurately, more quickly, and more rounds, and instead, you've

19   got an arm that, certainly in its early iterations -- I mean,

20   the idea behind automatic technology was to pull with one

21   trigger and keep firing and to fire rather indiscriminantly.

22   That's why they started for decades as weapons that were used on

23   the battlefields and weren't initially something that was

24   designed for self-defense.

25               And I think you see that you have people's

preferences follow, that that's not what people go out and

decide, hey, I really want to keep a sawed-off shotgun in my

house, because it's not really what people are thinking about,

when they're instead consistently gravitating towards

advancements in technology that just make it easier to fire

their firearms more accurately.  That's all we're talking about

here.

The things that the state has singled out, you

know, the state wants to talk quite a bit about lethality and

all that, but if you set aside the .50 caliber issue, which we

haven't challenged, the features we're talking about that the

state has used to define something as an assault weapon, they

aren't features that have any impact on the lethality of the

firearm if the ammunition hits its intended target.  I mean, an

AR platform rifle that fires with the same ammunition will cause

the same damage, whether or not it has a pistol grip or a

particular type of stock or is equipped with, you know, a flash

suppressor.  Those are just things that make it easier for the

person who's utilizing the firearm to use it accurately and,

yes, to fire the next shot accurately if their first one isn't

successful.

Now of course those are features that if you are

the rare person who wants to use firearms for horrific purposes

and cause absolute mass destruction, yes, they are going to make

it easier to do that.  But conversely, they are absolutely the

1    features that if you're the law-abiding citizen who wants to

2    defend yourself against somebody who's coming at you who's armed

3    and wants to do you harm, of course you want a firearm that you

4    can fire most accurately, and in the event that you don't fire

5    perfectly the first time under the stress of a self-defense

6    situation, that you're going to have a better chance of hitting

7    your target the second time or the third time or whatever it may

8    be.

9         And that's why we see law-abiding citizens

10   continue to purchase these types of arms, why we see that at

11   this point, the latest statistics from -- not just from, you

12   know, my client -- and I know the state likes to say nothing

13   NSSF does should count, but also from the study done by

14   Professor English at Georgetown, all of these statistics

15   demonstrate that when you're talking about the magazines the

16   state has banned -- I mean, it's at least like half the

17   magazines in this country at this point.  People are commonly if

18   not predominantly choosing to have magazines that have the

19   capacity that the state has deemed too large.

20        That's not because millions and millions and

21   millions of gun owners in this country actually are stockpiling

22   weapons because they plan to go and commit horrific crimes with

23   them.  It's because many law-abiding citizens, perfectly

24   reasonable people who choose to exercise their right to keep and

25   bear arms, believe that that is what's best for them to have for

1    lawful purposes like self-defense in their home.

2              And from our perspective, you know, once you've

3    established that commonality test, once -- I mean, and frankly,

4    it's really once the state has failed to meet its burden of

5    proving that something is not typically possessed by law-abiding

6    citizens for lawful purposes, that's the end of the inquiry.

7    That is the test.  The Supreme Court has already told us, it's

8    done the hard work in this particular context.  *Bruen* says the

9    historical tradition is that the people get to keep the arms

10   that are in common use for lawful purposes like self-defense.

11   So you don't have to go and say, well, wait, let's do a

12   historical inquiry as to whether those arms were common a

13   hundred or 200 years ago or whether someone used to ban them,

14   even though today they're actually common.

15             The Supreme Court, I mean, if you can go back to

16   *Heller* the Supreme Court addressed as quote, bordering on

17   frivolous, the argument that the Second Amendment protects only

18   those arms that are in existence or common at the time of the

19   founding, surely the same reasoning applies whether you think

20   ratification of the Second Amendment or the Fourteenth Amendment

21   is the relevant point.

22             The Court then reiterated that in *Bruen.*  And

23   particularly notable discussion in *Bruen*, the Court specifically

24   confronted the argument of, what if you're talking about an arm

25   that's common today but would have been viewed as dangerous and

1    unusual a hundred or 200 years ago?  And the Court specifically

2    addressed that argument and said, even if, even if the state

3    could prove that handguns would have been considered dangerous

4    and unusual back at the time of the founding, that wouldn't

5    matter, because the historical tradition is what's in common use

6    today is something that is what the people are entitled to keep

7    and bear, and if societal norms have shifted such that

8    technology developed in a way where what once seemed scary has

9    become actually, you know what, this works a heck of a lot of

10   better than a musket and we'd all be better off if we have

11   firearms that we know would fire more accurately and cause less

12   unintended damage, you know, if societal norms and technology

13   shift in a way that makes something more attractive to

14   law-abiding citizens for self-defense, that's what matters under

15   the historical tradition test.  You don't freeze in time the

16   inquiry of, you know, what would the average farmer in 1789 have

17   thought if handed a modern day handgun about the utility of that

18   firearm.

19           THE COURT:  Well, there's no question that at the

20   time our Constitution and the Bill of Rights was ratified, that

21   people possessing mechanisms that were hand held that could fire

22   projectiles were common, so too were mechanisms that were held

23   to the shoulder that had a longer barrel that fired projectiles.

24   I don't have any question about that.

25           However, they weren't the type of weapons that

could, you know, quickly cause the death of 20 people.  I mean,
200 years ago, if you wanted to cause the quick death of people,
it had to be a group of people getting together and say, let's
do this.

So because that wasn't the case with firearms at
the time the Constitution was ratified, the legislatures today,
are they just -- they're prohibited from confronting the kind of
gun violence that we have today that just was not even conceived
of 200 years ago?

MS. MURPHY:  I think that they are restricted in
their ability to confront that violence by saying, we're going
to prohibit law-abiding citizens from possessing arms that are
commonly -- in common use for lawful purposes.  That doesn't
mean they're powerless to do anything to address the very, very
serious concerns both about gun violence generally and about the
use of these and other types of firearms to commit mass
atrocities.

Certainly you can have -- work to craft the best
laws possible to keep these arms out of the hands of people who
will misuse them.  You can certainly craft laws designed to
ensure that everybody is as prepared as possible in the event of
a situation where firearms are utilized a certain way.  The
state has great leeway to impose back-end, you know, strong
deterrents in terms of sentencing and all of that for the misuse
of firearms.  There are many, many things the states can do.

1      But the one thing that, you know, the Second

2  Amendment is there to guard against is the state disarming

3  law-abiding citizens.  And the historical tradition is that they

4  can't disarm law-abiding citizens vis-a-vis arms that

5  law-abiding citizens commonly choose to possess for lawful

6  purposes, so --

7      THE COURT:  So the state has many options, but

8  one option is not taking away guns from law-abiding citizens.

9  Second Amendment says, look for other options, other ways to

10  address the problems that you have?

11      MS. MURPHY:  That's right.  And I think if you go

12  back to *Heller*, I mean, *Heller*, it was a case about

13  semiautomatic handguns.  It was not a case about some technology

14  of arms that, you know, only fire a few times a minute.  We're

15  talking about technology that is not really functionally

16  different from what we're talking about here.  It's essentially

17  some of the same firearms, just equipped with some other

18  features in this case.

19      And *Heller* didn't stop to say, well, wait a

20  second, you know, we know the handguns are extremely popular,

21  but we need to stop and analyze just how quickly they fire, just

22  how many rounds they fire, before we can say that this is

23  something that people are entitled to keep and bear.

24      And *Heller* also absolutely acknowledged, I mean,

25  handguns are -- as compared to what we're talking about here, if

1    you look at the statistics on firearms that are used in the

2    commission of violent crimes, it's actually -- you know,

3    handguns dwarf the use of really any type of long guns, but

4    certainly of the type of arms that are prohibited here.  Here, I

5    believe it's something in the neighborhood of 1 to 2 percent of

6    your typical violent crime that involves the type of arms that

7    we're talking about here.

8              So the Court -- you know, the Court didn't deny

9    that.  The Supreme Court didn't say, no, we think you're wrong,

10   handgun misuse doesn't happen, people don't use these firearms

11   to engage in terrible acts.  It just said, we've studied the

12   history and the history tells us that the Second Amendment

13   prioritizes and really preferences the right of law-abiding

14   citizens to keep the arms that they need to protect themselves

15   against the people who would use force against them and their

16   family and those around them and prioritizes that right to

17   self-defense.

18             THE COURT:  Let's move in a different direction.

19   An important part of this statute relates to restrictions on

20   what law-abiding citizens can do with the guns they possess in

21   terms of when they leave their own home.  And you're challenging

22   the restrictions -- well, some of the restrictions that have

23   been imposed in that regard.  So I'd like for you to address

24   that issue if you would.

25             MS. MURPHY:  Sure.  So, you know, the way this

1    law operates, it imposes -- it essentially creates like a
2    de facto grandfathering clause and says, if you are fortunate
3    enough to already possess these firearms, you can continue to
4    keep them if you comply with certain restrictions.  If you don't
5    already have one, you're out of luck.  If you do have one, you
6    can continue to keep it, but you can only use it on your own
7    property or the property that belongs to somebody who's given
8    you express permission to do so.  And here too, you know, we
9    just don't see a basis to single out these particular arms in
10   this manner and impose these restrictions on them, because we're
11   talking about, again, arms that are commonly possessed by
12   law-abiding citizens for lawful purposes.

13              Now this isn't a case about carry restrictions.
14   There are certainly -- you know, there is law from the Supreme
15   Court about being able to restrict the manner of carry
16   generally.  And there are certainly historical bases of
17   particular types of arms, that as a consequence of, say,
18   concealed carry laws, they couldn't be carried outside the home.
19   Predominantly what the state is relying on in trying to
20   demonstrate that this law is permissible is in fact a bunch of
21   concealed carry restrictions and, you know, this would be a
22   different case if we were just talking about restrictions on the
23   manner of carry.

24              THE COURT:  Well, the Supreme Court, Alito, in
25   its concurrence said Second Amendment protects the rights of gun

1    carrying citizens to carry outside of their home for

2    self-defense.  In reading the statute, it looks to me like,

3    well, you can put one in your car if the ammunition is taken out

4    of it and you've got it locked in some device.  But how do you

5    defend yourself outside -- even with a -- how do you defend

6    yourself?

7              MS. MURPHY:  That's absolutely right.  That's

8    exactly how the law works.  There are limited places you're

9    allowed to have it:  Your property, someone who gives you

10   express permission, you could take it to the gunsmith to be

11   fixed, and to the range.  If you're going to other places, you

12   cannot have access to the firearm.  So in that respect, even as

13   to the individuals who get to keep the arms, which is only

14   individuals who already have them, everybody else can't have

15   these arms at all, their ability to utilize them for

16   self-defense, which the Supreme Court has now told us includes

17   both keeping and bearing, has been severely constrained.

18              And that is another aspect of this law in which I

19   think when you're drawing distinctions based on categories of

20   arms, you need -- the state needs to be able to map those

21   distinctions onto the historical tradition test and demonstrate

22   that the restrictions it's imposing are consistent with that

23   tradition, and I just don't think that they can do that here.

24              And, you know, if I may talk for just a moment,

25   some of the history they've put forward, I don't even think on

1    its own terms, the history really gets them there.  I mean, the
2    state points to a variety of laws that it says impose severe
3    restrictions on pistols and revolvers and buoy knives.  But if
4    you really go through those laws, almost all of them are just
5    restrictions on concealed carry, which again, doesn't keep you
6    from possessing the firearm and doesn't keep you from openly
7    carrying it.  And the same is true of the buoy knife
8    restrictions.  Most of those were concealed carry restrictions.
9              And as to the handful of laws they identified
10   that did impose broader bans, they're the laws that either --
11   they talk about the 1837 Georgia law multiple times.  The
12   Georgia Supreme Court held that law unconstitutional precisely
13   because it didn't leave an outlet to lawfully keep and carry the
14   types of firearms and buoy knives that it prohibited.  They
15   point to some very late laws, like the 1891 West Virginia law.
16   The Supreme Court has now on multiple occasions looked at
17   precisely that law and said this law is not consistent with this
18   nation's historical tradition.
19             So really what you find is what we found in both
20   *Heller* and *Bruen*, laws that, you know, come later in time, are
21   out of step with what the Supreme Court has now said is what the
22   Second Amendment means, or laws that were broader and got struck
23   down even by State Supreme Courts back in the day, precisely
24   because they did impinge on the ability to keep and bear arms
25   that were considered to be lawful.

1        So, you know, we don't actually --

2            THE COURT:  Three minutes.

3            MS. MURPHY:  We don't actually think it's

4    essential to get into any of that history, again, because the

5    test here is a test that focuses on common use, but I don't even

6    think they've got the history right.

7            If I could just quickly say a word, you know,

8    about -- the state has made a big deal about this idea that the

9    test is really what arms are, quote, most useful in military

10   service.  I think that's just a very clear misreading of some

11   language in *Heller*.  *Heller* was simply talking about how the

12   consequence of the rule that certain arms -- that arms that are

13   highly unusual in society today may well mean that some of the

14   arms that are most useful in military service today can be

15   banned because military service -- military weapons have changed

16   to such a degree that, you know.  The most useful military

17   service weapon may well be the M16, which is not something

18   that's -- that's typically possessed by law-abiding citizens for

19   self-defense, but rather is actually highly unusual in society

20   at large.  The Court was just discussing the consequence --

21           THE COURT:  Well, I mean, today presently

22   standard issued to military personnel is a Mossberg shotgun, a

23   9-millimeter pistol, a .40 caliber pistol, so just the fact that

24   military people might find it useful doesn't mean that

25   law-abiding citizens can't also find it useful.

1          MS. MURPHY:  That's exactly right.  It's a test

2     that could never work because of course, the history of military

3     and civilian use of firearms is often indiscriminately

4     intertwined.  You just can't put -- sure, there are some

5     firearms that -- there are some arms, even if you just think

6     of -- taking out bearable arms, the old fashioned machine guns

7     that required multiple people to move around, some things are

8     just useful in warfare that are not useful at all for

9     self-defense.  Many things are interchangeable.

10          And I would just note that if you -- the nail in

11     the coffin to me in most useful in military service test that

12     the Court wants to -- state wants to pull from *Heller* is you

13     won't find that language anywhere in *Bruen*.  *Bruen* instead says,

14     five times, that the historical tradition test is what is in

15     common use today.

16          THE COURT:  All right.  Your time is up.  Your

17     45 minutes is up.  What I'm going to do, let's take a ten-minute

18     break.  When we come back, before we get to the government, if

19     any of the lawyers here wanted to address my questions about the

20     grenade launcher or .50 caliber weapons or anything else I

21     raised that counsel, her clients are not challenging, we'll give

22     you some time.  And then I think we'll give you ten minutes,

23     because you're going to be responding to his arguments anyway.

24          So all right.  So why don't you guys talk amongst

25     yourselves.  We'll see what -- we'll see what's left to argue

1    and then we'll start with the government's position.  Thank you.

2    We are adjourned to 2:30.

3                        (Recess at 2:17 p.m.)

4                        (Return at 2:31 p.m.)

5                   THE COURT:  Please be seated.  Thank you.

6             All right.  We're back on the record.  It's my

7    understanding that Mr. Maag is going to offer a response to some

8    questions I asked that previous counsel or client was not

9    opposing that particular aspect of the statute.

10                  So, Mr. Maag, the floor is yours.

11                  MR. MAAG:  Thank you, Your Honor.

12                  May it please the Court, Counsel.

13                  Questions were asked by Your Honor concerning

14   grenade launchers, .50 caliber rifles, and the like.  I think

15   it's important to note there's a substantial difference between

16   a grenade launcher, quote-unquote, and an actual grenade.  A

17   grenade, people think of it as a fragmentation device, an

18   explosive device, a random device.  While perfectly legal at the

19   time of the revolution, has for years been generally not

20   considered an item that has been commercially sought for

21   legitimate private use.  What is prohibited by the statute is

22   not something that is designed and used exclusively to launch

23   fragmentation device, shrapnel devices.

24                  You of course ordered that the state provide a

25   list of every prohibited item.

1          THE COURT:  I did.  And I was going to -- would

2     you put up on the screen -- it's page 4 of Document 37.

3          MR. MAAG:  That is accurate.

4          THE COURT:  There's -- AV -- Tac-D, which they

5     identify as grenade launcher.

6          All right.  So the second piece down, there we

7     are.  Grenade launcher.  Looks like it doesn't launch grenades.

8     To me, it looks like it fires --

9          MR. MAAG:  Looks to me like --

10          THE COURT:  Smoke or gas or --

11          MR. MAAG:  Looks to me like a 37-millimeter flare

12     gun.  You can tell that because of the cocking device on the

13     side.  And Tac-D sells flare guns, not grenades.

14          THE COURT:  All right.

15          MR. MAAG:  Be that as it may --

16          THE COURT:  Well, what's that say about flare

17     guns?  Are these commonly held?

18          MR. MAAG:  Flare guns are very commonly held.

19     They're originally -- they're called Very pistols, developed

20     shortly before the Civil War for signaling devices --

21          THE COURT:  What do we use them for in

22     self-defense?

23          MR. MAAG:  Self-defense or life preservation.

24     They are in fact required by Coast Guard regulations to have

25     signaling devices like this on many boats for calling for help

1    and you're in the wilderness.  Most simple way to call for help

2    with such a device was to have one with it if it's attached to

3    your firearm, so much easier to use it.

4                     As far as the self-defense use, tear gas,

5    nonlethal.  If someone's coming into your home, there's no

6    prohibition on possession of tear gas ammunition, which can be

7    used in a launcher of this type to deter an attack.  Same as a

8    nonlethal stun gun.  They are commonly held.  They are sold over

9    the market.  Matter of fact, they're not even regulated

10   federally as firearms.  They're considered an accessory.

11   They're expressly excluded from both National Firearms Act and

12   the Gun Control Act of 1968.

13               THE COURT:  So this piece of equipment that's

14   depicted in Government's Exhibit 37 identified as a grenade

15   launcher, you're saying that that piece of equipment is most

16   often used for launching flares and the purpose is for safety

17   for someone who may be out hunting and gets lost, if you're on

18   the boat in the middle of Carlyle Lake and you're distressed,

19   you have to fire something to alert the Coast Guard.

20               MR. MAAG:  The particular item in that picture,

21   yes.  There is a similar device, similar cosmetically appearing

22   device called an M203 grenade launcher that is a 40-millimeter

23   caliber that does, in addition to those same types of gas and

24   flare, can fire what would be available on the military market,

25   fragmentation grenades, but those are not made for 37-millimeter

flare devices such as this.  This is a rescue and assistance
and/or self-defense device that does not involve the use of
fragmentation grenades.

THE COURT:  So are you suggesting that it's
unfair to identify that particular piece of equipment as a
grenade launcher; it would be more accurately described as a
flare launcher?

MR. MAAG:  Flare launcher or flare gun or Very
pistol I suppose is a technical -- V-e-r-y, named after Mr. Very
who invented it way back when.  Those would be protected under
the Second Amendment, as equipment designed and intended for use
in legitimate self-defense, commonly owned by millions of
Americans.  Most larger boat owners will own a flare gun.
They're sold at Walmart in 12-gauge caliber, different than
shotgun 12-gauge, but they call them 12-gauge.  They sell flares
at Walmart.

THE COURT:  What about .50 caliber?

MR. MAAG:  .50 caliber, keep in mind that at the
time of the revolution, the standard bore diameter was
.69 inches, sometimes larger, sometimes smaller.  But for
basically a 12-gauge bore in modern --

THE COURT:  Well, George Washington carried a
56-caliber.  He carried 56-caliber pistols.

MR. MAAG:  Yes, pistols were generally smaller by
the time of the Civil War.  It was generally 57- or 58-caliber.

1    Basically over time, the bore diameters have tended to shrunk.

2     .50 caliber is simply a bore diameter.  It's a scaled up 30-06

3    cartridge.  It is commonly used.  It was invented in about 1920,

4    1921 by the firearms designer John Browning.  And until the last

5    few years, nobody has attempted to ban it.  The record shows the

6    state has no evidence of its use in crimes in this state.

7    That's in this record.  It is commonly used for recreational --

8    legitimate recreational purposes, and it is potentially a viable

9    self-defense tool in the proper circumstances.  It is certainly

10   not an offensive tool.  As the Court noted, it's too heavy.

11   Nobody's going to go rob a liquor store with a .50 caliber

12   rifle.  Nobody's going to go and commit a mass shooting with

13   a .50 caliber rifle.  And again, there's nothing in the record

14   in this case that indicates that it's ever happened, at least in

15   this state.

16                THE COURT:  All right.  Thank you for addressing

17   those questions, Mr. Maag.

18                MR. MAAG:  Thank you, Your Honor.

19                THE COURT:  Counsel?

20                MR. OWENS:  Your Honor, thank you.  And may it

21   please your Honorable Court.

22                My name is Troy Owens I represent the McHenry

23   defendants, State's Attorney Kenneally and Sheriff Tadelman.

24                THE COURT:  If you talk slower, that wouldn't

25   offend me.

1            MR. OWENS:  Thank you, Judge.

2            THE COURT:  I listened to my music too loud, so.

3            MR. OWENS:  It's the ten minutes, you know, has

4    me a little anxious.

5            THE COURT:  Don't sweat it.

6            MR. OWENS:  Thank you, Judge.

7            I think Your Honor knows that we're plaintiffs in

8    the Northern District, Western Division, essentially taken the

9    same position in your Honorable Court as we did in Rockford,

10   that we believe that an injunction, the injunction that the

11   plaintiffs have sought and that we have sought in both courts,

12   should issue and that the declaratory relief action ultimately

13   should be granted in both courts.

14           We believe the injunction in the dec. action

15   should be granted, striking down PICA, not based upon the

16   application of Sections 1983 or 1988, which my clients deny any

17   liability for.  We believe the injunction in the dec. action

18   should be granted based upon the analytical trend of Second

19   Amendment litigation and analysis by the US Supreme Court that

20   culminated in *Bruen*.

21           With ten minutes, what I'd like to do is simply

22   distill and bore down on the analytical standard that got us

23   here today that impacts the PICA, Protect Illinois Communities

24   Act, the injunction request, and the filings that were made by

25   the attorney general and the plaintiffs, Judge.

1          Very basically, I just wanted to take the

2     highlights of the main cases as they apply today.  I know

3     Your Honor knows that *Heller* essentially dealt with the District

4     of Columbia ban on handguns and that legislation was held to be

5     violative of the Second Amendment.  The Court in that case

6     articulated the reason we're all here today.  There seems to be

7     no doubt on the basis of both text and history that the Second

8     Amendment conferred an individual right to keep and bear arms,

9     some critical parts of that decision that I think is preserved

10    through *Bruen*.

11          The *Heller* Court cited to *Cruikshank*.  In that,

12    the First, Second, and Fourth Amendments to the US Constitution

13    preexist the Constitution and are not reliant upon that

14    instrument for their existence.  *Cruikshank* specifically cited

15    to the Declaration of Independence regarding these rights, that

16    these rights, First, Second, and Fourth, were endowed upon us by

17    our creator.

18          Erin brought it up today.  The *Heller* Court

19    considered the argument that only weapons that existed at the

20    time of our nation's founding should be considered with the

21    Second Amendment.  The Court actually used the word "frivolous"

22    to that argument.

23          And then other critical limits that came out of

24    *Heller* that I think bear upon the Court's decision in *Bruen* and

25    still exist today, is that the weapons, if they are dangerous

1   and unusual, they can be prohibited.  But dangerous and unusual.

2   And if the weapons are in common use, they are suitable Second

3   Amendment protections.

4                   THE COURT:  Even if they're dangerous?

5                   MR. OWENS:  The key is, dangerous and unusual.

6   All firearms are dangerous.  Everybody here would acknowledge

7   that you wouldn't purchase a firearm because it is benign or

8   it's not harmful.  But the key is, "and unusual."  Now I'll get

9   to that, Your Honor, but the answer is yes.  Common and

10  dangerous, but not unusual -- or and unusual.

11                  *McDonald* essentially gave us the key language

12  that it's clear that the framers and ratifiers of the Fourteenth

13  Amendment counted the Second Amendment as fundamental rights

14  necessary to preserve our system of liberty and made this Second

15  Amendment applicable on the states, which is why we're arguing

16  today about whether or not the Protect Illinois Communities Act

17  is -- should be stricken down.

18                      The question became ultimately that, how do we

19  analyze these Second Amendment questions?  The Seventh Circuit

20  had a couple of challenges, chances in *Friedman* and in *Wilson*.

21  The reason I bring this up is, I believe the attorney general's

22  filings before you is essentially, for lack of a better --

23  pardon the pun -- a shot at a target that's not *Bruen*.  It's a

24  shot at a target that's essentially *Friedman* and *Wilson*.

25                  *Friedman* gave us no, you know, ends-means strict

scrutiny, intermediate scrutiny analysis, but specifically asked
the question, do the regulation -- does the regulation in
question ban weapons that were in common use at the time of the
ratification of the Constitution, or does the regulation bear
upon some reasonable relationship to preserve the efficiency of
a well-regulated militia?

        *Wilson* gave us similar analysis.  That analysis
ultimately asked the Court threshold questions.  Is the
restricted activity protected by the Second Amendment?  If so,
does the strength of the government's reasons justify the
restriction at issue.  And then you get these questions that I
think bear upon their filings and the experts that they've used.
Does the regulation allow citizens to retain the right of
self-defense?  What is the severity of the law's burden on that
right?  Is there a substantial and important government interest
that the law serves?  They gave us examples:  Reducing dangerous
crime, making public feel safe.  Judge, I know you know all
this.  The reason I bring it up, I believe *Bruen* completely
changed the paradigm and directly impacts how this law should be
enforced.

        Erin brought it up.  Essentially the government's
burden is, do modern historical regulations impose a comparable
burden on the right of armed self-defense, and is the burden
comparably justified?  That last one almost sounds like an
ends-means analysis.  However, the Court asked us to ask the

1    question, if the regulatory burden is comparably justified,

2    keyword being "comparably."  Is the historical analog and the

3    legislation at issue, are these comparably justified, comparing

4    one to the other?  And I would say, based upon that analysis,

5    Judge, the answer for *Bruen* is, there's just simply no way.  If

6    the analysis was *Wilson* and *Friedman*, the government's filings

7    based upon the experts they've provided and the arguments

8    they've made, might make PICA a sustainable statute.  Same thing

9    with the experts they provided to you.  But based upon the

10   standard in *Bruen*, Judge, I think I respectfully submit that

11   PICA should fall.

12           The historical analog, I respectfully submit, as

13   it pertains to the Protect Illinois Communities Act, there is

14   literally none.  Taking a look at the actual strictures

15   contained within the legislation, this is effectively a ban on

16   virtually every semiautomatic rifle that can be constructed.

17   Unlike any other statute, there are 177 specifically enumerated

18   AR platform semiautomatic rifles that the day before PICA went

19   into effect, now cannot be purchased.  Not only those 177

20   weapons, but all copies, duplicates, and variants.  It's

21   effectively every semiautomatic rifle that is manufactured

22   today.

23           I'd ask the Court to take note of our filing.

24   We've provided some research.  There are 20 percent of the

25   firearms that exist today, and there's 24 million of these in

1    circulation as we stand in this courtroom today.  The day after

2    all these people who hold these weapons, essentially -- they'd

3    be illegal if they were purchased today.

4              THE COURT:  One minute.

5              MR. OWENS:  One minute.  Let me just say this

6    then, Judge.  Let me break it down.  *Bruen*, *Heller,* and

7    *Cruikshank* stand for the proposition that the First, Second, and

8    Fourth Amendments preexisted the Constitution and are not

9    reliant upon that text.  I'd ask the Court to use this

10   opportunity to look at this legislation through the prism of the

11   protectiveness by which those Courts articulated that standard.

12   The rights in question were not the right from the governor or

13   Illinois legislature, the Congress, the Supreme Court, or the

14   Constitution, or even the blood of patriots that heroically

15   secured them for us.  They were given to us by our creator,

16   according to our Supreme Court.

17             That's the last thing I'd ask, is viewed from

18   that prism, please don't let something so temporary as the

19   Illinois legislature's legislation, destroy something that the

20   law considers so timeless.  I'd ask you to grant this

21   injunction, Judge.

22             THE COURT:  Thank you.

23             MR. OWENS:  Thank you.

24             THE COURT:  All right.  Do you want a little time

25   before, or are you ready to go now?

Case 3:23-cv-00209-SPM   Document 88   Filed 04/13/23   Page 51 of 84   Page ID #3091

```
 1            MR. WELLS:  I'll probably need just a second to
 2    get set up, to make sure it's working.  I think maybe five
 3    minutes.
 4            THE COURT:  All right.  Let's take a brief five
 5    minute recess.
 6            (Recess at 2:47 p.m.)
 7            (Return at 2:53 p.m.)
 8            THE COURT:  Are we ready?
 9            MR. WELLS:  I am, Your Honor.
10            THE COURT:  Fire away.  No pun intended.
11            MR. WELLS:  So thank you, Your Honor.
12    Christopher Wells on behalf of the state defendants, the
13    attorney general, the governor, and the director of the Illinois
14    State Police.
15            THE COURT:  Can you speak up a little louder or
16    pull the microphone towards you?  Thank you.
17            MR. WELLS:  Is that better?
18            THE COURT:  That's better.
19            MR. WELLS:  Your Honor, the reason we're here
20    talking about the Constitution is because it endures.  It allows
21    each generation to address pressing social problems through our
22    elected representatives.
23            The Protect Illinois Communities Act addresses a
24    recent and acute social problem, mass shootings, perpetrated by
25    lone gunmen carrying AR-15s and large capacity magazines.  In
```

1    particular, on July 4th, 2022, a lone gunman used an AR-15 and

2    30-round magazines to kill seven people and wound 83 others in

3    one minute at a July 4th parade in Highland Park, Illinois.  As

4    Your Honor's remarks acknowledged at the outset, we're talking

5    about individual people here.  And I think frankly, the

6    statistics that I could read off to you about the number of

7    first graders that were killed at Sandy Hook, the number of

8    people that were killed in Orlando, Florida, in Las Vegas

9    Nevada, and El Paso, Texas, in Uvalde, Texas, with an AR-15 and

10   a 30-round magazine, I could quote statistics, Your Honor.  I

11   could list the number of deaths, but that would be a disservice

12   because it conceals the fact that we're talking about

13   individuals who were killed.

14           So faced with this undeniable pattern of mass

15   shootings perpetrated by lone individuals with AR-15s in

16   particular and 30-round magazines, the Illinois legislature made

17   a choice to take AR-15s and other similar weapons and 30-round

18   magazines off the civilian market in Illinois.  Plaintiffs' case

19   is that that's not possible because of the Second Amendment.

20   More specifically, they say that they've sold so many AR-15s and

21   large capacity magazines at this point that they're untouchable,

22   they can't be regulated, they can't be taken off the civilian

23   market.  That's their case.  All we have to do is count AR-15s

24   and large capacity magazines.

25           Your Honor, we don't think that's the

1    constitutional standard.  We don't think that's what *Bruen* said.

2    We don't think that's what *Heller* said.  I'm going to spend a

3    lot of time today, Your Honor, talking about what the

4    constitutional standard actually is.  And as Your Honor already

5    heard from the argument, we have different views about what the

6    two prongs of *Bruen* require.  We believe that the relevant

7    question in the text prong is whether or not arms protected are

8    arms in common use for self-defense.  *Heller* and *Bruen* both

9    stated that formulation.  Arms are arms in common use for

10   self-defense.

11                I'm going to spend quite a bit of time today

12   talking about *Heller* in particular, Your Honor, because I think

13   what *Heller* tells us about how you read the text, how you read

14   constitutional text, you read it in light of the purpose.  What

15   were the framers trying to accomplish through the text?

16                With respect to history, Plaintiffs' view, we

17   don't even get to history.  They say, all we have to do is count

18   AR-15s.  That is their case.  We've sold 24 million of them.

19   We've heard that quoted many times.  They say, these are arms,

20   they're common, that means they're not unusual, that means

21   there's no historical tradition.

22                With all due respect, it doesn't come down to

23   whether or not there's just been a lot of AR-15s sold, frankly,

24   in the last 20 years, because that's when they've become

25   popular, since the expiration of the 2004 Federal Assault

1    Weapons Ban.

2                    Your Honor, I'm going to address the text in the

3    first sentence.  Plaintiffs' view of text, we heard from them,

4    all that you have to show, all that they have to show, is that

5    these are bearable arms.  That's it.  Is it something that you

6    can take into your hands to cast or strike another?  We think

7    that is overly simplistic.  We don't think that is what the

8    Supreme Court said in *Heller* or *Bruen*.  The Supreme Court

9    interpreted the textual analysis to be a question of, what arms

10   are in common use for self-defense.

11                   There are nuclear missiles, Your Honor, nuclear

12   arms that we in common parlance refer to.  We have -- used to

13   have at least -- treaties with the Russians, the Strategic Arms

14   Limitation Treaties.  Those aren't arms protected by the Second

15   Amendment.  Same thing with tanks, same thing with fighter jets.

16   Plaintiffs will say, oh, well, those are not bearable arms.

17   Yes, they're not bearable arms, but stinger missiles, javelin

18   missiles can be carried by a single individual.  We're equipping

19   the Ukrainians with them right now.  They are being used on the

20   battlefield in Ukraine.  They're bearable arms.

21                   Plaintiffs' view of the standard is that an

22   individual could come into court and say, I would like to

23   acquire a javelin missile.  That's an arm.  I've carried my

24   plain text burden.  You can carry it.  It's bearable.  And then

25   the burden shifts to the government.  I don't think that is

1   consistent with the reading of *Heller*, how *Heller* read the

2   Second Amendment, or how *Bruen* reads it.

3                THE COURT:  Well, let me ask you, so the text of

4   the Second Amendment refers to well-regulated militia, and some

5   people have kind of ignored that.  But doesn't that suggest that

6   even at that time, what the people who adopted the Constitution

7   were saying is, you get to have arms, at least gives you a

8   fighting chance if you were in a militia and we had to beat back

9   the redcoats or somebody else.  And so it's not -- doesn't

10  suggest that you can have a Red Ryder BB gun and that's good

11  enough for you.  Isn't there some suggestion when you read it in

12  that context that suggests that even at that time, they thought

13  the people are going to have arms, a right to carry arms, that

14  could have some relevant military use if they were pressed in

15  the service in the militia?

16               MR. WELLS:  Certainly, Your Honor.  I don't think

17  our position -- and I heard counsel suggest that somehow it's a

18  pure military use test.  That's not what we've put forward.  It

19  is the fact that some weapons really are -- have characteristics

20  that undeniably push them way into the military zone, stinger

21  missiles, things of that category.  It's ultimately about

22  attributes and use.

23               THE COURT:  Okay.

24               MR. WELLS:  What are the attributes of these

25  particular weapons, and how are they used --

```
 1              THE COURT:  I didn't mean to take you off your --
 2    let's get back to your prepared --
 3              MR. WELLS:  No, Your Honor, I honestly welcome
 4    the questions.  I do think a lot of the questions that
 5    Your Honor had will come up naturally in the course of this.
 6    But I want to talk about Heller and I want to talk about
 7    Heller's textual interpretation, how it approaches text.
 8              Heller acknowledges that the right's not
 9    unlimited.  We know that.  We know it's not a right to keep and
10    carry any weapon whatsoever.  So how does Heller make the
11    determination of what types of weapons are protected by the text
12    of the Second Amendment and which are not?
13              THE COURT:  So what you're referring to in Heller
14    is, the Second Amendment does not enshrine the right to carry
15    any weapon whatsoever in any manner whatsoever and for whatever
16    purpose.
17              MR. WELLS:  Correct.
18              THE COURT:  That was in Bruen, but there may be
19    in Heller.  That's really the language you're referring to, it's
20    not unlimited?
21              MR. WELLS:  That is correct, Your Honor, and I've
22    got the text right there on the screen.
23              THE COURT:  Okay.
24              MR. WELLS:  And I think it -- where it comes up
25    again too I believe is in Justice Kavanaugh's concurrence.
```

1          THE COURT:  All right.

2          MR. WELLS:  And I think it's in the majority as

3     well.  There's an acknowledgment that, look, it doesn't mean

4     everything; right?  Everything that can be conceivably be a

5     bearable arm.

6          How does *Heller* make this determination?  And

7     *Heller* really, in a way that *Bruen* is not, is a case about

8     weapon type.  By the time you get to *Bruen*, there was no dispute

9     that the Court had held that handguns were the quintessential

10    self-defense weapon.  Same thing in *McDonald*.  Handgun case, but

11    it was clear at that point that handguns were protected.  *Heller*

12    engages with handguns relative to other types of arms in a way

13    that the successor cases do not.

14         So what does *Heller* say about that typology, and

15    how does it distinguish between what is in fact covered and

16    what's not?  Your Honor alluded to it.  What is the essential

17    issue in *Heller*, whether or not -- how you read the text of the

18    Second Amendment, a well-regulated militia being necessary to

19    the security of the free state.  The right of the people to keep

20    and bear arms shall not be infringed.  What does the militia

21    reference mean?  Does it mean anything?  How relevant is it to

22    the right that is protected?

23         As Your Honor knows, Heller concluded it's an

24    individual right.  It's not connected to militia service.  And

25    in fact, it really -- and I'm not using this in the means-ends

1  scrutiny way that other courts have.  It's a means to an end.

2  It protects a means, particular instruments, arms, in service of

3  the end of self-defense, self-defense being a preexisting right,

4  as the Court understood it, that frankly, what didn't even need

5  to be codified.  It was just there.  It was a right of English

6  men going back centuries.

7          So instead, what *Heller* does is it looks at the

8  text and says, this militia reference, it doesn't capture it

9  all, it actually looks to the underlying purpose, and determines

10  that self-defense, even though it's not textually referenced in

11  the Second Amendment, is central to how we understand it.  And

12  because handguns in particular were the quintessential

13  self-defense weapon in *Heller*'s view, an absolute prohibition of

14  handguns held and used for self-defense in the home was

15  unconstitutional.  So what do we know about handguns in

16  particular from *Heller*?

17          THE COURT:  They have pistol grips.

18          MR. WELLS:  They do have pistol grips, Your

19  Honor.  They're also readily accessible in an emergency, as the

20  Heller majority acknowledged.  You can keep them in your bedside

21  table.  They're harder to be wrestled way by an attacker because

22  the attacker can't grab the barrel as easily.  They're wider and

23  easier to use than a long gun and you can point one with one

24  hand and dial 911 with the other.  Those attributes mattered to

25  how the Court understood the special status of a handgun.  I

1    would suggest that most of those attributes do not apply to the

2    AR-15s that we're talking about in this case.

3                So even before the *Heller* Court reaches handguns,

4    it discusses three different categories of weapons that at least

5    strongly suggests are not protected, one of which is the

6    short-barreled shotgun from *Miller*, 1939 case, 20th century

7    case, Your Honor, addressing a 20th century regulation, the 1934

8    National Firearms Act.  So what did the Supreme Court -- how did

9    it interpret *Miller*?  *Miller* mentions the militia rationale.

10   That was how *Miller* approached the analysis.  Supreme Court

11   says, yeah, that's probably not wrong.  They're not looking at

12   it in that way.  But it's clear they're protecting the result of

13   that case.  So it reinterprets *Miller* in a way that suggests

14   that there are only certain types of weapons that are protected

15   by the Second Amendment, only certain weapon types.  So

16   short-barreled shotguns, look, those are not protected.  Why?

17   Because they have a connection to criminal violence.  They were

18   being used in particularly concerning forms of criminal violence

19   in the prohibition era, as Your Honor alluded to.

20               Briefly, one point about what's essential and

21   what's not essential in a firearm.  A barrel is an essential

22   component of a firearm.  The length of the barrel could be

23   regulated, however.  So when we talk about large capacity

24   magazines, a magazine -- a bullet, yes, a bullet may be

25   essential.  Something to hold bullets may be essential.  Does it

1    have to be large capacity magazine?  I don't think there is a

2    constitutional protection for a large capacity magazine.  Some

3    magazine, perhaps.  A large capacity magazine, I would suggest

4    no.  How do we know that?  We know that because short-barreled

5    shotguns, which I would note are not semiautomatic weapons, can

6    be heavily regulated under federal law because they have certain

7    attributes that make them prone to criminal misuse.

8              Another type of weapon, Your Honor alluded to it

9    earlier, the Thompson submachine gun.  Incredible rate of fire,

10   used in the St. Valentine's Day massacre, used in many other

11   massacres.  Frankly, though, as Your Honor may have seen from

12   some of our historical submissions, were Thompson submachine

13   guns the leading murder weapon of the day?  No, they weren't.

14   Other weapons were being used.  But they were being used in a

15   way that terrified the public, really high profile, well

16   reported-on incidents that led to the regulation.  This idea

17   that just because a particular weapon isn't the leading cause of

18   murder, that somehow we can't touch it, that's not how we do

19   Second Amendment analysis.

20             Your Honor, the last category of weapon that

21   *Heller* at least alludes to and strongly suggests that it can be

22   banned probably because it's also automatic and also because

23   it's a military weapon built for the battlefield, is M16 rifles

24   and the like.  And again, this comes back to textual analysis,

25   Your Honor.  How does this reference to the M16 arise in the

1    *Heller* discussion?  The dissent by Justice Stevens is heavily

2    arguing that you have to talk about militia weapons.  It's got

3    to be connected to the militia.  It's a collective right based

4    on militia service.  And frankly, Justice Scalia suggests that

5    there's a growing disconnect or the degree of fit is

6    significantly less than it used to be because he presumes that

7    M16s, which are the standard issue US Army weapon for soldiers

8    at that time, they presumptively can be regulated.  Does the

9    Court hold that definitively?  No, but it certainly gives us

10   quite a bit of insight that the M16 in particular is something

11   that could be banned from the civilian market.

12            So at the end of the day, there are four weapon

13   types that are addressed in *Heller*:  One, the handgun,

14   quintessential self-defense weapon, close -- based on its

15   attributes and its use, there's a close nexus to the purpose of

16   self-defense, which the Court understands to be the central

17   component of the Second Amendment.

18            Short-barreled shotguns, despite having their

19   barrel regulated, an essential part of a firearm, they were not

20   typically possessed by law-abiding citizens for lawful purposes.

21   *Heller* accepts that *Miller* -- while the rationale may have been

22   inconsistent with Heller's view about the individual nature of

23   the right protected, that the outcome was right.

24            Machine guns, again, Justice Scalia is startled

25   at the dissent suggestion that machine guns would be beyond the

1    reach of regulation.  M16, similar implication.

2                    THE COURT:  And that's M15 as it's equipped by

3    the US military?  Not just something that looks like an M15?

4    I'm sorry, M16, but the M16 as equipped by the military, which

5    is different than what's being sold to the civilians?  You would

6    agree with that?

7                    MR. WELLS:  So I don't know that -- I would agree

8    that -- the main difference is automatic fire.  I think we

9    acknowledge that.  M16 is select fire rifle.  It can engage in

10   automatic fire, three-shot bursts, semiautomatic fire.

11                   THE COURT:  Okay.

12                   MR. WELLS:  But I think our experts and I think

13   even Plaintiffs would suggest that first of all, the M16 was

14   originally called the AR-15, then when it became selected by the

15   US Army, they renamed it the M16, with that "M" denomination for

16   "Military."

17                   THE COURT:  For "Military," mm-hmm.

18                   MR. WELLS:  So there is a significant degree of

19   overlap between the M16 and the AR-15.  The

20   semiautomatic-automatic distinction is a distinction.  I would

21   suggest that in practice, we've seen that there's not a lot of

22   functional difference in how AR-15s are being used in mass

23   shootings in terms of the rate of fire, the number of people

24   killed.  If one soldier accomplished -- if one soldier were able

25   to perpetrate as many killings on the battlefield, I mean,

1    that -- that is a very substantial body count that is associated

2    with, again, a semiautomatic weapon.

3              I would also note in terms of the military

4    training, this is one of the things that we point out in our

5    materials, the army manual from I believe 2008 suggested that

6    you're supposed to use M16s primarily in semiautomatic mode

7    because it makes you more effective on the battlefield.  While

8    yes, automatic fire can be used for suppression and other

9    purposes and sometimes is necessary in battle, in our view, the

10   distinction is decreasingly significant, particularly in the

11   context of why the act was enacted, which is addressing mass

12   shootings.

13             So what does *Heller* tell us?  It tells us that

14   the purpose of the right is relevant to how we interpret the

15   text.  Well-regulated militia, decreasingly significant.  Why?

16   Because the right codified is a preexisting right to

17   self-defense, and so we read the text in light of that.  So what

18   arms are protected?  Arms for self-defense.  Other types of

19   weapons that have specific attributes that aren't suitable for

20   self-defense and are in fact being used or misused in the

21   criminal context, those weapons not protected.

22             *McDonald*, again, reaffirms that self-defense is

23   the central purpose here.  *Heller*, that's really what *Heller* is

24   motivated by.  What is the nature of the underlying right?  It's

25   the right to keep and bear arms for the purpose of self-defense.

1          THE COURT:  So who gets to choose what weapon a

2     law-abiding citizen selects to defend themselves?

3          MR. WELLS:  So, Your Honor, I would suggest that

4     again, it's a combination of attributes and particularly

5     experience in use.  I don't think that when machine guns were

6     outlawed, that the question was whether or not the market should

7     dictate whether or not those types of weapons are protected by

8     the Second Amendment.  We've never done --

9          THE COURT:  Let me -- here's what I'm getting at.

10    And what made me think about this is that, you know, on YouTube,

11    I saw this clip that somebody gets an alert on their cell phone,

12    they have a Ring camera, and there's four men that come up, big

13    burly guys.  They come up on the porch of this house, got masks

14    on, they start pulling out guns.  And I thought of this

15    scenario.

16         What if you were -- what if you were away on a

17    trip and this comes up on your cell phone?  And then your wife

18    calls and says, Oh my God, there's men outside.  I think they're

19    going to attack.  Yeah, I can see it on the Ring telephone -- I

20    can see it on my cell phone.  And she says, I'm at the gun safe.

21    I can pull the pump action shotgun that has three rounds, a gun

22    that your experts are suggesting is the gold standard for

23    self-defense in the home, or I can pull the AR-15 and I can

24    insert the five-round clip that's loaded or I can insert the

25    30-round clip that's loaded, or I should say magazine.

1             Don't you say, grab the AR-15 and take the

2    30-round magazine because there's four of them and the shotgun,

3    while that's ideal, there's only three rounds in it, honey, and

4    you're going to be panicked and you can't assume that every shot

5    you get off is going to be a lethal shot at first.  Wouldn't it

6    be reasonable under that -- as the story turned out, there was

7    some elder gentleman there with a shotgun and when they kicked

8    the door open, he opened fire and it scared them off.  But what

9    if it didn't scare them off?

10             MR. WELLS:  So, Your Honor --

11             THE COURT:  Who gets to decide -- does the

12    government get to say, no, ma'am, I'm sorry, you got to go with

13    the -- you got to go with the shotgun that has only three rounds

14    in it.  I know you're scared.  You may not be used to how to

15    load it, but God speed.

16             MR. WELLS:  So, Your Honor, I appreciate that

17    question.  I would suggest that, think about how we regulate

18    many dangerous things in society or things that aren't

19    inherently dangerous but actually harm people.  Baby cribs.

20    Baby cribs have lots -- have a lawful purpose, right?  You can

21    keep a baby crib in your home.  But when baby cribs have a

22    certain design that ends up killing lots of kids, what happens?

23    They get regulated.  In some instances, they even get taken off

24    the market.  It's Plaintiffs' job to show that this particular

25    product, which unlike baby cribs, is actually designed to kill

1    people, that it is in a specific category that puts it beyond

2    regulation.  It is -- we're talking about --

3                   THE COURT:  Baby cribs are not specifically

4    protected by the Constitution.  That's what's the difference.  I

5    understand -- I understand the analogy, but --

6                   MR. WELLS:  Well, Your Honor, and I would say,

7    look, your scenario is -- obviously any person would want to

8    protect their loved one, and I understand that that motivates a

9    lot of people to purchase firearms.  You know, I'm not

10   originally from Illinois.  I'm from North Carolina.  My

11   grandfathers, West Virginia, Southwestern Virginia, firearms

12   owners.  I'm not -- this isn't lost on me why people are

13   motivated to purchase any firearms.

14                  Your scenario, though, I would say, Your Honor,

15   that's one specific scenario.  I think if you look at actual

16   use, and this comes from Plaintiffs' own evidence, you look at

17   the English survey, which I think has some flaws that I'm -- can

18   highlight.  But if you look at that survey, what are people

19   choosing in actual self-defense scenarios?  66 percent of the

20   time, under the people that were surveyed, they said they were

21   choosing handguns.  Second choice, shotguns.  Third choice,

22   13 percent, only 13 percent rifles.  What type of rifle, what

23   level of specificity, we don't know.

24                  THE COURT:  So let me build on that scenario.

25   Let's say guy takes his wife and teenage daughter to a firing

1  range and tells them, I want you to learn how to fire this pump

2  action shotgun in case you need to use it in self-defense.  This

3  I think is your best choice.  Double lot ammunition.  Let's say

4  it holds five rounds.  And they fire it.  I don't like it, Dad.

5  Well, why not?  Because of the -- because of the significant

6  recoil.  And it's loud.  I'm afraid of this thing.

7          Here, try this AR-15.  Shoots a few rounds.

8  This, I like better.  I'm more comfortable with it.  It's not as

9  heavy.  It doesn't have the recoil.  I've got this little thing

10  at the end that shoots a green light or a red light so I can see

11  what I'm aiming at.  I want this one.  Does she get the right to

12  make that choice?  Or do I say, survey says, your best bet is

13  this shotgun?

14          MR. WELLS:  Well --

15          THE COURT:  In a situation where they have to

16  succeed at defending themselves, does the government get to say,

17  no, we're going to put you at a disadvantage because we prefer

18  you use the shotgun as opposed to a rifle that we don't like?

19          MR. WELLS:  Your Honor, we're going to talk about

20  the government.

21          THE COURT:  Yeah, we are.  We're talking about

22  the Constitution.

23          MR. WELLS:  I'd like to be clear.  I think who

24  makes the choice are the elected representatives of the people,

25  Your Honor.  I think yes, is there tension that some people may

1    not like that particular choice?  That's the nature of

2    self-government.  That's the nature of self-government in a

3    democratic society.  I believe that the legislature is entitled

4    to make the choice that in the aggregate, the amount of harm --

5            THE COURT:  Is that an infringement?

6            MR. WELLS:  Excuse me?

7            THE COURT:  Is that an infringement on the right

8    to bear arms, shall not be infringed?

9            MR. WELLS:  I would suggest that it's not,

10   because while we can identify hypothetical individual scenarios,

11   when you actually look at really the choices that people are

12   being -- are making in realtime across the board, according to

13   Plaintiffs' own data, 87 percent of people are choosing a

14   shotgun or handgun.

15           THE COURT:  Well, and, you know, statistics are

16   what they are, but in the pleading that was filed by Patrick

17   Kenneally, he cited a study that said, according to United

18   States Justice Department, Bureau of Justice Statistics,

19   household members are present for almost a third of all

20   burglaries and become victims of violent crime in more than a

21   quarter of those cases.  Studies on frequency of defensive

22   firearm use in United States have determined that there are up

23   to 2.5 million instances each year in which a civilian uses a

24   firearm for home protection.  All right.  18 percent of

25   2.5 million, oh, 15 percent, oh, 10 percent.  That's -- there's

1    still thousands and thousands of people using --

2                    MR. WELLS:  Well, Your Honor --

3                    THE COURT:  -- these kind of guns for

4    self-defense in their home.

5                    MR. WELLS:  And frankly, there are and will

6    continue to be many types of weapons that are lawful in

7    Illinois.

8                    THE COURT:  Okay.

9                    MR. WELLS:  And these particular plaintiffs are

10   not having their AR-15s taken away from them.  They're allowed

11   to continue possessing them.  Are there people who will not be

12   able to acquire AR-15s and they might have otherwise acquired

13   them?  Yes.  Yes.  Does that mean that this particular item -- I

14   think at the end of the day, Your Honor, a lot of the arguments

15   that could be made about some of these scenarios that we're

16   talking about could also be made about automatic weapons.  You

17   want the most fire power, you're going to be nervous, you need

18   to be able to -- you might miss, you need to be able to fire as

19   much as you need as quickly as you need.  I don't think

20   Plaintiffs have a good answer for how we even draw the

21   distinction.

22                   If we're going to accept, and I think Ms. Murphy

23   accepts but maybe not all the plaintiffs accept, that fully

24   automatic firearms can be regulated in a manner that takes them

25   out of the civilian market, how can we not make the same

1    arguments about number of shots, accuracy, being nervous, that

2    would also then sweep in automatic weapons?

3              So while, Your Honor, I concede, it is a

4    line-drawing challenge, and I think the question here is whether

5    or not Plaintiffs have established that these particular weapons

6    are in common use for self-defense.  And I think the answer to

7    that question is that they've not shown that.  So let's --

8              THE COURT:  Well, are we just looking at

9    self-defense in the home, or are we looking at self-defense

10   anywhere, that somebody might determine, offensively or

11   defensively, they've got to use arms to protect themselves?

12             MR. WELLS:  So I think, one, we've suggested, and

13   I don't think I've heard a response from Plaintiffs, these

14   particular weapons -- AR-15s, Illinois is a concealed carry

15   state, concealed carry for handguns.  I don't think they've

16   specifically identified places where they intend to carry them,

17   but they have standing to challenge that they --

18             THE COURT:  Well, there's all kinds of handguns

19   you're restricting by this as well, aren't you?  Any handgun

20   that has a clip or magazine that holds more than, what, ten

21   rounds or 15 rounds?

22             MR. WELLS:  15 rounds, Your Honor.

23             THE COURT:  All right.  So if you have a valid

24   concealed carry permit, are you able to carry your gun on you

25   outside your home?  You don't have to go through all the pesky

1    ammunition and has to be separated from the gun and has to be

2    put in a certain container out of your reach?

3                    MR. WELLS:  Yes, Your Honor, you can carry a

4    15-round magazine in a semiautomatic handgun, same handgun that

5    Chicago police officers carry every day, that law enforcement

6    around the state carry every day.  You can continue to carry

7    those.

8                    THE COURT:  If you have concealed carry.

9                    MR. WELLS:  If you have a concealed carry permit.

10                   THE COURT:  Do you know what the turnaround is

11   if -- to get your concealed carry permit when you file an

12   application?

13                   MR. WELLS:  Not as quick as it should be.

14                   THE COURT:  Mine's been pending since September.

15                   MR. WELLS:  I understand that, Your Honor.

16                   THE COURT:  Yeah.

17                   MR. WELLS:  And frankly, I -- having --

18   representing the state, we get sued in both directions.  We get

19   sued if it's not happening fast enough and we get sued because

20   we don't regulate guns enough.

21                   THE COURT:  But you're going to represent to this

22   Court that the state isn't intentionally slow-walking a lawful

23   citizen's applications for concealed carry permits because they

24   just don't want people having guns?

25                   MR. WELLS:  Your Honor, I have no knowledge

1    indicating that there's any slow-walking going on.  Do I

2    communicate with ISP about their application process in a way

3    that gives me enough vantage to know whether that's going on?  I

4    don't have that perspective, but I'm certainly not aware of

5    anything.

6                THE COURT:  All right.  All right.  I'll let you

7    get back to -- I took you away from where you were.

8                MR. WELLS:  No, it's -- I appreciate the

9    questions, Your Honor.

10               And again, I think it is important to talk about

11   what Plaintiffs' evidence of common use for self-defense is.

12   And it comes down to sales.  Ms. Murphy I think alluded to the

13   fact that some people have criticized that logic.  Well, yes,

14   the Seventh Circuit has criticized that logic.

15               It says -- in the *Friedman* case, the Seventh

16   Circuit said relying on how common a weapon is would be circular

17   to boot.  Machine guns aren't commonly owned for lawful purposes

18   today because they are illegal.  Semiautomatic weapons with

19   large capacity magazines are owned more commonly because until

20   recently in some jurisdictions, they have been illegal.  It

21   would be absurd to say that the reason why a particular weapon

22   can be banned is that there is a statute banning it so that it

23   isn't commonly owned.

24               First Circuit said, we agree, just counting sales

25   is illogical.  And I think the evidence in this case, Your

Honor, shows why it's illogical.  Look at the history of AR-15

sales.  1994, AR-15s were banned under federal law, Federal

Assault Weapons Ban.  Ten years the ban was in place.  When did

these 24.6 million sales occur?  88 percent after the expiration

of the ban.

Let's pick another point in time, since 2012.

What happened in 2012?  Sandy Hook massacre with an AR-15 and

large capacity magazine.  Big spike the year after.  64 percent

of all AR-15s, according to Plaintiffs' own data, have been

purchased after 2012 Sandy Hook massacre.

So I'm not going to speculate about --

THE COURT:  This graph, though, is just showing

purchases of guns that are on the AR-15 platform?

MR. WELLS:  So what this shows is modern sporting

rifles, which is the industry's terminology for AR-15 style

rifles.  It is a category that is -- that's where they get the

24 -- and I should say, it's import and production, so it's

National Shooting Sports Foundation and ATF data showing each

year how many are sold.  And so it shows the sales trajectory

year over year.  Right?  And then the 64 percent is what

percentage of the 24 million for that period of time.

Your Honor, ultimately, you know, there was some

discussion about when -- what is the threshold; right?  Is there

some numerical threshold?  Is it the 200,000 from the Caetano

concurrence of two justices?  It's two justices.  Your Honor

1    understands that there's got to be majority.  And I think the

2    *Delaware* case that we submitted for Your Honor's consideration

3    acknowledges, there are a 176,000 legally owned civilian machine

4    guns.

5                    THE COURT:  That's right.

6                    MR. WELLS:  Does that --

7                    THE COURT:  You have to get a license from the

8    feds, but.

9                    MR. WELLS:  True.  But does that mean that those

10   are in common use?  And people perhaps purchase them for

11   self-defense.  Does that mean that machine gun regulations are

12   somehow invalid because --

13                   THE COURT:  No, but every one that's purchased

14   those, in addition to having a FOID card, isn't there a much

15   more rigorous background check and licensing procedure?  So

16   presumably there are a lot of hurdles that an individual has to

17   vault over before they can get that license.

18                   MR. WELLS:  That's true.  It was also true of the

19   Federal Assault Weapons Ban in 1994.  I mean, we used the term

20   "ban," but these -- "ban" is perhaps too stringent whenever

21   we're talking about it, because there's always exceptions.

22   There's always intricacies to the law.  But was the Federal

23   Assault Weapons Ban in 1994 unconstitutional from the outset?

24   Are there now people who are convicted for possession of weapons

25   prohibited by that between 1994 and 2004 that we're now going to

1    have to revisit their convictions?  Is that what -- is that what

2    we're going to have to do?  I would suggest that the answer to

3    that question is, no, because in 1994, Congress could regulate

4    assault weapons in the way that they did.  And now, in 2023, the

5    Illinois legislature can also regulate assault weapons in the

6    way that it has.

7              And, Your Honor, I -- again, this question about

8    sales and what people are choosing, this is the success of the

9    AR-15 -- you know, Plaintiffs, we talk about timing, when did

10    the timing of this happen.  I don't think it's really disputed

11    that the AR-15 was developed in the late 1950s.  It became the

12    M16.  The semiautomatic civilian available version has been on

13    the market for a while.  It wasn't being chosen in great numbers

14    again until after 2004, the time the Federal Assault Weapons Ban

15    was enacted in 1994.  It wasn't selling in the way that it's

16    selling now.  What's changed?

17              A successful marketing campaign.  The firearms

18    industry has pushed these particular weapons that -- in ways

19    that frankly allude to their military service, and some of the

20    more extreme examples allude to the fact that they've been used

21    in mass shootings.  So what -- should we really be relying for

22    constitutional purposes on the success or failure of a marketing

23    campaign, of whether or not a particular item has been sold?

24              We point to two data points, Your Honor, that we

25    know establish a common use threshold.  50 to 60 percent of

1  households in Colonial America and around the time of the

2  revolution and the enshrinement of the Second Amendment, 50 to

3  60 percent of folks owned a musket or a fowling piece.  This is

4  2 percent of the population that owns a modern sporting rifle,

5  which is the AR-15 family of rifles.

6          Well below that threshold, as counsel alluded to,

7  50 percent of handguns -- 50 percent of the 461.9 million

8  handguns, 461.9 million firearms in circulation, 50 percent of

9  them are handguns.  That's 230 million.  That's nearly ten times

10 the 24.6 million that Plaintiffs have --

11         THE COURT:  How many -- do you know how many of

12 those handguns would be rendered illegal under this statute?

13         MR. WELLS:  So I would suggest that Plaintiffs

14 have not put forward much evidence at all that -- why they've

15 brought this lawsuit is about the handguns that would be

16 regulated.  I do not believe that the handguns with the

17 attributes that are regulated in the act are that prevalent.

18 They are -- the evidence simply is not there.  The evidence that

19 Plaintiffs have put forward is about the AR-15 rifle.  That

20 is -- we would not be here talking about 24.6 million if it

21 weren't for the AR-15.

22         So while yes, there are handguns frankly that get

23 converted to essentially function like an AR-15 rifle, those are

24 covered by the act, but the --

25         THE COURT:  Well, I'm concerned about all these

1    add-ons, that -- would you put up page 4?  Let's talk about some

2    of these.  I know -- I see you looking at your watch, and I'm

3    going to give you some additional time.  We're going to have to

4    switch out court reporters at ten to 4, so that will give us a

5    good break to -- all right.  We are having technical

6    difficulties.  Happens everywhere.  All right.  The top one.

7    You have to pull it down a little bit, Julie.

8                 A flash suppressor.  An otherwise legal gun under

9    the statute, it's equipped with a flash suppressor can make it

10   illegal.  What is it about a flash suppressor that changes the

11   dynamics such that it would move from a legal to an illegal

12   firearm with just that add-on?

13                MR. WELLS:  So, Your Honor, I would -- I would

14   make a point in the first instance, that the weapons that we're

15   talking about, the 24.6 million, most of them have more than one

16   feature that's on the list.  The way to think about the features

17   list, Your Honor, is the model list tells us about the existing

18   market.  The features list is about ways in which firearms

19   manufacturers, as they did during the 1994 to 2004 Federal

20   Assault Weapons Ban, were able to circumvent the particular

21   terms of that statute.

22                So what about a flash suppressor in particular?

23                THE COURT:  Yeah.

24                MR. WELLS:  It stabilizes the firearm during

25   periods of rapid fire.  Okay?  It prevents muzzle blindness,

1    flash blindness from -- during periods of rapid fire.

2              THE COURT:  Or during period of a single fire,

3    pull of the trigger.  So if someone's being attacked in their

4    home, it's night, and they fire their gun and it has a flash

5    suppressor, it reduces the amount of interference with their

6    vision from the flash, does it not?

7              MR. WELLS:  So yes, Your Honor.

8              THE COURT:  All right.  Let's move on to the next

9    one.  Go to page -- let's go to page 5.  Show the lower gun.  So

10   here's a pistol with a protruding grip.  Now suppose you have --

11   many people who are called upon to defend themselves are

12   elderly.  They're people who are disabilities.  And suppose if

13   they hold a pistol with one hand, because of early stages of

14   Parkinson's or something, they're shaky.  But with that, they're

15   able to stabilize it more and it makes it safer for them to use

16   and more accurate for them to use.  Would that not be a fair

17   assessment, at least for someone that might be suffering with

18   that disability?

19             MR. WELLS:  So, Your Honor, I -- with respect

20   to -- again, the particular features, we're not here today

21   because there are --

22             THE COURT:  I'm here today because of that.  I'm

23   really looking at -- it looks like all kinds of safety features

24   are made illegal by this statute in an effort to make every

25   possible gun that's out there, most guns out there, get you

1    tripped up on it.  The thumb hole -- I mean, the thumb stock,
2    that doesn't make the bullets any more lethal.  It doesn't make
3    the gunfire any faster, but it makes it easier for the user to
4    aim it and control the weapon, does it not?
5              The same could be said -- you know, even the arm
6    brace, you know, if you have an elderly person that wants to use
7    the handgun, but again, maybe they have diabetic neuropathy or
8    condition that millions or elderly people have, the arm brace,
9    they like it because they feel more comfortable, they feel
10   steadier.  The arm brace doesn't make the gunfire any faster or
11   the bullets impact at a higher velocity.  And you're making it
12   illegal and you're making it illegal for people that really may
13   benefit from using it in a self-defense scenario.
14             MR. WELLS:  So --
15             THE COURT:  Isn't that true?
16             MR. WELLS:  There are many different firearms
17   that will continue to be on the market that are legal and that
18   have attributes that are well suited for self-defense.
19   Handguns, again, that police officers carry, Your Honor, are not
20   impacted by this statute.  And again, the weapons that are being
21   sold, the weapons that are --
22             THE COURT:  But maybe the police officers have
23   passed their fitness training.  They're probably not elderly.
24   All right?  If they have a disability that hinders their ability
25   to use the issued firearms, they're probably taken out of duty.

1    So to say, look, there's a strap and fit 25-year-old police

2    officer who can use these weapons perfectly, great, he doesn't

3    need the arm brace or the second grip.  But what about the

4    82-year-old lawful citizen trying to save himself at his home?

5              MR. WELLS:  Your Honor, I believe the reason that

6    the particular features that are identified are on the list is

7    because they facilitate two things, sustained accuracy during

8    periods of rapid fire and concealability.  Those features are

9    associated with mass shootings and other criminal cases.

10             A lot of the same arguments, Your Honor, could be

11   made about the short-barreled shotguns that we know from *Miller*

12   and *Heller* are -- those regulations are permissible.  Right?  Is

13   it -- an elderly person, a short barreled shotgun may be

14   lighter, it may be easier to hold up.  There may be aspects of

15   that weapon that make it preferable in that circumstance.  But

16   based on actual experience and practice, how have they been

17   commonly used?  They've been commonly used in a manner that's

18   associated with unlawful activity.

19             THE COURT:  All right.  Four years ago, the

20   Illinois government passed Gun Trafficking Information Act and

21   it requires the state police or Illinois law enforcement to

22   detail key information related to firearms used in the

23   commission of crimes, including police reports, the number of

24   people killed in these crimes, where they occurred, and where

25   the firearms originated.

1          And I'm looking at an article from the

2   Pantagraph.  That's not Bloomington.  Maybe it's Bloomington.

3   May 18th, 2023, that -- where a named party in this case said

4   the lack of -- that -- here's this quote.  In the four years

5   since the law was signed, the state's top law enforcement

6   agency, still in the dark, telling lawmakers in February report

7   that the, quote, lack of centralized and uniform data collection

8   tool for use by all Illinois law enforcement agency has made

9   collection and reporting of all the mandated information

10  unattainable.

11         So your own law enforcement isn't able to come up

12  with this information for me to look at in determining this.

13  Your legislators aren't able to come up with this important

14  information to look at, because the Illinois government says

15  that such information is simply unattainable.  Why would I go

16  out on a limb on somebody's constitutional rights to say, well,

17  I'm going to take -- I'm going to take Illinois's word for it

18  nonetheless, even though they say that this relevant data that I

19  should be looking at, as they try to gather it, it's simply

20  unattainable?

21         MR. WELLS:  Your Honor, I would suggest that,

22  there's a bit of an irony here because there has been a

23  substantial push by the firearms industry and by the firearms

24  lobby to limit information about firearms, how many there are,

25  how many are used; right?  That's been a concerted effort.  So I

1    would not --

2                    THE COURT:  Well, how are you able to tell me,

3    people aren't using these guns in self-defense or they're not

4    worthwhile in self-defense or there's not enough elderly people

5    or people with disabilities having tried to defend themselves

6    with arms that they can't handle?  How can you -- how can you

7    tell me -- I mean, what can you show me that allows me to say,

8    yeah, I think that's a perfectly legitimate argument?

9                    MR. WELLS:  Your Honor --

10                   THE COURT:  And I have to consider people who

11   have disabilities.  I have to consider all Illinois residents.

12                   MR. WELLS:  Your Honor, I think the Illinois

13   legislature also has to consider all Illinois residents and

14   they're elected by the residents of Illinois to make some of

15   these difficult judgments.  And I concede, they are difficult

16   judgments.  The thing --

17                   THE COURT:  Let me ask you -- and we're going to

18   switch and I'll give you some more time.  But the telescoping

19   shoulder -- so let's say you have in a household, Dad is 6'3",

20   Mom is 5'1", and you want both to be able to use an AR-15 or an

21   otherwise lawful gun, but to have the shoulder stock being

22   adjustable makes it easier for both of them to use, doesn't it?

23                   MR. WELLS:  Well, Your Honor, it would still have

24   to fit within the other requirements, which are that it would be

25   a semiautomatic rifle.  If you had a pump action adjustable -- a

1    pump action shotgun, for instance, that had an adjustable stock,

2    that would not be restricted by the act and that would be a

3    weapon that could be purchased and used and adjusted to family

4    members.

5          THE COURT:  All right.  But my 5'1" tall wife

6    doesn't want to use the pump action shotgun because of the

7    recoil.  If an AR -- all right.  You're banning all ARs.  Let's

8    just say, even back to the ones that are kind of grandfathered

9    in, doesn't it make sense for them to have adjustable stocks, so

10   that more than one person can use it comfortably and the more

11   comfortable they are, the more likely they are to be accurate in

12   shooting?

13         MR. WELLS:  So there are certainly benefits to an

14   adjustable stock attached to a particular weapon, whether

15   that -- whether or not that means that AR-15s, which have many,

16   again, Your Honor, many of the features on this list, we

17   wouldn't be here if this -- if this weren't about the

18   combination of features that are incorporated in the AR-15 and

19   how it is being used and how other similar AR -- AR-style

20   rifles, the AK-47, they don't want to hear -- talk much about

21   the AK-47, which is also regulated, semiautomatic form as well.

22         Your Honor, there are line-drawing challenges to

23   be sure.  The question, though, is whether or not the particular

24   arms that Plaintiffs are seeking to acquire and sell and which

25   they've put forward evidence about, are arms in common use for

1    self-defense.  The ones that they're specifically focusing on,

2    that's -- that's the evidence that they've put forward.  Are

3    those particular arms in common use for self-defense?

4                    THE COURT:  All right.  Let's break here, because

5    we have to switch court reporters.  Let's take a seven-minute,

6    eight-minute break and we'll come back.

7                    (Recess at 3:51 p.m.)

8

9                    ° ° ° ° ° ° ° ° ° ° °

10                    <u>COURT REPORTER'S CERTIFICATE</u>

11                    I certify that the foregoing is a correct
     transcript from the record of proceedings in the above-entitled
12   matter.

13                    Dated this 13th day of April, 2023

14

15                    /s/ Hannah Jagler

16   _____

17                    Hannah Jagler, RMR, CRR, FCRR
                       Official Court Reporter

18

19

20

21

22

23

24

25