1          IN THE DISTRICT OF THE UNITED STATES OF AMERICA

2               FOR THE SOUTHERN DISTRICT OF ILLINOIS

3

4

5

6    ---------------------------------------------------------------
     DANE HARREL, et al.,
7                        Plaintiffs,
     v.                                  Case No. 23-cv-141-SPM
8
     KWAME RAOUL, et al.,
9                        Defendants.
     ---------------------------------------------------------------
10   FEDERAL FIREARMS LICENSEES OF
     ILLINOIS, et al.,
11                       Plaintiffs,
     v.                                  Case No. 23-cv-215-SPM
12
     JAY ROBERT "J.B." PRITZKER, et al.,
13   Defendants.
     ---------------------------------------------------------------
14   CALEB BARNETT, et al.,
                         Plaintiffs,
15   v.                                  Case No. 23-cv-209-SPM

16   KWAME RAOUL, et al.,
                         Defendants.
17   ---------------------------------------------------------------
     JEREMY W. LANGLEY, et al.,
18                       Plaintiffs,
     v.                                  Case No. 23-cv-192-SPM
19
     BRENDAN KELLY, et al.,
20                       Defendants.

21

22   ---------------------------------------------------------------

23          Transcript of Oral Argument - Volume II
                         April 12, 2023
24   ---------------------------------------------------------------

25

1

2

3

4   --------------------------------------------------------------
         Transcript of Oral Argument - Volume II
5                   April 12, 2023
              Proceedings held in person before
6            the Honorable **STEPHEN P. McGLYNN,**
             United States District Judge Presiding
7                East St. Louis, Illinois
    --------------------------------------------------------------

8

9

10

11

12                  Erikia Schuster, RPR
                     IL CSR #084-00
13                  750 Missouri Avenue
                 East St. Louis, IL   62201
14                    618-482-9226
             Erikia_Schuster@ilsd.uscourts.gov
15

       *Proceedings recorded by mechanical stenography; transcript*
16          *produced by computer-aided transcription.*

17

18

19

20

21

22

23

24

25

1

**APPEARANCES: (Case No. 23-cv-141-SPM)**

2

FOR PLAINTIFFS:                **DAVID G. SIGALE**

3                              Law Firm of David G. Sigale, P.C.
                               430 West Roosevelt Road

4                              Wheaton, Illinois 60187
                               630-452-4547

5                              Dsigale@sigalelaw.com

6   FOR DEFENDANTS:            **CHRISTOPHER GRAHAM WELLS**
                               Illinois Attorney General's Office

7                              Public Interest Division
                               100 West Randolph Street

8                              Chicago, Illinois 60601
                               312-814-1134

9                              Christopher.wells@ilag.gov

10                             **LAURA BAUTISTA**
                               Illinois Attorney General's Office

11                             500 South Second Street
                               Springfield, Illinois 62701

12                             217-557-0261
                               Laura.Bautista@ilag.gov

13

                               **THOMAS R. YSURSA**

14                             Becker, Hoerner & Ysursa, P.C.
                               Generally Admitted

15                             5111 West Main Street
                               Belleville, Illinois 62226

16                             618-235-0020
                               Try@bhylaw.com

17

                               **TROY OWENS**

18                             McHenry County State's Attorney's
                               Office

19                             2200 North Seminary Avenue
                               Suite 150

20                             Woodstock, Illinois 60098
                               815-334-4159

21                             Tcowens@mchenrycountyil.gov

22

23

24

25

1

**APPEARANCES: (Case No. 23-cv-215-SPM)**

2

FOR PLAINTIFFS:                    **CARL D. MICHEL**

3                                  Michel & Associates, P.C.
                                   180 East Ocean Boulevard, Suite 200

4                                  Long Beach, California 90802
                                   562-216-4444

5                                  Cmichel@michellawyers.com

6    FOR DEFENDANTS:               **CHRISTOPHER GRAHAM WELLS**
                                   Illinois Attorney General's Office

7                                  Public Interest Division
                                   100 West Randolph Street

8                                  Chicago, Illinois 60601
                                   312-814-1134

9                                  Christopher.wells@ilag.gov

10                                 **LAURA BAUTISTA**
                                   Illinois Attorney General's Office

11                                 500 South Second Street
                                   Springfield, Illinois 62701

12                                 217-557-0261
                                   Laura.Bautista@ilag.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    APPEARANCES:  (Case No. 23-cv-209-SPM)

2    FOR PLAINTIFFS:              ERIN E. MURPHY
                                  Clement & Murphy, PLLC
3                                 706 Duke Street
                                  Alexandria, Virginia 22314
4                                 202-742-8900
                                  Erin.murphy@clementmurphy.com
5
                                  ANDREW LOTHSON
6                                 Swanson, Martin & Bell, LLP
                                  330 N. Wabash Avenue
7                                 Suite 3300
                                  Chicago, Illinois 60611
8                                 312-321-9100
                                  Alothson@smbtrials.com
9

10                                DAVID G. SIGALE
                                  Law Firm of David G. Sigale, P.C.
11                                430 West Roosevelt Road
                                  Wheaton, Illinois 60187
12                                630-452-4547
                                  Dsigale@sigalelaw.com
13
                                  THOMAS G. MAAG
14                                Maag Law Firm, LLC
                                  22 West Lorena Avenue
15                                Wood River, Illinois 62095
                                  618-216-5291
16                                Tmaag@maaglaw.com

17                                CARL D. MICHEL
                                  Michel & Associates, P.C.
18                                180 East Ocean Boulevard, Suite 200
                                  Long Beach, California 90802
19                                562-216-4444
                                  Cmichel@michellawyers.com
20
     FOR DEFENDANTS:              CHRISTOPHER GRAHAM WELLS
21                                Illinois Attorney General's Office
                                  Public Interest Division
22                                100 West Randolph Street
                                  Chicago, Illinois 60601
23                                312-814-1134
                                  Christopher.wells@ilag.gov
24

25
```

```
 1
        APPEARANCES: (Case No. 23-cv-192-SPM)
 2      FOR PLAINTIFFS:         THOMAS G. MAAG
                                Maag Law Firm, LLC
 3                              22 West Lorena Avenue
                                Wood River, Illinois 62095
 4                              618-216-5291
                                Tmaag@maaglaw.com
 5
        FOR DEFENDANTS:         CHRISTOPHER GRAHAM WELLS
 6                              Illinois Attorney General's Office
                                Public Interest Division
 7                              100 West Randolph Street
                                Chicago, Illinois 60601
 8                              312-814-1134
                                Christopher.wells@ilag.gov
 9
                                LAURA BAUTISTA
10                              Illinois Attorney General's Office
                                500 South Second Street
11                              Springfield, Illinois 62701
                                217-557-0261
12                              Laura.Bautista@ilag.gov

13                              KEITH B. HILL
                                Heyl, Royster, Voelker & Allen, PC
14                              105 West Vandalia Street,
                                Mark Twain Plaza III, Suite 100
15                              Edwardsville, Illinois 62025
                                618-656-4646
16                              Khill@heylroyster.com

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:  (Case No. 23-cv-192-SPM)

 2    FOR PLAINTIFFS:          THOMAS G. MAAG
                               Maag Law Firm, LLC
 3                             22 West Lorena Avenue
                               Wood River, Illinois 62095
 4                             618-216-5291
                               Tmaag@maaglaw.com
 5
      FOR DEFENDANTS:          CHRISTOPHER GRAHAM WELLS
 6                             Illinois Attorney General's Office
                               Public Interest Division
 7                             100 West Randolph Street
                               Chicago, Illinois 60601
 8                             312-814-1134
                               Christopher.wells@ilag.gov
 9
                               LAURA BAUTISTA
10                             Illinois Attorney General's Office
                               500 South Second Street
11                             Springfield, Illinois 62701
                               217-557-0261
12                             Laura.Bautista@ilag.gov

13                             KEITH B. HILL
                               Heyl, Royster, Voelker & Allen, PC
14                             105 West Vandalia Street,
                               Mark Twain Plaza III, Suite 100
15                             Edwardsville, Illinois 62025
                               618-656-4646
16                             Khill@heylroyster.com

17

18

19

20

21

22

23

24

25
```

## **TRANSCRIPT OF PROCEEDINGS**

1                       

2         (Proceedings commenced at 4:00 p.m.)

3        MR. WELLS:  I want to -- if I may --

4        THE COURT:  I did use up a lot of time.  How much of

5 your slide show --

6        MR. WELLS:  At this point, I want to address history,

7 the historical prong, and I think I can make it fairly quick.

8        THE COURT:  We'll give you a little bit of leeway.

9        MR. WELLS:  And frankly, I spoke with Ms. Murphy --

10        THE COURT:  No.  I'm going to give you more time.  I

11 want to get this right.  Oral argument is very important.

12 It's very helpful.  You have watched this a lot of times and

13 when I was in the appellate court I learned the importance of

14 oral argument.  I saw how often it changed people's minds and

15 I'm not under any arbitrary guidelines.  I want to make sure

16 that everybody is able to make the arguments they feel they

17 need to make to advance their positions.  I'll give you a

18 five-minute warning when your time is running, but I'm going

19 to give you some time because there's still a lot to go

20 through.

21        MR. WELLS:  I think there is, Your Honor, but I think

22 I want to address the history prong.  I think it has been

23 acknowledged by both sides, really.  There is some type of

24 interplay between common use for self-defense under the text

25 prong and the historical tradition of regulating dangerous and

1  unusual weapons, how weapons in particular come to be

2  regulated.

3       Plaintiffs suggest that there's some type of

4  numerical threshold that gets passed where all of a sudden the

5  weapon is then beyond the scope of regulation.  And again, it

6  goes back to their syllogism of arms that are common, are not

7  unusual and therefore, there's not historical tradition.

8  Frankly, that's not how history happened, and I think we

9  introduced expert declarations that lay out that, in fact,

10  it's, one, weapons are invented and then they proliferate and

11  the proliferation of particular weapons and their use in

12  particular types of violence which is what causes legislatures

13  to regulate them.  It's not that these weapons are somehow

14  uncommon.  It's, in fact, that they're proliferating and

15  causing problems.  So that's dangerous and unusual weapons

16  tradition.  That is the tradition that I don't think

17  plaintiffs dispute that it exists and we know that from

18  Justice Cavanaugh in his concurrence.  And he's quoting,

19  again, *Heller*.  He's just quoting *Heller*.  There is an

20  acknowledgment that there is this tradition.  The question

21  before this Court is whether or not the act is consistent with

22  that tradition.

23       How do we make that determination?  *Bruen* tells us

24  that we use analogical reasoning.  Analogical reasoning we

25  also know that it's not a regulatory straight jacket and it's

1    also not a blank check.  The State has to identify a well

2    established and representative historical analog, but not a

3    historical twin.  And when one of two circumstances is

4    present, unprecedented societal concerns or dramatic

5    technological change, then the approach to analogical

6    reasoning has to be more nuanced.

7         We would suggest, Your Honor, that this case involves

8    both dramatic technological change and unprecedented societal

9    concern.  I think this is evident from the nature and

10   attributes of the weapons that are at issue.

11        Plaintiffs, I think at one point, questioned whether

12   or not we took the position that only weapons in 1791 are

13   those that are protected by the Second Amendment.  We've never

14   said that.  That was not our position.  Our position has been

15   to look at history and look at the evolution of weapons

16   technology for a couple of reasons.  One, to assess whether

17   there has been this dramatic technological change; and two, to

18   assess what types of regulatory responses have been prompted

19   by the dramatic technological change in prior eras, right?

20   Once the Supreme Court says you can consider dramatic

21   technological change, you have to consider when the technology

22   arose and what impacts it had and how did legislatures

23   respond.  So it necessarily requires consideration beyond

24   1791, beyond 1868.

25        Again, this case, I think, if you compare colonel era

1    muskets to AR-15s, it is obvious that there's been a

2    substantial evolution of firearms technology since then.  I

3    think we would also suggest that there's been a substantial

4    evolution in firearms technology really between 1868 and the

5    mid 20th century, significantly forward.  And that's why when

6    you look at in particular machine gun regulations, 1920s and

7    1930s, the regulations become more stringent.  There's no

8    doubt.  Conceal carry regulations of Bowie knives, of other

9    types of revolvers, that's what they were.  They were largely

10   conceal carry regulations.  But when the attributes of the

11   weapon become more dangerous, more powerful, higher rate of

12   fire, the nature of the regulation changes.  That's dramatic

13   technological change.  Throughout history, that is how

14   regulatory means have adapted to the particular technology.

15   And again, we know from *Heller* that machine guns in particular

16   are something that *Heller* presumed could be regulated.  Why?

17   Because of the particular technology involved and the

18   particular attributes that made them high rate of fire

19   battlefield weapons.

20         We think a similar set of considers brings AR-15s and

21   other assault weapons within the scope of that tradition.  So

22   this is a case that involves dramatic technological change.

23         Unprecedented societal concern.  Your Honor, we

24   discussed this at the beginning.  I think Your Honor

25   acknowledged the reality of mass shootings.  I think Your

1  Honor acknowledged while there may have been instances of
2  large scale violence in our country in the past, usually
3  perpetrated in groups, what we are looking at is something
4  new; a single individual that can carry a weapon into a school
5  and kill large numbers of in a short period of time.  That is
6  an unprecedented societal concern.
7      THE COURT:  Let me ask you this question:  Could a
8  fair reading of history in the United States with respect to
9  guns say that the law abiding citizenry, it's okay for them to
10 be equipped with firearms that would give them a fair chance
11 to defend themselves against the weapons that they might be
12 facing?  So would a -- if you had a Remington 22 Rimfire in
13 1776, a lever rifle that had 22 rounds, the Civil War would
14 have lasted about six weeks.  So as the technology has
15 increased so has the fire power and the weaponry of people who
16 seek to do you harm.  And isn't it a fair reading of the
17 Second Amendment in the history that you should be able to
18 defend yourself against likely threats?
19      The thing about the machine guns, very few people had
20 them at the time and so the weapons that were being used by
21 the average citizens, they were tremendously outgunned.  I'll
22 let you comment on that observation.
23      MR. WELLS:  Your Honor, so I think the machine gun
24 reference is important because if the premise is that you have
25 to have equivalency between people who are going to use

1  weapons in a criminal manner and the public at large, then I

2  think machine gun laws are out, right?  Thompson machine guns

3  were being used to kill people, to commit criminal acts.  Did

4  that mean then that citizens also had to have equivalent

5  weaponry?  Legislatures concluded that the answer to that

6  question was no.

7      THE COURT:  And maybe they concluded law abiding

8  citizens don't have equivalent weapons.  Nobody has these

9  things except the people who are using them for crime.  That's

10  why we're getting rid of them.

11      MR. WELLS:  So, Your Honor, again, I would go back to

12  the way *Heller* looked at specific types of weapons.  We know

13  it was three that we looked at that were unprotected.  One

14  that was protected.  Handgun, you look at the attributes and

15  the use.  You see that it has particular attributes for

16  self-defense.  It is being used for self-defense.  On the

17  other side of the equation, three other types of weapons;

18  short barrelled shotgun may have certain attributes that make

19  is good for self-defense.  It is not as heavy.  It can be

20  aimed more easily by a slight person, but how is it being

21  used?  It is being used by people to commit crimes in a manner

22  that can be regulated.  Is there some tension?  Undoubtedly.

23      THE COURT:  There's always going to be some tension.

24      MR. WELLS:  I think the question is what does the

25  Constitution require?  And what latitude does the legislature

1    have to make that judgment?  About handguns, we know.  *Heller*

2    says quintessential self-defense weapon.  Weapons that are

3    being used to perpetrate mass shootings, who decides, Your

4    Honor?

5         THE COURT:  Well, look, you take the AR-15s off the

6    market, under this statute a bolt-action rifle is legal.  We

7    all see what happened in Dallas in '62 with a guy who had a

8    $19 bolt-action rifle and a scope.  Oswald, I think it was an

9    Italian rifle, a Carcano weapon, I'm trying to think, but it

10   has a six round simple magazine.  He is shooting at a moving

11   target 100 yards and more away, and it's not full body.  It's

12   just upper body.

13        He gets off three shots.  Depending on who you ask,

14   he got off three shots in a little less than eight seconds or

15   11 seconds.  One shot hits a traffic light, the other one is

16   the kill shot and we've all seen it because we've all seen

17   that video.  The other one did lethal damage.  The guy in

18   Texas perched up there with a bolt-action rifle and a lot of

19   ammunition, killed a lot of people.  If Oswald had just

20   decided, well, up here on the 6th floor of the school book

21   depository, I'm just going to keep firing until they take me

22   out, every minute if every third shot was a kill shot, every

23   second shot was a serious wound and every third shot was a

24   miss, in a minute and a half he's killed eight people with a

25   gun that is perfectly legal under this law, and I'll let you

1    address that question.

2         MR. WELLS:  Your Honor, there's no doubt that gun

3    violence is a significant problem and has been for extended

4    stretches of our history.  And that particular weapons,

5    rifles, bolt-action rifles, have been used to perpetrate

6    horrendous crimes where multiple people have died.  I also

7    know, Your Honor, and I would point to the chart that we've

8    got up on the screen and that is in our brief, that the

9    frequency of high fatality mass shootings and the number of

10   fatalities that are involved, look at the cluster, Your Honor.

11   Look at the cluster.  It is -- yes, Texas shooting on here,

12   right?  But how often is it happening, Your Honor?

13        THE COURT:  Do any of these include mass shootings

14   perpetrated with guns that were legal under this statute?

15        MR. WELLS:  Yes.  Our position is not -- and again,

16   we're not suggesting that through this act mass shootings will

17   stop.  I don't think we've ever made that claim.  Will this

18   act reduce the likelihood by limiting access?  Hopefully.

19   That is the intent of the law.  What we know from empirical

20   research -- and I would point you in particular, Your Honor,

21   to our Professor Klarevas's declaration and research he's done

22   in particular on large capacity magazines.

23        THE COURT:  It's very interesting.  I read it.

24        MR. WELLS:  States that have regulations like those

25   in the act, they don't eliminate mass shootings, but they

1    reduce the lethality of them, and that is the type of

2    objective that I think the legislature can rifely strive for.

3    And Your Honor, I think we've talked about -- some about

4    history, but I do think it's important to address a couple of

5    things that came up from plaintiffs.  And again, one is the

6    suggestion that once you pass a numerical threshold certain

7    weapons are off the table.  That's not how the historical

8    traditional has happened.  If you look at the 1686 New Jersey

9    law that we cite in our brief and that I have got up here on

10   the screen, it says "Whereas, there have been great complaint

11   that several persons wearing swords, daggers, pistols, dirks,

12   stilettos, skeins or any other unusual or unlawful weapons by

13   reason of which several persons in this province receive great

14   abuses and put in great fear and quarrels and challenges made

15   to the great abuse of the habitants of this province."

16   They're telling us the why from *Bruen*.  They're telling us in

17   the statute why they're acting.  And its not because these

18   weapons are rare.  It's because they're prevalent, and they're

19   being used for criminal purposes, and that's why they're being

20   regulated.

21          Similar trajectory with the Bowie knife, Your Honor.

22   Invented in the 1820s, starts to be a preferred weapon in

23   duals and fights.  People are carrying them and killing one

24   another.  What happens?  There's regulatory response.

25          Revolvers patented, 1836 Colt revolver.  As we allude

1    to in our brief and some of our declarations, it struggled for

2    a little bit to get adopted, but then it starts to become

3    poplar around the Civil War and immediately thereafter and

4    starts to be used in criminal violence.  What happens?  It

5    gets regulated.

6              We have got an 1872 Wisconsin statute, Your Honor,

7    that we specifically highlight in our brief, it regulated

8    revolvers.  It included them in the list of what were

9    considered dangerous and unusual weapons or in Wisconsin's

10   terminology, offensive and dangerous weapons.  So plaintiffs

11   talk about, well, it is dangerous and unusual and you got to

12   do both like its some type of statuary text, it's a historical

13   tradition.  I don't think it lends itself to the type of word

14   play that plaintiffs are engaged in.  It is a concept that has

15   applied to many different things throughout history and we

16   have to look at it broadly to assess what were legislatures

17   trying to do.  How did they do it, and is the act that we're

18   looking at now does it satisfy that how and why test that

19   *Bruen* articulates?  So the idea that it somehow just counts or

20   if it's unusual -- it can't be -- if it's common, it can't be

21   unusual.  That's not the way history has happened.  Weapons

22   have been regulated because they become more common and become

23   used in criminal violence in a way that gets the legislature's

24   attention.

25             THE COURT:  I see the one is a misdemeanor, the last

1    one you referenced made possession that was a misdemeanor.  In

2    this statutory claim if somebody forgets to register or just

3    not filing, their first violation is a misdemeanor.  The

4    second violation is a felony.  So you can find lawful gun

5    owners who have committed no crimes, who never threatened

6    anybody, who have a long history of owning firearms and never

7    doing anything wrong facing a class three felony and you and I

8    know what that means.  Two to five years.  That conviction

9    they're a felon in possession, all their firearms have to be

10   surrendered.  They'll never be able to possess any gun or any

11   ammunition ever again unless pardoned by the Governor.  That's

12   pretty darn steep.

13         MR. WELLS:  Your Honor, what I would say to that is

14   that there is a mens rea requirement that requires knowledge.

15   This isn't a strict liability situation.  Knowledge has to be

16   required.  So a person who has already gotten a misdemeanor

17   conviction and then yet again?  They know their obligations

18   under the law.  The other thing I would say, Your Honor, is

19   that we have prosecutors who are imbued with discretion.

20         THE COURT:  Some of them don't want to enforce this.

21         MR. WELLS:  You're right.  Some of them are suing us.

22         THE COURT:  Sheriffs don't like it either apparently.

23         MR. WELLS:  Sheriffs don't like it.  But I can tell

24   you there are members of law enforcement who do like it.  Why?

25   Because the AR-15, certain categories with certain calibers,

1  fire a round for which law enforcement's bullet proof vests

2  are not rated.  So I understand the sheriff's position.

3         THE COURT:  There are people on both sides.

4         MR. WELLS:  There are law enforcement members on both

5  sides.

6         THE COURT:  Back to my question.  You could have a

7  55-year-old man who has passed every background check, no

8  criminal violations whatsoever and because of a failure to

9  register weapons that were perfectly lawful when he bought

10 them he could find himself a convicted felon facing two to

11 five years prison time, but certainly under the law would not

12 be able to possess -- he would have to digress himself of all

13 -- or forfeit all weapons, legal or not, compliant with the

14 statute or not, that he has.

15        MR. WELLS:  Your Honor, I think that same dilemma

16 applies to the short barrelled shotgun.  It applies to the

17 machine guns, which because people have possessed them or have

18 acquired them there's certain regulations that apply to them

19 because they are such dangerous items.

20        So the thing I would also point out, Your Honor, is

21 that the focus of this regulation is the industry.  How does

22 the statute work?  It regulates sale in particular.  It talks

23 about manufacturer.  It is focused on gun manufacturers and

24 gun dealers.  Those are the individuals who are -- the

25 prosecutor's case on mens rea is going to be easier.  They're

1    in this industry.  They know the futures of the firearms.

2    They know what the regulations are.  They know their

3    inventory.  That, I think, Your Honor, is where the statute

4    will bite.

5         THE COURT:  Five more minutes.

6         MR. WELLS:  So Your Honor, again, I think this case

7    comes down in our view to whether or not 20th century machine

8    guns and things like whether or not the AR-15, which has a

9    rate of fire that is quite comparable to machine guns in real

10   practice, that we know are part of this historical tradition,

11   they're part of the dangerous and unusual weapons regulations.

12   Whether or not statutes like Illinois's 1931 law that

13   restricted both the sale, purchase and possession of machine

14   guns, that was part of the historical tradition.  That was

15   part of the dangerous and unusual weapons tradition that

16   emerged in the 18th century, that continued in the 19th

17   century and in the 20th century swept in machine guns.  Why?

18   Because of how they were being used and because of their

19   particular attributes.  It was a well established tradition,

20   Your Honor, sale bans, possession bans.  You're familiar.

21        And I would just note, again, that the short barreled

22   shotgun we know from *Heller* that the Miller regulation from

23   1934, it was upheld, even though a barrel was necessary to a

24   firearm and even though the shortness of a barrel is an

25   attribute that might make it better suited for someone to use

1  for self-defense.  That is part of the historical dangerous

2  and unusual weapons tradition.

3         So National Firearms Act of 1934, short barrel

4  shotguns.  National Firearms Act 1934, machine gun

5  regulations.  Federal assault weapons ban in 1994.  Was that

6  unconstitutional from the get-go?  Again, are there ten years

7  worth of people who are regulated under that who had

8  convictions that are now going to be released?  Had the

9  plaintiffs passed the common use threshold in 1994?  The only

10  difference between now and then is that since 2004, when the

11  federal assault weapons ban expired, the firearms industry has

12  run a very successful marketing campaign in which they've sold

13  24.6 million AR-15s and similar weapons.  Is that how we're

14  going to make a Constitutional determination, that these

15  weapons that were banned under federal law since 2004 they

16  have been sold in great numbers.  Your Honor, I would suggest

17  that is not the way we've ever done constitutional law, that

18  the AR-15 regulations, the assault weapons regulations and the

19  large capacity machine regulations in the act, are consistent

20  with the historical tradition.

21         I'm going to talk briefly about irreparable harm,

22  Your Honor.  As I mentioned, there are essentially three

23  categories of plaintiffs here; individuals, gun stores,

24  advocacy plaintiffs.  The individuals in this case, many of

25  whom have already stated as a matter of record that they own

1 AR-15s, often in multiples, will get to continue to possess

2 those weapons.  The gun stores point to lost sales.  And yes,

3 we've acknowledged that sales of AR-15s since 2004, they've

4 been pretty good.  That is monetary harm, Your Honor.  That is

5 not irreparable harm.  The organizational plaintiffs, their

6 harm is derivative of the first two groups.  What is the other

7 side of the equation, Your Honor?  We know that ease of access

8 to AR-15s and large capacity magazines is associated with a

9 significant increase in high fatality mass shootings.

10 Reducing access to them is associated with a reduction in

11 fatalities associated with this particular type of heinous,

12 heinous crime.

13         THE COURT:  I know that.  I'll give you one more

14 minute to wrap up.

15         MR. WELLS:  Understood, Your Honor.  So Your Honor,

16 as I mentioned at the outset, you asked who to cite.  The

17 elected representatives of the State of Illinois have enacted

18 this statute to address acute social harm and the reason that

19 they've done so is consistent with why legislatures throughout

20 our history have regulated particular weapon types, the means

21 that they have chosen is consistent with how things like

22 machine guns have been regulated, and we think that for those

23 reasons this statute is constitutional and should be upheld.

24 Thank you, Your Honor.

25         THE COURT:  Thank you.

1          MS. MURPHY:  I just want to make a few points, Your

2     Honor.  First, I'd like to start out -- there was a lot of

3     effort to just say repeatedly, oh, this is about sellers, this

4     is about sales.  That's not what this is about.  Sure, we have

5     plaintiffs in this case who sell firearms and want to be able

6     to sell them.  Everybody here is also representing individuals

7     who want to exercise their Second Amendment rights and the

8     people who sell firearms want to be able to sell them to

9     people who want to purchase them.  They're individuals on both

10     sides of the equation here and individuals are the people who

11     want to keep and bear these firearms for self-defense.

12          The State seems to want to litigate this case as if

13     *Bruen* never happened.  There was much discussion about *Heller*

14     and *Heller* said things that said lots of things about the test

15     that I thought were pretty clear, but whatever *Heller* said

16     *Bruen* has made things very, very clear at this point.  And

17     *Bruen* makes crystal clear that this effort to conflate the

18     textural inquiry and the historical inquiry is just mistaken

19     and I will just read from *Bruen* itself.  *Bruen* says that the

20     Second Amendment's, quote, definition of arms is fixed

21     according to it's historical understanding and that definition

22     covers modern instruments that facilitate armed defense.

23     That's the definition of inquiry.  That's the textural

24     inquiry.  That is the end of it.  That is the end of the

25     threshold inquiry.

1    We then turn to the historical tradition inquiry,

2   which is when the burden shifts and it is not our burden.

3   It's not our burden to prove that every single arm that is at

4   issue here is commonly possessed as the State's burden to

5   prove that it satisfies historical tradition, and *Bruen* tells

6   us that too, and again, makes clear when it's talking about

7   definitions versus when it is talking about tradition.  The

8   Court specifically talks about how the, quote, historical

9   tradition is prohibiting the carrying of dangerous and unusual

10   arms versus arms that are in common use at the time.  We know

11   what the test is and the test is not our burden.  It's the

12   State's burden.  Their burden is one that focuses in on common

13   use.  We also know from both *Bruen* and *Heller* that common use

14   is not simply a question of how often do you actually fire the

15   firearm at an assailant in an act of self-defense.

16    *Heller* treated common use as a simple question of

17   possession, and understandably so because the Second Amendment

18   right is the right to keep and bear arms to be armed and ready

19   in the event that you have to face a self-defense situation.

20   It is not simply the bare right to be able to fire the arm in

21   the event someone comes in and tries to attack you or your

22   family.  And if that were the test, we would end up with

23   virtually nothing protected since fortunately most people

24   don't have to use their arms in self-defense frequently or

25   ever and about 80 percent of the time that arms are used

1    people successfully ward off assailants by the mere act of

2    brandishing.  So if this were really a test that asked you how

3    many rounds do you fire from a particular arm, I am not sure

4    what the State wouldn't be able to ban.  I think that's

5    precisely why the Supreme Court has never focused on use in

6    that sense, but has instead treated use as a simple question

7    of are these arms that people keep and bear for the lawful

8    purpose of being armed and ready in the event they need to use

9    them for self-defense.

10          Now, while the State didn't really make any effort

11   here to demonstrate that these are not arms that satisfy that

12   task, we did.  It seems we can't win because we put forward

13   evidence and they say your evidence doesn't count because you

14   guys are part of the industry and then they turn around and

15   complain that we, as part of the industry, aren't giving them

16   enough evidence.  If the State doesn't like our evidence, the

17   State can do its own surveys.  It can conduct it's own

18   research and try and make its case that what it wants to

19   prohibit is not something that is in common use for lawful

20   purposes, but Illinois hasn't tried to do that.  The

21   legislature didn't try to do that and the State hasn't tried

22   to do that in this litigation, and we do have evidence here

23   that is not just even from -- I certainly take issue with the

24   notion there's something wrong with evidence that comes from

25   NSSF, but we also have evidence in the form of the study done

1    by Professor English that is focusing not just on sales but

2    talking to people about what do you possess.  And that is what

3    showed that the numbers actually seem to be higher than the

4    industry had thought in terms of who owns what.  And the

5    numbers also show throughout all these studies that this is

6    not something that has just happened in the past few years out

7    of some clever marketing ploy.  20 percent of people who own

8    AR-15 styled rifles have owned them since before 1999, which

9    means really since before the 1994 ban since it wasn't lawful

10   to acquire them during the ban.  These are weapons that many

11   people owned even before then.

12           And let's not forget, this is also a case about

13   magazines with a capacity of more than ten rounds for long

14   guns and 15 rounds for handguns and those certainly are not

15   something that have only become popular in recent years

16   through any marketing ploys.  They account for roughly half

17   the magazines that are on the market.  I do just want to be

18   clear about one colloquy you had with the State.  Yes,

19   somebody could carry the 15 round magazine with their handgun,

20   but not any magazine that is higher than 15 rounds with the

21   handgun.  Anything above 15 rounds can only be possessed

22   pursuant to the grandfathering provisions in someone's home or

23   carried in a way where it's not accessible when going between

24   places where it is permitted.

25           THE COURT:  Are they allowed to carry an additional

```
1    clip or magazine?

2              MS. MURPHY:  15 rounds.

3              THE COURT:  Let's say you have a holster, you have a

4    pistol that has a 15-round magazine.  Could they have in their

5    pocket another magazine that they could switch out?

6              MS. MURPHY:  They can have another 15-round lower

7    magazine is how I understand it.

8              THE COURT:  They could have five more?

9              MS. MURPHY:  They could.  They could.  But to me,

10   that sort of gets at why it's a little hard to completely

11   rationalize the lines the state is drawing in terms of what

12   you can have and what you can't have.  It seems that part of

13   the complaint here is that modern firearms are much easier

14   than firearms used to be.  Of course, most things

15   technologically today are easier to operate than they were 100

16   or 200 years ago, and it is certainly faster to reload.  Now,

17   most people would prefer to not have to reload at all in a

18   self-defense situation, but there is no restriction on how

19   many rounds somebody can --

20             THE COURT:  One of the arguments you made was to --

21   the story of the Tommy gun.  There weren't many in use, but

22   what led to its outlawing is that they just happened to be

23   used in a number of very public murders and that people said,

24   hey, we've got to do something about this.  That's pretty

25   analogous to what has been happening lately with people
```

1    grabbing AR-15s and deciding I'm going to take out kids at a

2    school or people who are at a parade.

3         MS. MURPHY:  With respect, I don't think it is

4    because history with AR-15s or magazines of a certain capacity

5    didn't just start in the past ten years.  These are things

6    that have been around for a very long time and they have been

7    commonly possessed without incident by law-abiding citizens

8    for a very long time.  And they're possessed in the millions.

9    We're talking about any mass shooting is one too many mass

10   shootings, but fortunately they are a very small number of

11   occurrences.  We're talking about a few dozen people that have

12   engaged in these kind of acts as compared to by the State's

13   own estimate six million people who possess these arms.

14   That's just not the kind of comparison that ever existed when

15   it came to something like the Tommy gun.  It came on the

16   market in 1925 and was illegal within two years because

17   civilians responded by saying we don't want this.  We don't

18   think anyone should have this.  We are not thinking about this

19   as something we really need and only a few people are going to

20   misuse.  People viewed it as this isn't really something that

21   any of us think is particularly well suited for one on one

22   armed self-defense or even armed small defense guns, multiple

23   assailants.  It's just a different kind of technology that

24   people immediately treated as a technology that was unusual in

25   how it operated in that it operated with continuous fire with

1    a single pull of the trigger.

2         So I think the State's effort to conflate

3    semiautomatics and automatics is just belied by history.  We

4    have a hundred years of history here and 100 years of history

5    shows that during that whole time the states, the Federal

6    Government, repeatedly treated these technologies as two very

7    different things; as something, one, that never took hold, was

8    never popular.  Even today, yeah, there's a few hundred

9    thousand of automatic weapons that are lawfully owned, but

10   they are largely collectors items, not things that people have

11   for purposes like self-defense.  They just never took hold.

12        Semi-automatic technology is entirely different.  It

13   took hold before automatic technology even made its way onto

14   the market, and it really wasn't until a few decades ago that

15   we started to see any efforts to prohibit it.  Even now, this

16   is an outlier law.  I mean, 42 states permit the types of

17   firearms that Illinois is trying to prohibit.  The Federal

18   Government permits the types of arms that Illinois is trying

19   to prohibit.  So even today, we don't have a historical

20   tradition in the sense that I understand *Bruen* to require,

21   which is this is the common thing that the Government can do,

22   not just something that a couple of states have tried to do.

23   It is something that is unusual and it has been subject to

24   significant litigation, and yes, there have been decisions

25   upholding these laws, but oftentimes you have had that over

1    the dissent of judges and you've had members of the Supreme

2    Court raising a lot of concern about it.  These are hardly

3    laws that even today have taken hold in society in the way

4    that laws restricting automatic weapons did back when they

5    came into existence almost at the same time as automatic

6    technology itself did.

7              Really, the last point that I would just like to make

8    is the State talked today about the idea that this is all

9    about the notion of self-government and democratic society.

10   But the first rule of democratic society in this country is we

11   have a Constitution that so we can protect some rights that we

12   have decided are so fundamental that they should be protected

13   even when a majority of the people decide to enact legislation

14   that would restrict them.  And that's the whole point of the

15   Bill of Rights.  Just because a majority of members of the

16   legislature decide that they don't want to hear a particular

17   speech because it's unpopular or they want to allow

18   unreasonable searches because we've had enough with concerns

19   about rising crime rates, that doesn't allow states to become

20   laboratories of experimentation, that states don't get to

21   experiment when we're talking about fundamental constitutional

22   rights.  There may be ways that states can regulate,

23   certainly, but the Supreme Court has told us how states may

24   regulate at least when it comes to the Second Amendment and

25   the way they may regulate is by passing laws that they can

1    demonstrate are consistent with this nation's historical

2    tradition of how firearms have been regulated.

3           And what you see all throughout this nation's

4    historical tradition is that when you have advancements in

5    technology that are just about adding features that make

6    firearms easier for somebody to bear, easier for someone to

7    accurately shoot, that allow for somebody who is smaller, who

8    is taller, who is younger, who is older to be able to fire

9    their firearm in a self-defense situation and have the maximum

10   chance of actually successfully utilizing it for self-defense,

11   those are not things that have historically been treated as

12   reasons to say this is something nefarious that we need to

13   keep out of the hands of American people.  These are exactly

14   the kinds of advancements that people have welcomed, and they

15   are what have lead firearms to become popular.

16           As we see over time, firearms that became repeaters

17   that can operate more quickly, can fire more rounds, those are

18   welcome developments that understandably people want to see in

19   their firearms and the Supreme Court has now told us very,

20   very emphatically that if the American people choose arms for

21   the -- commonly chose them for the lawful purpose of

22   self-defense then the Government doesn't get to prohibit them.

23   That's what Illinois has tried to do here, not merely regulate

24   but outright prohibit people from obtaining these arms at all.

25   The law just cannot be reconciled with the Second Amendment as

1    interpreted most recently by the Supreme Court in *Bruen*.

2         THE COURT:  Thank you.  I want to thank the brief

3    writers.  There was very well written briefs that were

4    submitted by the parties.  There was some amicus briefs that

5    were submitted that were excellent.  I certainly appreciated

6    the arguments of counsel.  This is very well done.  I started

7    off today, in the trial court we see the people, not only the

8    victims but we also see the perpetrators of these things and

9    all of us would love to see a serious reduction in the number

10   of these mass shooter crimes in particular because that's what

11   has been referenced.  From where I sit and from what a lot of

12   judges see, I think we have to start looking at not just the

13   guns, but why we have all these troubled teens and young

14   people going through mental health crises.  What medicines are

15   they taking?  What red flags are we seeing and why are they

16   being allowed to come into school?  I think the courts would

17   be happy to see efforts made to identify children, teenagers,

18   individuals who are having a mental health crisis and say you

19   know what, until that person can successfully address that

20   crisis, let's prohibit them from having access to weapons.

21   Nothing like that is in this bill.  I hope in the future there

22   are bills that are like that, but that's just me, I guess,

23   editorializing.  I've been given a lot to read.  You've given

24   me a lot to think about, and we are adjourned.

25         (The hearing was concluded at 4:45 p.m.)

1

2                        REPORTER'S CERTIFICATE

3                    *   *   *   *   *   *   *

4      I, Erikia T. Schuster, RPR, Official Court Reporter for the

5  U.S. District Court, Southern District of Illinois, do hereby

6  certify that I reported with mechanical stenography the

7  proceedings contained in pages 85-117 and that the same is a

8  full, true, correct and complete transcript from the record of

9  proceedings in the above-entitled matter.

10

11  _/S/ Erikia T. Schuster_                    4/13/23
    IL CSR, RPR

12

13

14

15

16

17

18

19

20

21

22

23

24

25