# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CALEB BARNETT, *et al.*, <br>     Plaintiffs, <br>         vs. <br> KWAME RAOUL, *et al.*, <br>     Defendants. | Case No.  3:23-cv-209-SPM <br> ** designated Lead Case |
| DANE HARREL, *et al.*, <br>     Plaintiffs, <br>         vs. <br> KWAME RAOUL, *et al.*, <br>     Defendants. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*, <br>     Plaintiffs, <br>         vs. <br> BRENDAN KELLY, *et al.*, <br>     Defendants. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS <br> LICENSEES OF ILLINOIS, *et al.*, <br>     Plaintiffs, <br>         vs. <br> JAY ROBERT "JB" PRITZKER, *et al.*, <br>     Defendants. | Case No.  3:23-cv-215-SPM |

**<u>SUPPLEMENTAL DECLARATION OF JAMES E. YURGEALITIS</u>**

## <u>SUPPLEMENTAL DECLARATION OF JAMES E. YURGEALITIS</u>

I, James E. Yurgealitis, declare as follows:

### Background and Scope

1.      I have been retained by the Office of the Attorney General of Illinois to provide expert testimony in litigation challenging various aspects of Illinois Public Act 102-1116, also known as the Protect Illinois Communities Act (the Act). As of the date of this declaration, the scope of my engagement includes providing expert testimony in the following cases: *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, Case No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); and *Kenneally v. Raoul*, 3:23-cv-50039 (N.D. Ill.). I am being compensated at a rate of $400 per hour for my work on this declaration, and $1600 per travel + work day.

2.      I previously submitted a declaration to the Court dated February 27, 2023. I prepared my February 27, 2023 declaration in conjunction with the preliminary injunction motions pending at that time before the Court in the above-captioned, partially consolidated actions.

3.      I have been asked to prepare this supplemental declaration to respond to certain assertions made by the plaintiffs in *Langley v. Kelly*, Case No. 23-cv-192-NJR (S.D. Ill.), in their May 19, 2023 "Motion for Summary Judgment Counts IV and VI," Dkt. 111 ("May 19 Motion"), and the declarations and attachments submitted in support of the May 19 Motion, Dkt. 111-1–111-14. I have reviewed those materials in forming the opinions and observations reflected in this supplemental declaration. In addition, as noted in my February 27, 2023 declaration, I have reviewed the provisions of Public Act 102-1116 being challenged in this case.

4.      For ease of reference by the Court, I have re-submitted a true and correct copy of my current curriculum vitae as Exhibit A to this declaration, which describes my credentials, training,

background, and experience. My credentials, training, background, and experience as an expert witness are detailed on my Statement of Qualifications, a true and correct copy of which is attached as Exhibit B.

5.      I am currently self-employed as a legal and forensic consultant providing firearms related technical and public policy consulting, forensic case reviews, and testing and training services to corporations, legal counsel, and the public sector.  During my previous 26-year career as a federal law enforcement officer, I have been recognized, and testified as, an expert witness in numerous local, state, and federal courts. I have toured numerous firearms and ammunition manufacturer's facilities both in the United States and overseas. I maintain a personal library of firearms and ammunition related books and periodicals and maintain contact with other recognized experts in the field. My final assignment in government service was as Senior Special Agent/Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice, a position I held for nine years. During that time, I was responsible for all Bureau firearms and forensic firearms related training and research at the ATF National Laboratory Center in Ammendale, Maryland.

**The Act's Limits on Magazine Capacity**

6.      I have reviewed the *Langley* plaintiffs' May 19 Motion in which they state: "It is objectively impossible to differentiate a handgun magazine from a long gun. The reason is, multiple long guns use the exact same magazines as handguns." Dkt. 111 at 8. The May 19 Motion goes on to discuss the following examples: (1) 15-round magazines for the M9 Beretta pistol that can also be used for the Beretta CX4 rifle; (2) 15-round magazines for the Glock 19 that can also be used for the Kel Tec Sub 2000 rifle; (3) magazines for the Ruger 5.7 pistol that can also be used for the Ruger LC carbine rifle; (4) magazines that can be used in Ruger American and Glock pistols, as well as the

Ruger PC carbine rifle; and (5) "AR15 or M16 type magazines" that can be used in AR-15-style pistols, as well as AR-15-style rifles. Dkt. 111 at 8.

7.      The examples cited by the *Langley* plaintiffs refer to firearms where a magazine for handgun can also be used in a carbine or rifle, often produced by the same manufacturer. With few exceptions, firearms to which this interchangeability applies are a relatively recent development in firearms manufacture and constitute a small subset of firearms available to the public.

8.      The small subset of firearms mentioned by the *Langley* plaintiffs completely ignores that the vast number (and majority) of semi-automatic handguns available to the public utilize magazines that are not interchangeable with rifles or other long guns. Many handguns utilize magazines that are exclusively designed and manufactured for handgun use only.   A few popular 9mm handguns from well-established manufacturers that feature 15-round magazines that are not interchangeable with any rifles or other long guns include:

    a.   CZ: Model 75, Shadow;

    b.   Heckler & Koch: P30, P2000, USP;

    c.   Sig Sauer: P226, P229;

    d.   Smith & Wesson: 5900 Series, SW40F;

    e.   Sturm Ruger: P85, P89;

    f.   Springfield Armory: XD Series; and

    g.   Walther: P88, PPQ, PDP.

It is also worth noting that there are numerous manufacturers who offer 10-round capacity magazines for the abovementioned handguns to include Magpul and Mec-Gar.

9.      The examples included in the previous paragraph are illustrative, not exhaustive. But they illustrate that the *Langley* plaintiffs' statement that it is "objectively impossible to differentiate

a handgun magazine from a long gun" is misleading and incorrect. Dkt. 111 at 8. Magazines for the handguns identified in the previous paragraph are magazines for handguns only.

10.     There are also many rifles and other long guns on the civilian market that use magazines that cannot be used in handguns. A number of popular rifles use magazines that could not be used in a handgun, including, but not limited to:

      a.  Springfield Armory M1A

      b.  Ruger Mini-14

      c.  Ruger American Rifle (earlier models)

As with the handguns mentioned in paragraph 8 there are numerous manufacturers who offer 10-round magazines for these rifles.

11.     Again, the examples included in the previous paragraph are illustrative, not exhaustive.

12.     Simply put, not all magazines that can be used in a handgun can also be used in a rifle or other long gun. Similarly, not all magazines that can be used in a rifle or other long gun can also be used in a handgun. The few examples of interchangeability of magazines among handguns and rifles that the *Langley* plaintiffs have identified are, based on my experience, the exception, not the rule, in the civilian firearms market.

13.     Broadly speaking, the examples cited by the *Langley* plaintiffs reflect two relatively recent marketing trends by firearms manufacturers: (1) exploiting the popularity of specific handgun models to offer carbines from the same manufacturers that use the same magazines and the same caliber ammunition (the "handgun-to-carbine" trend); and (2) exploiting the popularity of specific rifle models, like the AR-15 platform, by offering handguns from the same manufacturers that use the same magazines and the same caliber ammunition (the "rifle-to-handgun" trend).

14.     Examples of the handgun-to-carbine trend include the first four examples identified by the *Langley* plaintiffs. The M9 Beretta series is a popular 9mm pistol that is typically sold with a 15-round magazine. In 2003, Beretta introduced the CX-4 "Storm" rifle, a version of which is depicted in the *Langley* plaintiffs' motion. Dkt. 111 at 9. Although I would need sales data from Beretta to confirm specific numbers, based on my knowledge of the civilian firearms market, the M9 Beretta pistol is far more prevalent than the CX-4 rifle. While some individuals may own both an M9 Beretta pistol and a CX-4 rifle, that number is likely to be significantly smaller than the number of individuals who own an M9 Beretta pistol, but not a CX-4 rifle. As a result, most owners of M9 Beretta pistols would be using magazines for those pistols exclusively as handgun magazines. Going forward, the CX-4 rifle is also listed by name in the Act as an "assault weapon" subject to the Act's restrictions. 720 ILCS 5/24-1.9(a)(1)(J)(4).

15.     The *Langley* plaintiffs also mention two examples of handgun-to-carbine interchangeable magazines for Ruger firearms. First, they mention that the Ruger 5.7 pistol uses a magazine that can also be used for the Ruger LC carbine. Dkt. 111 at 9 (citing Dkt. 111-2). Ruger first introduced the LC carbine in 2017, building on the popularity of the Ruger 5.7 pistol. I was surprised that the *Langley* plaintiffs chose to highlight this example, however, because both weapons, the Ruger 5.7 pistol and the Ruger LC carbine, come standard with a 20-round magazine—which is greater than the Act's capacity limit for either handgun or long gun magazines.

16.     Ruger also already sells "State Compliant" versions of both the Ruger 5.7 pistol and the Ruger LC carbine that have 10-round magazines. Below is an image from Ruger's website[1] advertising three versions of the Ruger LC carbine, the "Standard Model," the "State Compliant Model," and the "Capacity Compliant Model":

---

[1] Ruger, LC Carbine, https://ruger.com/products/lcCarbine/models.html



17.      As reflected in the images above, as well as Exhibit B to the May 19 Motion (Dkt. 111-2), the "Capacity" for both the "State Compliant" and "Capacity Compliant" Ruger LC Carbine models depicted above is "10". "Capacity" in this context refers to the magazine capacity for the magazines sold with these firearm models. I understand "Compliant" to refer to these models and their magazines being "compliant" with state laws regulating magazine capacity, firearm characteristics, or both. In other words, Ruger already markets two versions of the LC Carbine that

come standard with a 10-round magazine in order to comply with 10-round magazine capacity limits that exist in certain states.

18.     The fact that Ruger already markets "State Compliant" and "Magazine Compliant" versions of the LC Carbine with a 10-round magazine indicates to me that a 10-round limit for a long gun magazine is easily understandable by both firearms manufacturers and ordinary people.

19.     Although I would need sales data from Ruger to confirm specific numbers, based on my knowledge of the civilian firearms market, the Ruger 5.7 pistol is more prevalent than the Ruger LC carbine. Ruger is primarily a handgun manufacturer with the exception of some recent models, like the LC carbine, that they have released in the last decade. While some individuals may own both a Ruger 5.7 pistol and a Ruger LC carbine, that number is likely to be smaller than the number of individuals who own a Ruger 5.7 pistol, but not a Ruger LC carbine. As a result, many owners of Ruger 5.7 pistols would be using magazines for those pistols exclusively as handgun magazines.

20.     Ruger also offers a version of the Ruger 5.7 pistol that is "State Compliant," as reflected in the image below from Ruger's website[2]:

---

[2] Ruger, 5.7 Pistol, https://ruger.com/products/ruger57/models.html.



21.     As the image above reflects, the only difference between the model on the left and the "State Compliant" model is the capacity: "20+1" versus "10+1". I understand this to refer to magazine capacity. In other words, the "State Compliant" version of the Ruger 5.7 model comes with a 10-round magazine in order to be "compliant" with state laws limiting magazine capacity to 10 rounds. The "+1" refers to having a round in the chamber, in addition to the rounds in the magazine. From a technical perspective, it would be possible for Ruger to sell the Ruger 5.7 model handgun in Illinois with a 15-round magazine that complies with the Act.

22.     The *Langley* plaintiffs also cite the Ruger American pistol and the Ruger PC Carbine as capable of using the same magazine. Dkt. 111 at 9 (citing Dkt. 111-3). Ruger first introduced the PC carbine in 2022, building on the popularity of the Ruger American pistol. I was surprised that the *Langley* plaintiffs chose to highlight this example because both weapons, the Ruger American pistol and the Ruger PC carbine, come standard with a 17-round magazine—which is greater than the Act's capacity limit for either handgun or long gun magazines. *See* Dkt. 111-3.

23.    Similarly, as with the prior Ruger examples, Ruger sells "State Compliant" versions of both the Ruger American pistol and Ruger PC carbine that both come with a 10-round magazine. *Id.*

24.    An image from Ruger's website[3] depicting the standard and "State Compliant" versions of the Ruger PC carbine appears below:



25.    The fact that Ruger already markets a "State Compliant" version of the PC Carbine with a 10-round magazine indicates to me that a 10-round-limit for a long gun magazine is easily understandable by both firearms manufacturers and ordinary people.

26.    An image from Ruger's website[4] depicting a standard version and two "State Compliant" versions of the Ruger American pistol (one using .45 caliber ammunition, and the other using 9mm) appears below:

---

[3] Ruger, PC Carbine, https://ruger.com/products/pcCarbine/models.html; *see also* May 19 Motion, Exhibit C (111. 41-3).
[4] Ruger, American Pistol, https://ruger.com/products/rugerAmericanPistol/models.html.

RUGER AMERICAN® PISTOL DUTY

## ANYTHING ELSE WOULD BE UN-AMERICAN™



| Model: | 8605 |
|---|---|
| Caliber: | 9mm Luger |
| Capacity: | 17+1 |
| Safety Option: | Pro Model |
| Barrel Length: | 4.20" |
| MSRP: | $689.00 |
| Availability: | Available |

Spec Sheet ›   Buy Now ›



| Model: | 8618 |
|---|---|
| Caliber: | 45 Auto |
| Capacity: | 10+1 |
| Safety Option: | Manual Safety |
| Barrel Length: | 4.50" |
| MSRP: | $689.00 |
| Availability: | Currently Unavailable |

Spec Sheet ›   Buy Now ›



| Model: | 8638 |
|---|---|
| Caliber: | 9mm Luger |
| Capacity: | 10+1 |
| Safety Option: | Manual Safety |
| Barrel Length: | 4.20" |
| MSRP: | $689.00 |
| Availability: | Currently Unavailable |

Spec Sheet ›   Buy Now ›

27.     From a technical perspective, it would be possible for Ruger to sell the Ruger American pistol in Illinois with a 15-round magazine that complies with the Act.

28.     The *Langley* plaintiffs also state: "The pistol, 9mm caliber, Glock 19, standard capacity 15 rounds, . . .uses the exact same magazine as the Kel Tec Sub 2000 9mm rifle." Dkt. 111 at 9. The Kel Tec Sub 2000 was first introduced in 2001, when the federal assault weapons ban was in effect. The federal assault weapons ban limited magazine capacity to 10 rounds. As a result, when

first introduced, the Kel Tec Sub 2000 used a 10-round magazine. Kel Tec's website, which the *Langley* plaintiffs cite (Dkt. 111-1 at 6), lists "Magazine Capacity" for the Kel Tec Sub 2000 as "Varies by magazine." In other words, the Kel Tec Sub 2000 can use magazines of different capacities, to include a 10-round magazine that would be compliant with the Act. The fact that Kel Tec already manufactured the Kel Tec Sub 2000 with a 10-round magazine when the federal assault weapons ban was in effect indicates that a 10-round limit for a long gun magazine is easily understandable by both firearms manufacturers and ordinary people. In any event, the Act specifically identifies the Kel Tec Sub 2000 (J)(xv) as an "assault weapon". 720 ILCS 5/24-1.9(a)(1)(J)(xv).

29.     The *Langley* plaintiffs also state that firearms using "magazines fitting proposed NATO standard 4179, sometimes called AR15 or M16 type magazines, are used in both handguns (such as the below pistol) and long guns such as the U.S. military M16 rifle/M4 carbine series (which is related to the AR15) along with the Mossberg MVP, Remington Model 7615P, Ruger American Ranch and Predator, as well as the AR 15 style rifle (like shown below)." Dkt. 111 at 10.

30.     Below is a reproduction of the image of the "pistol" the *Langley* plaintiffs reference in the prior quote (*see* Dkt. 111 at 10):



11

31.     I am surprised that the *Langley* plaintiffs identified this firearm as an example. Although it is difficult to be certain because they have not identified the make, model, and caliber of this firearm, there are several features apparent in this image that are referenced in the Act's features-based definition of an "assault weapon," 720 ILCS 5/24-1.9(C). Assuming this "pistol" is semiautomatic, it has "the capacity to accept a detachable magazine at some location outside of the pistol grip[.]" *Id.* § (C)(v). It also has "a buffer tube . . . that protrudes horizontally behind the pistol grip and is designed . . . to allow or facilitate a firearm to be fired from the shoulder." *Id.* § (C)(vi). It also has "a flash suppressor" on the end of the barrel. *Id.* § (C)(iv).

32.     Below is a reproduction of the image of the "AR 15 style rifle" that the *Langley* plaintiffs included in the May 19 Motion (*see* Dkt. 111 at 10):



33.     Although it is difficult to be certain because the *Langley* plaintiffs have not identified the make and caliber of this firearm, based on the *Langley* plaintiffs' acknowledgement that this is an "AR 15 style rifle," it is included in the weapons specifically classified in the Act as an "assault weapon." 720 ILCS 5/24-1.9(a)(1)(J)(ii)(II) (listing "AR-15"). Although difficult to be certain based on this image, the magazine in this image appears to exceed either the 15-round limit for handguns or the 10-round limit for long guns in the Act.

34.     The two images cited by the *Langley* plaintiffs and referenced in the immediately preceding paragraphs are illustrative of the rifle-to-handgun trend I described above. Specifically, the popularity of AR-15-style rifles has led firearm manufacturers to produce "pistol" models utilizing the same ammunition and magazines as AR-15-style rifles. Although in its initial rifle configuration AR-15-type firearms have been available for over 50 years, its availability in a handgun configuration is more recent and can be traced back to the AR-based Olympic Arms OA-93 pistol introduced in 1992.

35.     With AR platform or "AR Type" rifles, the magazines can be interchangeable between rifle and handgun variants. However, both variants are firearms that can no longer be legally purchased under the Act.

36.     The magazine for AR-15-style rifles is often 30 rounds. The magazine for an AR-15-style pistol is also often 30 rounds. A 30-round magazine would exceed either the 15-round limit for handguns or the 10-round limit for long guns in the Act. The Act also specifically includes semiautomatic pistols that are "AR types" within the definition of "assault weapon." 720 ILCS 5/24-1.9(a)(1)(K)(ii).

37.     The *Langley* plaintiffs also reference the Mossberg MVP rifle. Below is an image from Mossberg's website[5] depicting the Mossberg MVP and its specifications:

---

[5] Mossberg, MVP Patrol Rifle, https://www.mossberg.com/mvp-patrol-rifle-27716.html.



38.     Notably, the "Capacity" listed by Mossberg for the Mossberg MVP is "10+1".

"Capacity" in this context refers to the magazine capacity for the magazines sold with this firearm

model. In other words, based on Mossberg's website, the Mossberg MVP is currently sold with a

standard 10-round magazine. In addition, the Mossberg MVP is a bolt-action rifle. The Act

specifically excludes bolt-action firearms from the definition of "assault weapon." 720 ILCS 5/24-

1.9(a)(2)(C).

39.     The *Langley* plaintiffs also reference the Remington 7615P rifle. Dkt. 111 at 10. According to the specifications listed in the *American Rifleman*,[6] a publication by the National Rifle Association ("NRA"), the standard magazine capacity of the Remington 7615P rifle is 10 rounds:

**Manufacturer**: Remington Arms Company, Inc. (Dept. AR), P.O. Box 700, Madison, NC 27025-0700; (800) 243-9700; www.remingtonle.com

**Caliber**: 5.56 mm NATO/.223 Rem.

**Action Type**: slide action, center-fire rifle

**Receiver**: Parkerized carbon steel

**Barrel**: 16 1/2" Parkerized carbon steel

**Rifling**: six groove, 1:9" RH twist

**Magazine**: detachable AR-15/M16 box magazine

**Sights**: Wilson Combat ghost-ring rear, XS Sight Systems bead front (tested)

**Trigger Pull**: two-stage, 6 lbs.,12 ozs.

**Stock**: length of pull, 14"; drop at heel, 2 1/2"; drop at comb, 1 1/2"

**Overall Length**: 37 1/2"

**Weight**: 7 lbs.

**Accessories**: 10-round magazine, instruction manual

**Suggested Retail Price**: $750 (tested), $675 with rifle sight

40.     In addition, according to the same publication, the Remington 7615P rifle is a pump-action rifle. The Act specifically excludes pump-action firearms from the definition of "assault weapon." 720 ILCS 5/24-1.9(a)(2)(C).

41.     The *Langley* plaintiffs also reference the Ruger American Predator rifle. Dkt. 111 at 10. According to Ruger's website,[7] excerpted below, the Ruger American Predator rifle comes standard with a 4-round magazine:

---

[6] National Rifle Association, *American Rifleman* (May 20, 2009), https://www.americanrifleman.org/content/remington-7615p-pump-action-rifle/.
[7] Ruger, American Predator Rifle, https://ruger.com/products/americanRiflePredator/specSheets/6974.html



**RUGER AMERICAN® RIFLE PREDATOR**

PRINT SPEC SHEET | FIND A RETAILER | BUY NOW

*AVAILABILITY: AVAILABLE*

**MODEL NUMBER: 6974 | CALIBER: 308 WIN**

| Stock | Moss Green Synthetic | Capacity | 4 | Overall Length | 38" |
|---|---|---|---|---|---|
| Model Option | Right-Handed | Thread Pattern | 5/8"-24 | Length of Pull | 13.75" |
| Sights | None-Scope Rail Installed | Magazine | Flush-Fit | Grooves | 5 |
| | | Barrel Finish | Matte Black | UPC | 7-36676-06974-3 |
| Barrel Length | 18" | Weight | 6.2 lb. | Suggested Retail | $619.00 |
| Barrel Material | Alloy Steel | Twist | 1:10" RH | | |

42.    The *Langley* plaintiffs also reference the Ruger American Ranch rifle. Dkt. 111 at 10.

According to Ruger's website,[8] excerpted below, the Ruger American Ranch rifle comes standard

with either a 3-, 5-, or 10-round magazine:

---

[8] Ruger, American Ranch Rifle, https://ruger.com/products/americanRifleRanch/models.html.



43.    Due to the limited number of firearm models that are subject to magazine interchangeability, it is my opinion that the average firearm owner would not encounter any confusion as to which magazine is legal for their handgun, rifle, or shotgun under the Act. The limits on magazine capacity are straightforward and easily understood by an individual with a basic knowledge of whether a firearm is a handgun or a shoulder-fired firearm.

17

### "AK Type" and "AR Type" Firearms

44.     The *Langley* plaintiffs also claim to be confused by the Act's use of the terms "AK type" and "AR type" to identify certain categories of firearms that are "assault weapons." Dkt 111 at 14, 18.

45.     Based on my experience, the phrase "AK type" is commonly understood by experts, manufacturers, and average people in the firearms market to refer to firearms using the same or similar receiver initially popularized by the AK-47 rifle. Even a simple Google search for "AK type" brings up numerous results directly referencing the AK-47 and / or AK-74.

46.     Based on my experience, the phrase "AR type" is commonly understood by experts, manufacturers, and average people in the firearms industry and market to refer to firearms using the same or similar receiver initially popularized by the AR-15, or ArmaLite Rifle. Even a simple Google search for "AR type rifle" or "AR type pistol" brings up numerous results directly referencing the AR-15.

### "Other" Firearm Types

47.     The *Langley* plaintiffs point to two tripod-mounted weapons as examples of firearms they claim are not handguns, rifles, or shotguns as those terms are used in the Act. Dkt. 111 at 6–8.

48.     The Japanese Type 3 cited by the *Langley* plaintiffs was originally a machine gun used by the Japanese Army prior to and during World War II. Dkt. 111 at 6. In its original, automatic form, the Japanese Type 3 would be heavily regulated under federal law. To the best of my knowledge, there are no semi-automatic versions of the Japanese Type 3 currently being produced by a federally licensed firearm manufacturer. To the extent there are any semi-automatic Japanese Type 3 weapons in Illinois, they are likely to be very few in number and owned by collectors of antique or historic firearms.

49.     The 1919A4 cited by the *Langley* plaintiffs was originally a machine gun used by the U.S. Army prior to and during World War II. Dkt. 111 at 6. In its original, automatic form, the 1919A4 would be heavily regulated under federal law. To my knowledge, there are no semi-automatic versions of the 1919A4 currently being produced by a federally licensed firearm manufacturer. To the extent there are any semi-automatic 1919A4 weapons in Illinois, they are likely to be very few in number.

50.     There are a number of semi-automatic rifles currently available which are belt fed. Two examples are the Ohio Ordnance M240SLR (a semi-automatic copy of the M240 machinegun)[9] and the FN M249S (a semi-automatic copy of the M249 Squad Automatic Weapon which FN manufactures for the U.S. Military).[10] Due to their prohibitive cost ($15,135 and $10,584 respectively), however, they are not likely to be owned by the average individual.

51.     In my opinion, based on my experience and expertise, the terms "handguns" and "long guns" as used in the Act's definition of "large capacity ammunition feeding devices" are easily understandable by both firearms manufacturers and ordinary people. Handguns, rifles, and shotguns comprise the vast majority of firearms in the civilian market in the United States. There are very few firearms that are not a handgun, rifle, or shotgun that are also legal in the civilian market under federal law.

*        *        *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

---

[9] https://www.oowinc.com/exclusives/semi-auto/m240-slr/
[10] https://www.gunsandammo.com/editorial/fn-m249s-semi-auto-belt-fed-rifle/455980

Executed on: 4/16/23 at Manchester, Maryland

James E. Yurgealitis

# EXHIBIT A

# James E. Yurgealitis

5004 Roller Rd., Manchester, Maryland 21102
24 Hour Mobile: (443) 452-7248
Email: jyurgealitis@gmail.com

_____

SUMMARY:

Self employed as a Legal and Public Policy Consultant providing Technical Firearms and Forensic Consulting, Testing and Policy Research / Training Services to Corporations, Legal Counsel and the Public Sector

EDUCATION:

B.A., Political Science and Psychology, St. John Fisher University, Rochester, New York – May 1985

PROFESSIONAL EXPERIENCE:

December 2012 to Present: Independent Legal and Policy Consultant / Subject Matter Expert

Currently provide independent consulting services to Corporations, Legal Counsel and Governmental entities in regard to Public Policy and Technical matters relating to Firearms, Firearms Policy, Forensics and Law Enforcement. Current and former clients include the Office of the District Attorney for Cook County Illinois, The City of Sunnyvale, California, The City of Highland Park, Illinois, The Office of the Attorney General for the Commonwealth of Massachusetts and the Center for American Progress, Washington D.C. I have provided sound policy and technical assistance for my clients to include expert testimony which successfully endured the opposition's legal appeals to the U.S. Circuit Court of Appeals and the U.S. Supreme Court.

December 2003 to December 2012: Senior Special Agent / Program Manager for Forensic Services ATF National Laboratory Center (NLC), Beltsville, Maryland. U. S Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

Directed the administration and management of ATF's Forensic Training Programs to include the National Firearms Examiner Academy (NFEA) a 12-month training program for State and Local Forensic Firearm Examiner Trainees. Also managed two additional forensic training programs. Administered a $1M + budget in accordance with strict ATF and National Institute of Justice (NIJ) guidelines and reporting requirements. Responsible for oversight of all Forensic Firearms related research at the NLC. Supervised a full and part time cadre of fifty-two (52) instructors and administrative personnel. Maintained liaison with commercial firearms and ammunition manufacturers and subject matter experts and ensure that lesson plans and curriculum reflected the latest technical developments in firearms manufacture, forensics and their application to federal and state law. Applied for, received and managed in excess of $2M in external grants to facilitate uninterrupted delivery of training during internal budget shortfalls. Detailed to the Department of Homeland Security Command Center in 2005 with overall responsibility to coordinate and direct Federal, State and Local Law Enforcement assets during and following Hurricanes "Irene" and "Katrina" and again in 2010 for "Andrew" and "Danielle".

June 1997 - December 2003:  Special Agent / Violent Crime Coordinator, ATF Baltimore Field Division, Baltimore, Maryland

Responsible for management of ATF's "Project Disarm", a joint law enforcement initiative between ATF, The United States Attorney's office for the District of Maryland (USAO), the Baltimore City Police Department, the Baltimore City States Attorney's Office and the Maryland State Police. Duties included reviewing over 400 state and local firearms related arrests annually for subsequent referral to the USAO and Federal Prosecution. Managed a caseload of 75 – 100 criminal cases annually. Responsible for selection, referral, follow - up investigation and subsequent indictment and prosecution of armed career criminals. Testified in front of Federal Grand Juries in excess of 75 times annually. Was recognized, and testified, as an expert witness in the Identification, Operability and origin of Firearms and Ammunition in three Federal Judicial Districts. Toured over 25 firearms and ammunition manufacturing facilities in Europe and the United States. Temporarily assigned in 2001 for three months to the 9-11 Task Force investigation in conjunction with FBI Assets. Temporarily assigned to the D.C. Sniper Task Force Intelligence Group in 2002 for two months.

June 1990 – June 1997:
Special Agent, ATF Baltimore Field Division, Baltimore, Maryland

Served in various capacities as a street-level Special Agent.  Acted as Group Supervisor and Assistant Special Agent in Charge on numerous occasions. Served on the Washington – Baltimore High Intensity Drug Trafficking Area (HIDTA) task force from 1995 – 1999.  Investigated armed narcotics trafficking organizations, seized assets, authored and executed Federal and state search and arrest warrants, conducted surveillance, interviews / interrogations, testified in Federal and state courts as a fact witness, purchased firearms, explosives and narcotics while in an undercover capacity, investigated fatal bombings and arsons, firearms trafficking, alcohol and tobacco trafficking, homicide, fraud and gun store burglaries. Also while detailed for 8 months as the Public Information Officer authored press releases, provided interviews to local and national print and television media outlets and made presentations to local and national public and special interest groups and associations.

April 1989 – June 1990 and July 1986 – March 1987: Special Agent, United States Department of State, Diplomatic Security Service (DSS), Washington Field Office, Rossyln, VA

Conducted investigations of violations of Federal Law under the department's purview to include Passport and Visa Fraud, Illegal trafficking of restricted firearms and war materials to prohibited countries, human trafficking, seized assets, authored and executed State, local and Federal Arrest and Search Warrants,  testified in Federal Court as a fact witness, detailed on an as needed basis to the Dignitary Protection Division as Agent in Charge of  multiple protective details for visiting and resident foreign dignitaries, temporarily assigned to support Physical and Personal Protective Security in various U.S. Embassies overseas on an as needed basis, detailed to the Secretary of State Protective Division on an as needed basis to supervise agents assigned to augment the permanent protective detail.

March 1987-February 1989: Special Agent, DSS, Secretary of State Protective Division, Washington, DC

Served in various capacities as Acting Agent in Charge, Acting Shift Leader, Lead Advance Agent and Shift Agent. Responsibilities included close personal protection of the Secretary of State both domestically and overseas, extensive foreign travel to facilitate and prepare security arrangements for overseas visits to include Presidential Summit meetings, liaison with foreign host government officials to plan and solicit assistance with security arrangements, supervision of agents temporarily assigned to augment the detail, liaison with U.S Government Intelligence Agencies and other Federal, State and Local Law Enforcement Agencies to identify and protect against potential threats to the Secretary of State.

<u>CLEARANCES</u>:  Top Secret March 1986 valid through February 2015. Numerous prior SCI Clearances.

<u>TEACHING EXPERIENCE:</u>

- Instructed at the Federal Law Enforcement Training Center (FLETC), for ATF and other Federal Law Enforcement Agencies
- Instructed at the International Law Enforcement Academy (ILEA) in Budapest, Hungary
- Instructed for numerous State, local and / or regional law enforcement agencies both in the United States, Canada and Central America

<u>LINKEDIN PROFILE AND ENDORSEMENTS:</u>

https://www.linkedin.com/in/james-jim-yurgealitis-68618464?trk=nav_responsive_tab_profile_pic

<u>REFERENCES:</u>

Available upon request

# EXHIBIT B

**Professional Qualifications of James E. Yurgealitis**
**Independent Legal, Public Policy and Forensic Consultant**

I, James E. Yurgealitis, being duly sworn, depose and state:

1.) That I was previously employed as a Senior Special Agent / Program Manager with the Bureau of Alcohol, Tobacco Firearms & Explosives, (ATF) United States Department of Justice, and had been so employed since 1990. Prior to 1990 I was employed as a Special Agent with the Bureau of Diplomatic Security, (DSS) United States Department of State and had been so employed since 1986.

2.) I have a Bachelor of Arts Degree in Political Science and Psychology from St. John Fisher College, Rochester, New York.

3.) I am a graduate of the Federal Law Enforcement Training Center, Glynco, Georgia, the Criminal Investigator Training Program, Bureau of Diplomatic Security New Agent Training, and the Bureau of ATF New Agent Training Program.

4.) I have completed the Firearms Interstate Nexus Training Program conducted by the Firearms Technology Branch, ATF Headquarters, Washington, D.C.

5.) I have completed both Advanced Interstate and European Nexus Training conducted by ATF in conjunction with several domestic and European firearm manufacturers.

6.) I have testified in excess of 200 times before Federal Grand Juries regarding the classification, operability, and commerce of firearms and / or ammunition.

7.) I have previously qualified as an expert witness regarding the origin, operability / classification and interstate movement of firearms and ammunition in U.S. District Court for the District of Maryland, U.S. District Court for the District of Delaware and the Circuit Court For Baltimore City, Maryland.

8.) I have conducted regular training for local, state and federal law enforcement agencies both domestically and overseas regarding firearms classification, operability and firearms statutes.

9.) I maintain a personal library of books, printed material and documents that relate to the field of firearms, ammunition, and firearms classification, attend local and national trade shows and professional association meetings, and regularly review periodicals relating to firearms and ammunition.

10.) I attend trade shows, maintain contact with, and regularly consult with other persons, to include  published authors and recognized experts in the origin, identification and  classification of firearms and ammunition.

11.) I have, during my tenure with ATF, personally examined in excess of five thousand

 Qualifications Of  James E. Yurgealitis contd.

firearms to determine their origin and classification and operability, and to facilitate
the tracing of  those firearms.

I have toured production facilities for numerous firearms and ammunition manufacturers. The
tours were conducted by corporate historians, corporate officers, or production engineering
personnel.

Domestic Firearm Manufacturers:
Bushmaster Firearms, Ilion, NY, USA
Colt, New Haven CT, USA (4x)
H&R 1871 Inc., Chicopee, MA, USA (2x)
Marlin, North Haven CT, USA (4x)
O.F. Mossberg & Sons, North Haven, CT, USA (4x)
Remington Firearms, Ilion, NY, USA
Savage Arms Inc., Westfield, MA, USA (4x)
Sig-Sauer / SIGARMS Inc., Exeter, NH, USA (3x)
Smith and Wesson, Springfield, MA, USA (4x)
Sturm Ruger, Newport, NH, USA (4x)
Yankee Hill Machining, Florence, MA, USA

Foreign Firearm Manufacturers:
Carl Walther GmbH, Ulm, Germany
Ceska Zbrojovka (CZ), Uhersky Brod, Czech Republic
Fegarmy (FEG), Budapest, Hungary
F.N Herstal S.A., Herstal, Belgium
Glock GmbH, Deutsch-Wagram, Austria
Heckler & Koch GmbH, Oberndorf au Neckar, Germany
J.P. Sauer & Sohn GmbH, Eckernforde, Germany

Domestic Ammunition Manufacturers:
Fiocchi Ammunition, Ozark, MO, USA
PMC, Boulder City, NV, USA
Remington, Lonoke, AR, USA (4x)
Sierra, Sedalia, MO, USA
Starline Brass, Sedalia, MO, USA

European Proof Houses
Beschussamt Ulm, (Ulm Proofhouse) Ulm, Germany
Beschusstelle Eckernforde, (Eckernforde Proofhouse) Eckernforde, Germany
Czech Republic Proofhouse, Uhersky Brod, Czech Republic
Liege Proofhouse, Liege, Belgium

-2-

<u>Qualifications Of  James E. Yurgealitis contd.</u>

<u>I have been allowed regular access to the following reference collections:</u>
Bureau of Alcohol, Tobacco Firearms and Explosives Reference Collection, Martinsburg, West Virginia, USA consisting of 5,000+ firearms

Liege Proofhouse, Liege, Belgium consisting of 1,000+ ammunition cartridges

Springfield Armory National Historic Site Firearms Collection, Springfield, MA, USA consisting of 10,000+ Firearms

Smithsonian Institution (Museum of American History) Firearms Reference Collection Washington, DC, USA, consisting of 4000+ firearms

Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany consisting of 10,000+ Firearms

<u>I have toured the following museums:</u>
Heeresgeschichtliches Museum, (Museum of Military History), Vienna, Austria
Hungarian Military Museum, Budapest, Hungary
Springfield Armory National Historic Site, Springfield, MA, USA
United States Air Force Museum, Dayton, OH, USA
United States Army Ordnance Museum, Aberdeen Proving Ground, Aberdeen, MD, USA
United States Military Academy Museum, West Point, NY, USA
United States Naval Academy Museum, Annapolis, MD, USA
Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany

<u>Membership in Professional Organizations:</u>

Member, International Ammunition Association (IAA)
Technical Advisor (pending approval), Association of Firearm and Toolmark Examiners (AFTE)
Member, Federal Law Enforcement Officers Association (FLEOA)