IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, *et al.*,<br>        Plaintiffs,<br>                vs.<br>KWAME RAOUL, *et al.*,<br>        Defendants. | Case No.  3:23-cv-209-SPM<br>** designated Lead Case |
| DANE HARREL, *et al.*,<br>        Plaintiffs,<br>                vs.<br>KWAME RAOUL, *et al.*,<br>        Defendants. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*,<br>        Plaintiffs,<br>                vs.<br>BRENDAN KELLY, *et al.*,<br>        Defendants. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS<br>LICENSEES OF ILLINOIS, *et al.*,<br>        Plaintiffs,<br>                vs.<br>JAY ROBERT "JB" PRITZKER, *et al.*,<br>        Defendants. | Case No.  3:23-cv-215-SPM |

**DIRECTOR KELLY'S MOTION TO SUPPLEMENT HIS RESPONSE
TO *LANGLEY* PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
<u>ON COUNTS IV AND VI (VAGUENESS)</u>**

Brendan Kelly, in his official capacity as Director of the Illinois State Police ("ISP"), through his attorney, Kwame Raoul, Attorney General of Illinois, pursuant to Federal Rule of Civil Procedure 56(d) and Local Rule 7.1(c), brings this motion to supplement his response to the *Langley* plaintiffs' partial motion for summary judgment on Counts IV and VI ("PMSJ") with evidence obtained through the limited discovery allowed by the Court. ECF 121. Specifically, Director Kelly requests that the following exhibits filed in conjunction with this motion be considered together with his response to the *Langley* plaintiffs' PMSJ:

(1) the transcript of plaintiff Matthew Wilson's October 3, 2023 deposition, filed together with copies of the marked deposition exhibits, attached as Group Exhibit A;

(2) the transcript of declarant Scott Pulaski's October 3, 2023 deposition, filed together with copies of the marked deposition exhibits, attached as Group Exhibit B; and

(3) a supplemental declaration by James E. Yurgealitis, Director Kelly's previously disclosed expert witness, addressing contentions made by plaintiff Matthew Wilson in an affidavit submitted with the *Langley* plaintiffs' reply in support of their PMSJ, attached as Exhibit C.

In advance of the oral argument on the *Langley* plaintiffs' PMSJ set for October 11, 2023, Director Kelly provides below a brief procedural history as context for his current motion to supplement, as well as a summary of evidence obtained from the depositions of Mr. Wilson and Mr. Pulaski supporting denial of the *Langley* plaintiffs' PMSJ.

## PROCEDURAL BACKGROUND

The *Langley* plaintiffs filed their lawsuit challenging the constitutionality of Illinois Public Act 102-1116, the Protect Illinois Communities Act ("PICA"), on January 13, 2023, in state court. *Langley* ECF 1-1. Director Kelly removed the action to this Court on January 23, 2023, where it was later partially consolidated with three similar pending actions. *Id.*; ECF 25.[1] All plaintiffs in the consolidated actions moved for a preliminary injunction against the challenged provisions of

---

[1] All subsequent references to docket entries are to the consolidated *Barnett* docket unless otherwise indicated.

PICA, alleging, *inter alia*, that PICA violated their rights under the Second Amendment. The *Langley* plaintiffs also moved for a preliminary injunction on claims unique to their case: a Fifth Amendment claim challenging the endorsement affidavit requirement in PICA (*Langley* Count I); and two Fourteenth Amendment claims alleging that certain terms in PICA violate the Due Process Clause due to unconstitutional vagueness (*Langley* Counts IV and VI (misnumbered as a duplicate "Count IV")). *Langley* ECF 6.

To streamline the proceedings, all parties and their counsel in the partially consolidated actions agreed to proceed with briefing the common Second Amendment claims; the Court entered an order setting a consolidated briefing schedule and stating that "[a]ny other rights raised" were "stayed and may be litigated at a later date." ECF 32 at 2–3 n.1. After the parties briefed the preliminary injunction motions in accordance with the Court's schedule, the Court heard oral argument on April 12, 2023, ECF 88, and issued a preliminary injunction on April 28, 2023. ECF 101. The state-official defendants in the consolidated actions immediately appealed pursuant to 28 U.S.C. § 1292(a)(1). ECF 102. On May 4, 2023, the Seventh Circuit granted the state-official defendants' motion to stay this Court's preliminary injunction while the interlocutory appeal proceeds. The Seventh Circuit heard oral argument on the interlocutory appeal on June 29, 2023, but as of this filing, has not issued a decision.

While the interlocutory appeal was being briefed before the Seventh Circuit, the *Langley* plaintiffs filed a partial motion for summary judgment on their Fourteenth Amendment vagueness claims on May 19, 2023. ECF 111. The *Langley* plaintiffs filed their PMSJ while a stay was in place, with no party having conducted any discovery, without making any Rule 26(a)(1) disclosures, and without the parties having conducted a Rule 26(f) conference. On June 2, 2023, Defendant Kelly moved for an order denying the PMSJ without prejudice and continuing the stay

3

on the *Langley* plaintiffs' Fifth and Fourteenth Amendment claims in light of the interlocutory appeal or, alternatively, setting a consolidated discovery schedule on all claims. ECF 112 at 5. The Court did not rule on Defendant Kelly's motion to continue the stay or, alternatively, to set a discovery schedule, prior to the deadline set by Local Rule 7.1(c)(1) for Director Kelly's response to the *Langley* plaintiffs PMSJ. As a result, Director Kelly filed a response to the *Langley* plaintiffs' PMSJ in which he reiterated his request for a stay or, alternatively, discovery. ECF 116 at 4.

On June 27, 2023, the *Langley* plaintiffs filed a reply in support of their PMSJ without leave of court and despite Local Rule 7.1(c) stating that reply briefs should be filed only in exceptional circumstances. ECF 117. The reply attached a seven-page declaration from plaintiff Matthew Wilson together with nine exhibits totaling thirty-six additional pages—none of which had been attached to the PMSJ or previously disclosed during the litigation. ECF 117-1. On June 29, 2023, the same day the Seventh Circuit heard oral argument in the interlocutory appeal, this Court partially granted Director Kelly's request for a stay by staying consideration of the *Langley* plaintiffs' PMSJ for forty-five days until August 14, 2023. ECF 119.

At a status hearing on August 14, 2023, the Court set oral argument on the *Langley* plaintiffs' PMSJ on October 11, 2023. ECF 122. At that hearing, Director Kelly renewed his request for discovery, including for documents and testimony from non-party gun manufacturers on various factual assertions made by the *Langley* plaintiffs—including assertions made for the first time on reply—and for depositions of the two declarants, Matthew Wilson and Scott Pulaski, relied upon in the PMSJ. ECF 123 (8/14/23 Hrg. Tr.) 8:09–13:10. The Court allowed Director Kelly's request to depose Mr. Wilson and Mr. Pulaski and ordered that "[t]he stay on discovery is lifted as to depositions of affiants in the *Langley* case." ECF 121.

The depositions of Mr. Wilson and Mr. Pulaski took place on October 3, 2023. Director Kelly has attached the transcripts of those depositions, in their entirety, as Group Exhibits A and B, together with the deposition exhibits marked and used by Director Kelly's counsel. Through this motion, and in accordance with Rule 56(d), Director Kelly requests that the Court consider the deposition transcripts and exhibits in adjudicating the *Langley* plaintiffs' PMSJ. Director Kelly likewise requests that the Court consider the second supplemental declaration of James E. Yurgealitis, attached as Exhibit C, responding to assertions raised for the first time in the *Langley* plaintiffs' reply in support of their PMSJ.

## SUMMARY OF DEPOSITION TESTIMONY

In light of oral argument on the *Langley* plaintiffs' PMSJ scheduled for October 11, 2023, Director Kelly includes the following summary of testimony from Mr. Wilson and Mr. Kelly at their depositions, which confirms that the PMSJ should be denied. In the interest of completeness, Director Kelly has submitted the deposition transcripts in their entirety.[2]

I.  **Even Plaintiffs' declarants are able to understand and apply PICA's restrictions on magazine capacity.**

   A. **Plaintiffs' declarants understand and apply PICA's magazine capacity limits in the real world.**

Plaintiffs have based their vagueness claim in part on the assertion that "[i]t is objectively impossible to differentiate a handgun magazine from a long gun [magazine]." ECF 111 at 8. This assertion cannot and does not establish that PICA's magazine capacity limits are unconstitutionally vague, as Director Kelly explained in his response at pages 8 through 13. ECF 116 at 8–13. The deposition testimony of the *Langley* plaintiffs' declarants has further confirmed that the dual-use nature of some magazines is not relevant to whether people of ordinary intelligence understand the

---

[2] In the interest of privacy, the transcript of Mr. Pulaski's declaration includes redactions for his home address and date of birth.

application of PICA in the real world. In the real world, people of ordinary intelligence, including plaintiffs' declarants, choose what magazine to purchase, carry, and use knowing the type of firearm the magazine will be used in. Plaintiffs' own declarants confirm that they do not interact with magazines in a vacuum and that they understand full well how to conform their conduct to PICA's magazine capacity limits.

For example, when asked at his deposition, Mr. Wilson was readily able to discern whether a magazine was legal to buy, sell, or carry under PICA. Mr. Wilson, who has a concealed carry license, testified that since PICA has taken effect, he now carries a Smith & Wesson 609 handgun with a 9-round magazine, whereas prior to PICA he carried a firearm with a 33-round magazine. Ex. A, Wilson Dep. 16:21-25, 19:1-20:5. Mr. Wilson affirmed that he understands that now that PICA is in effect, the Smith & Wesson 609 handgun he carries has to have a magazine that is 15 rounds or less. *Id.* at 20:4-9.

Mr. Wilson was also able to understand and apply PICA's capacity limits in considering what magazines he could legally purchase. When asked whether he could legally purchase a Walther PDP full-size with an 18-round magazine, he stated with confidence that "I may be able to purchase the pistol, but I would not be able to have the magazine." *Id.* at 52:10–16. Then, he confirmed the reason he would not be able to have the 18-round magazine is that PICA limits handgun magazines to 15 rounds. *Id.* at 52:20–22. When asked whether, under PICA, he could legally purchase a 10- or a 20-round magazine for a Heckler & Koch MR762A1, a rifle, he replied: "Only the 10." *Id.* at 58:10-19.  And again, in reference to a Heckler & Koch SP5, a handgun, for which 10-, 15- and 30-round magazines are offered by the manufacturer, he understood that he would only be able to buy "[t]he 10 and 15" but not the 30, because it "exceeds [PICA's] 15-round limit." *Id*. at 60:22–61:6.

6

Mr. Pulaski's understanding was just as clear. Also a concealed carry license holder, Mr. Pulaski now carries a Walther PPQ or a Glock 19, both with 15-round magazines, because of PICA. Ex. B, Pulaski Dep. 44:3–46:2. Although the Walther PPQ has 15- and 19-round magazines, Mr. Pulaski understands PICA limits him to carrying the 15-round magazine. *Id.* 44:8–19. And although the Glock 19 can accept magazines of 15 or 17 rounds, or up to 33 or 50 rounds with extensions, Mr. Pulaski now carries his Glock 19 with a 15-round magazine because of PICA. *Id.* 44:20–45:5.

At his firearms store, Piasa Armory, Mr. Pulaski knows that he can legally sell a Walther PDP Compact, a handgun, with a 10- or 15-round magazine, but he cannot legally sell an 18-round magazine for the PDP Full Size, also a handgun. *Id.* 24:11–12; 114:18–115:10. If a customer wanted a PDP Full Size handgun, Mr. Pulaski could direct them to the 10-round magazine to comply with PICA. *Id.* 115:1–17. For the Heckler & Koch MR762A1 rifle, "we would be required to only sell the 10-round magazine." *Id*. at 117:17–18. With regard to the Heckler & Koch SP5 handgun, Pulaski explained that a customer "would typically purchase that with a 30-round magazine," but under PICA his business "would be limited to selling [the customer] the 10- or 15-round magazine." *Id*. at 118:23–25.

Mr. Pulaski can make these distinctions because he sells magazines to customers who want to use them in firearms. When a customer comes to him asking to purchase a magazine, he testified that he "typically" has a conversation with the customer to understand what caliber the customer needs and what firearm the magazine is for. *Id*. at 159:1–22. Only after gathering that information does he direct the customer to a specific magazine. *Id*. at 159:14–22.

Nor does Mr. Wilson purchase magazines without considering the firearms they could be used for. Mr. Wilson testified that despite the fact magazines do not always bear a manufacturer's

7

name or the caliber ammunition they accept, he personally knows which of his firearms the magazines he owns can be used with. Ex. A, Wilson Dep. 37:8–15.

Neither declarant is actually confused by PICA's magazine capacity limits in real-world situations, and there is no basis to believe that anyone else who wants to sell or purchase a magazine would be either. The abstract indistinguishability of some magazines viewed in isolation and devoid of context does not make PICA's magazine capacity limits unconstitutionally vague.

### B. Interchangeability is exaggerated and irrelevant.

A second key argument that Plaintiffs make is that PICA's magazines restrictions are vague because select magazines can be used in both a handgun and a rifle. *See, e.g.*, ECF 111 at 8–10. As explained in Director Kelly's response (ECF 116 at 9–13), these cherry-picked examples are legally irrelevant. But testimony from plaintiffs' declarants confirms that this argument is hypothetical, disconnected from the real world, and fails to demonstrate that PICA's magazine capacity limits lack a "core of understandable meaning." *See Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 540 (7th Cir. 2019).

Plaintiffs' declarants admit, as they must, that not all magazines can be used in all firearms. Indeed, it would be "physically impossible" to do so. Ex. A, Wilson Dep. 37:16–18; *accord* Ex. B, Pulaski Dep. 22:2–23:3; 109:2–5. It could also be very dangerous. As Mr. Wilson explained, if you put a 9-millimeter round into a 5.56 NATO caliber AR-15 rifle and fired it, the firearm could explode. Ex. A, Wilson Dep. 39:12–25. So, interchangeability is limited.

Mr. Wilson's declaration also exaggerates the extent of the interchangeability of handgun and long gun magazines. Some of the magazines he claimed were "interchangeable" between a handgun and a rifle in fact require physical modification to achieve this result. In his June 27, 2023 Declaration (ECF 117-1, "Wilson June Decl.") filed on reply, Mr. Wilson testified that the

8

Springfield Armory XD uses magazines that are "largely interchangeable with the Beretta M-92 series, except that one needs to cut a single notch in the XD magazines to make them work in the M-92, or a single notch in an M-92 Beretta magazine to make them work in an XD." *Id*. ¶ 6(d). But at his deposition, Mr. Wilson elaborated that to make the required notch, he would need to use a Bridgeport mill (with the appropriate end mill) and a vise to hold the firearms in place. Ex. A, Wilson Dep. 78:10–79:21. There might be other ways to do it, he testified, but regardless, he admitted that one would have to "physically modify" the magazine to make it interchangeable. *Id*. at 80:1–3.

As it happens, the Springfield Armory XD series and the Beretta M-92 are both handguns, and thus subject to the same magazine capacity limitations under PICA. But some of Mr. Wilson's other examples of "interchangeable" magazines similarly require physical modification to make interchangeability possible. To make a Kel-Tec SUB2000 Gen2 rifle accept a CZ 75 or CZ Shadow handgun magazine, a user would have to physically modify the rifle using a "mag catch kit." *Id*. at 64:23–65:1. October 9, 2023 Second Supplemental Declaration of James Yurgealitis ("Yurgealitis 2d Supp. Decl.") ¶ 7.

The need for physical modification means that when one of these magazines is bought or sold, it is actually *not* interchangeable between a handgun and a rifle. Thus, at the time of sale and purchase, the capacity limitations of PICA apply straightforwardly and without confusion.

In addition, in his June declaration, Mr. Wilson listed several so-called "interchangeable" magazines that are actually only interchangeable in weapons that are no longer produced or imported for the current U.S. market. Despite personally never having interchanged magazines between a Ruger P85 or P89 (both handguns) and a Ruger PC9 (a rifle), *id*. at 78:3–9, Mr. Wilson declared that the P85 and P89 "use the same magazine as the Ruger PC9 rifle." ECF 117-1, Wilson

9

June Decl. ¶ 6(c). This is an overstatement—at most, P89 magazines are interchangeable with PC9 rifles manufactured before 2004. Yurgealitis 2d Supp. Decl. ¶ 16. Moreover, despite offering his opinion on the firearm, Mr. Wilson was unaware that the Ruger PC9 has been out of production since 2006. Ex. A, Wilson Dep. 75:1–4; Yurgealitis 2d Supp. Decl. ¶ 17. Finally, Mr. Wilson does not own a Ruger PC9 and has no intent to purchase one, nor did he have such intent prior to PICA becoming law. Ex. A, Wilson Dep. 75:5–16.

The Tanfoglio TZ-75, the AR-24 pistol, the Smith & Wesson 5900 series pistol, the Marlin Camp rifle in 9-millimeter—all firearms that Mr. Wilson cites as examples of magazine interchangeability—are all out of production or no longer sold in the United States. *See* Ex. A, Wilson Dep. 65:16–23 (Tanfoglio CZ-75); 66:15–21 (AR-24 pistol); 67:1–19 (S&W 5900 series and Marlin Camp Rifle). *See also* Yurgealitis 2d Supp. Decl. ¶¶ 12 (Tanfoglio TZ 75, AR-24), 14 (Marlin Camp Rifle out of production since 1999).

Even if Wilson were not exaggerating the extent of interchangeability, it would not matter. Buyers and sellers can still understand how PICA applies. For example, Mr. Pulaski knows that the H&K SP5 has a rifle version—the Heckler & Koch 94—which uses the same magazine as the SP5. Pulaski Dep. 147:1–4. Nonetheless, he knows that he cannot sell the 15-round magazine for use in the H&K 94 rifle—a buyer would have to own the SP5 handgun to legally purchase the 15-round magazine. Pulaski Dep. 147:5–13.

Mr. Pulaski's knowledge highlights a key feature of PICA—the statute criminalizes knowing conduct, not physical items. *Cf.* ECF 118 at 4 ("On the issue on magazine vagueness rests with just that [*sic*], the magazines.") Specifically, PICA prohibits the knowing sale (or purchase, etc.) of a magazine that exceeds the capacity allowed for the firearm for which the magazine is

10

purchased. *See* 720 ILCS 5/24-1.10(a)–(b). The statute's *mens rea* requirement makes the *Langley* plaintiffs' arguments about the physical properties of a magazine viewed in isolation irrelevant.

## II. Plaintiffs' declarants make clear that PICA's definition of assault weapons is not unconstitutionally vague.

The *Langley* plaintiffs seek to invalidate PICA in its entirety because the statute uses "AR types" and "AK types" to categorize specifically named models of firearms, and they disagree with that categorization for a handful of the listed firearms. 720 ILCS 5/24-1.9(a)(1)(J), (K); ECF 111 at 13–20. The *Langley* plaintiffs also feign uncertainty about whether certain firearms not explicitly identified in the statutory list might be construed—or, in their view, misconstrued—as "AR types" or "AK types" by law enforcement. *Id*. The deposition testimony from plaintiffs' declarants confirms that their confusion is contrived, and that PICA's definition of "assault weapon"—read in its entirety, as it must be—has a "core of understandable meaning." *Trs. of Ind. Univ.*, 918 F.3d at 540.

As an initial matter, the *Langley* plaintiffs' argument misconstrues the relevant legal question in this facial challenge: the issue is not whether a specific firearm should or should not be categorized as an "AR type" or "AK type"; it is whether the definition of "assault weapon" as a whole has a core of understandable meaning. *Id.* For example, the fact that plaintiffs disagree about whether the Armalite M-15 .22 LR is an "AR type" is irrelevant given that plaintiffs' declarant, Mr. Pulaski, acknowledges it has characteristics that bring it within PICA's characteristics-based definition of "assault weapon." Ex. B, Pulaski Dep. 70:17–71:4; 71:24–72:3; *see* 720 ILCS 5/24-1.9(a)(1)(A). In other words, it is legally irrelevant whether the particular firearms plaintiffs take issue with should have been listed somewhere other than under "AK type" or "AR type" in PICA; they are "assault weapon[s]" because they possess the characteristics laid out in 720 ILCS 5/24-1.9(a)(1)(A).

11

But even if the *Langley* plaintiffs' quibbling with where certain firearms are listed in PICA were not an irrelevant side-show (which it is), Plaintiffs' own declarants admitted in depositions that they generally understand the term "AR types". Both declarants used the AR-15 as their reference point for what an "AR type" firearm is. Ex. A, Wilson Dep. 26:20–22; Ex. B, Pulaski Dep. 47:8–48:10. Throughout his deposition, Mr. Wilson repeatedly gave testimony indicating that he understood what "AR type," "AR style," or just "AR" meant in reference to firearms. *See, e.g.*, Ex. A, Wilson Dep. 26:20–22 ("Q: So when I say AR-type, your first thought is AR-15? A: Yeah. Back to the original platform, yes."); 86:6–16; 89:1–15; 89:25–90:8; 91:18–19; 92:3–7; 92:17–24; 93:6–10; 110:24–111:7. In fact, he used the term "AR" himself during the deposition. *See, e.g.*, Wilson Dep. 117:8–18.

Mr. Pulaski also was able to readily understand the term "AR type" and even to define it: "An AR-type would be a firearm with typically a 16 or 20-inch barrel, adjustable or fixed stop, pistol grip, detachable magazine, and using a – a direct impingement gas system, rotary-operated bolt." Ex. B, Pulaski Dep. 47:10–13. He explained that these particular features are "[B]ased on the designs that [Eugene] Stoner produced [for the AR-15]." *Id.* at 48:6–10. An AR-10, he explained, would be similar to an AR type rifle, though the "AR-10 was typically a machine gun designed for the military." *Id.* at 48:11–15. Moreover, he understood an AR pistol to be an AR-15 that complies with the federal definition of a handgun. *Id.* at 48:20–22. Mr. Pulaski also readily understood the term "AR" or "AR type" in multiple contexts. *See, e.g., id.* at 53:16–55:21; 62:6–19; 83:24–84:1. Mr. Pulaski himself used the term "AR" in his deposition. *See, e.g., id.* at 60:19–24. He even uses "AR" on his company's website to refer to weapons that customers can modify or accessorize in what he refers to, in shorthand, as the "AR Build Room." *Id.* at 51:5–23; 52:1–

12

16. His customers generally do not use the AR Build Room to work on AR-7s or AR-5s. *Id*. at 52:25–53:4.

Moreover, while Mr. Wilson claimed in his June Declaration that he could not discern whether an AR-7 or an AR-5 were "AR type" rifles within the meaning of PICA (ECF 118-1, Wilson June Decl. ¶¶ 15, 18), he acknowledged in his deposition that the only reason he has any confusion is because of the letters "AR" in the names of those firearms. Ex. A, Wilson Dep. 96:15–18; 99:7–100:10. In fact, he agrees that an AR-7 "looks to be" a very different rifle from an AR-15. *Id*. 98:14–17. Likewise, he understands that an AR-5 is not restricted under PICA because, as a bolt-action firearm, it is excluded from the definition of "assault weapon." *Id*. 100:7–10; 100:17–101:11.[3] *See also* 720 ILCS 5/24-1.9(2)(c) (excluding bolt- and pump-action firearms from definition of "assault weapon"). Further, Mr. Wilson does not own an AR-5 and has no intent to purchase one. *Id*. at 98:25–99:6.

With regard to PICA's list of 43 models of "AR type[]" rifles, *see* 720 ILCS 5/24-1.9(a)(1)(J)(ii), Mr. Pulaski testified the State has compiled a large, but not necessarily complete, list of AR style rifle models. Ex. B, Pulaski Dep. 64:5–9. When asked to review that list, Mr. Pulaski agreed that 37 of the firearms were AR types in his view, and only 6 were not. *Id*. 67:6–68:24. Mr. Wilson identified only two from PICA's list that were not, in his view, AR type weapons. Ex. A, Wilson Dep. 110:1–21; 110:22–111:3. The only grounds he could articulate for excluding those two firearms from the AR type category was that they were made of a different

---

[3] The same is true, as Mr. Wilson acknowledged, of the two rifles pictured at Paragraphs 19 and 20 of his June Declaration that he claimed to be confused about. ECF 118-1, Wilson June Decl. ¶¶ 19–21. One of these is bolt action and one is pump action, thus explicitly excluded from PICA's definition of "assault weapon." *See* Ex. A, Wilson Dep. 101:16–102:18; 104:05–114; 106:10–25. *See also* 720 ILCS 5/24-1.9(2)(C).

13

material (polyethylene) and one of them did not use 7.62 caliber ammunition. *Id*.113:23–114:24 (ArmaLite M-15 .22 LR carbine); 114:25–115:10 (Smith & Wesson M&P 15 rifles).

But as Mr. Pulaski acknowledged, the ArmaLite M15 .22LR meets PICA's definition of "assault weapons" based on its characteristics. Ex. B, Pulaski Dep. 70:17–72:3. Other firearms that Mr. Pulaski singled out as not being AR-types were also clearly restricted: the AR-70, an automatic weapon issued to the Italian military, was already prohibited under federal law and meets PICA's features test (*id.* 74:21–76:2), and the LAR-47 (which he nonetheless characterized as "a derivative of the AR-15" (*id*. at 76:17–19)) meets PICA's features test, *id*. at 78:7–79:16.

Plaintiffs' declarants similarly understand what an "AK type" firearm is. When asked to review PICA's list of "AK type" rifles and identify any that he did not consider to be AK types, Mr. Wilson identified just one—the SKS with a detachable magazine. Ex. A, Wilson Dep. 125:9–19. Mr Pulaski likewise agreed that all of the firearms on the AK type list except the SKS were at least derivatives, variants, or copies of the AK-47. Ex. B, Pulaski Dep. 90:4–91:16; 92:9–11; 93:5–10; 93:15–25; 94:1–95:3; 95:8–11; 99:4–9 (discussing the ISP list). And both Mr. Wilson and Mr. Pulaski agreed that the SKS, though perhaps not, in their view, an AK-type firearm, shares caliber and country of origin with an AK-47. Ex. A, Wilson Dep. 127:22–25; Ex. B, Pulaski Dep. 96:10–17. Mr. Pulaski elaborated that the SKS was designed contemporaneously with and as a competitor to the AK-47. Ex. B, Pulaski Dep. 85:8–86:4.

Mr. Pulaksi also freely used the term "AK" throughout his deposition, and clearly has an understanding that there is a "family" of AK weapons. *Id.* at 88:15–17. *See also id*. 98:5–8; 99:19–23; 105:17–106:2; 163:3–8.

The deposition testimony from plaintiffs' own declarants dooms their argument that PICA is unconstitutionally vague because it refers to "AR types" and "AK types". The question is not

whether PICA gives adequate notice of what an "AR type" or "AK type" firearm is; it is whether PICA gives adequate notice of what an "assault weapon" is. Even where the *Langley* plaintiffs dispute the General Assembly's inclusion of a certain firearm as an "AR type," as with the ArmaLite M-15 .22 LR, their dispute is immaterial when that same firearm meets PICA's other, characteristics-based definition of an "assault weapon." But even considering the *Langley* plaintiffs' critique of the "AR type" and "AK type" list on their terms, their declarants affirm that "AR type" and "AK type" both have a "core of understandable meaning." *Trs. of Ind. Univ.*, 918 F.3d at 540. That "core of understandable meaning" is what allowed Mr. Pulaski to conclude that 37 of the 43 firearms listed under "AR type"—86% of the list—were properly included in that category. That "core of understandable meaning" is also why Mr. Wilson and Mr. Pulaski could only find one firearm—the SKS with detachable magazines—from PICA's list of twenty-seven "AK type" rifles to dispute. Indeed, it appears to be undisputed that "AR type" includes at least AR-15-style firearms, and that "AK type" includes at least AK-47-style firearms. While plaintiffs have attempted to conjure up esoteric line-drawing issues for specific firearms at the margins of what could be considered an "AR type" or an "AK type," the law in the Seventh Circuit is clear: "Some uncertainty at the margins does not condemn a statute." *Trs. of Ind. Univ.*, 918 F.3d at 540. PICA's definition of "assault weapon" is not unconstitutionally vague. The PMSJ should be denied.

## CONCLUSION

Director Kelly respectfully requests that the Court grant his motion to supplement his response to the *Langley* plaintiffs' PMSJ with the deposition transcripts and exhibits attached as Group Exhibits A and B, and the supplemental declaration attached as Exhibit C. Director Kelly likewise requests that the Court deny the *Langley* plaintiffs' PMSJ for the reasons stated in his response and in this motion to supplement the record.

Respectfully submitted,

/s/ Christopher G. Wells
Christopher G. Wells, No. 6304265
Kathryn Hunt Muse
Gretchen Helfrich
Rebekah Newman
Office of the Attorney General
100 W. Randolph Street
Chicago, IL 60601
(312) 814-3000
Christopher.Wells@ilag.gov

*Counsel for ISP Director Kelly*