```
 1                    IN THE UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF ILLINOIS
 2

 3   CALEB BARNETT, et al,        )
                                  )
 4              Plaintiffs,       )
                                  )
 5   v.                           )  No. 23-CV-00209
                                  )  East St. Louis, Illinois
 6   KWAME RAOUL, et al,          )
                                  )  MOTION HEARING
 7              Defendants.       )

 8

 9
                         TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE STEPHEN P. MCGLYNN

11                         OCTOBER 11, 2023

12
     APPEARANCES:
13
     FOR THE PLAINTIFFS:   MR. THOMAS G. MAAG
14

15   FOR THE DEFENDANTS:   MR. CHRISTOPHER G. WELLS
                           MS. LAURA K. BAURISTA
16
     ALSO PRESENT:         MR. THOMAS YRURSA
17                         MR. KEITH HILL
                           MS. KATHERINE ASFOUR
18                         MR. DAVID SIEGLE

19

20

21                    Erikia Schuster, RPR
                         IL CSR #084-00
22                      750 Missouri Avenue
                     East St. Louis, IL  62201
23                        618-482-9226
                   Erikia_Schuster@ilsd.uscourts.gov
24
         Proceedings recorded by mechanical stenography; transcript
25            produced by computer-aided transcription.
```

1          COURTROOM DEPUTY:  The Court calls case number

2    23-CV-209, Caleb Barnett, et al vs. Kwame Raoul, et al.  The

3    case is called for a motion hearing.  Will the parties please

4    identify themselves for the record?

5          MR. WELLS:  Your Honor, I'm Christopher Wells for the

6    Defendant Brendan Kelly in the Langley case.

7          THE COURT:  Good afternoon.

8          MS. BAUTISTA:  Good afternoon, Judge.  Laura Bautista

9    for the Defendants in the Langley case.

10          MR. MAAG:  Thomas Maag for the Langley plaintiffs,

11    along with Matthew Wilson, one of my clients.

12          THE COURT:  Any other lawyers here for the other

13    Defendants that want to identify themselves?

14          MR. YRURSA:  Tom Yrursa here for the St. Clair County

15    Defendants in the Harrel case, Your Honor.

16          MR. HILL:  Keith Hill, Your Honor, on behalf of Cole

17    Shaner in the Langley case.

18          MS. ASFOUR:  Good afternoon, Your Honor.  Katherine

19    Asfour on behalf of the Randolph County Defendants in the

20    Harrel case.

21          MR. SIEGLE:  Good afternoon, Your Honor.  David

22    Siegle, S-I-E-G-L-E on behalf of the Plaintiffs in the Harrel

23    case, 23-141.

24          THE COURT:  Good afternoon.  Anyone else?  All right.

25    We are set for hearing this afternoon on the Motion for

1   Summary Judgement.  The specific issue is the assertion that

2   the statute in question is unconstitutionally vague and is

3   therefore void.  There's a lot of moving parts to this case.

4   It's a part of a number of cases that have been consolidated

5   under the heading of Caleb Barnett, et al vs. Kwame Raoul, et

6   al, but today principally it's the issue of whether or not

7   this statute fails because it is vague.

8           Yesterday, the Government filed a rather lengthy

9   pleading.  I got it late yesterday afternoon.  You had a

10  pleading, but you also had hundreds of pages of attachments,

11  principally deposition transcripts.  The -- does the Plaintiff

12  wish to have time to respond to that pleading?

13          MR. MAAG:  If I can have seven days.

14          THE COURT:  Okay.  The Court will grant you seven

15  days to respond to that pleading.

16          All right.  Normally, in a case where the question

17  involves the constitutionality of a statute and a challenge to

18  it specifically claiming that it's unduly vague and therefore

19  could not be enforced, that's generally a question of law.

20  The parties, all though, have taken depositions and have

21  submitted some deposition transcripts.  Does the Plaintiff

22  anticipate offering any further evidence or testimony into

23  this record in support of the motion?

24          MR. MAAG:  Highly unlikely.

25          THE COURT:  Okay.  Would you say that it's totally

1   unlikely that you're going to do it today?  You don't have a

2   witness here?

3          MR. MAAG:  I don't have a witness here today.

4          THE COURT:  All right.  Does the Government intend to

5   call any witnesses or offer any further evidence for the

6   record in support of its position?

7          MR. WELLS:  Your Honor, as we've previously

8   indicated, we sought a discovery schedule and to follow the

9   kind of ordinary course of discovery.  The Court has allowed

10  us two depositions.  We are prepared to proceed with the

11  argument today.  Obviously, Mr. Maag has identified various

12  factual assertions.  To the extent that those weren't

13  previously identified in his Motion for Summary Judgement, we

14  would like to contest those, but we are prepared to proceed

15  with argument today.

16         THE COURT:  All right.  The Court recognizes that

17  this case involves the challenge to the exercise of a

18  constitutional right.  That is a statute that may in fact

19  criminalize the exercise of constitutional right in that my

20  schedule is really set by the schedule set out in the statute.

21  The statute has timeframes in which it became effective.  It

22  has a timeframe by which citizens have to comply with certain

23  reporting requirements.  And that reporting program is now in

24  effect, and I need to make sure that we address this, the

25  parties get at least some sense about the issues raised as to

1    the constitutionality of the statute before prosecution of the

2    violations of the statute begin in earnest.

3          Mr. Maag, it's your motion.  Please proceed.

4          MR. MAAG:  Thank you.  Do you wish me to speak from

5    the table or the podium, Your Honor?

6          THE COURT:  As long as I can hear you and understand

7    you, you can speak from wherever.  You can pace back and

8    forth.  You can wave your arms.  You can sit there or you can

9    even brush your beard to try to look prophecorial (sic),

10   whatever you want to do.  As long as we can hear you clearly,

11   I'm good with that.

12         MR. MAAG:  Perfect.  Thank you.  May it please the

13   Court, Counsel.  As the Court noted, we're here on the Langley

14   Plaintiffs' Motion for Summary Judgement as to constitutional

15   vagueness.  The motion raises several issues, but two primary

16   issues.  The first deals with magazines, ammunition feeding

17   devices.  The second deals with the list of firearms and

18   copies, duplicates of firearms, each is addressed in a

19   separate count.  Magazines are addressed in Count 4.  The

20   firearms issue is addressed in Count 6.

21         Addressing the magazine issue first, i.e. ammunition

22   feeding devices, the statute criminalizes possession, and I'll

23   just refer to all ammunition feeding devices as magazines for

24   simplicity, but there's a variety of them with various

25   technical differences.  But for ease of argument, I'll just

1   refer to them all as magazines generically.

2          Magazines for rifles and shotguns are limited to ten

3   rounds under the statute.  Magazines for handguns, i.e.

4   pistols, are limited to 15 rounds under the statute.  There is

5   no obvious restriction on magazine capacity for firearms that

6   are neither rifles, pistols nor shotguns.

7          THE COURT:  And what sort of guns would those be?

8          MR. MAAG:  Well, as is described in the Motion for

9   Summary Judgement, and there are examples given, for instance

10  on page five there is the Remington Tac-14 DM.  DM for

11  detachable magazine.  It is neither a rifle, a pistol or a

12  shotgun.  The Federal ATF classifies the firearm as a, quote,

13  other.  I'm not sure that the State of Illinois classifies it

14  as anything.

15         THE COURT:  Is that gun covered by this ban or is it

16  unclear?

17         MR. MAAG:  It is unclear to me that the gun is

18  covered by the ban.  I would say it's probably not because the

19  gun itself is a pump action, but it's not clear to me because

20  of the way the ban is written.  It is rather vague.  But I

21  will assume for the purposes of argument today that the

22  Remington Tac-14 DM itself is not covered by the ban.

23         The magazine used the Remington Tac-14 DM is the

24  identical magazine used in the Remington 870 DM shotgun.  So

25  it is unclear whether the ten round restriction for shotgun

1    magazines applies to the magazine in the 870 Tac-14 DM.

2              But more substantive, I think, is that even if we

3    exclude what the federal Government, the ATF classifies as

4    other guns, as is noted on page 9 with photographic examples

5    of the summary judgement motion, the Beretta 92 pistol, which

6    the US military used for years as the M9 pistol, uses the

7    exact same magazine as the Beretta CX4 Storm rifle.  The

8    magazines aren't just interchangeable, they're the same

9    magazine.  You can take the magazine out of one and put it in

10   the other.  The standard magazine for a Beretta 92 or M9

11   pistol is 15 rounds.  The magazine was probably originally

12   designed for the pistol so the question becomes if a person

13   finds a Beretta 15 round magazine, is that a rifle magazine or

14   a pistol magazine?  Is it subject to the regulations of a

15   rifle restriction of ten rounds or the pistol restriction of

16   15 rounds?  Does it matter whether the person owns both a

17   rifle and a pistol?  There is no objectively identifiable way

18   to determine simply by looking at the magazine whether or not

19   it is a rifle or pistol magazine under the statute as the

20   statute doesn't clarify and they are, in fact,

21   interchangeable.

22             But as noted in the motion, the Beretta 92 magazine

23   or M9 magazine is not unique in this fashion.  If it was,

24   maybe the State could simply say, well, that's just as applied

25   to that particular strange set of firearms.

1            But if you look at the Ruger brand, Ruger, the record

2    shows, makes a 5.7 millimeter pistol and a 5.7 millimeter

3    carbine, both of which use the same magazine.  The record

4    indicates the magazine originally designed for Glock pistols

5    are ambiguous in nine-millimeter carbines used in the Kel Tec

6    Sub 2000, used in numerous pistol nine-millimeter and other

7    pistol caliber carbines.  Are they restricted to 15 rounds or

8    ten rounds or does it matter if one of the firearms assembled

9    is something other than a rifle or a pistol?

10            Even what is referred to as STANAG magazines or M16

11   or quote/unquote AR-15 magazines have the same problem.  There

12   are both rifle and pistol -- rifles and pistols that use that

13   same magazine.  The same is true for US M1 carbine magazines.

14   Is a 15 round USM1 carbine magazine, the original standard of

15   the USM1 carbine of World War II, of which there are both a

16   pistol version currently manufactured by Inland Manufacturing

17   and previously made by Iver Johnson, and the original rifle

18   version made by a variety of defense contractors during World

19   War II and currently made by Inland Manufacturing.

20            THE COURT:  Can you spell that for the court

21   reporter?

22            MR. MAAG:  I-N-L-A-N-D.

23            THE COURT:  I was mishearing you and I thought maybe

24   she would too.  Let me just stop you there.  Isn't it very

25   simple to say, well, you can use your 15 round magazine in

1  your Beretta pistol, but you can't eject it and throw it into

2  your Beretta rifle?

3        MR. MAAG:  The statute does not say that.  The

4  statute does not criminalize the use of a 15 or even a 30

5  round magazine in a rifle.  In fact, the statute grandfathers

6  existing possession of magazines already possessed over 10 or

7  15 rounds and there is no restriction on their use just so

8  that you're on your own property or a shooting range or the

9  like.  If the State had intended, they could have said you may

10 not use an over 10 round magazine in a rifle or you could not

11 use an over 15 round magazine in a pistol, but that's not the

12 statute they wrote, and the State is stuck with the statute it

13 wrote.  I hope that answers your question, Your Honor.

14        As noted in the Summary Judgment Motion, it's the

15 possession of the magazine or the transfer of the magazine,

16 not the use that is prohibited.  Examples as indicated in the

17 record right here are include Glock 1911, CZ75 magazines,

18 AR-15 type magazines, AK-47 type magazines, a whole host of

19 magazines.  In fact, if you look at what the State just filed

20 yesterday in their assault weapon identification guide, which

21 was attached to one or both of the deposition transcripts and

22 I think it's fundamentally based on what you ordered the state

23 to produce earlier in this case, there are if you just look at

24 what they filed on page 57, 56, 57, 58, 59, what they call

25 AK-type pistols.  If you look on page 20, 19, 21, 22, 23 and

1  35 have what they call AK-type rifles using the same magazine;

2  the same for AR, what they call AR-type rifles and pistols on

3  page 62, 63, 64, page 29, 30, 31; FAL-type rifles and pistols

4  on page 68 and 45, XP-89 aka HK94 rifle and pistol versions of

5  the MP5, H&K submachine gun on page 69 and page 47 of their

6  filing, the same magazine.

7       The Ruger 1022 magazine, probably the most popular 22

8  rifle in the United States today, millions of them have been

9  sold, probably millions in the State of Illinois alone.  On

10  page 17, they have got a picture of the rifle with the

11  magazine that is the same magazine on page 70 being used in a

12  pistol.

13       Thompson submachine gun-type magazines, clones of the

14  submachine gun, rifles and pistols using the same magazine on

15  page 77, page 51, page 52, page 53.  I could go on, but their

16  own exhibit demonstrates that there is no genuine issue of

17  material fact that the identical magazines fit both rifles and

18  pistols.

19       The record in this case indicates no objective way

20  that a person of ordinary intelligence can discern whether a

21  given magazine is for a rifle or a pistol or in some cases

22  even a shotgun or an other.

23       THE COURT:  Well, doesn't the vagueness standard

24  merely say that it's sufficient if the citizen is provided

25  fair notice as to what conduct is forbidden and what we are to

1    look for is sort of the -- what is the core nature of the

2    statute, so if it says -- if you're going to have a rifle, you

3    can't have a magazine that can be used in that rifle that has

4    more than 15 rounds.  So you may have to pick and choose.  If

5    you want the Beretta pistol, then don't get the Beretta rifle

6    because it would be very easy to take the magazine out of the

7    Beretta pistol and put it in the rifle and that would make it

8    clear that the violation of what the statute is saying is

9    prohibited conduct.

10           MR. MAAG:  I agree the State could have done that,

11   Second Amendment issues aside, but that is not what the State

12   actually did in this case.  In this case, the State banned

13   possession or transfer of the magazine in isolation whether

14   you have a rifle, pistol, shotgun or not.  A consumer need not

15   even own or possess a rifle, pistol or shotgun to be subject

16   to the magazine restrictions of the statute.

17           Could they, i.e. the State, have said it is illegal

18   to put a 15 round magazine into a rifle?  Yes.  Second

19   Amendment issues aside, yes.  But again, that's not what they

20   did.  And it's not up to this Court or any other court to

21   write the statute that the legislature should of or could have

22   written when they didn't write it.

23           So in direct answer to your question, interpreting

24   the statute in a way that is different than the way it is

25   written is not appropriate and the answer is no, the statute

1    doesn't prohibit that.

2        THE COURT:  One of the tests we look at in

3    determining whether -- one of the tests that has been applied

4    in cases challenging the enforceability of a statute on

5    argument that it's vague is whether or not there is a

6    knowledge or knowable or knowing or mens rea or scienter

7    standard in the statute.  Isn't it true that the Seventh

8    Circuit and even the Supreme Court has told us that when you

9    have that aspect and there's a mens rea aspect to the criminal

10   statute, that addresses much of the concerns about whether

11   it's unduly vague or not?  Now, this does have a mens rea or

12   scienter or knowingly do certain things as part of the

13   statute, does it not?

14       MR. MAAG:  The direct answer yes, but there is almost

15   certainly a mens rea that would have to be produced such as in

16   the *US v. Staples* or *Staples v. US* case, I forget which way it

17   goes, which is a US Supreme Court case that deals with knowing

18   possession of machine guns; in that case, a semiautomatic

19   AR-15 rifle that apparently either depending on who you

20   believe which converted or malfunctioned into firing fully

21   automatic.

22       In that case, the Supreme Court said that as firearms

23   are traditionally -- semiautomatic firearms, such as the

24   AR-15, are traditionally held for lawful purposes that you

25   have to prove that the Defendant had knowledge of the physical

1    characteristics that brought it within the ambit of the

2    statute.

3          The mens rea does not go to knowledge of the law,

4    which is irrelevant unless the statute says so, and as far as

5    I can tell the statute doesn't.  So the mens rea would go to

6    whether or not a given magazine could hold ten rounds versus

7    13 rounds versus 15 rounds versus 16 rounds, not is this --

8    and of course, this goes back to the vagueness question, is

9    this a rifle magazine, a pistol magazine or a shotgun magazine

10   of which there's no way to tell.  And this is an area that is

11   protected by a fundamental constitutional right; therefore,

12   that is one of the issues or factors that the Court is to

13   consider in a vagueness challenge.  The established test in a

14   criminal statute -- and this is a criminal statute -- is void

15   for vagueness if persons of ordinary intelligence are unable

16   to ascertain what actions are illegal.

17         In this case, a person of ordinary intelligence

18   cannot ascertain whether a 13 round magazine is legal under a

19   given set of circumstances.  It might be.  It might not be.

20   It all depends on what I guess the police officer thinks when

21   he interacts with the citizen, what the prosecutor thinks when

22   the police officer brings the case to him to determine whether

23   to prosecute, what the trial court judge thinks when he's

24   considering a motion for directed verdict, and ultimately,

25   what the jury thinks, and that is the very definition of a

1   vague statute.  You don't leave it up for that big long list

2   of people to arbitrarily just decide willy-nilly whether or

3   not a statute's prohibitions are triggered, which is what this

4   does here.

5          As I stand here today, I don't have a clue whether a

6   13 round magazine that will fit in either a rifle or a pistol,

7   excluding the grandfathered items, can be possessed in the

8   State of Illinois.  I don't have a clue if I see a magazine

9   laying on the ground that I'm not familiar with whether or not

10  that's a rifle, pistol, shotgun or other magazine or even -- I

11  can potentially figure out how many rounds it holds if I could

12  discern what caliber it is, which that should not be too hard

13  to do, but without knowing the design history, what is being

14  manufactured, what is on the market and even then there's no

15  way to objectively discern whether a given magazine is a

16  rifle, pistol, shotgun or other magazine.

17         The other part of this motion, which is brought under

18  what I'll call for lack of a better term the copycat provision

19  of the statute wherein specific firearms, including copies,

20  duplicates, variance or altered facsimiles with the capability

21  of any such weapon, and there's a long list, are prohibited.

22  That smacks straight into the *Springfield Armory vs. Columbus*

23  case.  I believe that was Sixth Circuit which was cited in the

24  brief moving papers and which I think is completely

25  controlling here.  Just as in *City of Columbus*, this statute

1    prohibits for all AK types, even if I assume the statute

2    doesn't define it in any way, but even if I assume that AK

3    type means A-V-T-O-M-A-T, K-A-L-N-I-K-O-V, Model 1947 rifles

4    or things based on that rifle, I'm not sure exactly what that

5    means.  And the example that I give this is really fascinating

6    and shows just how little the legislature understood about the

7    topic they were legislating on is under the AK-type rifles

8    that are prohibited is SKS with detachable magazine.

9         As the record in this case shows, both the moving

10   papers and if you look at the depositions filed by the State

11   just yesterday or if you look at their own assault weapon

12   identification guide, an SKS isn't even remotely similar to an

13   AK-47.  I could certainly bore the Court with the technical

14   details of why, but they're completely different designs.

15   It's like saying a Ford F-150 is a copy of Daimler Gottliev's

16   original motor car of the late 1800s.  Yeah.  They've both got

17   a gasoline engine and four tires, but that's about where the

18   similarity ends.

19        A person of ordinary intelligence, even if they had

20   some knowledge of firearms, cannot look at this list of AK

21   types with SKS with detachable magazine on the list and have

22   any clue what that means, what is prohibited.  As noted in the

23   *Columbus* case, what if you change the caliber, what if you

24   make it a 0.22, what if you paint it a different color, what

25   if the barrel is little longer and you put a different type of

1    scope on it.

2         The same is true in what is on here, AR types.  As a

3    matter of historical fact, AR in AR-15 refers to the company

4    that originally designed it, Armalite, once upon a time out of

5    Costa Mesa, California, if I remember correctly.  I believe

6    they're located in Illinois today, but there was a whole

7    series of AR model rifles and a couple of AR model pistols.  I

8    think there was even one AR model shotgun if I remember

9    correctly.  Are all of the AR models designed by Armalite or

10   marketed by Armalite prohibited?  The example given in the

11   moving papers is the AR-7, which is a 0.22 caliber rifle that

12   disassembles into its stock.  It is marked AR-7.

13        If a police officer stops a citizen or sees a citizen

14   at a shooting range with an AR-7 and says that's an

15   interesting rifle, can I see it?  Oh, that says AR on it.

16   This ban prohibits all AR types.  You're under arrest.  Is

17   that what the legislature intended?  I don't know.  It says

18   all AR types.  It doesn't say all AR-15 types, but even if it

19   said all AR-15 types, the only gun I've ever seen marked AR-15

20   was sitting in the armory of the University of Mississippi

21   ROTC armory room and it itself was a converted M-16 A1 who was

22   converted to A2 specifications, literally a fully automatic

23   rifle.  I had never seen a semi-automatic rifle marketed as an

24   AR-15.  Maybe they exist.  I don't know.  But that's my

25   personal experience.

```
1            And as you go down the list, much like the SKS listed
2    under AK-type firearms, on the list -- let me find it here --
3    Beretta AR70.  An AR70 is not an Armalite design.  It is not
4    based on an Armalite design.  You can find a nice example of
5    it shown in the State's identification guide in the record.
6    Thank you.
7            It is a stamped sheet metal fully automatic firearm.
8    Certainly there are some semi-automatic plums, copies,
9    whatever words you want to use, floating around there.  I
10   think some of them are even made by Beretta.  But it's
11   certainly not what even a firearms aficionado would call an
12   AR-type firearm.  The only thing it has in connection with an
13   AR-15 is probably the shadow.
14           THE COURT:  Lets get back.  The test for vagueness,
15   we look at the statute and we ask does it have a substantial
16   understandable core and this statute identifies specific what?
17   Many of them.  It explains attachments that handguns can have
18   and may not have.  It explains attachments that rifles that
19   are semi-automatic may have or may not have.  It specifically
20   excludes bolt-action rifles.  It specifically excludes
21   rimfire.
22           MR. MAAG:  No, it does not.  Only in magazines and in
23   that, only in tubular magazines.
24           THE COURT:  But there's a specific exception where it
25   says you can have more than 15 in a magazine for a rifle if it
```

1       is that they're rimfire cartridges up to 25.

2               MR. MAAG:  If it is a tubular magazine like in Marlin

3       Model 60.

4               THE COURT:  So apparently you are able to discern

5       very specifically what this statute says you can't have when

6       it comes to rimfire ammunition.  Can't you go through this and

7       say, all right, this is -- the ordinary person go through it

8       and say, all right, I'm not a firearms expert, but I

9       understand what a handgun is.  It's one I hold in my hand and

10      fire.  I understand what a rifle is or a shotgun because

11      they're more shoulder mounted weapons.  I understand they are

12      variations, but isn't there an understandable core as to what

13      they're trying to regulate in this?

14              MR. MAAG:  Let's look at page 28 of their assault

15      weapon identification guide that should have been filed

16      yesterday as I understand it.

17              THE COURT:  Well, let me just stop you.  You can give

18      me one example or you can give me five examples of specific

19      things that might be questionable, but when you read the

20      statute in its entirety, isn't there a substantial

21      understandable core that this is infringing upon or I should

22      say it is restricting what firearms and what attachments both

23      in terms of handguns and shoulder held firearms that you can

24      have and that you cannot have.

25              MR. MAAG:  There are two different sections of the

1    statute as it relates to firearms, excluding different

2    classifications, i.e. rifles, pistols, shotguns.  You have

3    what I'll call the features test and then you have the

4    delineated list, including copies, duplicates, variance, et

5    cetera.  Our motion is not based on the features test.  I

6    agree a person of ordinary intelligence can look at a firearm

7    with a threaded barrel or a flash suppressor or a folded stock

8    and say, yes, that has a flash suppressor or possibly a

9    threaded barrel depending on whether they mean a threaded

10   muzzle or a threaded breech, but that is a different issue, or

11   whether it has a folding stock or whether it has a pistol grip

12   that protrudes conspicuously beneath the action of the firearm

13   to quote a different statute, not this statute.

14          That is a different question than what is challenged

15   here.  What is challenged here is let's assume that you took

16   an AR-15, an original AR-15, and said I want to sell as close

17   a copy of that as I possibly can in the State of Illinois and

18   not violate the statute.  Well, let's start by chopping the

19   threaded barrel and the flash suppressor off, and then let's

20   take the pistol grip off and put a straight line stock on it.

21   And then while we're at it, let's make it a fixed magazine so

22   it's not even a detachable magazine, and as the coup de grace,

23   as it were, let's change the caliber to something obscure that

24   nobody has used in years.  It's obsolete so they can't say it

25   has anything whatsoever to do with an AR-15.  How far do they

1   actually have to go before a given firearm is no longer an

2   AR-type firearm?

3           And the same thing goes for an AK.  An M1 Garand uses

4   the identical gas and bolt system as the AK designed by

5   Kalashnikov.  In Kalashnikov's original prototypes he started

6   off ripping off the Rams M1, and it just kind of morphed into

7   what it ultimately became.  As noted by the State's own

8   firearm identification guide, they have Armalite M15 0.22

9   caliber carbine on page 28 which is I believe listed in the

10  actual statute.  That firearm has no gas system.  It's a

11  direct blow back 22.  It uses a different magazine.  The grip

12  might be interchangeable with the original AR-15, but I doubt

13  many of the other parts are.  It is designed to look like an

14  original early '60s, late '50s, AR-15 rifle by Armalite, but

15  that doesn't mean it is.

16          If you take off the flash suppresser, you cut the

17  barrel off at the ends so there's no threads on the end of it.

18  You take off the pistol grip, well, then it doesn't fail the

19  features test in the statute.  The question is, is it still

20  prohibited as a copy, duplicate, variant or altered facsimile

21  with the capability of any such weapon.  And as noted in

22  *Springfield Armory* there's no objective test.  There's no way

23  that a person of ordinary intelligence, even if they're

24  familiar with firearms, can discern that.  It's a different

25  question whether or not it fails the features test or the

1    duplicates test.

2            THE COURT:  You had mentioned earlier grandfathering

3    in certain weapons.  There's a registry required by the

4    statute, is there not?

5            MR. MAAG:  Yes.  All grandfathered firearms, as I

6    understand it, are required to be registered.

7            THE COURT:  Does the Federal Firearm Owner Protection

8    Act prohibit states from creating or mandating gun registry?

9            MR. MAAG:  There is language in the statute that does

10   prohibit that.  Exactly how that is to be interpreted

11   vis-a-vis this case I haven't done the research on, but I'm

12   aware of what you're talking about.  That's obviously not

13   before the Court today.  I believe that the federal statute

14   just offhand maybe restricted to using federal money to create

15   such a registry, but again, that's not before the Court today.

16           The registry also requires registration of as near as

17   I can tell rifle stocks, 50 caliber ammunition, 50B and G

18   ammunition, specifically, and a whole host of items that I

19   don't think that the people of the State of Illinois really

20   realize is subject to registration under this act.  The way

21   that the statute is written, the spring in this pen may well

22   be considered an AR-15 part because this spring is nearly

23   identical to the spring -- if not completely identical -- to

24   the spring that holds the detent pin on a buffer on an AR-15.

25   That spring may technically be subject to registration, but

 1   that's a different issue than the subject motion here today.

 2            THE COURT:  All right.  Any further argument?

 3            MR. MAAG:  Not at this time.  Thank you.

 4            THE COURT:  All right.  We've gone 45 minutes.  I'm

 5   going to give my court reporter a break.  We'll take a

 6   five-minute recess, and we'll come back and we'll hear from

 7   the Government.

 8            (Recess taken.)

 9            THE COURT:  We are back on the record.  Mr. Wells,

10   please proceed.

11            MR. WELLS:  Thank you, Your Honor.  The Langley

12   Plaintiffs' motion should be denied for two clear-cut reasons.

13   First, the statutory terms at issue have a core of

14   understandable meaning and the Seventh Circuit has said a core

15   of meaning is enough to reject the vagueness challenge to a

16   criminal statute.

17            Second, the statute has a knowing mens rea

18   requirement that completely forecloses this vagueness

19   challenge.  These obstacles are particularly insurmountable

20   because the Plaintiffs are bringing a facial challenge.

21   Because this is a facial challenge, Plaintiffs needed to show

22   that no set of circumstances exist under which the law would

23   be valid.  They have not come close to meeting this

24   extraordinarily high burden.

25            Plaintiffs' motion gets the standard for a facial

1   challenge based on unconstitutional vagueness exactly

2   backwards.  Instead of focusing on whether the statute has a

3   core of understandable meaning, as the Seventh Circuit

4   requires, Plaintiffs focus on the periphery.  Plaintiffs, as

5   we heard, have identified two narrow ways in which they claim

6   the statute is unconstitutionally vague.

7         Their entire focus in their first vagueness claim is

8   on a subset of magazines in the 11 to 15 round range that can

9   potentially be used in rifles as well as handguns.  Their

10  entire focus in their second vagueness claim is on a handful

11  of firearms that they claim are on the edge of what counts as

12  an AR type or AK type.  Both of these challenges the periphery

13  of its statute's meaning, not its core.  According to the

14  Seventh Circuit, arguments about peripheral ambiguities are

15  not sufficient for a facial challenge based on alleged

16  unconstitutional basis.

17        I'm quoting directly from the *Trustees of Indiana*

18  *University* case, which we cite throughout our brief, quote, a

19  core of meaning is enough to reject a vagueness challenge

20  leaving to future adjudication the inevitable questions of the

21  statutory margin.

22        At the absolute most, all the Langley Plaintiffs have

23  put forward are speculative questions at the statutory margin.

24  That showing falls short of their burden to show that the

25  challenge statutory terms lack a core of understandable

1  meaning.  Plaintiffs' facial challenge fails for the

2  additional reason that the statute has a knowing mens rea

3  requirement.  For anyone to be convicted under the statute,

4  they would have to knowingly sell, purchase or possess a

5  prohibited assault weapon or magazine.

6      The Supreme Court has repeatedly rejected void for

7  vagueness challenges from multiple criminal statutes, from

8  highly controversial contexts where the statute has a

9  knowledge scienter requirement.

10      *Gonzales vs. Carhart*, 2007 case, upholding a partial

11 birth abortion ban.  The Supreme Court said there, quote, the

12 Court has made clear that scienter requirements alleviate

13 vagueness concerns.

14      *Holder vs. Humanitarian Law Project*, 2010 Supreme

15 Court case, upholding a statute prohibiting, quote, material

16 support for terrorist organizations.  There, the Supreme Court

17 said, quote, the knowledge requirement of the statute further

18 reduces any potential for vagueness as we have held with

19 respect to other statutes containing a similar requirement.

20      *Hill vs. Colorado*, 2000 Supreme Court case, rejecting

21 a vagueness challenge an eight foot buffer law for people

22 protesting outside of an abortion clinic.  Again, a very

23 controversial context.  The Court said that the vagueness

24 concern alleged by the Plaintiffs was, quote, ameliorated by

25 the fact that the statute contains scienter requirement.

1          The Seventh Circuit for its part has recognized that

2    a knowledge scienter requirement obviates vagueness concerns

3    for so-called multipurpose objects like the 11 to 15 round

4    interchangeable magazines that the Plaintiffs are focused on.

5          The object itself is not intrinsically legal or

6    illegal.  What matters is a person's conduct and intent

7    regarding the object.  As the Seventh Circuit said in the

8    Levus and Levus case, which we cited in our brief, if you're

9    knowingly selling a paperclip as a roach clip, then you're

10   selling drug paraphernalia.  But if you're selling the same

11   paperclip as office supplies, then that sale is perfectly

12   legal.  So the same object can either be sold illegally or

13   sold legally.

14         The intent requirement operates the same way here.

15   Selling an 11 to 15 round magazine knowing it's for a handgun

16   is legal.  Selling an 11 to 15 round magazine knowing it's for

17   a rifle is not.  So even if Plaintiffs edge cases were

18   relevant in this facial challenge, which they're not, the

19   statute's mens rea requirement means that it is not by

20   definition a trap for the innocent, only knowingly violating

21   the statute is punishable.

22         So those are the two principle reasons under the

23   legal standard why this motion fails; the act has a core of

24   understandable meaning and Plaintiffs' peripheral examples by

25   definition are insufficient to invalidate the act.  And

1   second, the act's mens rea requirement forecloses Plaintiffs'
2   facial challenge.  So at its foundation, the motion is
3   fundamentally inconsistent with the legal standard.
4           I now want to address specific flaws that the
5   arguments that the Plaintiffs make regarding magazines and the
6   AR-type and AK-type issue.  Plaintiffs' argument about the
7   interchangeably of some magazines is a textbook example of
8   focusing on the periphery, not the core.  The scope of
9   Plaintiffs' challenge is limited at the outset to 11 to 15
10  round magazines.  There's a whole group of magazines out there
11  that Plaintiffs know have a capacity of 16 or more rounds.
12  They aren't claiming to be confused about whether those
13  magazines are restricted under the act.  So right out of the
14  gate, we're talking about a subset of magazines.
15          Plaintiffs' challenge to the magazine capacity limit
16  is also based on a hypothetical that bears no resemblance to
17  the real world.  I call it their magazine in a vacuum
18  scenario.  Their complaint is not that people in the real
19  world going to a gun store to pick up a magazine for their
20  firearm are uncertain about whether the 15 or 10 round limit
21  applies.  If the magazine is for a handgun, the 15 round limit
22  applies.  If the magazine is for a rifle, the 10 round limit
23  applies.  Plaintiffs' complaint is not about the real world.
24  It's about this hypothetical.
25          If you hand someone a magazine that they've never

1   seen before -- I think Mr. Maag referred earlier to if I saw a

2   magazine on the ground over there, right?  So if you hand

3   someone a magazine that they've never seen before and you

4   provide no additional information about it, then it can be

5   hard to tell whether that particular magazine is for a

6   handgun, a rifle or both.

7           But the question in a vagueness challenge is not

8   whether some object viewed in isolation is or is not, quote,

9   legal in Illinois.  The question is whether the statute gives

10  people notice of what they can and cannot do.  And as with

11  many, many other criminal statutes what you can and cannot do

12  depends on your intent.

13          Out there in the real world, people aren't examining

14  an unknown magazine devoid of context.  They're buying a

15  magazine for a firearm they own knowing whether that firearm

16  is a handgun or a rifle.  They're choosing which magazine to

17  carry with their concealed carry handgun.  In those real world

18  contexts, people can readily understand that purchasing a 15

19  round magazine is legal when the magazine is for a handgun,

20  but not when the magazine is for a rifle.  Plaintiffs'

21  magazine argument is both speculative and peripheral and that

22  type of argument is insufficient for a facial challenge based

23  on vagueness.

24          I'd now like to turn to Plaintiffs' second argument.

25  Plaintiffs' argument about AR types and AK types is also the

textbook example of focusing on the periphery, not the core.
Plaintiffs start off on the wrong foot by asking the wrong
question.  The question is not whether a specific firearm is
or is not properly characterized as an AR type.  The question
is whether a definition of an assault weapon gives a person of
ordinary intelligence fair notice of what the law prohibits.

So once again, right out of the gate, Plaintiffs are
getting the focus of the inquiry wrong.  But even Plaintiffs'
evidence shows that AR type and AK type have a core of
understandable meaning.

There are 43 specifically named rifles listed as AR
types in the statute.  Out of that list of 43, Plaintiffs' own
witnesses have identified a total of six that they think may
not be an AR type.  When even Plaintiffs' own witnesses
acknowledge that 37 examples out of 43, 86 percent of the
list, fall into the AR-type category, that suggests that the
category has a core of understandable meaning.

And of the six examples that Plaintiffs' witnesses
identified that they disagree with the categorization of
whether or not it's an AR type, they haven't indicated that
any of those six would fail the features based test.  So those
six particular firearms that they quibble with on the list
would nonetheless be assault weapons whether they had been
listed as AR types or not because they meet the features based
definition, which as Mr. Maag indicated he's not contesting at

1    this point.

2         So the Plaintiffs in their reply brief and supporting

3    documents in their reply identified certain specific examples

4    that they question whether or not those are AR types.  There

5    were five in particular that I think were pictured in the

6    declaration that was submitted in reply.  Three of the

7    examples were either pump action or bolt action, which as Your

8    Honor acknowledged there's a specific exception in the statute

9    for pump action or bolt action.

10        The AR-7, Plaintiffs in their depositions

11   specifically acknowledged that it's a very different rifle

12   than the AR-15.  The only reason they claim to be confused is

13   because it uses the letters AR.  It doesn't -- the AR-7 does

14   not have in the terms of the statute by their own admission

15   the capability of the listed weapons.  Nor does the picture

16   they have shown of the AR-7, does that particular rifle have

17   the characteristics that would bring it within the

18   characteristics based definition.

19        The fifth picture is not identified by name or model

20   and there's no information about where the picture even comes

21   from.  But again, the focus here is entirely wrong.  It's

22   entirely away from where the Seventh Circuit says the focus

23   should be, which is on the core, does the statute have a core

24   of understandable meaning.  The Plaintiffs' own witnesses

25   demonstrate that it does.

1        As for the AK-type question, Plaintiffs' argument
2   there is even weaker.  Out of the 27 specifically listed
3   AK-type rifles in the statute, Plaintiffs' declarations
4   identified one, the SKS with attachable magazines that they
5   think is a misfit on that list.  So for 26 out of the 27
6   rifles listed under AK-type, 96 percent of the list,
7   Plaintiffs aren't disputing that they're, in fact, AK types.
8   Again, that's a pretty clear indication that there's a core of
9   understandable meaning even if we're just focusing on the
10  subcategory of AK type, not the broader relevant category of
11  assault weapon.

12       As for the SKS itself, Plaintiffs made various
13  comments earlier about the AR-15 particular model that uses
14  0.22 caliber ammunition, well, the SKS shares the same caliber
15  of ammunition as the AK-47.  It was developed in competition
16  with the AK-47 in the same country for the same military
17  around the same time period, so it's not as if the SKS was
18  just plucked out at random.

19       But again, taking issue with one out of 27
20  illustrative examples is not a basis for facially invalidating
21  an entire statute based on alleged vagueness.  Because the
22  definition of assault weapon has a core of understandable
23  meaning that is evident from both the characteristics based
24  definition and the make and model list, Plaintiffs' facial
25  challenge fails.  But even if this Court were to find merit in

1   Plaintiffs' claims, any relief must be limited to the specific

2   terms that Plaintiffs' claims are unconstitutionally vague.

3           This is an 111-page piece of legislation with a

4   severability clause.  Plaintiffs claim in their opening brief

5   that there is no severability clause, but that's wrong.  There

6   is.  Section 97 of Public Act 102 1112.  Given that there's a

7   severability clause, it would be an incredibly sweeping ruling

8   to invalidate the entire legislation based on a handful of

9   terms like AR type and AK type, which is what the Plaintiffs

10  have requested here.

11          It would be particularly inappropriate to grant that

12  relief in a case where Plaintiffs prematurely filed a Motion

13  for Summary Judgement before any discovery had taken place.

14  In a ruling in joining anything other than the specific terms

15  Plaintiffs challenged in their motion would be the type of

16  judicial overreach that the Seventh Circuit has cautioned

17  against in considering facial challenges.

18          So what the Plaintiffs are requesting is truly

19  extraordinary.  They want to facially invalidate a statute

20  because they claim it is unconstitutionally vague.  The legal

21  hill they are attempting to climb could not be higher and they

22  have not done it.  The challenged statutory terms have a core

23  of understandable meaning.  That's all that is required to

24  defeat Plaintiffs' motion.  The challenge statute also has a

25  mens rea requirement that eliminates any basis for facially

1   invalidating the act.

2         THE COURT:  With respect to this act, would you agree

3   that legislature advanced that its desires was to avoid mass

4   shootings like the instance that happened in Highland Park?

5         MR. WELLS:  There's certainly evidence in legislative

6   history that that indicates that was a key factor.

7         THE COURT:  Was one of the purposes of this statute

8   to deprive the rights of citizens to self defense?

9         MR. WELLS:  I do not believe that that was a purpose

10  of the legislature.

11        THE COURT:  All right.  Would you agree that there's

12  some arguments about -- the parties are arguing about whether

13  magazines constitute bearable arms or not, but would you agree

14  that some of these guns that are identified that are being

15  outlawed are arms as defined by the Second Amendment?

16        MR. WELLS:  I think consistent -- first of all, I

17  don't think Plaintiffs have moved on the Second Amendment.  I

18  think they've moved on Fourteen Amendment claims.  As we

19  stated in the prior oral argument, I think we do not agree

20  that what is listed in the statute are arms within the meaning

21  of the Second Amendment subject to protection.

22        THE COURT:  All right.  But you would -- all right.

23  So there's a couple of ways in which the Courts have looked at

24  the issue of vagueness.  In the *Davis* case, the Supreme Court

25  addressed issues of categorical approach versus a case

1    specific approach when addressing whether or not a person's

2    prior conviction was a crime of violence.  Are you familiar

3    with *Davis*?

4            MR. WELLS:  I am.  All though, I don't believe that

5    the Plaintiffs cited it, but I am.

6            THE COURT:  Well, I can do my own research.

7            MR. WELLS:  I understand.

8            THE COURT:  And so in *Davis*, the issue was whether a

9    prior conviction for a crime of violence would go into the

10   calculation of whether or not someone could be considered an

11   armed career criminal; fair enough?

12           MR. WELLS:  That's consistent with my recollection.

13           THE COURT:  All right.  And what the Supreme Court

14   said was, it was troubled that the judges were relying on a

15   categorical approach.  It's saying, well, you were convicted

16   of this particular crime and often in the course of this

17   particular crime violence can be used or is a part of it, the

18   threat of violence or the actual violence.  And the Courts had

19   come up with a -- well, this crime falls into this category

20   and so you, sir or madam, can be charged as an armed career

21   criminal.

22           The Supreme Court said that was vague, and it

23   couldn't be saved by what the lower courts started to do, and

24   that is to do a case specific approach.  And that is to say,

25   all right, I'll look at the actual facts surrounding the crime

```
 1    for which you were convicted and I'll try to determine whether
 2    there was any violence in that.
 3           And the reason the Supreme Court threw that out under
 4    the, quote, vagueness doctrine was because it said that the
 5    purpose of the vagueness doctrine was to avoid arbitrary and
 6    capricious enforcement of the law.  Is that consistent with
 7    your reading of Davis?
 8           MR. WELLS:  It is, which is an as-applied challenge.
 9           THE COURT:  All right.  Now, we actually have
10    litigants, state attorneys, the Sheriffs Association, other
11    people in law enforcement that say in our county we will not
12    enforce this statute.  So what -- and you are referencing real
13    world circumstances, am I not as the Court sitting here
14    looking at a circumstances where we know going into this
15    arbitrarily there are going to be safe havens in certain
16    counties or certain towns in Illinois, and then there's going
17    to be certain counties or certain towns in which there's going
18    to be a very vigorous prosecution of this statute.  Is that
19    fair to say?
20           MR. WELLS:  Your Honor, I think I'm aware that
21    comments like that have been made.  I would suggest that --
22           THE COURT:  It's been filed in pleadings.  This is
23    what they're saying to us, right?
24           MR. WELLS:  I understand, but Your Honor, this is the
25    Plaintiffs have chosen to bring a facial challenge and
```

1  speculation about how the law may be enforced in certain

2  counties or not enforced in other counties is beyond the scope

3  of what is relevant in a facial challenge, respectfully.  And

4  I understand what has been filed and the positions that have

5  been articulated by different members of law enforcement

6  throughout the state, I understand that.

7          THE COURT:  Doesn't *Davis* tell us by the invocation

8  of the vagueness doctrine you can swat down that which you

9  think is going to result in an arbitrary and capricious

10 application of criminal laws?

11         MR. WELLS:  Davis, again, is an as-applied challenge.

12 And part of the challenge with this case is that it's a facial

13 challenge.

14         THE COURT:  Throughout all of it.  We had to redo a

15 lot of those cases.

16         MR. WELLS:  I understand that, and there's a set of

17 three cases that I know that deal with statutes that deal with

18 residual clauses in criminal cases.  I'm familiar and I

19 understand what you're saying, but in most of those

20 circumstances there have been years of courts trying to apply

21 the specific language in those statutes and not settling on a

22 standard and I think the Seventh Circuit specifically noted

23 that distinction.

24         For instance, just in June of this year, June 16,

25 2023, in the *United States vs. Holden*, 70 F 4th 1015 1017,

1    reversing a dismissal of an indictment for lying on ATF Form

2    4473.   Judge Easterbrook, writing for the Seventh Circuit,

3    said, quote, the Supreme Court has told us that with -- that

4    except with respect to a law invalid in every possible

5    application or substantially overbroad with respect to speech,

6    a statute's constitutionality must be assessed as-applied.

7    The Plaintiffs have not brought an as-applied challenge.  They

8    have brought a facial challenge.

9         So will there be questions of statutory

10   interpretation that come up in the future?  Yes.  Potentially.

11   I think the Seventh Circuit recognizes that in the context of

12   a facial versus as-applied challenge, but Plaintiffs have

13   chosen to bring this as a facial challenge and under a facial

14   challenge they have not met the standard.

15        THE COURT:  All right.  Let's talk about the things

16   they did bring up.  One magazine that you can buy with a

17   handgun is legal, but it's interchangeable and can be used on

18   a rifle.  And let's say for purposes of argument an individual

19   has both.  Can that individual be prosecuted?  Under this

20   statute, does that individual violate this statute by having

21   in the same gun safe a magazine and his pistol that can be

22   ejected and put in a rifle?

23        MR. WELLS:  I would say two things to that, Your

24   Honor.  First, the prosecutor would have to show that they

25   knowingly possessed that for use in --

1          THE COURT:  It's in your gun safe.

2          MR. WELLS:  The rifle --

3          THE COURT:  It just says possess.  It's in your gun

4    safe, sir.

5          MR. WELLS:  The other rule that is at play here is

6    the rule of lenity, Your Honor.  In an actual specific

7    prosecution, a defendant may have a good argument that the

8    rule of lenity should apply.  That's the problem with talking

9    about these types of --

10          THE COURT:  No, that's not a problem.  We're faced

11    with the real world situation with a statute where in some

12    municipalities and in some counties there's going to a zealous

13    prosecution of this statute.  In other counties and

14    municipalities there's going to be zero or very little.  If

15    someone possesses a magazine that has a 15 round capacity that

16    can be put in a rifle, they may get a semi-automatic rifle and

17    therefore have it and have a 15 round capacity and he violates

18    that statute, doesn't he or she?

19          MR. WELLS:  Again, Your Honor, there would have to be

20    proof of mens rea.  The other thing I would note, Your Honor,

21    with respect to the example of differential enforcement in

22    different counties, that's already true for many different

23    criminal statutes.

24          THE COURT:  Unfortunately, that's true.

25          MR. WELLS:  That doesn't make out a constitutional

1    violation.

2          THE COURT:  In this statute, they're attempting to

3    criminalize conduct that is specifically referenced in the

4    United States Constitution and which says the right to keep

5    and bear arms shall not be infringed.  This is infringed.

6    It's regulated.  It's taxed in the sense that you're going to

7    have to pay some fees to register these things, and it is

8    criminalized.

9          Even the first violation as a misdemeanor, that's

10   still criminal law.  The second one, as you know, all right,

11   you lose this gun and every other gun you own, all the

12   ammunition and anything else that is a weapon or arm that's

13   gone, and you can't ever have it again.  So this is a pretty

14   daunting approach at addressing the exercise of a Second

15   Amendment right, right?  Unless we want to go preHeller and

16   preBruan and say it's a balancing test.  We get to decide if

17   you have some guns and not others.  We decide what gun you use

18   to defend yourself, you don't.  We decide what we think the

19   threat to you is going to be, not you, and you're

20   criminalizing it.

21         MR. WELLS:  So, Your Honor, I would note that the

22   issue of whether or not the statute actually infringes the

23   Second Amendment is before the Seventh Circuit.  So we're here

24   today on a Fourteenth Amendment vagueness challenge.  I

25   understand the Court's concern about the question of whether

1    or not there may be Second Amendment or Second Amendment

2    adjacent concerns implicated, but I don't think we know and we

3    can't say it here today because the Seventh Circuit hasn't

4    said it yet whether or not it's true that this is, in fact,

5    the statute that infringes the Second Amendment or implicates

6    the Second Amendment.

7            THE COURT:  Well, I anxiously await their decision.

8    But in the meantime, does this statute, does it apply to

9    constructive possession?  If my -- let's say the occupants of

10   a household, one of them owns firearms or attachments that

11   violate this statute.  The other occupant of the household has

12   access to the keys to the gun safe.  I know they're in there.

13   I know it's in there.  I store some of my own stuff in there.

14   Constructive possession, we see these cases all the time.

15   Drug case, if there's drugs on the table, there's a firearm on

16   the table and there's four people sitting around the table,

17   they all get charged.  Pull over a car, there's a gun under

18   the seat of the car, all right, you're the driver of the car.

19   It's not my gun.  Well, it's your car.  He's going to get

20   charged or she's going to get charged and then they are left

21   to hope that they can work out some deal with the prosecutor,

22   and said you were in constructive possession.  Does this

23   statute allow for the prosecution of citizens who arguably are

24   in constructive possession of these firearms?

25           MR. WELLS:  Your Honor, again, it's a facial

1    challenge.  Specific hypothetical situations are beyond the

2    scope of what is relevant in a facial challenge.  I understand

3    the Court has these specific concerns obviously, and if there

4    were a constructive possession case charged, a defendant can

5    raise whatever constitutional defense they think is

6    appropriate.  The other thing I would note, Your Honor, again,

7    there's a mens rea requirement that requires knowledge.  I

8    also heard Mr. Maag make reference to Staples.  I agree.  I

9    think the Staples analysis would factor in here in how we look

10   at mens rea.  So while I understand the Court wants to

11   speculate about particular situations, that is not --

12           THE COURT:  I'm not speculating.  I'm asking you.

13   Does this statute allow for the prosecution of someone who is

14   in constructive possession?

15           MR. WELLS:  I think this statute would allow for

16   prosecutions that are consistent with other prosecutions under

17   the same statuary framework.

18           THE COURT:  So with Mr. Maag's example, one magazine

19   can be lawfully purchased if it's put in a pistol, but it

20   can't be lawfully purchased if it's put in a rifle.  Who

21   decides is that a question of fact for the jury, is that a

22   question of law for the judge?  Who decides that?

23           MR. WELLS:  I think it would, again, depend on the

24   particular facts of the case.  The question here is whether or

25   not the statute has a core of understandable meaning.

1          THE COURT:  Listen, I asked him questions and he

2     didn't have an answer, okay, but I'm asking you.  I understand

3     vagueness, but if part of vagueness is arbitrary and

4     capricious or if an ordinary citizen looks at the statute and

5     is not alerted, hey, I can be violating the law here, that's

6     problematic.  Do you have an answer to my question or do you

7     not want to answer the question?

8          MR. WELLS:  Can you give me the precise question

9     again, Your Honor?

10          THE COURT:  All right.  In a scenario as to a person

11     being in possession of a magazine that let's say is housed or

12     cased in a pistol, the magazine is 15 rounds, the person also

13     has within his or her possession a semi-automatic rifle which

14     would also receive that 15 round magazine.  Is the question of

15     possession of that magazine for purposes of violating this

16     statute a question of law for the judge, a question of fact

17     for the jury?

18          MR. WELLS:  I think it would certainly implicate the

19     rule of lenity and in that case it may be a question of law in

20     that circumstance.

21          THE COURT:  Can a dealer sell -- let's talk about a

22     dealer that is looking to sell and can sell these 15 round

23     magazines to handgun owners.  A person comes in.  Let's say

24     he's a customer that the gun owner knows.  The gun owner knows

25     that at home the person has a semi-automatic rifle that could

1    receive the magazine that is being sold with the handgun.

2    Does that dealer violate the statute?

3              MR. WELLS:  Your Honor, I think --

4              THE COURT:  Because I know, because I sold one to you

5    last year, you've got a Beretta rifle semi-automatic this

6    would work in.

7              MR. WELLS:  Your Honor, again, I think the

8    prosecution in that case would have to prove beyond a

9    reasonable doubt that the person in that transaction knew that

10   they were selling the magazine for a rifle.  I don't think

11   under the facts that you've articulated that there's proof

12   beyond a reasonable doubt in that circumstance for the seller.

13             THE COURT:  Question of law or question of fact for a

14   jury?

15             MR. WELLS:  I think it depends on how well developed

16   the factual record is, but there's a good chance that it is a

17   question of law.

18             THE COURT:  Okay.  When we -- AK like weapon, AR like

19   weapon, who makes the determination of whether something is

20   like one of these specifically identified firearms?  Is that a

21   question for the judge or is that a question for the jury?

22             MR. WELLS:  I think in most instances, Your Honor,

23   there's the categories based definition which provides notice,

24   and there's the specific preparatory language that says

25   something has to have the same capability of one of the listed

1    weapons.  That could be a mixed question of fact and law.

2    Capability is something that can potentially be disputed, but

3    the mere prospect that some issues may have to be adjudicated,

4    the Seventh Circuit precisely anticipates that.  They

5    specifically say in the --

6         THE COURT:  Did that case specifically involve the

7    exercise of a core constitutional order?

8         MR. WELLS:  *The Trustees of Indiana University* case

9    involved I believe abortion doctors so it used to.  I don't

10   know that it does any more, but that being said the Seventh

11   Circuit has not differentiated that type of case from other

12   cases that may implicate constitutional rights with the

13   exception of the First Amendment.  Yes, there is a specific

14   set of overbreadth type arguments that can be made in the

15   First Amendment context, but not in the Fourth Amendment

16   context, not in the Sixth Amendment context, not in the Fifth

17   Amendment context.  We're not in the First Amendment context.

18        So while there may be some question about, okay, that

19   is the specific standard?  The Seventh Circuit has been very

20   clear that outside of the First Amendment context there aren't

21   these pre-enforcement facial overbreadth type challenges.

22        THE COURT:  With this statute, the way it's set up,

23   registration, recordkeeping, do you anticipate us judges

24   getting requests to issue warrants based upon Government

25   tracking of the purchase of ammunition and coming to a judge

1    and saying, well, we want a warrant for Joe Schmow's house

2    because he's buying a heck of a lot of ammunition normally

3    used in an AR-15 like weapon and he doesn't have registered

4    with us any AR-15 records and based upon our experience with

5    the ammunition and with the amount of frequency in which he's

6    purchasing this ammunition we believe he may have violated

7    this statute?  Should we anticipate receiving such requests?

8             MR. WELLS:  Your Honor, again, subject to my usual

9    response which is it's a facial challenge and that specific

10   scenario is beyond the scope of the facial challenge, the mere

11   fact of a particular caliber of ammunition being purchased I

12   do not know that that would rise to the level of giving

13   probable cause for a warrant.  That's going to be a question

14   that is heavily dependent on what evidence the Government

15   actually comes forward with.

16            THE COURT:  All right.  I'm out of questions.  If you

17   want to keep arguing, I'm all ears.

18            MR. WELLS:  Your Honor, you are familiar with our

19   arguments.  The motion should be denied because the statute

20   has a core of understandable meaning.  There's a mens rea

21   requirement and the scope of any relief should be limited to

22   what the terms of the statute that Plaintiffs have

23   specifically argued about.  So with that, I appreciate the

24   Court's time.  Thank you.

25            THE COURT:  Thank you.  Mr. Maag, just because it's

1  hostile to the Second Amendment doesn't mean it's vague, is

2  that true?

3        MR. MAAG:  I'm sorry.  I didn't --

4        THE COURT:  Just because the statute may be hostile

5  to the free exercise of the Second Amendment doesn't mean it

6  is vague?

7        MR. MAAG:  That's what I thought you said.  I just

8  wanted to make sure.  I agree that the mere fact that the

9  statute is hostile to a fundamental constitutional right is

10 not ipso facto.  I mean, it's unconstitutionally vague.  This

11 case, however, is both hostile to the Second Amendment and

12 largely unconstitutionally vague.

13       THE COURT:  I asked you, didn't this statute have a

14 discernible core meaning, and it puts the citizens on fair

15 notice of what is being regulated and what is being

16 criminalized?

17       MR. MAAG:  What it puts citizens on notice of is that

18 the state government considers the Second Amendment a second

19 class right, and the state government will do anything and

20 everything it can to prohibit the free exercise of those

21 Second Amendment rights.

22       THE COURT:  But if they're open and obvious about it,

23 that's not vagueness.  That's just in your face.

24       MR. MAAG:  That's true in part.  For instance, the

25 section of the statute (A)(1)(a), definition of assault weapon

1  including a semi-automatic rifle with a pistol grip or thumb

2  hold stock and various features, I could argue with an

3  absolute straight face and possibly even convince a court that

4  pistol grip is vague because pistol grip is a term of art

5  that's been used for firearms for hundreds of years long

6  before they referred to what sticks below an AR-15 or MR-16 as

7  a pistol grip stock, but more or less --

8          MR. WELLS:  Your Honor.

9          THE COURT:  I'm sorry.  Hold on.

10          MR. WELLS:  I don't want to -- I don't mean to

11  interrupt Mr. Maag, but obviously to the extent that he's

12  raising arguments about vagueness that weren't raised in the

13  motion itself, I'm going to object to that.  It just wanted to

14  note the objection.

15          THE COURT:  I'll let you guys get your $0.10 in.  I

16  will let you get your $5.60 in.  Whatever it takes, I'm going

17  to let you make your record.

18          MR. MAAG:  I agree that I could make some various

19  arguments.  At least with the features test, there is a

20  reasonable chance more or less that a person could figure out

21  whether or not a firearm had a folding telescoping thumb hole

22  or detachable stock, that's mechanically objectively

23  determined.

24          THE COURT:  Isn't that enough to save the statute?

25          MR. MAAG:  It might be enough if they had stopped

1   there.  It would be, for instance --

2             THE COURT:  What if I stop them there?

3             MR. MAAG:  That might be within your discretion.  It

4   may be within your discretion to determine that the entirety

5   of the statute, at least as it pertains to firearms, the

6   legislature intended the features test and the variance

7   duplicates examples to work in tandem, and I think that is

8   what they intended to do, but the problem is by intending to

9   do that, they made an unworkable -- in going to their own

10  assault weapon identification guide that they filed, on page

11  24, we go back to SKS detachable magazine.

12            As near as I can tell, an SKS with a detachable

13  magazine especially as pictured in this on page 24 doesn't

14  fail the features test.  It appears to be only here because

15  somebody at the legislature had a book with scary looking

16  firearms and including it on there.

17            THE COURT:  Well, if it's in there you know you can't

18  possess it, even if this thing isn't like the other things.

19  If they say we are banning this one, you can't own it.

20            MR. MAAG:  What they have a picture of is technically

21  not even an SKS.  If you want to get ultra technical that's

22  Chinese type 56 carbine.  You can tell from the spiked

23  bayonet.  The SKS is Soviet/Russian designed firearm and while

24  there's a great deal of similarities, it doesn't have a spiked

25  bayonet like that.  So that firearm will have no markings on

1    it whatsoever --

2         THE COURT:  But doesn't that just highlight the

3    arguments that the Government was saying, that even if you can

4    poke some holes in the application of this statute to certain

5    real world circumstances, that's not grounds to invalidate the

6    whole statute.  That's just something for judges to help clean

7    up as these cases go forward and say this is an unreasonable

8    application of this statute related to these particular

9    circumstances, whether it's these particular guns or these

10   particular add-ons or these facts about constructive

11   possession.

12        MR. MAAG:  As cited by the US Supreme Court cited in

13   my brief, *Grayned versus City of Rockford*, US Supreme Court

14   1972, vague was to create the risk of arbitrary and

15   discriminatory enforcement by police.

16        THE COURT:  Which is why I brought up *Davis*, that the

17   vagueness doctrine and the application was to avoid arbitrary

18   enforcement of that particular statute and said you can't do

19   it.  And it's not saved by judges converting it from a

20   categorical approach to a specific facts approach, right?  So

21   under -- go ahead.

22        MR. MAAG:  But there's also the third test is it may

23   have a chilling effect on guaranteed rights.  The chilling

24   effect is not necessarily saying it violates it, but there is

25   certain conduct that even the most strict court on the Second

1    Amendment will say, yes, there's a point of which some

2    legislation will violate that.  This statute, there are

3    firearms that are indisputable arguably a copy or a variance

4    of an AK or an AR, whatever that means, that somebody will

5    pick out that this is an AR variance that will be

6    constitutionally protected.  This statute puts a chilling

7    effect on the citizens of Illinois from being able to acquire

8    that because they're going to look at this statute and say,

9    well, this says I can't have a variant of an AK or an AR.  I'm

10   not exactly sure what that means.  There's no flash suppressor

11   on this gun.  It's not even a detachable magazine because they

12   welded the magazine in place.  There is no pistol grip on it.

13   The stock doesn't fold or telescope, but, you know, I can see

14   that there's some technological similarity there.  Is that gun

15   prohibited?

16          And that is the chilling effect on this and guns too.

17   There is no objectively defined AR or AK.  I'm not sure how

18   you could define it.  And that's basically the point of the

19   *Springfield Armory* case that I've cited out of the Sixth

20   Circuit.

21          If they had simply stopped, they being the

22   legislature, with the features test and had the legislature

23   simply stopped and said we are going to come up with a

24   magazine limit across the board, I'm not sure I can stand here

25   today and argue vagueness.  But that's not what they did.  And

1    the legislature is stuck with what they did.

2           And what they did was make a mess that, sure, if it's

3    got a flash suppresser, a folding stock and I can think of

4    grenade launcher attached to the firearm that it might be an

5    assault weapon.  We can figure that out.  But if you take

6    those things off, even if it sort of looks the same, even if

7    it is a different caliber, how much different must it be?  If

8    we're talking about a magazine capacity, if we drop a 13 round

9    magazine on the table here, is that legal or not?  We don't

10   know.  And that is where the legislature screwed up.

11          That's not to say, Second Amendment issues aside,

12   that they couldn't fix that.  But they haven't fixed that.

13   And for those reasons and the reasons previously made of

14   record, I believe that both the magazine capacity limitations

15   and subsection J at least, which is the rifles copies,

16   duplicates, also goes to pistols, shotguns in the other

17   section, is unconstitutionally vague.  I ask for summary

18   judgment in favor of the Langley Plaintiffs on those issues as

19   moved forward in my motion, and I ask for an injunction

20   against enforcement of same.  I understand there's a

21   severability issue.  I believe the Court has the discretion

22   because it is a substantial part of the statute to enjoin the

23   entire statute as part of it.  I understand that that is

24   something the Court may have to grapple with, but that's what

25   I'm asking for.

1          THE COURT:  Thank you.  You want to address the

2    argument of chilling of the exercise of Second Amendment

3    rights, or anything else that he raised that you think he

4    didn't raise in his initial argument?

5          MR. WELLS:  Sure, Your Honor.  Just three quick

6    points on the issue of severability.  Mr. Maag has essentially

7    conceded that the features based test is not being challenged

8    here.  So obviously, any relief that he's requested can't go

9    to the features based test.  *Davis* -- Your Honor, brought up

10   *Davis*, those -- *Davis* and the other two cases that are kind of

11   contemporaneous with *Davis*, including *Johnson*, those deal with

12   residual clauses and the relief in those particular cases is

13   specific to those residual clauses, not to the entire criminal

14   statute of which those residual clauses were part.

15   *Springfield Armory*, Mr. Maag brought up *Springfield Armory*,

16   we've distinguished that in the briefs.  *Springfield Armory*

17   itself says other gun control laws which seek to outlaw

18   assault weapons provided general definition of the type of

19   weapon ban and the Columbus City Council can do the same.  And

20   they cite the Federal Assault Weapons ban that had a features

21   based definition and a characteristics based definition.  So

22   this statute unambiguously has a features based definition and

23   a make and model list.  So *Springfield Armory* is

24   distinguishable by it its own terms, and for this reasons,

25   Your Honor, we believe that the motion should be denied.

1    Thank you.

2              THE COURT:  Do you have anything to say about the

3    chilling effect the statute has on the exercise of the Second

4    Amendment rights as argued by Mr. Maag?

5              MR. WELLS:  Again, I would note my prior response

6    that it's not clear the Second Amendments rights at this point

7    have been implemented.  We will hear about that from the

8    Seventh Circuit and maybe --

9              THE COURT:  They are clearly implicated.  They're

10   arms.  They're arms so the Second Amendment is implicated.

11   What we're waiting to hear from the Seventh Circuit and others

12   is whether the Supreme Court is going to accept these clear

13   restrictions on the exercise of the Second Amendment, attached

14   to nothing other than the exercise to keep and bear arms.  The

15   Second Amendment is implicated.  The question is whether --

16   not whether the Second Amendment is implicated.  The question

17   is can this statute survive judicial scrutiny and somehow find

18   that it does not infringe on the rights of citizens to

19   exercise their Second Amendment rights.

20             So the Second Amendment is clearly implicated and

21   it's not a second class right as the Supreme Court says.  The

22   only question is whether or not the Courts are going to allow

23   the states to restrict these particular types of weapons,

24   some, all, none.  That's up in the air.  And when I ruled

25   earlier, I didn't get to whether some of these can be

1    restricted, that none of them could be restricted.  I didn't

2    say anything like that.  I just said there are some that are

3    clearly widely held and possessed and that that test -- some

4    of the restrictions that are imposed can't pass that test.

5         The Seventh Circuit can let us know whether I was

6    right or wrong on that.  The judge in the Northern District

7    that saw it a different way, they're going to let her know

8    whether she was right or wrong on that.  This is a Second

9    Amendment case.  It is clearly implicated and so evaluating

10   this statute, the criminalization of the exercise of Second

11   Amendment rights, I think that that -- you got to thread the

12   needle on that.  It's not like, oh, well, we're going to let

13   this broad statute go through and we'll try to clean up the

14   mess later.  It is some parts or all.  I think when you're

15   criminalizing the pure exercise of the constitutional right,

16   if you can do it, then you're going to have to be very

17   precise, as I say thread the needle, and get it just right.

18   This law is not too hot.  It's not too cold.  It's just right,

19   okay?

20        MR. WELLS:  Your Honor, may I say just two quick

21   things in response to that.  I don't know if I answered

22   directly your question about chilling effect.  The thing I

23   would say is that chilling effect analysis has only been

24   applied in First Amendment cases in void for vagueness

25   doctrine.  It has not been applied to date in Second Amendment

1    cases.  That's what I would note on that point.  And again, I

2    think as Your Honor acknowledged, this broader statute, the

3    fundamental question is about the Second Amendment.  The

4    Seventh Circuit has the Second Amendment piece to this case.

5    We're here on 14th Amendment due process claims.  With all due

6    respect to Mr. Maag and his arguments, I think they are not

7    going to be what ultimately decides the validity of the

8    statute.  That will be decided as a Second Amendment issue.

9    That's all, Your Honor.

10           THE COURT:  All right.  Thank you.  Mr. Maag,

11   anything else?

12           MR. MAAG:  Not at this time.  Thank you.

13           THE COURT:  All right.  I'll take this case under

14   advisement.  Thank you all.

1                     REPORTER'S CERTIFICATE

2                   *   *   *   *   *   *   *

3      I, Erikia T. Schuster, RPR, Official Court Reporter for the

4    U.S. District Court, Southern District of Illinois, do hereby

5    certify that I reported with mechanical stenography the

6    proceedings contained in pages 1-55 and that the same is a

7    full, true, correct and complete transcript from the record of

8    proceedings in the above-entitled matter.

9

10   */S/ Erikia T. Schuster*                10/12/23
     IL CSR, RPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25