**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CALEB BARNETT et al., | |
|     Plaintiffs, | |
| v. | No. 3:23-cv-00209-SPM (lead case) |
| KWAME RAOUL et al., | |
|     Defendants. | |
| DANE HARREL et al., | |
|     Plaintiffs, | |
| v. | No. 3:23-cv-00141-SPM |
| KWAME RAOUL et al., | |
|     Defendants. | |
| JEREMY W. LANGLEY et al., | |
|     Plaintiffs, | |
| v. | No. 3:23-cv-00192-SPM |
| BRENDAN KELLY et al., | |
|     Defendants. | |
| FEDERAL FIREARMS LICENSEES OF ILLINOIS et al., | |
|     Plaintiffs, | |
| v. | No. 3:23-cv-00215-SPM |
| JAY ROBERT "J.B." PRITZKER et al., | |
|     Defendants. | |

**DIRECTOR KELLY'S COMBINED MEMORANDUM IN OPPOSITION TO THE
*LANGLEY* PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT ON *LANGLEY* COUNT I**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

    I.      Section 24-1.9(d) does not violate the privilege against self-incrimination. .......... 1

        A.      The endorsement affidavit is not directed at the criminally suspect and does not compel a confession of criminal activity. .................................... 2

        B.      The endorsement affidavit does not compel or coerce any testimony. ........ 8

        C.      The possibility plaintiffs will be prosecuted based on their endorsement affidavits is not real and substantial. ........................................................ 11

    II.     Plaintiffs should not be granted leave to add a new due process claim. ............... 15

CONCLUSION ............................................................................................................... 17

## INTRODUCTION

As of January 1, 2024, Illinois law generally prohibits possession of any "assault weapon" as defined by the Protect Illinois Communities Act ("PICA"). *See* 720 ILCS 5/24-1(a)(15), 24-1.9(c). But there are exceptions, one of which is relevant to the *Langley* plaintiffs' Fifth Amendment claim asserted in Count I of their complaint. The prohibition "does not apply to a person's possession of an assault weapon" owned before the law became effective on January 10, 2023, "if the person has provided [certain information] in an endorsement affidavit, prior to January 1, 2024." *Id.* § 24-1.9(d).

Plaintiffs moved for summary judgment on their Fifth Amendment claim, ECF 133, contending this endorsement affidavit violates the constitutional privilege against self-incrimination. As explained below, it does not. Therefore, the Court should deny plaintiffs' motion for summary judgment and grant Director Kelly's cross-motion for summary judgment.[*]

## ARGUMENT

### I.   Section 24-1.9(d) does not violate the privilege against self-incrimination.

Section 24-1.9(d) does not violate the privilege against self-incrimination for three reasons. First, the endorsement affidavit is a voluntary benefit that exempts owners of certain assault weapons from otherwise applicable criminal penalties; it is not directed at the criminally suspect, and the act of submitting an affidavit does not constitute a confession of criminality. Second, no one is compelled to submit an affidavit; the government has no authority to impose any criminal or economic penalty on residents who are eligible to submit an affidavit but, for whatever reason, decline to do so. Third, the possibility plaintiffs will be prosecuted based on the

---

[*] Because this issue presents "a pure question of law," as the Court correctly observed, *see* Transcript at 25:24-26:3 (Jan. 12, 2024), there are no relevant, material facts at issue in connection with this cross-motion, *see* L.R. 56.1(a).

information contained within their affidavits is not real and substantial; the fanciful chain of events they have dreamed up has no serious chance of coming to fruition.

    **A.**    **The endorsement affidavit is not directed at the criminally suspect and does not compel a confession of criminal activity.**

Registration and disclosure provisions are common in federal and state statutes. These types of provisions only implicate the Fifth Amendment if they are directed at the criminally suspect or compel confession of criminal activity. The endorsement affidavit process in PICA does neither of these things and, as a result, does not violate the Fifth Amendment.

Three leading cases, all decided on the same day, identify the narrow circumstances in which a disclosure or registration provision may infringe the Fifth Amendment right against self-incrimination. None of those circumstances is applicable here. In *Marchetti v. United States*, 390 U.S. 39, 42-44 (1968), the Supreme Court held the privilege against self-incrimination was violated by a federal statute requiring "those engaged in the business of accepting wagers" to register with the Internal Revenue Service and pay an occupational tax. Failure to register and pay was punishable by criminal penalties. *Id.* at 41-42. At the same time, however, "[w]agering and its ancillary activities [were] very widely prohibited under both federal and state law." *Id.* at 44-47. A person who registered and paid the occupational tax not only "increase[d] the likelihood that any past or present gambling offenses will be discovered and successfully prosecuted"; he also "declar[ed] a present intent to commence gambling activities" and thus "accuse[d] himself of conspiracy to violate either state gambling prohibitions, or federal laws forbidding the use of interstate facilities for gambling purposes." *Id.* at 52-53. Thus, the Supreme Court concluded, the federal registration and tax requirements created "'real and appreciable,' and not merely 'imaginary and unsubstantial,' hazards of self-incrimination." *Id.* at 48.

In *Grosso v. United States*, 390 U.S. 62, 64-65 (1968), the Supreme Court held the privilege against self-incrimination was also violated by a related requirement that those in the gambling business had to pay, as federal excise tax, 10 percent of the gross amount of wagers they accepted. Payment of the tax was accomplished by submission of a monthly return "expressly designed for the use only of those engaged in the wagering business; its submission, and the replies demanded by each of its questions, evidence in the most direct fashion the fact of the taxpayer's wagering activities"—activities that themselves were criminalized under both federal and state law. *Id.* at 65. Thus, the Supreme Court explained, "the statutory obligations are directed almost exclusively to individuals inherently suspect of criminal activities." *Id.* at 68. "The criminal penalties for wagering with which petitioner is threatened are scarcely 'remote possibilities out of the ordinary course of law,' yet he is obliged, on pain of criminal prosecution, to provide information which would readily incriminate him, and which he may reasonably expect would be provided to prosecuting authorities." *Id.* at 66-67 (citation omitted).

Finally, in *Haynes v. United States*, 390 U.S. 85 (1968), the Supreme Court held the privilege against self-incrimination was violated by a provision of the National Firearms Act. A person in possession of certain unlawfully acquired firearms was required to "furnish the Secretary of the Treasury with his name, address, the place where the firearm is usually kept, and the place of his business or employment," along with "his date of birth, social security number, and whether he has ever been convicted of a felony" plus "a full description of the firearm." *Id.* at 96. Failure to comply was "punishable by fines and imprisonment." *Id.* at 89. This registration requirement did not apply, however, to anyone who had complied with the National Firearms Act's mandates concerning the transfer, manufacture, or importation of the firearm in question. *Id.* at 96. The registration requirement was, in other words, "directed principally at those persons

who have obtained possession of a firearm without complying with the Act's other requirements, and who therefore are immediately threatened by criminal prosecutions." *Id.*

As the Seventh Circuit has explained, "[t]he objectionable feature of the statutes found" to violate the privilege against self-incrimination in *Marchetti*, *Grosso*, and *Haynes* "was that the act of registration itself constituted an Ipso facto confession of criminality." *United States v. Scherer*, 523 F.2d 371, 375 (7th Cir. 1975). The registration requirement declared unconstitutional in *Marchetti* required people to confess an intention to commence gambling activities in violation of federal and state law. 390 U.S. at 52. The registration requirement declared unconstitutional in *Grosso* required people to confess detailed information on gambling activities conducted in violation of federal and state law. 390 U.S. at 65. And the registration requirement declared unconstitutional in *Haynes* required people to confess possession of firearms that had not been transferred to them in accordance with federal law. 390 U.S. at 96; *see also Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 77 (1965) (registration requirement unconstitutional because it "requires an admission of membership in the Communist Party," which itself was unlawful); *Bionic Auto Parts & Sales, Inc. v. Fahner*, 721 F.2d 1072, 1083 (7th Cir. 1983) (recordkeeping requirement unconstitutional because it was "aimed at a select group suspected of criminal activities").

"By contrast," the privilege against self-incrimination is not violated when the mere act of registration "does not automatically subject a [person] to criminal penalties." *Scherer*, 523 F.2d at 375. A person who must register under these circumstances does not confront "the incriminating straight-jacket of alternatives created in" *Marchetti*, *Grosso*, and *Haynes* because the registration requirement is not "principally directed at persons who have failed to comply with other [statutory requirements] and thus 'inherently suspect of criminal activities.'" *Id.* Put

4

simply, a registration requirement does not run afoul of the privilege against self-incrimination when it is "clearly directed at law-abiding persons as well as criminally suspect persons." *Lauchli v. United States*, 481 F.2d 408, 411-12 (7th Cir. 1973).

In *United States v. Sullivan*, 274 U.S. 259, 263 (1927), for example, a bootlegger invoked the privilege against self-incrimination to justify his refusal to file a federal income tax return; most of his gains were "from illicit traffic in liquor," he explained. The Supreme Court rejected the argument: "It would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime." *Id.* at 263-64. Importantly, the requirement to file an income tax return is directed at all people with gains—not only the criminally suspect. And receiving income is not itself a crime; thus, confessing to its receipt, which is all one does by filing a federal income tax return, does not automatically subject anyone to criminal penalties. *See California v. Byers*, 402 U.S. 424, 429 (1971) (explaining the *Sullivan* bootlegger's tax return may have "increased his risk of prosecution and conviction" for trafficking in illicit liquor but there was no constitutional violation because "the compelled disclosures" on their own did not "confront [him] with 'substantial hazards of self-incrimination'"); *Albertson*, 382 U.S. at 79 ("In *Sullivan* the questions in the income tax return were neutral on their face and directed at the public at large, [as opposed to] a highly selective group inherently suspect of criminal activities.").

Likewise, in *Byers*, 402 U.S. at 425, the Supreme Court held "the constitutional privilege against compulsory self-incrimination" was not "infringed by California's so-called 'hit and run' statute which requires the driver of a motor vehicle involved in an accident to stop at the scene and give his name and address." The court highlighted two features of the law that landed it on the constitutional side of the equation. First, it was directed at "all persons who drive

automobiles in California," a group that, "numbering as it does in the millions, is so large as to render [the statute] 'directed at the public at large.'" *Id.* at 430-31. "It is difficult to consider this group as either 'highly selective' or 'inherently suspect of criminal activities,'" the court reasoned: "Driving an automobile, unlike gambling, is a lawful activity." *Id.* at 431. Second, requiring drivers involved in an accident to provide their contact information did not compel them to confess to a crime because "it is not a criminal offense under California law to be a driver 'involved in an accident.'" *Id.* Thus, complying with the challenged law would not, on its own, expose drivers to criminal punishment. *Id.*

Finally, in *Lauchli*, 481 F.2d at 411, the Seventh Circuit held the privilege against self-incrimination was not violated by a provision of the National Firearms Act requiring manufacturers of firearms to register with the Internal Revenue Service and pay an occupational tax. The court explained such manufacturers "are not almost exclusively individuals inherently suspect of criminal activities." *Id.* To the contrary, because the registration and tax requirements "were clearly directed at law-abiding persons as well as criminally suspect persons, no automatic hazard of self-incrimination under the Fifth Amendment was presented." *Id.* What's more, manufacturing firearms is not necessarily a violation of either federal or state law; thus, the mere act of registering and paying is not, on its own, a confession to a crime. *Id.*

Applying these principles to section 24-1.9(d) establishes the endorsement affidavit does not run afoul of the privilege against self-incrimination. A statute may violate the privilege if it is directed exclusively to "a highly selective group inherently suspect of criminal activities," *Albertson*, 382 U.S. at 79, but not if it is "directed at law-abiding persons as well as criminally suspect persons," *Lauchli*, 481 F.2d at 411-12. Here, as plaintiffs concede, ECF 133 at 2, section

6

24-1.9(d) is directed to law-abiding gun owners who wish to continue to lawfully possess assault weapons.

As the Illinois Supreme Court recently explained, this "provision permits persons who lawfully possessed assault weapons before January 10, 2023, to continue to possess them as long as they provide an endorsement affidavit to the Illinois State Police by January 1, 2024." *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 8 (citing 720 ILCS 24-1.9(c), (d)), *cert. denied*, No. 23-510, 2024 WL 72021 (U.S. Jan. 8, 2024). An endorsement affidavit "identifies the weapon and affirms that the individual owned it before January 10, 2023." *Id.* (citing 720 ILCS 5/24-1.9(d)). This exemption recognizes people who lawfully possessed assault weapons before this date "have a reliance interest in retaining possession of items legally acquired before such acquisition was prohibited." *Id.* ¶ 62. Meanwhile, the State's interest in "'reducing the number of assault weapons . . . in circulation'" can be accomplished "'by restricting the sale, purchase, and possession of new ones.'" *Id.* ¶ 63. Thus, section 24-1.9(d) reflects a legislative compromise promoting both the reliance interests of law-abiding gun owners and the legitimate governmental interest in reducing the number of mass shootings. *Id.* ¶¶ 62-63.

The plain language of section 24-1.9(d), and the Illinois Supreme Court's definitive interpretation of the exemption, demonstrate the endorsement affidavit is not "directed almost exclusively to individuals inherently suspect of criminal activities." *Grosso*, 390 U.S. at 68. In fact, the affidavit serves the opposite function; it exempts affiants from criminal liability and "creates a rebuttable presumption that [they are] entitled to possess and transport the assault weapon" at issue. 720 ILCS 5/24-1.9(d). Because the affidavit is directed to law-abiding gun owners who wish to continue lawfully possessing their exempt assault weapons—rather than "a

select group suspected of criminal activities"—it does not violate the privilege against self-incrimination. *Bionic*, 721 F.2d at 1083.

In addition, as the Seventh Circuit put it: "The objectionable feature of the statutes found" to violate the privilege against self-incrimination is "that the act of registration itself constituted an Ipso facto confession of criminality." *Scherer*, 523 F.2d at 375. "By contrast," the privilege against self-incrimination is not violated when the mere act of registration "does not automatically subject a [person] to criminal penalties." *Id.* Here, the mere act of submitting an endorsement affidavit does not constitute a confession of criminality or automatically subject a person to criminal penalties; once again, the affidavit serves the opposite function.

The affidavit is a voluntary benefit available to anyone who owned an assault weapon before January 10, 2023, that allows them to maintain possession of that weapon. People who choose to submit an affidavit do not confess to criminality or automatically become subject to criminal penalties. *See Scherer*, 523 F.2d at 375. To the contrary, they obtain "a rebuttable presumption that [they are] entitled to possess and transport the [identified] assault weapon," 720 ILCS 5/24-1.9(d), notwithstanding any criminal penalties that might otherwise apply, *id.* §§ 24-1(a)(15), 24-1.9(c); *see United States v. Freed*, 401 U.S. 601, 606 (1971) (no self-incrimination violation where "information [firearm transferee] supplies makes him the lawful, not the unlawful possessor of the firearm"). For all these reasons, section 24-1.9(d) does not violate the privilege against self-incrimination.

**B.      The endorsement affidavit does not compel or coerce any testimony.**

Plaintiffs' Fifth Amendment challenge to PICA's endorsement affidavit process fails for another, independent reason: the privilege against self-incrimination is violated only when a person is "***compelled*** in any criminal case to be a witness against himself." U.S. const. amend. V

(emphasis added). Thus, "there must be some element of compulsion before a court will find a Fifth Amendment violation." *United States v. Burton*, 724 F.2d 1283, 1288 (7th Cir. 1984). "Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States v. Washington*, 431 U.S. 181, 187 (1977). This is because "the Fifth Amendment privilege [is] intended to relieve claimants of the necessity of making a choice between incriminating themselves and risking **serious punishments** for refusing to do so." *Albertson*, 382 U.S. at 76 (emphasis added); *see Pennsylvania v. Muniz*, 496 U.S. 582, 596 (1990) ("the privilege reflects our fierce unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt that defined the operation of the Star Chamber, wherein suspects were forced to choose between revealing incriminating private thoughts and forsaking their oath by committing perjury") (cleaned up).

To determine whether a person has been compelled to incriminate himself, courts look to the penalty the government is able to extract if the person refuses to do so. Testimony may be coerced if the government can impose criminal penalties on a person who remains silent in the face of questioning. *E.g.*, *Haynes*, 390 U.S. at 97 (firearm owners "compelled, on pain of criminal prosecution, to provide [the government] both a formal acknowledgment of their possession of firearms, and supplementary information likely to facilitate their arrest and eventual conviction"); *Marchetti*, 390 U.S. at 48 (bookmaker "required, on pain of criminal prosecution, to provide information" about his unlawful activities). In addition, the government may coerce testimony if it threatens to revoke a professional license, *Spevack v. Klein*, 385 U.S. 511, 516 (1967), terminate the witness's employment, *Uniformed Sanitation Men Ass'n v. Commissioner*, 392 U.S. 280, 283-84 (1968), rescind eligibility to receive government contracts,

*Lefkowitz v. Turley*, 414 U.S. 70, 82-83 (1973), or bar participation in political associations or eligibility to hold public office, *Lefkowitz v. Cunningham*, 431 U.S. 801, 807-08 (1977).

The government here, by contrast, has no recourse against a person who is eligible to submit an endorsement affidavit but declines to do so. The decision whether to submit an affidavit is entirely voluntary; choosing to refrain, on its own, does not expose anyone to any penalties at all. 720 ILCS 5/24-1.9(d). True, people may face penalties if they both decline to submit affidavits and then also possess assault weapons in Illinois. *Id.* §§ 24-1(a)(15), 24-1.9(c). But those penalties arise because of the subsequent act of possession, not the failure to submit an affidavit. People who do not wish to submit an affidavit have other options available to avoid criminally possessing their exempt assault weapons in Illinois; they can sell the firearm to an eligible purchaser, retain ownership but move it out of state, give the firearm to law enforcement, or permanently disable or destroy it.

At most, then, people who decline to submit an endorsement affidavit forego the opportunity to continue lawfully possessing exempt assault weapons. To plaintiffs, the alternatives—like disposing of their weapons or moving them out of state—may be undesirable, and therefore they may feel some pressure to submit the affidavit. But, as the Supreme Court has held, "it has never been suggested that [all government] pressures constitute 'compulsion' for Fifth Amendment purposes." *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 287 (1998). Put another way, "pressure to speak in the hope of" obtaining a government benefit "does not make the [speech] compelled" in violation of the privilege against self-incrimination. *Id.* at 288. Because the endorsement affidavit does not compel any testimony, plaintiffs' Fifth Amendment challenge must fail.

10

**C.**     **The possibility plaintiffs will be prosecuted based on their endorsement affidavits is not real and substantial.**

To recap, plaintiffs' Fifth Amendment claim fails as a matter of law for two independent reasons. First, the endorsement affidavit is not directed at the criminally suspect and does not compel a confession of criminal activity. Second, it provides a voluntary benefit that does not compel any testimony whatsoever. But there is also a third reason why the claim is doomed. "The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Marchetti*, 390 U.S. at 53. This is because "the constitutional protection is confined to real danger, and does not extend to remote possibilities out of the ordinary course of law." *Heike v. United States*, 227 U.S. 131, 144 (1913). Thus, to invoke the privilege, the claimant must identify a "possibility of prosecution which is more than fanciful." *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 (7th Cir. 1979).

This possibility is typically satisfied when the information compelled by the government would, directly or indirectly, evidence past or present criminal wrongdoing. In *Haynes*, 390 U.S. at 96, for example, the Supreme Court identified an "exceedingly high" correlation between persons who are bound to register their firearms and "persons who have obtained possession of a firearm without complying with the [National Firearms] Act's other requirements, and who therefore are immediately threatened by criminal prosecutions." The court noted in particular that people who complied with the registration requirement necessarily provided the government "a formal acknowledgment of their possession of [unlawful] firearms." *Id.* at 97. In these circumstances, the court concluded, "a prospective registrant realistically can expect" not only "that registration will substantially increase the likelihood of his prosecution" but also "that the possession established by his registration will facilitate his prosecution." *Id.*; *see Grosso*, 390

11

U.S. at 66-67 ("hazards of incrimination can only be characterized as 'real and appreciable'" because the information government required of bookmaker about the illegal wagers accepted "would directly and unavoidably have served to incriminate him").

The requirement to show a real and substantial risk of prosecution usually is not satisfied, however, when the information compelled by the government speaks only to the possibility of future wrongdoing that may never be committed. *See Marchetti*, 390 U.S. at 54 ("prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination"). In *United States v. Apfelbaum*, 445 U.S. 115, 131 (1980), the Supreme Court held a trial witness did not, at the time he was called to the stand, face a real and substantial risk of prosecution based on his "future intention to commit perjury or to make false statements." In other words, "the privilege would not have protected him against false testimony that he later might decide to give" because there was, at the time he was called to the stand, no reason to believe he would make such a poor choice. *Id.* at 130. Likewise, in *Freed*, 401 U.S. at 606, another decision concerning the National Firearms Act, the court held the transferee of a regulated weapon could not invoke the privilege to avoid providing the government a photograph and fingerprints that might incriminate him, not for anything he had done, but rather in unspecified ways "in the future." The transferee's "argument assumes the existence of a periphery of the Self-Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self-Incrimination Clause such an expansive interpretation." *Id.* at 606-07.

Here, plaintiffs speculate their endorsement affidavits "could be used and abused by the State government, and others, like the City of Chicago, with access to the information." ECF 133 at 7. But they are cagey about how they think this could be done. They do not identify any past

or present acts or omissions as to which information contained in their affidavits could be incriminating. Instead, their argument, mirroring the theory rejected in *Freed*, seems to be based on the possibility the affidavit might incriminate some future conduct that has yet to occur. For instance, plaintiffs imagine "there will be some interesting traffic stops, especially in areas with local firearms regulation, but also potentially across the State, including Crawford County, about whether or not their PICA registered .22 pocket pistol, with a threaded barrel, is at home, or in some place it cannot be carried." *Id.* at 16. But they do not explain in any detail why there is a real and substantial possibility ***their*** endorsement affidavits will expose ***them*** to prosecution ***for a particular crime*** as a result of these hypothetical traffic stops. Similarly, they worry the Chicago police might use their endorsement affidavits "to single [them] out" if they travel there in the future, *id.* at 10, although they do not point to anything in the record from which the Court can infer such future interactions with municipal police are likely, *cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) ("'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require").

These omissions alone show plaintiffs' risk of incrimination is "trifling or imaginary" and thus the privilege against self-incrimination is unavailable to them. *Marchetti*, 390 U.S. at 53. Worse, plaintiffs' fears are founded on a serious misunderstanding of the constitutional requirements for an automobile search. They think "law enforcement around the state can use" their endorsement affidavits "to justify probable cause to search their car[s]." ECF 133 at 16 (citing *People v. Ross*, 289 Ill. App. 3d 1013, 682 N.E.2d 87 (1st Dist. 1997)).

The case they cite in support says nothing of the sort. The question in *Ross* was not whether the police had probable cause to search the defendant's car. *Ross*, 289 Ill. App. 3d at

1015, 682 N.E.2d at 88. The issue, rather, concerned the scope of a "so-called '*Terry* stop,' a brief seizure that must be supported by a reasonable suspicion of criminal activity in order to be within the bounds of the fourth amendment." *Id.* at 1016, 682 N.E.2d at 89 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). A police officer pulled over the defendant for running a red light and asked for his driver's license. *Id.* at 1015, 682 N.E.2d at 88. The defendant offered instead his firearm owner's identification card, which prompted the officer to ask if there was a gun in the car. *Id.*

The only question was whether "the defendant's [voluntary] production of a F.O.I.D. card created an independent basis upon which to continue and expand the officers' initial *Terry* stop" beyond merely investigating a traffic violation. *Ross*, 289 Ill. App. 3d at 1018, 682 N.E.2d at 90. The court concluded it did: "Once the officers were presented with an indication that the individual with whom they were dealing owned a firearm, it was only reasonable for them to be concerned about the whereabouts of that gun and to question him regarding it." *Id.* In other words, the court "h[e]ld simply that when police officers reasonably suspect the presence of a gun at a traffic stop, as they did in this case, they may ask those at the scene regarding its whereabouts without violating the fourth amendment." *Id.* Thus, a careful reading of *Ross* dispels plaintiffs' fears; the case does not remotely suggest the police will have probable cause to search their vehicles simply because they have submitted endorsement affidavits. *See Martin-Trigona v. Gouletas*, 634 F.2d 354, 362 (7th Cir. 1980) (finding "ample reason to believe [litigant's] claimed fear of self-incrimination is fanciful" due to his "tendency . . . to exaggerate, to believe himself the victim of conspiracies where none exist, and to suspect without any reasonable basis that others are persecuting him").

At bottom, plaintiffs have not shown the "hazards of incrimination" they must confront as a result of their endorsement affidavits are "substantial and 'real,'" rather than "merely trifling or

imaginary." *Marchetti*, 390 U.S. at 53. The exceedingly slight possibility they might some day commit acts or omissions for which the affidavits might prove incriminating "involve[s] only speculative and insubstantial risks of incrimination" of the sort insufficient to invoke the privilege against self-incrimination. *Id.* at 54. For all these reasons, plaintiffs' claim must fail.

## II.     Plaintiffs should not be granted leave to add a new due process claim.

For the first time in their summary judgment motion, plaintiffs refer to a due process claim concerning the endorsement affidavit. ECF 133 at 11. They say some people may have been unable "to properly actually register many common firearms that are required to be registered by the PICA statute." *Id.* But they do not provide any evidence demonstrating ***they*** are among the people who were affected by this problem. Although they attach an email someone appears to have written to the Illinois State Police complaining about these issues, the document is not authenticated and the author's name is redacted. ECF 133-5.

As the Seventh Circuit recently clarified, "district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's [summary judgment] briefs as a constructive motion to amend." *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023). But the court cautioned it was "generally impermissible" to assert a new claim in summary judgment briefing; a constructive amendment of this sort could be justified only under "an improbable confluence of events" that "will be all but impossible for a counseled plaintiff to establish." *Id.* at 489. Further, the court continued, "only when the general principles governing amendment of a complaint are satisfied should constructive amendment be permitted." *Id.*

Here, those principles compel the Court to deny plaintiffs permission. By constructively moving to amend their complaint, plaintiffs invoke the federal courts' jurisdiction to decide their due process claim and therefore bear the burden of establishing Article III's requirements are

satisfied. *See Lujan*, 504 U.S. at 561. Further, because this is a summary judgment motion, they must satisfy those requirements "by affidavit or other evidence" containing "specific facts"; they cannot rely on "general factual allegations." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (cleaned up). Among the indispensable Article III requirements is "[t]he general rule . . . that plaintiffs must allege their own injuries to establish standing." *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 384 (7th Cir. 2020). "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (cleaned up). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas v. Madison Avenue Associates, Inc.*, 926 F.3d 329, 333 (7th Cir. 2019).

Plaintiffs have not shown (or even asserted) they were affected by the registration issues discussed in their motion. Thus, they have not established a personal injury as required to invoke the federal courts' jurisdiction over a new due process claim. *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *see Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023) ("'plaintiffs must demonstrate standing for each claim'"). As the Court recently explained to other plaintiffs in these consolidated cases, they "cannot bring suit on behalf of hypothetical, unnamed Illinois citizens who allegedly" have been deprived of due process in connection with the endorsement affidavit. ECF 136 at 21. For these reasons, plaintiffs lack standing to pursue their due process claim. To the extent the Court construes this new claim as a constructive motion to amend, it should be denied.

**CONCLUSION**

For all these reasons, the Court should deny plaintiffs' motion for summary judgment,

ECF 133, and grant Director Kelly's cross-motion for summary judgment.


Dated: January 19, 2024                    Respectfully submitted,

KWAME RAOUL                                 /s/ Darren Kinkead
Attorney General of Illinois                Darren Kinkead, ARDC No. 6304847
                                            Office of the Attorney General
Laura K. Bautista, ARDC No. 6289023         115 South LaSalle Street
Kathryn Hunt Muse, ARDC No. 6302614         Chicago, IL 60603
Christopher G. Wells, ARDC No. 6304265      (773) 590-6967
                                            Darren.Kinkead@ilag.gov

17