```
 1              IN THE DISTRICT OF THE UNITED STATES OF AMERICA

 2                  FOR THE SOUTHERN DISTRICT OF ILLINOIS

 3   ---------------------------------------------------------
     DANE HARREL, et al.,
 4            Plaintiffs,
     v.                      Case No. 23-cv-141-SPM
 5   KWAME RAOUL, et al.,
              Defendants.
 6   ---------------------------------------------------------
     FEDERAL FIREARMS LICENSEES OF
 7   ILLINOIS, et al.,
              Plaintiffs,
 8   v.                      Case No. 23-cv-215-SPM
     JAY ROBERT "JB" PRITZKER, et al.,
 9            Defendants.
     ---------------------------------------------------------
10   CALEB BARNETT, et al.,
              Plaintiffs,
11   v.                      Case No. 23-cv-209-SPM
     KWAME RAOUL, et al.,
12            Defendants.
     ---------------------------------------------------------
13   JEREMY LANGLEY, et al.,
              Plaintiffs,
14   v.                      Case No. 23-cv-192-SPM
     BRENDAN KELLY, et al.,
15            Defendants.
     ---------------------------------------------------------

16

17                  Transcript of Status Conference
                           February 2, 2024
18                  Proceedings held by Zoom before
                    the Honorable STEPHEN P. McGLYNN,
19              United States District Judge Presiding
         --------------------------------------------------------

20
                            REPORTED BY:
21
     ERIKIA SCHUSTER, RPR, Official Court Reporter,
22   750 Missouri Avenue, East St. Louis, Illinois 62201
     Erikia_Schuster@ilsd.uscourts.gov
23
     Following proceedings recorded by mechanical stenography;
24   transcript produced by computer-aided transcription.

25
```

```
 1   APPEARANCES: (Case No. 23-cv-209-SPM)

 2   For Barnett              MATTHEW ROWEN
                              PLAINTIFFS: Clement & Murphy, PLLC
 3                            706 Duke Street
                              Alexandria, VA 22314
 4                            202-742-8900
                              Matthew.rowen@clementmurphy.com
 5
                              ANDREW LOTHSON
 6                            Swanson, Martin & Bell, LLP
                              330 N. Wabash Ave.
 7                            Suite 3300
                              Chicago, IL 60611
 8                            312-321-9100
                              Alothson@smbtrials.com
 9
     For Harrel               DAVID G. SIGALE
10                            PLAINTIFFS: Law Firm of David G.
                              Sigale, P.C.
11                            430 West Roosevelt Road
                              Wheaton, Illinois 60187
12                            630-452-4547
                              Dsigale@sigalelaw.com
13
     For Langley              THOMAS G. MAAG
14                            PETER MAAG
                              PLAINTIFFS: Maag Law Firm, LLC
15                            22 West Lorena Avenue
                              Wood River, Illinois 62095
16                            618-216-5291
                              Tmaag@maaglaw.com
17
     For FFL Illinois         SEAN ANTHONY BRADY
18                            KONSTADINOS T. MOROS
                              PLAINTIFFS: Michel & Associates,
19                            P.C.
                              180 East Ocean Boulevard, Suite 200
20                            Long Beach, CA 90802
                              562-216-4464
21                            Sbrady@michellawyers.com
                              Kmoros@michellawyers.com
22                            Case 3:23-cv-00209-SPM

23

24

25
```

```
 1
      For Defendants          CHRISTOPHER GRAHAM WELLS
 2                            KATHRYN HUNT MUSE
                              Raoul, Kelly, Illinois Attorney
 3                            General's Office and Pritzker:
                              Public Interest Division
 4                            100 West Randolph Street
                              Chicago, Illinois 60601
 5                            312-814-1134
                              Christopher.wells@ilag.gov
 6                            Kathryn.Muse@ilag.gov

 7    For Randolph Co.        KATHERINE FAY ASFOUR
                              Defendants: Evans & Dixon, LLC
 8                            211 N. Broadway, Suite 2500
                              St. Louis, MO 63102
 9                            314-552-4005
                              Kasfour@evans-dixon.com
10
      For McHenry Co.         NORM VINTON
11                            Defendants: McHenry County State's
                              Attorney's Office
12                            2200 North Seminary Avenue
                              Suite 150
13                            Woodstock, Illinois 60098
                              815-334-4159
14                            Tcowens@mchenrycountyil.gov

15    For Defendant Cole      KEITH B. HILL
      Shaner:                 Heyl, Royster, Voelker & Allen, PC
16                            105 West Vandalia Street,
                              Mark Twain Plaza III, Suite 100
17                            Edwardsville, Illinois 62025
                              618-656-4646
18                            Khill@heylroyster.com

19    For St. Clair Co.       THOMAS R. YSURSA
                              Becker, Hoerner & Ysursa, P.C.
20                            Generally Admitted
                              5111 West Main Street
21                            Belleville, IL 62226
                              618-235-0020
22                            Try@bhylaw.com

23

24

25
```

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2               (Proceedings commenced at 1:35 p.m.)
 3          COURTROOM DEPUTY:   United States District Court for
 4   the Southern District of Illinois is now in session.   The
 5   Honorable Stephen McGlynn presiding.   The Court calls case
 6   number 23-CV-209 Caleb Barnett vs. Raoul, et al.   The case is
 7   called for a status conference.   Parties, if you would please
 8   identify yourselves for the record.
 9          MR. ROWEN:   Good afternoon, Your Honor.   This is
10   Matthew Rowen for the Barnett Plaintiffs.
11          MR. MAAG:   Thomas Maag for the Langley Plaintiffs.
12          MR. SIGALE:   Good afternoon, Your Honor.   David
13   Sigale, S-I-G-A-L-E, on behalf of the Harrel Plaintiffs.
14          MR. BRADY:   Good afternoon, Your Honor.   Sean Brady
15   and Konstadinos Moros on behalf of the FFL Illinois
16   Plaintiffs.
17          MR. PETER MAAG:   Peter Maag for the Langley
18   Plaintiffs.
19          MR. VINTON:   Norm Vinton from McHenry County State's
20   Attorney office on behalf of State's Attorney Patrick
21   Kenneally.
22          MR. WELLS:   Good afternoon, Your Honor.   Christopher
23   Wells on behalf of the State defendants Governor Pritzker, the
24   Attorney General and the Illinois State Police Director.
25          THE COURT:   All right.
```

1    MS. MUSE:  Good afternoon.  Kathryn Hunt Muse for the

2  State defendants, the same as Mr. Wells.  Thank you, Your

3  Honor.

4    MR. HILL:  Keith Hill on behalf of Cole Shaner.

5    MR. YSURA:  Good afternoon, Your Honor.  This is

6  Tommy Ysura on behalf of the St. Clair County defendants.

7    MS. ASFOUR:  Katherine Asfour on behalf of the

8  Randolph County defendants.

9    THE COURT:  All right.  Anybody else?

10    MR. LOTHSON:  Andrew Lothson for the Barnett

11  Plaintiffs.

12    THE COURT:  All right.  I apologize.  I only have --

13  on the screen I'm only seeing ten lawyers and there is more

14  than that so I don't know how this is -- how this works, if

15  you rotate out if you start to speak or what.

16    All right.  When we met in early January we talked

17  about -- and I asked the Plaintiffs to get together to talk

18  about how they see proceeding for a final hearing on the

19  merits.  This is the only case like this around the country.

20  In some of the cases, the parties have just submitted various

21  stipulations, declarations from certain witnesses and then

22  briefed it.  Others, they have called witnesses.  But let's

23  talk to -- who wants to take lead for the Plaintiffs in

24  talking about how you foresee proceeding?  Do you anticipate

25  calling any witnesses to testify live at a hearing?

1          MR. ROWEN:  I'm happy to start off for the

2     Plaintiffs.  This is Matthew Rowen who represents the Barnett

3     Plaintiffs, but I can speak on that.

4          So, yes, the Plaintiffs do intend to call witnesses.

5     You know, we heard Your Honor loud and clear at the last

6     status conference that in Your Honor's words we all need to be

7     trial lawyers now and to that end, I think as the State's

8     status report reflects, the parties have had a number of

9     discussions both along the plaintiff groups and between the

10    two sides about what needs to be proved in light of the

11    Seventh Circuit's opinion, which is in many days very

12    different from the standard under which the other cases in the

13    other jurisdictions have been proceeding.  And we've had

14    discussions in terms of how we can go about proving the

15    factual questions that the Seventh Circuit seems to have in

16    mind.

17         The State put forward a schedule that they put in

18    their status report that extends out into the fall.  To be

19    fair to the State, the Plaintiffs have not had a great time

20    reaching an agreement among ourselves, which I think reflects

21    the fact that there are four cases with different claims

22    against different parties.  And even just looking at the

23    Second Amendment claims we have some different perspectives in

24    terms of strategy.  That said, we, on the Plaintiffs' side,

25    heard and share Your Honor's desire to move quickly to a final

1  resolution so we've been trying to figure out way to tighten

2  the schedule for things like stipulated facts or narrowing the

3  scope of issues in dispute, but we haven't been able to make

4  much headway in terms of getting an agreement with the State

5  on those sorts of things.  You know, if anything, the State

6  seems inclined to want to litigate issues like standing that

7  we had thought may be behind us.

8       With all that said, we're here to work with Your

9  Honor to figure out how to move things along as expeditiously

10  as possible, while still recognizing that there are a lot of

11  moving pieces here that are going to be unique in the sort of

12  the constellation of these Second Amendment cases across the

13  country in light of the standard that the Seventh Circuit has

14  put us to.

15       THE COURT:  Mr. Wells, what does the Government

16  envision?  Does it envision calling any witnesses?  Does it

17  envision calling any witnesses or doing as they've done in

18  some other states where there's just declarations that have

19  been submitted and then argument?

20       MR. WELLS:  So Your Honor, I think it depends on what

21  Plaintiffs' case in chief is.  I think we are open to either

22  approach.  We do think there's some benefit to proceeding

23  primarily on the papers, that that could help streamline

24  issues.  I did want to just flag for the Court's attention

25  Mr. Rowen mentioned a status report and it's one that we filed

1   solely on behalf of the state defendants an hour before the

2   hearing so I completely understand if the Court has not had an

3   opportunity to review that.  I think it reflects some of the

4   difficulties that from our perspective that we've encountered

5   in trying to get some basic information about what the scope

6   of the claims are, what Plaintiffs are seeking which items, a

7   lot of pretty fundamental questions.

8        We've had some productive exchanges this week, but

9   frankly our suggestion in that status report is a couple of

10  things.  One, we think there would be significant benefit to

11  having the parties engage with the Magistrate to come up with

12  a proposed schedule that we can live with and that affords the

13  parties what they need in terms of discovery.  I think one of

14  the things that we're struggling with and I think we heard it

15  from Mr. Rowen is that what this case looks like now I think

16  is very difficult from Plaintiffs' perspective than when they

17  filed this case.

18        And to the extent they intend to change their theory

19  or strategy or the scope of their claims, that's their right.

20  We just have to know what those claims are and what evidence

21  they're going to present.  And given that we are the

22  defendants, who according to the Seventh Circuit if the record

23  stays as it is we are likely to fail, we need to know how

24  things are changing.  And that, I think is that's what we've

25  been trying to get at in our conferrals with Plaintiffs and

1    thus far we just feel like we don't have it.

2          So the State defendants have put forward at the

3    preliminary injunction proceedings a variety of declarations

4    from a variety of experts.  We think that, again, we could

5    move forward to streamline the proceeding on the papers so to

6    speak that would move things along, but we've got to know what

7    we're aiming at here because it seems to have shifted as I

8    think Mr. Rowen candidly acknowledged.

9          THE COURT:  Tom, did they file something today?

10         UNIDENTIFIED SPEAKER:  (Undiscernible.)

11         THE COURT:  All right.  I've been in jury trial all

12   week.  I'm told that something was filed in the last hour.

13   How long is it?

14         MR. WELLS:  It's probably longer than it should be.

15   This is Mr. Wells again.  Really what it is, Your Honor, is

16   our attempt to kind of summarize how we've conferred in the

17   interim between the last time we met.  It kind of summarizes

18   what we've heard from Plaintiffs, what we've communicated back

19   and frankly our two respective proposals on schedule.  And

20   again, I think what we're struggling with is understanding how

21   Plaintiffs are going to litigate this in light of what the

22   Seventh Circuit has said.  And once we get that clarification,

23   I'm hoping that it will streamline things.  But without that,

24   it's very hard for us to say, you know, what we're going to

25   present.

1          So for instance, we've learned I think just this week

2    that both the Langley Plaintiffs and the Harrel Plaintiffs,

3    which I think will come as a surprise to the Court, are

4    actually proceeding on challenging the provisions relating to

5    grenade launchers.  So we don't see that in the pleadings.  We

6    don't know where that is on the face of those complaints.  It

7    is kind of hard for us to talk about a hearing when I don't

8    know whether or not we're going to have to call an expert

9    talking about the history of grenades and their use in the

10   military context.  So our suggestion in the status report was

11   two-fold, Plaintiffs, that we should go to the Magistrate to

12   try to work out a schedule and we should frankly get amended

13   pleadings so we can know what it is these Plaintiffs are

14   challenging and what evidence -- what is their evidence of

15   standing for those items?

16          Again, we feel like we just don't have a picture of

17   what -- what exactly we're going to be litigating when we're

18   finding out this week that we're talking about grenade

19   launchers.

20          MR. SIGALE:  Your Honor, may I speak for a second?

21          THE COURT:  If you identify who is speaking.

22          MR. SIGALE:  This is David Sigale for the Harrel

23   Plaintiffs.  Two things, first of all after discussing with my

24   people we will not be presenting proof or advancing the

25   grenade launcher issue.  So just to clarify that.  Second of

1   all, Mr. Wells, I suspect filed that status report that he's

2   talking about in the Barnett pleading.  As being a noticed

3   attorney on that, I'm going to get that report like at 11:59

4   tonight so I haven't seen it.  Is there some way if someone

5   could e-mail it?  Otherwise, I have no idea what document

6   everyone is talking about.

7           MR. WELLS:  Sure.  This is Mr. Wells.  David, we will

8   e-mail it to you.  And again, our intent, we recognize that it

9   was a tight timeframe, but frankly, it is because we didn't

10  know Plaintiffs' position on our latest proposal from meet and

11  confer.  We didn't have any proposed schedule from the

12  Plaintiffs until 8:36 this morning.

13          MR. SIGALE:  I'm not --

14          THE COURT:  Let me do it this way.  What written

15  discovery is the Plaintiffs going to send to the State of

16  Illinois that -- what are the sort of things that you're going

17  to be asking in written discovery of the State of Illinois?

18          MR. ROWEN:  This is Matthew Rowen, again, for the

19  Barnett Plaintiffs.  I think the universe of factual inquiries

20  that at least my clients intend to present to the State is

21  relatively small and that the big universe of facts are in the

22  form of expert facts that under the Seventh Circuit's opinion

23  take the shape of things like, you know, physical

24  characteristics of different features of firearms or physical

25  characteristics of different combinations of features and

1    historical usage and things like that.  So I think the
2    greatest bulk of the facts that the Seventh Circuit's opinion
3    puts the onus on the Plaintiffs to put on are not things that
4    we're going to necessarily be asking the State.  You know, I'm
5    sure there will be a few things but the relatively largest
6    bucket will be expert discovery.

7           THE COURT:  I'm having a hard time hearing anybody.
8    Is there any way we can make the acoustics in here any better
9    than it is?  If I wear Hannah's headset does that work.  I
10   don't even know if it reaches.

11          Well, so the capabilities of the firearms -- and
12   you're going to ask the State about that?  Wouldn't it be
13   easier just to see if the manufacturer would give us the spec
14   sheet?

15          MR. ROWEN:  I apologize, this is Mr. Rowen again, if
16   the audio didn't go through.  What I'm saying is that for most
17   of the facts that the Seventh Circuit had said that the
18   Plaintiffs will need to prove, those are not the types of
19   questions or inquiries that at least my clients intend to ask
20   the State.  But in order to satisfy the federal rules of
21   evidence, a lot of that is going to need to come in through
22   expert discovery because a lot of what the Seventh Circuit at
23   least as we read that opinion goes beyond just the bare
24   physical specifications.  So, you know, I think from our
25   perspective the bulk of the factual development will be, you

1    know, expert discovery.

2          MR. MAAG:  Thomas Maag for the Langley Plaintiffs.

3    Yes, I agree that a lot of the specifications can come from

4    the manufacturers, I think such as owner's manuals.  There

5    are, of course, a compendium of learned treatises I think is

6    the way it's referred to in the federal rules that, of course,

7    discuss firearms specifications, both military and

8    non-military going back hundreds of years.  I think those are

9    appropriately if not directly at least as counsel indicated

10   through experts.  The kind of discovery I'm contemplating from

11   the State is more along the line of tell us what you do know,

12   if anything, to try to limit some of the background

13   information that we need to put on.

14          For instance, we've submitted that we believe that

15   there's millions of these AR-15 type rifles.  Well, the State,

16   tell us how many you think there are and perhaps if the answer

17   is sufficient then we can kind of nip the need for formal

18   proof of 20 million AR-15 rifles in the United States.  If

19   they admit to some sufficiently large number we can cut that

20   in the bud as it were and just use their admissions, but

21   mostly background information is what I'm contemplating fact

22   wise from the State.

23          THE COURT:  All right.  Let the record reflect that

24   was Tom Maag speaking.  From the Government's standpoint, what

25   is the discovery you're seeking from the Plaintiffs?

1          MR. WELLS:  Sure.  In the first instance, we're going

2    to ask basic information like what weapons do you seek to

3    purchase or sell, what -- what weapons are you claiming in

4    common use?  For instance, the Seventh Circuit opinion was

5    pretty focused on AR-15 type rifles.  The Plaintiffs'

6    pleadings were focused on AR-15 type rifles.  Mr. Maag alluded

7    to it, is there a dispute about how many there are in

8    circulation?  We need to know the support for the Plaintiffs'

9    assertions about, oh, there are 24 million.  Okay.  What is

10   the backup for that?  Are there other types of weapons that

11   Plaintiffs are specifically challenging and what other kind of

12   common use numbers for that?  Are they going to proceed with a

13   common use theory on those?  Again, and I think kind of the

14   first baseline question we're asking is what happens, what

15   weapons do you want to purchase, what weapons do you want to

16   sell, what weapons do you want to manufacture?  And then I

17   think that leads to the question of what are the

18   specifications of those weapons, what is the design history of

19   those weapons?  Are they military in nature or military in

20   origin?  That is, I think, what we're bumping up against is

21   just a lack of basic understanding that beyond the AR-15 and

22   the modern sporting rifles, as Plaintiffs characterize them,

23   what else are we talking about because we need to develop --

24   we need to understand what specific weapons so we can have

25   experts opine on the characteristics of those opinions.

```
 1              THE COURT:  But you're already submitted experts.

 2              MR. WELLS:  This --

 3              THE COURT:  When this was all filed there's

 4    affidavits from experts, the Government has affidavits of

 5    experts.  They had detailed reports.  You submitted writings,

 6    Plaintiffs have.  I don't think we should try to make this

 7    tougher than it is.

 8              MR. WELLS:  Just to clarify, the Plaintiffs have not

 9    submitted expert declarations.  We have not gotten any expert

10    information or expert disclosures from the Plaintiffs and

11    again, I think what we're bumping up against is that the case

12    as pled focused on modern sporting rifles and AR-15 type

13    rifles.  That was the scope of the Seventh Circuit's ruling.

14    Now, we understand from our conversations with Plaintiffs that

15    they've got different -- nine different categories as they

16    assess it of firearms that they're going to introduce proof

17    on, but we don't know what those nine categories are.

18              While we have experts who opine on different parts of

19    the statute in modern sporting rifles in particular, we don't

20    know what Plaintiffs are going to introduce proof on beyond

21    that specific category of weapons.

22              THE COURT:  Any other Plaintiffs want to discuss

23    issues surrounding discovery?  All right.  So the firearms

24    that are commonly held, owned, there's a lot of data in the

25    records already.  I would imagine that maybe some of the
```

1    Plaintiffs that are sellers of firearms could testify that,

2    yeah, these are weapons that we hold out for sale and there's

3    a ready market for purchase by holders of Illinois FOID cards

4    who pass a background check.  There's a market for this,

5    people in Illinois are buying these guns.  The Seventh Circuit

6    had talked about 24 million versus some other number.  I mean,

7    let's be candid.  We know that there's a sufficient number of

8    AR-15s and other of the semi-automatic rifles sold in Illinois

9    to holders of FOID cards and that they possess them legally

10   before the enactment of the statute.  I don't think it's going

11   to be a tough hurdle to climb for most of these.

12          Now, if I recall correctly, you have the actual AK-47

13   is not widely held.  There's only a relatively small number of

14   them.  That doesn't mean that there aren't a bunch of copycats

15   or knockoffs.  Do we really think that there's going to be a

16   meaningful contest on whether or not there's sufficient AR-15s

17   owned in Illinois that they're not -- that it's so small that

18   it's not material.

19          MR. WELLS:  Your Honor, so I think there's AR-15s and

20   then there's other firearms.  Right?  The record is in a

21   different state on AR-15s than it is on other types of

22   firearms.  And again, from our perspective, it's in addition

23   to how many AR-15s there are, it's how are they used, right?

24   So for instance, the Plaintiffs have put in evidence from

25   Professional William English.  It is a survey.  It's not

1    evidence.  They've made allegations about a survey from Mr.

2    English.  Is that survey something that they're going to

3    attempt to introduce?  If so, we'd like to have the underlying

4    data that Mr. English relied upon.  We'd like to take his

5    deposition, right?

6            So I think there's more than meets the eye.  We're

7    not interested in discovery for the sake of discovery.  I

8    think we've shown that we can move incredibly quickly in these

9    cases.  This case was the first decision by any court of

10   appeal in the United States post *Bruin* on assault weapons

11   statute, and it came out ten months after the case was filed.

12   But what we need to know, again, is what weapons -- like, for

13   instance, if there are weapons -- Your Honor mentioned the

14   AK-47 fully automatic version, I doubt there are that many in

15   Illinois.  There are other firearms that are mentioned in the

16   statute that are no longer produced for the domestic US

17   market.  If we want to take those off the litigation list,

18   that's great.  That will simplify things.

19           I can't get Plaintiffs to commit to that, though.  I

20   can't get -- like for instance, I know Mr. Maag has extensive

21   firearm knowledge and we've seen in this case he'll introduce

22   in reply, oh, what about these guns?  What about these guns?

23   It is very hard as a defendant to know what evidence we need

24   when we don't even know what it is these Plaintiffs claim they

25   want to do that they can no longer do.  AR-15s, I get it.

1    Beyond that, we need basic disclosures in accordance with the

2    Federal Rules of Civil Procedure.

3         THE COURT:  What is in the legislative record?  I

4    mean, *Bruin* was -- *Heller, McDonald* and *Bruin* were the law of

5    the land when the statute was passed.  It is not like the

6    Government wasn't on notice that there were tests that the

7    Supreme Court or important things to the Supreme Court that we

8    relate to gun ban legislation in these -- this is certainly

9    gun ban legislation.  Is there anything in the legislative

10   that you guys developed that said, well, we can ban this gun

11   because nobody owns it?

12        MR. WELLS:  Well, Your Honor, I would say, one,

13   again, this Court is an Article 3 court that decides cases or

14   controversies as presented by the parties.  Whether or not

15   there was -- the scope of the legislative record, frankly,

16   there is a lot of evidence in the record about AR-15s.

17   There's witnesses from Highland Park for instance.  Are we

18   going to call those witnesses?  I mean, there's a lot in the

19   record if we want to retread the legislative history.  Again,

20   I don't know that that is necessary and frankly it may be

21   overbroad because if Plaintiffs are really -- if they can

22   articulate for us beyond the AR-15 group what it is that

23   they're actually challenging, then maybe we don't need to go

24   into the legislative record.  This Court, again, is here to

25   decide the case or controversy that Plaintiffs present, not

1    the kind of was this a good law, was this a bad law?  Should

2    it be tweaked here or elsewhere?  We have got to litigate what

3    the Plaintiffs are coming forward with.

4          THE COURT:  All right.  Did I hear somebody say

5    earlier -- suggest earlier that maybe there would be a

6    conference with a magistrate or a judge with the parties to

7    see if some of this stuff can be narrowed?

8          MR. WELLS:  Yes, Your Honor.  This is Mr. Wells.

9    That was our proposal to the Plaintiffs and we would

10   absolutely support that and think it would be beneficial.

11   Again, I think we've had some productive exchanges but even

12   just getting everybody on the phone has been a challenge.  So

13   get in front of a magistrate and trying to be collaborative as

14   we've shown to be in the past, I think that would be certainly

15   helpful from our perspective.

16         THE COURT:  Has the Plaintiffs agreed amongst

17   yourself, or can you quickly agree amongst yourselves who --

18   what lawyer or lawyers would be the ones that would

19   participate in such a conference that could essentially

20   represent the interest of everybody with respect to the

21   specific guns that are banned and the attachments and

22   accessories and magazines?

23         MR. ROWEN:  This is Mr. Rowen for the Barnett

24   Plaintiffs.  If we are ordered to do so, we will endeavor to

25   do our best to do so.  I know that, as I mentioned at the

1  outset, there are some different claims against different

2  parties among the four cases which adds a wrinkle and then

3  some differences of perspective on exactly what is being

4  challenged.  So it may not be the case that we really can get

5  a single lawyer for the Plaintiffs, but, you know, if we are

6  ordered by the Court to do so, we will comply with whatever we

7  are ordered to do.

8          THE COURT:  You're ordered to do it so -- but instead

9  of making you all fly in on short notice, even if it's two or

10  three Plaintiffs' lawyers, do you think you guys can -- I

11  mean, some of you guys are handling these cases nationally.

12  Most of you are recognized as experts in Second Amendment

13  cases, and I don't know how tough it would be.  I mean think

14  about it.  But when I asked you last month to -- for you guys

15  to get together and try to put together a joint proposal, that

16  hasn't worked out, has it?

17          MR. BRADY:  Your Honor, this is Sean Brady on behalf

18  of the FFL Plaintiffs.  I think perhaps it would be helpful to

19  maybe put into perspective the discrepancy that the sides are

20  having on the scope of what is being challenged because I

21  think that would inform discovery -- I share Your Honor's view

22  that this should not be as labor intensive and discovery

23  intensive as I think the State might believe it is, but that's

24  because they have a different view than at least I do and I

25  believe the other Plaintiffs' counsel does about the scope of

1    these challenges.

2          We don't think that it's necessary to, for example,

3    let's take semi-automatic handguns with a detachable magazine

4    or with a threaded barrel, okay.  Under our view, all that

5    needs to be litigated is whether handguns, semi-automatic

6    handguns with threaded barrels generally as a category are

7    protected or not, are military arms or not.  It sounds to me

8    that the State is suggesting -- this is my understanding and

9    Mr. Wells can correct me if I'm wrong -- that they want us to

10   say you Plaintiffs need to have standing to challenge the

11   restriction on a Colt 1911 with a threaded barrel and a Rock

12   Island Armory 1911 with a threaded barrel or, for example,

13   semi-automatic rifles that we think all we need to do is

14   litigate whether semi-automatic center fire rifles with a

15   detachable magazine and one of or more of the features

16   identified by the statute, whether that as a group, as a

17   category are protected arms or not.  We don't think it's

18   necessary to go down the list of every single firearm on the

19   list of -- by make and model that are assault weapons

20   identified by make and model because unless the State can

21   identify some material difference in those models that would

22   make a difference in the legal analysis.

23          So that I think -- if all we need to do is say, look,

24   semi-automatic center fire rifles with a detachable magazine

25   and one of the features as a category, whether you're talking

1    about the base model AR-15 like a Colt or Ruger that's a

2    thousand bucks and millions of people have them or a very

3    high-end AR that is custom made that only a few people have,

4    we think that we don't need to litigate every single specific

5    make and model of a gun.  We just need to litigate the

6    category of them.  And I think if we get some input on how we

7    would go about doing that -- and that's why I -- well, it's

8    obviously Your Honor's decision whether to order us to go to a

9    magistrate, but my concern with that is that that piece would

10   not be understood by a magistrate or appreciated in how we're

11   going -- how Your Honor wants to litigate this case.

12           MR. WELLS:  Your Honor, this is Mr. Wells.  If I may,

13   just to clarify, I don't think our position is we need to go,

14   Your Honor, threaded barrel by threaded barrel per firearm.  I

15   think there are categories like the AR-15 type that we've

16   already focused on.  I think, again, Mr. -- where I think we

17   break ways with Mr. Brady is that, again, this Court is here

18   to decide what Plaintiffs come forward and say they want to

19   purchase or sell or manufacture and as we see it we don't see

20   a lot of allegations indicating that, hey, you know what, we

21   wanted a threaded barrel or a rifle where the only

22   characteristic that it has that brings it within the scope of

23   the statute is the threaded barrel.  That's not how we see the

24   case pled.  We see the case pled as about modern sporting

25   rifles and maybe a handful of other things, but that's the

1    case that has been presented here.

2           So to the extent that Mr. Brady is willing to tell me

3    which of his Plaintiffs had an intent to acquire a

4    semi-automatic rifle with a threaded barrel and that's the

5    sole characteristic that brought it within the scope of the

6    statute before January 9th, just tell us who that is, right?

7    These are just kind of basic questions of standing that will I

8    think inform the scope of what we actually have to litigate.

9    I agree there's room to focus and streamline here, but it

10   comes down to Plaintiffs telling us what specifically they're

11   challenging about the statute and what they have standing to

12   challenge.

13          MR. BRADY:  Your Honor, Sean Brady.  I just wanted to

14   really quickly -- and then I'll defer to Mr. Sigale unless

15   Your Honor wants to say something.  I just want clarification

16   from Mr. Wells because if he is saying all Plaintiffs have to

17   do is to present somebody who says I want a semi-automatic

18   center fire rifle with a detachable magazine as one of the

19   features and doesn't have to say specifically one of the makes

20   and models that are -- that I want this specific make and

21   model, then I think we're in agreement on --

22          MR. WELLS:  Mr. Brady, again, I think we had

23   productive discussions.  Again, the case has to be litigated

24   in the real world, right?  Like what gun did they want to buy

25   that they can no longer buy?  That has got to be the focal for

1    Article 3 standing.  How have they been injured by the

2    statute?  It's not come in and let me red pen the statute.

3    It's what do you want to buy that the statute says you can no

4    longer buy or possess or whatever.  That should dictate what

5    the evidence in the case is.

6           MR. SIGALE:  Your Honor, David Sigale for the Harrel

7    Plaintiffs.  And while I wish to first throw my concurrence

8    behind Mr. Brady's stated position regarding the issue I also

9    just want to clarify for the Court that of course while we

10   will follow all court orders regarding working to narrow the

11   issues and expedite discovery within the scope of those

12   issues, the Harrel Plaintiffs are not -- do not wish to have

13   this matter before a magistrate.

14          THE COURT:  No.  The discussion is going to be before

15   me.  I don't think that this -- this shouldn't be that tough.

16   We know what -- so looking at the discussion in *Bevis*, the

17   Seventh Circuit referred to the AR-15 and all of its cousins,

18   which signalled to me that they were kind of lumping --

19   lumping them all together, even if some had larger sales than

20   others.  So if you say that the AR-15 is the FI50 Ford truck

21   and one of these others is, you know, Toyota, they seem to be

22   lumping them all together and not necessarily insisting that

23   each one has to be examined the way they looked at the AR-15.

24   The analysis they had seemed to me to be more talking about

25   the capabilities, perhaps, as an example.  They pointed out

1   that the AR-15 fires three hundred rounds a minute in

2   semi-automatic mode.  That's five finger pulls a second every

3   second for a minute.  I mean unless you have a ten-foot long

4   magazine on that or a barrel magazine that would be the size

5   of a medicine bottle you wouldn't be able to get that done.

6   So there may be come confusion on that, but more importantly

7   the -- we need to narrow this down and I think what has to

8   happen is a very quick meet and confer that I will supervise

9   and then we'll talk about these things.  With respect to with

10  *Friedman and Bevis* in the sorting between military and private

11  use, the military has told us what is reserved for military

12  use.  We already know that.  The M4, the M16, full mil spec,

13  that has the capabilities of switching between semi-automatic

14  versus fire and full automatic.  If the firearm does not have

15  that capability, it's not reserved for our military.  Okay?

16  That's a pretty good starting point.

17          So now you have to ask yourself, all right, well,

18  then if the arms are not excluded from the Second Amendment,

19  because they're not reserved to the military, so then they are

20  within the range of the reach of the reach of the Second

21  Amendment then you're looking at, all right, if these are arms

22  then can they be -- can Government, a Government restrict the

23  sale of possession of some of them because they are more

24  military like than they are civilian like.  That's not going

25  to be -- that's going to be an interesting test to apply.

1        But I'm looking at the proposed timeframe from the

2   Government.  That is way, way too long, getting us out in

3   November.  I don't want to do that.  In studying what other

4   courts have done with these things and thinking about what one

5   would present for a final hearing on the merits and what

6   they've done in other courts, I don't think that it's going to

7   be too terribly difficult to do.  I suspect that the State

8   will probably come up with a handful of experts to talk about

9   different things, maybe identify as experts some of the

10  affidavits and material that they filed in opposition to the

11  Plaintiffs' various motions for injunctive relief.  I don't

12  know what the Plaintiffs are going to do, but I mean some

13  Plaintiffs are bona fide experts in their own right.  They

14  sell these things.  They are federally licensed firearm

15  dealers.  And so they can -- their opinions could be relevant

16  as to what sales are like at their facilities, what was the

17  market in Illinois, are there people who are buying these

18  weapons?  Are there different features that might be more

19  attractive to different people, but it doesn't have to be that

20  complicated.

21        I also think that a lot of the stuff can be narrowed

22  down.  You probably could stipulate to stuff if you -- to a

23  lot of it if you are so inclined to work together, but the

24  Plaintiffs and defendants don't have to work together.  You

25  can make more work for yourselves.  That's for sure.  The sort

1  of things that I think I would be looking at is are these

2  firearms commonly owned and held by civilian gun owners for

3  any lawful use and might it include self-defense.

4          Now, the Seventh Circuit spoke only about

5  self-defense in the home and, of course, we are called upon to

6  defend ourselves in a lot of other places than just the home.

7  Maybe at work.  Maybe -- think of a woman who has some maniac

8  stalking her and is looking to jump when she's most

9  vulnerable.  That might be walking on a poorly lit parking

10  lot.  There are a lot of cases that people are called upon to

11  defend themselves, and I'm not going to limit it to just

12  looking at on what guns would be helpful to you if you were at

13  your front door fully armed confronting somebody at your front

14  door that was trying to get in.  Self-defense situations,

15  scenarios have a lot more dynamics than just that.  Magazines

16  and attachments, are they commonly owned by civilians?  With

17  respect to attachments does it have a use or function that may

18  be of value to citizens, improve accuracy, improve the fit of

19  the gun, improve safety, protect against hearing damage,

20  reduce recoil, add or increase tactical advantages that the

21  person engaging in self-defense might enjoy with these

22  additional attachments.  So those may be things that you want

23  experts to testify about.

24          As far as written discovery, from the State's

25  standpoint you're defending a law that you've already written

1    and one presumes that you've looked into all these things

2    before they passed the law.  Now you're trying to play

3    catch-up and figure out what are the ramifications of what

4    they actually banned, what are the uses to citizens of guns

5    they've already denied them the right to purchase.

6            I'm not interested in delaying this case for any

7    length of time so the Government can figure out what it is

8    that they actually passed in legislation.  I think that the

9    lawyers in this case have demonstrated a very facile

10   understanding of firearms and the attachments.  They are not

11   without resources to secure information about the -- you know,

12   what is in the owner's manual with respect to these guns.

13   Most of these guns will tell you, the manufacturer will tell

14   you what the expected rate of fire is for Bennett.  Is it 60

15   rounds a minute?  It is a 100 rounds a minute?  Whatever.  But

16   that should not be that difficult to get and I would think

17   that the manufacturers and sellers of a lot of these firearms

18   would be more than happy to cooperate with the Plaintiffs.

19           There are millions of people in Illinois that buy

20   these firearms.  There's a market for it.  There's millions of

21   people that look to buy ammunition so they can use their

22   firearms, they can practice firing their firearms, so it

23   should not be that difficult.  Anybody else want to weigh in?

24   Dave, do you have anything else you wanted to say about

25   discovery?

```
 1            MR. SIGALE:  I'm sorry, Your Honor.  David Sigale.

 2    Is Dave me?

 3            THE COURT:  That's you.

 4            MR. SIGALE:  It is.  Okay.  Well, I'm normally not

 5    one to pass up an opportunity for a soap box, but, no, Your

 6    Honor.  I have nothing more to say.  What Matt and Sean said I

 7    think summed it up really well.  Thank you, though.

 8            MR. WELLS:  Your Honor, if I may just make a couple

 9    of observations.  One, I appreciate all the items the Court

10    noted of particular interest, and I think that is very helpful

11    to the State defendants.  I think one of the things that would

12    be very clarifying for us is to get an understanding from the

13    Court if the Court is open to a quote/unquote trial on the

14    papers.  The advantage of that from our perspective is to the

15    extent is part of our concern here is the element of surprise.

16    We've got instances in this case where people are citing new

17    weapons in reply.  If we have a trial in the papers where

18    Plaintiffs are filing first and we can respond, that

19    significantly mitigates the anxiety that I think you're

20    hearing from me about, frankly, the element of surprise, which

21    the federal rules are designed to prevent.  That I think is at

22    the bottom of what we're going for here.  What do they have

23    standing for, what have we proven up and let's be clear about

24    that list so that there's not new stuff added along the way.

25            THE COURT:  Well, so it sounds like to me maybe a way
```

1   to move forward is for me to set a court-supervised discovery

2   conference.  There has not been agreement.  These type of

3   cases are a little different than your regular personal injury

4   action or contract dispute, but I think that if we set aside

5   some time soon for attorneys for the State to sit down and

6   confer with a representative group of the Plaintiffs' counsel

7   we can probably -- we can probably get 95 percent of this

8   hammered out and, you know, one of the things I wanted you

9   guys to be thinking about is what would trial look like.  Are

10  we going to rely on experts?  Are we going to call people in

11  to testify?  Are we just going to submit like business

12  records?  You know, the parties are going to stipulate that

13  the following documents are the owner's manual or

14  specification sheet for certain firearms that are identified

15  in -- specifically identified in the statute.

16          I don't know who owns a grenade launcher.  Can we

17  even own grenades legally?  You know, if you are launching

18  tennis balls to your golden retriever, I don't know what --

19  okay.  Unless you use it, as I say, to launch tennis balls to

20  your golden retriever or border collie, you know.

21          All right.  I'm in a jury trial for they tell me two

22  more weeks.  I don't think it's going to go quite that long.

23  Who do we have local?  We have the Maag brothers.  Who else is

24  in the St. Louis metropolitan area?  All right.  I -- by

25  Tuesday, Plaintiffs' lawyers are going to submit to me a

1    representative group of lawyers to participate in a

2    settlement -- a discovery conference and scheduling

3    conference.  Principally discovery to set the parameters of

4    discovery and then coupled with a suggested schedule for

5    others to look at and see if they think it can work.  I want

6    that by next Tuesday.  The discovery conference will be in

7    person so whoever is going to represent the Plaintiffs will be

8    expected to be here in person in East St. Louis.  I'll set

9    aside a day.  I don't know that it's going to need to take a

10   day but I'll set as much time as we need because based upon my

11   reading of other cases, as I say most of them have not -- most

12   of them have not ended up with lengthy evidentiary hearings

13   with a lot of testimony.  It's been more stipulations,

14   declarations, business records and the depositions of experts.

15           So all right.  Anybody else want to be heard on any

16   matter?

17           MR. SIGALE:  Just, Your Honor, David Sigale for

18   Harrel.  When the Court is setting that in-person conference,

19   if the Court would kindly not set it from March 1st to

20   March 8th, I'll be out of town.

21           MR. WELLS:  The same is true for the State

22   defendants.

23           THE COURT:  It will be before that.

24           MR. SIGALE:  I figured, but I wanted to make sure.

25           THE COURT:  In case you know, I've been good about

1     your vacations.

2          MR. WELLS:  I know, Your Honor.  I appreciate it and

3     I know my wife and my two children do too.  I sincerely do

4     appreciate it.

5          MR. SIGALE:  The same, Your Honor.

6          THE COURT:  Anybody else?

7          MR. WELLS:  If I could just clarify.  So the

8     Plaintiffs are submitting it to the Court.  Are they filing

9     that on the record or are they going to just tender it en

10    camera and copy us?  I just want to make sure that -- I wasn't

11    exactly sure as to who is getting it on Tuesday if that makes

12    sense.  Sometimes if it's negotiations it goes only to the

13    judge.  It sounds like this is something that might be filed

14    on the docket or tendered to us simultaneously, I presume.

15         THE COURT:  I'm sorry.  The audio in here is bad.  I

16    missed some of that.

17         MR. WELLS:  This is Mr. Wells.  I was trying to get

18    clarification that Plaintiffs are going to submit their list

19    of counsel both to the Court and to us, the State defendants

20    at the same time.

21         THE COURT:  Well, they have to submit it to me, at

22    least.  Why don't you guys submit to me?  If there's a dispute

23    between the Plaintiffs, I'll decide that first and then I'll

24    promptly inform you, Chris, who is on that team and you guys

25    would be free to talk about these issues before we get

1    together, but we'll be planning to get together promptly.

2            MR. WELLS:  Understood.

3            THE COURT:  All right.  Anybody else?  All right.

4    This is a very important matter.  The claimants believe that

5    their constitutional rights have been imperiled and so it's

6    the Court's belief that I should try to work through this with

7    as much dispatch as possible, understanding that we want to

8    get it right and that whatever discovery needs to be exchanged

9    can be exchanged, but also understanding that in these cases

10   there generally isn't a lot of prolonged and detailed

11   discovery.

12           So -- I would encourage the Plaintiffs to continue to

13   confer amongst themselves, trade information about who you may

14   want to call as live witnesses and why, see if you guys can

15   agree on an expert or two and I'd be reaching out to these

16   manufacturers and seeing what kind of business records that

17   you can get from them that the State might agree are

18   admissible business records and that could be relied upon for

19   the Court to answer some of the questions that might be

20   relevant to the inquiry.  With that, we are adjourned.

21   Everyone enjoy your weekend.  Thank you.

22           (Proceedings concluded at 2:32 p.m.)

23

24

25

```
1                      REPORTER'S CERTIFICATE

2                      *   *   *   *   *   *   *

3       I, Erikia T. Schuster, RPR, Official Court Reporter for the

4    U.S. District Court, Southern District of Illinois, do hereby

5    certify that I reported with mechanical stenography the

6    proceedings contained in pages 1-34 and that the same is a

7    full, true, correct and complete transcript from the record of

8    proceedings in the above-entitled matter.

9

10   /S/ Erikia T. Schuster              2/5/2024
     IL CSR, RPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```