IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, *et al.*,<br>  Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, *et al.*,<br>  Defendants. | Case No. 3:23-cv-209-SPM (Lead Case) |
| DANE HARREL, *et al.*,<br>  Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, *et al.*,<br>  Defendants. | Case No. 3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*,<br>  Plaintiffs,<br><br>v.<br><br>BRENDAN KELLY, *et al.*,<br>  Defendants. | Case No. 3:23-cv-192-SPM |
| FEDERAL FIREARMS LICENSEES OF ILLINOIS, *et al.*,<br>  Plaintiffs,<br><br>v.<br><br>JAY ROBERT "J.B." PRITZKER, *et al.*,<br>  Defendants. | Case No. 3:23-cv-215-SPM |

**<u>MEMORANDUM AND ORDER WITH RESPECT TO
SCHEDULING AND DISCOVERY CONFERENCE</u>**

**McGLYNN, District Judge:**

In order to address potential confusion, the Court issues the following Order to clarify the path to move forward in this litigation in advance of the Scheduling Conference on February 28, 2024. The Court first notes that the parties may offer any relevant evidence and advance any arguments as to any relevant issue in this litigation.

## APPLICABLE LAW

This case is a constitutional challenge to the Protect Illinois Communities Act, Ill. Pub. Act 102-1116 § 1 (codified at 720 ILL. COMP. STAT. 5/24-1.9–1.10) [hereinafter PICA]. The Plaintiffs in this action argue that PICA is unconstitutional under the Second, Fifth, and Fourteenth Amendments. The focus of this Order will be the Second Amendment claims. The Supreme Court has provided guidance on how Second Amendment cases should be analyzed via a one-step historical test. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008). The Seventh Circuit has stated that their preexisting test from *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), is consonant with *Bruen*'s historical test because it was not explicitly abrogated by *Bruen. See Bevis v. City of Naperville*, 85 F.4th 1175, 1190–91 (7th Cir. Nov. 3, 2023).

*Bruen* ruled that the Government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. Moreover, two of the relevant metrics are "how and

why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Supreme Court emphasized in *Bruen* that *Heller* previously determined that "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen* at 47 (citing *Heller* at 627). Importantly, when considering weapons that were banned at the time of the Founding, "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.* The Second Amendment does not preclude restrictions or the outright prohibition of weapons that are "dangerous and unusual." *Heller* at 627. Therefore, the Second Amendment protects weapons that are in "common use" as long as they are not "dangerous and unusual." Put another way, weapons that fit into the "common use" category and not into the "dangerous and unusual" category cannot be proscribed by the federal or state governments.

Additionally, the Supreme Court stated that the "definition of 'bear' naturally encompasses public carry" because "[m]ost gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table." *Bruen* at 32. "Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (i.e., carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id.* As "the need for armed self-defense

is perhaps 'most acute' in the home, we did not suggest that the need was insignificant elsewhere" because "[m]any Americans hazard greater danger outside the home than in it." *Id.* at 33 (quoting *Heller* at 628) (citing *Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012)).

The Seventh Circuit contends that *Friedman* and *Bevis* do not suffer from *Bruen*'s instruction that any two-step test is "one step too many." *Bruen* at 19; *see Bevis* at 1191. This Circuit adopts a scheme in which, prior to conducting any Second Amendment analysis as to a weapon, attachment, or magazine, the Court must first determine if the item in question constitutes an "Arm" for purposes of the Second Amendment. *See Bevis* at 1192. If the item does not, then the Seventh Circuit holds that the Second Amendment has nothing to say about a law banning or restricting it. *See id.* This method is required even if the item otherwise falls within the definition of what constitutes an "Arm" as set out in *Heller* and *Bruen*. *See Bevis* at 1192–1202. The Seventh Circuit contends that this precertification process renders *Friedman* consistent with the "methodology approved in *Bruen*" that they employed in *Bevis*. *Id.* at 1191.

This Court is tasked with determining whether the Plaintiffs are entitled to the declaratory and equitable relief they seek; specifically, that Illinois be enjoined from enforcing the provisions of PICA due to their unconstitutionality. In *Friedman* and in *Bevis*, the Seventh Circuit has come at this question from a different direction than that utilized by the Supreme Court in *Bruen*. As will be more fully explained

herein, the Plaintiffs should proceed in their constitutional challenge to PICA offering evidence relevant to the tests of *Heller* and *Bruen* as well as the tests applied in *Bevis*.

The Court is mindful that the *Friedman/Bevis* test manifestly shifts which party bears the burden to prove which arms are outside the protective reach of the Second Amendment; *Bevis* requires the citizen to prove that the weapons in question are protected by the Second Amendment instead of placing the burden on the Government to prove that its law banning or restricting arms is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen* at 19.

In its treatment of the banned AR-15 "and its many cousins covered by the Act," the *Bevis* court opined that it was likely they could be banned because "[b]ased on the record before us, we are not persuaded that the AR-15 is materially different from the M16." *Bevis* at 1196–97. "*Heller* informs us that the latter weapon is not protected by the Second Amendment, and therefore may be regulated or banned; because it is indistinguishable from that machinegun, the AR-15 may be treated in the same manner without offending the Second Amendment." *Bevis* at 1197 (citing *Heller*). The Seventh Circuit "conclude[d] this portion of the opinion by stressing again that this is just a preliminary look at the subject" and that "Second Amendment challenges to gun regulations often require more evidence than is presented in the early phases of litigation." *Id.* (citing *Atkinson v. Garland*, 70 F.4th 1018, 1023–25 (7th Cir. 2023)). Because of this, the Seventh Circuit stated that "[t]here thus will be more to come, and we do not rule out the possibility that the plaintiffs will find other

evidence that shows a sharper distinction between AR-15s and M16s (and each one's relatives) than the present record reveals." *Id.* Moreover, "[b]etter data on firing rates might change the analysis of whether the AR-15 and comparable weapons fall on the military or civilian side of the line." *Id.*

## BURDENS OF PROOF

### I. Are the covered items "Arms"?

Considering the discussion above, the Plaintiffs must establish that the items in question are not items that are beyond the gravitational pull of the Second Amendment; in other words, that the items are not on the wrong side of the delimits of the Second Amendment. According to the Seventh Circuit, Second Amendment protection does not embrace "weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Id.* at 1194. Such items would not trigger Second Amendment protection even though they would otherwise clearly fit the definition of "Arms" as defined in *Heller* and reaffirmed in *Bruen*.

*Bevis* requires the Plaintiffs to establish by a preponderance of the evidence that:

1. The weaponry in question is an item an ordinary person would keep at home for purposes of self-defense;

2. The weaponry in question is not exclusively or predominantly useful in military service; and

    3. The weaponry in question is not possessed for unlawful purposes.[1]

*See Bevis* at 1194. If the Plaintiffs can prove the above three propositions, then the item is captured by the gravitational pull of the Second Amendment and the case ripens at that moment into a claim where the Second Amendment might have something to say about it, according to the Seventh Circuit's rationale in *Friedman* and *Bevis*.

Having been captured within the Second Amendment's gravitational pull, in order to land safely on terra firma, the Plaintiffs need only establish by the preponderance of the evidence that Arms, attachments, and/or magazines are in common use for any lawful purpose and are not otherwise dangerous and unusual. If they are able to establish all of the above, the Plaintiffs will have met their burden to prove that the ban of specific items in PICA violates their Second Amendment rights.

*Friedman* and *Bevis* do hold that fully automatic "machineguns" are categorically beyond the limits of Second Amendment protection. *See Bevis* at 1190 (quoting *Friedman* at 408) ("[W]e reaffirmed 'the rule that the Second Amendment does not authorize private persons to possess weapons such as machine guns and sawed-off shotguns that the government would not expect (or allow) citizens to bring with them when the militia is called to service.'").

That being said, the Seventh Circuit also acknowledges that, "[o]bviously, many weapons are 'dual use': private parties have a constitutionally protected right

---

[1] The example given for this prong of precertification (which is not a test, mind you) is a sawed-off shotgun. *See Bevis* at 1193 (quoting *Heller* at 625). With this in mind, it appears this prong applies *only* to a class of Arms or attachments and is not a component of the bearer's case-specific criminal intent.

to 'keep and bear them' and the military provides them to its forces. In this sense, there is a thumb on the scale in favor of Second Amendment protection." *Bevis* at 1195 n.8. This exceptionally important clarification resolves any confusion that an Arm can *never* enter the gravitational pull of the Second Amendment simply by virtue of the fact that the military may provide that Arm or a similar Arm to its forces or that they would be useful in a military or law enforcement setting. Clearly, the "dual purpose" rule does not require Arms, attachments, or magazines to be defined as *either* for an exclusively military purpose *or* for an exclusively civilian purpose. Just because an Arm has a "cousin in the military" does not mean that the Arm is beyond Second Amendment protection. *See Bevis* at 1196.

The Seventh Circuit's acknowledgement of the dual purposes of a weapon could fairly be restated as follows: a civilian can have a constitutionally protected right to keep and bear particular Arms, attachments, or magazines, even if the military provides the same or similar Arms, attachments, or magazines to its own forces or law enforcement provides them to its officers if the arms have a dual use. Critically, the Seventh Circuit places the "thumb on the scale in favor of Second Amendment protection" for dual-use Arms. *Id.* In acknowledging the obvious, as the Seventh Circuit words it, the task at hand comes into clearer focus. It also helps chart the path for discovery in this case and more clearly fleshes out how a hearing on the merits should look.

In this vein, the Plaintiffs may choose to provide evidence that semiautomatic rifles, carbines, and pistols/handguns; specified attachments (e.g., barrel shrouds,

foregrips, flash suppressors, etc.); and/or magazines holding a specified number of rounds and/or ammunition-carrying devices are commonly held by civilians for self-defense or other lawful purposes and are not exclusively or predominantly useful in military or law enforcement contexts. Even if they are used by the military or by law enforcement, dual use may still be demonstrated. Once dual use is established, the scale tips toward Second Amendment protection.

A.    **How Weapons Are Sorted Between Military and Civilian Uses**

It is important to understand that there are far more *similarities* than *dissimilarities* between military use and civilian use when it comes specifically to semiautomatic rifles and pistols. Thus, the sorting process must necessarily be much more probing and multifaceted and must consider why a citizen might select certain weapons for self-defense and the practical challenges citizens face when called upon to defend their lives.

1. **Military Use**

The M16 and M4 are designed to be carried by members of the military. Military members utilizing M16 rifles or M4 carbines do so in specific ways, from guarding critical facilities or equipment to advancing on specific targets. Such soldiers, marines, airmen, and sailors are deployed with various other pieces of equipment including (but not limited to) the following: a Kevlar helmet, body armor, utility uniforms, tactical boots, load-bearing vests, knives, flashlights, a radio, a sidearm, and copious quantities of spare ammunition, to list a few. Our troops also proceed into harm's way as a trained unit, supported by air cover, reinforcements,

medical support, naval support, and reconnaissance and intelligence from human and satellite sources. In such situations, the M16 and M4 are designed to fulfill a specific niche; their semiautomatic fire feature permits precise target shooting while their ability to fire in a three-round burst or in a fully automatic capacity is designed to provide suppression fire in a situation where members of a squad are moving to or from an objective. Military hardware must meet the exacting military specifications to fire in a fully automatic capacity for a substantial period of time without failure.

### 2. Civilian Use

The average civilian may be called upon to defend his or her person, family, or property from an armed attack or invasion. This person is usually ambushed or is the target of a sneak attack and is stuck with the weapons he or she has readily available. The civilian may be called upon to defend others who are not armed and often will not have time to plan or regroup with other allied defenders. Combat in the home or property may draw the civilian away from ammunition supplies. The storage of Arms in the household usually requires restricted access to firearms and munitions because they must be maintained under lock and key and inaccessible to children or those who might self-harm. In an emergent situation, the accuracy, safety, ease-of-use, and magazine capacity of an individual defense weapon may literally be the difference between life and death of the civilian and his or her family members.

Thus, while both members of the military and civilians may be called upon to engage in mortal combat, the civilian is often an "army of one" with no backup, no support, and no reinforcements in the moment when the attack occurs. The life and

death stakes mandate that their firearms have both lethal capabilities and give, at a minimum, our citizens a fighting chance. Therefore, sorting between military use and civilian use is an exercise in understanding the complex dynamics of self-defense in which lethal force may be required to repel a rapist, a murderer, an arsonist, a kidnapper, a stalker, an armed burglar, or multiple attackers at once.

Moreover, if our inquiry is fully satisfied by simply considering a self-defense scenario in which one physically fit person confronts one other person at his or her front door while armed with a pistol or pump-action shotgun, then this case is fairly straightforward. However, if we consider only that scenario, then our search is superficial and woefully inadequate. Considering only that scenario does a great disservice to citizens who face mortal combat under very different circumstances. Unlike members of the military who must meet rigorous physical standards in order to be deployed in combat, citizens who may find themselves in a self-defense scenario may be of various ages with various ranges of physical mobility. Unlike deployed members of the military, a civilian called to defend himself or others may not be able to operate a pump-action shotgun or a pistol by reason of disability, age, or infirmity. Therefore, such consideration of physically fit individuals only would impermissibly exclude the elderly, disabled, infirm, and others. It would also ignore the myriad challenges facing a citizen in defending himself or herself in a confrontation.

### 3. Characteristics and Considerations

The following non-exhaustive list of considerations may be relevant to whether or not an item has lawful purposes or falls within the dual-use category. Does the

item in question: expand the civilian's options for offensive or defensive strategy and/or tactics for the protection of an individual or others in confronting one or more armed assailants; improve accuracy, safety, comfort, or ease of operation; protect against hearing damage, flash blindness, or personal injury; reduce recoil; reduce or eliminate downtime (because of reloading, cycling, or lack of ammunition before the threat is neutralized); or accommodate a disability, handicap, or physical infirmity.

Regarding magazines and ammunition-feeding devices, either party can offer evidence that magazines with a capacity of more than ten rounds for rifles or more than fifteen rounds for pistols are reserved for military use. However, if the Plaintiffs establish that magazines of larger capacity for rifles and pistols are in common use and are dual purposed, then the Plaintiffs satisfy both *Bevis* and *Bruen* and the court may treat such magazines as protected dual-use Arms covered by the Second Amendment.

## II. Historical Tradition

If the Plaintiffs establish that the weapons, attachments, or ammunition-feeding devices proscribed by PICA are "Arms" included within the protective reach of the Second Amendment in line with *Friedman* and *Bevis*, the Government "must affirmatively prove" that PICA "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" via a showing of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen* at 19, 29. The Court notes that such raw data has already been provided in other Second

Amendment challenges across the United States. *See, e.g.*, *Rhode v. Becerra*, No. 28-CV-00802-BEN-JLB (S.D. Cal. 2024) (Doc. 79).

### ANTICIPATED FINDINGS OF FACT

The parties are to meet and confer regarding a discovery schedule and the date for a final hearing on the merits of the Plaintiffs' claims for declaratory and equitable relief. The Court has previously advised the parties that this case will proceed on an expedited basis. The Court evaluates issues regarding burdens of proof and the elements that the respective parties must prove by a preponderance of the evidence in order to succeed in their claims or defenses. While the Court sets out its analysis for moving forward, the parties should know that this Order will neither prevent any party from advancing any argument nor restrict any party from offering any relevant evidence or advancing other theories of the case which individual parties deem appropriate. When the Court does enter a judgment with respect to the claims in this case, the Court will make a series of findings of fact based upon the relevant caselaw of *Heller*, *Bruen*, *Friedman*, and *Bevis*. However, the parties are free to suggest the Court make specific findings of fact on other elements or issues they believe to be relevant to *Heller*, *Bruen*, *Friedman*, *Bevis*, or any other cases at hand.

The Court notes that the Seventh Circuit in *Bevis* treated semiautomatic rifles as a category in referring to the AR-15 "and its many cousins covered by the Act." *Bevis* at 1196. In light of this, the Court will treat evidence relevant to any of the banned firearms as relevant to the class or category of firearms to which that weapon belongs. Additionally, the Court will also consider any evidence relevant to a class or

category of firearms to be relevant to any individual firearm in that class or category of firearms.

*The factual questions the Court will address include:*

1. Is the item an "Arm" as defined in *Heller* and *Bruen*?
2. Is the item an "Arm" as defined in *Bevis*?
3. Is there a rational basis for a civilian to select a particular "Arm" for use in self-defense in the home?
4. Is there a rational basis for a civilian to select a particular item for use in self-defense outside the home?
5. Is there a rational basis for a civilian to select a particular item for use in self-defense to repel a riot or large-scale attack?
6. Is the item an "Arm" that may be used to resist tyranny?
7. Is the item exclusively or predominantly useful in military or law enforcement settings?
8. Is the item specifically designated by the United States military as a weapon to be acquired by the United States military and issued to its troops?
9. Does the item meet all of the specifications required by the United States military to qualify for issue as a rifle or pistol to be deployed with United States troops?
10. Is the weapon materially different from an M16, M4, or machinegun?
11. Is the firing rate of semiautomatic weapons banned by PICA materially different from the firing rate of the M16, M4, or fully automatic machineguns?

12. Is the item a dual-use Arm that may be used in both military and civilian settings?

13. Is the item principally possessed and used for unlawful purposes?

14. Is the item in common use?

15. Is the item "dangerous and unusual"?

### CLAIMS FOR MONEY DAMAGES PURSUANT TO 42 U.S.C. § 1983

Some of the Plaintiffs have brought claims for money damages under 42 U.S.C. § 1983. *See Fed. Firearms Licensees of Ill. v. Pritzker*, No. 23-cv-00215-SPM (Doc. 55). In response to these claims, the Defendants have filed a jury demand "for any and all claims that can be tried by jury." *Id.* (Doc. 77, p. 51). Parties are granted fourteen (14) days) to brief the issue of whether the amount to award in money damages is a question that is to be decided by a jury, should the Plaintiffs' challenge to PICA be successful in whole or in part. In the event this Court decides that the measure of monetary damages suffered by any Plaintiff is a question of fact for a jury, this Court will bifurcate the hearing on the merits of claims seeking declaratory and equitable relief from the hearing on monetary damages to which certain Plaintiffs may be entitled. Discovery as to any of the Plaintiffs' alleged money damages will proceed on a different track than discovery to be scheduled for claims seeking only declaratory judgment or other equitable relief.

**IT IS SO ORDERED.**

**DATED: February 23, 2024**

**/s/ Stephen P. McGlynn**  
**STEPHEN P. McGLYNN**  
**U.S. District Judge**
