# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, *et al.*, <br>     Plaintiffs, <br>          vs. <br> KWAME RAOUL, *et al.*, <br>     Defendants. | Case No.  3:23-cv-209-SPM <br> ** designated Lead Case |
| DANE HARREL, *et al.*, <br>     Plaintiffs, <br>          vs. <br> KWAME RAOUL, *et al.*, <br>     Defendants. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*, <br>     Plaintiffs, <br>          vs. <br> BRENDAN KELLY, *et al.*, <br>     Defendants. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS LICENSEES OF ILLINOIS, *et al.*, <br>     Plaintiffs, <br>          vs. <br> JAY ROBERT "JB" PRITZKER, *et al.*, <br>     Defendants. | Case No.  3:23-cv-215-SPM |

## **DECLARATION OF CRAIG TUCKER**

I, Colonel Craig Tucker, declare as follows:

1. I am at least 18 years old and have personal knowledge of the statements contained in this declaration;

2. The statements contained in the expert report I authored in this case, dated June 7, 2024 and attached hereto as Exhibit 1, are true and accurate;

3. If called to testify at trial in this case, I would testify to the matters set forth in my expert report and elaborated in the deposition testimony I provided in connection with the above-captioned cases. My testimony would be consistent with all of the statements in the report and deposition, which included a description of my qualifications as an expert witness, a complete statement of all opinions I would express, and the basis and reasons for those opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2024

_____
Colonel Craig Tucker (RET)

2

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CALEB BARNETT, *et al.*, <br>     Plaintiffs, <br>         vs. <br> KWAME RAOUL, *et al.*, <br>     Defendants. | Case No. 3:23-cv-209-SPM <br> ** designated Lead Case |
| DANE HARREL, *et al.*, <br>     Plaintiffs, <br>         vs. <br> KWAME RAOUL, *et al.*, <br>     Defendants. | Case No. 3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*, <br>     Plaintiffs, <br> vs. <br> BRENDAN KELLY, *et al.*, <br>     Defendants. | Case No. 3:23-cv-192-SPM |
| FEDERAL FIREARMS <br> LICENSEES OF ILLINOIS, *et al.*, <br>     Plaintiffs, <br>         vs. <br> JAY ROBERT "JB" PRITZKER, *et al.*, <br>     Defendants. | Case No. 3:23-cv-215-SPM |

**REPORT OF COLONEL (RET.) CRAIG TUCKER**

## BACKGROUND AND QUALIFICATIONS

1. I am a Colonel, U.S. Marine Corps (Retired). I served as an infantry officer in the Marine Corps for 25 years. I have commanded infantry units from platoon to regiment. I commanded Regimental Combat Team-7 (RCT-7) in Iraq from February 2004 to April 2005. During my time in Iraq, I commanded 22 different U.S. Marine, U.S. Army, and Iraqi Army battalions and exercised tactical control over Naval Special Warfare and U.S. Special Forces and supported National Tier 1 assets. I commanded the Regiment in both Fallujah battles and numerous smaller battles. I was the target of multiple assassination attempts and was wounded in one such attempt in Husaybah Iraq in July 2004. Upon my return from Iraq, I was assigned to the U.S. Marine Corps National Training Center and was responsible for training and certifying units for combat in Iraq and Afghanistan.

2. I have received two Legion of Merit awards for exceptional meritorious conduct in the performance of outstanding combat services, the Military Order of the Purple Heart, the Navy Commendation Medal for Heroic Action, the Combat Action Ribbon, and seven Sea Service Deployment Ribbons, among other awards.

3. After I retired from military service in 2006, I served as an Assistant Deputy Administrator for the Office of Secure Transportation (OST), National Nuclear Security Agency. OST is a paramilitary organization consisting of federal agents armed with M4s. I was also the Department's Render Safe deputy program manager in Albuquerque NM.

4. In 2012, I joined Innovative Reasoning LLC, which provides professional support services to the U.S. Department of Defense and other government clients. While at Innovative Reasoning, I developed training programs and planning capabilities for the Marine Corps, and I developed and taught a training course on tactical decision-making for law enforcement officers.

5.  Through my military service, I gained extensive knowledge and familiarity with the full range of U.S. Marines Corps combat weapon systems. A combat weapon system includes the weapon and the individuals handling the weapon. The M4/M16 service rifle is part of the foundational combat weapon system. Ground and aviation weapon systems are specifically designed to support the M4/M16 service rifle weapon system. My career was spent in command, responsible for unit operations for Regiments, Divisions, and the Marine Expeditionary Force (25,000+ personnel) or training and evaluating Marines for combat. My primary purpose in the latter stages of my career was coordinating, and teaching others to coordinate, air and ground weapon systems to support the rifleman and his M4/M16 service rifle.

6.  I have fired the Colt AR-15 5.56 rifle and the Smith and Wesson 5.56 AR rifle. Both are advertised as the civilian version of the M16 combat rifle. In addition, I have extensive experience with the AK-47, having been on the receiving end of hundreds of 7.62 rounds. I have extensive experience with the Colt 1911 .45 caliber semiautomatic and the Berretta .9m semi-automatic pistol and used both weapons in Iraq.

7.  I am currently retired, living in New Mexico. I raise alpine pack goats to provide backcountry experiences for veterans who can walk the miles but can no longer carry the weight. I hold a B.S. in Criminal Justice from the University of Dayton, a Master of Military Art and Science from U.S. Army Command and General Staff College and the U.S. Army School of Advanced Military Studies, and a Master of Arts degree in National Security and Strategic Studies from the College of Naval Warfare, where I graduated with the highest distinction.

8.  I have been asked by the Office of the Illinois Attorney General to respond to the report submitted by Jeffrey Eby and Michael Musselman (Eby/Musselman Report). I am being compensated at the rate of $200/hour for my work on this report and $400/hour for any testimony

in connection with this matter. In the past four years, I have served as an expert witness in *Rupp v. Bonta*, Case No. 17-cv-00746 (C.D. Cal.) and *Wiese v. Bonta*, Case No. 17-cv-00903, (E.D. Cal.).

9. I served with CWO-5 Marine Gunner Jeffrey Eby and CWO-5 Marine Gunner Michael Musselman in the U.S. Marine Corps. There are few people I respect more than Gunner Eby. Gunner Eby and I served side-by-side for four years, including 15 months of combat in Iraq. I would risk anything for the man. It is not a stretch to say Gunner Eby is responsible for any successes achieved in my Battalion and Regimental command years. I did not work as closely with Gunner Musselman but I know him by reputation and performance as a stellar Marine Gunner. The purpose of this declaration is to present a broader perspective to their arguments concerning the employment of the infantry combat rifle.

## **OPINIONS**

10. The Eby/Musselman Report states they are unaware of a single military in the world, let alone any branch of the U.S. military, that uses semi-automatic-only rifles for general combat purposes. They conclude that a semi-automatic AR-15 and other weapons restricted under Illinois law cannot meet military standards. Their report is correct in that all U.S. combat rifles have an automatic selector switch. What the report does not state is that semi-automatic fire is the preferred method of employment for all combat rifles and all U.S. forces. That preference is evident in training programs, tactical employment, and combat operations. The purpose of the M16/M4 in the offense is to provide aimed semi-automatic fire at the rapid or sustained rate in order to locate, close with, and destroy the enemy with fire and maneuver. The purpose of the M16/M4 combat rifle is to provide the rifleman an efficient and effective method of human destruction. That personal destruction is almost exclusively achieved by employing semi-automatic fire in response to a fire team leader's fire commands. This efficient killing is achieved

4

through weapon design, weapon cycle of operations, and extensive, continuous training on proper weapons employment. A Marine is not allowed to handle a combat rifle until he/she is trained and qualified annually through an extensive multi-week training *conducted almost exclusively using semi-automatic fire.*

11. In my 15 months of intense infantry combat, I never once saw any infantry member fire their rifle on automatic except for very short auto bursts upon room entry. These very short 10-15 round bursts spread across 10,000 infantrymen resulted in a critical ammunition shortage. During the First Battle of Fallujah in April 2004, the 1st Marine Division was down to one day of ammunition on hand before resupply units fought their way through.

12. This experience highlights one of the critical challenges associated with riflemen employing automatic fire: it is logistically unsustainable, even when employed judiciously. The M16/M4 is not a suppression weapon. For that reason, every unit, including the 4-person rifle team, carries a machine gun specifically designed to provide suppression to allow riflemen to maneuver and close with semi-automatic fire on the enemy.

13. Employing the M16/M4 to provide two minutes of suppression (as described in Eby/Musselman Report at 4) is particularly problematic. The first problem is logistics. An M16 on automatic is theoretically capable of firing 700-800 rounds per minute, 1400 rounds in two minutes. The rifleman combat ammunition load is usually 210 rounds spread through 7 magazines. Two minutes of suppression would require 46 magazines, adding significant weight to the combat load. Furthermore, after two minutes of suppression, the rifleman would need an immediate resupply. The second problem is the M16/M4 is not designed to fire on automatic for extended periods of time. The rifle overheats, requiring constant cooling. The heat can misshape the barrel, and the rate of misfires and magazine feed problems increases considerably. The third problem is

training. Marines employed as rifleman are not trained on M16/M4 automatic fire. There are no qualifications or annual requirements associated with M16/M4 automatic fire. A majority of Marines will only fire on automatic in training to familiarize themselves with handling the weapon on automatic. Weapons handling is the fourth problem. An M16/M4 on automatic is difficult to control and providing aimed fire of any type is very challenging. Thus, Eby and Musselman are correct to recognize the widespread preference for semi-automatic fire in the report, stating that "U.S. forces have employed semi-automatic fire during the last 60 years of combat…" Eby/Musselman Report at 6.

14. In their report, Eby and Musselman refer several times to "peer competitor[s]." Eby/Musselman Report at 4-6. The "peer competitor" concept is an intelligence-based planning and programming effort. A "peer competitor" is a nation with the technology and training to compete toe to toe with the U.S. Military in conventional war. The Department of Defense and the Services use the peer competitor concept to develop capabilities, weapons, equipment, doctrine, and tactics capable of countering or defeating the designated peer competitor. The peer competitor process has zero impact on the relative use of semi-automatic vs. automatic firing modes. For service rifles, semi-automatic fire will remain the preferred method of killing for all of the reasons stated above—logistics, training, weapons handling, and weapons function. The presence of a peer competitor does not require an increase in use of automatic fire.

15. Because standard issue military rifles are used for semi-automatic fire, an AR-15 could readily meet military standards. An M16/M4 fired semiautomatically is no different than an AR-15. The M16/M4 is a lightweight, 5.56 mm, air-cooled, gas-operated, magazine-fed assault rifle, with a rotating bolt. So is the AR-15. It has the exact same design.

6

16. The M16/M4 is a weapon of war specifically designed to kill as many people as possible as quickly as possible. The entire weapon is designed for efficient killing in rifle combat. Simply labeling the civilian version of an M16 as a "sporting rifle" or a "hunting rifle" does not change the true nature of the weapon of war, including its purpose and capabilities. The AR-15 and M16/M4 are both designed to kill efficiently and effectively.

17. Finally, I take issue with Eby and Musselman's suggestion that an AR-platform rifle is the "best designed home defense weapon." Before a particular weapon is selected for a specific purpose, a number of questions must be addressed, including:

   a. What is the nature of the threat?

   b. What other weapons are available that can accomplish a particular goal while limiting negative collateral consequences?

   c. Are the individuals armed with a particular weapon capable of handling it correctly?

The Marine Corps analyzes these questions at length before arming infantry rifleman with the M16/M4. However, Eby and Musselman do not address these questions at all before concluding that citizens should be armed with weapons of war.

## PUBLICATIONS

18. In the previous ten years, I have authored one publication: Craig Tucker, Kyleanne Hunter, Joe Plenzer, "The NRA Has Entered the Province of Cowards," The Daily Beast (published July 15, 2017).

Dated: June 7, 2024

/s/ *[signature]*
Colonel Craig Tucker

8