# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CALEB BARNETT, *et al.*,<br>        Plaintiffs,<br>                vs.<br>KWAME RAOUL, *et al.*,<br>        Defendants. | Case No.  3:23-cv-209-SPM<br>** designated Lead Case |
| DANE HARREL, *et al.*,<br>        Plaintiffs,<br>                vs.<br>KWAME RAOUL, *et al.*,<br>        Defendants. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*,<br>        Plaintiffs,<br>                vs.<br>BRENDAN KELLY, *et al.*,<br>        Defendants. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS<br>LICENSEES OF ILLINOIS, *et al.*,<br>        Plaintiffs,<br>                vs.<br>JAY ROBERT "JB" PRITZKER, *et al.*,<br>        Defendants. | Case No.  3:23-cv-215-SPM |

## DECLARATION OF JASON DEMPSEY

I, Jason Dempsey, declare as follows:

1. I am at least 18 years old and have personal knowledge of the statements contained in this declaration;

2. The statements contained in the expert report I authored in this case, dated June 8, 2024 and attached hereto as Exhibit 1, are true and accurate;

3. If called to testify at trial in this case, I would testify to the matters set forth in my expert report and elaborated in the deposition testimony I provided in connection with the above-captioned cases. My testimony would be consistent with all of the statements in the report and deposition, which included a description of my qualifications as an expert witness, a complete statement of all opinions I would express, and the basis and reasons for those opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August ____14____, 2024

_____

Jason Dempsey

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CALEB BARNETT, *et al.*,<br>    Plaintiffs,<br>       vs.<br>KWAME RAOUL, *et al.*,<br>    Defendants. | Case No.  3:23-cv-209-SPM<br>** designated Lead Case |
| DANE HARREL, *et al.*,<br>    Plaintiffs,<br>       vs.<br>KWAME RAOUL, *et al.*,<br>    Defendants. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*,<br>    Plaintiffs,<br>       vs.<br>BRENDAN KELLY, *et al.*,<br>    Defendants. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS<br>LICENSEES OF ILLINOIS, *et al.*,<br>    Plaintiffs,<br>       vs.<br>JAY ROBERT "JB" PRITZKER, *et al.*,<br>    Defendants. | Case No.  3:23-cv-215-SPM |

**REPORT OF JASON DEMPSEY**

## BACKGROUND AND QUALIFICATIONS

1.      I am a retired U.S. Army infantry officer. During my time in the military my operational assignments included tours in the 82nd Airborne Division, the 75th Ranger Regiment, the 3rd Infantry Division, the 10th Mountain Division, and the 101st Airborne Division (Air Assault). I served in these units at all ranks from second lieutenant to lieutenant colonel. I deployed to both Afghanistan and Iraq during my time in service, and last served as a special assistant to the Chairman, Joint Chiefs of Staff.  I am a graduate of the United States Military Academy, West Point and hold a PhD in political science from Columbia University.

2.      My relevant military training includes basic military training and pre-commissioning training at the United States Military Academy, West Point, the Bradley Infantry Fighting Vehicle Commanders Course, the Basic Airborne Course, the Jumpmaster School, Ranger School, the Combined Armed Services Staff School, and the Command and General Staff College. I also graduated with honors from the Infantry Basic Officer Leader Course and the Amphibious Warfare School of the United States Marine Corps.

3.      I have personally trained with, and overseen the training of others, on a full suite of military weapon systems including the M16 and M4 service rifles,[1] the M9 pistol, the M203 grenade launcher, the M249 Squad Automatic Weapon (SAW), the M60 and M240 machine guns, 60mm and 81mm mortar systems, the M72 and AT4 anti-tank weapons, and the M242 Bushmaster and TOW II missiles systems that are part of the Bradley Infantry Fighting Vehicle. As an infantry officer, my primary weapon was the M4 service rifle. The M4 service rifle I carried had a selector

---

[1] The M4 is essentially a shorter version of the M16, with a shorter barrel and adjustable buttstock.

lever allowing me to choose between the semiautomatic fire setting and the 3-round burst setting. It did not have a fully automatic setting. I also carried an M9 pistol.

4.    As a cadet at the United States Military Academy, West Point, I went through basic and advanced rifle marksmanship training in addition to training small unit maneuvers at the buddy-team, fire team, squad, and platoon levels. In later years I also supervised and managed the training of new cadets in these areas, in addition to spending a summer as an acting drill sergeant training new soldiers on these techniques during basic training at Fort Leonard Wood, Missouri.

5.    As an infantry officer in the 82nd Airborne Division, my job was to design and supervise the training of infantrymen at the platoon (~36 soldiers) and company (~120-160 soldiers) levels. This involved taking soldiers from basic individual proficiency with their assigned weapon systems up through platoon and company maneuvers. This training began with basic and advanced rifle marksmanship (individual weapons proficiency) and proceeded to training at the buddy-team, fire-team, squad, and platoon levels. Exercises at these levels were executed with all weapons systems organic to a light infantry platoon and included dry-fire, blank fire, and live-fire maneuvers, with a focus on the drills included in Army's Infantry Rifle Platoon and Squad techniques publication, ATP 3-21.8 ("ATP 3-21.8") (this is the core document that outlines fire and maneuver techniques for infantry units in both the United States Army as well as the United States Marine Corps).[2] These drills were augmented with unit-specific training that included airborne insertions and airfield seizures.

---

[2] Infantry Rifle Platoon and Squad, ATP 3-21.8, January 2024, Department of the Army, available at https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN40007-ATP_3-21.8-000-WEB-1.pdf.  ATP 3-21.8 was previously known as FM 3-21.8 and FM 7-8. During my service, I was trained on prior versions of the Infantry Rifle Platoon and Squad manual, including the 2007 version, linked here: https://www.marines.mil/Portals/1/Publications/FM%203-21.8%20%20The%20Infantry%20Rifle%20Platoon%20and%20Squad_1.pdf. The doctrinal

6.      My time in the 75th Ranger Regiment included the planning, resourcing, and supervision of similar training, with an additional focus on close-quarters battle, contested airfield seizures, and raids. The weapons systems employed in these exercises were similar to those employed by the 82nd Airborne Division with the addition of the .50 caliber Barrett sniper rifle and the Carl Gustaf 84mm recoilless rifle.

7.      As a company commander in the 3rd Infantry Division, I was again responsible for taking the platoons under my command through the same sequence of training to achieve weapons proficiency and the ability to maneuver at the team, squad, platoon and company level, with the addition of the ability to maneuver in conjunction with the Bradley Infantry Fighting Vehicle and M1 Abrams main battle tank. I deployed with this company to Kuwait where we patrolled the border with Iraq while training the maneuvers outlined in ATP 3-21.8 in addition to those outlined in ATP 3-90.1, The Armor and Mechanized Infantry Company Team.[3] We were also able to focus on trench clearing exercises, combined arms obstacle breaches, and coordinated mounted and dismounted attacks that utilized all weapon systems from the M4 to the 120mm cannon on the M1 Abrams.

8.      In 2005 I volunteered for a brief deployment to Iraq, where I traveled between Baghdad and Kirkuk working with State Department and military personnel to help draft and coordinate policy towards Kirkuk and the reconciliation of conflict stemming from the displacement of Kurdish and Shiite populations in northern Iraq. During this deployment I carried an M9 and an M4.

---

principles I discuss herein are the same in both prior and current versions of the Infantry Rifle Platoon and Squad document.

[3] Armor and Mechanized Infantry Company Team, ATP 3-90.1, October 2023, Department of the Army, available at https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN39568-ATP_3-90.1-000-WEB-1.pdf

9.     During my time with the 10th Mountain Division, I served as a battalion and brigade operations officer. In the role of battalion operations officer I oversaw, resourced, and approved all training for four maneuver companies preparing for deployment to Afghanistan. This involved coaching company commanders on the proper way to take their soldiers through individual marksmanship training and up to the ability to maneuver their companies in support of battalion-level operations. When we deployed to eastern Afghanistan, we established the first major presence of American forces to the east of the Kunar river along the border with Pakistan. Our mission was to interdict foreign fighters and insurgents attempting to enter Afghanistan while partnering with Afghan forces to defeat the insurgency in Kunar province. Upon our deployment, the role of operations officer shifted from overseeing training to setting and maintaining operational standards for all routine patrols and missions along with direct review of all operations that were classified as medium to high-risk or required external support such as indirect artillery fire or supporting aircraft. The hundreds of missions that I either personally planned or approved ranged from company level air assaults and raids on high-value targets to routine mounted and dismounted patrols in the villages and mountains of eastern Afghanistan.

10.    Midway through this deployment I assumed the role of operations officer for a brigade combat team conducting counterinsurgency operations across two previously unoccupied provinces to the south of Kabul. This role was similar to that of a battalion operations officer, but now I was in charge of resourcing and overseeing operations being conducted by six subordinate battalions. My job again involved setting and maintaining operational standards for all routine missions but included a greater focus on the allocation of air and other support assets in support of large operations and high-risk missions. In this role I designed and oversaw the execution of several large-scale operations involving infantry companies and battalions maneuvering in both

5

urban and mountainous environments, in addition to oversight and support to hundreds of more routine patrols and operations.

11.     My last operational assignment in the Army was with the 101st Airborne Division (Air Assault) as a combat advisor to Afghan National Security Forces. In this role I led a team of twelve other soldiers and officers. In preparation for our deployment, our training focused on individual small arms proficiency as well as buddy-team, fire team, and squad level maneuvers. All members of the team carried an M4 as their primary weapon system and an M9 as backup. Upon deployment, my team advised Afghan National Army and Afghan Border Police forces. The bulk of our advising involved training these Afghan units on staff functions and on 'how to train' their subordinates on the basics of small unit tactics, relying primarily upon the drills found in ATP 3-21.8.  During this tour we conducted hundreds of foot patrols, mounted movements, and air operations with our Afghan counterparts. Following this tour in Afghanistan I returned one last time for a brief assessment of the advisory mission.

12.     In addition to training on and carrying an M4 throughout my military career, I have fired similar rifles many times in civilian life. Upon completion of my deployment with the 101st Airborne Division (Air Assault) I purchased a commemorative Sig Sauer 516 Patrol FDE that, absent the ability to fire three-round bursts, is functionally an exact replica of the M4 that I carried in the military.

13.     I have been asked by the Office of the Illinois Attorney General to prepare a rebuttal report in response to opinions offered by Jeffrey Eby and Michael Musselman, J. Buford Boone, and David Lombardo. I am being compensated at the rate of $200/hour. I have not served as an expert witness in any other case.

14.    My opinions are based on my experience, military training, and study of military doctrine in my 22-year career in the United States Army.

**OPINIONS**

15.    Eby and Musselman opine that "virtually none of the firearms that Illinois has restricted" can meet the "standards that the military demands."  Eby/Musselman Report at 3. Regarding rifles, they base this opinion exclusively on a distinction in a firearm's "volume of fire." *Id*. at 6.  The M16-series rifles used by the military can fire on "burst or automatic fire." *Id*. The semiautomatic-rifles restricted under Illinois law cannot. *Id*. Thus, according to Eby and Musselman, a weapon such as an AR-type rifle is not "remotely sufficient to handle the military's requirements for weapons it uses against peer level countries." *Id*.  J. Buford Boone, III draws a similar distinction between semiautomatic AR-15s and the M-16, opining that "The actual firing capacity of the majority of shooters with the AR-15 would be even less than half that of the M-16, representing a significant difference between the two weapons." Boone Report, ¶ 77.

16.    I completely disagree that this "volume of fire" distinction has any significance in analyzing the relative utility or effectiveness in combat of an M16-series rifle compared to a semiautomatic-only AR-type rifle. The fact of the matter is that infantry riflemen serving in the military almost *never* use their M16-series service rifle for burst or automatic fire. I never did in my military service, nor was I ever trained, nor did I ever train soldiers, on any tactical scenario in which burst or automatic fire from infantry riflemen was called for. The tactical purpose of an infantry rifleman is to kill specific enemy targets with well-aimed, effective fire. The infantry rifleman fulfills this purpose through firing the M4/M16 on the semiautomatic setting. It would make *absolutely no difference* whether the infantry rifleman's well-aimed, effective semiautomatic fire came from an M16-series rifle with the selector switch in semiautomatic mode or from an AR-

type rifle that exclusively fires semiautomatically. The core distinction identified in Eby and Musselman's report is not a meaningful one based on how infantry riflemen are trained to operate the M4/M16 in combat.

17.    In my experience as an infantry officer with service at all echelons from platoon to brigade-level operations, I never once trained or instructed any infantry rifleman to use an M4/M16 service rifle on the 3-round burst or fully automatic setting. My first exposure to the use of the M16 included versions that still had a selector option for fully-automatic fire in addition to options for three-round burst and semiautomatic, and from that first exposure it was emphasized that the automatic fire and burst options were never to be used given the inaccuracy of the weapon in those modes, the increased likelihood of jamming, and the waste of ammunition such firing entailed.

18.    I have directly trained or supervised the training of thousands of infantry riflemen for combat, and I trained each and every one of them to fire exclusively on the semiautomatic setting.

19.    There are two reasons for exclusively semiautomatic use of the M4/M16 service rifle. First, semiautomatic fire is more accurate. If an infantry rifleman fires on 3-round burst with an M4/M16 service rifle, the first bullet may hit its intended target, but the recoil of the weapon is likely to send the next two rounds well above the initial point of aim. Even on the 3-round burst setting, the shooter will have to spend more time between each engagement bringing the weapon back on target, whereas the shooter on semiautomatic can more quickly deliver accurate fire. The same three rounds fired semiautomatically will all hit their target with nearly comparable speed. This difference in accuracy is only exacerbated when the M4/M16 rifle is fired on the fully automatic setting. Second, semiautomatic fire is more efficient. If two similarly skilled shooters engage in target practice with an M4/M16, one firing on burst and one firing semiautomatically,

the semiautomatic shooter will not only hit more targets more quickly, but will have more ammunition left over to pursue additional targets.

20.    These advantages of semiautomatic fire help to explain why, as Eby and Musselman acknowledge, "U.S. Forces have employed semi-automatic rifle fire during the last 60 years of combat . . ." Eby/Musselman Report at 6.

21.    My experience is not unique. Rather, it is grounded in basic military doctrine. ATP 3-21.8[4] provides the doctrinal framework for how infantry rifle platoons and squads fight.[5] This publication provides the basic templates for all light infantry operations at the team, squad and platoon levels. As an infantry officer I was expected to have a copy of earlier versions of this manual with me during training exercises, and every officer and non-commissioned officer at the company level will reference it regularly when designing, conducting, and evaluating training. It explains that the basic infantry unit in the U.S. forces is the fire team, consisting of a rifleman, an automatic rifleman, a grenadier, and a team leader. Each team member's duties are as follows:

    a.    The rifleman's purpose is "placing well-aimed fire on the enemy."[6] The rifleman is armed with an M16/M4 service rifle.

    b.    The automatic rifleman provides the fire team with "a high volume of sustained suppressive direct fires of area targets."[7] The automatic rifleman is armed with an M249 machine gun.

    c.    The grenadier is armed with a 40-millimeter grenade launcher to provide the fire team with high trajectory capability.[8]

---

[4]  Infantry Rifle Platoon and Squad, ATP 3-21.8, January 2024, Department of the Army, available at armypubs.army.mil/epubs/DR_pubs/DR_a/ARN40007-ATP_3-21.8-000-WEB-1.pdf

[5] While my discussion here focuses on the military doctrine described in the Army's ATP 3-21.8, I know from my experience in the U.S. Army that the basic infantry tactics of the United States Marine Corps do not differ in any material way.

[6] ATP 3-21.8 at 1-31.

[7] *Id.* at 1-30.

[8] *Id.* at 1-29.

      d.    The team leader has overall responsibility for the team members' actions[9] and carries an M16/M4 service rifle.

22.    Army doctrine provides that "the most important fire technique during fast-moving, modern combat is rapid semiautomatic fire. It is the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple or moving targets."[10] Accordingly, an infantry rifleman fulfills his or her primary purpose of providing well-aimed, effective fire through use of the M4/M16 service rifle set for semiautomatic fire.

23.    Eby and Musselman assert that combat sometimes requires the infantry rifleman to fire automatically, for example when providing suppressive fire when encountering a hidden opponent or when providing suppressive fire to allow a 3-man machine gun team to get set up. Eby/Musselman Report at 4. This opinion ignores the crucial distinction between an M4/M16-armed infantry rifleman and an M249-armed *automatic* rifleman.  It is the automatic rifleman who has the duty to provide suppressive fire from the M249, which is also referred to as the squad automatic weapon or "SAW."  Eby and Musselman throughout their opinion assign tasks to the M4/M16-carrying rifleman that doctrine assigns to the M249 squad automatic weapon. *See* Eby/Musselman Report at 3 (stating the infantry rifleman would provide suppressive fire) and 6 (stating infantry rifleman must train to provide suppressive fire). The M249 squad automatic weapon, which is designed for automatic fire, is a belt-fed weapon that utilizes a 200-round ammunition drum and is stabilized with an integrated bipod. This allows for automatic fire that is both more rapid and more accurate than can be provided by an M4 on 3-round burst or automatic fire. The M249 squad automatic weapon is also less likely to jam than an M4/M16 firing automatically.

---

[9] *Id.* at 1-27.
[10] Rifle Marksmanship M16-M4- Series Weapons (FM 3-22.9) at 7-12 (produced in this litigation at OAG003359).

24.    David Lombardo's testimony about automatic fire is similarly misleading. In a video produced as part of his expert disclosures, Lombardo opined that "if two or more individuals are operating together, one operator might opt to use full automatic to cause the enemy to seek cover which allows the other operator to run to a position of greater advantage." He offers this opinion after a video depicting an M4 rifle being fired on the automatic setting. While Lombardo is correct about the use of automatic fire to suppress, he does not explain that by military doctrine and practice such automatic fire would be provided by the M249 squad automatic weapon, rather than an M4/M16 service rifle. Even in a scenario with only two riflemen maneuvering independently without a squad automatic rifle, we always train that covering fire is provided by the riflemen in semiautomatic mode, as automatic fire from an M4 increases the likelihood of the weapon jamming and wastes ammunition, putting the riflemen at greater risk of becoming combat ineffective.

25.    There is no tactical requirement for automatic fire from the M4/M16 service rifle, because according to basic military tactics, an infantry fire team includes both the infantry rifleman to provide precision fire and an automatic rifleman to provide suppressive fire. In the basic formation of the infantry fire team, the fire team wedge, the infantry rifleman stands behind the automatic rifleman, as shown below:[11]

---

[11] ATP 3-21.8 at 3-47.



Figure 3-2. Fire team wedge

26. If circumstances require automatic fire, the "AR," or automatic rifleman, provides it from the M249 squad automatic weapon. There is no need for the "RFLM," or infantry rifleman, to provide duplicate automatic fire from an M4/M16, wasting ammunition that could be fired more accurately.

27. When fire teams are combined to form a squad, the infantry rifleman remains paired with an automatic rifleman, as shown below:[12]



Figure 3-4. Squad column, fire teams in wedge

---

[12] *Id*. at 3-53.

28.    Thus, when this squad column encounters an opponent and requires suppressive fire, there are two automatic rifleman who can meet that need with the M249 squad automatic weapon.

29.    When a group of infantry squads combine to form an infantry platoon, the duties of the automatic riflemen and infantry riflemen remain the same:[13]



Figure 3-7. Platoon column, example

[13] *Id*. at 3-68.

30.     In the larger platoon formation, just as in the smaller formations, any need for automatic fire is met by the multiple automatic riflemen armed with M249 squad automatic weapons. Eby and Musselman assert that the M4/M16 must provide suppressive fire to allow the 3-man machine gun team to get set up. Eby/Musselman Report at 4. This is not accurate. The platoon column in Figure 3-7 shows that the weapons squad is placed in the second tier (note the machine gun crew identified as "MG Team"). In front of the weapons squad is a lead squad with two automatic riflemen. These automatic riflemen will provide suppressive fire from an M249 squad automatic weapon to allow the machine gun team to set up, not the M4/M16s as Eby and Musselman opine.  Thus, under basic infantry principles, there is no need for an infantry rifleman to provide duplicative and wasteful automatic fire, when the squad automatic weapon can meet that need.

31.     This distinction between the unique duties of the infantry rifleman and the automatic rifleman similarly applies in training and practice.  Eby and Musselman explain that the demands of combat create a "critical" need to train with fully automatic fire and "constant training exercises" which focus on "sufficient accurate suppression with full auto firing." Eby/Musselman Report at 6. This is true when referring to how automatic riflemen practice and train with the M249 squad automatic weapon.  But it is entirely inaccurate when discussing the M4/M16 service rifle. I have never been a part of any training exercise in which any soldier was instructed to practice, rehearse, or train how to fire their M4/M16 service rifle on 3-round burst or automatic fire.

32.     Eby and Musselman are also incorrect to state that infantry rifleman only use semiautomatic fire because they have only engaged "non-peer enemies." Eby/Musselman Report at 6. I instructed infantry riflemen training to face opponents in Iraq and Afghanistan to fire their M4/M16 service rifles semiautomatically because that was the best way to effectively hit targets

with accurate fire. I would offer the exact same instruction to infantry facing "peer opponents." The suggestion that U.S. forces have used the M4/M16 suboptimally due to "low intensity" combat or an opponent that "lacked training, equipment, aerial support, or reinforcements" defies logic. Rather, the optimal use of the M4/M16 is semiautomatic fire, regardless of the opponent. In fact, military doctrine specifies that the basic tactical formations described above—in which the rifleman will always be accompanied by a squad automatic weapon for automatic suppressive fire—apply against a "peer threat."[14]

33.     Infantry doctrine also addresses the precise tactical scenario Eby and Musselman describe, in which U.S. forces are moving offensively and come under fire from a hidden opponent. Eby/Musselman Report at 4. ATP 3-21.8 describes a "movement to contact" operation, in which a company will "make initial contact with the smallest friendly force possible, consistent with protecting the force while retaining enough combat power to develop the situation and mitigate the associated risk."[15] An infantry unit would pursue such an operation with the formations described above, with automatic riflemen paired with infantry riflemen, each with a distinct duty. Nothing in military doctrine provides that in a Movement to Contact operation, the infantry riflemen usurp the role of the automatic rifleman and utilize suppressive automatic fire against the enemy.

34.     Because infantry riflemen fire their rifle on the semiautomatic setting, an infantry rifleman could fulfill his or her purpose with a semiautomatic AR-platform rifle rather than an M4 or M16 rifle. The semiautomatic AR-platform rifle functions identically to an M4 or M16 on the semiautomatic setting. As Eby and Musselman acknowledge, the military M4 and M16 series

---

[14] ATP 3-21.8 at xiii, "Preface" ("ATP-3-21.8 provides doctrine for the Infantry Rifle platoon and squad of the Infantry rifle company against a peer threat.")
[15] *Id*. at 4-8.

rifles use 5.56 x 45mm bullets. Eby/Musselman Report at 8.  Semiautomatic AR-platform rifles can fire identical ammunition.  Eby and Musselman are also correct that these bullets were not selected with self-defense in mind, but rather to accomplish the military mission at hand. *Id*.

35.    While I disagree with Eby and Musselman's conclusions regarding the suitability of semiautomatic AR-platform rifles for military combat, I agree with the following opinions they offered in their report. I agree that, with rare exceptions, pistols in the military are primarily used for the same purpose they are in civilian life: self-defense. Eby/Musselman Report at 7.  I also agree that the military exclusively uses the kinds of high-capacity ammunition feeding devices that are restricted under Illinois law. *Id*.

## PUBLICATIONS

36.    I have authored the following publications in the previous ten years:

- Center for a New American Security Reports:

    o    With Katherine Kuzminski, Nathalie Grogan and Cody Kennedy, "Transitioning to Tech: Transitioning Service Members and Veteran Perceptions Regarding a Career in the Technology Sector." November 11, 2021.

    o    With Amy Schafer, "Veteran Pathways to Employment: Hurdles and Opportunities." January 29, 2020.

    o    With Emma Moore and Damon J. Phillips, "Veteran Tech Entrepreneurial Ecosystems." September 12, 2019.

    o    With Phillip Carter, Katherine Kidder, and Amy Schafer, "Passing the Baton: A Bipartisan 2016 Agenda for the Veteran and Military Community." 2015.

16

- "The Accountability Avoidance Two-Step," in Paths of Dissent, Andrew Bacevich and Daniel Sjursen, Eds. (2023)

- "The All-Volunteer Force is in Crisis," The Atlantic, July 2, 2023

- "Don't Believe the Generals," The Atlantic, September 2, 2022

- "What Went Wrong: Two New Books Get it Right on Afghanistan," Just Security, August 12, 2021.

- "We Got Afghanistan Wrong, but There's Still Time to Learn Something," Politico Magazine, April 25, 2021.

- "What Should be Addressed in Austin's Confirmation Hearing for Defense Secretary," Just Security, January 19, 2021.

- "John Kelly lent his military credibility to Trump. It's too late now to stay neutral," Washington Post, September 8, 2020.

- With Patrick Basu, MD, "What Afghanistan Can Teach Us About Fighting Coronavirus," Politico Magazine, May 12, 2020.

- "How Donald Trump Ruined the Navy," The New Republic, April 13, 2020.

- "America never committed to training Afghan forces. I know because I tried," Washington Post, December 24, 2019.

- "Coming to terms with America's undeniable failure in Afghanistan," War on the Rocks, February 11, 2019.

- "The Pentagon's Wars: Winning at Home While Losing Overseas," Texas National Security Review, May 1, 2018.

- "It is time to send HR McMaster to Afghanistan." The Hill, March 5, 2018.

- "It seems inconceivable that we are still fighting in Afghanistan … and yet here we are." Task & Purpose, October 23, 2017.

- "Will Trump's military fetish end up hurting American democracy – or saving it?" Task & Purpose, September 13, 2017.

- "Trump's right – we are losing in Afghanistan." The Hill, August 10, 2017.

- "Is There Trouble Brewing for Civil-Military Relations in the U.S.?" World Politics Review, May 23, 2017.

- "Afghanistan Vet: Don't Celebrate Dropping the 'MOAB' in Afghanistan – It's Just More of the Same." Independent Journal Review, April 19, 2017.

- "I Served in Afghanistan. We Don't Need More Troops, We Need to Change Their Mission." Independent Journal Review, March 27, 2017.

- "Elephants in Afghanistan: The Military's Counterinsurgency Failure." War on the Rocks. December 1, 2016.

- "Our Generals Failed in Afghanistan." Foreign Policy. October 18, 2016.

- "The Army's Double-Standard When it Comes to Offensive Symbols." The Washington Post. May 18, 2016.

- "Afghanistan, Bowe Bergdahl and the Lessons of Serial." War on the Rocks. April 15, 2016.

Dated June _8_, 2024

/s/ _____

Jason Dempsey