**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CALEB BARNETT, *et al.*, <br> Plaintiffs, <br> vs. <br> KWAME RAOUL, *et al.*, <br> Defendants. | Case No.  3:23-cv-209-SPM <br> ** designated Lead Case |
| DANE HARREL, *et al.*, <br> Plaintiffs, <br> vs. <br> KWAME RAOUL, *et al.*, <br> Defendants. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*, <br> Plaintiffs, <br> vs. <br> BRENDAN KELLY, *et al.*, <br> Defendants. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS <br> LICENSEES OF ILLINOIS, *et al.*, <br> Plaintiffs, <br> vs. <br> JAY ROBERT "JB" PRITZKER, *et al.*, <br> Defendants. | Case No.  3:23-cv-215-SPM |

**STATE DEFENDANTS' MOTION**
**TO BAR CERTAIN OPINIONS OF PLAINTIFFS' EXPERTS**

## TABLE OF CONTENTS

LEGAL STANDARD ...................................................................................................... 1

ARGUMENT .................................................................................................................... 3

   1.   **Randy Watt, David Lombardo, and Matthew Little** ...................................... 3

   2.   **Jeffrey Eby and Michael Musselman** ............................................................ 7

   3.   **James Ronkainen** ..........................................................................................11

   4.   **Stephen Helsley** ........................................................................................... 13

   5.   **Daniel Kemp** ................................................................................................. 15

   6.   **Michael Dennis** ............................................................................................ 16

   7.   **Paul Leitner-Wise** ........................................................................................ 18

CONCLUSION ............................................................................................................... 19

Defendants JB Pritzker, Kwame Raoul, and Brendan Kelly ("State Defendants") respectfully move pursuant to Federal Rules of Civil Procedure 26 and 37 and Federal Rule of Evidence 702 to bar certain opinions of Plaintiffs' expert witnesses, stating as follows:

Plaintiffs in these consolidated cases have disclosed reports by eleven expert witnesses.[1] Many of these opinions suffer from fatal methodological deficiencies or fall outside the expert's pertinent qualifications and are therefore unreliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In addition, in some instances Plaintiffs failed to comply with the disclosure obligations of Federal Rules of Civil Procedure 26 and 37, which requires excluding their opinions.

## LEGAL STANDARD

Expert opinions must satisfy the rigorous requirements of Federal Rule of Evidence 702 and *Daubert*, which require experts to possess relevant qualifications and apply a reliable methodology.[2] To meet this standard, experts must "connect the dots" between the underlying data and their conclusions and cannot rely on mere ipse dixit. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832, 837 (7th Cir. 2015). Indeed, Rule 702 was amended in 2023 to clarify that "each expert opinion must stay within the bounds of what can be concluded from a reliable

---

[1] Pursuant to the parties' stipulation, only Plaintiffs' witnesses Watt, Eby, and Ronkainen will be called to testify live at the bench trial beginning on September 16, 2024, while other expert witnesses' testimony may be presented via declaration. ECF 218 ¶¶ 2, 9–10. During the September 9 pretrial conference, the Court instructed the parties to file any *Daubert* motion pertaining to the witnesses slated for live testimony no later than September 13. Plaintiffs have not yet filed any declarations for expert witnesses whose opinions they intend to offer into evidence. In the interest of judicial economy and the efficient resolution of this matter, however, State Defendants are submitting this omnibus motion addressing the evidentiary deficiencies for all of Plaintiffs' experts they are challenging—i.e., the three expected to testify live, as well as those who provided written reports that Plaintiffs may choose to authenticate via declaration.

[2] Although "the court in a bench trial need not make reliability determinations before evidence is presented . . . the determinations must still be made at some point." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010).

application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendment; *see also id.* (explaining that prior decisions holding "that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility" are "an incorrect application of Rules 702 and 104(a)"). These standards apply equally to testimony by a non-scientific expert, which must "be tested to be sure that the person possesses genuine expertise in a field and that her court testimony adheres to the same standards of intellectual rigor that are demanded in her professional work." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (internal quotation marks omitted).

State Defendants acknowledge that the role of Rule 702 and *Daubert* in Second Amendment cases remains an unsettled area of law, with courts diverging on whether *Daubert* governs testimony pertaining to "legislative facts." *Compare Oregon Firearms Fed'n v. Kotek*, No. 2:22-CV-01815-IM, 2023 WL 4698752, at *1 (D. Or. May 31, 2023) (applying *Daubert*) *with Ass'n of New Jersey Rifle & Pistol Clubs v. Platkin*, No. CV 18-10507-PGS-JBD, 2024 WL 3585580, at *4–5 (D.N.J. July 30, 2024) (declining to apply *Daubert*). In this case, however, the Seventh Circuit remanded these cases to this Court to further develop the evidentiary record, *see Bevis v. City of Naperville*, 85 F.4th 1175, 1197 (7th Cir. 2023), and faithful application of *Daubert* principles is necessary to ensure the integrity of any expert opinions on which this or other courts may rely. Indeed, even if this Court were to conclude that the normal evidentiary rules governing expert testimony do not technically apply to legislative fact-finding, Plaintiffs' proffered expert opinions should still be excluded. As explained in greater detail in State Defendants' Motion to Preclude Consideration of William English & NSSF Surveys (ECF 223), the constitutional stakes of this case and the far-reaching implications of any factual findings

make a thorough inquiry into reliability *more* important, not less. *See* ECF 223 at 1–5 (citing *McCormick on Evidence* § 331 and *Free v. Peters*, 12 F.3d 700, 706 (7th Cir. 1993) (overruling a district court's finding of legislative fact rooted in flawed social science methodology)); *cf. Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("[T]he idea that experts should use reliable methods does not depend on Rule 702 alone . . . .").

In addition to the substantive requirements of reliability, expert testimony is inadmissible if the proponent of the testimony does not adhere to the disclosure requirements of Rule 26(a)(2). *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 (7th Cir. 2010) (explaining that the failure to properly disclose experts results in "automatic and mandatory" exclusion under Rule 37 unless the non-disclosure was justified or harmless). In this litigation, incomplete or improper disclosures warrant excluding the pertinent testimony because the compressed timeline for discovery limited any opportunity to cure prejudice resulting from deficient disclosures.[3] *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

## ARGUMENT

The opinions of Plaintiffs' experts identified below should be excluded in whole or in part for failing to comply with the rules governing expert testimony.

### 1. Randy Watt, David Lombardo, and Matthew Little

Plaintiffs have produced reports from three self-defense instructors: Randy Watt, David Lombardo,[4] and Matthew Little. Each draws broad conclusions about the market for defensive

---

[3] The parties in these four consolidated cases conducted fact and expert discovery simultaneously over about six months while preparing for a bench trial that will begin on September 16. To accommodate this accelerated timeline, the parties stipulated to limit the number of depositions and agreed most expert reports could be submitted with declarations in lieu of live testimony. ECF 218. The parties' agreement not to depose most experts only enhances the importance of adequate disclosures under Rule 26(a)(2).

[4] Plaintiffs' disclosures under Federal Rule of Civil Procedure 26(a)(3) suggest that they may not intend to rely on Lombardo's report. *See* ECF 224 at 3–5. But because Plaintiffs have not formally withdrawn Lombardo and have not submitted their experts' declarations to the Court at the time this motion is being

firearms that are inadmissible because they are not based on reliable methodologies. Watt opines that certain PICA-regulated firearms are "commonly possessed by the American public for lawful personal defense and training therefor." Watt Rpt., Ex. 1, at 12. Lombardo states that Illinois has banned "categories of firearms and magazines that are commonly owned by law abiding citizens throughout Illinois and across the country for entirely lawful and non-military purposes." Lombardo Rpt., Ex. 2 at 2. Little also opines that PICA-regulated firearms and magazines are in common use for various purposes. Little Rpt., Ex. 3, at 3. These claims about how many people own certain products and the reasons for their ownership are not supported with any data or statistical analysis. None of these witnesses conducted or discussed any survey or market research, case studies, or even anecdotes about the preferences of any given set of students. Instead, they based their conclusions on their overall experience as self-defense instructors.

The failure to apply reliable methods or cite any underlying data renders these opinions inadmissible under Rule 702. Experts relying solely or primarily on their own experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see also Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019) (affirming the exclusion of testimony by an experienced expert who failed "to show how his experience or expertise led to his conclusions"). Specifically, experience is insufficient to draw conclusions about the nature of an entire product market. In *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005), an expert witness in a breach of contract case opined as to the number of television converter boxes that could be

---

filed, this motion addresses the bases to exclude Lombardo's opinions to preserve arguments for the record in the event that Plaintiffs ultimately proffer his report.

sold in San Juan, Puerto Rico, citing only his "industry experience," "awareness," and "curriculum vitae." *Id*. at 418. Such vague answers revealed the expert "either had no method or could not describe one." *Id*. Conclusions about consumer preferences and market share that are based purely on experience and awareness cannot be tested, cannot be replicated, and "aren't worth much to either science or the judiciary." *Id*. at 419. The Seventh Circuit excluded the expert's attempt at statistics-through-intuition. *Id*. at 418–19.

Watt, Lombardo, and Little take the same flawed approach as the expert in *Zenith Electronics*. For example, Watt testified during his deposition that he knew certain rifles were popular because:

> I have a great deal of expertise in this realm. I'm involved in training with firearms. I own a number of firearms. I am in this firearms world. I read the magazines. I follow the news stories. I have a great deal of background expertise. You've seen my CV. I attended a lot of training. It is my personal knowledge being in this field that informs my opinion.

Watt Dep. Tr., Ex. 4, at 115:14–116:3. When pressed to identify data analysis that supports his opinion, Watt explained, "conducting analysis and data—the data is not part of what I do," *id*. at 120:11–18, and that he did not "see a need" to "put numbers against these things." *Id*. at 127:16–15. Lombardo similarly roots his conclusions on his "personal knowledge and many years of first-hand experience and observation." Lombardo Rpt. at 1. So too with Little, who based his conclusion on his "personal observation" of students, products, and sport shooting competitors. Little Rpt., Ex. 3, at 4.  Experts cannot simply point to their resume and then draw a conclusion that requires statistical evidence. *See Zenith*, 395 F.3d at 419 ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."); *Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 1195651, at *4

(N.D. Ill. Mar. 22, 2013) (excluding statistical opinions proffered by an expert not qualified to apply statistical methods).

Even if these experts had systematically collected, analyzed, and reported data, based on their experience and observations, their opinions would still be unreliably based on unrepresentative samples. *See Chavez v. Ill. State Police*, 251 F.3d 612, 643 (7th Cir. 2001) ("[A] non-random sample might undermine the reliability of the statistics."); *see also Allgood v. Gen. Motors Corp.*, No. 102CV1077DFHTAB, 2006 WL 2669337, at *10–11 (S.D. Ind. Sept. 18, 2006) (collecting cases barring expert testimony that rested on unreliable samples). Here, the expert opinions suffer from selection bias that overrepresents students likely to use assault weapons. Watt markets his courses under the brand name "Warrior Creed"; he teaches a self-defense philosophy based on a poem he wrote regarding his service in the Iraq War; and he markets his courses with militaristic imagery. Watt Dep. Tr., Ex. 4, at 38:3–5; 63:13–23; 74:10–76:6; *see also* Warrior Creed Webpage, Ex. 5 (Ex. 10 to Watt Dep.). By marketing his self-defense courses with consistent reference to military service, his sample over-selects students who prefer weapons with military characteristics. Lombardo, on the other hand, bases his views in part on his "extensive interaction with the shooting public." Lombardo Rpt., Ex. 2, at 2. Lombardo's public interactions include his role as a political pundit and radio host, in which he routinely discusses his opposition to gun regulations. Lombardo has called PICA "one of the most historic political blunders ever made by a squatting politician"[5] and has expressed a wish to "Give John Q. Public the freedom to travel anywhere in the United States and be able to carry a really big gun with a large capacity

---

[5] David A. Lombardo, *Opinion: Pritzker's Epic Failure to Intimidate Law-Abiding Gun Owners in Illinois*, Illinois Review (Jan. 1, 2024), www.illinoisreview.com/illinoisreview/2024/01/opinion-pritzkers-epic-failure-to-intimidate-law-abiding-gun-owners-in-illinois.html#google_vignette.

magazine."[6] Given his public activism, his sample of "interactions" over-selects those who share his preferences regarding PICA-regulated items.

Finally, to the extent these experts seek to rely on extrinsic or secondary-source materials rather than their own observations, they have failed to properly identify or disclose any such materials, and their opinions should be excluded on that basis. Under Rule 26(a)(2)(B)(ii), underlying materials that are not properly identified and disclosed must be excluded. *Duff v. Grandberry*, No. 14 CV 8967, 2017 WL 1375539, at *2 (N.D. Ill. Apr. 17, 2017). Watt broadly states that he relied on "industry and media information" without identifying any particular article or publication. Watt Rpt., Ex. 1, at 13. Watt acknowledged at his deposition that he "would have no idea of how to collect 40 years of news stories or magazines or all the other books and all the other internet materials that have formed my opinions." Watt Dep. Tr., Ex. 4, at 128:1–7. For his part, Lombardo simply fails to identify a single source on which he relied. Little identifies only the names of industry publications he has read, without identifying any particular issue of or article from any of these publications. Little Rpt., Ex. 3, at 2. These vague disclosures do not meet the requirement of Rule 26 because they do not provide sufficient information to allow Defendants to locate the materials, cross examine the witnesses about them, or prepare an appropriate rebuttal. Any opinion based on undefined and undisclosed materials must be excluded.

## 2. Jeffrey Eby and Michael Musselman

Jeffrey Eby and Michael Musselman jointly authored a report regarding military use of firearms, and Eby separately submitted a report purporting to rebut the opinions of the State Defendants' experts Phil Andrew and James Yurgealitis. Eby & Musselman Rpt., Ex. 6; Eby

---

[6] David Lombardo, *Rant of the Week: A Gun Owner's Wishes for the New Year*, BearingArms.com (Jan. 7, 2018), www.bearingarms.com/davidl/2018/01/07/rant-of-the-week-ten-wishes-for-the-new-year-n31581.

Rebuttal Rpt., Ex. 7. Eby and Musselman's opinions asserting that automatic fire from standard-issue infantry rifles (e.g., M16, M4) is "critical" in combat are inadmissible because they are not based on sufficient facts and data regarding real-world military conflicts, but rather on hypothetical combat scenarios in which they imagine automatic fire from these rifles would be useful.

In their opening report, Eby and Musselman opine on the use of automatic fire for suppression in combat. Ex. 6 at 4–6. But as they acknowledge, the combat situations they envision do not reflect the reality of U.S. military engagements over the past 60 to 70 years (roughly the entire time the AR-15 has existed), in which semiautomatic fire from M16 and M4 rifles has predominated among U.S. troops. *Id.* at 6 (noting that "U.S. Forces have employed semi-automatic fire during the last 60 years of combat" because it "made sense in those situations where we were not facing well trained, well-armed opponents"). Instead, Eby and Musselman argue that automatic fire from a rifle would be more important in a hypothetical military conflict against a "peer threat." *Id.*

These suppositions about what tactics might be used in a potential war between the United States and China or Russia are inadmissible under *Daubert* because they are impossible to reliably test. Eby and Musselman's analysis based on a theorized future conflict is akin to the opinions that were excluded in *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887 (7th Cir. 2011). In *Bielskis*, the plaintiff proffered expert testimony about a hypothetical design alternative that had not actually been used in the marketplace or empirically tested, instead asserting that "the principles" of the alternative design were adequate. *Id.* at 895. The Seventh Circuit upheld the exclusion of this evidence, explaining that "'the principles' alone hardly constitute testimony based on 'sufficient facts or data.' Without more, there is no way to assure that [the expert's]

proposed alternatives are 'the product of *reliable* principles and methods.'" *Id.* (quoting and emphasizing Fed. R. Evid. 702). The opinions of Eby and Musselman regarding the possible utility of automatic fire similarly depend on abstract principles rather than empirical testing or validation; there is simply no way to reliably assess what role, if any, automatic fire from standard-issue infantry rifles would actually play in such a conflict. Even if it were possible to test such theories, Eby and Musselman have not attempted to support their conclusions with reliable real-world evidence of military firearms use,[7] and these opinions should be barred.

Similarly, Eby's opinions about the role of semiautomatic fire in his rebuttal report, *see* Eby Rebuttal Rpt., Ex. 7, at 4–5, are not based on a sound methodology but rather reflect Eby's specific and idiosyncratic views about what future combat engagements may require. During his deposition, Eby lamented that U.S. military leaders have been "learning the wrong lessons from the wrong fights" by "setting the force up to continually fight in a third-world country," and that the military's adoption of tactics designed to reduce harm to civilians in Afghanistan and Iraq, like minimizing the use of automatic fire, meant that "we should have just switched the force and sent in LAPD and NYPD." Eby Dep. Tr., Ex. 8, at 64:9–67:3; *id.* at 89:21–90:16. But Eby's personal belief that the U.S. military should not have modulated the use of automatic fire is not a reliable basis to diminish the empirical importance of semiautomatic fire. *See Caraker v. Sandoz Pharms. Corp.*, 172 F. Supp. 2d 1046, 1049 (S.D. Ill. 2001) (refusing to admit expert conclusions

---

[7] Eby testified during his deposition that he was unaware of any publications supporting the contention that the reason that U.S. forces have employed semi-automatic fire during the last 60 years of combat is due to fighting non-peer enemies. Eby Dep. Tr., Ex. 8, at 174:17–175:2. And Eby and Musselman's sole empirical source is a document published in 1952 that states that "[r]ecent [Operations Research Office] investigations in Korea" support the conclusion that "unaimed or volume fire" plays a more important role in offensive versus defensive combat. Eby & Musselman Rpt., Ex. 6, at 6. Even if this 70-year-old document could support their claims about the dynamics of a future conflict, their citation is misleading; the document actually *disparages* fully automatic fire from "hand weapons" as tactically ineffective. *See* Norman Hitchman, *Operational Requirements for an Infantry Hand Weapon* at 21–23 (1952), available at www.cfspress.com/sharpshooters/pdfs/Operational-Requrements-For-An-Infantry-Hand-Weapon.pdf.

that "are more like personal opinions than products of any scientific methodology rigorously applied").

Finally, the Court should exclude three additional opinions of Eby and Musselman that lack any underlying data and are not based on a reliable methodology. *First*, their estimates of the practical sustained rate of fire for automatic and semiautomatic weapons (*see* Ex. 6 at 9–10) are not grounded in any data or the product of testing, *see* Eby Dep. Tr., Ex. 8, at 272:24–273:9; 278:19–280:16 (explaining that these estimates were based on the experience of "me training some people on my range" rather than data, testing, or documented rates of fire in real-world shootings). *Second*, Eby and Musselman's opinions regarding the types of firearms used by every military in the world, Ex. 6 at 3, are not supported by a methodology sufficient to support such sweeping claims, *see* Eby Dep. Tr., Ex. 8, at 209:15–211:22 (explaining that the only publication he reviewed was "the Google search," without reference to any specific sources of data or information). *Third*, their opinions that "[t]he AR-platform rifle has been the most significant design in weaponry for common use among the public over the last 60 years" and that "an 11.5" AR-platform short-barreled rifle" is "the best designed home defense weapon," Ex. 6 at 11, lack sufficient facts or data. Eby and Musselman did not perform a comprehensive comparison of the firearms available to civilians, and Eby testified that his expertise lies in military weapons rather than the "few" civilian firearms he is familiar with. Eby Dep. Tr., Ex. 8, at 15:5–22 ("I'm not an expert in all weapons. I'm an expert in which I had to train within the military."). And because Eby and Musselman have not drawn reliable comparisons based on a clear methodology, these conclusory opinions are inadmissible. *See Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996) (affirming the exclusion of expert testimony about the preference for a proposed

10

alternative product design that failed to meaningfully compare the options, including "the relative efficacy of the two designs").

### 3.  James Ronkainen

James Ronkainen, a former employee of Remington Arms, submitted a rebuttal report that primarily describes his observations relating to growth in the market for so-called Modern Sporting Rifles ("MSRs"). Ronkainen Rpt., Ex. 9. Many of Ronkainen's opinions are inadmissible because they are not proper rebuttal and because they are not based on sufficient facts and data.

First, to the extent that Ronkainen purports to rebut Defendants' experts Lucy Allen and Louis Klarevas, his opinions are improper and untimely under Rule 26(a)(2)(D)(ii). Ronkainen's discussion of the self-defense uses of assault weapons cites paragraphs 31–36 of Allen's report, in which Allen relies upon the Heritage Foundation's database on defensive gun uses to conclude that rifles are rarely used in self-defense. Allen Rpt., ECF 185-8 ¶¶ 31–36. But instead of engaging with Allen's methodology or reasoning, Ronkainen presents entirely new and separate opinions that MSRs are "suitably used for defense purposes," citing various "innovations and designs." Ex. 9 at 3. Ronkainen does not "contradict, impeach or defuse the impact of" any of Allen's analysis, which is the only "proper function" of rebuttal evidence. *Stanfield v. Dart*, No. 10 C 6569, 2013 WL 589222, at *3 (N.D. Ill. Feb. 14, 2013) (quoting *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008)). Moreover, new arguments and evidence are not permitted on rebuttal. *McCann v. Ogle County*, No. 11 C 50125, 2016 WL 5807922, at *1 (N.D. Ill. Oct. 5, 2016); *Stanfield*, 2013 WL 589222, at *4. The suitability of MSRs for self-defense is plainly part of Plaintiffs' case-in-chief, *see, e.g.*, *Barnett* Compl., ECF 1 ¶¶ 34–42, meaning that Ronkainen's separate arguments about the usefulness of assault weapons for self-defense were required to be presented in an opening report, *see Gravitt v. Mentor Worldwide LLC*, 342 F.R.D. 130, 135 (N.D. Ill. 2022) (citing *Peals*, 535 F.3d at 630).

Similarly, Ronkainen claims to rebut a fifteen-page section of Klarevas's report, *see* Ex. 9 at 3, but does not accurately describe or meaningfully engage with Klarevas's opinions. Ronkainen incorrectly alleges that Klarevas "suggest[s] that MSR production volumes did not result in significant quantities of MSRs being produced for the civilian marketplace." The relevant portion of Klarevas's report, however, discusses flaws in several surveys of ownership of assault weapons to conclude that "the number of assault weapons in circulation in the United States is unknown."[8] Klarevas Rpt., ECF 185-7, at 8. By not acknowledging or discussing these critiques, Ronkainen fails to "contradict, impeach or defuse the impact of" Klarevas's analysis. *Stanfield*, 2013 WL 589222, at *3. Instead, Ronkainen improperly offers *new* evidence and argument regarding the size of the market for MSRs. *See* Ronkainen Rpt., Ex. 9 at 3–5. *See also McCann,* 2016 WL 5807922, at *1; *Stanfield*, 2013 WL 589222, at *4. "The plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case . . . must put in his evidence on the issue as part of his case in chief." *Braun v. Lorillard Inc*., 84 F.3d 230, 237 (7th Cir. 1996). Disclosing these new opinions in the guise of rebuttal deprives Defendants of the opportunity to fully develop the record, including challenging his methodology and assumptions in their rebuttal, and requires barring them. *See Sonrai Sys. v. Romano*, No. 16 C 3371, 2021 WL 1088314, at *8 (N.D. Ill. Mar. 22, 2021) (explaining that the appropriate remedy for an improper rebuttal report is to strike all portions of the report constituting improper rebuttal).

Ronkainen's opinions on the size of the market for MSRs should also be barred under *Daubert* because they are methodologically unsound. Ronkainen relies on his vague personal

---

[8] Later in his report, Ronkainen also purports to rebut the opinion of Defendants' expert Phil Andrew that MSRs are a "small fraction of firearms in private possession in the United States." Ronkainen Rpt., Ex. 9, at 5 (quoting Andrew Rpt., ECF 185-2 ¶ 37). But Ronkainen does not offer opinions (let alone data) regarding the proportion of assault weapons in the firearms market as a whole and therefore does not rebut Andrew's opinion.

recollections about the size and growth of the MSR market during his time in the industry, but cites no data that would show the overall size of that market, *see* Ronkainen Dep. Tr., Ex. 10, at 138:12–6, the specific proportion of MSRs that are sold to civilians rather than law enforcement, *see id.* at 131:22–133:11, or the share of the overall firearms market that MSRs represent. Ronkainen Rpt., Ex. 9, at 4–5.

Nor does he know these numbers. Ronkainen claimed that sales data are available through the references in his report, but he concedes that that data do not directly show the volume of sales of MSRs. Ronkainen Dep. Tr., Ex. 10, at 131:4–15; 132:23–133:11 (conceding that "the data is confounded"); 135:21–137:3. And while he claims to be able to disambiguate some data, he admits that he never did so, nor did he estimate total MSR sales. *Id.* at 138:12–22. Ronkainen's sole basis for claiming that the overall MSR market was growing is that "[a]necdotally that was the experience." *Id.* at 140:3–18.

What few data Ronkainen presents contradict his assertion that the market for MSRs was growing "markedly and steadily." Ronkainen Rpt., Ex. 9, at 2. Production data provided to the Bureau of Alcohol, Tobacco, and Firearms from Bushmaster (2007-2011) and DPMS (2007-2015) show volatile production levels for both companies—not steady growth. *Id.* at 4. Moreover, production for both companies was lower in the last year of the data than the first. *Id.* The "analytic gap" between Ronkainen's data and his conclusions is simply "too great." *Textron,* 807 F.3d at 832, and his opinions on the size of market for MSRs should be barred.

### 4.  Stephen Helsley

Former law enforcement officer Stephen Helsley has submitted a rebuttal report in response to Defendants' expert historian Brian DeLay. Helsley's report should be barred under *Daubert* because he is not qualified as a historian and his opinions are not based on sufficient facts and data. First, despite citing experience in narcotics enforcement, forensic analysis, marksmanship, and

13

firearms collecting, Helsley's report does not demonstrate qualifications in the history of firearms regulation. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (explaining that the question is not whether an expert "is qualified in general" but whether he or she is qualified "to answer a specific question"); Fed. R. Evid. 702 (requiring, pursuant to the 2023 amendments, that the proponent of an expert's testimony "demonstrates to the court that it is more likely than not that the expert is relevantly qualified). Helsley explicitly states that he is relying on this background, including his background as an "avid shooter," as part of the basis for his opinions. Helsley Rpt., Ex. 11, at 2. The only experience as a historian that Helsley discloses is his role as "'Rigby Historian'/archivist," *id.* at 1, but he does not identify his responsibilities in this role or explain how this experience makes him relevantly qualified. Further, Helsley discloses no education or training in historical methods. *See Burton v. Am. Cyanamid*, 362 F. Supp. 3d 588, 607 (E.D. Wis. 2019) (barring historical testimony of untrained expert).

Helsley's lack of historical qualifications is reflected in his ad hoc methodology. He has not carried out a "a thorough review of the pertinent historical record," *Burton*, 362 F. Supp. 3d at 607, but instead has supplied only a sliver of history focused on isolated examples of individual manufacturers and government regulations. The sufficiency of an expert's facts or data involves a "qualitative" assessment of whether the expert has "employ[ed] those kinds of facts or data on which experts in the field would reasonably rely." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (cleaned up). Helsley relies on little or no scholarly history, and he fails to identify the sources of several of the images he includes. *See, e.g.*, Helsley Rpt., Ex. 11, at 15 (Figs. 13 & 14), 16 (Fig. 16). Moreover, in contrast to professional, trained historians, Helsley relies on personal information, family memorabilia, and anecdotes about Thanksgiving outings.

*Id*. at 7, 10–11. Because Helsley's methodology is unreliable and the historical facts and data he cites are qualitatively insufficient, his opinion should be barred.

### 5. Daniel Kemp

The bulk of the rebuttal report of Daniel Kemp is inadmissible because it does not constitute proper rebuttal. And to the limited extent the report seeks to rebut specific opinions of the Defendants' experts, it lacks sufficient underlying data or methodology to pass muster under *Daubert* and Rule 702.

As explained above, rebuttal reports cannot present new arguments and evidence to bolster a party's prima facie case, but instead must "contradict, impeach or defuse the impact of" an opposing expert's opinions. *Stanfield*, 2013 WL 589222, at *3; *see also Peals*, 535 F.3d at 630; *Braun*, 84 F.3d at 237. Kemp's report fails to meet this standard. Rather than responding specifically and concretely to any of the State Defendants' experts, Kemp offers freewheeling historical musings that, to the extent they are relevant at all, should have been disclosed in full in an opening report. For instance, Kemp purports to respond to specific claims about the 20th-century military lineage of certain firearms regulated by PICA, *see* Kemp Rpt., Ex. 12, at 2, but proceeds to broadly opine on the merits of civilian and military firearms since the 1500s, *id.* at 2–12. But because State Defendants and their experts have not made any blanket claim that military weapons are generally superior to civilian weapons throughout American history, Kemp's opinions do not engage with Defendants' experts. *See id.* at 15 (stating that Kemp's opinions generally comparing military and civilian firearms are "contrary to the suggestions of others" but failing to identify to whom this rebuttal is directed).

In the few instances where Kemp does attempt to engage in passing with the State Defendants' experts, his opinions are not based on sufficient facts and data or derived from a reliable methodology. First, Kemp criticizes the opinions of Phil Andrew regarding the lethality

of assault weapons firing 62-grain 5.56mm projectiles, *id.* at 15, but he states only that this caliber "has been criticized for causing wounds like an ice pick," without any evidentiary support or reasoning. Second, he disputes the medical opinions of Dr. Stephen Hargarten regarding the wounding potential of assault weapon fire, *id.*, but lacks relevant medical qualifications and fails to support his criticism with any medical literature or ballistic evidence. Third, his criticisms of Yurgealitis's opinions related to body armor penetration, *id.*, are not supported by any evidence or methodology underlying the claim that other weapon types have similar ballistic properties. The absence of underlying evidentiary support or an explanation of the methodology use to generate these opinions renders them inadmissible ipse dixit. *See Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (rejecting ipse dixit conclusions that were based on "no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected").

### 6. Michael Dennis

The report of the *Langley* Plaintiffs' rebuttal expert Michael Dennis should be barred as improper rebuttal. Dennis offers opinions unconnected to any of Defendants' expert reports; indeed, his only direct reference to any other expert's opinion is a single sentence at the beginning of his report generically mentioning "certain opinions stated by persons hired by state parties." Dennis Rpt., Ex. 13, at 1. Dennis's report otherwise does not purport to respond to any expert's opinion, and it should be excluded on that basis. *See Stanfield*, 2013 WL 589222, at *3; *see also Peals*, 535 F.3d at 630; *Braun*, 84 F.3d at 237. Moreover, because Dennis offers substantive opinions intended to bolster Plaintiffs' prima facie case about subjects for which there is virtually no other factual record in this litigation (including opinions related to the weapons preferences of law enforcement agencies, the use of firearms to fight "tyranny," and

opinions about the functionality of grenade launchers), admitting Dennis's report would pose a unique and substantial risk of unfair prejudice.

Even if Dennis's report had been properly disclosed, it would be inadmissible under *Daubert* and Rule 702 because he cites virtually no evidence to support his sweeping conclusions. A significant number of Dennis's opinions, such as those about the reasons police officers carry firearms, Dennis Rpt., Ex. 13, at 1, the types of firearms chosen by police departments, *id.* at 2, the use of assault weapons to "defend liberty from tyranny," *id.* at 2–3, the process of modifying an AR-15 to enable automatic fire, *id.* at 7, and the willingness of gun owners to unlawfully modify their weapons, *id.*, entirely lack relevant empirical support.

In addition, Dennis does not apply a reliable methodology. For example, he relies heavily on the premise that police use assault weapons and large-capacity magazines for "[t]he defense of self and others," *id.* at 1, to argue that assault weapons must be suitable for civilian self-defense because law enforcement agencies choose them as well. But he does not acknowledge or discuss any situations in which law enforcement uses firearms for specialized purposes like executing search warrants, controlling crowds at large events, attempting to take an armed and barricaded suspect into custody, or myriad other circumstances that present tactical considerations unique to law enforcement. For example, he uses two handpicked examples to support his claim about the need for large-capacity magazines for self-defense—both involving the unique law enforcement function of executing traffic stops leading to protracted shootouts. *Id.* at 4–5. Because Dennis's report is characterized by "no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected," it should be excluded. *Mid-State Fertilizer*, 877 F.2d at 1339; *see also Textron*, 807 F.3d at 837.

### 7.  Paul Leitner-Wise

The opinions of Plaintiffs' expert Paul Leitner-Wise should be excluded because he is not qualified to opine on the design and manufacturing of assault weapons. His stated qualifications are misleading, inaccurate, or even fabricated, leaving him with insufficient expertise.

First, Leitner-Wise disclosed limited formal education and training, and his educational credentials may be fake. Leitner-Wise admitted at this deposition that his schooling did not include firearms or firearm design, and that he has no certifications in firearms design. Leitner-Wise Dep. Tr., Ex. 15, at 23:5–10, 28:21–29:3. He has never been a chartered or licensed engineer, nor was he willing to disclose any information about ever being supervised by engineers. *Id.* 25:19–28:10. Both in Leitner-Wise's report and deposition, he claims to have received a B.S. and a Master of Business Administration from "Stafford University" in the United Kingdom.[9] Leitner-Wise Rpt., Ex. 14, at 1; Leitner-Wise Dep. Tr., Ex. 15, at 20:20-21:5. But unlike Staffordshire University (which is a public research university located in Staffordshire, England), "Stafford University" was a fraudulent institution that piggybacked on the reputation of Staffordshire University to sell fake degrees until it was shut down by the U.K. government in 2017. BBC, *Fake university degree websites shut down* (Jan. 3, 2017), Ex. 16.[10]

Leitner-Wise's seemingly falsified educational history is just one of many discrepancies in his qualifications. Other than his education at "Stafford University," Leitner-Wise relies on only his "[e]xperience and observation." Leitner-Wise Dep. Tr., Ex. 15, at 43:11–20. Yet he testified that from 2007 through 2020 he did not work *anywhere*, except during a "brief period"

---

[9] Curiously, Mr. Leitner-Wise also did not specifically recall the year of his B.S. degree at his deposition. *See* Leitner-Wise Dep. Tr., Ex. 15, at 21:10-20.

[10] Despite State Defendants' request over two months ago for materials pertaining to Leitner-Wise's educational background, Leitner-Wise Dep. Tr., Ex. 15, at 22:9-19, 137:14-19, Plaintiffs have not provided copies of his diplomas or transcripts to substantiate his qualifications, nor have they amended his report to correct any inaccuracies.

in 2011–2012. *Id.* at 76:9–77:10, 80:9–81:19; *see also* Leitner-Wise Rpt., Ex. 14, at 1 (claiming, contrary to this testimony, that from 2007–2017 he "[a]cted as a design and engineering consultant in firearms companies").

Leitner-Wise's claim that he founded "Leitner-Wise LLC" and has worked there from 2017 to the present, *see* Leitner-Wise Rpt., Ex. 14, at 2, is also misleading. During his deposition he testified that he did not actually found that company. Leitner-Wise Dep. Tr.. Ex 15, at 83:12-13. Moreover, this LLC is not registered in the jurisdictions in which he testified it does business. *Compare id.* at 82:23–83:11 (claiming registration of Leitner-Wise, LLC in Texas, D.C., and Illinois) *with* Ex. 17 (state government business registration records showing statuses of "dissolved," "revoked," and "voluntarily terminated").

Leitner-Wise's general description of his expertise in his report is also unsupported. His report claims that he has been "[f]ormally recognized by the United States Government as a leading expert in the field of firearms design," Leitner-Wise Rpt., Ex. 14, at 1. But this "recognition" refers to the government's suggestion in immigration proceedings that he could *apply* for an EB-1 visa (reserved for individuals with "extraordinary ability")—not that he ever in fact received such a visa or that the United States government recognized him as a "leading expert" in any field. Leitner-Wise Dep. Tr., Ex. 15, at 105:5–24; *see id.* at 35:21–36:13 (stating that his application for a green card has not been granted).

Taken together, these falsehoods support an inference that Leitner-Wise has not accurately described his education and professional experience, and Plaintiffs have failed to meet their burden to show that he is qualified under Rule 702 to offer an opinion in these cases.

## CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court bar the opinions of Plaintiffs' experts identified above.

19

Dated: September 13, 2024

Respectfully submitted,

KWAME RAOUL
*Attorney General of Illinois*

/s/ John Hazinski
Christopher G. Wells, No. 6304265
Kathryn Hunt Muse, No. 6302614
Gretchen Helfrich, No. 630004
Michael M. Tresnowski, No. 6324767
John T. Hazinski, No. 6329791
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000
john.hazinski@ilag.gov

20