**IN THE DISTRICT OF THE UNITED STATES OF AMERICA
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

---

| | |
|---|---|
| CALEB BARNETT, et al., | |
| Plaintiffs, | |
| v. | Case No. 23-cv-209-SPM |
| KWAME RAOUL, et al., | * Designated Lead Case |
| Defendants. | |

---

| | |
|---|---|
| DANE HARREL, et al., | |
| Plaintiffs, | |
| v. | Case No. 23-cv-141-SPM |
| KWAME RAOUL, et al., | |
| Defendants. | |

---

| | |
|---|---|
| JEREMY LANGLEY, et al., | |
| Plaintiffs, | |
| v. | Case No. 23-cv-192-SPM |
| BRENDAN KELLY, et al., | |
| Defendants. | |

---

| | |
|---|---|
| FEDERAL FIREARMS LICENSEES OF ILLINOIS, et al., | |
| Plaintiffs, | |
| v. | Case No. 23-cv-215-SPM |
| JAY ROBERT "JB" PRITZKER, et al., | |
| Defendants. | |

---

**Transcript of Bench Trial - Day 4
September 19, 2024**

Proceedings held before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

---

**REPORTED BY**:

**HANNAH JAGLER**, RMR, CRR, FCRR, Official Court Reporter,
750 Missouri Avenue, East St. Louis, Illinois 62201
618-482-9481 - Hannah_Jagler@ilsd.uscourts.gov

Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES**:

For Barnett
Plaintiffs:

**ANDREW LOTHSON**
Swanson, Martin & Bell, LLP
330 N. Wabash Ave., Suite 3300
Chicago, IL 60611
312-321-9100
Alothson@smbtrials.com

**MATTHEW ROWEN**
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900
Matthew.rowen@clementmurphy.com

For Harrel
Plaintiffs:

**DAVID G. SIGALE**
Law Firm of David G. Sigale, P.C.
55 W. 22nd St., Suite 230
Lombard, IL 60148
630-452-4547
Dsigale@sigalelaw.com

**WILLIAM V. BERGSTROM**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
202-220-9600
Wbergstrom@cooperkirk.com

For Langley
Plaintiffs:

**THOMAS G. MAAG**
Maag Law Firm, LLC
22 West Lorena Avenue
Wood River, IL 62095
618-216-5291
Tmaag@maaglaw.com

For FFL Illinois
Plaintiffs:

**SEAN ANTHONY BRADY**
Michel & Associates, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, CA 90802
562-216-4464
Sbrady@michellawyers.com

For Defendants
Raoul, Kelly,
and Pritzker:

**CHRISTOPHER GRAHAM WELLS**
Illinois Attorney General's Office
Public Interest Division
115 S. LaSalle St.
Chicago, IL 60603
312-814-1134
Christopher.wells@ilag.gov

**KATHRYN HUNT MUSE**
Illinois Attorney General's Office
115 S. LaSalle Street, Ste 31st Floor
Chicago, IL 60603
312-814-3000
Kathryn.Muse@ilag.gov

**GRETCHEN ELIZABETH HELFRICH**
Illinois Attorney General's Office
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
312-814-3614
Gretchen.Helfrich@ilag.gov

**JOHN THOMAS HAZINSKI**
Illinois Attorney General's Office
115 S. LaSalle St.
Chicago, IL 60603
312-814-3000
John.hazinski@ilag.gov

**MICHAEL MARK TRESNOWSKI**
Illinois Attorney General's Office
100 West Randolph Street, 11th Floor
Chicago, IL 60601
773-758-4496
Michael.tresnowski@ilag.gov

For Randolph Co.
Defendants:

**KATHERINE FAY ASFOUR**
Evans & Dixon, LLC
211 N. Broadway, Suite 2500
St. Louis, MO 63102
314-552-4005
Kasfour@evans-dixon.com

For St. Clair Co.
Defendants:

**THOMAS R. YSURSA**
Becker, Hoerner & Ysursa, P.C.
Generally Admitted
5111 West Main Street
Belleville, IL 62226
618-235-0020
Try@bhylaw.com

| | |
|---|---|
| For McHenry Co.<br>Defendants: | **TROY OWENS**<br>McHenry County State's Attorney's Office<br>2200 North Seminary Avenue, Suite 150<br>Woodstock, Illinois 60098<br>815-334-4159<br>Tcowens@mchenrycountyil.gov |
| For Defendant Cole<br>Shaner: | **KEITH B. HILL**<br>Heyl, Royster, Voelker & Allen, PC<br>105 West Vandalia Street,<br>Mark Twain Plaza III, Suite 100<br>Edwardsville, Illinois 62025<br>618-656-4646<br>Khill@heylroyster.com |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>INDEX</u>

**PAGE**

WITNESS: **JASON DEMPSEY**

Direct Examination By Ms. Muse.......................... 557

Cross-Examination By Mr. Lothson........................ 612

Redirect Examination By Ms. Muse....................... 651

Examination By the Court............................... 653

Closing Argument By Mr. Lothson........................ 661

Closing Argument By Ms. Muse.......................... 665

**TRANSCRIPT OF PROCEEDINGS**

(Proceedings commenced at 9:04 a.m.)

(Portion of the following proceedings were excerpted, sealed and filed under separate cover.)

THE COURT:  All right.  We are on the record.  We are still in the presentation of the defendants, their case in chief.

Call your next witness.

MS. MUSE:  Would you like the attorneys to announce themselves for the record first?  It's up to you.  You know who we are at this point.

THE COURT:  I know who you are.  But why not.

MS. MUSE:  Okay.  I'm Kathryn Hunt Muse for the state defendants, Governor Pritzker, Attorney General Raoul, and Director Kelly.

MR. WELLS:  Christopher Wells also on behalf of the state defendants.

MR. TRESNOWSKI:  Mike Tresnowski also on behalf of the state defendants.

MS. HELFRICH:  Gretchen Helfrich also on behalf of the state defendants.

MR. HAZINSKI:  John Hazinski for the state defendants.

MR. LOTHSON:  Andrew Lothson for the Barnett plaintiffs.

MR. ROWEN:  Matthew Rowen for the Barnett plaintiffs.

MR. BRADY:  Sean Brady on behalf of the FFL plaintiffs.

MR. BERGSTROM:  Will Bergstrom for the Harrel plaintiffs.

MR. SIGALE:  Your Honor, good morning.  David Sigale, S-i-g-a-l-e, on behalf of the Harrel plaintiffs.

MR. T. MAAG:  Thomas Maag on behalf of the Langley plaintiffs.

MS. ASFOUR:  Katherine Asfour on behalf of the Randolph County defendants.

MR. YSURSA:  Thomas Ysursa on behalf of the St. Clair County defendants.

MR. HILL:  Keith Hill on behalf of Crawford County State's Attorney Cole Shaner.

THE COURT:  All right.  Good morning to all. Welcome to all who are here.

Are you handling the next witness?

MS. MUSE:  I am.  Thank you, Your Honor.  State defendants would like to call Lieutenant Colonel Jason Dempsey to the stand.

THE COURTROOM DEPUTY:  Please raise your right hand.  Do you swear that the testimony you're about to give before this Court will be the whole truth and nothing but the

truth?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Please state your full
name and spell your last name for the Court.

THE WITNESS:  Jason Dempsey, D-e-m-p-s-e-y.

THE COURTROOM DEPUTY:  Thank you.  Have a seat.

DIRECT EXAMINATION

BY MS. MUSE:

Q   Good morning, Colonel Dempsey.  Well, I should say, I
understand that your rank when you retired was Lieutenant
Colonel, but it is proper to call you Colonel for short?

A   In common usage, yes.

Q   Okay.  So you've been asked to testify here, given your
22 years serving in the military and your expertise in
tactical weapons by the US Army.  But first I'd like to ask
you for some background information about your education and
career so we can help understand how you developed this
expertise.  When did your interest in the military begin?

A   My father was an infantry officer in Vietnam and I grew up --
he stayed in the military for a career, so it was kind of the
life I lived, air I breathed.  Born on a military
installation, lived in, on military bases most of my young
life.

Q   All right.  And where did you go to high school?

A   My father retired from the military out of Jefferson City,

Missouri.  He was an advisor of the National Guard so that's where I went to high school.

Q   All right.  And where did you go to college?

A   I went to college at the United States Military Academy at West Point.

Q   How many years were you at West Point as a cadet?

A   Four years.

Q   What weapons training did you receive as a cadet at West Point?

A   As a cadet at West Point, the first summer, you go through the equivalent of Army basic training, and that involves familiarization and qualification on M4, M16.  At that point, it was the M16 series of rifles.  During the second summer, you're introduced -- again, you run through basic rifle marksmanship and qualification, and then you proceed to team-, squad-, and platoon-level tactics.  During that year, I also acted as a acting drill sergeant at Fort Leonard Wood, Missouri, where I ran a basic training unit through basic and advanced rifle marksmanship.  During the third and last training period at West Point, I was in charge of training the incoming cohort of cadets, and so they were running through the, again, the basic -- equivalent of basic training.

Q   Okay.  You used the word qualification.  What is that?

A   Qualification is just a standard set of drills and training

that culminates using your -- again, the M16 on a standard popup range with targets from 25 to 300 meters.  You have to hit a certain number out of the 40 targets that present themselves to qualify.

Q   All right.  And then you used a couple terms like squad and platoon.  Could I just ask you briefly what are the units in the US Army and how they relate to each other in the hierarchy?

A   Sure.  And so you have -- and this is fairly generic.  Obviously units differ by function and type.  But for the generic order of business, you start with the individual soldier rifleman.  Typically he's paired in a buddy team, although that is not an official -- it's a method of -- it's what we train on, but not official unit designation.

The first would be the fire team, typically comprised of four personnel, led by a slightly hire-ranking junior NCO.  Following that, you combine a couple fire teams and then you have a squad.  Squad is typically between nine to 12 personnel.  You combine several squads together, typically three plus a weapons squad, and you get a platoon, typically of 36 personnel.  You then combine a bunch of platoons together, typically three plus a weapons platoon, and again, varies by type of unit, but then that basic structure is a company.  And a company can range anywhere from 130 to 180 personnel.  You combine several companies,

maneuver and support companies, and you have a battalion.  A battalion is typically 600 to 800 personnel.  And then again, you combine, in much the same way, you combine a bunch of battalions together, and you have a brigade or brigade combat team.  Above a brigade, you combine a bunch of brigades together, you have a division, which can be around 15-, 20,000 folks.  And then above that is a corps.

Q   All right.  Thank you.  What was the primary weapon you and the other cadets at West Point were training on when you were there?

A   It was the M16.

Q   And what firing modes did the M16s that you trained on have at the time?

A   Typically they were semi and burst, although there are a few older models still floating around that had semiautomatic fire and full auto selectors.

Q   What is burst?

A   Burst is a setting where you get three rounds with one trigger pull.

Q   How does one choose a firing mode on the M16?

A   There's a selector switch on the left side of the weapon that you manipulate with your thumb.

Q   Which firing modes did cadets use for the M16 during training exercises when you were at West Point as a cadet?

A   Only semiautomatic.

Q   When you were a cadet at West Point, were you ever tested on your proficiency using semiautomatic firing of the M16?

A   That was the basis of weapons qualification, using semiautomatic fire.

Q   When you were a cadet at West Point, were you tested on your proficiency using automatic firing of the M16?

A   Never.

Q   Burst?

A   Never.

Q   Did you supervise the training of -- well, I think you talked a little bit about this, but the training of others while you were at West Point?

A   Yes, both at Fort Leonard Wood, Missouri, and then as a supervisor of incoming cadets.

Q   And when you were managing and supervising that training of others, was West Point still having cadets primarily use the M16s?

A   Yes.

Q   And were they still having cadets practice in semiautomatic mode?

A   Only in semiautomatic mode.

Q   And cadets were still qualifying in semiautomatic mode --

A   Yes.

Q   -- on their M16s?

A   Yes.

Q   Did you learn about military doctrine at West Point?

A   Yes.

Q   Generally, what is military doctrine?

A   Military doctrine, if you ask -- well, we're constantly trying to get people to understand the definition.  But it boils down to, essentially to the fundamental principles that define and guide the actions of the organization.  Typically it will be embodied in a series of manuals, starting with capstone doctrinal publications.  You're talking about ADP 1 for the Army and MCDP 1 for the Marine Corps.  That kind of defines the institution.  That document will be paired with a war-fighting document, typically 3.0.  That's the designation.  And then you move down to what we call techniques manuals and training manuals.  Now where doctrine ends in a specific, you know, technical manual would not be considered doctrine, but everything -- all of the documents we use were informed by the fundamental principles outlined in the capstone documents.

Q   And do these documents ultimately guide how you maneuver in combat?

A   Yes.  They provide the principles upon which we maneuver.

Q   And you mentioned technical publications.  Are those sometimes called ATP?

A   No.  Because those are your training publications.  Those still will be considered doctrine.  What won't be -- like

when I say technical publication, I mean like a maintenance publication.  How to repair a Humvee, that would not be considered doctrine.

Q   I see.  So ATP is an example of military doctrine?

A   Yes.

Q   But then there are other technical publications?

A   Right.

Q   That are not called ATP?

A   Right.

Q   That are not doctrine; is that right?

A   Yeah.  Anything that deals with tactics, techniques, and procedures is technically considered doctrine.  And like I said, the names are a bit of a soup, you know, constantly change.  I don't mean to confuse anyone with the military's odd nomenclature, but yeah.

Q   Does the military publish different ATPs, or you mentioned ADPs, depending on the opponent?

A   No, because these are fundamental principles.  They apply to all levels of threat.

Q   So they're not mission specific?

A   No, they are not.

Q   At West Point, did you learn about only the military doctrine applicable to the US Army?

A   We were exposed and oriented to joint doctrine at that time.

Q   And what do you mean by joint doctrine?

A    Joint doctrine, less developed, more general, but that's the doctrine that guides the joint force.  And so by joint force, I mean Army, Navy, Air Force, Marines, now Space Force.

Q    And what's the relative size, if you compare the infantry, the Army, to the Marine Corps?

A    You know, varies by time.  The Army typically fluctuates between 470,000 to 530,000 folks.  I think we're now close to the 470,000 mark.  Same with the Marine Corps.  Marine Corps is typically under 200,000.  I think, you know, generally around 170,000.  So two and a half to three times -- the Army's about two and a half, three times the size of the Marine Corps.

Q    When you were at West Point as a cadet, did cadets carry military doctrine around with them?

A    Yes.

Q    Did you continue to carry around any military doctrine after you left West Point?

A    Yes.  As an infantry officer, basically as you go through infantry officer training and then as part of training the first unit, you know, every lieutenant is -- typically has a copy of what we used to call FM 7-8.  It's got a different name now.  I think it's ATP 30-something.  But FM 7-8 is the rifle platoon and squad.  It's basically the playbook for what an infantry platoon will do.  And so, you know, it's standard always to have one of those in your cargo pocket.

Q    All right.

         MS. MUSE:  Mike, could you pull up -- or maybe Jackie, if you could turn the screen on, Exhibit 263.  First exhibit of the day.

BY MS. MUSE:

Q    Colonel Dempsey, do you see something marked as Exhibit 263 on the screen in front of you?

A    I do.

Q    And what does this appear to be?

A    Infantry Rifle Platoon and Squad, ATP 3-21.

Q    Is this what you just referenced -- does this appear to be a copy of what you just referenced as FM 7-8?

A    It is.  And what you'll notice throughout, just having looked at these, you know, recently, the -- yeah.  They are pretty much verbatim.  You know, minor changes throughout, but yes, this is -- if you said FM 7-8 to pretty much anybody in the Army right now, they'd pull up this document.

Q    All right.  Could you go to the second page?  And the third? Keep going a little bit.  Doesn't come soon?  Let's take it down.  Keep going.

         Let's get back to what you were doing at West Point.  When did you graduate from West Point?

A    In the spring of 1993.

Q    Did you become an officer in the US Army at that time?

A    Yes.  Graduation is a twofold event.  It's simultaneously

your graduation from West Point and a commissioning ceremony as a second lieutenant of the United States Army.

Q  Where did you report after graduating West Point?

A  Following my graduation, I reported to Fort -- then in Fort Benning, now Fort Moore, Georgia.

Q  And what courses did you take there?

A  Fort Moore, Georgia, is the home of the infantry.  Now it's also the home of the infantry and the armor, the armor branch.  In Fort Benning, I began my training with United States Army Airborne School, just about three weeks to be airborne qualified.  That was followed by the Infantry Officer Basic Leader Course, which is a four- to five-month course that runs infantry officers through the entire gamut of individual qualifications through company-level operations on all the weapon systems that -- and procedures and techniques that a young lieutenant might encounter, whether he's going to light infantry or mechanized infantry company.

Q  Could you provide some examples of the types of weapons you were trained on when you were in Fort Benning?

A  Yeah.  I mean, it's pretty exhaustive because it's where you're getting exposure to all of the assets of the infantry.  Most of the weapons I'd seen through training at West Point, but by then, we were starting to see some M4s, although most of us were still carrying M16s.  We would then also carry the M-249 SAW, which is a squad automatic weapon.  We trained

primarily then on the M-60 machine gun.  That was in the process of being replaced by the M-240 machine gun.  Higher caliber than the -- and much larger weapon than the M-249 SAW.

We then had familiarization and firing of the suite of antitank weapon systems.  Back then, common to see the LAW, the light antitank weapon.  That's the little thing you probably see in movies.  As well as the AT4, which is a larger antitank weapon system.

Also exposure and familiarization firing with 60-millimeter mortars, which are organic to an infantry company, as well as 81-millimeter mortars typically organic to infantry battalion.  As well as 120-millimeter mortars, as well as exposure to 155 Howitzers, not part of the infantry, but familiarization because they are commonly in use.  And then the -- I forgot the machine guns.  Suite would be the .50-caliber machine gun.

And then in terms of vehicle-mounted weapon systems, we were given exposure to the Bradley Fighting Vehicle.  The Bradley Fighting Vehicle is armed with -- primarily again, then I think they had the 240s on them as a coaxial weapon, paired with a 25-millimeter cannon and the TOW-2 antitank weapon system, which is similar to the AT4 but much more powerful longer range, and guided.

Q  You mentioned a couple of machine guns.  What does the Army

mean when it uses the phrase machine gun?

A   When we talk about machine guns, we're talking about a weapon specifically built for providing automatic fire.  That will typically have three characteristics.  It will have some kind of built-in bipod collapsible, extendible.  Might also, depending on the size of the machine gun, have a tripod, obviously not carried with the machine gun, but used as part of it so it will have some kind of stabilizing platform.  It will be belt-fed versus fed by a magazine.  So belt-fed, we're talking about rounds linked together with small pieces of metal to provide efficient feeding through the rifle or through the machine gun.  And then it will also come with a spare barrel, so a SAW gunner will carry a spare barrel as well as a M-60 or M-240 machine gunner, and that's because of the rate of fire through these weapons.  You need to be trained and ready to switch out the barrel because they will overheat and become inoperable if you fire too much through them.

Q   Does the military use the phrase machine gun to refer to M16s?

A   No.

Q   M4s?

A   No.

Q   What did you do next after graduating from the Infantry Officers Basic Course?

A   From there, I reported to the US Army Ranger School.

Q   What is Ranger School?

A   Ranger School is the Army's premier leadership and small unit tactics development course.  You have to pass basic infantry qualifications before you can apply and be accepted to the school.  And then through the first week, you're run through a retest of several of those qualifications, everything from doing the PT test again, the five-mile run, land navigation, et cetera.

And then you're put in succeedingly harsh environments, starting with a series of operations in the woods around Georgia.  At the time, we still had a desert phase.  So once we completed and passed the phase in Georgia, you're picked up, flown out to the desert in Texas, operate at a slightly higher level.  In Georgia, you're properly operating at the squad level.  By the time you go to the desert, you're operating at platoon level.  From there you're picked up in the mountains of North Georgia and, again, platoon-level operations.  And finally, assuming you keep passing each phase, you're then sent down to Florida, which we call the swamp phase, and you conduct platoon-level operations in the swamps in North Florida.

Throughout each of those phases, you're tested and graded.  You're given various positions.  So one day, you might be carrying an M4.  The next day, you might be carrying

an M-60 machine gun or you might be carrying the machine gun tripod, you might be a radioman, you might be the squad leader.  And at the end of each day, you're evaluated on how well you did that day and you have to pass a certain number of positions in each phase to continue to advance and graduate.

Q   And did you pass each phase?

A   I did.

Q   So when did you graduate Ranger School?

A   I believe it was April of 1994.

Q   And what did you do after Ranger School?

A   Following Ranger School, I reported to the 1st Brigade of the 82nd Airborne Division at Fort Bragg, now Fort Liberty, North Carolina.

Q   Was that for additional schooling?

A   No.  At that point, I was taking over a platoon.

Q   And what service weapon were you issued in the 82nd Airborne Division?

A   By then, we had M4s in circulation, so I was issued an M4.

Q   Was that a problem, given that you trained only the M16 at West Point?

A   No, the weapons are functionally identical.

Q   What do you mean by functionally identical?

A   They fire the same.  You strip and clean them generally the same.  Everybody wants an M4.  Slightly shorter barrel and

more convenient to carry around.

Q  And what firing modes did your M4 have?

A  I only ever saw -- I know that there are -- there exists M4s with full auto option.  I only ever saw M4s that had semiautomatic and burst fire options on them.

Q  And why do soldiers in an airborne division need to know how to use an M4?  Do they stay in the air?

A  No.  It's the primary infantry weapon system.  The training and the mission of the airborne brigade is generally similar to a regular light infantry unit.  So you're talking about company-, battalion-level light infantry maneuvers.  The exception with the -- or the added capability of the 82nd Airborne Division is to do airfield seizures and contested entry.  So you'll be armed with the same weapons, you just jump out of a plane with that weapon, land on the airfield or drop zone, assemble, and go about regular light infantry type stuff.

Q  All right.  What were your duties in the 82nd Airborne Division?

A  82nd Airborne Division, I served as a rifle platoon leader and as a rifle company executive officer.

Q  So I think you mentioned the platoon is 36 people; is that true of the team that you led?

A  Yes, when fully manned.

Q  And the company I think you mentioned was about 120 to 160

soldiers?

A    Yes, an airborne company floats closer to about 130, 140.

Q    And what did you do with your teams?

A    When I arrived, we were preparing for the projected invasion of Haiti, so we did what -- fairly standard, but, you know, what we call fairly standard training rotation.  Essentially you start with ensuring that your entire platoon is qualified on their individual weapons systems.  From there, you move to buddy team training with blank and live rounds.  And from there to team level training.  And each of these, it would take place both, again, dry fire, blank fire, culminate in live fire exercise, exercises.  Do that at the team level, then at a squad level, and then ultimately the platoon level.

And you would go through something called ex-eval, external evaluation, where you jump into an area, and for four days, exercise the platoon on a whole variety of motions, from fighting in an urban environment, obviously seizing an airfield, dismounted movement through various terrain, raids, ambushes, and, you know, standard attacks.

And then that would all culminate -- you then move from there, sorry, to company-level operations, ultimately mass tactical exercises where -- again, specifically because we were planning to invade Haiti, you'd have the entire brigade, sometimes entire division, would all jump on the same night, you know, assemble your platoon, you

move in and integrate with a company- and battalion-level operation.

Q   Did you ultimately invade Haiti?

A   No.  We were -- we had loaded the aircraft, taken off, and were I think just off the southern tip of Florida when it was -- Jimmy Carter and Colin Powell had negotiated an arrangement, and so we -- the aircraft turned around.  We came home.

Q   And when you were on the plane on the way to Haiti, what service rifle did you have on you?

A   I was carrying an M4.

Q   And when you were -- before you got on the plane and you were drilling, what kinds of -- are there any manuals that laid out some of the drills that you would have been drilling on?

A   Even there, even as lieutenant in 82nd, you always had access to 7-8 and we'd be carrying it in your cargo pocket and regularly training your platoon on the battle drills within that document.

Q   When was the last time you carried a field manual on your person?

A   Probably 2013.

Q   Other than writing for the report that you provided in this case, have you had any other reason to look at versions of military field manuals or ATP publications since that date?

A   I have.  Looked extensively at the Army capstone doctrinal

manuals.

Q   When you were deposed in this case on August 9th, you were asked whether you developed doctrine for combat.  Do you remember that?

A   I do.

Q   Do you remember what you said at the time?

A   I said I had not.

Q   Is your answer to that question different today?

A   It is.

Q   How would you answer that question today?

A   The chief of staff of the Army is currently rewriting the Army's capstone doctrinal manual, and I was invited by his team to go to West Point last week and spend time with the authors of that document, reviewing it, editing it, and offering suggestions.

Q   All right.  So returning to what you were doing in the 1990s then, when did you leave Fort Bragg and where did you report next?

A   Following my time as a company executive officer at the 82nd, around '96, I applied for, assessed, and was selected to serve in the 75th Ranger Regiment.  I was assigned to the 2nd Ranger Battalion at Fort Lewis, Washington.

Q   And what was your rank when you reported to Fort Washington?

A   I was a first lieutenant at Fort Lewis.

Q   Did you have the same M4 service rifle in Fort Bragg or were

you issued a new service rifle?

A    Yeah, you're always issued a new one.  Units have their own stock.  You're assigned a specific weapon.  So I got a new one in the ranger regiment.

Q    And was it an M4 again?

A    It was an M4.

Q    And what firing modes did this M4 have on it?

A    It had semi-auto and burst.

Q    And what were your duties in the 75th Ranger Regiment?

A    The 75th Ranger Regiment primarily has the same mission as the 82nd Airborne Division, but with a few key differences.  It is tailored for much more high-risk raids and airfield seizures, whereas the 82nd will seize broad swaths of land with an airfield insertion.  The 75th, we're the first ones to open the door or to seize key parts of a contested airfield, so we conducted a lot more airborne operations, as well as a focus on raids, you know, specifically helicopter insertions to raid heavily-contested environments.  Typically that would be a compound or an urban environment.  And my job there was to run, resource, plan, and oversee the training of that ranger company as they move through those missions.

Q    And what weapons systems were you using?

A    Again, primarily a full suite of weapons available to soldiers in 82nd Airborne Division, so all the mortars I mentioned that we trained on, the addition within the ranger

regiment were basically the Barrett .50-cal sniper rifle was fairly new and unique weapon system, as well as the Carl Gustaf, which we used in place of the typical AT4.  It's an 84-millimeter recoilless rifle.

Q   During your time in the 75th Ranger Regiment, were you preparing to fight a particular opponent?

A   Occasionally missions would come up.  You know, if there was a situation around the world where somebody thought US intervention might be necessary or particularly if there was a hostage scenario, somewhere in the world, the unit would be alerted and we would go through a planning cycle and a training cycle, if there was enough time, tailored to that threat.

Q   What firing mode did your regiment use when training with service rifles?

A   We always used semiautomatic mode with our M4s.

Q   When did you depart from the 75th Ranger Regiment?

A   I left -- I guess it was '96.  Maybe.  No, '97, I left the ranger regiment.

Q   And what was your rank at that time?

A   I just pinned on captain.

Q   What did you do next?

A   I was -- it was time where you're sent to the next level of schooling.  I opted to go to, apply for, and was assigned to the Amphibious War School at Quantico, Virginia, now known I

think as the Expeditionary Warfare School.  It's the senior
captain and junior majors career course of the United States
Marine Corps.

Q   So the Amphibious War School of the US Marine Corps, is
that --

A   Yes.

Q   And about how long was that?

A   It was a year, nine months or so.

Q   And briefly, what kinds of things did you learn at that
school?

A   Well, we studied doctrine extensively, military history, you
know, doctrine -- when I say doctrine, obviously exposure to
the Marine Corps's capstone documents.  You know,
interestingly, we still used hard copies at that time, you
know, and so we're given a stack of books, and typically that
stack of books about this high, about that much, would be
Marine Corps doctrine, but then -- just given how the Marine
Corps operates.  The rest of them, Army doctrinal
publications and field manuals.  So that's what we studied,
in addition to a deep dive into military history.  And then
obviously modified the kind of things I was familiar with,
with amphibious operations, ship loading, you know, all the
things that a Marine captain or major might be required to
understand.

Q   And you just made some movements with your hand that

unfortunately won't make it into the transcript.

A   Sorry.

Q   I hate to put you to numbers, but if you said ballpark, when you were describing the percentage of doctrine that was by the Marine Corps --

A   By quantity and weight, not an assertion of importance, but by quantity and weight, it was probably 15 percent Marine Corps doctrinal publications and 85 percent Army doctrinal publications.

Q   And what did you do after Amphibious Warfare School?

A   Went to another round of Army schooling.  Combined Arms Services Staff School, Fort Leavenworth, Kansas.  That was just an exposure to the next level of both doctrine and staffing for -- at the battalion and brigade level.  I also went to the Bradley Fighting Vehicle Leaders Course because I was on my way to assume command of a mechanized infantry company.

Q   Briefly, what kinds of things did you learn in the Bradley Infantry Fighting Vehicle Course?

A   The Bradley Fighting Vehicle Leaders Course is basically, you take senior NCOs and officers that have come from light assignments, or if they're juniors that are going to a mechanized infantry company for the first time, and you train extensively on the Bradley Fighting Vehicle, and so that involves maneuvering it, repairing it, getting used to the

weapon systems.  They're organic to it, again, which are the coaxial 240 machine gun, 25-millimeter cannon and the TOW-2 weapons system.

Q    And I think you mentioned that after the Bradley Infantry Fighting Vehicle Course, you went to the Combined Arms Services Staff School; is that right?

A    Yes, Fort Leavenworth.

Q    Right.  So briefly, what kinds of things did you learn at the Combined Arms Services Staff School?

A    Again, that was an exposure to basically doctrine operations and staffing at the next level of command.  So basically how do you be a captain that's in an operation, battalion level or brigade level or, you know, in an exposure, light exposure to division-level operations.

Q    And where and when did you report after that school?

A    The fall of 1998, I reported to Fort Stewart, Georgia, and went to 2nd 7th Infantry which was a mechanized infantry battalion where I first served as air or assistant operations officer for mechanized infantry battalion.

Q    What division was that?

A    3rd Infantry Division.

Q    And what was your initial role when you were --

A    I was assigned as the, again, the assistant operations officer at a battalion.  So planning, resourcing, training that the battalions companies would be doing.

Q   About how many soldiers were in your company?

A   When I took command of a company after serving as assistant operations officer -- a mechanized infantry company is slightly bigger than a light infantry company.  And so I want to say we, you know, fluctuate between 140 and 160 personnel.

Q   And what kind of opponent or mission was your company training for?

A   At the time, we were primarily training for fighting in Iraq. It was pre-911, pre-US invasion, and so we had -- the Army was regularly rotating units into Kuwait to operate along the desert as deterrent to Saddam Hussein and his forces, and so most of the training we did was tailored to that threat.  And we spent a lot of time in the deserts of California assuming we were going to be doing large-scale, mounted, mechanized operations, which are kind of force-on-force, fighting other tanks, fighting other tanks, other -- yeah.

Q   What was the primary service rifle your company trained on?

A   Well, everybody carried the M4.

Q   What firing mode did they train on?

A   We only ever trained on semiautomatic fire.

Q   Was your company deployed or sent over to Iraq?

A   Yes.  I took the company to Kuwait in November timeframe of 1999, spent New Year's 2000 in the desert, few kilometers from the border with Iraq.  At that time, we established encampments and then basically spent four months training,

which was great.

Q   And what weapons did you carry when you were in Kuwait?

A   I carried personally carried M4, M-9 and then the rest of the
infantry company was outfitted with the weapons I've
described previously, but in addition to 14 Bradley Fighting
Vehicles.

Q   When you were in Kuwait, what kinds of maneuvers were your
company training there?

A   Again, we had a great time because we were away from the
flagpole and had a ton of resources, so we trained full on
company-level maneuvers, so an entire company spread out, you
know, traveling across the desert with tanks and Bradley
Fighting Vehicles in support.  I was also the -- take a lot
of time to dig extensive trench lines, which was a lot of fun
just because we could use every weapon system, and so --
which you often can't do in the United States due to, you
know, just the ability to find land where you can fire all
these weapon systems.  And so we culminated with trench live
fire exercises that involved soldiers using their M4s, 249s,
240s in support, hand grenades, LAWs, AT4s, and Bradley
Fighting Vehicles and tanks maneuvering and firing as part of
that training -- training exercise.

Q   Include trench-clearing exercises?

A   Yes.

Q   And combined arms obstacle breaches?

A    Yes.  So the -- that was -- maybe it sounds sexy, but it's one of the more boring things we can do because typically it's a orchestrated maneuver.  That's what we were planning for at the time, the idea that we would have to invade Iraq, so we planned both large-scale offense and large-scale defensive operations.  Combined arms breach is a very complex task that involves integrating an engineer battalion that will either demine or blow up, literally blow up a lane through a minefield, clear the area of wire and other obstacles, and allow for a company to charge through the obstacle belt.  And so obviously we replicated what we knew of the obstacle belts in Iraq and trained to breach them.

Q    Did you mount or dismount any attacks?

A    The unique thing about a mechanized infantry company is that that's the way it operates.  It has the Bradley Fighting Vehicle, which can reach out and touch somebody typically at 3,500 to 4,000 meters.  You know, the range of the TOW is significant, but then it's also able to move into close quarters because you have infantry in support who can be on the ground protecting against, you know, personnel with RPGs.  Or if, you know, you were up on a trench, the Bradley Fighting Vehicle can support and take care of any tanks or any mounted forces in the area, whereas the infantrymen can dismount and operate to clear any local threats.

Q    What did you do after your assignment in the 3rd Infantry

Division?

A    I gave up command of my company in July of 2001.  I had an option there of, you know, stay tactical, maybe go back to the ranger regiment, or stay in the -- you know, or do what we call an operation -- excuse me, a support or institutional assignment.  West Point reached out and asked if I was interested in coming back to teach.  So I chose to -- I applied for and was selected to go back to teach at West Point.  And as part of that assignment, the Army sends you to school for two years to earn a degree before you return, and spend one tour teaching cadets.

Q    What school did you attend?

A    So I started at Columbia University in August of 2001.

Q    And what degree program were you in?

A    I was in the political science program, and a friend talked me into applying for and working on a doctorate degree.

Q    A doctorate degree?

A    Yes, a doctoral degree.

Q    Did you ultimately get a Ph.D. from Columbia?

A    I did.

Q    So it sounds like you were on active duty, but you mentioned for the first two years, you were basically a civilian doing coursework?

A    Yes.  I was active duty Army captain but my place of duty was at Columbia and my job was to pass all my coursework.

Q   All right.  After those first two years, did you stay in New York as a student or what did you do next?

A   Following those two years, I went back up -- then I transitioned up to West Point to begin my teaching assignment.

Q   What was your title when you were teaching at West Point?

A   I think I was an instructor, then assistant professor.

Q   And how many academic years did you teach at West Point?

A   I taught for three academic years at West Point.

Q   What did you do during your summers when you had time off teaching?

A   Well, the Iraq war had kicked off and lot of us were anxious to get over there.  So the first summer, yeah, the first summer there, I was overseeing cadet training.  And so all the training I described earlier, typical to have an officer overseeing that.  So my first summer, I oversaw cadets as they went through their second summer of training, so essentially running them through all the things we talked about, individual weapons qualification, but then more of a focus on platoon- and company-level infantry maneuvers.  And so I supervised cadets doing that for one summer.  And then the second summer, I volunteered and managed to get over to Iraq for the summer of 2005.

Q   What were some of the duties when you were deployed in Iraq in 2005?

A    That deployment was a little bit of a -- it was unique. Because I'd been sent out over there out at West Point, I ended up in the Office of Political and Military Economic Assessment, basically trying to figure out, how do we run Iraq.  That should not instill any confidence in anybody. And my job at the time, a -- I don't know what to call it. The Peshmerga were abducting or keeping -- were keeping Sunni Iraqis that they had captured in joint operations with US Forces and they were basically taking them up north and keeping them for hostage or rather for, you know, payments from the Sunni tribes, and it was causing issues.  So I was tasked first to go look into that, and then if I could, figure out what our policy towards the larger Kurdish population would be.  So I traveled throughout Northern Iraq, meeting with Kurdish leaders, politicians, as well as the military forces in that area trying to devise a plan for how we ameliorate the minor conflict that had erupted and what our long-term plan should be for Northern Iraq.

Q    And what service weapons were you carrying when you were in Iraq for this deployment?

A    Kind of a host of ones.  Because I primarily carried an M-9. Depending on who I was patrolling with, often rolling with Blackwater security attachments assigned to diplomatic personnel, and they always loaned me an M4.  If I was on patrol with a army tactical unit, did a lot with the National

Guard up there, and fortunately they still had the M16.  If I was on the ground then, I would be carrying an M16.

Q   Did you return -- you returned from Iraq for your third and final academic year at West Point?

A   I did.

Q   And what did you do after finishing teaching at West Point at the end of the 2005-2006 academic year?

A   From there, it was heading back basically to get the full Army refresher.  So I reported to Fort -- excuse me, Fort Leavenworth, Kansas, again.  There, I went to something called the Command and General Staff School or Command and General Staff College.  And that is a full nine months of study of Army and joint doctrine, history, military history, basically everything you need to know or might need to know about operating at brigade, division, and corps level.

Q   In addition to learning about doctrine and history, did you also learn about operations?

A   Yes.  I mean, that's fundamentally -- yeah, yeah, we would -- you know, the whole year is full of tabletop and war game exercises at -- we replicate, you know, being in a battalion, a brigade, a division, or a corps.

Q   What did you do after graduating Command and General Staff College?

A   From there I was assigned to 1st -- excuse me, 3rd Brigade of the 10th Mountain Division.

Q   And what was your role with the 10th Mountain Division?

A   Started off for a few months as, again, as operations officer at the brigade level, overseeing the unit, was just coming out of what were then the 15-month deployments, and they were just coming back from Afghanistan.  So I spent a few months managing the refit, the on-boarding qualification, and, you know, the basic training management for new personnel.  And then after that, I moved down and became the operations officer of 1st Battalion, 32nd Infantry.

Q   What mission were your units training for?

A   The unit had just left Afghanistan.  Iraq was still -- Iraq was still the primary fight.  And so we spent the first half of the year under the assumption or under guidance that we would be deploying the city -- or the battalion to Sadr City, which is a suburb of Baghdad, name for, you know, the Sadrs.  So at that point, we were training for counterinsurgency and operations in an urban environment like Baghdad.

Q   Did the training include individual marksmanship?

A   It did.

Q   And what rifles were used for this marksmanship training?

A   At this point, you know, there weren't any M16s left, at least not in the inventory of operational units, so everyone was carrying an M4.

Q   Were you and those under your command ever deployed to Afghanistan?

A    Yes.  Halfway through our training cycle and about six months prior to our projected deployment, the Army made the decision that we did not need to backfill the units in Iraq.  It had quieted down by then.  Afghanistan was heating up and so we were part of the first -- it was before the Afghan surge, but the Army was making a decision to bulk up forces in Afghanistan, particularly in the eastern regions.  And so that's where we ended up going.

Q    Briefly, what did you do during that tour?

A    The combat tour or the prep?

Q    The -- well, we'll start with -- let's do briefly, you can tell me each.

A    Again, so, you know, the training cycles, you know, as described earlier, generally the same.  You always start with the building blocks and you move up those units that we discussed at the beginning of testimony, squad-, platoon-, and company-level qualifications and maneuvers and external evaluations.  Again, with the training for Sadr City, we actually spent time, a lot of time on either mock cities in urban environments or, you know, actually hanging out in Syracuse trying to figure out, you know, how we'd operate in a built-up area like that.  Following that, you know, with the pivot to Afghanistan, the focus was much more on helicopter insertions, establishing remote fighting positions, bases, OPs, as well as operating in a mix of urban

and mountainous terrain.

Q    So how did your role change from when you were in the US compared to when you were in Afghanistan?

A    So basically as an operations officer, you know, you're in charge of all designing, resourcing, planning, all of the training and mentoring the company commanders as they put their training plans together, approving what they suggest, help and coach them through that process.  And then once you are deployed, it's about managing their operations.  And so, you know, you train your unit right, you have an idea for how they operate.  And then once deployed, the job of an operations officer at the battalion level -- basically you set up a headquarters.  You know, imagine a Tom Clancy movie but on a much cheaper budget.  So, you know, so plywood area with screens, monitoring radios, so monitor all the missions from day to day, approve any high-risk missions, go over in detail any missions that entailed a significant degree of risk.  And then occasionally we'd put together larger operations, where I or the battalion commander would deploy with, you know, the platoon- or company-size element that we might be sending on a helicopter insertion to a remote village.  We also spent a lot of time -- we were on the border with Pakistan and Afghanistan, so we spent a significant amount of time walking all the passes in Kunar Province.

Q    Did you plan or approve any missions when you were in
Afghanistan?

A    That was my main job, yes.  Extensively.

Q    About how many --

THE COURT:  We've been going for an hour and
15 minutes.  Why don't we take a brief recess.  Five minutes,
and we will come back with testimony.

(Recess at 10:15 a.m.)

(Return at 10:28 a.m.)

THE COURT:  All right.  Please be seated.  Thank
you.  All right.  We are still in the direct examination of
Colonel Dempsey.

Sir, you're still under oath.  Please proceed.

MS. MUSE:  Thank you, Your Honor.

BY MS. MUSE:

Q    Colonel Dempsey, I think when we left off just now, you were
talking about Afghanistan and I think you led a couple task
forces.  What was the name of the first task force?

A    Task Force Chosen.

Q    And about how many people did you lead on Task Force Chosen?

A    The task force was approximately 650, 700 people depending on
how you count.  Various attachments.

Q    What did you --

THE COURT:  Hold on just a second.  Sir, in the
back with your cell phone, unless you have -- unless you've

received permission ahead of time from the Court to be using your cell phone -- and you haven't?

GALLERY WITNESS:  No, sir.

THE COURT:  All right.  Well, away it goes.

BY MS. MUSE:

Q    What did you do after serving as the operations officer for Task Force Chosen?

A    Midway through the deployment, we lost a senior leader to PTSD and had to reshuffle -- sorry, lost the senior leader to posttraumatic stress disorder and had to reshuffle the brigade hierarchy.  So I was pulled from being the operations officer for the battalion-level task force in Kunar, and I assumed the role of brigade combat team level operations officer in two provinces south of Kabul, Wardak and Logar Province.  The brigade combat team, that -- as we stated earlier, so that was several thousand personnel with a much wider range of assets and units.

THE COURT:  Could you spell those two provinces for my court reporter?

THE WITNESS:  Wardak, is W-a-r-d-a-k, and Logar is L-o-g-a-r.

THE COURT:  Thank you.

THE WITNESS:  Yes, sir.

BY MS. MUSE:

Q    What was the name of the task force that you were the brigade

operations officer for?

A    Task Force Spartan.

Q    Do you remember the approximate dates that you were serving as the brigade operations officer?

A    June through December of 2009.

Q    What were you responsible for as brigade operations officer for Task Force Spartan?

A    Essentially the same as being a battalion-level operations officer, but at one degree higher.  In other words, on any given day, we'd have three to four named operations underway.  A named operation was something that was considered high value or of an elevated risk.  And so my job was to regularly review the concept of operations for each of those plans, run them through an approval process.  And then the other part of my job at the brigade level was I had an attached aviation squadron.  And so there, I spent a lot of time allocating air assets, either for unit-level movement or in providing aerial, you know, fire support from helicopters.  We also had several counter-IED elements and the more specialized ones, we had, you know, floaters that we would designate or assign for special missions.

Q    So am I right from your earlier descriptions that you were in charge of six subordinate battalions?

A    Yes, approximately six battalions.

Q    In leading Task Force Spartan, did you rely on your knowledge

in military doctrine?

A    Yes.

Q    How so?

A    Again, fight like you train, train like you fight is the common saying.  And so, you know, everything we'd done in terms of training at the brigade level in the United States had prepared us for how we operated overseas.  And so you adhere to standard set of reporting and operational procedures, as well as, you know, you're always pushing the fundamentals.

Q    So you didn't figure things out when you got there, you put into action what you trained previously?

A    No, most of the basics remain the same.  There's a little bit of a learning curve as you bring in, you know, counter-IED assets, you know, specialized vehicles that might do minesweeping and whatnot, because you generally get those in theater, but everything else was decided before we got there.

Q    How often did soldiers in the operations you were overseeing fire weapons?

A    That's a really hard exact number to pin down, but I do remember, you know, we were operating in the run-up to the elections.  First open presidential elections were that August.  We'd also had Bowe Bergdahl go AWOL from the province south of me which opened -- were two incentives for insurgents to step up the operations across Wardak and Logar.

That's a long way of saying the number for the months I was in charge of the brigade, we averaged over 200 sig-acts per month, significant activities.  A sig-act would be anything that would include, say, a direct fire engagement, an IED strike, or some type of rocket or mortar attack.  And we had just over 200 of those per month.

Q  Would you say soldiers in your operations fired weapons at least weekly?

A  Probably daily.

Q  How many times did soldiers in the operations you oversaw fire at the enemy?

A  Again, probably daily.

Q  How many soldiers in the operations you were leading carried M4s or M16s?

A  We were for the most part full suite M4s, so every infantryman would have been carrying an M4.  And if I had to put a number -- so we had two infantry -- two maneuver infantry battalions, a cav. squadron.  I couldn't tell you, but it would be probably 2,000 people carrying M4s.

Q  Did any of those approximately 2,000 soldiers have the occasion to fire their M4 or an M16?

A  Yes.

Q  Would you say dozens of times?

A  Like I said, those -- the elements out on patrol, you know, again, across Wardak and Logar, we probably saw at least once

a day.  So if you had 200 sig-acts a month, you know, so somebody's getting fired at, I can't do the math there, maybe six times a day.  Somebody's either firing or receiving fire, being hit by an IED.

Q   About how many total rounds do you think were shot through an M4 or M16 barrel under your command?

A   I have no ability to estimate that.  But probably a lot.

Q   Were any of those rounds shot at another human?

A   Yes.

Q   When did you return from Afghanistan?

A   Late 2009, or right at the end -- just before New Year's 2009.

Q   What did you do next?

A   From that point, I was -- stayed in the brigade operations role for another I think six months, so managed the redeployment of the brigade, managed the type of training you do there, getting people off to the schools they may have missed during deployment, integrating new soldiers and overseeing, you know, basic -- you know, the individual training that we're able to do during a redeployment period. And then I relinquished that role in the summer of 2010.

Q   Did -- before you resume -- gave up the role in 2010, did you do after-action reviews?

A   Yes, we did extensive after-action reviews.

Q   Why did you leave the 10th Mountain Division or what'd you do

next?

A    Well, for one, I'd fulfilled my duties and was due for -- to rotate out of the division.  So I applied for and was accepted into the White House Fellows program.

Q    What is a White House Fellow?

A    The White House Fellows program established in the late '60s, essentially to take Americans typically around the age of 25 to 35 and place them with cabinet officers in the Federal Government as kind of exposure to national-level politics and to inspire public service.

Q    Briefly, what issue did you work on when you were a White House Fellow?

A    I was placed in the office of the First Lady and working with her and the Second Lady, they wanted to design, you know -- we're still at the height -- close to the height of the conflicts, and so I was brought in specifically as an Army officer coming off a deployment to design and then ultimately launch what became known as Joining Forces, which was an effort to mobilize businesses, basically civil society, the nongovernment elements of the United States, to find ways to support the military family and veteran community.

Q    What did you do after your fellowship was complete?

A    When my fellowship was complete, I had -- I left Afghanistan. I put my name in to return as soon as I could.  And that meant volunteering for a advisory position, but the advisory

position was not going to start for another year.  So I shifted over -- technically belonged to OMB, but I was part of the White House Task Force on Veterans and Military Families.  There, I oversaw implementation of Presidential Study Directive 9, which was an effort to get all the various government agencies, even though I was not directly related to the military, you know, housing, urban development, commerce, et cetera, to figure out how to -- what they were doing for the military community and if they could do more, as well as overseeing DoD, VA Task Force that was overhauling the Veteran Transition Program as soldiers left the service.

Q   Where did you report after serving on the White House Task Force?

A   Following that, then I reported to the 101st Airborne Division, Fort Campbell, Kentucky, despite most of it being in Tennessee.

Q   And what was your role there?

A   I took command of an advisory team.  An advisory team, team of about nine to 12 senior -- not senior, but captains and majors as well as senior and noncommissioned officers, and our job was to prepare to deploy to Afghanistan and partner with Afghan forces.

Q   What kind of training did you do to prepare for that deployment?

A   That was a little bit more of a dial-down back to team- and

squad-level training, because we were a nine- to 12-person element.  So we did all the basic weapons qualifications in addition to maneuvering as a fire team as a, you know, an ad hoc squad.  So that would involve all the things that, you know, we might be expected to do, from defend ourselves to, you know, clear an area or a compound where we might be visiting or in.  We did all that, in addition to refreshing on how we were setting up the Afghan National Security Forces, so a study of basically whatever doctrinal principles that we could port over to them and what procedures we could teach them on to help them be more efficient and effective.

Q   Did you train again on basic rifle marksmanship?

A   Yes, we did.

Q   What service rifle did you train on?

A   We were using the M4.

Q   What firing mode did you train on?

A   We only ever trained on semiautomatic mode.

Q   When you were deployed to Afghanistan for this tour, what were your duties?

A   A lot of chaos during that deployment.  Was initially pulled out to investigate a green on blue attack, which was a fire fight that erupted between our Afghan allies and American force.  Completing that, I then moved over and took over an advisory team with the Afghan Border Police.  So I was partnered with a commander who had control of a couple

thousand kilometers of the area where I'd previously operated in.  So he was in charge of all the border passes in Kunar down through Khost, Paktia, and Paktika.  My job --

THE COURT:  Could you spell those for us?

THE WITNESS:  Oh, that's a tough one, Your Honor. Khost is K-h-o-s-t, Paktika is P-a-k-t-i-k-a.

THE COURT:  We're going to live with your spelling, brother.

THE WITNESS:  Well, you'd be amazed how many different spellings there are just within the United States Army of these --

THE COURT:  For purposes of this case, those are properly --

THE WITNESS:  These are authoritative, yes.

THE COURT:  There you are.

THE WITNESS:  Paktia, P-a-k-t-i-y-a [sic], and then Kunar, K-u-n-a-r.

BY MS. MUSE:

Q   Did you conduct any foot patrols?

A   Yes.

Q   Just a couple or a lot?

A   Not regularly.  You know, so during the course of that deployment, I'm Afghan counterpart.  We probably visited -- well, not probably.  I counted over 50 different bases and outposts and border passes.  And so oftentimes we'd travel

there by helicopter, but then it'd be a small unit moving from a landing zone to whatever we were going to look at, whether it was a border pass, an Afghan unit, what have you. So yeah, a few times a week on dismounted patrol and probably the same, a few times a week on mounted patrols.  What you call -- I just call them a movement, but, you know, a patrol.

Q    What was the primary weapons system that members of the team carried?

A    All of us carried the M-9 service pistol and the M4.

Q    When did your operational assignment to the 101st Airborne Division end?

A    We redeployed late spring, early summer of 2013.

Q    Where did you work next?

A    I took a job what's called the Commanders Action Group for the Chairmen of the Joint Chiefs.

Q    Is that the Joint Chiefs of Staff of the Pentagon?

A    Yeah.  Yes.  The Joint Chief Staff of the Pentagon.  The chairmen, four-star general who runs the joint staff, senior advisory -- senior military advisor to the president, and oversees the service chiefs, so Army, Navy, Air Force, Marines.  Space Force.  Don't want to forget.

Q    So while you were serving as a special assistant at the Pentagon, were you asked to travel abroad?

A    Yeah.  In 2014, an officer I'd worked with both in the ranger regiment and had been my brigade commander in the 10th

Mountain Division by this time was a major general and he was in charge of all -- he was in charge of the advisory mission in -- they named it RCE, but that same era, I deployed from that involved -- covered the provinces previously named. The -- and he asked me to come back and, you know, give him an over-time assessment of the advisory mission.

Q   About when did your service in the Pentagon end?

A   I ended my service and retired from the US Army in 2015, June of 2015.

Q   And when did you retire from the Army?

A   June 30th, 2015.

Q   What was your rank when you retired?

A   I was lieutenant colonel.

Q   Why did you retire?

A   You know, I'd had a lot of fun, but it'd been a long 22 years.  I had two kids.  I had not known my daughter when she was 2 or 4.  I didn't know my son when he was 5 or 7. The family was settled and enjoyed the area, so it was time to do something different.

Q   And what's your job today?

A   Today my primary focus is on veteran transition to higher education.  So I do a couple different things.  My primary role is I run the nonprofit center out of Columbia University that serves veterans nationwide.  We've served over 200,000 veterans, basically helping them navigate the path from

service through higher ed and on to employment.

Q   Are you affiliated with any advocacy organizations that try to influence gun policies?

A   I am part of the Veterans Advisory Council, which is an organization of veterans that tries to get some productive discussions around weapons.

Q   Is that the council for the Vet Advisory Council of Everytown for Gun Safety?

A   Yes, it is.

Q   And what's the primary issue that that advisory council focuses on?

A   Most of us are -- most members of the council are gun owners and unfortunately most of us have dealt with friends and colleagues who have committed suicide predominantly through the use of firearms.  So the only advocacy work we've done and focused on thus far is talking to veteran organizations and advocating for kind of a spectrum of, you know, how do you talk to a buddy who might be suicidal, how do you work through the tools available, you know, safeguard their weapons if they have them, how do you have those discussions and how do you prevent suicide by firearm.

Q   Are you paid for your work on the Veterans Advisory Council?

A   I am not.

Q   All right.  Now that we've reviewed your qualifications to serve as an expert on the tactical use of weapons by the

Army, let's turn to your role in these cases.

MS. MUSE:  Mike, could you pull up Exhibit 214?

BY MS. MUSE:

Q    Having him pull up a copy of your report that we filed on the docket at 222-3.  For the trial, it's marked as Exhibit 214. And scroll to page 5 of the document.  Do you see Exhibit 214 on your screen, Colonel Dempsey?

A    I do.

Q    Do you recognize this as the cover for the report you authored in this matter?

A    I do.

Q    And do you recall submitting a declaration for this report?

A    Yes.

Q    What were you asked to do by me and my colleagues at the Office of the Illinois Attorney General?

A    The question I was asked to address was the tactical use of the M4, M16 series of rifles in the United States Army.

Q    Before drafting your report in this case, did you review some expert reports from the plaintiffs?

A    I did.  I reviewed the Eby-Musselman report as well as watched a video and read the report -- I believe it's Lombardo and Boone I believe.

Q    What opinions in those reports did you respond to when you drafted your report?

A    I specifically addressed the utility of the -- utility and

use cases of the M4 in combat and the modes of fire that we use them in.

Q   Did your report ultimately respond to everything in those three reports you mentioned?

A   No.

Q   Did you rely on any other documents when you were drafting your report?

A   I reviewed a couple Army doctrinal publications.

Q   And why did you review those?

A   It'd been a little while since I cracked open 7-8.  It was nice to see they had the same pictures they've used for the last 40 years.  And yeah, just wanted to see what the -- our current Army language, if anything had changed since I'd been in uniform.

Q   So other than the documents we've just mentioned, what else did you base your opinions on in this matter?

A   I based my opinion on both my understanding of those documents and then how I'd seen those documents, you know, the principles, espousal in those documents, how they'd been employed over 22 years in the United States Army.  I used my personal experience being trained by others in the Army, as well as my experience training and designing training for others in the Army, as well as my experiences deployed to Iraq and Afghanistan.

Q   Now I think we can -- your declaration has already been

accepted into evidence.  But I'll just ask you a few questions to highlight some of the opinions you put into your report.  You can put it down for now.  What is the tactical purpose of an infantry rifleman?

A    To provide well-aimed effective fire on enemy forces.

Q    What rifles are issued to infantry riflemen to accomplish that purpose?

A    The M4.

Q    And before the M4, what rifle was issued for this purpose?

A    The M16.

Q    In exercises, what firing mode did infantry riflemen use their M4s and M16s to accomplish this purpose?

A    Always semiautomatic.

                THE COURT:  Haven't we been through all this?

                MS. MUSE:  Excuse me?

                THE COURT:  Haven't we been through all this?

                MS. MUSE:  Not with this expert, Your Honor.

                THE COURT:  His training on M4, his experience with an M4, training on semi-auto?

                MS. MUSE:  I'm really wrapping up here, sir, but I would note that I've established --

                THE COURT:  It's ten minutes to 11.

                MS. MUSE:  I'll wrap it up.

                THE COURT:  I don't think anybody's challenging this guy's expertise.  Is anybody challenging his expertise on

the plaintiffs' side?  I'm seeing no hands raised.

MS. MUSE:  Well, I'll make it quick.

THE COURT:  All right.

MS. MUSE:  I would like to note that I have established his training on these weapons, but I'd like to ask a little bit about --

THE COURT:  I'm going to let you go.  I'm just starting to feel like we are recycling.  I want to hear his opinions.

MS. MUSE:  All right.

BY MS. MUSE:

Q   In combat, what firing mode did infantry riflemen use their M4s and M16s to kill the enemy?

A   Semiautomatic.

Q   Why do soldiers use semiautomatic mode when firing their M4 and M16s?

A   Most effective and most reliable mode.

Q   What do you mean by effective?

A   Effective is, you can place well-aimed fire in semiautomatic mode better than you can in burst.  With burst, there's an inherent recoil that will throw off your second and third bullet.  And firing in semiautomatic -- or firing in burst also dramatically increases jamming the weapon.  Again, machine guns are designed for rapid automatic fire.  It's kind of a secondary tertiary function that the M4 is not

primarily designed for.

Q   Are you familiar with how US military documents use the term
peer threat?

A   I am.

Q   What does that term mean?

A   Peer threat, even though they use it, I wouldn't say it's
exceptionally well-defined.  But typically it will mean if
you're facing a force, such as we assumed, you know, that
Saddam Hussein was -- represented a peer threat because he
had a large army, had extensive array of weapons systems.
Today we consider peer threats to be, say, Belarus, Russia or
China that have the capabilities and range of weapons in
large enough armies that they could pose, you know, an
existential threat.

Q   Does the optional firing mode for M4 or M16 depend on whether
the military is fighting a peer threat?

A   No.

Q   Has the US Military fought a peer threat recently?

A   No.

Q   How do you know what the US military tactics are for peer
threat if we haven't fought one recently?

A   For the soldier on the ground who's facing an enemy force, it
is irrelevant whether there's an army of a hundred thousand
or, you know, a gang of 20 behind that force.  He or she is
going to use the most effective mode of fire to keep

themselves alive and to kill the enemy.

Q   In your report, you use the term precision fire.  What's
that?

A   Precision fire would be, you know, basically hitting what
you're aiming at.

Q   Is that different from suppressive fire?

A   Yes.  You could have a nerdy debate a little bit on that and
we do in the infantry.  But essentially suppressive fire
still has to be accurate because the fire has to be close
enough to make the person actually believe that if they move
or stick their head up, they're actually going to catch a
bullet.  So you can't just fire rounds into the air and count
that as suppressive fire.

Q   What's the best way for the infantry rifleman to deliver
precision fire?

A   Through the semiautomatic mode.

Q   On which weapon?

A   The M4.

Q   What's the best way for the infantry to provide suppressive
fire?

A   If the infantry begins to provide suppressive fire, that's
when you utilize employment of the M-249 SAW or the M-240
machine gun.  Again, I assume we're talking about a light
infantry formation at this point.

Q   Should soldiers use automatic fire from an M4 or M16 to

provide suppressive fire?

A    No.

Q    Why not?

A    Because, again, it's -- even if -- it's still less accurate than the suppressive fire that can be provided by M-249 or M-240 machine gun.  It also increases the likelihood of jamming.  And, you know, it reduces their ability to, you know, hit targets.  You get one well-aimed bullet and two that fly off somewhere else.

Q    How does the infantry organize itself to ensure that they don't need to rely on an M4 or M16 to provide automatic fire?

A    Well, again, every formation of the team is comprised of four personnel.  Three of them will be carrying an M4, one of those M4s will be outfitted with the addition of an M-203 grenade launcher, and then the fourth member of that team will be carrying the squad automatic weapon, the M-249.

Q    So if the fire team encounters an enemy, how does the fire team suppress the enemy?

A    Well, the rifleman in contact will provide well-aimed direct fire on the enemy.  The SAW will move into position.  And if the team leader decides that they need to suppress, then the SAW will provide automatic fire on the enemy position.

Q    Does the fire team use the M4 or M16s at all?

A    Yes.

Q    And that was to place the targeted fire you mentioned?

A   Say it again.

Q   That was to place the targeted fire you mentioned?

A   Yes, that will be shooting at the enemy as well.

Q   What if a larger group like a squad comes under fire from the enemy?  How does the squad suppress the enemy?

A   Same principles apply, only now you're maneuvering two teams, so you have access to two squad automatic weapons.  So the initial team will array itself to suppress the enemy with its three rifles, its M-203 grenade launcher and its M-249 SAW.  The other team will maneuver left, right.  And, again, we're talking about kind of basics here, but establish a linear position or positions where they can all provide fire on the target.

Q   What if a platoon comes under fire from the enemy?  How do they suppress the enemy?

A   At the platoon level, you have the complement now of three squads with a total of six squad automatic weapons, but you also have the addition of two M-240 machine guns.  And it will be the platoon leader, if he decides that suppressive fire is in order to maneuver his squads, or he's been given the mission to suppress, so a platoon can maneuver -- well, move the two 240 machine guns into positions where they can provide the best and most accurate fire on the area that needs suppressed or destroyed.

Q   What if there's a situation where there's only one M-249

available and it malfunctions?  Would a rifleman suppress the enemy using automatic fire from an M4 in that scenario?

A   No.

Q   What about an extreme scenario where a rifleman's alone and gets ambushed?  How would that individual rifleman suppress the enemy?

A   He should continue to use semiautomatic fire and not put himself in a position where he, through a jam or running out of ammunition, renders -- you know, makes the situation worse.

Q   In all your military training, were you ever trained on a tactical scenario in which you should use an M4 or an M16 in burst or automatic fire mode?

A   Never.

Q   For the thousands of cadets and infantry riflemen you trained throughout your career serving in the military, in what fire setting did you train them to use their service rifles for combat?

A   We always and only trained semiautomatic fire.

Q   For the thousands of soldiers under your leadership in Kuwait, Afghanistan, and Iraq, what firing setting did you expect them to use when firing their M4s and M16s?

A   Always semiautomatic mode.

Q   In your military service, did you ever encounter a tactical scenario that required you to use your M4 or M16 in burst or

automatic firing mode?

A    I did not.

Q    Final question.  Do you recall any tactical scenario that arose for the thousands of soldiers under your leadership which called for the M4 or M16 to be fired in burst or automatic firing modes?

A    I do not.

MS. MUSE:  No further questions at this time.  Thank you.

THE COURT:  All right.  Who's handling cross?

MR. LOTHSON:  That would be me, Your Honor.

THE COURT:  All right.  Are we going to be a while, or do you think...

MR. LOTHSON:  I think we can finish before lunch.

THE COURT:  All right.

MR. LOTHSON:  We need to switch over, HDMI, running off this port right here.

THE COURTROOM DEPUTY:  Who has it?

MR. LOTHSON:  But it's off of that hub.

THE COURTROOM DEPUTY:  But it's down there?

MR. LOTHSON:  Right.

Ready to roll?

CROSS-EXAMINATION

BY MR. LOTHSON:

Q    Colonel Dempsey, you personally own a SIG Sauer AR-15, a

Model 516 for personal use; correct?

A    That is correct.

Q    This rifle came from the manufacturer with a detachable
30-round magazine?

A    Yes.

Q    It's semiautomatic; correct?

A    Yes.

Q    You own it for personal use?

A    Yes.

Q    You store it in your home?

A    Yes.

Q    You've purchased additional magazines for that rifle that you
keep in your home?

A    Yes.

Q    20- or 30-round magazines?

A    30-round magazines.

Q    No 20s?

A    I don't think so.

Q    In your deposition, I recall you suggesting perhaps there was
a 20-round magazine in your collection?

A    I haven't opened the box.

Q    But post purchase, you bought multiple 30-round magazines for
your SIG AR-15 Model 516?

A    Yes.

Q    This rifle has a detachable magazine; correct?

A    Yes.

Q    Has a pistol grip?

A    Yes.

Q    Adjustable stock?

A    Actually it didn't come with a pistol grip.  It does have an adjustable stock, yes.

Q    You said it didn't come with a pistol grip?

A    Yeah, I have a pistol grip.

Q    You added it yourself?

A    Yes.

Q    Has a barrel shroud?

A    Yes.

Q    Flash suppressor?

A    Yes.

Q    Have you reviewed the Illinois law at issue in this litigation?

A    Yes.

Q    PICA?  You have?

A    Yes.

Q    Pull up Exhibit 191.  Go to page 1 -- page 88.  On page 88, do you see reference to SIG Sauer 516 rifles?  It's been highlighted for you on the screen.

A    I see SIG Sauer 516 rifles, yes.

Q    You'd agree with me that Illinois bans the rifle that you own for personal use?

A    That is my understanding.

Q    Do you believe that civilians should be banned from purchasing semiautomatic AR-15 style rifles?

A    I have an opinion that we need to pair the use of these weapons with the principles of training, safety, and accountability.  I'm not in approval of banning outright, but I do think they need to come with principles, again, of training, safety, and accountability.

Q    You're not an engineer?

A    I am not.

Q    You're not a gunsmith?

A    I am not.

Q    You're not an armorer?

A    No.

Q    You've never provided training to anyone on self-defense in the home?

A    No.

Q    You've never received any formal self-defense training?

A    Define self-defense training.

Q    The question is for you and it's not for me to define.

A    I mean...

Q    You have never received any formal self-defense training; correct?

A    I've received ton of combatives training, which I'd consider self-defense training.

Q    You're not a certified -- you're not certified as a
self-defense instructor; correct?

A    In combatives, yes, at one point, I was.

Q    Say that again.

A    In combatives, yes, at one point, I was.

Q    And what certification do you hold in that?

A    We had some rudimentary levels of -- when I say combatives,
I'm talking about jujitsu and hand-to-hand combat.  That's
what I talk about when I'm saying self-defense.

Q    Okay.  So you're not suggesting self-defense with a firearm;
correct?

A    No.

Q    Okay.  You realize that this lawsuit is about firearms;
right?

A    I left the question open.  I mean, yes, I've been trained in
self-defense.

Q    In Iraq and Afghanistan, you did not fight against a peer
enemy; correct?

A    No.

Q    You personally have rarely engaged in direct combat with the
enemy; correct?

A    Relative to most of the troops I led, that is correct.

Q    And you never trained men to use full auto on their M4s or
M16s; correct?

A    None of the weapons we were issued when we were deployed had

full auto capability on the M4, M16, so that is correct, I did not.

Q You never trained men to use the burst setting on their M4 or M16s; correct?

A That is correct.

Q Let's pull up paragraph 31 of Mr. Dempsey's report in this matter. Last sentence of paragraph 31, you state, I have never been a part of any training exercise in which any soldier was instructed to practice, rehearse, or train how to fire their M4/M16 service rifle on three-round burst or automatic fire; correct?

A That is a correct reading of that statement.

Q Would you agree with me that you believe the United States Army is not trained to use full auto fire from M4s and M16s in combat?

A That is correct.

Q You didn't provide such training; right?

A That is correct.

Q Let's go to paragraph 16 of your report. In the sentence that starts, I never. It reads, I never did in my military service, nor was I ever trained, nor did I ever train soldiers, on any tactical scenario in which burst or automatic fire from infantry riflemen was called for. Do you see that?

A Yes, I see it.

Q    Again, you never trained men in tactics to use full auto settings on their service rifles; correct?

A    That is correct.

Q    Go to paragraph 18 of his report.  The sentence that starts, I have.  It states, I have directly trained or supervised the training of thousands of infantry riflemen for combat, and I trained each and every one of them to fire exclusively on the semiautomatic setting.  Do you see that?

A    I do.

Q    Okay.  You believe that the United States Army is not prepared to use full auto fire from M16s; correct?

A    Given that none of the weapons we have are capable of firing full auto, that is correct.

Q    You believe that the Army is not prepared to use full auto fire from M4s; correct?

A    Given that none of the M4s we use have full auto capability, that is correct.

Q    You believe that the Army is not prepared to use burst fire from M16s; correct?

A    That is correct.

Q    And they do have that setting?

A    They do.

Q    Same question with respect to M4s.  You believe that the Army is not prepared to use burst setting from an M4; correct?

A    Yes.

Q    The men you trained would not be prepared to use either burst or full auto?

A    That is correct.

Q    You never recommended to any superior that the Army should replace all M4s and M16s with semiautomatic only rifles?

A    Question never came up.  No.

Q    You never suggested it?

A    No.

Q    You stay in contact with high-level Army personnel; correct?

A    Yes.

Q    Do you understand that yesterday, the state called retired Colonel Tucker and he said he did not believe the military should replace select fire rifles with semiautomatic only rifles?  Do you disagree with Colonel Tucker?

A    I do.

Q    Now you took no steps to serve other members of the Army; correct?

A    I have talked to other members of the military.

Q    Who are these people that you've talked to?

A    Last week when I was hanging out writing doctrine, I wanted to check with some current soldiers, so I talked to one noncommissioned officer who is the drill sergeant of the year, which means he was not only -- not only combat veteran but also in charge of training basic training, in addition to training other drill sergeants on how to use the weapon.  I

asked him if there had been any movement or if anyone in the military or he had ever used burst fire.  And he said, yes, because -- only in situations where they had a little bit of ammunition to waste, the range was closed down, and they didn't want to turn it into canister of ammunition, so they wanted to screw around.  Otherwise, he said it'd never been used.

The other person I discussed it with was a Special Forces lieutenant colonel getting ready to take battalion command.  I asked if he'd ever used it, if there was any movement within the Special Forces community to fire on anything other than semiautomatic mode.  He said no.  He said at one point, him and his team had a crazy idea that maybe they'd try to use it but found it so inefficient, wasteful of ammunition, that they never pursued it again as a tactic, technique, or procedure.  Those are the two people I've talked to about this.

Q    Two people is not a formal survey; correct?

A    No, it isn't.

Q    At your deposition a month ago, August 9th, 2024, you were unaware that the Army had officially adopted a new combat rifle for infantrymen; correct?

A    That is correct.

Q    You were shown documents at your deposition that demonstrated this fact; correct?

A    That the Army was fielding a new weapon?

Q    Correct.

A    Yes.

Q    That's how you came to learn about that?

A    Yes.

Q    So let's be clear, you rendered an opinion on the Army's use
of combat rifles and you did not know what the Army had
adopted for a combat rifle going forward as of August 9th,
2024?

A    The Army's been debating changing rifles for decades.  Some
people get -- take enjoyment out of reading the twists and
turns.  And if you asked me in the time of my military career
if the Army was considering a new rifle, I'd always say yes
because we always are.  Where it was in the state of how --
whether or not it was being adopted, I was appreciative of
your team of bringing me up to speed.

Q    I'm going to ask my question again because you did not
answer.  You rendered an opinion on the Army's use of combat
rifles and did not know what the Army had adopted for the
combat rifle going forward as of August 9th, 2024?

A    That is correct.

Q    At the time of your deposition, you did not know that the new
rifle for the Army was the XM7; correct?

A    Correct.

Q    As of the time of your deposition, a month ago, you did not

know that the XM7 is full auto capable; correct?

A    Correct.

Q    The XM7 does not have a burst setting; correct?

A    I'll take your word for it.

Q    You don't know one way or the other?

A    No.

Q    You do agree with me that the Army has adopted a new combat rifle for infantrymen; correct?

A    Yes.  Adopted is a heavy lift there.  We'll wait.  It will be at least a decade or more before most units probably see it.

             MR. LOTHSON:  Move to strike everything after yes as nonresponsive.

             THE COURT:  Overruled.

BY MR. LOTHSON:

Q    I'm showing you what's been marked as Exhibit 28.  The title reads, the Army has finally fielded its next-generation squad weapons.  Do you see that?

A    I do.

Q    You've had a chance to read through this article?

A    Assuming it's the same one I was shown at deposition, yes. If not, I haven't read it.

Q    Do you agree that this rifle confirms that this article discusses the firing capabilities of the XM7?

A    I assume so.

Q    The rifle depicted here, the XM7, does not have a burst fire

setting; correct?

A    Is that stated somewhere in the article?

Q    Do you dispute that the Army has adopted a new rifle to replace the M4 and M16?

A    No.

Q    You have no explanation for why the Army would adopt a rifle with a full auto capability if auto fire isn't necessary; correct?

A    Could you restate the question?

Q    You have no explanation for why the Army would adopt a rifle with full auto capability if auto fire isn't necessary; correct?

A    We're talking about the Army acquisition system, and so, you know, there's a lot to be debated about what the Army acquisition systems produces and what justifications they use for certain capabilities, whether it be on weapons or on vehicles.

Q    Have you ever been a part of the solicitation process for the fielding of the Army's new infantry combat weapon system?

A    I have not.

Q    You're not aware of any military anywhere in the world that issues semiautomatic only rifles to its infantry?

A    No, I'm not.

Q    To your knowledge, every other country's military in the world issues select fire rifles to its infantrymen; correct?

A    If by select fire, you mean select from semi to burst or full, then yes.

Q    Would you support removing select fire capability from infantry rifles, making them semiautomatic only?

A    I would.

Q    What's Big Army?

A    Big Army is a colloquial term used to describe Army headquarters and all its various commands.

Q    You used that phrase multiple times in your deposition; correct?

A    Yes.

Q    Now you never contacted Big Army to tell them that they could just do away with burst or auto modes for their infantry combat rifles; correct?

A    Given that we had the rifles in hand, no.

Q    You spoke a lot about the M249 in your deposition, in your report, and you mentioned it again here today; right?

A    Yes.

Q    Now are you aware that the Marines replaced the M249 in the infantry squads specifically due to mechanical failures during any engagement other than a prone firing position?

A    I'm unaware, but I have no reason to contest that assertion.

Q    Do you know the model that the Marines replaced the 249 with?

A    No.

Q    Have you heard of the M27?

A    I've heard that name.  Haven't looked into it.  What is it?

Q    Made by H & K.

A    Okay.

Q    A fully auto capable detachable magazine rifle.

A    Okay.

Q    Do you know whether it's belt-fed or not?

A    I have no idea.

Q    You've never witnessed a contested room clear of an urban structure; correct?

A    Can you define witness?

Q    Is that a yes or a no?

A    I have observed through ISR platforms.

                    MR. LOTHSON:  Pull up Mr. Dempsey's deposition, which has been marked as Exhibit 140.  Turn to page 26, line 15 through 19.

BY MR. LOTHSON:

Q    The question -- let me ask you, Mr. Dempsey.  Do you recall giving this deposition on August 9th, 2024?

A    I do.

Q    You were under oath?

A    Yes.

Q    Just like you are here today?

A    That is correct.

Q    Swore to tell the truth?

A    Absolutely.

Q    Do you recall being asked this question:  During your time in combat in either Iraq or Afghanistan, did you ever witness any room entries?  And if you don't understand what I mean by room entries, I'm happy to clarify.

And did you give this answer:  None contested?

A    The answer I gave starts there, and then continues on lines 22 through 25.

Q    Let me ask my question again.  Did you give the answer:  None contested?

A    That is the first part of my answer, yes.

Q    I'm going to ask it a third time.

THE COURT:  No, you're not.

MR. LOTHSON:  Fair.

THE COURT:  You can read the rest of your answer that you think is relevant to that question.

THE WITNESS:  I answered the rest of the question, you know, when you say observe, you know, the implication was that, you know, I'm stacked up in the stack of a team about to enter a room, or right behind it.  No, in terms of under direct fire engagement.  I have cleared rooms, none contested.  But I've also observed teams breaching compounds and entering buildings under fire through ISR, aerial assets, i.e., video feeds.

THE COURT:  Was that all your answer --

MR. LOTHSON:  That's not his answer at all.

THE COURT:  -- as you gave it?  Why don't you read the lines 22 through 25 that was -- you believe --

THE WITNESS:  Okay.

THE COURT:  -- is responsive to the question.

THE WITNESS:  Sorry, sir.

Yeah, yeah, no, I never observed any contested -- well, I take that back.  Observe is tough.  Like being personally behind a team as they entered a room under fire, no.

THE COURT:  All right.

BY MR. LOTHSON:

Q    You've never participated in a shipboard takedown; correct?

A    I have not.

Q    You've never personally cleared a contested enemy bunker?

A    That is correct.

Q    We talked a lot about the doctrine earlier today.  And you brought up one that's referenced in your report, the Infantry Rifle Platoon and Squad; right?

A    Yes.

Q    Used to be called 7-8 and now it has a new designation; correct?

A    Yes.

Q    The new designation is 3-21.8; correct?

A    Yes.

Q    Now you claim that no Army publication calls for the use of automatic fire from anything but an M249 or maybe an M240;

Q   right?

A   Yes.

Q   When you were in the Middle East, were you ever attacked by
an airplane or helicopters?

A   No.

Q   What is the appropriate response to an air attack against an
exposed infantry element while on a combat or recon patrol?

A   I have to go back into recall.  Essentially you try to put up
a wall of fire in the projected area where you think that
aircraft is moving towards, assuming you don't just hide and
get the hell out of the way.  You're talking about fighting
an aircraft.

Q   We're calling up Exhibit 32.  Let's go to page 136 of the
PDF.  Well, let's stay on the first page first.  Do you
recognize Exhibit 32 from the plaintiffs?

A   I do.

Q   This is the same as Exhibit 263 from the defense.

A   I assume so.  Looks the same.

Q   Go ahead and read the title of the document.

A   Infantry Rifle Platoon and Squad.

Q   What's the date?

A   January 2024.

Q   This is the document you cited in Footnote 2 of your report
in this case; correct?

A   Yes.

Q    Go to page 136, paragraph 4-42.  See this, right in the
middle of the page?  I'm going to go five lines down.  Four
lines down.  The sentence reads:  Should hostile aircraft
attack during movement, the subordinate unit under attack
moves off the road into a defensive posture and immediately
engages the aircraft with all available automatic weapons.
Do you see that?

A    I do.

Q    There's no mention in there of using only an M249 or other
light machine gun; correct?

A    There is not.

Q    It says nothing about the use of semiautomatic only fire;
correct?

A    Correct.

Q    Doesn't say anything about throwing grenades?

A    That's correct.

Q    It says, use all available automatic weapons; correct?

A    That is correct.

Q    So if members under attack have an XM7 with full auto
capability, this doctrine right here would suggest that they
should use that; correct?

A    The way I read this doctrine at time of publication, the
weapon is the M4.

Q    This publication is 2024?

A    That is correct.

Q    All available automatic weapons?

A    Yes.

Q    That would include an M4 that's capable of firing on full auto?

A    It would not because such weapon doesn't exist in the Army inventory.

Q    You're saying that such weapon has never existed?

A    It has.

Q    And there are M16s with full auto capabilities; correct?

A    There once were.

Q    And the new Army infantry rifle is a full auto rifle; correct?

A    Based on your description, yes.

Q    You'd have nothing to contradict that either, do you?

A    I don't.

Q    Do you know what a final protective line is?

A    Yes.

Q    What is the final protective line in the defense used for?

A    It's basically to prevent an overrun of a position.  And it will be coordinated fire of all assets, both in support and/or organic to the unit.

Q    What rate of fire would you recommend for riflemen during this type of engagement?

A    I would recommend what they can best use sustained effective fire, and do it in a way that they do not render themselves

combat incapable by jamming their weapon or running out of ammunition.

Q   And would you suggest that at all costs?

A   Putting yourself -- rendering yourself combat incapable is a horrible thing.  So yes, I would recommend they stick with semiautomatic fire.

Q   And what's worse than rendering yourself combat incapable?

A   Well, if you render yourself combat incapable, you're more likely to be killed.

Q   Let's turn to Exhibit 32, page 437, paragraph A/51.

THE COURT:  We've been going for a while.  Why don't we take a quick recess, I'll give the court reporter a break.  Probably don't have much -- do you have much more, or?

MR. LOTHSON:  Ten, maybe 15 tops.

THE COURT:  All right.  Time to correct.  Let's take a five-minute recess.

(Recess at 11:28 a.m.)

(Return at 11:35 a.m.)

THE COURT:  Be seated.  Thank you.  All right. Back on the record.  Still in cross-examination of the witness. You may continue.

BY MR. LOTHSON:

Q   If we can go back and pull up Exhibit 32, page 437 of the PDF.  The final protective line, we were talking about that. Do you recall?

A    Yes.

Q    Scroll down to the second page, the start -- the sentence
that starts, they spare no ammunition in repelling the enemy
assault, a particular concern for medium machine guns and
other automatic weapons.  Do you see that?

A    I do.

Q    Doesn't mention the SAW specifically; correct?

A    It does not.

Q    Doesn't mention the M240; correct?

A    Correct.

Q    Doesn't call out the M4 or M16; correct?

A    Correct.

Q    In a defensive of final protective line, there is no military
doctrine that says, do not use your M4 on burst mode;
correct?

A    Correct.

Q    In fact, there's no military doctrine that says, don't use
your M4 on burst mode in any context?

A    Correct.

Q    There's no military doctrine that says, do not use your M4 on
full auto, when the full auto M4s were available; correct?

A    Again, you'd have to understand the principles of doctrine,
which state that you want to place well-aimed effective fire
and maintain the combat effectiveness of yourself and your
weapon.  Given that firing the M4 on burst or full auto

increases likelihood that you ran out of ammunition or jam your weapon and render yourself combat ineffective, I would say the doctrine implies that you stay on semiautomatic.  And that's been reenforced by every training exercise in every training installation I've ever been involved in, ever seen or ever heard of.

Q   Does this doctrine that we have up on the screen in the final protective line imply the use of semiautomatic mode on a weapon?

A   This line you have up is specifically talking about machine guns and guns with automatic weapon capability.

Q   This entire paragraph says nothing about semiautomatic only use of a weapon?

A   It does not.

Q   Would you order a soldier being overrun by the enemy in a final protective line scenario to not utilize burst or full auto in order to save the gun over their own life?

A   They're going to lose their life if their gun is combat ineffective.  So yes, I would recommend they stay on semiautomatic fire.

Q   All the way through being overrun, to the point where they are then killed with a functioning firearm?

A   Yes, because in their last moments, they'll be able to fire that weapon and take out more enemy.

Q   Have you seen US Army studies proving the increased hit ratio

on hidden targets using burst fire?

A    No.

Q    Salvo?

A    No, never heard of that word.

Q    It's in the reports in this case.

A    Okay.

Q    No mention of Salvo reports in your expert report in this case; correct?

A    That is correct.

Q    Salvo II?  Have you heard of that?

A    No.

Q    SAWS report, the SAWS report?

A    I don't know what a SAWS report is.

Q    During an attack against a fortified enemy defensive position by a non-reenforced dismounted rifle platoon, how would you handle the time of suppression that exceeds the ammunition quantity of your available light machine gun's ability, the M249?

A    I would use the M4 in semiautomatic mode as opposed to both weapons running out of ammunition.

Q    Would one option be to have the rifleman assume the duty of suppression on burst or auto for the gap in coverage?

A    I would not recommend it because it would be ineffective and a waste of ammunition.

Q    Another option might be to have non-linked ammunition in the

magazines provided to the light machine gunners?

A    That is an option.  Also a great way to jam a SAW.

Q    Good point.  That would be at the risk of failing to feed or failing to fire out of the SAW; correct?

A    Correct.

Q    And that type of disruption in suppression during the most critical stage of an attack would leave friendly forces on our side left exposed to enemy positions?

A    You would present a false binary.

Q    Well, let's talk about time of suppression.  All right?  Pull up page 32 -- excuse me -- Exhibit 32, page 442 of the PDF. This is in a document you cite your report, Footnote 2.

A    Mm-hmm.

Q    Time of suppression, A-70.  I'm going to read the sentence that starts, usually.  Usually, a unit suppresses an enemy position using the sustained rate of fire of its automatic weapons.  Did I read that correctly?

A    Yes.

Q    Automatic weapons is plural; correct?

A    Yes.

Q    No mention of the M249; correct?

A    Correct.

Q    No limitation on the firearm at issue here and discussed as being something other than an M4; right?

A    No, because when this document was written, the M4's in use

and the M4 is not considered an automatic weapon.

MR. LOTHSON:  Move to strike everything after no.

MS. MUSE:  Your Honor, it's going to save us some time on redirect if we just leave that, but it's up to you.

THE COURT:  It's a bench trial.  Overruled.

BY MR. LOTHSON:

Q    Let's pull up Exhibit 33.  Turn to page 162.  First of all, the cover page.  Do you recognize this document?

A    Yes.

Q    Go ahead and read its title.

A    Armor and Mechanized Infantry Company Team.

Q    You cited this document in Footnote 3 of your report; correct?

A    Yes.

Q    Time of suppression is referenced in this document as well; right?

A    I haven't read it thoroughly in a while.  I assume so.

Q    It is.

A    Thanks.

Q    Turn to page 162.  5-66, time of suppression.  There's a sentence that starts, normally.  I'll go ahead and read it for the record:  Normally, a unit suppresses an enemy position using the sustained rate of fire of its automatic weapons.  Do you see that?

A    I do.

Q    Did I read it correctly?

A    Yes.

Q    No mention of the M249 here?

A    No.

Q    No mention of M240 here; correct?

A    Correct.

Q    No mention of engaging in suppression with mere semiautomatic fire; correct?

A    This sentence also talks about automatic weapons.  So by definition, it excludes the M4.

Q    And by definition, it excludes semiautomatic mode for suppression; correct?

A    In calculating sustained rate of fire, you're basing it on the automatic weapons.  It does not talk -- it implies and talks about a leader's ability to figure out how long he can provide that automatic fire.  And so it's about figuring out how long those machine guns can shoot.

Q    Doesn't say the word machine gun, does it?

A    When I use the term machine gun, I use it synonymous with automatic weapons.

Q    It doesn't say a word about semiautomatic?

A    It does not.

Q    Do you think that's why the Army moved to a full auto rifle for its infantrymen?

A    I don't know why the Army moved to a full auto for its

riflemen.

Q   You were prepared to render opinions in this case without understanding what the Army was up to with its latest infantry combat rifle; correct?

A   I know that the Army has issued automatic rifles before and we decided not to use them.  It's good odds it will happen again.

Q   I'm going to ask my question again because you didn't answer it.  Do you think that's why the Army moved to a full auto rifle in the XM7 instead of a burst capable rifle under select fire?

A   I have no opinion.

Q   Back to your report in this case, paragraph 12.  This is the paragraph in your report where you discuss your personal ownership of a SIG Sauer 516 Patrol?

A   That is correct.

Q   In the first sentence, you say, I have fired similar rifles many times in civilian life, in reference to the M4?

A   Yes.

Q   You have fired more than just your own SIG Sauer 516 while a civilian; correct?

A   Yes.

Q   With respect to your SIG Sauer 516, you state here that it is functionally an exact replica of the M4 that I carried in the military.  I quote you verbatim on that.

A    Mm-hmm.

Q    Is that a yes?

A    You do quote me verbatim.

Q    You realize that rifles in the military must meet certain
specifications?

A    Yes.

Q    What are those specifications?

A    Too many to list.

Q    And you've not identified any of the too-many-to-list in your
report; correct?

A    I have not.

Q    You do not know whether your SIG Sauer meets those
specifications?

A    I know by using it, it's functionally equivalent.  Actually
probably a little bit better given that it has a piston.

                    MR. LOTHSON:  Move to strike as nonresponsive.
I'll ask the question again.

                    THE COURT:  Overruled.

BY MR. LOTHSON:

Q    You do not know whether your SIG Sauer meets those
specifications?

A    That is correct.

Q    Let's talk about your SIG Sauer.  What material is the barrel
on your SIG 516?

A    I don't know.

Q   What is the length of the barrel on the 516?

A   Couldn't give you an exact number.

Q   What's the twist rate of the barrel?

A   Don't know.

Q   What heat treat are the critical components?

A   Don't know.

Q   What finish is the bolt carrier group?

A   Don't know.

Q   Have you conducted any endurance testing on your civilian purchased AR-15?

A   Seem like a dumb way to use your personal weapon, but.  So no.

Q   You've done no endurance testing on your personal weapon to determine its accuracy over its anticipated useful life; correct?

A   I have not.

Q   You haven't conducted any abuse testing on any civilian-grade AR-15?

A   It's a sure way to lose friends.  I have not.

Q   A sure way to lose friends?

A   If I take a friend's M4 or AR-type rifle and I conducted abuse testing on it, we're probably not going to be friends after I'm done with it.

Q   You didn't do it for the purposes of this litigation either, did you?

A    I did not.

Q    You didn't engage in the scientific method in order to render the opinion that your SIG 516 was functionally an exact replica of a military grade M4; right?

A    That is correct.

Q    You do understand that the military rifle must meet certain specifications, though; right?

A    I do.

Q    We're calling up Exhibit 36, turning to page 9 of the PDF. You understand what this document is; correct?

A    Flip back up to the top.

Q    This is the military specification for carbines in 5.56-millimeter for the M4.

A    Okay.

Q    This was referenced in your deposition; right?

A    I believe it was discussed, yes.

Q    You've seen -- you've had a chance to review this document at some point in time?

A    I have --

Q    Perhaps not in great detail?

A    I reviewed what you showed me at deposition.

Q    Do you recall seeing the specification for a military-grade rifle that it required select fire capability?

A    No.

Q    Are you disputing that the requirements for the M4 required

Q   select fire capability?

A   No.

Q   Are you aware of any regulation or engineering standard that governs the proper design of a civilian-grade AR-15 rifle?

A   No.

Q   Are you aware of any industry standard specific to a civilian-grade AR-15 rifle?

A   Only via what I see in advertising, so no.

Q   And what you see in advertising is not an industry standard per se; right?

A   Assuming they're not being deceptive, probably not.

Q   You have no reason to believe there's deception; correct?

A   That is correct.

Q   Same question for an M4/M16.  You're aware of no standard that you can cite that governs the proper design of such a rifle?

A   No.

Q   In your roles in the US Army, at deposition, you testified that you never developed doctrine for combat; correct?

A   That is correct.

Q   And you changed your answer here on direct examination today?

A   Yes.

Q   Right?

A   I did.

Q   In Afghanistan or Iraq, the rules of engagement did not

restrict the use of automatic fire; correct?

A   That's a larger conversation about the intent and applications of rules of engagement.  Rules of engagement are specifically about limiting civilian casualties and about providing well-aimed fire.

Q   In --

A   By implication, the rules of engagement do not allow for unaimed fire.

Q   How many total rounds did you personally fire at the enemy in the Middle East wars?

A   Thankfully none.

Q   You've only fired full auto in a service weapon a handful of times; correct?

A   That is correct.

Q   Same with burst.  You've only fired burst, in burst mode, a handful of times; correct?

A   That is correct.

Q   You never did a side-by-side comparison of the M16 firing in full auto and an M16 being fired in semi-auto; correct?

A   I think you have to define side-by-side comparison.  If I fire 30 rounds in a semi and I try to fire full auto, I'd count that as side by side.  You might have a scientific standard you're trying to push.

Q   Pull up Mr. Dempsey's deposition, page 78, line 20.  At your deposition, were you asked this question:  Did you ever do a

Q  side-by-side comparison of the M16 firing in full auto and an M16 being fired in semiautomatic?  Were you asked that question?

A  Yes.

Q  Line 24:  The Witness: --

MS. MUSE:  Excuse me.  There's a line 23 there. I'd just like to note it says, objection, vague, so let's give the witness an opportunity to clarify the answer if you'd like to read it out loud.

MR. LOTHSON:  That's an improper interjection in my cross-examination.

THE COURT:  I can't read it.  What does line 23 say?

MR. LOTHSON:  It's an objection from the lawyer at the deposition.

MS. MUSE:  I've raised it now because previously during your cross-examination, you've read parts of his answer of the deposition without giving him the opportunity to read the full answer, so I'm anticipating your behavior again here by asking, if you're going to read his answer here, that he have the opportunity to explain it or we can review the objection that was made to the question.

THE COURT:  This is cross-examination.  The objection is overruled.  If we have to address it in redirect, we can.  But let's see where we go with this.

MR. LOTHSON:  The witness gave a one-word answer.

THE COURT:  All right.  Well, he can read.

BY MR. LOTHSON:

Q    What was your answer at deposition to that question?

A    My answer to that vague question was no.

Q    Exhibit 31 of your report -- excuse me, yeah, Exhibit 31, your report, we're going to call that up.  Paragraph 19.  You have a couple of sentences here that I'm going to read into the record.  Second -- strike that.  Third full sentence says, if an infantry rifleman fires on three-round burst with an M4/M16 service rifle, the first bullet may hit its intended target, but the recoil of the weapon is likely to send the next two rounds well above the initial points of aim.  Next sentence:  Even on three-round burst setting, the shooter will have to spend more time between each engagement bringing the weapon back on target, whereas the shooter on semiautomatic can more quickly deliver accurate fire.  You see that?  Did I read it correctly?

A    I do.

Q    You've completed no scientific testing or scientific study to validate those sentences in your report; correct?

A    It only takes basic levels and not much firing to realize the truth of those statements.

Q    Again, you've not completed any testing or scientific study to validate those sentences in your report; correct?

A    Every element of Army training I've ever been through has described the effectiveness of three-round burst in that way.

Q    And you've only ever engaged in that type of firing a handful of times?

A    That is correct.

Q    I'm going to give you a hypothetical.  The Army is stationed in protecting the Philippines from invasion by China.  Assume that the Chinese military invades.  If you could make the decision, would you eliminate burst and full auto capabilities in the service rifles used by the infantry in the Philippines?

A    I would.

Q    Would you swap out proven M4s for civilian-grade AR-15s bought off the shelf from local gun stores in Illinois?

A    Depending on the manufacturer.

Q    Maybe yes, maybe no?

A    Yes.  Probably -- maybe yes, maybe no.  That is accurate.

Q    A point made in your report is that while automatic fire is necessary in combat, it is to be provided by the M249; correct?

A    Yes.

Q    Last sentence in paragraph 30 reads:  Thus, under basic infantry principles, there is no need for an infantry rifleman to provide duplicative and wasteful automatic fire, when the squad automatic weapon can meet that need.

A    That is correct.

Q    Let me reiterate that.  When the squad automatic weapon can meet that need; right?

A    Yes.

Q    So long as you have a functioning M249, that's all you need for suppression; right?

A    No, because good suppression will engage the whole team.  The M4s, M16s are firing effective fire, effective aim fire.  The squad automatic weapon will be providing the automatic fire.  It's in tandem and conjunction.  That's how we provide suppressive fire.

Q    But you need automatic fire for suppression; correct?

A    No.

Q    Are you contradicting the earlier paragraphs that we reviewed related to suppression in the infantry manual?

A    Again, we can get into a long conversation about the meaning of suppression.  It is to degrade the enemy's ability to maneuver.  If it's you and I in a shootout, I can degrade your maneuver by providing semiautomatic fire against the doorway you're trying to enter.  That's technically suppressive fire.  Suppressive fire can then in larger scale operations involve a whole cohort and contingent of weapons.  There is no definition of suppressive fire that relies on specific weapons systems or modes of fire.

Q    Let's turn to paragraph 26 of his report.  And we can see

both paragraph 26 and Figure 3-2.  Do you see that?  These are images that you placed into this report; correct?

A   Yes.

Q   AR on the left stands for automatic rifleman; correct?

A   Yes.

Q   And then down in paragraph 26, second sentence, you state, there is no need for the RFLM, or infantry rifleman, to provide duplicative automatic fire from an M4/M16.  Do you see that?

A   The sentence continues, but yes, I see the portion you've quoted.

Q   So in this figure, 3-2, if both the AR on the left and the AR on the right are disabled, destroyed, or killed, and suppressive fire is needed, the M4 in burst would provide that; correct?

A   No.

Q   The M4 in burst would be an option available?

A   It would be a suboptimal option.  The first step, we would train those -- those team members to do -- would be to recover the SAW from the injured serviceman and get it into operation.  Everyone else would be, again, continuing to fire rapidly, aimed, effective fire through semiautomatic mode.

Q   If a soldier under your command in my scenario where the automatic rifleman on the left and the automatic rifleman on the right are out of the engagement and their weapon is

unavailable, would you seek discipline of an infantryman who utilized his M4 on burst mode?

A    I'd tell him they did something stupid because they wasted two out of three rounds in trying to suppress the enemy. Because, again, as I stated earlier, the M4 is less accurate in burst mode than a SAW, the SAW because it's larger, longer barrel, stabilizing bipod, and the efficiency of belt-fed can keep rounds fired close to the enemy, whereas a soldier firing on burst might get one round close to the enemy.  The other two are just noise.

Q    Paragraph 32 of your report, last sentence -- strike that. First of all, this paragraph is referring to peer opponents?

A    Mm-hmm.

Q    Correct?

A    Yes.

Q    Last sentence reads:  In fact, military doctrine specifies that the basic tactical formations described above, in which the rifleman will always be accompanied by a squad automatic weapon for automatic suppressive fire, apply against a peer threat?

A    That is correct.

Q    This sentence presumes that the SAW is always available; correct?

A    This sentence discusses the basic infantry formation and how you're supposed to employ it in combat.

Q    And the infantry formation can be disrupted in combat; correct?

A    It can.

Q    In combat against a peer threat, will we lose troops?

A    We will.

Q    If the squad automatic weapon is destroyed, that will leave the tactical formations that you described above in your report to only M4s and M16s; right?

A    And the M203 grenade launcher.

Q    And at some point, the XM7; right?

A    Sure.

Q    You have no reason to disagree with that?

A    No.

Q    You're not a master gunner; correct?

A    That is correct.

Q    If I heard you correctly on direct examination, you are affiliated with Everytown?

A    I'm affiliated with the Veterans Advisory Council that acts as an advisory board to members of Everytown.

Q    And you are a member of its advisory council?

A    I am.

Q    Do you know whether Everytown filed an amicus brief in the Seventh Circuit in the Bevis case in this matter?

A    I have no -- I have no idea.

                    MR. LOTHSON:  No further.

THE COURT:  How long redirect?

MS. MUSE:  I'm going to need -- I don't want everybody hungry and angry with me.  I am going to need a few minutes on the redirect.  I could start it after lunch if you'd like.  Happy to do it now.  All right.  I'll --

THE COURT:  I'm not.  I'm going to break for lunch.  I'm going to give people a break.  I'm going to give the witness a break.  We've been going at it a long time.  You can stick around?  You're not catching a flight or anything, are you?

THE WITNESS:  No, sir.

THE COURT:  All right, brother.  We'll see you at 1:30.  We are in recess for lunch.

(Recess at 12:06 p.m.)

(Return at 1:31 p.m.)

THE COURT:  Please be seated.  Thank you.  All right.  We are back on the record.  We are in redirect.

Sir, you are still under oath.  Please proceed.

MS. MUSE:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. MUSE:

Q   Colonel Dempsey, Mr. Lothson asked you about the SIG Sauer rifle that you own that qualifies as an Illinois assault weapon.  Do you recall that?

A   Yes.

Q    How did you come to purchase that rifle?

A    Commemorative.  As part of a commemorative bulk purchase that the unit put together for some of the members of the unit together as we were departing Afghanistan in 2013.

Q    Is there anything about it that makes it special and signifies it as part of the purchase?

A    Yeah, it's engraved with the unit crest and dates of the deployment.

Q    Do you use that rifle for self-defense?

A    I do not.

Q    Mr. Lothson asked you about your gunsmithing, engineering, and armor credentials.  Do you recall that?

A    Yes.

Q    Do gunsmiths tell soldiers how to use their weapons?

A    They do not.

Q    Do engineers?

A    No.

Q    Do armorers?

A    No.

Q    Mr. Lothson asked you about the technical specifications of some weapons.  Do you recall that?

A    I do.

Q    Were you able to direct hundreds of missions for the US Army without knowing the technical specifications of every weapon your soldiers used?

A    Yes.

          MS. MUSE:  No further questions at this time. Thank you.

                    EXAMINATION BY THE COURT

BY THE COURT:

Q    Well, Colonel, you're a leader, trained leader, you volunteered to lead, and you led people into battle.  And I bet you'd spend every night thinking, how do I protect my people, how do I minimize the loss of life, how do I minimize my own soldiers and strangers who are noncombatants that just find themselves... and that's what you did?

A    Mm-hmm.

Q    And you knew there were going to be casualties?

A    Yes.

Q    People were going to die and people were going to have serious injuries, permanent scars, some people were going to be so psychologically damaged that it haunted them for the rest of their lives, sometimes leading them to end their own life.  It's a lot of responsibility.  So we thank you.

          You led people in confrontation?

A    Yes.

Q    Some was, you were able to plan for, and some was ambush. And I think you have important -- I think your experiences can really inform certainly this Court who has no military experience about important issues in this case.  So I'm going

Q   to ask you a few questions in that regard.  You were asked about peer threats?

A   Mm-hmm.

Q   And we would say, well, those were armies that really have a fighting chance against us; right?  What would we call some third-world country with no standing army?  What would we call them?  What would we call the United States, a superior threat to them?  Or do we have a term for that?

A   Not particularly, Your Honor.

Q   All right.  It seems to me the takeaway from what you're trying to tell us is that in confrontation, you want to place well-armed rounds -- or well-aimed fire on who you're confronting; right?

A   That is correct.

Q   And in your own experience, you found that rifles in semiautomatic mode were the most useful and most accurate?

A   That is correct, Your Honor.

Q   If it's on full auto, you're just spraying all over the place?

A   That is correct.

Q   With the --

A   With the M4, correct.

Q   With the M4 and the AR-15.  To have any kind of control, you really need one of those larger, specially-designed machine guns that were belt-fed?

A   Yes, Your Honor.

Q   When you went into battle, how many rounds of ammunition did you want your soldiers carrying?  Let's talk with infantrymen.

A   Standard basic load is seven magazines.

Q   Which is 210 rounds?

A   That's correct.

Q   All right.  So six on the person, one in the... and you want them to be well armed with ammunition because you don't know how many rounds you're going to need?

A   That's correct, Your Honor.

Q   Is there training that you go through where you say, all right, if you are called upon to fire on an enemy, do you limit the rounds?  Are you trained, keep firing until the enemy is neutralized?  Do you have any training with respect to that?

A   You want to hit the enemy, correct, Your Honor.  And yeah, you want to kill the enemy.

Q   All right.  And first shot, not always successful; right?

A   Depends on how good the marksman is.

Q   All right.  We spend extraordinary amount of time training our soldiers like yourself to be good shots in confrontation; right?

A   That's correct.

Q   All right.  And you were asked about final protective lines.

That's a term of art you use in the military to describe, we have to hold this line or we are in serious trouble?

A    Yes, Your Honor.

Q    We could lose the engagement?

A    Yes.

Q    Sometimes there's no retreat; isn't that right?

A    That's correct.

Q    You got to fight your way out?

A    Mm-hmm.

Q    So here -- I'm not a leader, but the issue here seems to me is, what do we say to our follow citizens who are faced with confrontation?  Maybe it's a peer opponent, or often, maybe a superior opponent.  And what rules should we force the law-abiding to live by?  You yourself have selected weapons to defend yourself now that you're in civilian life?

A    I have weapons, but they're not to defend myself.

Q    What if you're attacked?

A    Your Honor, it'd take me probably five to ten minutes to get to the weapon and ammunition, assuming I could find the keys, and frankly that's enough time to leave my house with my phone.

Q    Well, but you have weapons anyway?

A    Yes.

Q    And are they semiautomatic?

A    Yes.

Q   Are they suitable for self-defense?

A   Not what I would choose primarily for self-defense, no.

Q   Not what you would choose for self-defense?

A   No.

Q   You don't even want to hear the rest of the circumstances surrounding the confrontation?

A   If you'd like to give them to me, I'm happy to hear them.

Q   No, I'm just -- it seemed like a definitive answer.

A   That's correct.  I can't imagine a scenario where I would choose these weapons for self-defense.

Q   Yet you own them?

A   I do.

Q   How about others?  Did you see others saying, I've got to defend myself and my family?

A   I wouldn't recommend these weapons for them either.

Q   You don't know the scenario.

A   If we're talking about untrained shooters and your most common scenarios for home invasion, then there are other weapons I'd pick.

Q   How many invaders might influence the weapon you recommend?

A   I haven't thought about it, Your Honor.

Q   What if it's someone who's petite and has a hard time dealing with the recoil from a shotgun?

A   I recommend they buy a smaller shotgun, go for a .410.

Q   Now you did say -- thought I saw where you said the important

thing is to try to pair weapons with training and safety and accountability in mind; right?

A    That is correct.

Q    Okay.  And you stand by that?

A    I do.

Q    All right.  And one of the reasons you don't like full auto in confrontation is because if somebody's practiced and trained, semi-auto, they're likely to preserve ammunition to get off better and accurate shots?

A    In semiautomatic mode, yes, Your Honor.

Q    All right.  And all the things being equal; right?

A    Mm-hmm.

Q    That's a yes?

A    Yes, sir.

THE COURT:  All right.  Thank you for your service.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Any further questions in light of the Court's questions?  Any further cross in light of the Court's cross?

Thank you, Colonel.  You may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  All right.  Any more witnesses?

MR. HAZINSKI:  Your Honor, no more witnesses from the defense.  But if we may, I think it might be an appropriate

time for us to do a little cleanup on the exhibits --

THE COURT:  All right.

MR. HAZINSKI:  -- on the record.  I'll give plaintiffs' counsel an opportunity to apprise the Court.

MR. BERGSTROM:  Sure.  So as to plaintiffs' exhibits, which we made the motion to move into the record yesterday at the close of our case, I believe we have agreement that all the remaining exhibits on the list should be admitted without objection now, subject to any existing motions on the docket or something like that.

MR. HAZINSKI:  That's right.  And subject to any conversation we had this morning, which of course Your Honor is aware of, and to the extent that there were objections of course in court that relate to those documents, although I'm not sure that there are any, but Your Honor has taken those and will resolve them in due course as needed.

THE COURT:  All right.

MR. HAZINSKI:  From the defendants' perspective, Your Honor, we would like to move into evidence, with the agreement of the plaintiffs, Defendants' Exhibits 222 through 238, 240 through 245, 256 through 288, and in addition, handful of exhibits used with the witnesses yesterday, Exhibits 213, 249, and 254.

The last note I'd make for the record, Your Honor, is that as we've discussed previously declarations and

deposition testimony of the witnesses was submitted into evidence through electronic filing on the docket and the parties are not resubmitting those exhibits to avoid the redundancy.  We understand those are already in evidence and the Court may consider them.

MR. LOTHSON:  Your Honor, my only --

THE COURT:  I already got five big boxes over there.  Any response to the exhibits he's moved to admit?

MR. BERGSTROM:  We don't have any objection to those exhibits subject to whatever --

MR. LOTHSON:  No objection to that, Your Honor, but I would note that we also filed a series of depositions and declarations last week on to the record.  No need to re-tender those.  There were a handful of depositions that we need to go back and double-check to make sure that Your Honor has the exhibits, and I'm thinking of Mr. Curcuruto, Mr. Fatohi and Mr. Pulaski's depositions.  I need to double-check the record. We may be submitting a set of deposition exhibits with those, subject to any pending objections that they have via their Daubert motion that they've already filed.

MR. HAZINSKI:  That's right, Your Honor, and I believe those exhibits should be on the record.  I think we filed them.  But if not, we can address that with Mr. Lothson.

THE COURT:  All right.  Anything else?

MR. BERGSTROM:  No, Your Honor.

THE COURT:  All right.  Parties have asked for some time to offer closing arguments and we'll start with plaintiffs.

MR. LOTHSON:  Your Honor, we greatly appreciate the opportunity to present live testimony this week.  Our case addresses a core constitutional question, whether certain types of commonly owned firearms and feeding devices used by law-abiding citizens for lawful purposes can nevertheless be banned by the state of Illinois.

Plain and simple, PICA does not pass constitutional muster.  Between the filings that we made last week, the submission of many depositions and declarations, and the testimony you heard live this week, there are several important takeaways from this record evidence.

The witnesses have spoken to the specifics of the firearms and features at issue in PICA.  A pistol grip is useful for self-defense on rifles, pistols, and shotguns, and is not a militaristic feature.  A forward protruding grip is useful for self-defense on rifles, pistols, and shotguns and is not a militaristic feature.  A folding adjustable or detachable stock is useful for self-defense on both rifles and shotguns and is not a militaristic feature.  A thumbhole stock is useful for self-defense and is not a militaristic feature.  A flash suppressor is useful for self-defense and is not a militaristic feature.  A barrel shroud is useful for self-defense and is not

a militaristic feature.  A threaded barrel is useful for self-defense, because it allows the user to easily add items such as a flash suppressor or a compensator, which are useful for self-defense and training and is not a militaristic feature.

The ability to change magazines quickly is useful for self-defense.  Having more rounds at the ready is useful for self-defense.  As Colonel Tucker explained, any time you have to change a magazine, you're vulnerable.  Someone has to cover you.  That's one of the state's experts.  But as Randy Watt explained, in most self-defense situations, there is no one there to cover you.  You're on your own.

The firearms at issue under PICA are not exclusively or predominantly reserved for the military.  Of the many firearms that were discussed, the only small arms that are exclusively or predominantly useful in military settings are select fire weapons capable of burst or auto fire.  Fully automatic or burst fire is useful for suppression, but is not ideal for hitting a specific target by people without significant training.

Semi-auto fire does not have that hurdle to entry.  In a self-defense situation, the defender wants to be able to hit their target and only their target.  Suppression is a military aim.  Semiautomatic firearms with features that enhance ergonomics and accuracy are ideal for that defensive purpose.  The US Military does not issue semiautomatic only

rifles as general purpose service rifles and had not done so for over 60 years.  No military in the world that we know of issues semiautomatic only rifles as general purpose service rifles.  Indeed, the state has not offered one, despite being invited to over the course of this litigation.

To meet the specifications required by the US Military to be a service rifle issued to troops, a rifle must be able to fire fully automatic or burst.  Even Colonel Tucker, the state's expert, would not support getting rid of select fire for the military.  The firing rate of a semiautomatic firearm is materially different from the firing rate of a fully automatic firearm.  One trigger pull, one shot, that is a semiautomatic firearm.  That depends on the user.

Semiautomatic rifles are materially different from an M16 or an M4, even if they have a pistol grip, a folding stock, the ability to accept a detachable magazine.  Semiautomatic pistols are materially different from an M16 or M4, even if they have a pistol grip, even if they have a folding stock, or the ability to accept a detachable magazine.  Semiautomatic shotguns are materially different from an M16 or an M4, even if they have a pistol grip, a folding stock, or the ability to accept a detachable magazine.

The firearms at issue under PICA are commonly owned for lawful purposes, including self-defense.  Semiautomatic rifles with the capacity to accept detachable

magazines and that have one or more of a following features, pistol grip, protruding grip, a folding adjustable or detachable stock, a thumbhole stock or a barrel shroud or a flash suppressor are commonly owned by ordinary Americans.  Ordinary American citizens commonly acquire such rifles for lawful purposes and they train for them for defense in mind.

Firearms experts and self-defense experts recommend that the ordinary American citizens use such rifles, particularly when equipped with 20- or 30-round magazines for their own personal self-defense.  As Scott Pulaski told us, the only witness from Illinois that the Court heard from this week live, before the ban, such firearms were extremely popular with his customers in Illinois, and he recommended them to his customers, including for self-defense.

Semiautomatic pistols with the capacity to accept a detachable magazine and that have one or more of the following features, a threaded barrel, a second pistol grip, protruding grip for the forward hand, a barrel shroud, the ability to accept a magazine outside of the pistol grip or a flash suppressor, are commonly owned by ordinary American citizens.  Ordinary American citizens commonly acquire such pistols for lawful purposes, and they train with them.  Firearms experts and self-defense experts recommend that ordinary American citizens use such firearms, equip them with 20- or 30-round magazines for their personal defense.

Now semiautomatic shotguns with a pistol grip or another ergonomic grip and a detachable magazine or a magazine with a capacity of more than five rounds are commonly owned by ordinary American citizens.  Ordinary American citizens commonly acquire such shotguns for lawful purposes, and they train with them.  Firearm experts and self-defense experts recommend that ordinary American citizens use such firearms for their personal defense.

While the live testimony portion of this case has concluded, we have submitted many written materials and a lengthy list of legislative facts.  We're in the process of preparing our proposed statement of facts and conclusions of law, which will further support these points.

As I said at the outset of the week, the evidence and applicable law plainly show that the Court should, one, find in favor of the plaintiffs and declare PICA unconstitutional under the Second Amendment of the United States Constitution, and two, enter a permanent injunction enjoining the state of Illinois from enforcing PICA.  Thank you, Your Honor.

THE COURT:  Thank you.  Anybody else for plaintiff before we go -- anybody else?  Was that the last word?  All right.

MS. MUSE:  The key question this week was, is there a material difference between the assault weapons Illinois restricts and the combat rifles used in the military?  We heard

from two Marines, Gunner Eby and his commanding officer Colonel Tucker, both trained on and carried M16s and M4s when they were deployed.  We heard from an Army officer, Lieutenant Colonel Dempsey, who trained and carried M16s and M4s.  We even heard a little from someone who served in the National Guard, Mr. Watt, who used these combat rifles.  All four of these witnesses agree on some fundamental facts.

They all said the military predominantly trains using M16s and M4s in semiautomatic firing mode.  They all said that the US Military overwhelmingly fires M16s and M4s on semiautomatic in combat.  Even Mr. Watt had only ever seen M4s fired on automatic mode in combat, quote, maybe a handful of times.

And when we paired their testimony about combat with the testimony that we heard about AR rifles for civilians this week, three more fundamental facts came into focus:

One, both kinds of weapons have pistol grips, forward protruding grips, folded adjustable stocks, thumbhole stocks, flash suppressors, and barrel shrouds.

Two, the combination of features that make the M16 and M4 incredible weapons for high rate of fire to kill our country's enemies are the same combination of features on the AR rifles that Illinois restricts to protect American lives.

Three, the performance of these weapons in semiautomatic is the same.  Gunner Eby told us there's a

civilian version of the Marine service rifle.  He said it's exactly the same as the military's weapon, except for the fire selector switch.  The two weapons have the same caliber, same muzzle velocity, and same rapid semiautomatic rate of fire, according to Gunner Eby.

Now it's not that the plaintiffs didn't try to muddy the waters.  They had Mr. Ronkainen come in and tell us that in Remington's mind, military-grade rifles were, quote, totally separate from the AR rifles they manufactured for civilians.  They weren't separate.  Remington made the parts for both kinds of weapons in the same building.  These parts were made from the same manufacturing equipment.  The same engineer, Mr. Ronkainen, was in charge of overseeing both product lines.  They're not even separate lines on his resume.

Mr. Ronkainen also spoke about the innovations Remington developed recently to sell a wider variety of customized AR rifles.  He said they made rifles more comfortable for left-handed shooters and they made adjustable stocks that allow a, quote, little kid to use it.  But you didn't hear him testify about any innovations that made AR rifles less lethal when civilians are being shot at.

I think plaintiffs know they can't keep running away from the fact that the rifles they want to buy and sell are basically the same guns as M16s and M4s.  In fact, when they asked their own expert about a carbine course he attended,

Mr. Watt explained that, quote, we used the civilian version of the M4.  We used an AR semi-auto only carbine, end quote.

Plaintiffs openly admit that the military and commercial rifles both fire the same ammunition.  In fact, their attorney used the term 5.56 to search through Mr. Pulaski's business records to identify firearms he sold that were AR rifles.  That's because AR rifles are chambered in 5.56 NATO, just like M16s and M4s.

And Gunner Eby described how he bought military ammunition on the internet and then fired it through his AR-15 to develop new optics for military rifles.  We're talking about essentially the same weapons firing the same ammunition.

What we heard this week focused on AR rifles.  A few facts about other weapons Illinois restricts came out, and they're going to help narrow the issues before the Court.  The Illinois law here also prohibits .50-caliber rifles and the BMG cartridges they use.  Mr. Pulaski told us these are rarely sold and purchased.  Gunner Eby explained these .50-caliber rifles can fire bullets that destroy vehicles and can hit targets four and a half miles away.

Illinois's also classified certain pistols and shotguns as assault weapons.  Mr. Watt made clear that these pistols are not like the handguns Americans are commonly using for self-defense.  No, these pistols are like the AR rifles that Illinois restricts.  That's why Mr. Watt keeps these AR pistols

out of his pistol training classes.  They're actually the same as AR rifles, just a little shorter.

Mr. Watt also made clear that the few shotguns Illinois restricts are like the tactical shotguns that Mr. Watt used when he was in specialized law enforcement teams.  No one told us that they use them for duck hunting.

Now I know Mr. Lothson just told a different story about what we heard this week.  According to him, we heard about how Illinois has restricted weapons that are extremely popular for self-defense.  But just like we predicted, all we heard about that claim this week were anecdotes.

We heard hearsay from Mr. Pulaski about what customers wrote on the forms that he collects.  Mr. Pulaski shared his general impressions from what he saw on those forms over the years.  He didn't provide any of the forms and he didn't review them for this case.  That's not reliable evidence.

We heard from Mr. Ronkainen.  Remington marketed AR-15s for self-defense because they knew that's what customers would want after the federal ban was lifted.  He didn't work in the marketing group that received that feedback, nor could he say how customers actually used the products that Remington sold.  It's not reliable or relevant evidence.

We heard from Gunner Eby, who's never been qualified to provide an opinion on civilian self-defense.  He shared his personal opinion that he prefers an AR-15 for home

self-defense.  But note that he prefers an AR-15, only because his first choice, an automatic weapon, is illegal under federal law.  Mr. Eby's personal opinions don't line up with the law, just like his personal opinions about automatic fire don't line up with military doctrine.  In any event, his personal opinions aren't reliable evidence.

Finally, we did hear from someone plaintiffs disclosed as an expert on civilian self-defense, but Mr. Watt provided us with personal observations, nothing more.  He presented no data analysis, no surveys, he offered no numbers. He shared anecdotes about attending the firearm industry's annual marketing show, but those anecdotes were riddled with confirmation bias and devoid of methodology.  He conceded he never attempted to find a representative sample for his opinions.

Instead, we heard about the preferences of students who self-select into Mr. Watt's Warrior Creed courses. His anecdotes describe the militaristic approach of some self-defense courses, but they aren't reliable evidence about the needs of ordinary Americans.

And this is why the written testimony is so critical to resolve these cases.  That evidence substantiates what we heard this week, that assault weapons are not materially different from military rifles.

And it also answers other questions in this case.

The state's evidence shows that assault weapons have features that make them great for rapid, successive fire at long ranges, appropriate for the battlefield, and not the features needed for self-defense scenarios.  The state's evidence shows that when self-defense scenarios happen, people don't need more than a 10-round magazine.  And the written evidence shows that Illinois's law is constitutional for an entirely independent reason that no witness this week has discussed.  It's relevantly similar to historical regulations of dangerous and unusual weapons and is part of our historical tradition to reserve some weapons for law enforcement in the military.

We look forward to providing our proposed findings of fact and conclusions of law for the Court.  They'll show that when you cut through the paper and all the testimony here, the plaintiffs' evidence is not enough for this Court to strike down any part of Illinois's law.  It wasn't enough for preliminary injunction and it's not enough now.  Thank you, Your Honor.

THE COURT:  Thank you.

Could you turn on the ELMO?  All right.

Thank you.  I appreciate the efforts of the attorneys.  This is a case that's bigger than all of us.  It's a very important case.

You're going to be submitting arguments with respect to history and traditions of the United States.  And

when this case started, I thought, why East St. Louis?  Why do I have this case?  There are smarter judges, there are more experienced judges in the federal system.  Maybe it's -- maybe it's because we're here.

I've encouraged you guys while you've been in town to go see the sites of East St. Louis, and people have laughed like there's nothing to see here.  There are 24 sacred sites that you've driven by, that you've driven over, that might be relevant to what we're talking about.

What brought us here was a response to a horrible event in Highland Park.  Just horrible.  And there's people there who will never forget it.  They'll never forget it.  There are people who sustained losses there that will never get over them.  That was July 2021.

As we sit in this courtroom, right behind me is 7th Street -- I'm sorry, is 8th Street.  Across the way is St. Mary's Hospital where my twin brother and I were born, most of my brothers and sisters were born.  But you look towards the jury box, that's south.  The next street you hit is Broadway.  And you have an unobstructed view right here from this courthouse --

Tom, would you put this on the ELMO?

So you go straight out where you turn in to get here.  This is July of 1917.  Right here.  Straight out this way, you hit Otto Nelson's house.  Who is Otto Nelson?  Otto

Nelson was the only black detective on the East St. Louis Police Department.  His home is right there.  Police station just a few blocks down.

During the July 4th weekend, we had a riot.  And Otto watched as a mob burned his house down because he was black.  Fortunately for him, he was able to hide in some weeds and sneak across to get to the Eads Bridge.  That's Sacred Site Number 8.

7th and Broadway, the end of these parking lots, 7th and Broadway was the old Broadway Opera House.  And word got out among the mob that they saw black men, women, and children going into the Broadway Opera House to hide, so they set it on fire.  Old wooden building, inferno, nothing left.  Nobody escaped.

You go down to 6th Street, 6th and Railroad Avenue, that direction, blacktop.  During the course of the riots, there was 100 blacks who got themselves into two homes, and they were armed.  They were shooting back.  And the rioters thought that wasn't fair.  They complained.  They went to the National Guardsmen who are otherwise just sitting around watching it all, said hey, these guys down here have guns.  Well, we can't have that.  So they went down there, National Guard, declared there's going to be a truce.  We're going to give you, everybody in these two houses, safe passage across the Eads Bridge.  That was 6th Street.

On 4th Street -- let me back up.  Broadway was an important line of demarcation in the history of East St. Louis, because everything on the other side was referred to as the South End.  It's where the blacks lived.  It was on the South End.  They still call it the South End.

Look at this picture.  That building that I have the arrow marked, it's where you are right now.  In my own mind, I call this picture "Now, He Guards."  All of that area, there were black homes, modest, humble, some shacks.  Just shacks.  But it was home.  It was their homes.  Their families were there, their pets were there, everything they owned.  And the mob just burned them all.  Just burned them all.

They set Scott and Iva Clark's house on fire.  He was 4th and Railroad.  There's an education building, higher education building, as you're trying to get onto the Poplar Street Bridge, you look to your left, and you'll see it.  That's all the South End.  All black houses.  And poor Scott and Iva, they set his house on fire, their house on fire.  And while it was collapsing around them, they fled and got in the next house.  They set that on fire.  They escaped again.

They're running along the railroad tracks and they see a National Guardsman.  They think, great, he'll save us.  "Can't help you."  So they caught up to them.  The mob did.  They beat Scott in the head with an iron pipe.  And they put a noose around his neck, but they realized the rope was not long

enough to hang him.  So they just dragged him through the streets.  He was begging for mercy.  Please, leave me alone, I haven't done anything wrong.  Dragged him through the streets.  His death was ruled strangulation.

Now 4th and Broadway, as you're heading -- if you're going to head over to St. Louis, you're going to pass it.  To your left is -- there's called a Fountain of Youth Park.  Modest, but all kinds of things happened right there.  St. Louis reporter who came over to cover the riot sees six bodies laying there, and one guy that they're pulling up to hang from a lamppost, and they're yelling, pull for East St. Louis.  And his dead body hanged there for a number of hours.  Ambulance drivers came up.  They wanted to help the wounded.  The mob threatened to kill them.  So they left.  There was a Guardsman there, just watching.  Guess he couldn't do anything.

It's also where they stopped a streetcar, and they jumped on and they dragged all the blacks off that streetcar.  What's going on here?  Beat them.  Blew some guy's head off right down the street.  But every black that was on there was beaten.

If you go to 4th and Division, they found the body of a little kid just cremated.  He was hiding under his bed.

Now Ms. Narcis Gurley, who lived two houses down, age 71, she and some older ladies were hiding in her home.  And

she could hear the people outside and they were frightened, they were hiding.  And the fire was jumping from house to house and finally came to theirs, but they were so afraid of the mob that they stayed in there until literally the burning house was collapsing on them.

Narcis told WEB DuBois that when they left out of the house, they were horribly burned, second-, third-degree burns.  Clothes were burned off of them.  And I guess this is what passed for the compassion of that mob.  One shouted to kill them.  Another guy says, they're old ladies, let them go.  But they lost everything.  Everything.

I wonder, they tried to make a stand.  They tried to make a stand on the beginning of the South End, which is Broadway, a final protective line you might say.  They were poorly armed and they were slaughtered.  The official death toll is 39.  Nobody believes that.  Most believe it's in the hundreds.  There were people fleeing from this mob that just jumped in the Mississippi, knowing they're going to drown, jumped off a bridge to certain death, kind of like people jumping out of the World Trade Center.

What if they had, not a lot of them, but what if they had some of these weapons we're talking about today?  Who knows.

Then there's 1921 Tulsa, 35-square-block neighborhood that they called the Black Wall Street.  It was a

black neighborhood, it was very successful, very nice homes, the envy of Tulsa.  Much the same thing happened.  A mob set upon them, killed many of them, burned whatever they had.

Maybe you want a more current example:  Aurora, Colorado.  You've seen that video I'm sure, through a peephole or doorbell cam, someone nervously waiting inside as these international gangsters, terrorists, well-armed, are going door to door, attacking people.  The video you saw occurred nearly 30 days after the police had been called.  I heard an excuse offered, didn't particularly resonate with me why they couldn't help these poor people, but they are on their own.  Maybe there's some little kid hiding under the bed in that apartment, "Mom, are the bad guys gone yet?"

That's part of our history too.  We are going to confront evil people.  We're going to be called on to defend ourselves.  Sometimes we're called on to defend our house, our neighborhood.  Maybe you're called on to defend the whole South End.

There are some people that think -- some academics and a number of jurists that with respect to what we have here today, Second Amendment has nothing to say.  She's too old.  She's lost her vitality.  To some, she doesn't even make sense.  Maybe she's senile.

But before you say toodeloo to East St. Louis, drive by those things, take in those sites, see if you think it

might have some relevance to the things that we struggle with here today.  Terrible things happen that we all wish wouldn't happen.  And the innocents, even when they beg for mercy, are not always treated mercifully.  You never know what's going to happen to you or your loved ones.

That's why I think this case is very, very important, because we have to get it right.  I don't question the sincerity of any of the lawyers here advocating on either side.  You all have things you can point to, sad stories, that you can say, God, isn't that terrible?  Nevermore.

So I bid you bonne chance, safe trip home.  You have 30 days to submit your briefs and facts.  We are adjourned.

(Proceedings concluded at 2:23 p.m.)

° ° ° ° ° ° ° ° ° ° °

## <u>COURT REPORTER'S CERTIFICATE</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 20th day of September, 2024

/s/ Hannah Jagler

_____

Hannah Jagler, RMR, CRR, FCRR
Official Court Reporter