## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, *et al.*,<br>    Plaintiffs,<br>        vs.<br>KWAME RAOUL, *et al.*,<br>    Defendants. | Case No.  3:23-cv-209-SPM<br>    ** designated Lead Case |
| DANE HARREL, *et al.*,<br>    Plaintiffs,<br>        vs.<br>KWAME RAOUL, *et al.*,<br>    Defendants. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*,<br>    Plaintiffs,<br>        vs.<br>BRENDAN KELLY, *et al.*,<br>    Defendants. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS LICENSEES OF ILLINOIS, *et al.*,<br>    Plaintiffs,<br>        vs.<br>JAY ROBERT "JB" PRITZKER, *et al.*,<br>    Defendants. | Case No.  3:23-cv-215-SPM |

## STATE DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

    I.   Illinois responds to horrific mass shootings by regulating assault weapons, large capacity magazines, and other deadly items.....................................................................................2

        A.  The Act adds criminal offenses for deadly weapons. .......................................... 3

        B.  The Act defines firearms and accessories for the new offenses. ....................... 3

        C.  The Act exempts existing owners and trained professionals.............................. 7

    II.  The plaintiffs sue to keep buying and selling deadly firearms and accessories. .................. 8

        A.  Four plaintiff groups sue state and local officials. ............................................. 8

        B.  Plaintiffs wish to engage in prohibited conduct. ............................................... 9

    III.  Courts refuse to enjoin the Act pending trial................................................................. 14

    IV.  The Court expedites proceedings to resolve these cases. .................................... 16

ARGUMENT ....................................................................................................................19

    I.   Plaintiffs fail to meet the heightened standard for facial challenges................................ 19

    II.  Plaintiffs' proposed conduct is not protected by the Second Amendment's text.............. 21

        A.  Large capacity magazines and attachments are unnecessary accessories. ...................... 23

        B.  None of the restricted items are like the "Arms" protected by the text.......................... 25

            1.   Items restricted by the Act were designed for military combat. ............................... 27

            2.   Their lethality far exceeds what is commonly used for self-defense....................... 35

        C.  Plaintiffs' ahistorical interpretations of the text must be rejected. ................................... 41

            1.   The Second Amendment right is not a right to "any weapon whatsoever." ............. 41

            2.   Sales trends do not define constitutional text. .......................................................... 43

    III.  The Act is consistent with the Nation's history and tradition of regulation. ...................... 45

        A.  The Act responds to unprecedented societal concerns. .................................................. 46

        B.  Legislatures have long regulated weapons associated with increased or novel violence................................................................................................................. 50

        C.  The Act comparably restricts access to weapons that pose unacceptable threats to public safety while preserving access to arms for self-defense................................ 55

    IV.  The optional registration process easily survives rational basis review. ........................... 58

    V.  Any injunction must be limited in scope and should be stayed pending appeal. ............... 60

CONCLUSION..................................................................................................................62

## TABLE OF AUTHORITIES

**Cases**

*Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023)................................... 14

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ...................................... passim

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc)...................................... passim

*Burson v. Freeman*, 504 U.S. 191 (1992) ................................................................. 51

*Capen v. Campbell*, 708 F. Supp. 3d 65 (D. Mass. 2023) ...................................... passim

*Caulkins v. Pritzker*, 2023 IL 129453 .............................................................. 7, 60

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015)....................................................... 20

*Cox v. United States*, No. 11-cr-22, 2023 WL 4203261 (D. Alaska June 27, 2023).................... 24

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012)....................................... 20

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194 (3d Cir. 2024) ................................................................................................ 43

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023) .............................................................................................. 50

*DeWilde v. United States*, No. 23-cv-3, 2023 WL 4884582 (D. Wyo. July 17, 2023)................ 26

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... passim

*Doe v. Reed*, 561 U.S. 186 (2010).................................................................... 20

*Doe v. Rokita*, 54 F.4th 518 (7th Cir. 2022) ................................................. 60

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) .......................... 27, 43

*Gates v. Caterpillar*, 513 F.3d 680 (7th Cir. 2008) .............................................. 11

*Goldman v. City of Highland Park*, No. 22-cv-4774, 2024 WL 98429 (N.D. Ill. Jan. 9, 2024)... 14

*Grant v. Lamont*, No. 22-cv-1223, 2023 WL 5533522 (D. Conn. Aug. 28, 2023) ..................... 39

*Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009) ....................................... 26

*Hanson v. District of Columbia*, 671 F. Supp. 3d 1 (D.D.C. 2023) ..................... 35, 40

*Hartford v. Ferguson*, 676 F. Supp. 3d 897 (W.D. Wash. 2023)......................... 50

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)........................ 35

*Herrera v. Raoul*, 670 F. Supp. 3d 665 (N.D. Ill. 2023) ................................. 14

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) .............................................. 26

*In re A & F Enters., Inc. II*, 742 F.3d 763 (7th Cir. 2014) .................................. 61

*James v. Hale*, 959 F.3d 307 (7th Cir. 2020)............................................... 11

*Liebhart v. SPX Corp.*, 998 F.3d 772 (7th Cir. 2021)....................................... 60

*Lukaszczyk v. Cook County*, 47 F.4th 587 (7th Cir. 2022) ............................... 59

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)....................................... 21

*McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997) ............................... 61

*Miller v. Garland*, 674 F. Supp. 3d 296 (E.D. Va. 2023).......................... 24, 26

*Minerva Dairy v. Harsdorf*, 905 F.3d 1047 (7th Cir. 2018)............................. 60

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024) ...................................... 20

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ........................ passim

*Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63 (D. Conn. 2023)................ passim

*Nat'l Org. for Women v. Scheidler*, 396 F.3d 807 (7th Cir. 2005)........................ 60

*Ocean State Tactical v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022)............... passim

iii

*Ocean State Tactical v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) ........................ passim
*Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874 (D. Or. 2023) ........................ passim
*Planned Parenthood of Ind. and Ky. v. Marion Cnty. Prosecutor*, 7 F.4th 594 (7th Cir. 2021).... 20
*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002 (7th Cir. 2021) ....... 61
*Rupp v. Bonta*, No. 17-cv-746, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024) ..................... passim
*Second Amendment Arms v. City of Chicago*, No. 10-c-4257, 2024 WL 3495010 (N.D. Ill. July 22, 2024) ................................................................................ 24, 25
*Thayer v. City of Chicago*, 110 F.4th 1040 (7th Cir. 2024) .......................................... 20
*United States v. Cooperman*, No. 22-cr-146, 2023 WL 4762710 (N.D. Ill. July 26, 2023) ......... 24
*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ................................................ 24
*United States v. Dixon*, No. 22-cr-140, 2023 WL 2664076 (N.D. Ill. Mar. 28, 2023) ................. 26
*United States v. Hansen*, 599 U.S. 762 (2023) ....................................................... 21
*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ................................................ 26
*United States v. Herriott*, No. 23-cr-37, 2024 WL 3103275 (N.D. Ind. June 24, 2024) ................. 4
*United States v. Miller*, 307 U.S. 174 (1939) ................................................. 25, 26, 27
*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136 (3d Cir. 2016) ............................................................................. 26
*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ................................................ passim
*United States v. Royce*, No. 22-cr-130, 2023 WL 2163677 (D.N.D. Feb. 22, 2023) ............. 24, 26
*United States v. Rush*, No. 22-cr-40008, 2023 WL 403774 (S.D. Ill. Jan. 25, 2023) ................. 26
*United States v. Saleem*, 659 F. Supp. 3d 683 (W.D.N.C. 2023) ............................... 24, 25
*United States v. Salerno*, 481 U.S. 739 (1987) ...................................................... 20
*United States v. Simien*, 655 F. Supp. 3d 540 (W.D. Tex. 2023) ..................................... 26
*United States v. Sprague*, 282 U.S. 716 (1931) .................................................... 22
*United States v. Villalobos*, No. 19-cr-40, 2023 WL 3044770 (D. Idaho Apr. 21, 2023) ............. 24
*United States v. Woznichak*, No. 21-242, 2023 WL 7324442 (W.D. Pa. Nov. 7, 2023) ............... 26
*United States v. Zaleski*, 489 F. App'x 474 (2d Cir. 2012) .......................................... 26
*Viramontes v. County of Cook*, No. 21-cv-4595, 2024 WL 897455 (N.D. Ill. Mar. 1, 2024) ....... 39
*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 23-cv-710, 2024 WL 3466482 (D. Vt. July 18, 2024) ................................................................................ passim
*Warth v. Seldin*, 422 U.S. 490 (1975) .............................................................. 61
*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ........................ 20
*Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) .............................................. 27

**Statutes**

18 U.S.C. § 921 .................................................................................. 4
20 ILCS 2605/2605-35 ........................................................................... 2
20 ILCS 2610/17c .............................................................................. 37
720 ILCS 5/24-1 ............................................................................ passim
720 ILCS 5/24-1.10 ......................................................................... passim
720 ILCS 5/24-1.9 .......................................................................... passim
720 ILCS 5/7-1 ................................................................................ 36
Pub. L. No. 103-322, 108 Stat. 1796 ............................................................. 4

**Rules**

Fed. R. Civ. P. 65 ................................................................................................ 61
S.D. Ill. L.R. 7.1 ........................................................................................... 18, 19

**Treatises**

4 W. Blackstone, Commentaries on the Laws of England (1769) ......................... 21, 50

**Regulations**

20 Ill. Admin. Code § 1230.10 ............................................................................ 8
20 Ill. Admin. Code § 1230.15 ............................................................................ 8
20 Ill. Admin. Code § 1230.65 ............................................................................ 8

## INTRODUCTION

In under a minute, a shooter armed with an assault weapon and large capacity magazines fired 83 rounds into a crowd at a July 4th parade, killing seven people and wounding 48. The Illinois General Assembly responded to this and other increasingly common mass shootings in the same way American legislatures have addressed novel forms of violence for centuries: by regulating the instruments of death. Through the Protect Illinois Communities Act, Illinois restricts assault weapons, large capacity magazines, and similarly dangerous weapons, accessories, and ammunition. Plaintiffs ask this Court to enjoin the Act and to declare a new constitutional right to any deadly weapon of their choice.

These cases pose three questions: (1) can the State of Illinois prohibit the sale and possession of assault weapons, .50 caliber rifles, and .50 caliber cartridges? (2) can the State require the registration of assault weapons and attachments as a condition for their lawful possession? and (3) can the State limit the size of magazines sold to fifteen rounds of ammunition for handguns and ten for long guns? The answer to all three questions is yes—none of the activity the State regulates is protected by the Second Amendment's text and, even if it were, these restrictions adhere to our Nation's history and tradition of weapons regulation. Plaintiffs answer no by stretching the Second Amendment beyond its historical purpose of protecting self-defense. To plaintiffs, any restriction of consumer choices regarding weapons and accessories is unconstitutional—regardless of the level of destruction they can inflict. Plaintiffs failed to support this theory at the preliminary injunction stage, and now they fail to prove the merits of their claims.

Plaintiffs' claims fail for two independent reasons. *First*, they fail to show the Second Amendment's text protects the conduct they wish to engage in. The historical understanding of the text is that it protects an individual's right to armed self-defense. The Second Amendment has never meant that individuals have a right to any weapon or accessory of their choosing. Nor has a

1

weapon's commercial popularity determined its constitutionality. *Second*, regardless of whether the text presumptively protects any activity a plaintiff wants to engage in, there is an American tradition of regulating dangerous and unusual items that pose significant public safety threats. The Act fits squarely in this tradition, which spans our Nation's history.

The Act is constitutional. The Court should enter judgment for defendants on all claims.

## BACKGROUND

### I. Illinois responds to horrific mass shootings by regulating assault weapons, large capacity magazines, and other deadly items.

On July 4, 2022, a shooter using an AR-15-style rifle and 30-round magazines rained gunfire upon families watching a parade in Highland Park, Illinois. ECF 247, State Defs.' Proposed Findings of Fact ("FOF") ¶¶ 1–3. The range, accuracy, and rate of fire enabled by the shooter's assault weapon and the volume of rounds and abbreviated reloading time enabled by his large capacity magazines meant the shooter was able to fire approximately 83 rounds in less than 60 seconds. FOF ¶ 3. He killed seven people and wounded 48 others. *Id*. The range of the assault weapons allowed the shooter to conceal himself on a rooftop and allowed him to evade apprehension on site despite the presence of law enforcement on the scene. FOF ¶¶ 3–4. A massive manhunt ensued, requiring significant local, state, and federal law enforcement resources to respond. FOF ¶ 4. Hospitals were flooded with injured patients from 8 to 85 years old. FOF ¶ 4. The Highland Park massacre was just one of many mass shootings increasingly plaguing the country in recent years. FOF ¶¶ 452–453.

On January 10, 2023, Illinois enacted the Protect Illinois Communities Act ("Act") to amend various parts of Illinois criminal and civil statutes with a host of measures to promote public safety. FOF ¶¶ 11–12. Most are not at issue in this litigation. *See, e.g.*, 20 ILCS 2605/2605-35(a)(7) (regarding human trafficking and illegal drug and firearms trafficking investigations). These cases

2

involve the Act's amendments to the criminal code restricting the sale, purchase, manufacture, delivery, importation, and possession of certain deadly weapons and devices.

### A. The Act adds criminal offenses for deadly weapons.

All provisions in the Act challenged by plaintiffs amend 720 ILCS 5/24, which is the Illinois Criminal Code article that defines offenses with deadly weapons. Before the Act, Section 24-1(a) already defined unlawful use of weapons and established offenses for many dangerous items. *See, e.g.*, 720 ILCS 5/24-1(a)(1) (bludgeon, black-jack, slung-shot, sand-club, sand-bag, metal knuckles, throwing star, or switchblade knife), (a)(2) (dagger, dirk, billy, dangerous knife, razor, stiletto, broken bottles), (a)(3) (tear gas projector or bomb), (a)(4) (concealed pistols, revolver, or other firearm without a license), (a)(7) (machine gun, short-barreled rifle, bomb, grenade, Molotov cocktails, or artillery projectiles), (a)(9) (pistol, revolver, firearm, or ballistic knife while identity concealed), (a)(13) (billy club). Those preexisting restrictions are not challenged here.

The Act amends Section 24-1(a) by amending subpart (11) and adding subparts (14), (15), and (16) to create offenses for the unlawful use of weapons involving assault weapon attachments, .50 caliber cartridges, accessories that increase the rate of fire for semiautomatic firearms, assault weapons, and .50 caliber rifles. Definitions of key terms for these offenses were added to Section 24-1.9. The Act also adds Section 24-1.10 to create and define offenses for large capacity ammunition feeding devices.

### B. The Act defines firearms and accessories for the new offenses.

Plaintiffs wish to engage in prohibited conduct with assault weapons, assault weapon attachments, .50 caliber cartridges, .50 caliber rifles, and large capacity ammunition feeding

devices.[1] Each item is separately defined.

**Assault Weapons**. While Section 24-1(a)(15)–(16) establishes the elements for offenses with assault weapons, Section 24-1.9(a)(1)–(2) defines "assault weapon." Like the expired federal assault weapons ban and other state and local laws, the Act defines assault weapons both by reference to features and through an inexhaustive list of models. *See, e.g*., Pub. L. No. 103-322, § 110102(b), 108 Stat. 1796 (amending 18 U.S.C. § 921(a)); FOF ¶¶ 111–112. The Act **includes** firearms in the assault weapon definition as follows:

- Section 24-1.9(a)(1)(A)–(I) describes firearm types with specific characteristics that bring them within the assault weapons definition. This includes detachable magazine-fed semiautomatic rifles with one or more listed features: a pistol grip or thumbhole stock; a protruding grip for the non-trigger hand; a folding, telescoping, thumbhole, or detachable stock; a flash suppressor; a grenade launcher; or a barrel shroud. 720 ILCS 5/24-1.9(a)(1)(A). For detachable magazine-fed semiautomatic pistols, the listed features are a threaded barrel; a second pistol grip or other protruding grip for the non-trigger hand; a barrel shroud; a flash suppressor; the capacity to accept a detachable magazine outside the pistol grip; or a buffer tube, arm brace, or other device designed to allow shoulder-firing. *Id.* § 1.9(a)(1)(C). Semiautomatic shotguns are prohibited if they have one or more of the following features: a pistol grip or thumbhole stock; a protruding grip for the non-trigger

---

[1] While the Act added Section 24-1(a)(14) to criminalize conduct regarding accessories that increase the rate of fire for semiautomatic firearms (such as bump stocks and Glock switches), no plaintiff has shown it intends to engage in conduct with devices or parts regulated by this provision. Vague assertions by plaintiffs that they seek to acquire everything banned by the Act are insufficient to establish Article III standing. *See, e.g.*, Vandermyde Decl. ¶¶ 5, 8 (ECF 209) (vaguely declaring he possessed various "parts" that the Act restricts and seeking to maintain possession of such "parts"). If the Court finds a plaintiff has standing to challenge Section 24-1(a)(14), then a Second Amendment challenge to that provision would fail for the same textual and historical reasons described in this brief as for other accessories. *See also, e.g.*, *United States v. Herriott*, No. 23-cr-37, 2024 WL 3103275 (N.D. Ind. June 24, 2024) (finding Glock conversion devices not protected by the Second Amendment).

hand; a folding or thumbhole stock; a grenade launcher; a fixed magazine with a capacity above 5 rounds; or the capacity to accept a detachable magazine. *Id.* § 1.9(a)(1)(F). The Act also prohibits weapons with fixed magazines above a certain size (10 rounds for semiautomatic rifles, *id.* § 1.9(a)(1)(B), and 15 rounds for semiautomatic pistols, *id.* § 1.9(a)(1)(D)), as well as shotguns with revolving cylinders, *id.* § 1.9(a)(1)(E), and semiautomatic firearms that can accept a belt ammunition feeding device, *id.* § 1.9(a)(1)(G).

- Section 1.9(a)(1)(J)–(L) lists specific firearms makes and models and "copies, duplicates, variants, or altered facsimiles with the capability of" of the specifically listed firearms. For both rifles and pistols, this includes all AK and AR types, along with other enumerated weapons. *Id.* § 1.9(a)(1)(J)–(K).

Then, the Act **excludes** certain firearms from the definition of "assault weapon." 720 ILCS 5/24-1.9(a)(2). Firearms are excluded under section (a)(2) if they are (A) unserviceable or inoperable, (B) an antique or replica, (C) manually operated by bolt, pump, lever or slide action, (D) an air rifle, or (E) a handgun under Illinois' Firearms Concealed Carry Act that is not otherwise listed in Section 24-1.9. *Id.* The Illinois State Police published a guide with photographs to assist the public in identifying assault weapons. FOF ¶ 19.

**Assault Weapon Attachments**. While Section 24-1(a)(11) establishes the elements for offenses with assault weapon attachments, Section 24-1.9(a)(3) defines "assault weapon attachment." It means "any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into any of the firearms listed in" the assault weapon definition.

**.50 Caliber Cartridges**. The term "cartridge" was already defined for an unlawful use of weapons offense prior to the Act as part of Illinois' restrictions on explosive bullets: "a tubular metal case having a projectile affixed at the front thereof and a cap or primer at the rear end thereof, with the propellant contained in such tube between the projectile and the cap." 720 ILCS 5/24-1(a)(11). The Act amends the offense in (a)(11) to add restrictions for .50 caliber cartridges. The Act defines ".50 caliber cartridge" to mean "a cartridge in .50 BMG caliber, either by designation or actual measurement, that is capable of being fired from a centerfire rifle." 720 ILCS 5/24-1.9(a)(6). It excludes from this definition memorabilia and display items that are permanently altered to prevent them from being used as live ammunition. *Id.*

**.50 Caliber Rifles.** While Section 24-1(a)(16) establishes the elements for offenses with .50 caliber rifles, Section 24-1.9(a)(5) defines ".50 caliber rifle" to mean "a centerfire rifle capable of firing a .50 caliber cartridge." However, it excludes from this definition "any antique firearm, any shotgun including a shotgun that has a rifle barrel, or any muzzle-loader which uses black powder for hunting or historical reenactments." 720 ILCS 5/24-1.9(a)(5).

**Large Capacity Ammunition Feeding Devices.** The Act also adds Section 24-1.10 to create an offense for the manufacture, delivery, sale, purchase, and possession of certain ammunition feeding devices.

- Section 24-1.10(a) provides definitions. With some additions and exceptions, a large capacity ammunition feeding device means "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." *Id*. For this offense, handguns are defined by reference to preexisting state law and long guns are defined as a rifle or shotgun. *Id*. While the definition of "large capacity

6

ammunition feeding devices" includes belt, drums, and other devices that are not magazines, for brevity this brief refers to all defined items as "large capacity magazines."

- Sections 24-1.10(b), (c), and (g) define the elements of and fine for the offenses, and Sections 24-1.10(d), (e), and (f) create exceptions.

Finally, the Act does not amend, nor do plaintiffs challenge, many preexisting provisions regarding unlawful use of weapons, such as Section 24-1(a)(7)(i) regarding machine guns.

### C. The Act exempts existing owners and trained professionals.

The Act includes several exemptions; most are not at issue here. For example, those who lawfully possessed large capacity magazines prior to the Act may continue to do so. 720 ILCS 5/24-1.10(c)-(d). In addition, the Act's purchase-and-possession restrictions do not apply to law enforcement, members of the military, and other trained professionals. *Id.* 5/24-1.9(e), 1.10(e); *see generally Caulkins v. Pritzker*, 2023 IL 129453.

There is a "grandfathered individuals" exemption, which states that the Act's prohibitions do "not apply to a person's possession of an assault weapon . . . if the person lawfully possessed" that weapon as of the effective date of the law (January 10, 2023) if that person "provide[s] in an endorsement affidavit, prior to January 1, 2024, under oath or affirmation" certain specified information to the Illinois State Police. 720 ILCS 5/24-1.9(d). In other words, to lawfully possess an assault weapon after January 1, 2024, an individual not otherwise exempted from the Act must submit an endorsement affidavit. There is no penalty for assault weapon owners who opt out of registering by disposing of or transferring out of state their weapons. For those who register, the endorsement affidavit must state: (1) the individual's Firearm Owner's Identification Card ("FOID card") number; (2) an affirmation that they possessed the assault weapon(s) prior to January 10, 2023; and (3) the make, model, caliber, and serial number of the assault weapon(s) they possess.

720 ILCS 5/24-1.9(d)(1)–(3). The Illinois State Police issued rules for this process, 20 Ill. Admin. Code §§ 1230.10, 1230.15, 1230.65, and accepted endorsement affidavits electronically through its online portal for obtaining, renewing, and updating a FOID card or a Concealed Carry License. FOF ¶ 19.

## II.  The plaintiffs sue to keep buying and selling deadly firearms and accessories.

### A.  Four plaintiff groups sue state and local officials.

Four plaintiff groups separately sued to challenge the Act. ECF 1; *FFL* ECF 1; *Harrel* ECF 1;[2] *Langley* ECF 1-1. This Court consolidated the cases. ECF 32.

There are twenty-one plaintiffs. The *Barnett* plaintiffs are two individuals (Caleb Barnett and Brian Norman), two retailers (Hoods Guns & More and Pro Gun and Indoor Range), and one trade association (National Shooting Sports Foundation or "NSSF"). The *Harrel* plaintiffs are one individual (Dane Harrel), two retailers (C4 Gun Store, LLC and Marengo Guns, Inc.), and three advocacy organizations (Illinois State Rifle Association, Firearms Policy Coalition, Inc., and Second Amendment Foundation). The *FFL* plaintiffs are two individuals (Chris Moore and Jasmine Young), one retailer (Piasa Armory), and four advocacy organizations (Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, and Gun Owners Foundation). The *Langley* plaintiffs are three individuals (Jeremy Langley, Timothy Jones, and Matthew Wilson).

---

[2] At the time, two *Harrel* plaintiffs (the Second Amendment Foundation and Firearms Policy Coalition) had a pending case in the Northern District of Illinois challenging a local ordinance restricting assault weapons. *Viramontes v. Cook County*, No. 21-cv-4595 (N.D. Ill.). Rather than adding a claim against the Act to their existing action, these plaintiffs opted to try a different forum and filed suit in the Southern District of Illinois. *Harrel* ECF 1. They then requested the Northern District court stay their preexisting case pending resolution by this Court. *Viramontes*, ECF 69. Judge Pallmeyer declined to stay *Viramontes* while awaiting resolution of the just-filed *Harrel* action, noting in part that the former was at the summary judgment stage. *Viramontes*, ECF 88. In March 2024, Judge Pallmeyer granted summary judgment in favor of the government defendants, finding that the plaintiffs failed to point to anything in the record that meaningfully distinguished binding precedent upholding assault weapons restrictions. *Viramontes*, ECF 129, 130. These two plaintiffs are appealing that decision in the Court of Appeals. No. 24-1437 (7th Cir.). At the same time, they hope for a different outcome regarding these legal and factual questions in this District.

There are ten defendants. The *Barnett* plaintiffs sued Illinois Attorney General Kwame Raoul and Illinois State Police Director Brendan Kelly. The *FFL* plaintiffs sued Governor JB Pritzker, Attorney General Raoul, and Director Kelly.[3] The *Harrel* plaintiffs sued Attorney General Raoul and Director Kelly, as well as three State's Attorneys (James Gomric, Jeremy Walker, and Patrick Kenneally) and two sheriffs (Jarrod Peters and Robb Tadelman). The *Langley* plaintiffs sued Director Kelly and a State's Attorney (Cole Price Shaner). This brief is submitted on behalf of the State of Illinois defendants in all four cases: Defendants Raoul, Pritzker, and Kelly ("State Defendants"). All defendants are sued in their official capacities for declaratory and injunctive relief. ECF 172, ¶¶ 1–3 (parties' stipulation). The *Barnett* plaintiffs also sue Defendants Raoul and Kelly in their individual capacities to seek nominal damages of $1 each. *Id.*

## B. Plaintiffs wish to engage in prohibited conduct.

The Act restricts conduct (e.g., manufacture, import, sale, purchase, and possession) with respect to specific items (e.g., assault weapons, attachments, .50 caliber rifles, .50 caliber cartridges, and large capacity magazines). This chart illustrates which provisions in the Act restrict conduct that the plaintiff groups wish to engage in:[4]

---

[3] The *FFL* plaintiffs have not identified a threat of injury from Governor Pritzker.

[4] This chart reflects which provisions prohibit conduct plaintiffs want to engage in, even though some plaintiffs purport to challenge a definition or nonexistent statutes. *See, e.g.*, *FFL* ECF 82 at n.45, n. 47–51, n. 53–56 (citing 720 ILCS 5/24-19(a)(1)(J), 720 ILCS 5/24-1(b)(1)(C)(i), 720 ILCS 5/24-9-1(b), 720 ILCS 5/24-9/1(b), and 720 ILCS 5/24-9.1, none of which exists).

| Provision | Conduct | Item | Plaintiffs |
|---|---|---|---|
| 720 ILCS 5/24-1(a)(11) | Sells, possesses, or purchases[5] | Assault weapon attachment or .50 caliber cartridge[6] | *FFL*[7] |
| 720 ILCS 5/24-1(a)(15) | Possesses | Assault weapon[8] | *Barnett, Harrel, FFL* |
| 720 ILCS 5/24-1(a)(16) | Manufactures, sells, or purchases[9] | Assault weapon | *Barnett, Harrel, FFL* |
| | Sells or purchases[10] | .50 caliber rifle | *FFL*[11] |
| 720 ILCS 5/24-1.10(b) | Delivers, sells, or purchases[12] | Large capacity ammunition feeding devices | *Barnett, Harrel, Langley* |

This chart is based on plaintiffs' sworn testimony.[13] In sum, the *Barnett* and *Harrel* plaintiffs

challenge some restrictions for assault weapons and large capacity magazines, while the *Langley*

---

[5] Subsection 1(a)(11) also prohibits manufacturing, delivering, and importing assault weapon attachments and .50 caliber cartridges, but no plaintiff presented evidence that they seek to engage in those activities.

[6] Prior to the Act, Section 24-1(a)(11) prohibited selling, manufacturing, or purchasing explosive bullets. Plaintiffs do not challenge this offense—only how the Act amends it for attachments and .50 caliber cartridges.

[7] ECF 209, Vandermyde Decl. ¶ 6 (GOA member who seeks to acquire assault weapon attachments); ECF 217, Knutson Decl. ¶ 5 (GOA member who seeks to acquire ammunition for .50 BMG rifle); ECF 204, Pulaski Decl. ¶¶ 3–5 (seeks to sell assault weapon attachments and .50 caliber ammunition).

[8] Subsection 1(a)(15) also prohibits carrying and possessing .50 caliber rifles, but no plaintiff presented evidence that they seek to engage in that conduct.

[9] Subsection 1(a)(16) also prohibits delivering and importing assault weapons, but no plaintiff presented evidence that they seek to engage in that conduct.

[10] Subsection 1(a)(16) also prohibits manufacturing, delivering, and importing .50 caliber rifles, but no plaintiff presented evidence that they seek to engage in that conduct.

[11] ECF 204, Pulaski Decl. ¶¶ 3–5 (seeks to sell .50 caliber rifles).

[12] Subsection 1.10(b) also prohibits manufacturing large capacity magazine feeding devices, but no plaintiff presented evidence that they seek to engage in that conduct.

[13] The *Barnett*, *FFL*, and *Harrel* plaintiffs opted to prove their intended conduct by filing declarations. ECF 198–210, 215, 217. While the *Langley* plaintiffs filed declarations recently, ECF 221-1, 222-2, 222-3, those do not establish standing for three reasons. First, they were too late. They were filed after discovery closed, after pretrial disclosures, after dispositive motions, a day before trial witness lists were due, and 11 days before trial. Second, these late declarations contradict the *Langley* plaintiffs' interrogatory answers. Plaintiffs were asked to identify all firearms, ammunition feeding devices, and attachments they would obtain but for the Act, and all three answered: "I would obtain over 15 round magazines for a variety of rifles, pistols, and shotguns." FOF n.6; ECF 247-62, 247-63. None identified a firearm they wished to acquire. *Id.* On the eve of trial, they filed three declarations claiming an identical desire to "acquire a variety of semi automatic firearms with prohibited features." ECF 221-1 ¶ 5, 221-2 ¶ 5, 221-3 ¶ 5. But a court "may disregard an affidavit that attempts to create a sham issue of fact." *James v. Hale*, 959 F.3d 307, 311 (7th

plaintiffs focus on large capacity magazines.[14] The *FFL* plaintiffs do not challenge restrictions on large capacity magazines, but they challenge restrictions for assault weapons, attachments, .50 caliber rifles, and .50 caliber cartridges. No plaintiff has been convicted under the Act or brings an as-applied challenge. Their facial challenges can be summarized by the types of plaintiff: an individual, retailer, or advocacy entity.

**Individual plaintiffs**. No plaintiff claims that the Act disarmed them.[15] Nor could they, considering the vast commercial market of handguns, rifles, shotguns, and magazines that one can lawfully purchase and possess in Illinois. *See* FOF ¶¶ 340, 358–361, 365–366, 369–373, 428, 431–432. When the Act became effective, the individual plaintiffs not only already owned multiple firearms, but most already owned firearms and magazines that the Act restricts.[16] These included, among other items, semiautomatic rifles with prohibited features (such as AR- and AK-platform rifles)[17] and semiautomatic pistols with features that bring them within the Act's definition of

---

[14] The *Langley* plaintiffs do not like additional aspects of the Act. However, they failed to show they want to engage in conduct beyond obtaining magazines. *See supra* note 13.

Cir. 2020). These declarations attempt to create a sham issue of fact because they attempt to fill a material omission from prior sworn statements. *See id.* at 316 (sham affidavit rule applies to "prior deposition or other sworn testimony"); *Gates v. Caterpillar*, 513 F.3d 680, 687–88 (7th Cir. 2008) (barring introduction of new evidence under sham affidavit doctrine because the party had been asked a question that would have required that information to be disclosed but failed to disclose it). Finally, even if the declarations were timely and consistent with prior testimony, they are insufficiently specific and concrete to establish standing.

[15] Plaintiffs owned firearms prior to the Act that they continue to own or possess. *E.g.*, ECF 198, Barnett Decl. ¶ 6 ("I am able to retain possession of my current firearms and magazines[.]"); ECF 200, Norman Decl. ¶ 6 (same).

[16] ECF 215-1, Harrel Decl. ¶ 4; ECF 198, Barnett Decl. ¶ 4; ECF 200, Norman Decl. ¶ 4 (listing 9 assault weapons); ECF 207, Moore Decl. ¶ 7(a).

[17] *See* ECF 198, Barnett Decl. ¶ 4 (AK-47 & AR rifles); ECF 200, Norman Decl. ¶ 4 (three AR-15 rifles); ECF 207, Moore Decl. ¶ 7 (semiautomatic rifle with detachable magazine and pistol grip, adjustable stock, barrel shroud, and flash suppressor).

"assault weapon."[18] The Act did not require relinquishment of these items. Some plaintiffs opted to register their assault weapons to continue to possess them.[19]

Rather, the individual plaintiffs want to purchase *more* firearms and accessories than they already own.[20] The firearms that individual plaintiffs wish to acquire include AR-15 style rifles[21] and semiautomatic pistols and shotguns with features bringing them into the Act's definition of "assault weapon."[22] Finally, one *FFL* plaintiff wants to possess an assault weapon without registering it.[23] Plaintiffs do not submit evidence showing how they used their weapons cache before the Act, but some provide conclusory assertions that new acquisitions will be used for lawful purposes.[24]

**Retailers**. No retailer claims the Act rendered it unable to sell firearms and magazines.[25] Retailers remain free to sell a vast array of handguns, rifles, shotguns, magazines, cartridges, and other ammunition to the public. The five retailer plaintiffs bring this suit so they can sell a larger selection of products—even those they have never sold before.[26] The retailers' declarations do not

---

[18] ECF 198, Barnett Decl. ¶ 4; ECF 200, Norman Decl. ¶ 4.

[19] ECF 198, Barnett Decl. ¶ 6; ECF 200, Norman Decl. ¶ 6.

[20] *See* ECF 198, Barnett Decl. ¶¶ 4, 5, 10 (owns "multiple" assault weapons, listing three, and states he wants "more firearms", while also stating he owns "multiple" large capacity magazine devices and wants "more magazines"); ECF 200, Norman Decl. ¶¶ 4, 5, 10 (owns "multiple" assault weapons, listing nine, and states he wants more assault weapons, while also stating he owns "multiple" large capacity magazine devices and wants "more magazines"); ECF 207, Moore Decl. ¶ 6 (wants three additional assault weapons); ECF 208, Young Decl. ¶ 5 (same); ECF 215-1, Harrel Decl. ¶ 5 (wants "additional semiautomatic firearms," listing two assault weapons, and "additional noncompliant magazines").

[21] *See* ECF 207, Moore Decl. ¶ 6(a); ECF 208, Young Decl. ¶ 5(a).

[22] *See* ECF 207, Moore Decl. ¶ 6(b)–(c); ECF 208, Young Decl. ¶ 5(b)–(c).

[23] ECF 207, Moore Decl. ¶ 7.

[24] *See, e.g.*, ECF 198, Barnett Decl. (not describing use); ECF 200, Norman Decl. (same); ECF 215-1, Harrel Decl. (same).

[25] The Act prohibits the manufacture, deliver, sale, and import of restricted items. Plaintiffs' evidence does not present a reason to delineate among those activities and thus, for brevity, this brief refers to this conduct collectively as sales claims.

[26] ECF 204, Pulaski Decl. ¶ 5(D) (declaring that, but for fear of prosecution, Piasa Armory would "sell any legal and safe firearm or ammunition that [the Act] restricts, even if it has not sold it in the past").

specify which makes and models listed in the statute they have sold or hope to sell but highlight their interest in selling rifles with features that bring them within the Act's assault weapon definition and "firearms on the AR platform."[27]

**Advocacy Groups**. The advocacy plaintiffs are trade groups or associations that promote firearms ownership or the firearms and ammunition industry. Seven of the eight advocacy plaintiffs sue on behalf of members who are individuals, retailers, or manufacturers.[28] Like the retailer plaintiffs, retailer members allege that the Act "constricts the consumer market."[29] Like the individual plaintiffs, individual members allege that the Act prohibits them from purchasing more firearms or magazines. In addition to wanting more AR- and AK-platform rifles like individual plaintiffs, two members of *FFL* advocacy plaintiffs want to acquire assault weapon attachments and rare auction items like .50 BMG caliber rifles, their ammunition, and variants of submachineguns like a HK MP5 type firearm.[30] Finally, the eighth advocacy group, *FFL* plaintiff

---

[27] ECF 199, Hood Decl. (Hood's Guns) ¶¶ 8–9 (declaring it would sell "firearms and magazines" unlawful to sell under the Act, "including firearms on the Armalite Rifle ("AR") platform"); ECF 202, Smith Decl. (Pro Gun) ¶¶ 8–9 (same); ECF 204, Pulaski Decl. (Piasa) ¶¶ 3–4(A) (declaring it previously sold "various firearm categories" that the Act restricts and that it wishes to sell "particularly the semiautomatic rifles with detachable magazines and related features, such as pistol grips, flash suppressors, adjustable stocks, barrel shrouds, etc."); *see also* ECF 215-2, Brooks Decl. (C4) ¶ 6 (declaring it would sell "noncompliant magazines and banned firearms" without specifying firearm type or magazine capacity); ECF 215-3, DeBock Decl. (Marengo) ¶ 6 (same).

[28] Plaintiffs National Shooting Sports Foundation, Inc. (NSSF) and Federal Firearms Licensees of Illinois (FFL) are trade groups with some firearm manufacturer and retailer members in Illinois. The Illinois State Rifle Association (ISRA), Firearms Policy Coalition, Second Amendment Foundation, Gun Owners of America (GOA), and Guns Save Life are individual membership organizations. Some of these latter organizations count as members the proprietors of some of the retailer plaintiffs (e.g., the owner of C4 (Brooks) and the owner of Marengo (DeBock) belong to ISRA, Firearms Policy Coalition, and Second Amendment Foundation). ECF 215-2, Brooks Decl. (C4) ¶ 4; ECF 215-3, DeBock Decl. (Marengo) ¶ 4.

[29] ECF 201, Keane Decl. (NSSF) ¶ 10.

[30] ECF 209, Vandermyde Decl. ¶ 6 (GOA member who seeks to acquire assault weapon attachments and an HK MP5, in addition to four other specific assault weapons and "several types of AK pattern firearms"); ECF 217, Knutson Decl. ¶ 5 (GOA member who seeks to acquire .50 BMG rifle and its ammunition).

Gun Owners Foundation, is a legal foundation that failed to submit evidence demonstrating associational standing.[31]

### III. Courts refuse to enjoin the Act pending trial.

Plaintiffs requested a preliminary injunction based on the Second Amendment, and, on April 28, 2023, the Court enjoined the Act in its the entirety. ECF 99. The Seventh Circuit stayed that injunction pending appeal. ECF 108. Meanwhile, other plaintiffs had sued in the Northern District of Illinois to challenge the Act's assault weapons restrictions, and the judges in those two cases denied preliminary injunctive relief. *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023); *Herrera v. Raoul*, 670 F. Supp. 3d 665 (N.D. Ill. 2023). All three preliminary injunction decisions were appealed, and the Seventh Circuit consolidated the six cases and found plaintiffs were not entitled to preliminary relief. ECF 145 (hereinafter *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023)). The Court of Appeals held that the plaintiffs had not shown a likelihood of success on the merits of their claims. *Id.*

The Court of Appeals first considered whether the regulated conduct is covered by the constitutional text. It looked to "the 'plain text' of the Second Amendment to see whether the assault weapons and large capacity magazines (. . . short-hand for the many items covered by [the Act]) fall within the scope of the 'Arms' that individual persons are entitled to keep and bear." *Id.* at 1192. The plaintiffs had "the burden of showing that the weapons addressed in the [Act] are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for

---

[31] ECF 205, Pratt Decl. ¶¶ 3, 7 (describing Gun Owners Foundation (GOF) not as a membership organization but as a "legal defense and educational foundation" and then describing the identities of two members of GOA—not GOF). *See, e.g.*, *Goldman v. City of Highland Park*, No. 22-cv-4774, 2024 WL 98429, at *4–5 (N.D. Ill. Jan. 9, 2024) (dismissing for lack of standing associational plaintiff that failed to provide identifying information about members to bring Second Amendment claims on their behalf).

lawful purposes." *Id.* at 1194. The Court reviewed the voluminous record and found that the plaintiffs had not satisfied this burden because "assault weapons and large capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Id.* at 1195. In their pleadings and requests for relief, the plaintiffs emphasized that the Act's restrictions on assault weapons banned most purchases and sales of AR-15s. The Seventh Circuit considered the evidence submitted and concluded, "[W]e are not persuaded that the AR-15 is materially different from the M16," which "*Heller* informs us . . . is not protected by the Second Amendment, and therefore may be regulated or banned." *Id*. at 1197 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008)).

While these conclusions were enough to sink the likelihood that plaintiffs would succeed on the merits of their claims, the Seventh Circuit further considered whether the Act is consistent with this Nation's tradition of regulations to conclude that plaintiffs had not shown a likelihood of success in that regard either. Specifically, the Seventh Circuit considered whether the Act is "consistent with the history and tradition of firearms regulation," *id*. at 1198, and found that it is. For this inquiry, the State Defendants must show that the Act is constitutional by showing it is part of the "enduring American tradition of state regulation," based on the "answers to two questions: (1) how, and (2) why," does the "regulation 'burden a law-abiding citizen's right to armed self-defense?'" *Id*. at 1199 (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29 (2022)). The State satisfied this burden by pointing to historical regulations that imposed comparable burdens on the Second Amendment right as the challenged laws and were enacted to "advance similar purposes." *Id.* at 1200. For example, there is a "long-standing tradition of regulating the especially dangerous weapons of the time, whether they were firearms, explosives, Bowie knives, or other like devices," to protect public safety. *Id.* at 1199. And, as part of this tradition, there is a

"long" history of allowing "the military and law enforcement [to] have access to especially dangerous weapons," while restricting "civilian ownership of those weapons." *Id.* at 1201. After this careful analysis, the Court of Appeals concluded that one plaintiff's challenge to the Act's registration provisions for grandfathered individuals was also likely to fail because it "will be valid as long as it can withstand rational basis review." *Id.* at 1202.

Ten days after the Court of Appeals issued its decision, one set of plaintiffs (*FFL*) made a second attempt to secure a preliminary injunction. *FFL* ECF 57. On December 22, 2023, the Court denied that motion. *FFL* ECF 75. The Court also granted the State Defendants' motion to dismiss the *FFL* plaintiffs' Due Process Clause claims, *id.*, leaving the *FFL* plaintiffs only with Second Amendment claims, *see* ECF 193 ¶ 1 (stipulation characterizing the remaining claims).[32]

### IV. The Court expedites proceedings to resolve these cases.

**Discovery and Stipulations**. At the next status hearing, the Court emphasized that these cases would "be on an expedited docket." ECF 148, Hr'g Tr. 24:24–25 (Jan. 12, 2024). On February 23, 2024, the Court *sua sponte* issued a 16-page opinion on the "path to move forward in this litigation," setting out the Court's views on the law and relevant factual questions. ECF 166.[33] On February 28, the Court set an expedited schedule for fact discovery: 14 days for initial disclosures and written discovery requests to be served, followed by a deadline 21 days later to

---

[32] The *Langley* plaintiffs are the only other plaintiffs who brought non-Second Amendment claims. They moved for summary judgment on their vagueness claims and the Court denied their motion on December 14, 2023, without identifying any disputed issues of material fact. ECF 132. On August 30, 2024, Defendant Kelly filed a cross-motion for summary judgment based on the parties' prior briefing and the Court's December 14 order, ECF 220; that motion is pending. Finally, the *Langley* plaintiffs brought Fifth Amendment claims, on which the Court granted Defendant Kelly summary judgment on September 10, 2024. ECF 226.

[33] One *FFL* plaintiff member described this order as the Court giving the plaintiffs "a paint-by-numbers scheme" of what to prove. Greg Bishop, "Federal Judge Lays Out Roadmap for How to Challenge Illinois' Gun Ban Proceeds," Center Square (Feb. 28, 2024), www.thecentersquare.com/illinois/article_c65d712e-d670-11ee-9658-d351d172d757.html (quoting *FFL* plaintiff's member Todd Vandermyde).

respond to discovery requests. ECF 169. On April 11, the Court set a 30-day deadline for submitting expert reports to the Court. ECF 179. In accordance with the Court's orders, in May the parties provided the Court with reports from 18 expert witnesses. ECF 185, 190, 194; *see* ECF 193 ¶ 3 (stipulation).

On May 16, the Court asked if there would be any problems "in getting this case tried in July"—i.e., less than four months after discovery began. ECF 192, Hr'g Tr. 7:5. The parties explained they were still producing documents, had only started fact depositions, and wished to submit rebuttal expert reports and conduct expert depositions. *E.g.*, *id.* 7:6–11:13. The Court emphasized it wanted to "expedite things," *id.* 14:9, and directed the parties to develop a schedule that would lead to a trial "on an expedited basis," *id.* 15:24–17:9. On May 24, the parties filed a stipulation characterizing the remaining claims, proposing a schedule that expedited trial, and agreeing to a trial format that would limit the number of trial days as follows:

> The parties anticipate submitting some forms of testimony via deposition transcripts and/or declarations for the Court's consideration. To reduce the need for live testimony, the parties also propose that they address via paper submissions standing, the vagueness claims, the challenged Illinois statute's registration provisions, and whether the statute is "consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 17 (2022). As fact and expert discovery progresses, the parties will identify additional issues, witnesses, and/or exhibits that can be presented via paper submissions.

ECF 193 ¶¶ 1, 5.

On June 4, the Court set deadlines for discovery to close and scheduled a September trial. ECF 195. On June 10, the parties exchanged 9 rebuttal reports, 7 of which were from new witnesses. From July 12 to 19, to avoid live testimony, plaintiffs filed declarations to describe the conduct they wish to engage in. ECF 198–210, 215, 217.[34] On July 25, the Court approved the

---

[34] The *Langley* plaintiffs filed declarations in September that were untimely, contradicted by prior sworn testimony, and insufficiently specific and concrete. *See supra* note 13.

parties' stipulation agreeing to limit the number of expert depositions, submit most expert testimony to the Court via declarations, and limiting live testimony at the final hearing to, at most, 6 of the parties' disclosed 25 expert witnesses. ECF 218.

**Pending Motions**. On September 6, the State Defendants filed a motion to preclude consideration of surveys created by William English and NSSF, explaining that plaintiffs had signaled an intention to submit these sources directly into evidence and that they were insufficiently reliable to do so. ECF 223.[35] Plaintiffs did not respond to this motion within the fourteen-day period provided by Local Rule 7.1(b)(2)(A), or after.

In May, the parties had proposed that *Daubert* motions be filed after trial, and the Court delayed the generally applicable deadline for such motions. ECF 195. At the final pretrial conference, the Court ordered the parties to file *Daubert* motions before the bench trial began. FPC Tr. 11:6–25. The plaintiffs stated they did not anticipate filing any "Daubert-esque motions related to the defense experts," *id.* 8:5–8, and they filed no such motions for the State's 13 experts. The State Defendants timely moved to bar certain opinions of plaintiffs' experts. ECF 229. The omnibus motion identifies issues with 10 of 11 of the expert witnesses plaintiffs disclosed. Plaintiffs have not filed any opposition to the motion to exclude expert testimony, despite the thirty days provided under Local Rule 7.1(b)(1)(A) for such responses expiring on October 14.

**Evidence**. The State Defendants submitted written testimony in the form of declarations from one fact witness and 13 experts, who attached their Rule 26 expert reports. ECF 222 at 2–3

---

[35] At the final pretrial conference, plaintiffs' counsel insinuated this motion may have been untimely under the Local Rules. ECF 227, Final Pretrial Conference ("FPC") Tr. 7:23–8:3 (Sept. 9, 2024). Not so. First, the motion to preclude was not a *Daubert* motion and there was no deadline for motions in limine or for objections to exhibits. Second, even if it were considered a *Daubert* motion, the Court's prior orders altered the deadline set by the Local Rules for those motions. ECF 195. During the final pretrial conference, the Court set a September 13 deadline for *Daubert* motions, which the motion to preclude preceded by a week. ECF 227, FPC Tr. 11:5-25.

(listing 14 declarations with docket locations). At the final pretrial conference, the Court confirmed

it would accept the expert witnesses' declarations with Rule 26 reports into evidence via already-

filed declarations, and ordered plaintiffs to file their declarations as well. ECF 227, FPC Tr. 22:22–

25, 23:18–19. The Court also instructed both parties to file any deposition transcripts they wanted

submitted into evidence in advance of trial. *Id.* 7:11–17; 12:22–25. The State Defendants filed four

deposition transcripts of plaintiffs' witnesses: Mr. Eby, Mr. Ronkainen, Mr. Curcuruto, and Mr.

Fatohi. ECF 230. Plaintiffs did not file any transcripts for defense witnesses. *See* ECF 232.

**Live Testimony**. From September 16–19, the Court held a bench trial in the four

consolidated cases. ECF 233–238. Plaintiffs presented four witnesses, and the State two. *Id.* When

the hearing concluded on September 19, the court gave the parties thirty days to submit briefs and

proposed facts. Tr. 678:11–12; ECF 238.[36] State Defendants filed a document titled "State

Defendants' Proposed Findings of Fact" on the same day as the filing of this brief; it is cited herein

as FOF. ECF 247. That filing includes both proposed findings of fact (both adjudicative and

legislative facts) and proposed findings that involve mixed questions of fact and law.

## ARGUMENT

### I. Plaintiffs fail to meet the heightened standard for facial challenges.

Plaintiffs mount facial challenges to the Act. No plaintiff shows an individualized need for

a particular item restricted by the Act—instead, they seek to enjoin all restrictions on a category

of firearm or accessory they desire (e.g., large capacity magazines) because they want to sell or

purchase at least one item in that category. Because plaintiffs request injunctive relief that goes

well beyond their "particular circumstances," their cases are facial challenges. *See Ctr. for*

---

[36] Local rules permit the State Defendants to file a twenty-page brief in each of these four cases. *See* Local
Rule 7.1(a)(3). To reduce redundant briefing and to reflect the consolidated fashion in which these cases
have been adjudicated, the State Defendants file this consolidated brief of less than eighty pages to request
judgment in all four cases.

*Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012) ("Where the 'claim and the
relief that would follow . . . reach beyond the particular circumstances of the [] plaintiffs,' '[t]hey
must . . . satisfy [the] standards for a facial challenge to the extent of that reach.'") (quoting *Doe
v. Reed*, 561 U.S. 186, 194 (2010); *see also Planned Parenthood of Ind. and Ky. v. Marion Cnty.
Prosecutor*, 7 F.4th 594, 605 (7th Cir. 2021) (contrasting a pre-enforcement facial challenge with
an as-applied challenge).[37]

Plaintiffs' challenge "is the 'most difficult challenge to mount successfully,' because it
requires [them] to 'establish that no set of circumstances exists under which the Act would be
valid.'" *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quoting *United States v. Salerno*,
481 U.S. 739, 745 (1987)); *see also City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). As this
Court has observed, "facial challenges are 'disfavored for several reasons,'" including that they
"often rest on speculation," "run contrary to the fundamental principle of judicial restraint," and
"threaten to short circuit the democratic process." ECF 132 at 7–8 (quoting *Wash. State Grange v.
Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)). When considering the
constitutionality of the Act, this Court's "'task is to seek harmony, not to manufacture conflict,'"
and not to "focus[] on hypothetical scenarios where [the Act] might raise constitutional concerns."

---

[37] Because this brief is being filed simultaneously with plaintiffs' briefs, the State Defendants do not know
whether plaintiffs will try to escape the demanding standards for a facial challenge in their post-trial
submissions. But having brought facial challenges to the statute as a whole, *see, e.g.*, Trial Tr. 8:25–9:20,
665:14–19, plaintiffs cannot salvage their claims at this late stage by transforming them into "as-applied"
challenges. As the Supreme Court recently explained, choosing to "litigate [their] cases as facial challenges"
is a decision that "comes at a cost." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). Like the
plaintiffs in *Moody*, plaintiffs here have simply "treated the laws as having certain heartland applications,"
without "address[ing] the full range of activities the laws cover." *Id.* Indeed, plaintiffs' focus on a handful
of regulated items and their failure to adduce evidence pertaining to countless other items the Act restricts
"knocks out any entitlement to challenge" the statute. *Thayer v. City of Chicago*, 110 F.4th 1040, 1043 (7th
Cir. 2024).

*Rahimi*, 144 S. Ct. at 1902 (quoting *United States v. Hansen*, 599 U.S. 762, 781 (2023)). Here, plaintiffs fail to satisfy the heightened standard applicable to their challenges.

## II. Plaintiffs' proposed conduct is not protected by the Second Amendment's text.

The Second Amendment protects only certain conduct. At the Founding, the Second Amendment was understood by Americans to protect a pre-existing "right of self-preservation." *Heller*, 554 U.S. at 595 (quoting Blackstone's Commentaries). Since 2008, the Supreme Court has held that the Second Amendment protects an individual's right to keep and bear Arms for self-defense and, since 2010, that this protection extends against states' regulations as well. *Heller*, 554 U.S. at 635; *McDonald v. City of Chicago*, 561 U.S. 742 (2010). The Supreme Court has recognized that self-defense is "the central component of the right" protected in the text of the Second Amendment. *Heller*, 554 U.S. at 599. Similarly, when the Fourteenth Amendment was ratified and secured Second Amendment rights against state interference, it was "Congress's desire to enable the newly freed slaves to defend themselves against former Confederates." *Rahimi*, 144 S. Ct. at 1897 (citing *McDonald*, 561 U.S. at 771–76). Thus, the individual right "codified in the Second Amendment . . . secures for Americans a means of self-defense." *Id.* (citing *Bruen*, 597 U.S. at 17).

In *Bruen*, the Supreme Court laid out a methodology grounded in text, history, and tradition that courts should use to assess a Second Amendment claim. First, courts "decide whether 'the Second Amendment's plain text covers an individual's conduct.'" *Bevis*, 85 F.4th at 1191 (quoting *Bruen*, 597 U.S. at 24); *see also Bianchi v. Brown*, 111 F.4th 438, 445–46 (4th Cir. 2024) (en banc) ("[A] court first looks to the text of the Second Amendment to see if it encompasses the desired conduct at issue."); *Ocean State Tactical v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024) ("[W]e first consider whether 'the Second Amendment's plain text covers' the possession of LCMs [large

capacity magazines].'" (quoting *Bruen*, 597 U.S. at 17)). The Supreme Court has emphasized that in interpreting the constitutional text, courts must be guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). "Normal and ordinary meaning" is that which would "have been known to ordinary citizens in the founding generation." *Id*. at 577. In other words, the text codified "a specific entitlement with a particular meaning in the ratifying public's consciousness, with baked-in prerogatives and qualifications alike." *Bianchi*, 111 F.4th at 447 (citing *Bruen*, 597 U.S. at 21). Therefore, any understanding of what the word "Arms" protects today must be grounded in history. *See Heller*, 554 U.S. at 595, 598; *Bruen*, 597 U.S. at 25 (endorsing "reliance on history to inform the meaning of constitutional text—especially text meant to codify a pre-existing right . . . .").

Plaintiffs here want to engage in conduct with various deadly weapons and accessories, and the parties dispute whether that conduct is protected by the text. Plaintiffs bear the burden to establish that the instruments they seek constitute protected "Arms." *Bruen*, 597 U.S. at 24; *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 23-cv-710, 2024 WL 3466482, at *7 (D. Vt. July 18, 2024); *Rupp v. Bonta*, No. 17-cv-746, 2024 WL 1142061, at *9 (C.D. Cal. Mar. 15, 2024); *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 89 (D. Conn. 2023); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 888 n.4 (D. Or. 2023); *Ocean State Tactical v. Rhode Island*, 646 F. Supp. 3d 368, 374 (D.R.I. 2022), *aff'd on other grounds*, 95 F.4th 38 (1st Cir. 2024). Plaintiffs fail to meet that burden for *any* of the items with which they want to engage in prohibited conduct and thus their claims fail at the first step of the *Bruen* inquiry. First, large capacity magazines and assault weapon attachments do not constitute Arms because they are accessories, not bearable

arms. Second, all the regulated items do not qualify as Arms because they are more like military-grade weaponry than arms for individual self-defense.

### A. Large capacity magazines and attachments are unnecessary accessories.

The *Barnett*, *Harrel*, and *Langley* plaintiffs challenge the Act's restrictions on large capacity magazines, while the *FFL* plaintiffs challenge the Act's restriction on assault weapon attachments (i.e., devices designed to attach to firearms to convert them into assault weapons). Neither constitutes a protected "Arm" because they are accessories.

Historical evidence regarding the meaning of 'arms' shows that ordinary people did not use this word to refer to accessories during the Founding and Reconstruction eras. The Supreme Court has used Founding Era dictionaries to define "Arms" as "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581. The distinction between weapons and accessories was familiar to "ordinary citizens in the founding generation." *Cf. id.* at 577. During the ratifying eras, ammunition storage containers, cartridge boxes, and cartouch boxes were referred to as "accoutrements," not arms. FOF ¶ 510 (citing Report of Dennis Baron). Similarly, "arms" did not refer to attachments such as flints, holsters, and shields, or weapons parts such as the hilt of a sword. *Id*; *see also Ocean State Tactical*, 646 F. Supp. 3d at 387–88 (relying on Dr. Baron as an authority on the historical difference between "Arms" and "accoutrements"); *Capen v. Campbell*, 708 F. Supp. 3d 65, 88 (D. Mass. 2023) (same).

A magazine is a receptacle that holds the firearm's ammunition (cartridges or shells) before it is fed into a firearm's chamber. FOF ¶ 40. Magazines are commercially available in many different sizes for the same firearm. FOF ¶¶ 353, 358–359, 409–410, 435. Large capacity magazines are a subset of magazines that are commercially available. FOF ¶¶ 358–359, 435.

Magazine capacity does not affect the operability of a firearm. FOF ¶ 357. Firearms designed to use large capacity magazines will function with smaller magazines. *Id*; *see also Kotek*, 682 F. Supp. 3d at 912 ("[W]hile magazines may often be necessary to render a firearm operable, LCMs are not."). Assault weapon attachments are similarly optional. Attachments like a folding stock can alter how a weapon is used or concealed, but they are not required for a firearm to fire nor do they themselves fire. *See* FOF ¶ 107 (describing folding stocks).

This Court should find, as other courts have, that large capacity magazines are optional accessories and not protected by the text of the Second Amendment. *See, e.g.*, *Kotek*, 682 F. Supp. 3d at 923; *Capen*, 708 F. Supp. 3d at 88; *Ocean State Tactical*, 646 F. Supp. 3d at 388. A large capacity magazine is not a "weapon of offence," and "like other accessories to weapons, [is] not used in a way that 'cast[s] at or strike[s] another.'" *Ocean State Tactical*, 646 F. Supp. 3d at 386–87 (quoting *Heller*, 554 U.S. at 582).

This Court also should find that assault weapon attachments are not "Arms." This Court would join the overwhelming consensus of courts to find that accessories are not "Arms" within the Second Amendment. *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (silencers); *Second Amendment Arms v. City of Chicago*, No. 10-c-4257, 2024 WL 3495010, at *7 (N.D. Ill. July 22, 2024) (laser sights); *United States v. Cooperman*, No. 22-cr-146, 2023 WL 4762710, at *1–2 (N.D. Ill. July 26, 2023) (silencers); *Cox v. United States*, No. 11-cr-22, 2023 WL 4203261, at *7 (D. Alaska June 27, 2023) (silencers); *Miller v. Garland*, 674 F. Supp. 3d 296, 313–14 (E.D. Va. 2023) (stabilizing braces); *United States v. Villalobos*, No. 19-cr-40, 2023 WL 3044770, at *11–12 (D. Idaho Apr. 21, 2023) (silencers); *United States v. Saleem*, 659 F. Supp. 3d 683, 695–98 (W.D.N.C. 2023) (silencers); *United States v. Royce*, No. 22-cr-130, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) (silencers). Firearms can effectively be used without

attachments. *See, e.g.*, *Second Amendment Arms*, 2024 WL 3495010, at *10 ("[A] firearm remains an effective weapon without a laser sight attached and thus a laser sight is not a weapon protected by the Second Amendment.") (cleaned up); *Saleem*, 659 F. Supp. 3d at 698 ("A firearm is effective as a weapon of self-defense without the use of a silencer . . . ."). Here, Illinois residents have been operating and will continue to operate firearms in self-defense without large capacity magazines or assault weapon attachments.

### B.  None of the restricted items are like the "Arms" protected by the text.

Collectively, the plaintiffs challenge the Act's restrictions on assault weapons, assault weapon attachments, .50 caliber rifles and cartridges, and large capacity magazines. None of these items are protected "Arms" because they are much more like weapons that have not been historically protected by the Second Amendment's text than weapons that have been.

When an individual right to arms was first recognized in *Heller*, that right was limited to certain arms. Specifically, *Heller* held that the Second Amendment confers an individual right to keep and bear "Arms" for self-defense and thus protected the respondent's right to keep and bear a handgun. *Heller*, 554 U.S. at 625. But *Heller* also recognized that right "extends only to certain types of weapons." *Id.* at 623 (discussing *United States v. Miller*, 307 U.S. 174 (1939)). Among the weapons outside its scope are (1) weapons that are "not typically possessed by law-abiding citizens for lawful purposes," such as short-barreled shotguns; *id.* at 625, and (2) weapons that are "most useful in military service," such as "M-16 rifles and the like," *id.* at 627. *Heller* elucidated that the text of the Second Amendment in the 18th century was meant to protect the sorts of small arms citizens possessed at home for personal self-defense. *Id.* at 627–28; *see also Bevis*, 85 F.4th at 1192–93 (applying *Heller*).

But *Heller* is not unique for recognizing that not all firearms are protected "Arms." The understanding that some arms fall outside of the meaning of "Arms" in the Second Amendment's text is reflected in judicial opinions that long predate *Heller*, such as in *United States v. Miller*, 307 U.S. 174 (1939) (short-barreled shotguns). After *Heller*, courts continued to apply this historical understanding of the text's scope by finding some bearable arms are not Arms. *See, e.g.*, *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3d Cir. 2016) (machineguns); *Hollis v. Lynch*, 827 F.3d 436, 447–51 (5th Cir. 2016) (same); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (same); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (same); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (same).

Nothing in *Bruen* changed this historical limitation on the text. *See, e.g.*, *United States v. Dixon*, No. 22-cr-140, 2023 WL 2664076, at *2–3 (N.D. Ill. Mar. 28, 2023) (handgun modified for automatic fire not protected); *DeWilde v. United States*, No. 23-cv-3, 2023 WL 4884582, at *5–7 (D. Wyo. July 17, 2023) (M16 rifle); *United States v. Simien*, 655 F. Supp. 3d 540, 546 (W.D. Tex. 2023) (pistols modified with switches); *Miller v. Garland*, 674 F. Supp. 3d at 315 (E.D. Va. 2023) (short-barreled rifles); *Royce*, 2023 WL 2163677, at *2–4 (D.N.D. Feb. 22, 2023) (same); *United States v. Rush*, No. 22-cr-40008, 2023 WL 403774, at *1–3 (S.D. Ill. Jan. 25, 2023) (modified AR-15 rifle); *United States v. Woznichak*, No. 21-242, 2023 WL 7324442, at *8–9 (W.D. Pa. Nov. 7, 2023) (short-barreled shotgun). Again, this is because "the Arms the Second Amendment is talking about are weapons in common use for self-defense." *Bevis*, 85 F.4th at 1192; *see also Bruen*, 597 U.S. at 32 (discussing weapons "'in common use' today for self-defense"); *Heller*, 554 U.S. at 624 (describing "arms 'in common use at the time' for lawful purposes like self-defense") (quoting

26

*Miller*, 307 U.S. at 179); *Birmingham*, 2024 WL 3466482, at *5 ("[T]o presumptively qualify for Second Amendment protection, the relevant weapons must be commonly used for self-defense.").

The Seventh Circuit has thrice considered whether weapons and accessories restricted by the Act here fall outside the historical meaning of "Arms," and thrice declined to find such weaponry protected. In *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), the court found assault weapons and large capacity magazines were not protected by the constitutional text. Four years later, in *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), the court declined to revisit this conclusion. And four years after that, in addressing the four appeals filed in these cases along with two others with which they were consolidated, the Seventh Circuit found that the items restricted by this Act were not protected Arms. *Bevis*, 85 F.4th at 1192–97.[38]

The Seventh Circuit made a preliminary assessment that the Illinois legislature was entitled to conclude that "assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Id.* at 1195. Plaintiffs fail to undermine that assessment. Rather, the record developed since *Bevis* confirms that the weapons restricted by the Act were designed for military use and are far more lethal than arms ordinary people use for individual self-defense. Thus, the regulated instruments do not fall within the historical reach of "Arms."

### 1.  Items restricted by the Act were designed for military combat.

The items restricted by the Act were initially designed, or patterned after those initially designed, for militaries. The commercial versions available today are not materially different from

---

[38] At page 1183, the *Bevis* court made clear that for readability its opinion uses the word "assault weapon" to refer to not only what the Act defines as an assault weapon, but also assault weapon attachments, .50 caliber rifles, and .50 caliber cartridges. At times, this brief similarly uses "assault weapons" to include .50 caliber rifles or "assault weapons and large capacity magazines" to refer to all challenged items.

their military counterparts.

> ### a.   "Assault rifles" were designed for and employed by militaries around the world.

In the middle of the 20th century, a new category of firearms emerged to meet the offensive needs of militaries—assault rifles. The first was the German military's Sturmgewehr ("StG") 44. FOF ¶¶ 35–36. "Sturmgewehr" means "storm rifle" or "assault rifle." FOF ¶ 35. The StG 44 adopted a potent combination of features that other "assault rifles" would carry forward. FOF ¶¶ 46, 48–49. It used a gas operating system which enabled a higher rate of fire than bolt-action rifles. FOF ¶ 38. Built with steel stampings, the weapon also was lighter and more mobile. FOF ¶ 38. Its ammunition had the power and range needed for combat, but was lighter than other rifle ammunition so soldiers could carry more of it. FOF ¶ 39. The assault rifle's 30-round magazine was more than triple the capacity of contemporary combat rifles, like the American M1 Garand, which had an 8-round magazine. FOF ¶¶ 40, 60. The external and detachable nature of its "box" magazine provided soldiers with the ability to rapidly reload. FOF ¶¶ 38, 106. It also had features to manage recoil. The ease of managing recoil—the rearward and upward impulse generated by firing—affects a weapon's combat effectiveness because recoil management is critical to accurately placed follow-on shots. FOF ¶ 211. To reduce recoil, the StG 44 incorporated a barrel shroud and pistol grip that was separate from the butt stock. FOF ¶ 38; *see also id.* ¶¶ 46, 108, 213–214, 216, 219.

The StG 44 influenced the design of the AK-47, an assault rifle developed for the Soviet military in 1947. FOF ¶¶ 42–44, 46. The AK-47 carried forward many of the StG 44's features including: a gas-powered operating system; a detachable magazine; a separate pistol grip; a separate shoulder stock; a barrel shroud or foregrip; and use of lighter-weight steel stampings. FOF ¶¶ 38, 46.

The U.S. military adopted its own assault rifle after a dispute within the military establishment over caliber of ammunition. FOF ¶¶ 52–97. A firearm designer named Eugene Stoner built the first AR-15 in 1957 in response to a request from General Willard C. Wyman. FOF ¶ 71–72. The AR-15 used bullets that would become known as 5.56mm NATO caliber ammunition. FOF ¶¶ 74, 91, 155, 157. As Stoner explained to Congress, these smaller caliber, high velocity bullets "payoff so much in wound ballistics" because they "immediately go unstable" when they hit something, like a human body. FOF ¶¶ 68–69. These rounds not only had a greater wounding potential than the military's previous ammunition, but they also provided significant logistical benefits: Troops could carry more of them and shoot for longer duration. FOF ¶ 70.

The AR-15 was a marked improvement in American firearms technology. First, it incorporated a direct gas impingement operating system invented by Stoner. FOF ¶¶ 75–76. This system, which continues to be a defining characteristic of AR-style firearms today, uses a portion of the gas propelling the bullet down the barrel to cycle another round into the chamber. FOF ¶ 76. Unlike a bolt-action rifle, where the shooter manually cycles the bolt with a handle to make the firearm ready to fire again, the operation of the action in an AR-15 takes place automatically and is part of the gun's operating system. FOF ¶ 76. Second, it incorporated design features from the StG 44 and AK-47. As with those assault rifles, the AR-15 used a detachable "box" magazine to carry ammunition—initially 20 rounds but later 30 rounds in most military magazines. FOF ¶¶ 80, 205. AR-15 rifles also incorporated features that helped manage recoil to keep the rifle on target during repeat fire: a pistol grip, flash suppressor, and forward grip. FOF ¶ 213.

The AR-15 first demonstrated its effectiveness on the battlefields of Vietnam in 1962. Units deploying the AR-15 in combat found the "AR15 rifle to be an outstanding weapon with phenomenal lethality." FOF ¶ 81. It caused "the abdominal cavity" of an enemy soldier to

"explode," decapitation with "one round in the head," and the severing of limbs. FOF ¶¶ 82–85. After news spread of the shocking damage AR-15s could inflict, the U.S. military purchased more. In 1962, the Air Force began procuring the rifles. FOF ¶ 86. Soon after, the Army procured 85,000. FOF ¶ 87. By the end of 1963, the Army had given the AR-15 its official military designation: the M16. FOF ¶ 88. By 1968, U.S. military branches had procured more than a million, and the M16 became the standard small arm for all U.S. forces. FOF ¶ 89.

Since its adoption in the 1960s, the AR-15/M16 platform has provided a highly effective combat weapon for the U.S. military. FOF ¶ 93. U.S. troops have carried the M16 or its shorter version, the M4, in every conflict since the Vietnam War, including the wars in Afghanistan and Iraq. FOF ¶¶ 93–97. Today, most of the U.S. Army continues to carry the M4. FOF ¶ 97.

### b.  Assault weapons and large capacity magazines provide the same lethality to civilians as to the military.

While manufacturers were making AR platform rifles for the U.S. military, they also were making semiautomatic versions to sell commercially. The year after the Army adopted the AR-15 as the M16, Colt produced a semiautomatic AR-15 for the civilian market. FOF ¶ 206. When the U.S. military adopted a new M16 variant (A2) in the 1980s, Colt released a new AR-15 variant (A2) and promised consumers: "All of the guns in the AR-15A2 series have features consistent with the M16A2[.]" FOF ¶ 101. Commercially available weapons today incorporate the same core design features as their military counterparts: They can shoot small-caliber but high-velocity bullets like 5.56mm NATO, they use Stoner's direct gas impingement operating system, they have detachable large capacity box magazines, and they have features to manage recoil like a pistol grip, a flash suppressor, and a barrel shroud and/or an additional forward grip. FOF ¶¶ 213–219. Manufacturers even use the same manufacturing equipment to create parts for military and commercial rifles. FOF ¶ 152.

When manufacturers sell assault weapons to the public, these firearms have the same performance characteristics as their military counterparts.[39] The typical caliber of an AR-platform rifle is 5.56mm NATO—the same caliber used by the M16 and M4. FOF ¶¶ 155–157. The typical muzzle velocity of a civilian AR-15 firing this caliber of ammunition matches the muzzle velocity of an M16—around 3,100 feet per second—three times the speed of a typical pistol. FOF ¶¶ 160, 162–163. The velocity and energy of a typical AR-15 or M16 bullet enable a shooter to penetrate a steel helmet 600 yards away. FOF ¶ 189. Both the AR-15 and M16 use 30-round magazines that allow shooters to shoot uninterrupted for longer periods with fewer reloads. FOF ¶¶ 204–205, 207. When one 30-round magazine has been exhausted, the time to reload an AR-15 is the same as for an M16. FOF ¶ 207. The net effect is also the same: The wounds inflicted by rounds fired from an M16 are identical to the wounds inflicted by an AR-15. FOF ¶ 169.

Users of military and civilian versions of AR rifles know them to function identically in semiautomatic mode too. For example, when plaintiffs' expert Jeffrey Eby needed to test military-grade ammunition for a manufacturer designing optics for military rifles, Eby used his "civilian" AR-15 rifles to conduct the testing. FOF ¶¶ 276–278. Specifically, he was able to replicate the velocities of the bullets the U.S. military listed for M4 and M16 rifles with his AR-15s. FOF ¶ 278. Similarly, Lt. Col. Dempsey testified at trial that he and members of his unit from Afghanistan purchased semiautomatic Sig Sauer 516s to commemorate their deployment because these assault weapons were "functionally equivalent" to the M4s they had carried in Afghanistan. FOF ¶ 280.

---

[39] At times, plaintiffs have insinuated that it is legally significant whether a firearm meets military specifications, i.e., "MIL SPEC." *See, e.g.*, FOF ¶¶ 276–277. It is not. When the federal government purchases items en masse they often issue lengthy specifications that vendors must meet. While these specifications must be met for procurement purposes, the testimony of the military witnesses on the functional differences between military and civilian assault weapons demonstrate that "MIL SPEC" is not a meaningful indicator of a weapon's lethality, *see, e.g.*, FOF ¶¶ 276–278, 280, nor is it a meaningful way of differentiating weapon types for purposes of constitutional analysis.

Firearms manufacturers have exploited this equivalence in marketing and selling the AR-15's "combat-proven" design to the public. FOF ¶¶ 122, 128–129. U.S. troops famously carried M16 and M4 rifles in combat in wars in Afghanistan and Iraq, FOF ¶ 125, and Plaintiff NSSF's former president remarked on the effect of these wars on commercial sales of AR-style rifles: "There has never been a better accidental advertising campaign in history." FOF ¶ 126.

The removal of the automatic or burst firing modes from commercial AR rifles has not stripped them of their militaristic capabilities. The parties' three military experts (Eby, Tucker, and Dempsey) all testified that the military trains troops to use their M16s and M4s on semiautomatic mode. FOF ¶¶ 220–221, 226. The Marine witnesses could recall only isolated incidents where burst or automatic modes were used in combat, while the Army expert could not recall any tactical scenario that arose during his 22-year career in which any of the thousands of soldiers under his leadership needed to use an M4 or M16 in burst or automatic firing modes. FOF ¶¶ 222, 226, 242. Even plaintiffs' expert Randy Watt, who was permitted at trial to share his personal recollections about his time with the National Guard,[40] admitted that he only ever saw the M16 shot on automatic mode "a handful of times," FOF ¶ 224, and never saw M4s fire on burst, FOF ¶ 225. The military experts consistently testified that the military rarely uses the M16 or M4 in automatic or burst because those modes are less accurate than semiautomatic, FOF ¶¶ 220, 230, 232–233, and they

---

[40] Plaintiffs did not disclose any opinions from Watt regarding the use of firearms by the U.S. military, and he testified during his deposition that he did not intend to offer any opinions about firearms other than those discussed in his report. ECF 232-24 (report); ECF 232-13, Watt Dep. 110:7–9. Nonetheless, at trial Watt was permitted (over the State's objection) to testify regarding the nature of military training on an M4 and the "infantry standard practices" for rifle-carrying members of the U.S. infantry. Trial Tr. 379:18–380:19; 381:13–382:23. The State reasserts its objections to Watt's opinions on the military use of firearms. This nondisclosure denied the State's expert witnesses Dempsey and Tucker the opportunity to rebut Watt's opinions and prevented the State from challenging their admissibility under *Daubert* and Federal Rule of Evidence 702. *See* ECF 229 at 3–7 (State's motion to exclude Watt's disclosed opinions for failure to apply reliable methods or cite any underlying data).

are more likely to make the rifle jam or otherwise malfunction, FOF ¶¶ 234–235. These problems explain why military troops use M16s and M4s on semiautomatic mode. FOF ¶¶ 220–221, 226. That the military predominantly uses M16 and M4s on semiautomatic mode is also why manufacturers can accurately market semiautomatic AR-15s to the public as "combat-proven." FOF ¶ 129.

### c. Regulations have targeted the militaristic features of assault weapons since they were first used to massacre civilians.

When AR rifles began to make American communities look like battlefields, they caught the attention of lawmakers.

Although a semiautomatic version of assault rifles first appeared in the civilian firearms market as early as 1964, AR-style and AK-style rifles were not immediately accepted by the firearms industry or the public. FOF ¶¶ 98, 124. Even three decades later in the early 1990s, they were estimated to constitute less than 1% of the total civilian gun stock. FOF ¶¶ 102, 118.

But in January 1989, a gunman killed five children and wounded 30 others with a semiautomatic AK-47 at a school in Stockton, California. FOF ¶ 103. Americans were shocked to learn that this Soviet military rifle was being sold commercially. In March of that year, President George H.W. Bush's administration halted the importation of military-style assault weapons. FOF ¶ 103. The administration banned importation of assault-type rifles that had a "military appearance," a "large magazine capacity," and were "semiautomatic version[s] of a machinegun." FOF ¶ 103. To identify which weapons were subject to the import ban, ATF was instructed to identify the features that distinguish modern military assault rifles from traditional sporting rifles. FOF ¶¶ 104–105. ATF issued a report explaining how each feature—*e.g.*, the ability to accept a detachable magazine, folding/telescoping stocks, pistol grips, flash suppressors, and grenade

launchers—served a military purpose without typically being found on a sporting rifle. FOF ¶¶ 106–110.

By 1994, it was clear that domestic production of military-style firearms meant that an import ban would not halt their proliferation, so Congress passed a ten-year federal assault weapons ban. FOF ¶ 111. Distinguishing the banned firearms from less potent semiautomatic weapons, the law defined assault weapons by their militaristic features. For example, the definition of "assault weapon" in the federal ban included semiautomatic rifles able to accept detachable magazines that also had two or more of the following: a folding or telescoping stock; a pistol grip; a bayonet mount; a flash suppressor or threaded barrel designed to accommodate one; or a grenade launcher. FOF ¶ 111. In addition to defining "assault weapons" based on features like those previously identified by the ATF, the federal ban also enumerated specific firearms included within the definition of prohibited "assault weapons"—including AR-15 and AK-47 rifles. FOF ¶ 112. Finally, the federal ban prohibited magazines with capacities greater than ten rounds. FOF ¶ 112.

After a mass shooting in Illinois, its legislature similarly decided to restrict weapons of war by passing the Act. Lawmakers did so not only by restricting specific AR rifles that are semiautomatic versions of the M16 and M4, but also by referencing features to ensure similarly militaristic weaponry was also restricted. The Act prohibits AK type rifles, which descend from the AK-47 designed for the Russian military to use in combat. *See* 720 ILCS 5/24-1.9(a)(1)(A) & (J)(i)–(ii); FOF ¶¶ 44, 291–293. The Act restricts .50 caliber rifles and their .50 BMG ammunition which were both developed for the military to use against vehicles and for sniping targets miles away. FOF ¶¶ 322, 327–328, 331, 533. The Act restricts semiautomatic versions of the submachineguns that "shower[ed] lead" on the battlefields of World War I and those that became a "mainstay of the Nazi war machine" in World War II. FOF ¶¶ 305, 312; *see also id.* ¶¶ 306–321.

34

The few pistols that the Act restricts as assault weapons have features that make them akin to AR or AK rifles. FOF ¶¶ 336–339, 349–353. The regulated shotguns are similarly tactical. FOF ¶¶ 367, 374–376. The regulated accessories either enable firearms to be converted into AR or AK-type weapons or enable the uninterrupted firepower for which assault weapons are designed. 720 ILCS 5/24-1.9(a)(3).

The record here confirms what other courts have found: Assault weapons are "military-style weapons of war, made for offensive military use." *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011); *see also Capen v. Campbell*, 708 F. Supp. 3d 65, 85 (D. Mass. 2023) ("Assault rifles were developed for modern military combat, not self-defense."). An AR rifle is "functionally identical to its military counterparts, the M16 and its carbine version, the M4, which have the same basic structure, operation, near-equivalent muzzle velocities . . . and rates of effective fire." *Capen*, 708 F. Supp. 3d at 85; *see also Bevis*, 85 F.4th at 1195 ("[T]he AR-15 is almost the same gun as the M16 machinegun."). Assault weapons, "including the AR-15, the AK-47, and the Barrett .50 caliber sniper rifle" are "military-style weapons designed for sustained combat operations." *Bianchi v. Brown*, 111 F.4th 438, 441 (4th Cir. 2024) (en banc). Large capacity magazines, too, were originally "popular in military settings, and indeed many of them were designed specifically for military (and law enforcement) use." *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 13 (D.D.C. 2023). Today large capacity magazines "sold to civilians are often the same LCMs used in the military." *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 922 (D. Or. 2023). The restricted items were made for military combat.

### 2. Their lethality far exceeds what is commonly used for self-defense.

The other unifying feature of the regulated items also underscores why they are not protected Arms: The lethality of these weapons far exceeds the level of firepower needed for

personal protection outside of war zones. In other words, the Act does not just target items because they were developed for a military use—that list would include GPS navigation, duct tape, or even cargo pants. No, the Act restricts weaponry that was developed for the military, weaponry the military trains troops to use to efficiently kill others in combat, and weaponry that enables a level of destruction well beyond what lawful self-defense permits.

Our Nation of laws has never allowed individuals to unleash an unlimited level of violence in the name of self-defense. Baked into Illinois law, like our Nation's laws, are the requirements of necessity, imminence, and proportionality when using force in self-defense. For example, the Illinois Criminal Code permits a person to use force "when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a). Additional criteria must be met, however, when deadly weapons are used because that amount of force "is intended or likely to cause death or great bodily harm." *Id*. This amount of force is justified "only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." *Id.* This Illinois code provision—which is not challenged by plaintiffs— reflects our Nation's long-standing common law principle that the amount of force one uses must be justified by the threat.

Illinois has long prohibited weapons that inflict a level of carnage not necessary for personal protection. For example, 720 ILCS 5/24-1(a)(3) prohibits tear gas projectors and bombs while (a)(7) prohibits machine guns and grenades. By adding offenses to Section 24-1(a), the Act reflects that the phenomenal lethality of assault weapons and large capacity magazines exceeds what is needed for individual self-defense. Indeed, elsewhere Illinois determined that not even its law enforcement officers should use the level of force exerted by certain assault weapon

attachments and .50 caliber rifles and cartridges. *See* 20 ILCS 2610/17c(b) (prohibiting Illinois State Police from purchasing and utilizing .50 caliber rifles, .50 caliber ammunition, and grenade launchers). Plaintiffs, inexplicably, believe they are entitled to greater firepower than what even the most highly trained and specialized state police officers can use.

The Illinois legislature's determination that these weapons are too deadly is supported by evidence in five ways. First, a single bullet fired from the restricted weapons can permanently destroy the human body. The energy release per bullet fired from an AR-15 is approximately 4 to 19 times greater than from handguns. FOF ¶ 172. The large kinetic energy and force produced by assault weapons means that their bullets create a larger cavity in a human body. FOF ¶ 169. In laboratory testing, the temporary cavity created by a bullet fired from an AR-15 was significantly larger than the cavity caused by handguns. FOF ¶ 173. These effects are amplified because the high-energy bullets used by both AR-15s and M16s tend to "yaw" (rotate sideways) and fragment inside the body, causing greater injury to adjacent tissue and organs. FOF ¶¶ 69, 170–171. This damage is magnified in children's bodies given their more compact vital organs. FOF ¶ 174. Thus, in school shootings, the percentage of children who die after being shot is tragically high. FOF ¶ 175 (100% in Sandy Hook, 80% in Uvalde). Meanwhile, plaintiffs have not presented any evidence that suggests this level of mutilation is needed for Americans engaging in lawful self-defense.

Second, the restricted weapons—like their military counterparts—are designed to inflict this enormous damage from immense distance. According to the U.S. Army, the effective range for both AR-15s and M16s to hit a human-size target is between 460 and 550 meters, or about 500 to 600 yards. FOF ¶ 180. Meanwhile, a bullet fired by a .50 caliber rifle can travel up to 4.5 miles. FOF ¶ 328. By comparison, a 9mm handgun has an effective range of 0 to 50 yards. FOF ¶ 185.

Civilian self-defense encounters typically occur within 5 to 7 yards. FOF ¶ 398. Plaintiffs have not shown that Americans need to hit targets hundreds of yards away—or miles away—to engage in lawful self-defense.

Third, the damage a single bullet can cause to a body and these weapons' ability to fire them from long ranges combine to pose intolerable risks of overpenetration when fired in American homes and communities. For example, the M855 bullet, the round used by the U.S. military in Iraq and Afghanistan and readily available for civilian purchase for use in AR-15 rifles, can penetrate a 3/8-inch-thick steel plate. FOF ¶ 189. Indeed, the U.S. military initially selected the M855 after testing demonstrated it would penetrate a steel helmet at 600 meters. FOF ¶ 189. The U.S. Army's current ammunition for M4s, the M855A1, is available to purchase and use in civilians' AR-type rifles and it can penetrate car doors, body armor, and concrete masonry. FOF ¶¶ 190–191. Thus, if an assault weapon was fired in a close-range self-defense scenario, walls would be insufficient to protect other household members or neighbors. Meanwhile, plaintiffs have not shown that Americans need to penetrate steel plates for lawful self-defense.

Fourth, the destruction a single bullet from the restricted weapons can cause, at prolonged distances, is multiplied because features on assault weapons manage recoil to allow a shooter to smoothly shoot additional bullets in rapid succession. As plaintiffs' own expert witnesses admitted at trial, features referenced by the Act to define assault weapons all serve the same purposes on a military M4 and M16 as they do on a civilian AR-15—managing recoil. FOF ¶ 219 (a pistol grip, a barrel shroud, a flash suppressor, and a vertical foregrip); *see also* FOF ¶¶ 214–217. These features are typical of AR-pattern rifles. FOF ¶ 213. Thus, an assault weapon shooter can comfortably fire one bullet after another, each threatening to create permanent cavities in a human body, regardless of whether that body is close or not to the shooter.

38

Fifth, the damage of a series of bullets fired in rapid succession across long distances is compounded by large capacity magazines. A rapid succession of fire pauses briefly when the magazine is empty and needs to be switched. The use of 30-round magazines allows shooters to shoot uninterrupted for longer periods and to take more shots with fewer reloads. FOF ¶¶ 38, 106, 207, 353, 478. For example, in Highland Park, a shooter used 30-round magazines to fire approximately 83 shots in under a minute. FOF ¶ 3. Plaintiffs have not shown that this amount of uninterrupted firepower is needed for lawful self-defense. Rather, the only empirical evidence in the record regarding the number of bullets an ordinary citizen needs for self-defense is from economist Lucy Allen.[41] Her review of incidents showed that, on average, defenders fired 2.2 shots. FOF ¶ 379. Of the incidents in Illinois, there were no incidents where the defender was reported to have fired more than 10 shots. FOF ¶ 379.

Assault weapons, like the military weapons from which they originated, are designed to efficiently kill or maim large numbers of people from a long range and in a short period of time. Given this excess of firepower, it is unsurprising that numerous federal courts have held that assault weapons and .50 caliber rifles are not "Arms" protected by the Second Amendment's right to arms for individual self-defense. *See, e.g.*, *Viramontes v. County of Cook*, No. 21-cv-4595, 2024 WL 897455, at *8 (N.D. Ill. Mar. 1, 2024); *Grant v. Lamont*, No. 22-cv-1223, 2023 WL 5533522, at *6 (D. Conn. Aug. 28, 2023); *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 103 (D. Conn. 2023). Like Illinois, other states have prohibited assault weapons due to their "combination of power, rapidity of fire, concealability, and high magazine capacity." *Rupp v. Bonta*, No. 17-cv-746, 2024 WL 1142061, at *14 (C.D. Cal. Mar. 15, 2024). And as the Fourth Circuit summarized:

---

[41] The State separately filed a motion to preclude consideration of the study of William English, which is an unreliable, non-peer-reviewed paper that plaintiffs have cited to this Court and relied on in appellate briefing. ECF 223.

"What brings [assault weapons and .50 caliber rifles] beyond the scope of the Second Amendment together, and what separates them from the handgun, is their ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection." *Bianchi*, 111 F.4th at 451. The "catastrophic" injuries from assault weapons that can be "inflicted with precision from hundreds of yards away—go far beyond the reasonable requirements of self-defense." *Capen*, 708 F. Supp. 3d at 86–87. That is both why some states and localities have opted to restrict them, and why such arms are not protected by the historical Second Amendment right.

Similarly, virtually every court to consider whether large capacity magazines should be constitutionally protected because they are used for self-defense has found that they should not. *See, e.g.*, *Ocean State Tactical v. Rhode Island*, 646 F. Supp. 3d 368, 388 (D.R.I. 2022) ("There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not."), *aff'd on other grounds*, 95 F.4th 38; *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 23-cv-710, 2024 WL 3466482, at *39 (D. Vt. July 18, 2024) ("The expected number of shots required for self-defense is easily allowed by Vermont's LCM limit, and it is exceedingly rare for an individual to need to use more than 10 rounds."); *NAGR v. Lamont*, 685 F. Supp. 3d at 98 (finding no persuasive evidence that LCMs "are commonly used or are particularly suitable for self-defense"); *Hanson*, 671 F. Supp. 3d at 16 ("LCMs fall outside of the Second Amendment's scope because . . . they are not in fact commonly used for self-defense."); *Kotek*, 682 F. Supp. 3d at 897 ("[T]his Court finds that the features unique to LCMs—the ability to shoot more than ten bullets without reloading—are not 'commonly used . . . for self-defense.'") (citing *Bruen*, 597 U.S. at 38).

### C.  Plaintiffs' ahistorical interpretations of the text must be rejected.

Plaintiffs seek to divorce history from the Second Amendment's text. They do not want the Court to consider the reason why "Arms" are protected, nor do they want the Court to consider how the items they seek today are dissimilar from traditional tools for self-defense. Instead, they ask the Court to find the textual inquiry satisfied in one of two ways: (1) by asserting subjective preferences about how they want to prepare for future, hypothetical self-defense scenarios, or (2) by pointing to production numbers suggesting millions of some items have been sold to American consumers recently. Binding precedent forecloses both approaches.

### 1.  The Second Amendment right is not a right to "any weapon whatsoever."

Plaintiffs refuse to acknowledge a limitation on which firearms and accessories are protected by the text of the Second Amendment. For example, *FFL* plaintiffs want to sell and acquire .50 caliber rifles and their cartridges, which are "powerful enough 'to disable or destroy military targets such as armored personnel carriers, radar dishes, communication vehicles, missiles, aircraft, bulk fuel and ammunition storage sites.'" *Bianchi*, 111 F.4th at 453 (quoting the report of an American Bar Association special committee on gun violence). Plaintiffs' military expert testified that a .50 caliber rifle would be his last choice for self-defense at home, FOF ¶ 329, while plaintiffs' self-defense expert does not train anyone to use .50 caliber firearms in self-defense, FOF ¶ 334. But an *FFL* plaintiff testified that he sold them and would continue to do so if not for the Act, and a *FFL* plaintiff member wants to acquire one. Pulaski Decl. (ECF 204) ¶¶ 3(G), 4(A), 5(A); Vandermyde Decl. (ECF 209) ¶ 7(b). Meanwhile the *Barnett, Harrel*, and *Langley* plaintiffs want to sell and acquire all large capacity ammunition feeding devices restricted by the Act regardless of capacity. In plaintiffs' view, *all* firearms and accessories deserve

presumptive constitutional protection. This position contradicts binding decisions of the Supreme Court and the Seventh Circuit.

The Supreme Court has repeatedly emphasized that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 21; *Rahimi*, 144 S. Ct. at 1897. When *Heller* recognized an individual right to keep and bear Arms, it did so in reliance on a historical tradition that itself makes clear that right did not extend to all weapons:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.

*Heller*, 554 U.S. at 626; *see also Rahimi*, 144 S. Ct. at 1897; *Bevis*, 85 F.4th at 1189.

Plaintiffs would like to sell and acquire the strongest weapons available. But by claiming their personal desires (or fears) should define the contours of constitutional text, plaintiffs want "Arms" to cover "any weapon whatsoever." *Heller*, 554 U.S. at 626. No court has ever held that the text of the Second Amendment is so capacious. Constitutional text cannot be defined by "subjective intentions such that if enough individuals filled out a survey stating that they owned high powered shotguns or niche sniper rifles for the purpose of self-defense, that would" grant those weapons constitutional protection. *NAGR v. Lamont*, 685 F. Supp. 3d at 87; *see also Rupp*, 2024 WL 1142061, at *16 n.17. Instead, the Second Amendment requires courts to engage in line-drawing about what constitutes an "Arm" to ensure "that a nuclear weapon such as the now-retired M388 Davy Crockett system, with its 51-pound W54 warhead, can be reserved for the military, even though it is light enough for one person to carry"—and even if a plaintiff declares they would use it for self-defense. *Bevis*, 85 F.4th at 1182.

**2.  Sales trends do not define constitutional text.**

The Supreme Court has repeatedly told courts not to employ an ahistorical analysis when considering the text of the Second Amendment. *Bruen*, 597 U.S. at 19 ("*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history."); *see also Ocean State Tactical*, 95 F.4th at 51 ("Despite plaintiffs' fixation on the ownership rates . . . such statistics are ancillary to the [historical] inquiry the Supreme Court has directed us to undertake."). Accordingly, the Seventh Circuit has held that the meaning of the constitutional text "Arms" cannot be based on the current popularity of an arm. *Bevis*, 85 F.4th at 1198–99; *see also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[R]elying on how common a weapon is at the time of litigation would be circular . . . ."). Other jurists agree. *See, e.g.*, *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 213 (3d Cir. 2024) (Roth, J., concurring) ("A law's constitutionality cannot be contingent on the results of a popularity contest."). Basing constitutionality on popularity would have "anomalous consequences." *Bevis*, 85 F.4th at 1199. For example, in 1994, the Federal Assault Weapons Ban "made civilian possession of AR-15s (among other assault weapons) unlawful," and "few civilians owned AR-15s." *Id.* But after the legislation expired in 2004, "these weapons began to occupy a more significant share of the market." *Id*. If the constitutional inquiry were tied solely to commercial circulation numbers, "the federal ban would have been constitutional before 2004, but unconstitutional thereafter." *Id*. Similarly, the constitutionality of the federal anti-machinegun statute (which *Heller* confirmed) would depend on that statute's continued existence.

Not allowing sales to define constitutional rights makes good sense for another reason too: They tell us little about how many people are buying these goods or why. Instead, plaintiffs' production numbers may reflect that sellers are marketing customizable items to a niche group of

43

firearms owners who collect multiple weapons and accessories. *See, e.g.*, Norman Decl. (ECF 200) ¶¶ 4, 5, 10 (plaintiff who owns at least nine assault weapons and wishes to acquire more). It is undisputed that selling assault weapons has become a profitable enterprise. But jumps in demand occur for products even when "needs" may not have changed. Take, for example, surges in demand for Stanley cups, Lululemon leggings, or Rolex watches. Plaintiffs here include manufacturers and retailers that are profit-driven businesses who want to follow a similar sales trajectory. But like the growth of the market for water bottles, athleisure clothing, and luxury watches, a jump in AR-15 sales alone tells us nothing about which consumers are buying more of them or why. Indeed, it is difficult to infer anything from assault weapon sales estimates given the phenomenon of "panic buying," FOF ¶¶ 135–138, and the fact that some sellers tell customers that buying more assault weapons will persuade courts they cannot be banned, FOF ¶ 147. Similarly, the capacity sizes of magazines sold by manufacturers tell us what they think is profitable to sell—not who is buying them or why. [42]

Plaintiffs may point to a survey that purports to estimate how many Americans own assault weapons. Setting aside the unreliability of that estimate, *see* ECF 223 (moving to preclude consideration of the William English survey), ownership rates are not evidence of use. *See Birmingham*, 2024 WL 3466482, at *24 ("[M]ost of Plaintiffs' evidence goes to the common ownership of guns and LCMs. But 'common ownership' is different from 'common use for self-defense,' which is what *Bruen* mandates.") The Supreme Court has never "suggested that the constitutionality of arms regulations is to be determined based on the ownership rate of the

---

[42] Plaintiffs appear to advocate for allowing manufacturers and retailers to decide which detachable magazines receive constitutional protection by deferring to whatever size they market as "standard." *See* Hood Decl. (ECF 199) ¶ 5 (declaring that "standard-capacity magazines" are what the Act defines as large capacity ammunition feeding devices). Courts should not interfere with a state legislature's authority to regulate dangerously lethal accessories and give authority to manufacturers and retailers to produce whatever size accessories they want to designate as "standard."

weapons at issue, regardless of its usefulness for self-defense." *Ocean State Tactical*, 95 F.4th at 51.

In sum, this Court should resist plaintiffs' calls to ignore the historical meaning of the text. As other courts have recognized when presented with plaintiffs' popularity arguments, plaintiffs' "proposed application of a 'common use' standard would effectively ignore an important underpinning of *Bruen*: that the meaning of the Second Amendment should be grounded in text, history, and tradition, not shifting modern attitudes, and that its protection should be categorical." *Capen*, 708 F. Supp. 3d at 78 (citing *Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring)).

### III. The Act is consistent with the Nation's history and tradition of regulation.

Even if this Court were to find that assault weapons and large capacity magazines are protected under the text of the Second Amendment, which they are not, plaintiffs' claims fail at *Bruen*'s second step, which asks whether the Act is "consistent with the Nation's historical tradition of firearm regulation." *Bevis*, 85 F.4th at 1191 (quoting *Bruen*, 597 U.S. at 24). At this step, the Court must consider whether there are "representative historical analogue[s]" of the modern regulation. *Id.* at 1192 (quoting *Bruen*, 597 U.S. at 30). A modern regulation need not "precisely match its historical precursors," however. *Rahimi*, 144 S. Ct. at 1898. To "pass constitutional muster," the modern regulation "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). The question is whether the historical precursors are "'relevantly similar' to laws that our tradition is understood to permit." *Id.* (quoting *Bruen*, 597 U.S. at 29). Relevant similarity has two dimensions: first, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense," and second, "whether that burden is comparably justified." *Bruen*, 597 U.S. at 29. Put another way, the Court must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* In some cases, historical analogies are "relatively

simple to draw." *Id*. at 27. But when a modern regulation implicates "unprecedented societal concerns or dramatic technological changes," *id.*, this task becomes more "challenging," and "'may require a more nuanced approach'" *Bevis*, 85 F.4th at 1191 (quoting *Bruen*, 597 U.S. at 27).

Our Nation has a long and deeply rooted regulatory tradition of limiting access to and use of categories of weapons when they present new kinds of danger. *See Bevis*, 85 F.4th at 1199 (noting the "long-standing tradition of regulating the especially dangerous weapons of the time"); *Bianchi*, 111 F.4th at 464 (finding a "venerable tradition" in which "legislatures, since the time of our founding, have responded to the most urgent and visible threats posed by excessively harmful arms with responsive and proportional legislation"). Coinciding with this tradition is another: allowing the military or law enforcement to access and use specialized weaponry for offensive or tactical uses while restricting such weapons for civilian use. *See Bevis*, 85 F.4th at 1202 ("[T]here is a long tradition, unchanged from the time when the Second Amendment was added to the Constitution, supporting a distinction between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use.").

The Act is relevantly similar to historical regulations that reflect both traditions. Like regulations in prior eras, the Act restricts civilians from using certain weaponry to protect public safety while preserving access to arms for self-defense.

### A. The Act responds to unprecedented societal concerns.

This Court should take a "nuanced approach" when comparing the Act to historical regulations because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27–28. Assault weapons and large capacity magazines are modern inventions causing

a recurring modern nightmare: mass-casualty shootings perpetrated by lone gunmen. Regulations like the Act respond to these challenges.

Assault weapons and large capacity magazines represent dramatic technological changes from the weaponry of the ratifying eras. Compared to the muskets of 1791 or the Colt revolvers or Winchester repeating rifles of 1868, the weapons and magazines regulated by the Act are terrifyingly efficient killing machines. Before the combination of self-chambering and detachable magazines that led to the emergence and eventual proliferation of automatic and semiautomatic weapons in the early 20th century, repeat fire was a comparatively slow operation. FOF ¶¶ 509, 520, 530. The near-instantaneous swapping of a modern 30-round magazine is materially different from manually re-filling each chamber of a Colt revolver, individually inserting rounds into a Winchester repeating rifle, or loading a single musket ball down a muzzle in half a minute. *See* FOF ¶¶ 509, 520, 530. And these weapons' fast access to large amounts of ammunition is coupled with dramatic changes across multiple other dimensions: rate of fire, power, range, sustained accuracy, and, ultimately, lethality. *See, e.g.*, FOF ¶¶ 172–177, 492, 508–509, 530. These differences have tragic implications: The Highland Park shooter could not have inflicted the same carnage in a minute with a musket, a Colt revolver, or a Winchester repeating rifle as he did with his AR-15 and 30-round magazines. Indeed, "[t]he features of modern assault weapons— particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality— along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably comparable." *Capen*, 708 F. Supp. 3d at 83.

While this sea change in weaponry was greeted as "phenomenal" for the military's offensive uses, FOF ¶ 81, it has led to unprecedented safety threats at home. In Colonial times, the firearms owned by Americans—muskets and fowling pieces—were infrequently associated with

criminal violence. FOF ¶ 492. They were not typically stored ready to fire because of the risk of corrosion, and this reduced the likelihood of impulsive use. FOF ¶ 492. Given that they were heavy and single-shot, FOF ¶ 508, they also could not easily be wielded to murder a crowd of civilians quickly. It took at least half a minute to load a muzzle-loaded weapon if the weapon was clean and if powder, wadding, and shot were at hand. FOF ¶ 509. Thus, "Founding-era society faced no risk that one person with a gun could, in minutes, murder several dozen individuals." *Ocean State Tactical*, 95 F.4th at 49. But in the last two decades, mass shootings have come to threaten Americans' everyday lives at school, places of worship, work, and everywhere in between. There is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948. FOF ¶ 438. But in the 18 years following the expiration of the federal assault weapon ban in 2004, there were twenty double-digit-fatality mass shootings—a frequency rate of one incident every 0.9 years. FOF ¶ 442. Worse, mass shootings committed with assault weapons and large capacity magazines are becoming more lethal, involving more shots fired, and increasing in frequency. FOF ¶¶ 444–469.

At the same time, the proliferation of assault weapons and large capacity magazines has hampered law enforcement's ability to prevent and respond to active shooters. Most standard-issue ballistic vests provided to uniformed law enforcement officers are not rifle-rated and do not protect against the 5.56mm NATO caliber bullets commonly used in AR platform firearms. FOF ¶ 192. During the shooting at Robb Elementary in Uvalde, Texas, law enforcement waited precious minutes to intervene because of a lack of body armor and other protection against the shooter's AR-15. FOF ¶ 193. The long-range capability of these weapons makes it difficult for even the best-trained and most-resourced law enforcement officers to secure locations. *See Bianchi*, 111 F.4th at

475 n.9 (Gregory, J. concurring) (noting that a former President was nearly assassinated with an AR-15 at a campaign event).

In addition to the increasing threats posed by mass shooters, large capacity magazines are driving up the shooting lethality rate—i.e., the odds that a shooting will result in a fatality—in Chicago and other large cities. FOF ¶¶ 470–478. Chicago's shooting lethality rate has risen markedly in recent years—from 12.65% in 2010 to 18.89% in 2023. FOF ¶ 471. At the same time, the number of high capacity (15–29 rounds) and extremely high capacity (30 rounds or more) magazines recovered at shootings by the Chicago Police Department has increased more than sixfold. FOF ¶ 473. An analysis by Professor Jens Ludwig has shown that this increase in large capacity magazine use, in connection with the proliferation of illegal Glock switches (devices that modify semi-automatic weapons to fire automatically), is driving the change. FOF ¶ 477. Thus, while no plaintiffs here challenge it, the Act also added a subpart to the Illinois criminal code to prohibit accessories that increase the rate of fire for semiautomatic firearms, such as Glock switches. 720 ILCS 5/24-1(a)(14).

The Act must be analyzed in the context of an unprecedented societal concern that is being fueled by specific weaponry. The Act responds to the need to protect communities from the increasing threat of a single individual equipped with an assault weapon and large capacity magazines murdering dozens in a matter of minutes, if not seconds, and bringing entire communities to a halt. As the Fourth Circuit observed when explaining why it would take a nuanced approach to analyze Maryland's assault weapons law:

> Certainly it would have been shocking to the Framers to witness the mass shootings of our day, to see children's bodies 'stacked up like cordwood' on the floor of a church in Sutherland Springs, Texas; to hear a Parkland, Florida high school student describe her classroom as a 'war zone' with 'blood everywhere'; to be at a movie in Aurora, Colorado when suddenly gunfire erupted, leaving bodies strewn and blood on seats, blood on the wall, blood on the emergency exit door'; to run past

> 'shoes scattered, blood in the street, bodies in the street' while bullets blazed
> through the sky in Dayton, Ohio; to watch law enforcement officers encounter 'a
> pile of dead children' in Sandy Hook, Connecticut; to stand next to one of those
> officers as he tried to count the dead children, but 'kept getting confused,' as his
> 'mind would not count beyond the low teens.'

*Bianchi*, 111 F.4th at 463. This Court should join other courts in concluding that mass shootings

using assault weapons and large capacity magazines are an unprecedented societal concern. *See,*

*e.g.*, *id.*; *Rupp v. Bonta*, No. 17-cv-746, 2024 WL 1142061, at *33 (C.D. Cal. Mar. 15, 2024); *Or.*

*Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 924 (D. Or. 2023); *Del. State Sportsmen's Ass'n v.*

*Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 599 (D. Del. 2023); *Nat'l Ass'n for*

*Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 107 (D. Conn. 2023); *Hartford v. Ferguson*, 676 F.

Supp. 3d 897, 907 (W.D. Wash. 2023).

### B. Legislatures have long regulated weapons associated with increased or novel violence.

The Supreme Court has recognized our country's "historical tradition of prohibiting the

carrying of 'dangerous and unusual weapons'"—a tradition derived from English law pre-dating

the Founding and subsequently incorporated into American law. *Heller*, 554 U.S. at 627 (quoting

4 W. Blackstone, Commentaries on the Laws of England 148–49 (1769)); *see also Bruen*, 597 U.S.

at 21; *id.* at 81 (Kavanaugh, J., concurring) ("[N]othing . . . should be taken to cast doubt on . . . the

historical tradition of prohibiting the carrying of dangerous and unusual weapons."); *Rahimi*, 144

S. Ct. at 1897 (discussing tradition of "bann[ing] the carrying of 'dangerous and unusual

weapons'"). The Seventh Circuit recognized the relevance of that tradition for the Act. *Bevis*, 85

F.4th at 1190 (recognizing the "long-standing tradition of regulating the especially dangerous

weapons of the time, whether they were firearms, explosives, Bowie knives, or other like

devices"). In each era, American legislatures regulate categories of weapons when their

proliferation among civilians coincides with escalating or novel forms of violence. The nature of the regulation is defined by the danger posed by the technology.

Colonies, and then states, regulated weapons when they were used to cause terror and commit crime. Categorical restrictions on specific dangerous or unusual weapons appeared in the American colonies as early as the 17th century. FOF ¶ 488. For example, a 1686 New Jersey law restricted concealed carrying of "any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons" because they induced "great fear and quarrels." FOF ¶ 488. Legislatures also adopted "affray" laws similar to the 14th century Statute of Northampton, which prohibited going armed with "dangerous or unusual weapons" to the terror of the public. FOF ¶ 489. For example, a 1786 Virginia statute said that "no man" should "go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county." FOF ¶ 490. Overall, early America had a diverse tradition of regulating weapons for public safety. FOF ¶ 492. While categorical regulations of firearms were not as widespread at the time, the Constitution "does not require States to regulate for problems that do not exist." *Burson v. Freeman*, 504 U.S. 191, 207 (1992). Homicide among colonists was rare, and homicide by firearm was rarer still. FOF ¶ 492. That began to change in the first half of the 19th century. FOF ¶ 493.

Antebellum era legislatures responded to soaring homicide rates in southern and frontier states that were driven by increased ownership of concealable weapons such as fighting knives. FOF ¶ 493. Bowie knives and similar fighting knives were invented in the 1820s and gained notoriety in the 1830s as they became widely used to ambush, bully, and intimidate law-abiding citizens, and to seize advantage in fist fights. FOF ¶¶ 494–495. Legislatures responded to this burgeoning violence with categorical restrictions. FOF ¶ 497; *see also id.* ¶¶ 498–502. In the 1830s, at least seven states enacted laws barring the carrying of Bowie knives and throughout the

remainder of the 19th century and into the early 20th century, every state plus the District of Columbia restricted Bowie knives with either state-wide restrictions or local legislation. FOF ¶ 497. This regulatory focus on knives was driven by their disproportionate lethality: "At that time, Bowie knives were considered more dangerous than firearms[.]" *Ocean State Tactical*, 95 F.4th at 48.

Meanwhile, another technological invention also took hold in the 19th century, lead to unacceptable violence, and spurred regulation—percussion cap pistols. FOF ¶ 503. In the 1810s, inexpensive pistols were developed that could be discharged with percussion caps, allowing them to be carried loaded for longer. FOF ¶¶ 503–504. The proliferation of these concealable percussion cap pistols helped propel an upward trend in homicides, and guns started to be involved in a much higher percentage of homicides in the first half of the 19th century than they had been before. FOF ¶ 505. In response, legislatures passed laws regulating pistols. Between 1813 and 1838, at least six states enacted prohibitions on carrying certain concealable weapons, including pistols. FOF ¶ 506. Regulations restricting the concealed carry of pistols proliferated throughout the remainder of the 19th century. FOF ¶ 507; *see also Rupp*, 2024 WL 1142061, at *29 ("[S]tates passed over twenty laws during the late-eighteenth and early-nineteenth century banning the possession, sale, and/or manufacture of dangerous and unusual weapons, including pocket pistols, slungshots, and metallic knuckles."). Because regulations of knives and pistols were responding to how civilians were misusing these weapons, some explicitly exempted law enforcement or members of the military. FOF ¶¶ 550–558.

In the post-bellum period, the diffusion into society of another technology—revolvers—contributed to escalating violence and led to similar regulations. FOF ¶ 523. Revolvers were invented in the 1830s and were the first firearms to reliably allow shooters to fire more than one

bullet without reloading. FOF ¶ 518. They did not proliferate in society until after the Civil War. FOF ¶ 522. After revolvers became the weapon of choice for men to conceal to ambush romantic partners, kill law enforcement, and engage in shootouts in bars, streets, and churchyards, FOF ¶ 523, regulation followed. By the turn of the 20th century, at least 12 states and territories had enacted laws including revolvers on the list of weapons subject to carry prohibitions; at least another five had followed suit by 1917. FOF ¶¶ 524–525. Even where states did not specifically add the term "revolver" to their statutes, revolvers were prohibited under catch-all terms. FOF ¶ 525. During this same period, explicit distinctions between civilians, on the one hand, and law enforcement or military, on the other, became more common in state and territorial law. FOF ¶ 554. Accordingly, more and more laws regulating weapons included exemptions for government agencies and officials. FOF ¶¶ 555–558.

At the end of the 19th century, the firing capacity of firearms leapt forward with the invention of automatic and semiautomatic firearms paired with changeable magazines. FOF ¶ 482. In the 1890s, semiautomatic and automatic weapons became available due to three technological innovations—self-loading mechanisms, smokeless powder, and detachable magazines. FOF ¶ 531. In the 1920s, these weapons began appearing in American society. FOF ¶ 482. These new technologies gave individuals or small groups the ability to kill large numbers of people in a short time. FOF ¶ 532. When they were used in high-profile crimes such as the St. Valentine's Day Massacre of 1929 in Chicago, a widespread regulatory response followed. FOF ¶¶ 533–534. At least 36 states enacted anti-machinegun laws, at least nine passed laws restricting semiautomatic weapons, and at least four passed laws that left ambiguity as to whether they applied to both. FOF ¶¶ 536–538. Some legislatures restricted semi- and fully-automatic weapons by focusing on the weapon's firing capacity—i.e., their ability to fire a certain number of rounds without reloading—

rather than the firing mode—i.e., the number of trigger pulls required to fire rounds. FOF ¶¶ 539–542.

By this time, the practice of distinguishing weapons restrictions for civilians from those for law enforcement and military was well established: When states passed laws regulating automatic and semiautomatic firearms during the 1920s and 1930s, every law exempted the U.S. military. FOF ¶ 559. While these 20th-century regulations post-date the ratifying eras, they demonstrate a continued tradition of regulating dangerous and unusual weapons that "reinforc[es] our understanding" of the Second Amendment's original meaning. *Rahimi*, 144 S. Ct. at 1924 (Barrett, J. concurring) (cleaned up); *see also Bruen*, 597 U.S. at 35–36 (later history is relevant when there is a "regular course of practice" that "liquidate[s] & settle[s]" the meaning of the Constitution and does not contradict the text).

Today, the pattern of invention, commercial proliferation, concerning criminal use, and regulatory response is repeating. Firearms technology took another leap forward with the invention of assault rifles equipped with detachable large capacity magazines in the mid-20th century. FOF ¶¶ 33–92. Assault weapons and large capacity magazines began trickling into civilian society in the following decades. FOF ¶ 102. Their high-profile use in the growing number of mass shootings in recent decades has drawn a regulatory response. In 1989, California banned assault weapons. FOF ¶ 483. In 1994, Congress banned them for ten years. FOF ¶ 483. In 2023, Illinois enacted the Act. FOF ¶ 484. Like historical categorical weapons restrictions, the Act exempts law enforcement and members of the military. 720 ILCS 5/24-1.9(e). Today, fourteen states plus D.C. and numerous localities restrict assault weapons and/or large capacity magazines. FOF ¶ 485.

The Act continues the through line from regulations of "fighting knives" and pistols in the 18th and 19th centuries, to revolvers in the latter half of the 19th century, to machine guns and

large capacity semiautomatic guns in the early 20th century, to assault weapons and large capacity magazines in the late 20th and early 21st centuries. The scope of these regulations was commensurate with the danger posed by the technology—whether concealed-carry prohibitions on single-shot pistols to outright possession bans on powerful machine guns. The limitations the plaintiffs challenge in the Act are consistent with this tradition.

### C. The Act comparably restricts access to weapons that pose unacceptable threats to public safety while preserving access to arms for self-defense.

The Act is consistent with historical tradition under the metrics set forth by *Bruen*. The regulatory burden is comparably justified. The Act's purpose is the same one that has motivated countless previous legislatures: protecting public safety by limiting access to weapons linked to novel forms of criminal violence. *See Bevis*, 85 F.4th at 1200 (the Act "advance[s] similar purposes" to those underlying historical regulations). As explained above, the emergence of assault weapons and large capacity magazines as mass shooting instruments is a recent phenomenon that has inflicted unprecedented death and injury in communities across the country. These tragedies have shown that "[s]emiautomatic firearms fitted with LCMs are highly effective weapons of mass slaughter." *Ocean State Tactical*, 95 F.4th at 48. The frequency of these incidents is only increasing. FOF ¶¶ 439–442. In other words, the public safety justifications underlying the Act are nearly identical to those that prompted 18th, 19th, and 20th century legislatures to regulate categories of weapons associated with an increase in homicides attributable to specific weapons and other criminal misuse.

The Act's restrictions on weapons also impose a "comparable burden on the right of armed self-defense," *Bruen*, 597 F. 4th at 3, because in reserving assault weapons and .50 caliber rifles for the military and law enforcement, "[m]any other weapons remain" available to Illinois residents for self-defense purposes, *Bevis*, 85 F. 4th at 1201. As explained above, the weapons

regulated by the Act are designed for combat. *Supra* Section II.B.1. Their defining characteristics allow them to fire dozens of rounds rapidly and accurately across long distances, while inflicting injuries that destroy organs and kill children. *Id.* These features are unnecessary for self-defense, *supra* Section II.B.2, but have been used by mass shooters to inflict untold harm on innocent victims in Illinois and other communities across the country. At the same time, there is no evidence that assault weapons are commonly used for self-defense. Instead, evidence shows that handguns are overwhelmingly preferred for self-defense scenarios, FOF ¶ 386, which typically occur in close quarters and in circumstances where individuals benefit from their concealable nature or ease of handling. And because the Act preserves access to a vast array of handguns, rifles, and shotguns, it is consistent with historical analogues in that it imposes restrictions on the dangerous and unusual instruments causing harm to the public while preserving the ability for Americans to own and carry other arms for self-defense. "These analogues include restrictions on the sale, carrying, concealment, brandishing, possession, and certain types of uses of certain weapons, in the form of taxes, fines, and criminal penalties." *Banta v. Ferguson*, No. 23-cv-112, 2024 WL 4314788, *11 (E.D. Wash. Sept. 26, 2024) (declining to preliminarily enjoin Washington's assault weapons law).

Nor do the Act's restrictions on large capacity magazines impair Illinoisans' ability to defend themselves—for two reasons. *First*, there is no evidence that self-defense scenarios require the amount of ammunition that the Act prohibits. As discussed *supra*, the only reliable empirical evidence in the record is from expert Lucy Allen. Allen found that in many defensive incidents no shots were fired and, when they were, 2-3 shots were fired on average. FOF ¶¶ 378–382. The Act restricts ammunition feeding devices with capacities greater than 10 rounds for long guns and 15 rounds for handguns. 720 ILCS 5/24-1.10(a). Allen's unrebutted testimony demonstrates that the lower capacity magazines permitted under the Act are more than adequate for self-defense. As

other courts have observed, "LCMs are very rarely used in self-defense. Accordingly, 'it reasonably follows that banning them imposes no meaningful burden on the ability of [citizens] to defend themselves.'" *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 23-cv-710, 2024 WL 3466482, at *14 (D. Vt. July 18, 2024); *see also Ocean State Tactical*, 95 F.4th at 45.

*Second*, the Act does not limit the number of magazines that can be purchased or possessed. As the Seventh Circuit observed:

> Anyone who wants greater firepower is free under these laws to purchase several magazines of the permitted size. Thus, the person who might have preferred buying a magazine that loads 30 rounds can buy three 10-round magazines instead.

*Bevis*, 85 F.4th at 1197. This Court should join other courts that have concluded that similar limitations on magazine capacity "impose[] virtually no burden on self-defense." *Capen*, 708 F. Supp. 3d at 92; *see also Ocean State Tactical*, 646 F. Supp. 3d at 397 ("To the extent that the statute, by prohibiting LCMs, diminishes the shooting ability of the person holding the firearm, it is truly *de minimis*. The law puts no limit on the number of ten-round magazines an owner may have at her feet at any one time.").

In conclusion, the Act is constitutional under our Nation's longstanding tradition of regulating "dangerous and unusual" weapons. *See Bruen,* 597 U.S. at 21; *Rahimi*, 144 S. Ct. at 1897; *Heller*, 554 U.S. at 627. These regulations have limited the sale, possession, and use of such weapons since the Colonial era. *Bevis*, 85 F.4th at 1190, 1199–1200. In each era, legislatures imposed restrictions on the sale, possession, or use of categories of weapons to respond to the type of harm that those weapons presented when their proliferation had caused escalating or novel forms of violence. And legislatures reserved certain of these "especially dangerous" weapons to the military and law enforcement while ensuring that "[m]any other weapons remain that are more universally available" for civilian self-defense. *Bevis*, 85 F.4th at 1201. The Supreme Court has

emphasized that a modern statute's mechanism of regulation need not "precisely match its historical precursors." *Rahimi*, 144 S. Ct. at 1898. Here, the Act fits comfortably within the historical tradition: It responds to mass shootings and the untenable risks to public safety by restricting the particular tools fueling these threats.

## IV. The optional registration process easily survives rational basis review.

Although the Act generally prohibits possession of assault weapons, assault weapon attachments, .50 caliber rifles, and .50 caliber cartridge devices, 720 ILCS 5/24-1.9(c), the "grandfathered individuals" exemption allows a person to possess these items if the person satisfies three conditions. First, the person must have a FOID card. *Id.* 24-1.9(d). Second, the firearm or accessory in question must have been possessed by that person before January 10, 2023 (the date the Act went into effect). *Id.* Third, the person must have submitted this information, along with details regarding "the make, model, caliber, and serial number of the .50 caliber rifle or assault weapon," to the Illinois State Police in the form of an endorsement affidavit prior to January 1, 2024. *Id.* There are additional exceptions, which also require submitting an endorsement affidavit, for people who inherit, or move into Illinois with, a prohibited firearm or accessory. *Id.*

In *Bevis*, the Seventh Circuit panel unanimously agreed that plaintiffs had not shown that the Act's endorsement affidavit process burdened Second Amendment rights. *Bevis*, 85 F.4th at 1202, 1219. Like the "shall-issue" licensing schemes that the Supreme Court approved in *Bruen*, the Act's optional registration process is automatic and not subject to official discretion. *See Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). This requirement is therefore subject only to rational basis review, *Bevis*, 85 F.4th at 1202—a standard it easily surpasses.[43] Under rational basis

---

[43] The Act would survive even if a separate history and tradition analysis were required. Firearms registration requirements trace to the earliest days of the Colonial Era. By 1631 in Virginia, just two decades after the founding of Jamestown, the colony had a "muster" law requiring an annual accounting of "arms and munition" held by its inhabitants. 1631 Va. Acts 174, Acts of Feb. 24, 1631, Act LVI. Later, state

review, the State need only show that there is "a reasonably conceivable state of facts that could provide a rational basis" for the requirement. *Lukaszczyk v. Cook County*, 47 F.4th 587, 602 (7th Cir. 2022) (cleaned up). "Rational basis review is a heavy legal lift for the challengers" here because the Act "comes to court bearing a strong presumption of validity, and the challenger must negative every conceivable basis which might support it." *Id.* (cleaned up). Plaintiffs have not come close to carrying their burden.

The endorsement affidavit is a simple solution to an obvious problem. Some people are allowed to possess specific assault weapons, while others are not allowed to possess any at all. The affidavit allows law enforcement to distinguish lawful possession from unlawful activity. *See* 720 ILCS 5/24-1.9(d) ("a completed endorsement affidavit submitted to the Illinois State Police by a person under this Section creates a rebuttable presumption that the person is entitled to possess and transport the assault weapon"); *see also Bruen*, 597 U.S. at 38 n.9 (approving of firearms licensing regimes that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'"). Thus, the affidavit effectuates the rational legislative purpose to "balance" the public safety interest in "'limiting the number of firearms [ ] most likely to result in a mass shooting'" against Illinois residents' "reliance interest in retaining possession

---

legislatures imposed taxes on specific firearms, the collection of which necessarily required the firearms to be identified and disclosed to the government. For example, in 1856, North Carolina imposed a tax on "every pistol, except as used exclusively for mustering," that "at some time within the year" had been "used, worn or carried about the person of the owner[.]" 1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled 'Revenue,' ch. 34, § 23, pt. 4. Likewise, in 1867, Alabama imposed a tax "[o]n [a]ll pistols or revolvers in the possession of private persons not regular dealers holding them for sale," and on bowie knives. Revised Code of Alabama p. 169, Image 185 (1867). In 1918, Montana required "every person" within the state, "who owns or has in his possession any fire arms or weapons"—defined as "any revolver, pistol, shot gun, rifle, dirk, dagger, or sword"—to "make a full, true, and complete verified report" to the local sheriff of all such weapons he or she "owned," "possessed," or "control[ed]." 1918 Mont. Laws 6-7, 9, ch. 2, §§ 1, 3, 8). And, as noted in *Miller*, the National Firearms Act of 1934 imposed registration requirements for regulated firearms. *See* 307 U.S. at 175 n.1 (quoting, *inter alia*, § 5 of the National Firearms Act of 1934 (requiring owners of grandfathered weapons to register their weapons within 60 days by providing "the number or other mark identifying such firearm, together with [the owner's] name, address, place where such firearm is usually kept, and place of business or employment")).

of items legally acquired before such acquisition was prohibited." *Caulkins v. Pritzker*, 2023 IL 129453, ¶¶ 62-63; *see also Minerva Dairy v. Harsdorf*, 905 F.3d 1047, 1055 (7th Cir. 2018) ("[O]n rational-basis review the state does not need to present actual evidence to support its proffered rationale for the law, which can be based on rational speculation unsupported by evidence or empirical data.") (cleaned up).

The endorsement affidavit requirement survives rational basis review, and judgment should be issued in favor of the State Defendants on these claims too.

## V. Any injunction must be limited in scope and should be stayed pending appeal.

Plaintiffs are not entitled to a permanent injunction because they have not prevailed on their claims. If the Court disagrees, however, any injunction it enters must be limited in scope and should be stayed pending review by appellate courts.

A permanent "injunction issues 'only as necessary to protect against otherwise irremediable harm.'" *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021). Therefore, enjoining defendants from enforcing a provision of the Act against a plaintiff who has not challenged that provision, or who lacks standing to challenge it, "would violate the rule requiring courts to tailor injunctive relief to the scope of the violation found." *Nat'l Org. for Women v. Scheidler*, 396 F.3d 807, 817 (7th Cir. 2005). Any injunction must address each plaintiff individually—and may provide only the specific relief that plaintiff has proven an entitlement to. *Doe v. Rokita*, 54 F.4th 518, 519 (7th Cir. 2022) ("[R]elief should be no greater than necessary to protect the rights of the prevailing litigants.") In other words, the injunction may enjoin enforcement of only the specific provisions of the Act that the plaintiff has proven are causing an Article III injury. The injunction cannot simply enjoin defendants from enforcing the entirety of the Act against the plaintiffs as a group, irrespective of their standing.

Further, "plaintiffs lack standing to seek—and the [Court] therefore lacks authority to grant—relief that benefits third parties." *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). That means the Court cannot enjoin enforcement of the Act as to everyone in Illinois. Plaintiffs cannot avoid this rule simply because some are advocacy groups purporting to have thousands of members. These groups' standing to sue "is derivative of—and not independent from—individual standing." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021). As a practical matter, any injunction must identify exactly which members are being given relief so that defendants will know how to comply. Fed. R. Civ. P. 65(d)(1)(C) (injunction must "describe in reasonable detail . . . the act or acts restrained or required"); *see Warth v. Seldin*, 422 U.S. 490, 515 (1975) (when association seeks injunction it "will inure to the benefit of those members of the association actually injured").

Finally, any injunction should be stayed pending appeal—or at the very least for ten days while defendants seek relief in the Seventh Circuit. A stay will "minimize the costs of error" and is "necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on its merits." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). It will also be consistent with the Seventh Circuit's prior orders governing this case. That court already held that defendants are likely to prevail on the merits—meaning, at the very least, plaintiffs' claims present a close call. *Bevis*, 85 F.4th at 1202. What's more, the Seventh Circuit stayed the preliminary injunction this Court entered last year. *Id.* at 1187. The public will not benefit from another confusing period between an immediately effective order from this Court and a stay from the Seventh Circuit.

## CONCLUSION

The evidence before the Court shows that the challenged provisions of the Act are constitutional. For the foregoing reasons, the State Defendants request that the Court deny plaintiffs' requests for relief and enter four separate judgments in favor of the defendants in:

    a.  *Caleb Barnett, et al. v. Kwame Raoul, et al.*, No. 3:23-cv-00209;

    b.  *Federal Firearms Licensees of Illinois, et al. v. Jay Robert "J.B." Pritzker, et al.*, No. 3:23-cv-00215;

    c.  *Dane Harrel, et al. v. Kwame Raoul, et al.*, No. 3:23-cv-00141; and

    d.  *Jeremy W. Langley, et al. v. Brendan Kelly, et al.*, No. 3:23-cv-00192.

Dated: October 21, 2024            Respectfully submitted,

                            KWAME RAOUL
                            *Attorney General of Illinois*

                            /s/      Kathryn Hunt Muse

                            Christopher G. Wells, No. 6304265
                            Kathryn Hunt Muse, No. 6302614
                            Gretchen Helfrich, No. 630004
                            John T. Hazinski, No. 6329791
                            Michael M. Tresnowski, No. 6324767
                            Office of the Illinois Attorney General
                            115 S. LaSalle St.
                            Chicago, IL 60603
                            (312) 814-3000
                            kathryn.muse@ilag.gov

                            *Counsel to Defendants Governor Pritzker, Director Kelly, and Attorney General Raoul*