## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, *et al.*, <br> *Plaintiffs*, <br> v. <br> KWAME RAOUL, *et al.*, <br> *Defendants*. | Case No.  3:23-cv-209-SPM <br> ** designated Lead Case |
| DANE HARRELL, *et al.*, <br> *Plaintiffs*, <br> v. <br> KWAME RAOUL, *et al.*, <br> *Defendants*. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*, <br> *Plaintiffs*, <br> v. <br> BRENDEN KELLY, *et al.*, <br> *Defendants*. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS LICENSEES OF ILLINOIS, *et al.*, <br> *Plaintiffs*, <br> v. <br> JAY ROBERT "JB" PRITZKER, *et al.*, <br> *Defendants*. | Case No.  3:23-cv-215-SPM |

### PLAINTIFFS' JOINT RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO BAR CERTAIN OPINIONS OF PLAINTIFFS' EXPERTS

The Defendants have moved to exclude the opinions of ten of Plaintiffs' expert witnesses for failure to comply with the standards laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or because their opinions comprise improper rebuttal testimony. *See* State Defs.' Mot. to Bar Certain Expert Ops., Dkt. 229 (Sept. 13, 2024) ("Defs.' Mot."). The Defendants' motion is unfounded and must be denied.

**LEGAL STANDARDS**

"Any assessment of the admissibility of expert witness testimony begins with Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert*, as together they govern the admissibility of expert witness testimony." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). Under Rule 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if[:] … (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702. In applying Rule 702 and *Daubert*, this Court's task can be summarized as "ensur[ing] that the expert testimony at issue 'both rests on a reliable foundation and is relevant to the task at hand.' " *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000) (quoting *Daubert*, 509 U.S. at 597).

"An expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Although

> extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience. Accordingly, we consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.

*Trs. of the Chi. Painters & Decorators Pension, Health & Welfare & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787–88 (7th Cir. 2007) (citation and internal quotation marks omitted). When presenting expert testimony based on experience, the expert "must explain how [his] experience leads to the conclusion reached, why that

experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702, Advisory Committee Notes to 2000 Amendments. In other words, although testimony may not be based on "subjective belief or speculation," and the court cannot accept an expert's *ipse dixit*, as long as an expert has relevant experience and is able to explain "the 'methodologies and principles' that support his opinion," his testimony complies with *Daubert* and Rule 702. *Metavante*, 619 F.3d at 761.

Furthermore, it is important to consider the *Daubert* standard in context. Because this case is a bench trial, "the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting, and [the court] must take this factor into consideration." *Id.* at 760. The *Daubert* inquiry in this case is ultimately subservient to this Court's final determination about whether expert testimony is persuasive or helpful: "[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).

Finally, it is important to clarify exactly what is at stake under the Defendants' motion to exclude most of Plaintiffs' expert witnesses under *Daubert*. Both Federal Rule of Evidence 702 and *Daubert* are concerned with an expert's *opinions*. But in this case, as will be discussed with respect to specific experts below, there are relatively few opinions that are truly necessary to assisting the Court in assessing whether the Illinois ban on common firearms and firearm magazines is constitutional under the Second Amendment. There are, however, a wide variety of *facts* that this Court will need to sift through in making its decision. Facts regarding how the military uses certain firearms and firearm features, how civilians use certain firearms and firearm features, the history of firearm regulation in this country, and the commonality of the banned

firearms and firearm magazines are all core factual issues in this case. They are also, however, "legislative facts." Legislative facts, in contrast to adjudicative facts, or "facts concerning the immediate parties" to litigation, are general facts about the world that transcend the immediate parties but nonetheless "have relevance to legal reasoning … in the formulation of a legal principle or ruling by a judge or court." FED. R. EVID. 201, 1972 Advisory Committee Note to Subdivision (a). Such are the key facts in this case, which do not directly concern any of the parties beyond their ability to demonstrate standing to bring this lawsuit. *See Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011).

As relevant for purposes of the present motion,[1] the important thing to note about legislative facts, is that the Court's review of them is "unrestricted." FED. R. EVID. 201, 1972 Advisory Committee Note to Subdivision (a). It can find them anywhere, including, for example, in law review articles, "books and other documents not prepared specially for litigation or refined in its fires." *Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990). As a result, even if this Court were to conclude that any of Plaintiffs' experts do not pass muster under *Daubert*, there is nothing restricting this Court from reviewing the sources on which Plaintiffs' experts relied and relying on any facts relayed by those opinions or sources. For precisely this reason, a district court confronting a Second Amendment challenge to New Jersey's similar ban on certain firearms and ammunition magazines recently denied the parties' *Daubert* motions, simply because "it is within the Court's discretion and an exercise of its gate-keeping function to decide the issues presented to it based upon all information presented," so that

---

[1] For a broader discussion of how legislative facts are properly treated, *see* Pltfs' Opp'n to State Defs.' Mot. to Preclude Consideration of William English & NSSF Surveys ("Pltfs' Opp'n to Mot. to Preclude"), filed concurrently with this opposition.

ignoring potentially relevant information in any particular expert report was unjustifiable, and it was appropriate, instead, for the Court to "consider[] all the expert reports presented to it … [and] rel[y] upon the information it believes to be most credible in making this decision." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin*, --- F. Supp. 3d ----, 2024 WL 3585580, at *5 (D.N.J. July 30, 2024) ("*ANJRPC*"). This Court can, and should, resolve these motions in precisely the same way.

**ARGUMENT**

**1.  Randy Watt, David Lombardo, and Matthew Little**

The Defendants move to exclude testimony from Randy Watt, David Lombardo, and Matthew Little demonstrating that the banned firearms and magazines are commonly used by civilians for lawful purposes, objecting that this testimony is "not supported with any data or statistical analysis" but rather based on their experience, which they claim "is insufficient to draw conclusions about the nature of an entire product market." Dkt. 229 (Defs.' Mot.) at 3–4. The Defendants compare this testimony to the testimony at issue in *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, where an expert, based only on his experience with the market, attempted to estimate "the number of customers in San Juan who would have subscribed to DirecTV during the period 2002 through 2008, and second the percentage of those customers who would have used [defendant's product] instead." 395 F.3d 416, 418 (7th Cir. 2005); *see* Dkt. 229 (Defs.' Mot.) at 4–5. But this fundamentally misunderstands the nature of Watt, Lombardo, and Little's testimony. They have not testified to anything that "requires statistical evidence," Dkt. 229 (Defs.' Mot.) at 5, like the percentage of customers who might prefer one television service over another; nor have they attempted to estimate the actual size of the firearms market or the share of that market held by the banned firearms and magazines. Their testimony is both more modest and more directly useful to this Court than that.

5

Little, for example, has testified that (1) he is the owner and lead instructor of a company that provides firearms training nationwide, and (2) of the students in the various courses he and his company have offered, "most, if not all," use magazines and firearms that are banned by Illinois. *See* Dkt. 229-3 (Little Rep.) at ¶¶ 1, 6–7. This observation is significant, because Little has personally trained or observed the self-defense training of thousands of students. *Id.* ¶ 15. He further testified that his experience matches those of other instructors with whom he has discussed these issues. *Id.* ¶ 8. That experience is logically connected to and adequate to support Little's conclusions that the firearms and magazines Illinois has banned are common choices of the American public, including for the purposes for which he trains members of the public, like competitive shooting and self-defense. *Id.* ¶¶ 11–14.

The same is true for David Lombardo, who similarly did not attempt a scientific analysis of the size of the market for the banned firearms and magazines, but rather based his conclusion —that many banned firearms, including AR- and AK-platform rifles, and banned magazines are commonly owned for lawful purposes —on his "personal knowledge and many years of first-hand experience and observation." Dkt. 229-2 (Lombardo Rep.) at 1. His experience as an NRA- and Illinois-certified firearms instructor is adequate to support those conclusions, as he attested that he has seen "many hundreds (if not thousands)" of students choose AR-platform rifles alone for self-defense purposes, and that same experience instructing them in the use of those arms is adequate to support his conclusion that the firearm is well-suited for target shooting, home defense, and game hunting. *Id.*

Steven "Randy" Watt, who testified live at trial, also did not attempt a comprehensive assessment of the size of the firearm market, but testified as to the common and legitimate civilians uses of the banned firearms and magazines, based on broad personal experience

consisting of more than three decades in law enforcement, extensive military service (including three tours in Afghanistan and Iraq), and decades of work as a firearms trainer. Dkt. 229-1 (Watt Rep.) at ¶¶ 7–8. As relevant to the Defendants' motion, Watt testified that in the firearms instruction courses offered by his company (and in some instances, taught by Watt personally), students typically bring AR-platform rifles and pistols or semiautomatic shotguns that, even if not banned by name, would be banned by feature under PICA, *see* Dkt. 240 (9/18/2024 Trial Tr., Watt) at 412:5–21; 413:21–22; 432:22–433:5; 436:11–437:10; 439:16–440:16; Dkt. 229-1 (Watt Rep.) at ¶¶ 6–8, 11, 9–12, as well as magazines that are similarly banned, *see* Dkt. 240 (9/18/2024 Trial Tr., Watt) at 414:25–416:1; 429:24–430:13. That was true both for his classes and for classes taught by his competitors and contractors. *Id.* at 420:4–425:14. That background alone was enough to support his claim that the banned firearms and magazines are popular and well-suited for self-defense. Watt's opinion was also informed by publications he trusted and used to stay abreast of new developments in the firearms and firearms training industry—like *Gun Digest*—which evidenced that a wide variety of banned firearms and magazines were offered by a large number of manufacturers, confirming for him that the banned firearms and magazines are, in fact, broadly popular with consumers. Dkt. 229-1 (Watt Rep.) at ¶ 10, 11–12.

Ultimately, the Defendants' objection to all this testimony is that Plaintiffs' experts could not say *precisely* how many AR-15s or other banned firearms there are in the country. But even though it would have been, as Watt put it in his testimony, "hard to put any type of a hard number on" these things, Dkt. 240 (9/18/2024 Trial Tr., Watt) at 440:14–15, they could all very easily testify based on their significant experience that the firearms banned by Illinois are not rare or unusual weapons, but are instead very common choices of people hoping to be able to successfully defend themselves in the unfortunate event that they are confronted with the need to

do so. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). It is true that surveys and market research are other avenues to demonstrating the banned firearms are not "dangerous and unusual weapons," *see District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (quotation marks omitted), and in fact, such evidence corroborates the testimony of Little, Lombardo, and Watt, *see generally*, Pls'. Opp'n to Mot. to Preclude; Pls'. Proposed Findings of Fact ¶¶ 78–154. Indeed, the Defendants' own expert concedes that there are likely at least 14.1 million AR-15 rifle owners in this country, a statistical estimate that is broadly consistent with the experiences of Watt, Little, and Lombardo. *See* Dkt. 185-7 (Klaravas Rep.) at 20. But the Defendants cannot force Plaintiffs to prove their case *only* through statistics. That these experts testified through experience is not disqualifying.

### 2. Jeffrey Eby and Michael Musselman

The Defendants next move to exclude "Eby and Musselman's opinions asserting that automatic fire from standard-issue infantry rifles (e.g., M16, M4) is 'critical' in combat" on the ground that they "are not based on sufficient facts and data regarding real-world military conflicts, but rather on hypothetical combat scenarios in which they imagine automatic fire from these rifles would be useful." Dkt. 229 (Defs.' Mot.) at 8. It compares the testimony to an expert testifying in a personal injury case that an alternative design for a scaffold system could have prevented the injury, without testing the design first. *Id.* (citing *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 895 (7th Cir. 2011)). And again, the Defendants fault Eby and Musselman, like Little, Lombardo, and Watt, for not basing their opinions on "empirical testing or validation." *Id.* at 9.

None of these are valid grounds on which to exclude their testimony. Both Eby and Musselman are Marine gunners, weapons and tactics experts, by training. *See* Dkt. 234

(9/16/2024 Trial Tr., Eby) at 90:20–91:10; 103:23–104:5. Eby has personally developed training programs for each individual weapons system employed by the Marine Corps, which included prescribing appropriate training for infantrymen armed with a standard-issue infantry rifle. *Id*. at 91:16–92:8. Such training included (and still includes) instruction in how to use automatic fire in certain situations, including when clearing a trench, responding to a near ambush, carrying out an attack at night, or entering and clearing a room of enemy combatants. *Id*. at 92:19–93:7; 103:4–12. His testimony was also based on his experience writing "military doctrine," which he described as "a best practice scenario," taught to Marines to help them develop "a baseline [from which] to form their opinion" of how to proceed in a given scenario. *Id*. at 95:1–11; 95:25–96:4. His personal experience also included actual instances of infantry using automatic fire with standard-issue rifles (in some cases, at his direction), when performing room entries or attempting to suppress enemy movements. *Id*. at 123:17–125:5. And he testified that his opinion was influenced by studies conducted by the military that had convinced him of the importance of automatic fire as a component of an infantry rifle, noting, for instance, that automatic fire, deployed in a military situation where a target is taking cover, was able to increase the hit rate on the target, as compared to aimed semiautomatic fire. *Id*. at 127:12–129:23; 131:8–20. As a result, there is nothing hypothetical about Eby and Musselman's testimony regarding the importance of automatic fire for infantrymen or its use in combat, and their report and testimony is more than adequately backed up by their extensive experience.

Indeed, the testimony of the Defendants' expert, Colonel Tucker, confirms the testimony of Eby and Musselman on this score. Colonel Tucker generally burnished Eby's expertise. Dkt. 240 (9/18/2024 Trial Tr., Tucker) at 536:10–20 ("Gunner Eby is one of the finest infantrymen that ever wore the uniform. I have a tremendous amount of respect for the man."); *id*. at 546:25–

547:9 (agreeing that Eby "generally has more technical knowledge than [Tucker] would on an M-4, M-16"); Tucker Dep. at 17:13–14 (noting that as Marine gunners, Eby and Musselman are the real "expert[s] on the employment of weapon systems"). He also testified that in training, approximately 10 percent of training time with an M-16 is done in an automatic mode, Dkt. 240 (9/18/2024 Trial Tr., Tucker) at 519:2–5, that when he was in combat "there was a lot of use of unaimed automatic fire," and that there are "appropriate" circumstances for a soldier to "use that selective switch on automatic or burst," which comes down to a "tactical decision," made "based on a requirement for suppression versus the requirement for aimed fire," Tucker Dep. at 19:21–21:19. And he affirmed that he would not remove the automatic or burst fire capability from the standard-issue infantry rifle if he could, "[b]ecause in combat, options are life. And I would not want to take that option away from either that fire team leader, that squad leader, or that young Marine, that if he needs it, he has it," Dkt. 240 (9/18/2024 Trial Tr., Tucker) at 545:1–13.

The Defendants' other objections fare no better. They ask the Court to exclude Eby and Musselman's estimates of the practical sustained rate of fire for automatic and semiautomatic weapons because they are not "grounded in any data or the product of testing." Dkt. 229 (Defs.' Mot.) at 10. But Eby and Musselman explained that while a "cyclic rate" of fire can be known with the sort of specificity the Defendants desire, their conclusion was that an effective rate, in general, cannot be known with such specificity, because it depends upon too many variables. *See* Dkt. 229-6 (Eby & Musselman Rep.) at 10. And at trial Eby testified that even the manufacturer-listed effective rates of fire generally overstate semiautomatic fire capacity, because sustained fire at the listed rates would likely cause damage to the weapon. Dkt. 234 (9/16/2024 Trial Tr., Eby) at 166:13–168:5. Eby and Musselman's statements in their report, about the rates of fire they would expect novices to be able to achieve at given distances were not intended or presented

10

as an analysis of the technological capabilities of any given firearm—as they had already explained, such estimates are difficult if not impossible to make reliably—but rather reasonable expectations for novice shooters, estimates that their experience in training countless individuals to shoot more than qualified them to make.

The Defendants also seek to exclude "Eby and Musselman's opinions regarding the types of firearms used by every military in the world." Dkt. 229 (Defs.' Mot.) at 10. Eby and Musselman's testimony that they were "unaware of a single military in the world, let alone any branch of the U.S. military, that uses any semiautomatic-only rifles for general combat purposes," was also more than adequately explained by their experience. Dkt. 229-6 (Eby & Musselman Rep.) at 3. As Eby testified at trial, in addition to a detailed knowledge of the firearms used by the United States armed services, he had participated in bilateral training with over fifteen other militaries, not one of which used a semiautomatic only service rifle. Dkt. 234 (9/16/2024 Trial Tr., Eby) at 115:24–117:5. That experience is adequate to support Eby's testimony, which again, is confirmed, rather than refuted, by the Defendants' own expert, who admitted at trial that he was unaware of a military in the world that issues semiautomatic-only rifles to its infantry. *See* Dkt. 241 (9/19/2024 Trial Tr., Dempsey) at 623:21–624:2.

Finally, the Defendants move to exclude Eby and Musselman's testimony that the AR-platform rifle "is the best designed home defense weapon" on the grounds that they "did not perform a comprehensive comparison of the firearms available to civilians," again likening this to a case in which an expert failed to adequately compare proposed alternative product designs. Dkt. 229 (Defs.' Mot.) at 10 (quotation marks omitted). But Eby and Musselman do not have to prove that the AR-platform rifle is the best of all possible designs for a home defense firearm to suggest, as they have, that their experience in firing weapons at attackers has taught them that its

11

features make it "easier to employ, easier to reload, easier to hit a target without a careful aim, when the body alarm response is" making accurate fire difficult, than more traditionally styled firearms. Dkt. 234 (9/16/2024 Trial Tr., Eby) at 198:23–199:4; *see also id.* at 199:5–200:5. Such conclusions are directly and clearly related to their experience and admissible as expert testimony. *See Metavante*, 619 F.3d at 761.

### 3. James Ronkainen

The Defendants move to exclude much of the rebuttal report of James Ronkainen on the ground that his opinions are not proper rebuttal to the Defendants' experts Lucy Allen, Louis Klarevas, and Phil Andrew, and not based on sufficient data. Dkt. 229 (Defs.' Mot.) at 11. Neither of these objections is valid.

Under Rule 26, rebuttal reports must pertain to "the same subject matter" identified in the other party's expert reports. FED. R. CIV. P. 26(a)(2)(D)(ii). The Defendants wrongly claim that Ronkainen's rebuttal of Lucy Allen "presents entirely new and separate opinions that MSRs are 'suitably used for defense purposes,' " and urge that because "[t]he suitability of MSRs for self-defense is plainly part of Plaintiffs' case-in-chief," "Ronkainen's separate arguments about the usefulness of assault weapons for self-defense were required to be presented in an opening report."[2] Dkt. 229 (Defs.' Mot.) at 11. The whole premise of the Defendants' argument is wrong. "Rule 26 does not automatically exclude evidence that an expert could have included in [an] original report." *Bakov v. Consol. World Travel, Inc.*, No. 1:15-cv-02980, 2019 WL 1294659, at *11 (N.D. Ill. Mar. 21, 2019) (quotation marks omitted). Indeed, "whether evidence *could have been* offered in a case in chief does not mean it cannot properly be rebuttal evidence. Rather,

---

[2] As noted elsewhere, an "MSR" or "Modern Sporting Rifle," is another moniker used to describe modern, semiautomatic rifles, like the civilian AR- and AK-platform rifles.

evidence that … [provides] … 'additional support to an argument made in a case in chief' " can be offered as rebuttal evidence if it " 'also contradicts, impeaches or defuses the impact of evidence offered by the adverse party.' " *Pantaleo v. Hayes*, No. 1:08-cv-6419, 2011 WL 2517265, at *1 (N.D. Ill. June 23, 2011) (quoting *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008)). Furthermore, a rebuttal expert may refute an adverse expert's report by, among other things, offering a different perspective on the same topic; he is not required to merely quibble with the original expert's method of answering a question. "[I]f they are offered to contradict or rebut the other party's report, an expert may introduce new methods of analysis in a rebuttal report. Rebuttal reports can use, as well, additional data not found in the expert report, so long as it relates to the same subject matter." *Ernst v. City of Chicago*, No. 1:08-cv-04370, 2013 WL 4804837, at *2 (N.D. Ill. Sept. 9, 2013) (citation omitted).

Ronkainen's report followed these rules. It is true, as the Defendants claim, that the suitability of the banned firearms for lawful purposes like self-defense is part of Plaintiffs' case in chief—and through the expert reports of Watt, Little, and Lombardo (as well as voluminous additional evidence), Plaintiffs presented significant expert testimony on that topic in their case in chief. But that does not, of itself, make the topic inappropriate for rebuttal treatment as well where it is responsive to an opinion offered by an opposing expert. *Pantaleo*, 2011 WL 2517265, at *1. In her expert report, Allen sought to show, in part, that use of rifles in self-defense is a rare phenomenon. *See* Dkt. 185-8 (Allen Rep.) at ¶¶ 31–36. The clear upshot of Allen's testimony was that she disputes the prevalence and therefore the importance of the use of rifles for self-defense. Ronkainen sought to "defuse the impact of" Allen's analysis, *Peals*, 535 F.3d at 630 (quotation marks omitted), by approaching the same subject matter from a different angle and demonstrating, as an expert who had designed features of the banned firearms destined for the

commercial market, that both the manufacturers of the banned arms, and their consumers, were highly interested in their self-defense capabilities. Dkt. 229-9 (Ronkainen Rep.) at 2. To that end, Ronkainen testified that innovations in firearms technology that "had the added purpose to serve the demand for use of AR15 and AR10 platform MSRs for self and home defense purposes" spurred the investment of "millions of dollars and countless hours because of the high demand from the private commercial sector." *Id.* Such testimony tends to show that Allen's analysis of a database that, as she admits, "is not comprehensive but meant to 'highlight' stories of successful self-defense" does not show the true scope of the demand for, or use of, the banned rifles for self-defense. Dkt. 185-8 (Allen Rep.) at ¶ 33. It is therefore appropriate content for a rebuttal report.

Similarly, Ronkainen's rebuttal of Louis Klarevas's report, which attempted to poke holes in the wide variety of sources that demonstrate that both the firearms and magazines banned by Illinois are extremely common and popular choices among law-abiding consumers, is appropriate rebuttal evidence for this Court to consider. Among other claims, Klarevas said in his report that "[a]ll of the data pertaining to MSRs published by the NSSF point to the same conclusion: production and importation of MSRs is a very recent phenomenon." Dkt. 185-7 (Klarevas Rep.) at 15. Klarevas further claimed that data regarding rifle production compiled by NSSF was a poor guide in this case because its "estimate reflects the entire domestic stock, not the necessarily smaller subset of MSRs personally owned by private civilians." *Id.* at 21. Ronkainen, in his report, showed that, contrary to Klarevas's speculation about the limits of the data, his personal experience as Director of MSR New Product Development for Remington, DPMS, and Bushmaster demonstrated that, "MSR production volumes for lawful sales to civilians stayed robust year over year," going back at least to 2007. Dkt. 229-9 (Ronkainen Rep.) at 3–4. This testimony is *directly* responsive to Klarevas's report and tends to contradict and defuse the impact

14

of Klarevas's skepticism about relying on NSSF data. That Ronkainen does not spend significant time "describ[ing] or meaningfully engag[ing] with Klarevas's opinions" when offering his contrary ones is of no moment. A rebuttal expert need not even *cite* an adverse expert report, let alone describe it. *Pantaleo*, 2011 WL 2517265, at *2. And as noted above, a rebuttal expert is not limited to poking holes in an affirmative expert's thinking; he can offer evidence contrary to what was contained in an affirmative expert report. Holding otherwise " 'would impose an additional restriction on parties that is not included in the rules.' " *Ernst*, 2013 WL 4804837, at *2  (quoting *Deseret Mgmt. Corp. v. United States*, 97 Fed. Cl. 272, 274 (Fed. Cl. 2011)).

In a footnote, the Defendants claim that Ronkainen similarly does not properly rebut the opinion of "Phil Andrew that MSRs are a 'small fraction of firearms in private possession in the United States,' " because he "does not offer opinions (let alone data) regarding the proportion of assault weapons in the firearms market as a whole." Dkt. 229 (Defs.' Mot.) 12 n.8. As with the Defendants' objections to Little, Watt, and Lombardo's testimony, this argument amounts to nothing more than complaining that Ronkainen did not perform a task he was not assigned. Ronkainen did not need to (and did not claim to) provide statistical evidence to rebut Andrew's claim. Rather, Ronkainen testified that his personal experience directing the development of such firearms for Remington, including closely monitoring the market for such firearms, taught him that consumer demand for such firearms grew over time, and that such firearms remained a large share of the products manufactured by Remington's family of companies. *See, e.g.*, Dkt. 229-9 (Ronkainen Rep.) at 4–5; *see also* Dkt. 236 (9/17/2024 Trial Tr., Ronkainen) at 270:3–24 (discussing the time- and money-intensive investments Remington and its sister companies made in developing new products in this area). That testimony at a minimum "defuses the impact" of Andrew's and is admissible.

15

Finally, the Defendants object that, leaving aside rebuttal issues, Ronkainen's testimony should be omitted under *Daubert* because his assessment of the size of the market for banned rifles was "methodologically unsound," resulted from his personal experience as a player in the market rather than statistical analysis, and could not be reduced to specific numbers. Dkt. 229 (Defs.' Mot.) at 12–13. Again, an expert's opinion is not inadmissible under *Daubert* merely because it is based on experience or because the expert does not speak with the precision that the Defendants would prefer. Here, it would be difficult to imagine an individual with a better foundation for his assessment of the market for these firearms than Ronkainen. He testified at length at trial to all the ways in which he carefully monitored the market and sought to create firearms at Remington that would be well received by consumers. *See, e.g.*, Dkt. 236 (9/17/2024 Trial Tr., Ronkainen) at 274:9–275:12 (describing attending industry events and soliciting feedback from consumers); *id.* at 278:5–18 (describing changes made to meet customer needs). This experience, combined with his intimate knowledge of Remington's business (and that of its related companies and competitors), *see, e.g.*, *id.* at 287:1–289:8 (discussing AR-15 rifles manufactured by Remington, Bushmaster, and DPMS), his attention to the market through Gun Digest, *see id.* at 310:7–312:13, and his review of ATF data, *see, e.g.*, *id.* at 312:14–320:14, was more than enough to support his conclusion that "MSR production volumes for lawful sales to civilians stay[ed] robust year over year[,]" *id.* at 312:14–19.

### 4. Stephen Helsley

The Defendants move to exclude the testimony of Stephen Helsley on the grounds that he is not qualified to opine on "the history of firearms regulation" and that, methodologically, he fails to conduct "a thorough review of the pertinent historical record." Dkt. 229 (Defs.' Mot.) at 14 (quoting *Burton v. Am. Cyanamid*, 362 F. Supp. 3d 588, 607 (E.D. Wis. 2019)). Neither

objection has merit. First, as to the content of Helsley's report, again, the Defendants' complaint is that Helsley has failed to accomplish something he never set out to do. Though the Defendants suggest he should have performed "a thorough review of the pertinent historical record," *id.* Helsley's task as a rebuttal expert was a narrow one. (Indeed, had Helsley's report taken a broader approach to history it is likely the Defendants would have made the same improper rebuttal argument against him as against Plaintiffs' other rebuttal experts.) The Defendants' expert Brian DeLay opined that the line between military arms and those available to civilians became "more pronounced in the early twentieth century" based on his assertion that "dozens of states passed laws regulating automatic and semi-automatic firearms during the 1920s and 1930s" that restricted civilians but not the military. Dkt. 185-4 (DeLay Rep.) at ¶ 94. Helsley's report is narrowly focused on highlighting the existence of significant military surplus sales throughout the twentieth century, which tends to show that, at least insofar as non-automatic firearms are concerned, the line DeLay purports to draw has no basis in reality, because civilians were widely able to, and frequently did, purchase such "military" firearms for personal use. *See* Dkt. 229-11 (Helsley Rebuttal Rep.) at 2. Unlike the expert in *Burton*, who sought to demonstrate that over a more than 100 year period, "paint formulators and consumers have known that interior and exterior architectural paints should be used for their intended uses," 362 F. Supp. 3d at 607, the narrow task set for Helsley required no all-encompassing historical analysis, and the presentation of the specific data points regarding the sale of military surplus firearms to civilians in his report is adequate, in itself, to rebut DeLay's opinion.

Regarding Helsley's qualifications, under Rule 702, an individual can be qualified as expert "by knowledge, skill, [or] experience"; PhDs are not a prerequisite. FED. R. EVID. 702. Here, Helsley's report, itself, demonstrates he has the knowledge and skill to opine on the overlap

between civilian and military arms in the twentieth century. *See* Dkt. 229-11 (Helsley Rebuttal Rep.) at 1. He is the author of several books about firearms and historical firearms and has worked as the archivist for John Rigby & Co., one of the world's oldest and most reputable firearm manufacturers. *Id.*; *see also British gunmaking since 1775, History*, RIGBY, https://bit.ly/3UeQCud (last visited Oct. 18, 2024). Furthermore, the factual contentions in Helsley's report that defeat DeLay's claim—the existence of Francis Bannerman and Sam Cummings' military-surplus empires, or the government's own direct-to-civilian sale of military arms through the Civilian Marksmanship Program—are easily verifiable through Helsley's own citations or a quick Google search which yields several articles from reputable publications that make the same point: non-automatic firearms used by the military remained widely available to the American public throughout the twentieth century. *See, e.g.*, Joseph E. Persico, *The Great Gun Merchant*, 25 AM. HERITAGE (Aug. 1974), https://bit.ly/48bDEmW (describing Francis Bannerman's operation as "the largest dealer in the world in military goods" (quotation marks omitted)); Edwin Shrake, *The Merchant of Menace*, SPORTS ILLUSTRATED (May 11, 1970), https://bit.ly/3YsdIjw ("Although Cummings' operation has a distinctly military feel about it, Interarms enjoys a brisk civilian trade."). And given that these are all, as discussed in detail above, "legislative facts," even if the Court were not inclined to treat Helsley as a qualified expert, it can still rely upon the facts about the military surplus trade in firearms in the twentieth century to reject DeLay's arguments, since that information is generally applicable historical fact. *See Ind. Harbor Belt R.R.*, 916 F.2d at 1182.

Finaly, had Plaintiffs known, prior to the eve of trial, that the Defendants would challenge Helsley's qualifications, they would have offered him for live testimony at trial to establish his expertise beyond dispute. To the extent the Court does have concerns about Helsley's expertise,

before it excludes his testimony, Plaintiffs should be permitted to make an offer of proof to establish his qualifications. *See Cummins v. Lyle Indus.*, 93 F.3d 362, 370–71 (7th Cir. 1996) (detailing offers of proof made in the district court to establish expert's qualifications).

### 5.  Daniel Kemp, Michael Dennis, and Paul Leitner-Wise

The Defendants move to exclude the opinion of Daniel Kemp and Michael Dennis on the grounds both offer improper rebuttal that is based on insufficient facts or data. Dkt. 229 (Defs.' Mot.) at 15–16. They move to exclude the opinion of Paul Leitner-Wise based, in part, on concerns about his credentials. *Id*. at 18–19. The concerns about Leitner-Wise were raised to Plaintiffs' attention for the first time, despite months of meeting, conferring, and discovery proceedings, by the Defendants' motion filed on the eve of trial.

In the interest in narrowing the issues before the Court, Plaintiffs have not relied upon Kemp, Dennis, or Leitner-Wise's opinions or testimony in their proposed Findings of Fact and Conclusions of Law. The Court, of course, remains free to rely on any verifiable "legislative facts" contained in any of the expert reports. *See ANJRPC*, 2024 WL 3585580, at *5.

### CONCLUSION

The Court should deny the motion to exclude certain opinions of Plaintiffs' experts.


Date: October 21, 2024                                    Respectfully submitted,


Paul D. Clement*                                s/ *Andrew A. Lothson (with permission)*
Erin E. Murphy*                                 Andrew A. Lothson (*pro hac vice*)
Matthew D. Rowen*                               Swanson, Martin & Bell, LLP
Nicholas A. Aquart *                            330 N. Wabash
CLEMENT & MURPHY, PLLC                           Suite 3300
706 Duke Street                                  Chicago, IL 60611
Alexandria, VA 22314                             alothson@smbtrials.com
(202) 742-8900
                                                 Gary C. Pinter
* *pro hac vice*                                 Swanson, Martin & Bell, LLP

103 W. Vandalia Street
Suite 215
Edwardsville, IL 62025
(618) 655-3131
gpinter@smbtrials.com

*Counsel for Plaintiffs Caleb Barnett, Brian Norman, Hood's Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc.*

David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com


* *pro hac vice*

_s/ David G. Sigale (with permission)_
David G. Sigale (Atty. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

*Counsel for Plaintiffs Dane Harrel, C4 Gun Store, LLC, Marengo Guns, Inc., Illinois State Rifle Association, Firearms Policy Coalition, Inc., and Second Amendment Foundation*

Mark L. Shaw, Esq.
Jennifer Craigmile Neubauer, Esq.
Michael A. Danforth, Esq.
SHAW LAW LTD.
33 North County Street, Suite 300
Waukegan, Illinois 60085
(T): (847) 244-4696
(F): (847) 244-4673
mlshaw@shawlawltd.com
jcneubauer@shawlawltd.com
michael@danforthlawgroup.com

_s/ Sean A. Brady_
Sean A. Brady, Esq.*
C.D. Michel, Esq.*
Konstadinos T. Moros, Esq.*
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802

* *pro hac vice*

*Counsel for Plaintiffs Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, Piasa Armory, Jasmine Young, and Chris Moore*

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a copy of the foregoing was served upon counsel of

record for the Defendants by e-mail on October 21, 2024.

*s/ Sean A. Brady*
Sean A. Brady