**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CALEB BARNETT, *et al.*,<br>    *Plaintiffs*,<br>v.<br>KWAME RAOUL, *et al.*,<br>    *Defendants*. | Case No.  3:23-cv-209-SPM<br> ** designated Lead Case |
| DANE HARRELL, *et al.*,<br>    *Plaintiffs*,<br>v.<br>KWAME RAOUL, *et al.*,<br>    *Defendants*. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*,<br>    *Plaintiffs*,<br>v.<br>BRENDEN KELLY, *et al.*,<br>    *Defendants*. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS<br>LICENSEES OF ILLINOIS, *et al.*,<br>    *Plaintiffs*,<br>v.<br>JAY ROBERT "JB" PRITZKER, *et al.*,<br>    *Defendants*. | Case No.  3:23-cv-215-SPM |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................ 1

PROPOSED FINDINGS OF FACT ............................................................................... 3

I.    The Protect Illinois Communities Act And Plaintiffs Standing To Challenge It. ............... 3

    A.    PICA Bans a Large Swath of Rifles, Pistols, and Shotguns. .................................. 3

    B.    Plaintiffs Are Injured by PICA's Prohibitions in Several Ways. ............................ 7

II.   Firearms And Ammunition Feeding Devices That PICA Bans Are Arms That Ordinary People Would And Do Keep At Home For Lawful Purposes, Including Self-Defense. ....................... 13

    A.    The Features That Render a Rifle, Pistol, or Shotgun an "Assault Weapon" Under PICA Are Useful for Civilian Self-Defense. ............................. 14

    B.    PICA Bans Rifles That Ordinary People Would and Do Keep at Home For Self-Defense and Other Lawful Purposes. ....................................... 20

    C.    PICA Bans Pistols and Shotguns That Ordinary People Would and Do Keep at Home For Self-Defense and Other Lawful Purposes. ............................ 27

    D.    PICA Bans as "Large Capacity Ammunition Feeding Devices" Detachable Magazines That Ordinary People Would and Do Keep at Home For Self-Defense and Other Lawful Purposes. .......................................... 31

III.  The Common Arms PICA Bans Are Not Exclusively Or Predominantly Used By The Military Or Exclusively Or Predominantly Useful For Military Purposes. ....................................... 35

    A.    The Firearms That PICA Bans Lack Automatic-Fire Capability. ......................... 36

    B.    No Military in the World Is Known to Use Any Of The Firearms PICA Bans for Combat—Or Any Semiautomatic-Only Rifle. ...................................... 37

    C.    Automatic Fire Serves a Critical Military Purpose. ............................................. 41

    D.    The Firearms And Feeding Devices PICA Bans Are Distinguishable From Military-Grade Weapons In Several Important Respects. .......................... 44

    E.    Semiautomatic Firing is the Quintessential Dual-Use Capability, And The Other Features PICA Singles Out Are Also Dual Use Functions. ................ 53

PROPOSED CONCLUSIONS OF LAW ....................................................................... 57

i

I.    The Firearms And Feeding Devices That PICA Outlaws Are "Arms." ............................. 59

II.   No Historical Tradition Justifies PICA. ................................................................. 66

      A.    The Historical Tradition Framework ...................................................... 67

      B.    The Arms PICA Bans Are Not Dangerous And Unusual. .................................... 70

      C.    Defendants Have Identified No American Historical Tradition Of Banning Semiautomatic Firearms Or Feeding Devices That Law-Abiding Citizens Own For Lawful Purposes. ......................................... 73

CONCLUSION ................................................................................................. 98

**INTRODUCTION**

This case involves a challenge to the Protect Illinois Communities Act ("PICA"), a law that bans hundreds of models of rifles, pistols, and shotguns, as well as the ammunition feeding devices that come standard with them and allow them to function as intended. This Court preliminarily enjoined the law as likely inconsistent with the Second Amendment, but the Seventh Circuit reversed, holding that weapons "that are not possessed for lawful purposes" and/or are "exclusively or predominantly useful in military service" do not qualify as "Arms" within the meaning of the Second Amendment. *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S.Ct. 2491 (Mem.) (2024); *see* U.S. Const. amend. II (securing "the right of the people to keep and bear Arms"). The Seventh Circuit also concluded that the firearms and feeding devices that PICA bans likely fit that bill. *See Bevis*, 85 F.4th at 1195-97. In doing so, however, the court took pains to "stress[]" that it had taken "just a preliminary look at the subject," *id.* at 1197—a point Defendants emphasized in resisting Supreme Court review, *see* State Defs.' Br. in Opp'n at 16-18, *Harrel*, 144 S. Ct. 2491 (Nos. 23-877, 23-878, 23-879, 23-880, 23-944, 23-1010 (U.S.) (Apr. 15, 2024). Because it "recognize[d] [that] Second Amendment challenges to gun regulations often require more evidence than is presented in the early phases of litigation," the Seventh Circuit expressly declined to "rule out the possibility that the plaintiffs will find other evidence" that demonstrates that its preliminary views about the firearms PICA bans were mistaken. *Bevis*, 85 F.4th at 1197. And the court noted in particular that evidence regarding the construction, function, application, and modification of firearms, and "[b]etter data on" their different "firing rates," might draw a "sharper distinction" between the firearms PICA bans and firearms traditionally reserved for military service, and indeed "might change the analysis" altogether. *Id.*; *see also id.* at 1196 (preliminarily evaluating

1

similarities and differences between semiautomatic AR-15 rifles and automatic M-16 rifles in terms of "ammunition" used, "kinetic energy," "muzzle velocity" and "effective range").

On remand, this Court ordered the parties to develop the more comprehensive record that *Bevis* contemplated. In particular, the Court instructed the parties to focus on, *inter alia*, the utility of each of the various items PICA addresses for purposes of "use in self-defense"; whether each "item" PICA addresses is "principally possessed and used for unlawful purposes"; whether an item is "specifically designated by the United States military as a weapon to be acquired by the United States military and issued to its troops"; whether an item "meet[s] all of the specifications required by the United States military to qualify for issue as a rifle or pistol to be deployed with United States troops"; whether "the firing rate of semiautomatic weapons banned by PICA [is] materially different from the firing rate of the M16, M4, or fully automatic machineguns"; and whether the items PICA addresses are "materially different from an M16, M4, or machinegun." Dkt.166 (Order) at 14-15. Since then, the parties developed an extensive documentary record and presented four days of live witness testimony on the firearms and feeding devices banned by PICA. The question this Court now faces is whether Plaintiffs have met their "burden of showing that the weapons addressed in [PICA]": "are Arms that ordinary people would keep at home for purposes of self-defense," as opposed to "weapons that are not possessed for lawful purposes"; and are "not … exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194; *see also* Dkt.166 (Order) at 6-7. If so, then the firearms and feeding devices that PICA outlaws are "captured by the gravitational pull of the Second Amendment," and "the Plaintiffs need only establish by the preponderance of the evidence that" the prohibited arms "are in common use for any lawful purpose and are not otherwise dangerous and unusual." Dkt.166 (Order) at 7.

2

**PROPOSED FINDINGS OF FACT**

**I.    The Protect Illinois Communities Act And Plaintiffs Standing To Challenge It.**

The threshold question in any case is whether the plaintiffs have standing.  *See United States v. Furando*, 40 F.4th 567, 575 (7th Cir. 2022) ("The threshold inquiry for this, and every, federal suit is whether the claimants have Article III standing to bring their claims.").  Plaintiffs have proven the following facts relevant to that inquiry.

**A.    PICA Bans a Large Swath of Rifles, Pistols, and Shotguns.**

1. On January 10, 2023, Illinois Governor JB Pritzker signed into law Public Act 102-1116, titled the Protect Illinois Communities Act ("PICA").

2. PICA makes it "unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon, assault weapon attachment[1], .50 caliber rifle[2], or .50 caliber cartridge[3]," with some exceptions.  720 ILCS 5/24-1.9(b).

3. PICA defines "assault weapon" to encompass many different categories of firearms, including certain semiautomatic rifles, semiautomatic pistols, semiautomatic shotguns, and shotguns with revolving cylinders.  720 ILCS 5/24-1.9(a).[4]

---

[1] PICA defines "[a]ssault weapon attachment" to mean "any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into any" firearm defined as an "assault weapon" under 720 ILCS 5/24-1.9(a)(1); 720 ILCS 5/24-1.9(a)(3).

[2] PICA defines ".50 caliber rifle" to mean "a centerfire rifle capable of firing a .50 caliber cartridge," with some exceptions.  720 ILCS 5/24-1.9(a)(5).  Certain .50 caliber rifles, "like the 458 SOCOM," "were designed for self-defense" and are "very different" from "the .50 caliber[s] that the military uses." Dkt.240 (9/18/2024 Trial Tr., Watt) at 500:10-24.

[3] PICA defines ".50 caliber cartridge" to mean "a cartridge in .50 BMG caliber, either by designation or actual measurement, that is capable of being fired from a centerfire rifle," with some exceptions.  720 ILCS 5/24-1.9(a)(6).

[4] PICA does not define the terms rifle, pistol, shotgun, or semiautomatic.  "[A] rifle is defined by two main traits:  It is a *long gun*: the gun has a stock and is designed to be used with the stock braced against a shoulder.  [And it] has a *rifled bore*: the inside of the gun's barrel is cut with a pattern of spiral grooves that rotate the bullet as it travels down the barrel."  Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1970 (3d ed. 2021); *see also id.* at 1992 ("With a long gun, there are three points of contact: the stock against the shoulder, the trigger hand holding the stock or pistol grip immediately behind the trigger, and the nontrigger hand holding the fore-end of the gun.").  "[A] shotgun is a long gun with a *smooth bore*, a barrel whose interior lacks the spiral rifling grooves found in rifles and

4. <u>First</u>, in 720 ILCS 5/24-1.9(a)(1)(A), PICA defines "assault weapon" as any "semiautomatic rifle that has the capacity to accept a detachable magazine or that may be readily modified to accept a detachable magazine[5], if the firearm has one or more of the following":

(i) a pistol grip or thumbhole stock;

(ii) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii) a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner; that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;

(iv) a flash suppressor;

(v) a grenade launcher;

(vi) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.

5. PICA also defines "assault weapon" to include all "AK type[]" rifles, 720 ILCS 5/24-1.9(a)(1)(J)(i), all "AR type[]" rifles, 5/24-1.9(a)(1)(J)(ii), all "Thompson" rifles, 5/24-1.9(a)(1)(J)(xx), and various specifically named models of semiautomatic rifles that have the capacity to accept a detachable magazine or that may be readily modified to accept a detachable magazine and that have one or more of the features listed in (a)(1)(A) or satisfy (a)(1)(B), *see* 5/24-1.9(a)(1)(J)(ii). These definitions are duplicative. With a single exception—"SKS with a

---

handguns." *Id.* at 2001. A pistol, by contrast, is a handgun. *See id.* at 1984-85. "With a handgun, one or two hands hold the grip immediately behind the trigger, providing one point of contact with the firearm for stability." *Id.* at 1992. The term "pistol" usually refers to a semiautomatic pistol, as opposed to a revolver. *Id.* at 1985; *see id.* at 1987-89. That is how PICA uses the term. *See* 720 ILCS 5/24-1.9(a). Finally, "semiautomatic" or ("semi-automatic") refers to a type of firing mechanism or firing action. Semiautomatic firearms are different from lever-action, bolt-action, or pump-action firearms that require human energy to reload a new round into the chamber. "Each time the gun is fired, the semi-automatic action uses part of the energy from firing the cartridge to automatically eject the spent casing, recock the firing mechanism, and load a new cartridge into the firing chamber." Johnson, *supra*, at 1984; *accord id.* at 1968; *see also* Dkt.185-4 (DeLay Rep.) at ¶69; James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 Cardozo L. Rev. 681, 685-87 (2015). Unlike an *automatic* firearm, a *semi*-automatic firearm fires only one round of ammunition with each function of the trigger. Johnson, *supra*, at 1984.

[5] PICA defines the term "detachable magazine" to mean "an ammunition feeding device that may be removed from a firearm without disassembly of the firearm action, including an ammunition feeding device that may be readily removed from a firearm with the use of a bullet, cartridge, accessory, or other tool, or any other object that functions as a tool, including a bullet or cartridge." 720 ILCS 5/24-1.9(a)(7).

detachable magazine," 5/24-1.9(a)(1)(J)(i)(VI)—each firearm listed in in (a)(1)(J) is captured by the features-based definition in in (a)(1)(A) or satisfies (a)(1)(B).  *See also* **Addendum**.

6. <u>Second</u>, in 720 ILCS 5/24-1.9(a)(1)(B), PICA defines "assault weapon" to include any "semiautomatic rifle that has a fixed magazine[6] with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition."

7. <u>Third</u>, in 720 ILCS 5/24-1.9(a)(1)(C), PICA defines "assault weapon" to include any "semiautomatic pistol that has the capacity to accept a detachable magazine or that may be readily modified to accept a detachable magazine, if the firearm has one or more of the following:

(i) a threaded barrel;

(ii) a second pistol grip or another feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

(iv) a flash suppressor;

(v) the capacity to accept a detachable magazine at some location outside of the pistol grip; or

(vi) a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip and is designed or redesigned to allow or facilitate a firearm to be fired from the shoulder.

8. PICA also defines "assault weapon" to include all "AK type[]" pistols, 720 ILCS 5/24-1.9(a)(1)(K)(i), all "AR type[]" pistols, 5/24-1.9(a)(1)(K)(ii), all "MAC type[]" pistols, 5/24-1.9(a)(1)(K)(x),   all "Thompson type[]" pistols, 5/24-1.9(a)(1)(K)(xiii), all "UZI type" pistols, 5/24-1.9(a)(1)(K)(xiv), and various specifically named models of semiautomatic pistols that have the capacity to accept a detachable magazine or that may be readily modified to accept a detachable magazine and that have one or more of the features listed in (a)(1)(C) or satisfy (a)(1)(D), *see* 5/24-1.9(a)(1)(K)(iii)-(ix), (xi)-(xii).  These definitions are duplicative.  Each firearm listed in (a)(1)(K) is captured by the features-based definition in (a)(1)(C) or (a)(1)(D). *See* **Addendum**.

---

[6] PICA defines the term "fixed magazine" to mean "an ammunition feeding device that is permanently attached to a firearm, or contained in and not removable from a firearm, or that is otherwise not a detachable magazine, but does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition."  720 ILCS 5/24-1.9(a)(8).

9.    <u>Fourth</u>, in 720 ILCS 5/24-1.9(a)(1)(D), PICA defines "assault weapon" to include any "semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds."

10.    <u>Fifth</u>, in 720 ILCS 5/24-1.9(a)(1)(E), PICA defines "assault weapon" to include any "shotgun with a revolving cylinder."

11.    <u>Sixth</u>, in 720 ILCS 5/24-1.9(a)(1)(F), PICA defines "assault weapon" to include any "semiautomatic shotgun that has one or more of the following":

(i) a pistol grip or thumbhole stock;

(ii) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii) a folding or thumbhole stock;

(iv) a grenade launcher;

(v) a fixed magazine with the capacity of more than 5 rounds; or

(vi) the capacity to accept a detachable magazine.

12.    PICA also defines "assault weapon" to include various specifically named models of shotguns that have one or more of the features listed in (a)(1)(F) or satisfy (a)(1)(E). *See* 5/24-1.9(a)(1)(L). These definitions are duplicative. Each firearm listed in in (a)(1)(L) is captured by the features-based definition in (a)(1)(F) or by (a)(1)(E). *See* **Addendum**.

13.    <u>Seventh</u>, in 720 ILCS 5/24-1.9(a)(1)(G), PICA defines "assault weapon" to include any "semiautomatic firearm that has the capacity to accept a belt ammunition feeding device."

14.    <u>Eighth</u>, in 720 ILCS 5/24-1.9(a)(1)(H), PICA defines "assault weapon" to include any "firearm that has been modified to be operable as an assault weapon as defined in this Section."

15.    <u>Ninth</u>, in 720 ILCS 5/24-1.9(a)(1)(I), PICA defines "assault weapon" to include any "part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person."

16.    Finally, PICA declares in 720 ILCS 5/24-1.9(a)(2) that the term "[a]ssault weapon" does not include:

(A) Any firearm that is an unserviceable firearm or has been made permanently inoperable.

(B) An antique firearm or a replica of an antique firearm.

6

(C) A firearm that is manually operated by bolt, pump, lever or slide action, unless the firearm is a shotgun with a revolving cylinder.

(D) Any air rifle as defined in Section 24.8-0.1 of this Code.

(E) Any handgun, as defined under the Firearm Concealed Carry Act, unless otherwise listed in this Section.

17.   Possession of an "assault weapon" (aside from grandfathered firearms) is a Class A misdemeanor, with subsequent violations a Class 3 felony.  720 ILCS 5/24-1(a)(15), (b).  Sale is classified variously as a Class 3 or Class 2 felony.  720 ILCS 5/24-1(a)(11), (14), (16), (b).  And each firearm is a "single and separate violation."  720 ILCS 5/24-1(b).

18.   The prohibition applies to "any person within this State," except peace officers, police, prison officials, active-duty members of the military, and certain private security contractors.  720 ILCS 5/24-1.9(b), (e)(1)-(7).  It does not exempt any others, such as military veterans who are weapons experts.  *See* Dkt.234 (9/16/2024 Trial Tr., Eby) at 201:6-202:8.

19.   Grandfathered owners of firearms PICA defines as "assault weapons" may retain their firearms if they register them, but they are severely restricted in how and where they may keep and bear them.  Such owners "shall possess such items only" "on private property owned or immediately controlled by the person;" "on private property that is not open to the public with the express permission of the person who owns or immediately controls such property"; "while on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair"; "at a properly licensed firing range or sport shooting competition venue"; or "while traveling to or from these locations," provided that the firearm is unloaded and placed in a container.  720 ILCS 5/24-1.9(d).

**B.   Plaintiffs Are Injured by PICA's Prohibitions in Several Ways.**

20.   Each of the eight individual Plaintiffs across the four consolidated actions— Messrs. Barnett and Norman (*Barnett*); Ms. Young and Mr. Moore (*FFL*); Mr. Harrel (*Harrel*); and Messrs. Langley, Jones, and Wilson (*Langley*)—is an adult resident of Illinois who is not prohibited from purchasing or possessing a firearm under state or federal law.  *See* Dkt.228 (Joint Statement of Stipulated Facts) at ¶1; *see also* Dkt.198 (Barnett Decl.) at  ¶2; Dkt.200 (Norman Decl.) at ¶2; Dkt.207 (Moore Decl.) at ¶¶2, 4, 9; Dkt.208 (Young Decl.) at ¶¶2, 4, 8; Dkt.215-1 (Harrel Decl.) at ¶¶2-3; Dkt.222-1 (Langley Decl.) at ¶¶2-3; Dkt.221-1 (Jones Decl.) at ¶¶2-3; Dkt.221-3 (Wilson Decl.) at ¶¶2-3.

21.   None of the individual Plaintiffs is exempted from PICA's ban.  Each individual Plaintiff is thus now prohibited from acquiring in Illinois the firearms and feeding devices that PICA bans.  *See* Dkt.198 (Barnett Decl.) at ¶6; Dkt.200 (Norman Decl.) ¶6; Dkt.208 (Young Decl.) at ¶3; Dkt.207 (Moore Decl.) at ¶3; Dkt.215-1 (Harrel Decl.) at ¶4; Dkt.221-1 (Langley Decl.) at ¶7; Dkt.221-2 (Jones Decl.) at ¶7; Dkt.221-3 (Wilson Decl.) at ¶7.

22.   Before PICA took effect, Plaintiffs Barnett, Norman, Young, Moore, and Harrel each possessed, kept, and bore in Illinois firearms that are now classified as "assault weapons"

7

and/or magazines that are now classified as "large capacity ammunition feeding devices" under PICA, and all have been forced either to part ways with their long-lawful firearms after Illinois enacted PICA, or to register them with the state and comply with PICA's various use restrictions. *See* Dkt.198 (Barnett Decl.) at ¶¶4-9; Dkt.200 (Norman Decl.) at ¶¶4-9; Dkt.208 (Young Decl.) at ¶4; Dkt.207 (Moore Decl.) at ¶4; Dkt.215-1 (Harrel Decl.) at ¶4.

Specifically, for example:

Before PICA took effect, Plaintiff Caleb Barnett possessed, kept, and bore in Illinois, *inter alia*, an AKM-47 rifle with a 30-round magazine, a Sig Sauer M400 AR rifle with a 30-round magazine, and a Heckler & Koch VP9 Tactical pistol with a threaded barrel and a 17-round magazine. *See* Dkt.198 (Barnett Decl.) at ¶4.

- Mr. Barnett's AKM-47 rifle is a semiautomatic AK-type rifle and banned under PICA as an "assault weapon" by name [5/24-1.9(a)(1)(J)(i)(I)], by type [5/24-1.9(J)(i)], and by virtue of its features [5/24-1.9(a)(1)(A)(i), (vi)]. The rifle magazine that comes standard with it is banned under PICA as a "large capacity ammunition feeding device" [5/24-1.10(a)(1)].

- Mr. Barnett's Sig Sauer M400 Tread rifle is a semiautomatic AR-type rifle banned under PICA as an "assault weapon" by type [5/24-1.9(a)(1)(J)(ii)] and by virtue of its features [5/24-1.9(a)(1)(A)(i), (ii), (iii), (iv) (vi)]. The rifle magazine that comes standard with it is banned under PICA as a "large capacity ammunition feeding device" [5/24-1.10(a)(1)].

- Mr. Barnett's Heckler & Koch VP9 Tactical pistol is a semiautomatic pistol banned under PICA as an "assault weapon" by virtue of its features [5/24-1.9(a)(1)(C)(i)]. The 17-round pistol magazine that comes standard with it is banned under PICA as a "large capacity ammunition feeding device[]" [5/24-1.10(a)(1)].

Before PICA took effect, Plaintiff Brian Norman possessed, kept, and bore in Illinois, *inter alia*, two Keltec PMR30 pistols, a Keltec P50 pistol, a Heckler & Koch VP9 pistol, two Yankee Hill AR-15 Specter rifles, and a Rock River AR-15 Varmint A4 rifle, as well as multiple magazines that are now defined as "large capacity ammunition feeding devices" under 720 ILCS 5/24-1.10. *See* Dkt.200 (Norman Decl.) at ¶¶4, 5.

- Mr. Norman's Keltec PMR30 pistols are semiautomatic pistols banned under PICA as "assault weapons" by virtue of their features [5/24-1.9(a)(1)(C)(i), (iv)]. The pistol magazines that come standard with them are banned under PICA as "large capacity ammunition feeding devices" [5/24-1.10(a)(1)].

- Mr. Norman's Keltec P50 pistol is a semiautomatic pistol banned under PICA as an "assault weapon" by virtue of its features [5/24-1.9(a)(1)(C)(i), (v)]. The pistol magazine that comes standard with it is banned under PICA as a "large capacity ammunition feeding device" [5/24-1.10(a)(1)].

8

- Mr. Norman's Heckler & Koch VP9 pistol is a semiautomatic pistol banned under PICA as an "assault weapon" by virtue of its features [5/24-1.9(a)(1)(C)(i)].

- Mr. Norman's Yankee Hill AR15 Specter rifles are semiautomatic AR-type rifles banned under PICA as "assault weapons" by name [5/24-1.9(a)(1)(J)(ii)(XLIII)], by type [5/24-1.9(a)(1)(J)(ii)], and by virtue of their features [5/24-1.9(a)(1)(A)(i), (iii), (vi)]. The rifle magazines that come standard with them are banned under PICA as "large capacity ammunition feeding devices" [5/24-1.10(a)(1)].

- Mr. Norman's Rock River AR-15 Varmint A4 rifle is a semiautomatic AR-type rifle banned under PICA as an "assault weapon" by name [5/24-1.9(a)(1)(J)(ii)(XXXV)], by type [5/24-1.9(a)(1)(J)(ii)] and by virtue of its features [5/24-1.9(a)(1)(A)(i), (vi)]. The rifle magazine that comes standard with it is banned under PICA as a "large capacity ammunition feeding device" [5/24-1.10(a)(1)].

Before PICA took effect, Plaintiff Chris Moore possessed, kept, and bore in Illinois, *inter alia*, at least one semiautomatic rifle with a detachable magazine and a pistol grip, adjustable stock, barrel shroud, and flash suppressor, that is now banned under PICA as an "assault weapon" by virtue of its features [5/24-1.9(a)(1)(A)(i), (iii), (iv), (vi)]. Dkt.207 (Moore Decl.) at ¶5. But for PICA, Mr. Moore would have lawfully maintained possession in Illinois of his once-lawful firearms. *Id.* at ¶7.

23. The individual Plaintiffs fear arrest, criminal charges, prosecution, fines and/or incarceration, and so have refrained from selling, purchasing, and/or in some cases, possessing the firearms and parts that are now classified as "assault weapons" and magazines that are now classified as "large capacity ammunition feeding devices" under PICA. *See* 720 ILCS 5/24-1.10; *see* Dkt.198 (Barnett Decl.) at ¶12; Dkt.200 (Norman Decl.) at ¶12; Dkt.208 (Young Decl.) at ¶7; Dkt.207 (Moore Decl.) at ¶8; Dkt.215-1 (Harrel Decl.) at ¶¶5-6; Dkt.217 (Knutson Decl.) at ¶6; Dkt.69-1 (Vandermyde Decl.) at ¶¶6-8; Dkt.221-1 (Langley Decl.) at ¶¶4-6; Dkt.221-2 (Jones Decl.) at ¶¶4-6; Dkt.221-3 (Wilson Decl.) at ¶¶4-6.

24. But for PICA, each individual Plaintiff in this consolidated action would also buy firearms and parts that are now classified as "assault weapons" and magazines that are now classified as "large capacity ammunition feeding devices." *See* 720 ILCS 5/24-1.10; *see* Dkt.198 (Barnett Decl.) at ¶10; Dkt.200 (Norman Decl.) at ¶10; Dkt.208 (Young Decl.) ¶7; Dkt.207 (Moore Decl.) at ¶8; Dkt.215-1 (Harrel Decl.) at ¶¶5-6; Dkt.221-1 (Langley Decl.) at ¶¶4-6; Dkt.221-2 (Jones Decl.) at ¶¶4-6; Dkt.221-3 (Wilson Decl.) at¶¶4-6.

25. Specifically, for example:

- Plaintiff Chris Moore wishes to lawfully acquire and possess within Illinois at least one new semiautomatic rifle with a detachable magazine and a pistol grip, adjustable stock, barrel shroud, and flash suppressor, such as a Bravo Company Mid 16 MOD 0, chambered in 5.56 NATO, or similar AR-style semiautomatic rifle, that is now

9

banned under PICA as an "assault weapon" by type [5/24-1.9(a)(1)(J)(ii)] and by virtue of its features [5/24-1.9(a)(1)(A)(i), (iii), (iv), (vi)];

- Plaintiff Chris Moore wishes to lawfully acquire and possess within Illinois at least one new semiautomatic pistol with a detachable magazine and threaded barrel that is now banned under PICA as an "assault weapon" by virtue of its features [5/24-1.9(a)(1)(C)(i)]; and

- Plaintiff Chris Moore wishes to lawfully acquire and possess within Illinois at least one new semiautomatic shotgun with a pistol grip and either a detachable magazine or an internal magazine with a capacity of over 5 rounds, that is now banned under PICA as an "assault weapon" by virtue of its features [5/24-1.9(a)(1)(F)(i), (v), (vi)].

Dkt.207 (Moore Decl.) at ¶¶6-7.

26. PICA has also injured the retailer Plaintiffs that are party to this consolidated action, including Hood's Guns & More ("Hood's"), Pro Gun and Indoor Range ("Pro Gun"), Piasa Armory ("Piasa"), C4 Gun Store, LLC ("C4"), and Marengo Guns, Inc. ("Marengo"). Each of those retailer Plaintiffs is "authorized to sell firearms" within the State of Illinois "as a Federal Firearms Licensee licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ('ATF')." Dkt.228 (Joint Statement of Stipulated Facts) at ¶¶16-22.

27. Before PICA was enacted, each retailer Plaintiff sold to the general public for self-defense or other lawful purposes firearms, parts, and feeding devices that PICA now prohibits. Hood Decl. ¶5 & HG&M000001-000056; Dkt.10-4 (Smith Decl.) at ¶¶5-6 & NSSF002059-002307; Dkt.221-7 (Pulaski Decl.) at ¶3; Dkt.215-2 (Brooks Decl.) at ¶5; Dkt.215-3 (DeBock Decl.) at ¶5; *see also, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 54:12-22, 57:5-10.

Specifically, for example, Piasa sold, *inter alia*:

- 5/24-1.9(a)(1)(A): semiautomatic rifles that accept detachable magazines and have one, multiple, or all of the following features, including some of the rifles listed by make and model in 5/24-1.9(a)(1)(J), or their copies, duplicates, variants, or altered facsimiles:

  i. a pistol grip or thumbhole stock

  ii. a protruding grip that can be held by the non-trigger hand;

  iii. an adjustable, folding, or detachable stock;

  v. a flash suppressor; and

  vi. a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel

- 5/24-1.9(a)(1)(B): semiautomatic rifles that have a fixed magazine with the capacity to accept more than 10 rounds;

- 5/24-1.9(a)(1)(C): semiautomatic pistols that accept detachable magazines and have one, multiple, or all of the following features, including some of the pistols listed by make and model in 5/24-1.9(a)(1)(K), or their copies, duplicates, variants, or altered facsimiles:

> i. a threaded barrel;

> ii. a second pistol grip or another feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

> iii. a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

> iv. a flash suppressor;

> v. the capacity to accept a detachable magazine at some location outside of the pistol grip; and

> vi. a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip;

- 5/24-1.9(a)(1)(F): semiautomatic shotguns that have any one of the following features, including, some of the shotguns listed by make and model in 5/24-1.9(a)(1)(L), or their copies, duplicates, variants, or altered facsimiles:

> i. a pistol grip or thumbhole stock;

> ii. any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

> iii. a folding or thumbhole stock;

> iv. a fixed magazine with the capacity of more than 5 rounds;

> v. the capacity to accept a detachable magazine

- 5/24-1.9(a)(1)(G): semiautomatic firearms that have the capacity to accept a belt ammunition feeding device;

- 5/24-1.9(a)(1)(I): individual parts that when affixed to a rifle, pistol, or shotgun, would bring the respective firearm into PICA's definition of an "assault weapon," including, but not limited to: pistol grips; flash suppressors; barrel shrouds; adjustable, telescoping, or removal stocks; thumbhole stocks; and a part capable of functioning as a protruding grip that can be held by the non-trigger hand;

11

- 5/24-1.9(a)(1)(J)(i)(VI): SKS rifles with a detachable magazine; and

- 5/24-1.9(b): rifles chambered for .50 BMG ammunition, as well as .50 BMG ammunition itself.

Dkt.221-7 (Pulaski Decl.) at ¶¶3-4.  But for fear of prosecution under PICA for doing so, Piasa would continue selling to non-exempt purchasers each of the firearms (and ammunition, and accompanying magazines) described in the preceding paragraphs.  *Id.* at ¶5.

28.   Retailers Hood's and Pro Guns, respectively, purchased for sale "hundreds of thousands of dollars['] worth of firearms, magazines, and related merchandise … nearly half" of which is "attributable to firearms now defined as 'assault weapons,' and deemed unlawful under … [PICA] … accessories for the same … and … magazines, now defined as 'large capacity ammunition feeding devices,' under [PICA]."  Dkt.10-3 (Hood Decl.) at ¶5; Dkt.10-4 (Smith Decl.) at ¶¶6-9.  Retailer Piasa sold such arms to various citizens seeking a viable weapon for self-defense, including male and female customers, elderly customers, and those with apparent disabilities desiring to protect themselves with a firearm.  *See* Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 75:1-10.

29.   But because the retailer Plaintiffs fear arrest, criminal charges, prosecution, fines and/or incarceration, they have refrained from selling, purchasing, or possessing the firearms and parts now classified as "assault weapons" and magazines now classified as "large capacity ammunition feeding devices."  *See* Dkt.199 (Hood Decl.) at ¶9; Dkt.202 (Smith Decl.) at ¶10; Dkt.221-7 (Pulaski Decl.) at ¶5; Dkt.215-2 (Brooks Decl.) at ¶7; Dkt.215-3 (DeBock Decl.) at ¶7; *see also, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 26:7-16, 54:17-25

30.   If not for PICA, retailer Plaintiffs would sell products that PICA prohibits to non-exempt consumers in Illinois.  Dkt.199(Hood Decl.) at ¶9; Dkt.202 (Smith Decl.) at ¶10; Dkt.221-7 (Pulaski Decl.) at ¶5; Dkt.215-2 (Brooks Decl.) at ¶6; Dkt.215-3 (DeBock Decl.) at ¶6; *see also, e.g.*, Dkt.234 (9/16/2024 Trial Tr, Pulaski) at 28:10-29:10 (discussing sales during six-day period when PICA was enjoined); *see also* Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 58:16-60:16 (discussing Piasa's regular need to turn down sales of "AR-type rifle[s]" and prohibited "magazines" post-enactment of PICA).

31.   The decisions forced upon them by the State of Illinois to curtail their businesses have caused the retailer Plaintiffs to suffer economic harm in the form of lost sales.  Dkt.199 (Hood Decl.) at ¶10; Dkt.202 (Smith Decl.) at ¶10; Dkt.221-7 (Pulaski Decl.) at ¶4; Dkt.215-2 (Brooks Decl.) at ¶¶5-6; Dkt.215-3 (DeBock Decl.) at ¶¶5-6.

32.   While the retailer Plaintiffs still have the option to sell prohibited firearms to exempt persons, such sales do not make up for the lost business caused by PICA.  *See, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Piasa) at 68:19-69:5, 69:21-23.

33.   Various of the individual and retailer Plaintiffs are also members of organizational Plaintiffs, including Illinois State Rifle Association ("ISRA"), Second Amendment Foundation ("SAF"), Firearms Policy Coalition ("FPC"), National Shooting Sports Foundation ("NSSF"), and Federal Firearms Licensees of Illinois ("FFL-IL").  *See* Dkt.228 (Joint Statement of

12

Stipulated Facts) at ¶¶3-15 (listing details on the various organizational Plaintiffs); *Id.* at ¶¶3, 23-24 (stipulating that "Plaintiff Harrel is a member of ISRA, SAF, and FPC," that retailer Plaintiff "Piasa is a member of FFL-IL" and that retailer Plaintiffs Hood's and Pro Gun "are members of NSSF"); *see also* Dkt.215-1 (Harrel Decl.) at ¶3 (highlighting same as to Plaintiff Harrel); Eldridge Decl. ¶5 (highlighting same as to Plaintiff Piasa); Dkt.199 (Hood Decl.) at ¶10 (highlighting the same as to Plaintiffs Hood's and Pro Gun); Dkt.215-4 (Pearson Decl.) at ¶¶3-5 (further highlighting C4 and Marengo, who are injured members of ISRA); Dkt.215-5 (Combs Decl.) at ¶¶3-6 (highlighting same as injured members of FPC); Dkt.215-6 (Gottlieb Decl.) at ¶¶3-6 (highlighting the same as injured members of SAF). Those organizational Plaintiffs too have a stake in this consolidated action based on the injuries faced by their individual members and retailer members.

34.    The remaining organizational Plaintiffs too have individual and retailer members who have suffered the same injuries. That includes Mr. Stephen Knutson, a member of Plaintiff Gun Owners of America, Inc. ("GOA"); Mr. Todd Vandermyde, a member of Plaintiff GOA, Plaintiff Guns Save Life ("GSL"), and supporter of Plaintiff Gun Owners Foundation ("GOF"); Mr. John Boch, a member and Executive Director of Plaintiff GSL; Mr. Roger Krahl, President of Sportswereus, Inc. dba R. Guns, a member of FFL-IL; and many others. *See* Dkt.217 (Knutson Decl.) at ¶¶2-4 (describing former possession of "AR-platform rifle" and magazine now restricted by PICA and desire and apprehension to purchase "a .50 BMG rifle" that too is restricted by PICA); Dkt.209 (Vandermyde Decl.) at ¶¶5-8 (describing former possession of "AR-platform rifle" with various features and magazines, "semiautomatic pistol" and "shotgun" now restricted by PICA and desire and apprehension to purchase other various arms that are also prohibited by PICA); Dkt.206 (Boch Decl.) at ¶¶5-6 (detailing communications with members concerning PICA's restriction on their desire to purchase and possess now-banned firearms); Dkt.210 (Krahl Decl.) at ¶2 (describing R Guns sales pre- and post-PICA, and how the "survival" of the business "is in doubt, due to [PICA's] restrictions on the products … previously manufactured and sold in Illinois"); Dkt.205 (Pratt Decl.) at ¶¶4-7 (detailing communications with members concerning PICA's restriction on their desire to purchase and possess now-banned firearms); Dkt.201 (Keane Decl.) at ¶¶7-12 (detailing economic harm to retailers based on lost business, manufacturers based on the need for costly "re-design or re-tool[ing]" of "their products for sale in Illinois," and NSSF itself, as a result of potential loss in "membership dues").

## II.    Firearms And Ammunition Feeding Devices That PICA Bans Are Arms That Ordinary People Would And Do Keep At Home For Lawful Purposes, Including Self-Defense.

The first question under *Bevis* is whether Plaintiffs have shown that the firearms and feeding devices PICA bans "are Arms that ordinary people would keep at home for purposes of self-defense." 85 F.4th at 1194. Plaintiffs have proven the following facts relevant to that inquiry.

13

**A.** **The Features That Render a Rifle, Pistol, or Shotgun an "Assault Weapon" Under PICA Are Useful for Civilian Self-Defense.**

*- The <u>ability to fire semiautomatically</u>* [720 ILCS 5/24-1.9(a)(1)(A) (rifles), (a)(1)(B) (pistols), (a)(1)(F) (shotguns)]

35.   Semiautomatic firing was the "great innovation" in modern firearms technology. Dkt.185-4 (Delay Rep.) at ¶69.   The modern semiautomatic action was invented in the 1880s, and "semi-automatic firearms first started coming on the market in the 1890s."  *Id.* at ¶¶70-74; *see also* David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 ALBANY L. REV. 849, 857-58 (2015); Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403, 520 (2d ed. 2018).

36.   Semiautomatic firearms are different from lever-action, bolt-action, or pump-action firearms that require human energy to reload a new round into the chamber.  Johnson (3d ed.), *supra*, at 1984; *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 246:5-20; Dkt.240 (9/18/2024 Trial Tr., Watt) at 443:18-444:1; Dkt.185-4 (DeLay Rep.) at ¶69; Jacobs, supra, at 685-87.

37.   With a semiautomatic firearm, by contrast, "[e]ach time the gun is fired, the semi-automatic action uses part of the energy from firing the cartridge to automatically eject the spent casing, recock the firing mechanism, and load a new cartridge into the firing chamber."  Johnson (3d ed.), *supra*, at 1984; *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 228:7-229:18, 246:5-247:11; Dkt.185-4 (DeLay Decl.) at ¶69; Jacobs, <u>supra</u>, at 685-87.

38.   "Because the use of recoil energy or diversion of gases in the semi-automatic action significantly reduces felt recoil, semi-automatics can be easier to use by persons who do not have great upper-body strength" compared to lever-action, bolt-action, breach-loading, or pump-action firearms that require human energy to reload a new round into the chamber.  Johnson (3d ed.), *supra*, at 1995; *see also* Dkt.240 (9/18/2024 Trial Tr., Watt) at 451:8-24(explaining recoil management and discussing the "semiautomatic system and how it expels gas, so that some of that gas that generates recoil is expended in the system versus putting the full pressure back on to the shooter"); *see also* Dkt.240 (9/18/2024 Trial Tr., Watt) at 453:13-20, 489:10-17 (noting how semiautomatic "AR pistols" help with "recoil management," and recommending such a firearm for "weaker" individuals or "people of petite size that … don't want to fire [a different] weapon because of the recoil" but nonetheless desire a firearm for self-defense); Dkt.234 (9/16/2024 Trial Tr., Eby) at 198:23-200:5 (discussing benefits of AR semiautomatic firearms as "home defense" weapons for those with physical limitations).

39.   The semiautomatic action thus effectively "runs itself."  Dkt.240 (9/18/2024 Trial Tr., Watt) at 443:18-25.  "It doesn't involve a number of mechanical motions by the shooter."  *Id.* For example, with semiautomatic function, there is no need to "hand-operate major portions of the firearm," like with a "bolt" or pump action; the simplicity allows the user to fire multiple shots accurately without needing to reload or undertake a cumbersome or arduous physical process.  *Id.*  The semiautomatic capability "efficiently and effectively utilizes the torque from the gas to make the system run so the shooter doesn't have to do anything related to that"

14

operation.  *Id.*; *see also id.* at 454:6-17 (Watt); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 228:7-229:18, 246:5-247:14; Johnson (2d ed.), *supra*, at 463; Johnson (3d ed.), *supra*, at 1984.

40.  "Semi-automatic pistols, shotguns, and … rifles are … appropriately and commonly used for typically small game hunting for many of the same reasons they are well-suited for self and home defense—accuracy, reliability and ease of handling."  Dkt.232-23 (Lombardo Rep.) at 2; *accord* Dkt.232-17 (Eby & Musselman Rep.) at 11; *see also, e.g.*, Dkt.232-21 (Little Rep.) at ¶¶17-22 ("[S]emiautomatic firearms that accept detachable magazines are so well suited for defense of self or others as to render all other types of firearms obsolete for that purpose."); *see also* Boone Rep. ¶¶38-424 (explaining utility of AR-type rifles for self-defense, including with the home).

41.  "For all users, the reduced recoil" that the semiautomatic action facilitates "helps keep the muzzle on target, increasing the accuracy of a second shot."  Johnson (3d ed.), *supra*, at 1995; *see also* Dkt.240 (9/18/2024 Trial Tr., Watt) at 451:8-24.

42.  "The reduced recoil and greater accuracy for second or subsequent shots also have obvious self-defense utility."  Johnson (3d ed.), *supra*, at 1995; *see also* Dkt.232-21 (Little Rep.) at ¶¶17-22.

- ***The ability to accept a detachable magazine*** [720 ILCS 5/24-1.9(a)(1)(A) (rifles), (a)(1)(C) (pistols), (a)(1)(F)(vi) (shotguns)]

43.  A detachable magazine is a device that holds ammunition in a stack, typically underneath the firearm, and can be replaced with a new magazine when needed.  *See* Johnson (3d ed.), *supra*, at 1978-79 ("rectangular, parallelogram, or curved boxes that can be filled with ammunition, temporarily attached to the gun during use, and then removed when empty and replaced with a freshly loaded magazine, allowing continued firing"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 444:2-9 ("The detachable magazine allows you to feed the weapon the maximum number of allowable rounds in that magazine … in one instance.").

44.  Detachable magazines "facilitate efficient loading/reloading," which is critical in a self-defense situation.  Dkt.232-24 (Watt Rep.) at ¶6; *see also id.* ("Every instructor and virtually every attendee of the [defensive carbine] course uses detachable magazines that have a capacity exceeding 10 rounds with their carbine."); Dkt.232-21 (Little Rep.) at ¶17 (detailing various "defensive" benefits of "a detachable magazine," including increased "ammunition capacity … when reacting to an attack, especially as fine motor skills deteriorate significantly under stress"; "reliability" due to jam mitigation; safe storage; and safe transportation).

45.  Firearms equipped "with detachable magazines … typically can be reloaded more quickly than other firearms, especially by nonexperts."  Johnson (3d ed.), *supra*, at 1995; *see also id.* ("[M]any police and citizens prefer the ability to quickly reload if necessary."); Dkt.240 (9/18/2024 Trial Tr., Watt) at 444:2-9; Dkt.232-21 (Little Rep.) at ¶17.

15

*- A **pistol grip*** [720 ILCS 5/24-1.9(a)(1)(A)(i) (rifles), (a)(1)(F)(i) (shotguns)]

46.   A pistol grip is a handgrip that extends below a firearm that allows the user to place his or her "hand in an ergonomic position" improving the user's "ability to control the weapon" and "to manage recoil" for "more effective and efficient" use of the firearm—including, for example, all AR-type firearms, which all comes standard with pistol grips.   Dkt.240 (9/18/2024 Trial Tr., Watt) at 446:22-447:12; Lombardo Video 1 at 10:14-11:44.

47.   "[A] pistol grip on a semiautomatic carbine or shotgun capable of accepting detachable magazines can aid self-defense in multiple ways, some of which are:  positioning the hand for optimal trigger control and access to the firearm's safety and magazine release; sharing of absorption of the firearm's recoil through the hand as well as the shoulder, thus aiding in accuracy and rapid follow up shots as needed; allowing the defender to grasp the firearm in a way that makes dropping it or having it taken away in a struggle with an attacker less likely; and, facilitating one-handed use of the firearm in case the other hand is injured or needed to perform some other task (e.g., calling 911)." )."  Dkt.232-24 (Watt Rep.) at ¶15; Dkt.240 (9/18/2024 Trial Tr., Watt) at 447:18-448:5, 451:8-24, 453:21-25, 454:4-25, 458:1-7.

48.   A pistol grip can be "essential to safe [firearm] handling," because it helps users more "easily access the manual safety" and reduce the potential of "bystander" endangerment, and it also permits the user to operate the firearm with one hand, "in case of injury or the need to perform a vital task with the support hand," or to retain "the weapon if an attacker attempts to disarm."  Dkt.232-21 (Little Rep.) at ¶¶19(A)-(B) & 20-21; Dkt.240 (9/18/2024 Trial Tr., Watt) at 447:18-448:5, 451:8-24; *see also* Dkt.232-22 (Ronkainen Rep.) at 3 (describing how "new grip … designs" led to "performance and reliability advantages for all uses …, including hunting, sport shooting, and for self or home defense");

49.   Some rifles effectively require a pistol grip (or something like it) because of their modern straight-line design.  *See* E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U.L.J. 193, 229 (2018) (explaining that some rifles are "designed to reduce muzzle rise by moving the buttstock in line with the barrel so that the rifle's recoil will push straight back into the shooter shoulder," but that this design "requires a pistol grip separate from the buttstock because it is too awkward to pull the trigger while gripping the raised buttstock when firing the rifle from the shoulder").

50.   Pistol grips can be particularly helpful in terms of safely and effectively wielding a firearm to persons with disabilities or those with smaller or more feeble hands.  *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 265:22-5 ("So if you have somebody that has a small hand, they can choose a grip that … fits them and puts their trigger finger in the proper location to pull the trigger right.  If you have a larger hand, you can put a grip that has a larger diameter.").

51.   Pistol grips have particular ergonomic, self-defense benefits on semiautomatic shotguns (in addition to on pistols and rifles).  Dkt.240 (9/18/2024 Trial Tr., Watt) at 454:4-25 (noting that the pistol-grip benefits for a semiautomatic shotgun are "even greater" than those applicable to a semiautomatic rifle "because the recoil from a shotgun is substantially greater than the recoil from a carbine"); *see also* Dkt.232-22 (Ronkainen Rep.) at 3 (describing how "new grip … designs" led to "performance and reliability advantages for all uses," "including hunting,

16

sport shooting, and for self or home defense"); Dkt.232-24 (Watt Rep.) at ¶15; Dkt.232-21 (Little Rep.) at ¶19.

> *- A **_forward protruding grip_*** [720 ILCS 5/24-1.9(a)(1)(A)(ii) (rifles), (a)(1)(F)(ii) (shotguns)]*

52.    Forward or protruding grips "stabiliz[e] the firearm in continued fire and for accuracy.  It's ergonomically placed so that [one] can get the right … isometric tension on the carbine to … have it under strict control."  Dkt.240 (9/18/2024 Trial Tr., Watt) at 449:12-19.

53.    A forward grip "on a defensive carbine, shotgun, or pistol can aid self-defense in multiple ways, some of which are: it offers the defender options for grasping the firearm with their forward hand in various ways conducive to effective individual control of the firearm, based on physiology, adverse weather, or other conditions, and, thereby, enhancing safe handling and effective use of the firearm, particularly under the stress of a self-defense situation."  Dkt.232-24 (Watt Rep.) at ¶16.

54.    "A forward grip also allows defenders to grasp the firearm in a way where their forward hand is less likely to move or slip while firing."  *Id.*  And so "a forward grip can increase the defender's control of the firearm, which can improve accuracy and facilitate the firearm's safe us, all of which facilitate effective self-defense."  *Id.*

55.    Forward or protruding grips can be particularly helpful in terms of safely and effectively wielding a firearm to persons with disabilities or those with smaller or more feeble hands.  *Id.* at ¶15; Dkt.232-21 (Little Rep.) at ¶¶13, 19B, 20A (finding that such features are "well suited for defensive use both inside and outside the home, when appropriate ammunition is used").

> *- A **_thumbhole stock_*** [720 ILCS 5/24-1.9(a)(1)(A)(i) (rifles), (a)(1)(F)(i) (shotguns)]*

56.    A "stock" is the part of a long gun to which the barrel, action, and firing mechanism are attached, and that allows the user to firmly brace the firearm and more easily aim with stability.  *See* Dkt.232-21 (Little Rep.) at ¶19(C).  "When firing [a] rifle, the shooter braces its *stock* against the shoulder of the same arm she uses to operate the trigger."  Johnson (3d ed.), *supra*, at 1970.

57.    A thumbhole stock is a stock with a small hole drilled through the grip area which allows the user of a firearm to place the thumb on his or her firing hand into the stock of a rifle behind the trigger guard, mimicking the ergonomics of a pistol grip.  *See* Dkt.232-24 (Watt Rep.) at ¶6.

58.    Thumbhole stocks create a more comfortable and stable grip, which provides for greater accuracy and decreases the risk of dropping the firearm or firing stray shots in self-defense or competition shooting scenarios.  *See* Dkt.232-21 (Little Rep.) at ¶19(A); Dkt.232-24 (Watt Rep.) at ¶15; *see also* Dkt.232-22 (Ronkainen Rep.) at 3 (describing how "new" "stock … designs" led to "performance and reliability advantages for all uses …, including hunting, sport shooting, and for self or home defense").

17

- ***A folding, telescoping, detachable, or otherwise adjustable stock*** [720 ILCS 5/24-1.9(a)(1)(A)(iii) (rifles), (a)(1)(F)(iii) (shotguns)]

59.   "[E]verybody has a different physiology," so, "to control a firearm, the distance or the pull length of the stock is different for different people."  Dkt.240 (9/18/2024 Trial Tr., Watt) at 444:12-18.

60.   Having a firearm that fits the person increases the person's ability to control the firearm.  *See id.* at 446:14-19 (Watt) ("[F]it is very, very important to the efficient and effective use for a firearm, particularly for self-defense…. It is a basic principle.").  "This is especially true for the population groups arguably most in need of a firearm for self-defense, the disabled, the small statured, the elderly, and the frail."  Dkt.232-21 (Little Rep.) at ¶19(C).

61.   Having an adjustable stock "allows … a wide variety of people" to comfortably utilize the same firearm.  Dkt.240 (9/18/2024 Trial Tr., Watt) at 444:12-18; *see also* Lombardo Video 1 at 7:51-8:01; Dkt.232-24 (Watt Rep.) at ¶17 ("User-adjustable stocks are simply an acknowledgement that people come in different sizes."); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 266:6-17 (discussing ability to adjust a stock to accommodate "bulky clothing" or "the stature of the person" firing the weapon); *Id.* at 266:20-22 (Ronkainen) ("You're able to use the firearm more safely, if the ergonomics … are adjustable to your particular requirements or your needs."); Dkt.240 (9/18/2024 Trial Tr., Watt) at 445:18-25 ("[S]hort people like me need shorter stocks, taller people need longer stocks in order to be able to function effectively with the firearm.").

62.   "The same is true for detachable stocks" more generally, "which allow[] the stock to be changed out to find one that is most comfortable for the user" and a folding stock, which "can be folded alongside the rifle for safe storage and transportation of the firearm."  Dkt.232-21 (Little Rep.) at ¶19(C); *see also* Dkt.88 (4/13/2023 Tr. of Oral Argument) at 83:13-14 (counsel for Illinois conceding that "there are certainly benefits to an adjustable stock attached to a particular weapon"); *see also* Dkt.232-22 (Ronkainen Rep.) at 3 (describing how "new" "stock … designs" led to "performance and reliability advantages for all uses …, including hunting, sport shooting, and for self or home defense").

63.   A telescoping stock is an adjustable shoulder stock, which allows a person to change the length of his or her firearm to fit his or her stature, and "is essential for maximizing accuracy … handling," and "for defensive use of [a] rifle."  Dkt.232-21 (Little Rep.) at ¶19(C); Dkt.232-24 (Watt Rep.) at ¶17; Lombardo Video 1 at 6:41-8:24.

64.   Adjustable stocks "allow for the safe operation of the long-gun by another person of a different stature," besides the owner, "such as the owner's spouse."  Dkt.232-24 (Watt Rep.) at ¶17.

65.   Adjustable stocks do not render a long gun concealable.  *See* Dkt.232-24 (Watt Rep.) at ¶17 ("Adjustable stocks usually only allow the stock to change length by a few inches. While those inches can be critical for proper use of the long-gun by the user, they are negligible in concealing the long-gun."); Dkt.240 (9/18/2024 Trial Tr., Watt) at 444:10-18 ("A collapsible stock … doesn't take it below any type of a legal limit.").

18

- *A <u>flash suppressor</u>* [720 ILCS 5//24-1.9(a)(1)(A)(iv) (rifles), (a)(1)(C)(iv) (pistols)]

66.   A flash suppressor is a device designed to reduce or redirect muzzle flash—the sudden flash of light caused by the explosion of gunpowder when a firearm user fires a shot—from the user's field of vision.  *See* Dkt.232-21 (Little Rep.) at ¶¶19(D), 20(C); Dkt.232-24 (Watt Rep.) at ¶18; David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396-99 (1994).

67.   A flash suppressor does not hide the flash from those in the direct line of fire; it prevents the user from being blinded in low lighting conditions, such as at dusk or dawn, or during the nighttime, and can help reduce recoil and muzzle movement, increasing accuracy and making the firearm less painful to use.  *See* Dkt.232-21 (Little Rep.) at ¶19(D); Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, *supra*, at 396-99.

68.   Flash suppressors aid defensive use of a rifle or pistol.  Dkt.232-24 (Watt Rep.) at ¶18; *see also*  Dkt.232-21 (Little Rep.) at ¶19.

69.   "A fair percentage of self-defense employments … are in limited light," and "th[e] muzzle flash can be quite blinding if it rises directly up into the vision path of the shooter."  A flash suppressor "helps direct [the muzzle flash] away," allowing the user to "continue to positively identify and ensure that" he or she is "shooting at the right things at the right time."  Dkt.240 (9/18/2024 Trial Tr., Watt) at 449:25-450:25; *see also* Dkt.232-24 (Watt Rep.) at ¶18 (noting a flash suppressor's utility in low-light self-defense situations, such as "in an unlighted hallway at night").

70.   Flash suppressors also assist with "recoil by limiting what we call muzzle rise of the firearm."  Dkt.240 (9/18/2024 Trial Tr., Watt) at 450:7-9, 451:4-15; *see also* Dkt.232-21 (Little Rep.) at ¶19.

- *A <u>barrel shroud</u>* [720 ILCS 5/24-1.9(a)(1)(A)(vi) (rifles), (a)(1)(C)(iii) (pistols)]

71.   A barrel shroud is a piece of wood, metal, or other material, built to fit around the barrel of a firearm, which provides a safe place to put one's hand when bracing the firearm given that the "barrel can get hot" while firing.  Dkt.240 (9/18/2024 Trial Tr., Watt) at 452:5-20; Dkt.232-21 (Little Rep.) at ¶¶19(E), 20(D); Dkt.232-24 (Watt Rep.) at ¶19; Lombardo Video 1 at 8:25-9:22; *see also* Dkt.232-22 (Ronkainen Rep.) at 3 (describing how "new … handguard designs" led to "performance and reliability advantages for all uses …, including hunting, sport shooting, and for self or home defense"); Johnson (3d ed.), *supra*, at 1968 ("Barrel shrouds (or handguards) cover the barrel on a rifle or shotgun.").

72.   Barrel shrouds allow "for the attachment of devices that aid and assist in self-defense shooting such as flashlights," as well as "slings" to "help control the firearm."  Dkt.240 (9/18/2024 Trial Tr., Watt) at 452:5-20; Dkt.232-21 (Little Rep.) at ¶¶19(E), 20(D); Dkt.232-24 (Watt Rep.) at ¶19; Lombardo Video 1 at 8:25-9:22.

19

73. Barrel shrouds are critical for self-defense. Dkt.232-24 (Watt Rep.) at ¶19. Without such a feature, users would have to put their hands "directly … on the barrel" and would "burn" themselves. Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 261:23-262:1.

74. "[V]irtually every semiautomatic rifle/carbine and AR-pistol in existence" has some kind of barrel shroud (or a protruding grip to serve the same feature), Dkt.232-24 (Watt Rep.) at ¶19, because, without one, the firearm would be "unsafe" to operate, Dkt.232-21 (Little Rep.) at ¶19(E). *Accord* Lombardo Video 1 at 8:53-9:03.

### - *A __buffer tube, brace, or other part that protrudes horizontally behind the pistol grip to facilitate shoulder firing__* [24-1.9(a)(1)(C)(vi) (pistols)]

75. A buffer tube is a piece of metal or some other material that contains the buffer and the recoil spring of a firearm. Dkt.232-21 (Little Rep.) at ¶20(B).

76. The piece of material that contains the buffer and the recoil spring can act as a mounting point for the buttstock or an arm brace—which "does facilitate self-defense by stabilizing the weapon and allowing it to be fired effectively by the population groups … arguably most in need of a firearm for self-defense, the handicapped, the small statured, the elderly, and the frail." *Id.*; *see also* Dkt.232-24 (Watt Rep.) at ¶6.

### - *A __threaded barrel__* [24-1.9(a)(1)(C)(i) (pistols)]

77. Threading in a barrel allows users to attach various devices, such as a muzzle brake or compensator, to a pistol. *See* Dkt.240 (9/18/2024 Trial Tr., Watt) at 429:1-6; Dkt.232-21 (Little Rep.) at ¶20(E); Dkt.232-24 (Watt Rep.) at ¶11(b); Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, *supra*, at 396.

78. Both muzzle brakes and compensators are designed to redirect propellant gases to counter recoil and its resultant poor accuracy, and are often used in competitive shooting. *See* Dkt.240 (9/18/2024 Trial Tr., Watt) at 429:7-18 ("It reduces recoil, which makes the firearm more controllable"); Dkt.232-21 (Little Rep.) at ¶20(E); Lombardo Video 1 at 12:35-12:48, 13:03-13:11.

### B. PICA Bans Rifles That Ordinary People Would and Do Keep at Home For Self-Defense and Other Lawful Purposes.

### - *Millions of Ordinary People __Do__ Keep the Rifles PICA Bans for Self-Defense*

79. Most semiautomatic rifles today come standard from the manufacturer with the capacity to accept a detachable magazine as well as a thumbhole stock; a pistol grip; a folding, telescoping, or detachable stock; a flash suppressor; and/or a barrel shroud. *See* Johnson (3d ed.), *supra*, at 1995; *see also, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 67:24-68:1 (describing "AR-15 or AR-type rifle[s]" without "a pistol grip" as "extremely uncommon"); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 261:9-262:7 (describing that nearly all modern sporting rifles ("MSRs") have the capacity to accept a detachable magazine, and have flash suppressors, barrel shrouds, and/or adjustable stocks); Dkt.240 (9/18/2024 Trial Tr., Watt) at 412:5-11, 469:3-16; Dkt.232-24 (Watt Rep.) at ¶¶6, 12, 15-16 (noting that "pistol grips … are commonly found on

20

the carbines" of students and instructors in defensive-training courses); Lombardo Video 1 at 6:26-6:41, 10:14-11:44; Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, *supra*, at 396.

80.    Indeed, semiautomatic rifles with the capacity to accept a detachable magazine and one or more of those features are so common that they are simply known as "modern sporting rifles." *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 261:9-262:7 (explaining that nearly all modern sporting rifles ("MSRs") have the capacity to accept a detachable magazine, and have flash suppressors, barrel shrouds, and/or adjustable stocks); *Id.* at 232:20-233:16 (Ronkainen) (discussing design and manufacturing of "modern sporting rifles").

81.    Two of the most common types of MSRs are rifles built on the AR or AK platform. *See, e.g.*, Johnson (3d ed.), *supra*, at 2000 (using "modern sporting rifle" and "AR-type rifle" interchangeably); *2021 Firearms Retailer Survey Report* at 7, NSSF, https://bit.ly/3CXJwC1 (referring to "AR-style/modern sporting rifles"); Dkt.232-23 (Lombardo Rep.) at 2 (using the term "modern sporting rifles"); Dkt.232-15 (Curcuruto Dep.) at 24:20-22 (same); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 232:20-233:16 (Ronkainen) (same); Dkt.232-12 (Ronkainen Dep.) at 14:1-2 ("That term [MSR] applies to AR-style rifles, AK-style rifles, semiautomatic rifles in general."); Dkt.232-15 (Curcuruto Dep.) at 24:20-22 (highlighting the "commonality of AR or AK platform firearms which we called modern sporting rifles").

82.    The AR platform is an "open source" design that can be modified with "countless variations and adaptations," with "ready-made retail parts" "made by numerous manufacturers under different product names." This makes AR-platform rifles accessible to the needs of lawful users of many different shapes, sizes, and capabilities. *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 264:17-265:2 (discussing "modular nature of the platforms"); Dkt.232-12 (Ronkainen Dep.) at 20:17-24 (describing AR-platform); Dkt.232-23 (Lombardo Rep.) at 1 (highlighting "the popularity of AR-platform rifles" due to "their ready adaptability for different uses," including "target matches, home defense, and various types of game hunting"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 468:6-16 (discussing how the semiautomatic rifles PICA bans by name "are suitable for self-defense").

83.    "The AR-platform rifle has been the most significant design in weaponry for common use among the public over the last 60 years." Dkt.232-17 (Eby & Musselman Rep.) at p.11; *see also* David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849, 859-60 (2015) (first AR-15 rifle was released in 1963).

84.    Semiautomatic AR-platform rifles "traditionally have been widely accepted as lawful possessions" all across the country. *Staples v. United States*, 511 U.S. 600, 612 (1994). That remains true now. *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting) (noting that "semiautomatic rifles" like the AR-15 are "commonly available" to the civilian public).

85.    The AR-15 is now "[t]he most popular general-purpose rifle in America." Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1995 (3d ed. 2021) (2024 Supp.); *see also, e.g.*, Jon Schuppe, *America's Rifle: Why So*

21

*Many People Love the AR-15*, NBC News (Dec. 27, 2017), https://tinyurl.com/3pet65j5 ("[T]he AR-15 remains a jewel of the gun industry, the country's most popular rifle, irreversibly lodged into American culture."); Patrick Sweeney, *Gun Digest Book of the AR-15* 104 (2005) (listing models).

86.   "AR-15-type rifles are used for lawful purposes such as self-defense, hunting, and target practice."   Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1996 (3d ed. 2021) (2024 Supp.); *see also, e.g.*, David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849-50, 866, 859 n.88 (2015); Dkt.232-21 (Little Rep.) at ¶11; Dkt.232-24 (Watt Rep.) at ¶11; Dkt.232-13 (Watt Dep.) at 117:5-7 ("[I]n the self-defense realm, these are the favorite style of rifles and carbines that people show up [with] for training."); Dkt.240 (9/18/2024 Trial Tr., Watt) at 411:5-412:24; *see also id.* at 468:6-24 (discussing how the semiautomatic rifles that HB5471 bans by name "are suitable for self-defense"); *see also* Dkt.232-18 (Boone Rep.) at ¶¶38-42 (citing ATF and FBI weapons selection data in concluding that shoulder-fired semiautomatic rifle are the people's "weapon of choice" for "self-defense"); Dkt.232-22 (Ronkainen Rep.) at p.2 (describing the design of various AR-15 platform rifles serving "the demand for use of" such weapons "for self and home defense purposes"); Dkt.232-22 (Ronkainen Rep.) at p.2 ("I was directly involved in analyzing, designing and manufacturing rifles that were well suited" for the "widely chosen" purpose of "self and home defense"); Pltfs' Tr. Ex. 140, Dempsey Dep. at 61:5-64:7 (state's expert describing that even he and his friends purchased and use semiautomatic rifles with a detachable 30-round magazine for recreational purposes because "shooting is not an unfun experience").

87.   Consumers consistently report that one of the most important reasons they purchase AR-platform and other modern sporting rifles is for self-defense (and the others are lawful purposes such as hunting and sport shooting).  *See, e.g.*, NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* 18, 26 (July 14, 2022), bit.ly/3oXjavU (charting "Recreational targeting shooting" and "Home/self-defense" as the two highest rated "Reasons for Ownership"); NSSF, *2021 Firearms Retailer Survey Report* 7 (estimating that more than 40% of "AR-style/modern sporting rifles" were sold for self-defense or "[p]ersonal-protection purposes," just over 30% for "[t]arget/informal shooting," and just under 30% for "[h]unting purposes"); *see also, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 54:2-11 ("Q. … Has any purchaser of an AR-type rifle indicated on one of these forms that Piasa collects that the reason for the purchase was self-defense?  A. They have.  Q. And how often is that the response for AR-type rifles in your experience?  A. Without review of these, of those forms, like – couldn't speculate, but we typically receive responses such as personal protection or collection, sport shooting, hunting, competition."); William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 33-34 (May 13, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494 (finding widespread ownership of AR-platform rifles); *Poll of current gun owners*, Washington Post-Ipsos (Mar. 27, 2023), https://bit.ly/46CqzRa (finding 20% of gun owners currently own an AR-15 or similar style rifle, 60% of respondents citing target shooting as a "major reason" for owning them and 30% citing that as a "minor reason," and protection of self, family, and property rating as even more important, with 65% as a major reason and 26% reporting it as a minor reason); *see also* Dkt.185 (Klarevas Rep.) at 19 ("[T]he Washington Post and Ipsos are considered to be organizations that conduct credible public opinion polls.").

88.   Modern sporting rifles are the most popular category of rifles in America today. *See, e.g.*, Dkt.232-21 (Little Rep.) at ¶11 (opining that "AR-15 style rifles" "that accept detachable magazines" "are the most popular rifle in the country"); Dkt.232-24 (Watt Rep.) at ¶11 (similar); Dkt.232-12 (Ronkainen Dep.) at 110:10-11 (noting that the AR-15 has been a "primary product" in the consumer market); Emily Guskin et al., *Why do Americans own AR-15s?*, Washington Post / Ipsos (Mar. 27, 2023), https://tinyurl.com/3ddz8pj2 (20% of sampled gun owners own an AR-style rifle).

89.   As James Ronkainen explained, based on his nearly four decades of experience in the industry, the lawful "market" for MSRs has "been consistent or expanding" over the years—so much so that even just the few manufacturers with which he was professionally involved produced millions of MSRs. *See, e.g.*, Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 312:17-19 ("Q. … [D]id MSR production volumes for lawful sales to civilians stay robust year over year" "during your tenure as director of MSR new product development for Remington, DPMS and Bushmaster …[?]   A. Yes."); Dkt.232-22 (Ronkainen Rep.) at pp.3-4 (similar); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 335:15-16 ("if you look at the overall general trend, it continued to climb").   *See generally* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 215:22-25, 251:21-252:2, 263:8-264:16, 351:6-18 (describing experience, which includes engineering, research and development, and interfacing and planning with sales and marketing departments).

90.   Dozens of manufacturers make and sell modern sporting rifles. *See, e.g.*, Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 316:6-18, 327:15-22, 328:14-25 (discussing large "publicly traded companies" in the "consumer MSR marketplace" as well as "numerous other smaller companies"); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 302:23-312:19 (reviewing several retailer product catalogs that advertise and sell long-lawful but now-prohibited MSRs, including the "R-25 … [an] AR-15-style or type of firearm"); Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 41:17-49:23 (highlighting some of the "dozens, if not hundreds, of … manufacturers of AR-type rifles," many of which are sold by Piasa Armory); *see also* Dkt.232-12 (Ronkainen Dep.) at 110:10-11.

91.   Data from the Annual Firearm Manufacturers Report ("AFMER"), "a report that the [ATF] requires to be filed on an annual basis by FFLs with a manufacturing license" and which tabulates all firearm production for sale in the United States and those produced for export, Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 312:23-25, shows the prevalence of MSRs. While AFMER does not break out MSRs from all other rifles, many of the most prominent manufacturers of rifles made *only* MSRs. *See id.* at 316:6-18, 327:15-22 (noting that in 2013 there were "80-plus … MSR exclusive manufacturers listed in the AFMER," like "Bushmaster" and "DPMS," and one could cross-reference the MSR numbers from those manufacturers with the overall numbers reported to get a conservative estimate of MSR production for sale); *see also id*. at 323:11-327:11 (detailing review of AFMER numbers).

92.   Looking only at AFMER data and MSR-only manufacturers, millions of MSRs were produced for sale in the United States over the past decades. *See* Dkt.232-12 (Ronkainen Dep.) at 132:23-134:22, 136:10-137:3 (noting that, while AFMER reports do not separate out MSRs from all rifles, "the data can be parsed" to come to a "conservative[]" estimate of MSRs that is undoubtedly lower than "[t]he actual number" and still in the millions); *see also* Pltfs' Tr. Ex. 78, ATF, 2022 AFMER Report at 1 (ATF reported that well over 3.5 million rifles were

produced for sale in the United States in 2022 alone); Pltfs' Tr. Ex. 77, ATF 2021 AFMER Report at 1 (over 3.9 million); Pltfs' Tr. Ex. 76, ATF 2019 AFMER Report at 1 (over 1.9 million); Pltfs' Tr. Ex. 75, ATF 2018 AFMER Report at 1 (over 2.8 million); Pltfs' Tr. Ex. 74, ATF 2017 AFMER Report at 1 (over 2.5 million); Pltfs' Tr. Ex. 73, ATF 2016 AFMER Report at 1 (over 4.2 million); Pltfs' Tr. Ex. 72, ATF 2015 AFMER Report at 1 (over 3.6 million); Pltfs' Tr. Ex. 71, ATF 2014 AFMER Report at 1 (over 3.3 million); Pltfs' Tr. Ex. 70, ATF 2013 AFMER Report at 1 (over 3.9 million); Pltfs' Tr. Ex. 69, ATF 2012 AFMER Report at 1 (over 3.1 million); Pltfs' Tr. Ex. 68, ATF 2011 AFMER Report at 1 (over 2.3 million); Pltfs' Tr. Ex. 67, ATF 2010 AFMER Report at 1 (over 1.8 million); Pltfs' Tr. Ex. 66, ATF 2009 AFMER Report at 1 (over 2.2 million); Pltfs' Tr. Ex. 65, ATF 2008 AFMER Report at 1 (over 1.7 million); Pltfs' Tr. Ex. 64, ATF 2007 AFMER Report at 1 (over 1.6 million).

93.    Industry data confirms these conclusions.

94.    In 2018, according to NSSF, modern sporting rifles accounted for nearly half (48%) of all rifles produced in the United States.  NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3CRHhQl; *accord* NSSF, *Firearm Production in the United States* 7 (2020), https://tinyurl.com/bdhvzjea.

95.    In 2020, another 2.8 million modern sporting rifles were produced in or imported into the United States.  *See* NSSF, *Firearm Production in the United States* 7 (2020), https://tinyurl.com/bdhvzjea.

96.    Data shows that, as of 2020, more than 24 million MSRs were owned nationwide. NSSF, *Firearm Production in the United States* 7 (2020), https://tinyurl.com/bdhvzjea; *accord* English, *supra*, at 2.

97.    That number has grown still in the past few years, with most recent industry data from 2023 demonstrating that more than 28 million modern sporting rifles are in circulation today.  NSSF, *NSSF Releases Most Recent Firearm Production Figures* (Jan. 11, 2024), https://tinyurl.com/3rs4zam6; *see also* NSSF, *Firearm Production in the United States* 3 (2023); Dkt.240 (9/18/2024 Trial Tr., Watt) at 436:25-437:1 ("It's my opinion,"—based on "training, education, experience, background, military and law enforcement, and particularly … in th[e] industry conducting training, attending shows, researching,"—"that these are the most popular firearms used in the firearms training and self-defense industry.").

98. Defendants' own experts endorse similar conclusions.  *See, e.g.*, Dkt.185 (Klarevas Rep.) at 20 (estimating "the number of Americans who own AR-15-platform firearms" at "14.1 million" to "18.2 million adults").

99.    Defendants themselves have endorsed the (low) estimate that roughly "6.4 million … Americans," which is more people than live in 33 of the 50 states of this country, own AR-platform rifles.  *See, e.g.*, Dkt.47 (State.Br. at 22, CA7 No. 23-1825 (7th Cir. June 5, 2023)); *see also* Dkt.185 (Klarevas Rep.) at 21 (noting that that figure is close to NSSF's findings); *cf.* Dkt.232-22 (Ronkainen Rep.) at 5 (rejecting "Mr. Andrew's" unevidenced "suggest[ion] that MSRs are a 'small fraction of firearms in private possession in the United States'" by noting that

"MSRs were a significant portion of our sales to consumers/civilians" (quoting Dkt.185-2 (Andrew Rep.) at ¶37)).

100. At least one of Defendants' witnesses keeps and bears for lawful personal use the common arms that PICA now bans. *See, e.g.*, Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 612:25-614:19 (confirming ownership and personal use of "SIG Sauer AR-15" with semiautomatic capability, multiple 30-round magazines, a pistol grip, adjustable stock, flash suppressor, and barrel shroud); *cf.* Dkt.240 (9/18/2024 Trial Tr., Watt) at 456:13-458:12 ("I keep" AR-type rifles and pistols with 30-round magazines and "semiautomatic shotguns" with "detachable magazines" and "pistol grips" "for self-defense" and to "train" others in the art). The state's expert, Lt. Colonel Dempsey, himself goes so far as to disapprove of the state's efforts to "outright" ban these common firearms. Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 615:4-8.

101. Individual retailer data from within the state of Illinois also prove that law-abiding citizens do in fact buy and sell MSRs (at least before PICA outlawed them). *See, e.g.*, Pltfs' Tr. Ex. 129, HG&M_000001-000056 (detailing firearm acquisitions and dispositions from Hoods Guns & More between 2019 and 2024); Pltfs' Tr. Ex. 131, NSSF_002059-002307 (detailing the same for Pro Guns & Indoor Range); *see also* Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 57:5-58:15 ("Q. Okay. So usually, there were always AR-type rifles in Piasa's inventory at the store? A. Yes, our strategy was to keep several in stock at all times. Q. Okay. And why? A. That's what our customers wanted."); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 302:23-312:19 (reviewing several retailer product catalogs that advertise and sell long-lawful but now-prohibited firearms, including the "R-25 … [an] AR-15-style or type of firearm," "multiple" "shotguns," "pistols," and firearms with features like "thumbhole stock[s]," "pistol grips," and the like).

102. Finally, PICA's own registration scheme confirms that many people in Illinois own the arms PICA bans. For example, as part of its grandfathering provision, nearly 70,000 firearms—now banned from purchase or sale—were registered with the State of Illinois in just the four-month period, between October and December of 2023, after PICA's enactment. *See* Pltfs' Tr. Ex. 189, State Resp. to *Langley* Interrogatories 8-9 (citing https://isp.illinois.gov/Foid/Statistics). Another nearly 12,000 were added in the month of January 2024 alone. *Id.* These figures do not include those who removed from Illinois firearms that PICA bans or who failed to register for lack of notice or otherwise.

### *- The Rifles That PICA Bans Are Suitable for Civilian Self-Defense, and Thus Are "Arms That Ordinary People <u>Would</u> Keep At Home For Purposes of Self-Defense"*

103. "[T]he large number of people that choose these arms for self-defense related purposes are not making bad choices; to the contrary, they are making wise choices." Dkt.232-24 (Watt Rep.) at ¶12.

104. MSRs "are extremely well suited for self-defense, including within confined areas like a home." Dkt.232-18 (Boone Rep.) at ¶42; *see also* Dkt.232-23 (Lombardo Rep.) at 2 ("The presence on a firearm of one or more of the features that Illinois has chosen to ban and criminalize improve the safe operation, function and handling of the firearm.").

25

105. "AR-platform rifles are lighter in weight, shorter in length and have less recoil than most traditionally-styled wooden-stock semi-automatic rifles, making them easier to handle and shoot."  Dkt.232-23 (Lombardo Rep.) at p.1.

106. AR-platform rifles "are also very accurate and reliable."  Dkt.232-23 (Lombardo Rep.) at 1.

107. "While handguns are easier to maneuver and store and shotguns have devastating firepower at short distances, the AR-15 carbine offers several advantages as a primary home defense weapon."  Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1997 (3d ed. 2021) (2024 Supp.).  Some of those advantages are:

> • AR-platform rifles have far less recoil than shotguns and less recoil than most other rifles and handguns.  *Id.*  Less recoil makes a firearm easier to shoot.  *Id.*
> • AR-platform rifles' "lighter weight, shorter barrel, and ergonomic stock and grip make it easier to handle than shotguns and most other rifles."  *Id.*
> • AR-platform rifles' can be equipped with a red-dot sight or low-power scope for more accurate aiming, which are useful for self-defense.  *Id.*  "Lights and lasers easily can be attached to the AR-15's handguard for better identification and targeting.  Scopes and lights can be added to most firearms, but the AR-15 is famously easy to accessorize because it often comes with rails that make accessorizing simple."  *Id.*
> • AR-platform rifles' standard 30-round magazine "is larger than standard semiautomatic handguns (15-18 rounds), revolvers (5-6 rounds), and shotguns (3-6 rounds)."  *Id.*  "This ensures that the operator is prepared for a variety of defensive scenarios without carrying additional ammunition and pausing to reload, such as when confronting multiple attackers in a home invasion."  *Id.*

*See also, e.g.*, Dkt.240 (9/18/2024 Trial Tr., Watt) at 443:18-25, 468:6-16; Dkt.240 (9/18/2024 Trial Tr., Watt) at 441:17-443:12 ("[I]t's my opinion they're very suitable for self-defense" because they "improve ergonomics, they improve accuracy, they're very maneuverable, they're controllable, and a number of those features help create an ability for a wide variety of persons to control and utilize that firearm successfully."); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 271:10-19, 285:1-4 ("[H]and size, stature and all that, you know, play into … the best ergonomics for the gun, so having [firearms] with the capability of adjusting or changing … is preferred" and the AR-platform is "optimal" for such modifications).

108. That explains why so many people report that they keep these weapons for purposes of self-defense.  *See, e.g.*, Dkt.232-18 (Boone Rep.) at ¶¶38-42 (citing ATF and FBI weapons selection data in concluding that shoulder-fired semiautomatic rifle are the people's "weapon of choice" for "self-defense"); Dkt.232-22 (Ronkainen Rep.) at 2 (describing the design of various AR-15 platform rifles serving "the demand for use of" such weapons "for self and home defense purposes"); Dkt.232-22 (Ronkainen Rep.) at 3 ("I was directly involved in analyzing, designing and manufacturing rifles that were well suited" for the "widely chosen" purpose of "self and home defense").

26

109. The rifles used in popular "defensive carbine course[s]" like, for example, those self-defense expert Mr. Randy Watt teaches, are commonly "AR platform rifles" and other MSRs. Dkt.240 (9/18/2024 Trial Tr., Watt) at 411:5-412:24; *accord* Dkt.232-13 (Watt Dep.) at 117:5-7 ("[I]n the self-defense realm, these are the favorite style of rifles and carbines that people show up for training."). *See generally* Dkt.240 (9/18/2024 Trial Tr., Watt) at 411:5-412:24 (in those classes, Mr. Watt instructs on "[s]afety, safe handling, firing the firearm effectively, and then performing the things necessary to keep the firearm functioning and working, reloading, reducing stoppages of fires," amongst other items so that persons can "utilize the carbine effectively in a self-defense situation"); *id.* at 417:8-19 (classes are taken "mostly" by "members of the general public"); *id.* at 418:12-425:14 (discussing the "very large market" and vast "number of … individuals" who teach defensive carbine courses to law-abiding citizens). Watt is not alone; Plaintiffs other self-defense experts expressed the same opinions. *See, e.g.*, Dkt.232-21 (Little Rep.) at ¶¶11, 15; Dkt.232-23 (Lombardo Rep.) at 1.

110. In short, MSRs (i.e., semiautomatic rifles capable of accepting detachable magazines that also have a pistol grip, a forward grip, a barrel shroud, a flash suppressor, or a thumbhole stock, folding stock, telescoping stock, or otherwise detachable stock) are commonly used and well-suited for lawful personal defense, competitive shooting, hunting, and recreational purposes. *See, e.g.*, Dkt.240 (9/18/2024 Trial Tr., Watt) at 442:14-443:12 ("[I]t's my opinion they're very suitable for self-defense" because they "improve ergonomics, they improve accuracy, they're very maneuverable, they're controllable, and a number of those features help create an ability for a wide variety of persons to control and utilize that firearm successfully."); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 271:10-19, 285:1-4 ("[H]and size, stature and all that, you know, play into … the best ergonomics for the gun, so having [firearms] with the capability of adjusting or changing … is preferred," and the AR-platform is "optimal" for such modifications.); Dkt.232-13 (Watt Dep.) at 78:6-10 ("Q. Is that training that you offer popular? A. Very popular. The civilian model AR-15 models are very popular, and people like to get trained with them."); Dkt.232-13 (Watt Dep.) at 131:24-132:2 (the features PICA singles out for rifles "are very common and in self-defense training and use"); Dkt.232-21 (Little Rep.) at ¶¶11-22 (opining that semiautomatic rifles capable of accepting detachable magazines, as well as the grips, suppressors, stocks, shrouds, and large-capacity magazines Illinois proscribes, "are commonly possessed by members of the American public for various purposes, including competitive sports, training, and lawful personal defense"); Dkt.232-24 (Watt Rep.) at ¶¶6, 11-12, 15-19 (elucidating the defensive benefits of the grips, stocks, flash suppressors, and barrel shrouds Illinois proscribes); Dkt.232-18 (Boone Rep.) at ¶¶38-41 (citing an ATF report demonstrating "that semiautomatic rifles with the features the challenged law singles out … are extremely well suited for self-defense, including within confined areas like a home"); Dkt.232-22 (Ronkainen Rep.) at 2 ("The MSR platform is a natural fit with the rifle portions of 3-gun competition, target shooting, and for hunting, especially varmints, predators, and, depending on caliber, also big game" and "suitab[le] for home and self-defense[.]"); Lombardo Video 1 at 7:10-7:21, 11:18-11:44 & Video 2 at 8:31-8:53 (similar).

## C. PICA Bans Pistols and Shotguns That Ordinary People Would and Do Keep at Home For Self-Defense and Other Lawful Purposes.

111. Semiautomatic pistols with the capacity to accept a detachable magazine are exceedingly common and commonly owned by law-abiding citizens for lawful purposes. *See,*

*e.g.*, *Caetano*, 577 U.S at 416-17 (Alito, J., concurring in the judgment) ("semiautomatic pistols" are among "the weapons most commonly used today for self-defense"); NSSF, *Firearms Retailer Survey Report* 9 (2021) (44.2% of firearms sold in 2020 were semiautomatic pistols).

112. "More than three-quarters of new handguns produced in the United States in recent years have been *semi-automatic pistols*, also frequently referred to simply as *pistols*." Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1985 (3d ed. 2021) (2024 Supp.).

113. "The vast majority of semi-automatic pistols feed their ammunition from a detachable magazine inserted into the gun's grip, although a few have magazines that are inserted elsewhere." Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1985 (3d ed. 2021) (2024 Supp.).

114. Modern semiautomatic pistols with the capacity to accept a detachable magazine commonly come standard from the manufacturer with, or have the capacity to accept, a threaded barrel. *See, e.g.*, Dkt.232-21 (Little Rep.) at ¶¶6, 10(B); Dkt.232-24 (Watt Rep.) at ¶11(b); *see also* Dkt.232-21 (Little Rep.) at ¶6 (explaining that many of his students' semiautomatic pistols have threaded barrels that help "significantly improve accuracy on follow-up shots"); Wm. Alan Bartley & Geoffrey Fain Williams, *What Is an Assault Weapon? Definitions, Attributes, and Implications Regarding Legislation*, 57 Gonz. L. Rev. 515, 534 (2022) (citing statistics showing that "threaded barrels/flash suppressors are … common features"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 440:10-16 (noting that "it's very rare to have a [self-defense] class that doesn't have one or more pistols with threaded barrels").

115. Modern semiautomatic pistols with the capacity to accept a detachable magazine commonly come standard from the manufacturer with, or have the capacity to accept, a second pistol grip or protruding grip. *See, e.g.*, Dkt.232-21 (Little Rep.) at ¶¶13, 19, 20-21; Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 67:24-68:1 (describing "AR-15 or AR-type rifle[s]" without "a pistol grip" as "extremely uncommon"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 414:7-11 (describing "AR pistols" commonly brought to self-defense courses as having "[f]orward" pistol grips); *see also id.* at 438:5-439:24 (similar).

116. Modern semiautomatic pistols with the capacity to accept a detachable magazine commonly come standard from the manufacturer with, or have the capacity to accept, a barrel shroud. *See* Dkt.232-21 (Little Rep.) at ¶20(D) (noting that barrel shrouds "are a feature of virtually every AR-15 style pistol in existence"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 414:18-24, 439:8-9 (discussing how AR pistols have either a barrel shroud or "something by which you can grip forward without gripping the barrel, because the barrel will get hot"); Dkt.232-24 (Watt Rep.) at ¶19 (similar).

117. Modern semiautomatic pistols with the capacity to accept a detachable magazine commonly come standard from the manufacturer with, or have the capacity to accept, a flash suppressor. *See* Dkt.232-21 (Little Rep.) at ¶¶19, 20; Dkt.232-24 (Watt Rep.) at ¶6; Dkt.240 (9/18/2024 Trial Tr., Watt) at 439:10-11; *see also, e.g.*, Pltfs' Ex. 107, 2011 Bushmaster Catalog at 17 (listing "Bushmaster Pistols" sold with "A2 birdcage flash suppressor"); Pltfs' Ex.110, 2014 Bushmaster Catalog at 15 (AR pistols all pictured for sale with standard flash suppressors); Pltfs'

28

Ex. 120, 2013 Remington Catalog at 60 (picturing 1911 semiautomatic pistol with threaded barrel capable of accepting flash suppressor).

118. Modern semiautomatic pistols with the capacity to accept a detachable magazine commonly come standard from the manufacturer with the capacity to accept a detachable magazine at a location other than the pistol grip. *See* Dkt.240 (9/18/2024 Trial Tr., Watt) at 414:7-11 ("Q And do those AR pistols accept detachable magazines? A They do. Q And do they accept detachable magazines outside of the pistol grip? A Forward of the pistol grip, yes."); *see also id.* at 439:2-5 (same); *see also, e.g.*, Pltfs' Ex. 107, 2011 Bushmaster Catalog at 17; Pltfs' Ex.110, 2014 Bushmaster Catalog at 15.

119. Modern semiautomatic pistols with the capacity to accept a detachable magazine commonly come standard from the manufacturer with, or have the capacity to accept, a buffer tube or arm brace. *See* Dkt.240 (9/18/2024 Trial Tr., Watt) at 439:5-7; Dkt.232-24 (Watt Rep.) at ¶6 (AR pistols "almost always have a buffer tub extending behind the receiver … or an arm brace"); Dkt.232-21 (Little Rep.) at ¶20(B) (a buffer tube is a necessary component of AR-style pistol's "operating system," and comes standard with "virtually every AR-15 style pistol in existence"); *see also* Dkt.232-23 (Lombardo Rep.) at 2 (similar); Pltfs' Ex. 107, 2011 Bushmaster Catalog at 17; Pltfs' Ex.110, 2014 Bushmaster Catalog at 15.

120. Pistols equipped with the features referenced in §24-1-9(a)(1)(C) are commonly owned, kept, and borne by law-abiding citizens for lawful purposes, including self-defense. *See, e.g.*, Dkt.240 (9/18/2024 Trial Tr., Watt) at 427:16-428:22 (discussing self-defense courses for law-abiding citizens); Dkt.240 (9/18/2024 Trial Tr., Watt) at 453:13-20 (pistols with the "features" that PICA bans "allow for … controllability, accuracy, recoil management, immediate reload" and thus "are very, very much a part of self-defense techniques"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 439:21-24 (highlighting "AR pistol" as one of the many banned but "very common" firearms that he sees in his "training" courses "because of its functionality and ability as a self-defense firearm Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 302:23-312:19 (reviewing several retailer product catalogs, including multiple "pistols"); Dkt.232-21 (Little Rep.) at ¶¶6, 12, 20, 22; Dkt.232-24 (Watt Rep.) at ¶¶7, 12, 15-19; Wm. Alan Bartley & Geoffrey Fain Williams, *What Is an Assault Weapon? Definitions, Attributes, and* Implications *Regarding Legislation*, 57 Gonz. L. Rev. 515, 534 (2022) (citing statistics showing that "threaded barrels/flash suppressors are … common features").

121. They are commonly used for other lawful purposes too, like competitive shooting, training, and recreation. *See, e.g.*, Dkt.232-21 (Little Rep.) at ¶¶12, 20, 22; Dkt.232-23 (Lombardo Rep.) at 2.

122. Semiautomatic shotguns are commonly owned by law-abiding citizens for lawful purposes. Dkt.232-21 (Little Rep.) at ¶¶16, 21 (describing common and lawful use of such firearms); Dkt.232-24 (Watt Rep.) ¶¶11-12, 15 (same); Dkt.232-23 (Lombardo Rep. at 2 (same); Dkt.240 (9/18/2024 Trial Tr., Watt) at 440:17-441:16 (noting that the firearms and features references in HB5471's subsection F relating to semiautomatic shotguns are "extremely popular and used in self-defense training"); *see also id.* at 431:15-433:15 (noting that majority of participants in self-defense course bring semiautomatic shotguns); *id.* at 434:14-435:3 (discussing other "very well attended" defensive shotgun classes); Dkt.232-13 (Watt Dep.) at

29

135:11-14 ("Q. Do you have an opinion about the semi-automatic shot guns here in 11C? Do you have an opinion about their popularity? A. Yes. That they are very popular."); *see also* Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field & Stream (Mar. 20, 2023), https://bit.ly/42nqTBX (listing various semiautomatic shotguns now banned under HB5471); Dkt.232-23 (Lombardo Rep.) at 2 ("Semi-automatic pistols, shotguns, and AR-platform rifles" that often come standard with larger capacity magazines "are also appropriately and commonly used for typically small game hunting," "self- and home defense," and "the very popular '3 Gun' shooting competitions.").

123. Modern semiautomatic shotguns commonly come standard from the manufacturer with a pistol grip and/or protruding grip. Dkt.232-21 (Little Rep.) at ¶¶13, 19, 20-21; *see also* Dkt.240 (9/18/2024 Trial Tr., Watt) at 432:3-21 (discussing the type of "tactical shotgun" that individuals often bring to self-defense courses as "generally" having a "pistol grip"); *id.* at 440:17-441:16 (noting further that such a firearm is "a common defensive shotgun that are extremely popular and used in self-defense training"); Pltfs' Ex. 118, 2014 Remington Catalog at 53 (picturing Remington "Model 1100 Tac-2" semiautomatic shotgun with pistol grip) Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 306:2-16 (discussing "Model 11-87" semiautomatic shotgun from 2012 Remington catalog that has "a pistol-like" thumbhole stock grip); Pltfs' Ex. 119, 2012 Remington Catalog at 14; Dkt.232-24 (Watt Rep.) at ¶8.

124. Modern semiautomatic shotguns commonly come standard from the manufacturer with a folding or thumbhole stock. Dkt.240 (9/18/2024 Trial Tr., Watt) at 432:3-21 (discussing the type of "tactical shotgun" that individuals often bring to self-defense courses as "generally" having an "adjustable stock"); *id.* at 440:17-441:16 (noting further that such firearms are "a common defensive shotgun that are extremely popular and used in self-defense training"); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 306:2-16 (discussing "Model 11-87" semiautomatic shotgun from 2012 Remington catalog that has "a thumbhole stock"); Pltfs' Ex. 119, 2012 Remington Catalog at 14.

125. Modern semiautomatic shotguns commonly come standard from the manufacturer with a fixed magazine with the capacity to accept more than 5 rounds. *See* Dkt.240 (9/18/2024 Trial Tr., Watt) at 431:15-433:15 (noting that a vast majority of participants in his self-defense courses bring with them semiautomatic shotguns that carry the "standard … seven rounds."); *id.* at 433:13-17, 440:22-441:16, 455:1-21 (discussing fixed magazines and noting also noting "[t]hat availability of ammunition beyond three to five rounds … is very, very important … in a self-defense" situation); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 304:15-305:22, 307:14-20, 308:4-309:19 (highlighting the "multiple" different kinds of "Remington Versa Mex shotgun" which is "a semiautomatic shotgun" that can hold "eight [or] more" rounds); Pltfs' Ex. 119, 2012 Remington Catalog at 50-51; Pltfs' Ex. 118, 2014 Remington Catalog at 5; *see also* Dkt.232-18 (Boone Rep.) at ¶72; Dkt.232-24 (Watt Rep.) at ¶8.

126. Modern semiautomatic shotguns commonly come standard from the manufacturer with the capacity to accept a detachable magazine. Dkt.240 (9/18/2024 Trial Tr., Watt) at 440:17-441:16 (confirming that a shotgun with "the capacity to accept a detachable magazine" is "a common defensive shotgun that [is] extremely popular and used in self-defense training"); Dkt.232-24 (Watt Rep.) at ¶8.

30

127. Shotguns equipped with the features referenced in 720 ILCS 5/24-1-9(a)(1)(F) are commonly owned, kept, and borne by—and in fact, are "extremely popular" among—law-abiding citizens for lawful purposes, and are often "used in self-defense training."  Dkt.240 (9/18/2024 Trial Tr., Watt) at 440:17-441:16, 453:21-456:6, 458:3-13.  Indeed, in Mr. Watt's popular defensive shotgun courses, a vast majority of participants keep and carry semiautomatic shotguns that carry the "standard … seven rounds."  Dkt.240 (9/18/2024 Trial Tr., Watt) at 431:15-433:15; *see also* Dkt.240 (9/18/2024 Trial Tr., Watt) at 434:14-435:3 (discussing other "very well attended" defensive shotgun classes); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 302:23-312:19 (reviewing several retailer product catalogs, including "multiple" "shotguns" with the features PICA singles out); Dkt.232-24 (Watt Rep.) at ¶¶14-17 (discussing self-defense benefits of shotguns equipped with pistol grips, forward grips, and adjustable stocks); *see also* Dkt.232-21 (Little Rep.) at ¶¶16, 21.

128. It is also "not rare" for citizens to bring semiautomatic shotguns with detachable magazines to self-defense courses.  Dkt.240 (9/18/2024 Trial Tr., Watt) at 433:13-17, 455:1-21 ("That availability of ammunition beyond three to five rounds … is very, very important … in a self-defense" situation); Dkt.232-13 (Watt Dep.) at 135:11-14 ("Q. Do you have an opinion about the semi-automatic shot guns here in 11C?  Do you have an opinion about their popularity?  A. Yes. That they are very popular."); Dkt.232-24 (Watt Rep.) at ¶8.

129. Shotguns equipped with features referenced in 720 ILCS 5/24-1-9(a)(1)(F) are commonly used for lawful duck hunting.  *See, e.g.*, Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field & Stream (Mar. 20, 2023), https://bit.ly/42nqTBX.

### D.   PICA Bans as "Large Capacity Ammunition Feeding Devices" Detachable Magazines That Ordinary People Would and Do Keep at Home For Self-Defense and Other Lawful Purposes.

130. PICA makes it "unlawful for any person within this State to knowingly manufacture, deliver, sell, purchase, or cause to be manufactured, delivered, sold, or purchased[,] a large capacity ammunition feeding device."  720 ILCS 5/24-1.10(b).

131. PICA defines "large capacity ammunition feeding device" to include any "magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition for long guns[7] and more than 15 rounds of ammunition for handguns[8]."  720 ILCS 5/24-1.10(a)(1).

---

[7] PICA defines the term "long gun" to mean "a rifle or shotgun."  720 ILCS 5/24-1.10(a).

[8] PICA defines the term "handgun" to have "the meaning ascribed to it in the Firearm Concealed Carry Act."  720 ILCS 5/24-1.10(a).  That Act in turn defines "handgun" as "any device which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas that is designed to be held and fired by the use of a single hand," with some exceptions.  430 ILCS 66/5.

31

132. PICA also defines "large capacity ammunition feeding device" to include "any combination of parts from which a device described in paragraph (1) can be assembled." 720 ILCS 5/24-1.10(a)(2).

133. The term "large capacity ammunition feeding device" under PICA does not include "an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition," or "a tubular magazine that is contained in a lever-action firearm or any device that has been made permanently inoperable." 720 ILCS 5/24-1.10(a).

134. PICA's "large capacity ammunition feeding device" prohibition applies to "any person within this State," except peace officers, police, prison officials, active-duty members of the military, and certain private security contractors. 720 ILCS 5/24-1.10(e).

135. "A person who knowingly manufactures, delivers, sells, purchases, possesses, or causes to be manufactured, delivered, sold, possessed, or purchased in violation of this Section a large capacity ammunition feeding device capable of holding more than 10 rounds of ammunition for long guns or more than 15 rounds of ammunition for handguns commits a petty offense with a fine of $1,000 for each violation." 720 ILCS 5/24-1.10(g).

136. Individuals who lawfully owned such devices before PICA's effective date may continue to possess them, but only subject to the same restrictions on their use and disposal placed on the rifles, pistols, and shotguns PICA defines as "assault weapons." 720 ILCS 5/24-1.10(d).

137. Ammunition feeding devices, commonly known as magazines, are a critical functional component of a semiautomatic firearm. They are not just "containers" that passively hold ammunition. *Contra* Dkt.185-10 (Baron Rep.) at 3. They are designed to, and do, actively feed ammunition into the firing chamber of a semiautomatic firearm. *See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1994 (3d ed. 2021) (2024 Supp.) ("Semi-automatic rifles store *and feed* their ammunition from a magazine." (emphasis added)); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018); *cf., e.g.*, R.I. Gen. Laws §11-47.1-2(2) (defining "ammunition feeding device" as the part of the firing mechanism by which "ammunition [is] fed continuously and directly … into a semi-automatic firearm").

138. When a user pulls the trigger, the round in the chamber fires, and the semiautomatic action combines with the magazine to feed a new round into the chamber. *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 228:7-229:18, 246:15-248:1; Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1984-85 (3d ed. 2021) (2024 Supp.). So, without an ammunition feeding device, one cannot load more than one round of ammunition into a semiautomatic firearm. *See, e.g.*, Dkt.240 (9/18/2024 Trial Tr., Watt) at 444:2-9 ("The detachable magazine allows you to feed the weapon the maximum number of allowable rounds in that magazine … in one instance."); Dkt.232-21 (Little Rep.) at ¶17 (detailing various "defensive" benefits of "a detachable magazine," including increased "ammunition capacity"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 501:17-502:3 (discussing stress of self-defense scenarios that make it difficult to reload quickly and thus support the self-defense need for larger magazines); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018).

139. A *detachable* magazine (as opposed to a *fixed* magazine) is one that can be readily removed from and re-inserted into the firearm. Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1978 (3d ed. 2021) (2024 Supp.).

140. Modern ammunition magazines are different in form and function from Founding-era "cartridge cases." Founding-era cartridge cases were wooden boxes for storing ammunition when it was not in use; they were not attached to a firearm, and they played no role in its operation. *See* Dkt.185-10 (Baron Rep.) at ¶35. Modern ammunition feeding devices of the sort PICA outlaws play a critical role in feeding ammunition into the firearm to allow it to operate as intended. *See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1985 (3d ed. 2021) (2024 Supp.).

141. Tens of millions of Americans collectively own hundreds of millions of the detachable ammunition feeding devices PICA prohibits. *See, e.g.*, NSSF, *Detachable Magazine Report*, at 3 (1990-2021), https://tinyurl.com/ykj42mc6 (excluding "[m]ilitary and law enforcement sales," and noting "conservative estimate" that around 56% of consumer detachable pistol magazines have a capacity of more than 10 rounds, totaling 112,997,000, and 50% of consumer detachable rifle magazines have a capacity of more than 10 rounds, totaling 451,393,000; also finding that "approximately 74 percent or 717 million magazines" in circulation have a standard capacity of more than 10 rounds); NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* 31 (July 14, 2022), https://bit.ly/3GLmErS (reporting that 69% of detachable rifle magazines have a capacity of 20 or 30 rounds); English, *supra*, at 22-23 (estimating that 39 million Americans, or more than 15% of all American adults, own or have owned a detachable magazine that holds more than ten rounds); *see also* English, *supra*, at 1; Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 65-57 (2004), https://bit.ly/3wUdGRE (similar); Dkt.232-21 (Little Rep.) at ¶¶11-12, 14; Dkt.232-24 (Watt Rep.) at ¶¶11-12; *Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019); *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (en banc); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

142. Many (if not most) modern handguns on the market today in many states, including multiple Glock, Smith & Wesson, and Beretta semiautomatic pistols, come standard with detachable magazines capable of holding more than 15 rounds of ammunition. *See, e.g.*, Pltfs' Tr. Ex. 96, *Gun Digest 2018* at 386-88, 408 (Jerry Lee and Chris Berens, ed. 2017) (multiple Glock, Smith & Wesson, and Sig Sauer pistols); *Duncan v. Becerra*, 970 F.3d 1133, 1142 (9th Cir. 2020) (highlighting Beretta Model 92, "a popular handgun used for self-defense" "which entered the market in 1976," "comes standard with a sixteen-round magazine"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 430:1-13 ("very common" detachable magazine capacities for pistols "are in the teens, 15-, 17-, 19-, even 20-round magazines"); *see also* Dkt.232-21 (Little Rep.) at ¶¶12, 15, 19; Dkt.232-24 (Watt Rep.) at ¶11; Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403, 1985 (3d ed. 2021).

143. Modern sporting rifles typically come standard with a detachable 20- to 30-round magazine. *See, e.g.*, Pltfs' Tr. Ex. 101, *Gun Digest 2023* at 399-407 (listing various AR-style rifles that come standard with 20 to 30-round magazines); Pltfs' Tr. Ex. 100, *Gun Digest 2022* at

394-403 (same); Dkt.240 (9/18/2024 Trial Tr., Watt) at 415:3-5 (noting that "it's very rare to see anything other than a 30-round magazine" in rifle self-defense courses, though other sized magazines are sometimes used); *see also* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1999 (3d ed. 2021) (2024 Supp.).

144. Individual retailer data from within the state of Illinois also proves that citizens do in fact buy and sell the detachable magazines that PICA bans. *See, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Pulaski) at 55:9-14 ("Q. Okay. Do you have an idea of how many magazines Piasa – now restricted magazines that Piasa sold prior to PICA taking effect? A. I would estimate several hundred per year. Q. And you base that on the records -- what do you base that on? A. Again, point of sale records and ordering records from our suppliers.").

145. The typical individual who possesses these commonplace magazines does so for lawful purposes, including self-defense. *See, e.g.*, English, *supra*, at 23; Dkt.232-21 (Little Rep.) at ¶¶11-12, 15, 17-18, 20; *see also, e.g.*, Dkt.232-23 (Lombardo Rep.) at 2 ("Semi-automatic pistols, shotguns, and AR-platform rifles" that often come standard with detachable magazines having capacities that PICA restricts "are also appropriately and commonly used for typically small game hunting," "self- and home defense," and "the very popular '3 Gun' shooting competitions."); Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403, 1997 (3d ed. 2021) (2024 Supp.) ("AR-15 rifles" which regularly come standard with 30 rounds magazines, "are used for lawful purposes such as self-defense, hunting, competitive shooting, and target practice.").

146. The most common reasons cited for owning these Illinois-proscribed magazines are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). *See* William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 23 (May 13, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

147. Having more rounds at the ready is a benefit for civilian self-defense. *See, e.g.*, Dkt.232-21 (Little Rep.) at ¶18 ("[L]imiting a rifle to a ten-round capacity, a handgun to a 15-round capacity, and a shotgun to a five-round capacity handicaps the user in a self-defense situation. All other factors being equal, more ammunition is better in a defensive incident."); Dkt.240 (9/18/2024 Trial Tr., Watt) at 480:23-481:1.

148. A civilian is "never going to know exactly how much ammunition [he or she] should have on hand" in a self-defense situation, "so it is good to have a good amount of ammo" ready. Dkt.232-13 (Watt Dep.) at 150:8-10; *see also, e.g.*, Dkt.232-24 (Watt Rep.) at ¶6 (explaining the importance of "detachable magazines in order to facilitate efficient loading/reloading while under the rapidly unfolding threat of violence"); *see also* Dkt.232-24 (Watt Rep.) at ¶7 (a common axiom in self-defense is "there is no such thing as too much ammo.").

149. Defendants' own expert confirmed that restricting citizens to smaller-capacity magazines could prove dire in self-defense situations. "Anytime you have to change a magazine, you're vulnerable," and, according to Colonel Tucker, the only way to be protected in that situation is for "[s]omebody to cover for you." Dkt.240 (9/18/2024 Trial Tr., Tucker) at 542:1-2;

*see also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015) ("When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm."). But in civilian self-defense situations, there is normally no one to provide "cover."

150. There are, unfortunately, numerous real-life instances in which civilians needed more than 5 to 15 rounds to repel assailants. *See* Crime Prevention Research Center, *Ten Cases Over The Last Few Years Where People Have Had To Fire Ten Or More Shots In Self Defense* (Oct. 22, 2020) (providing inexhaustive list where "dozens" to "hundreds" of shots were fired in self-defense); *see also, e.g.*, G. Halek, *Houston Concealed Carriers Unload on Armed Muggers -- Why We Travel in Packs*, Concealed Nation (Dec. 21, 2015), https://perma.cc/X33S-89KZ (victim of attempted robbery emptied a 12-round magazine when shooting two assailants); Gus G. Sentementes & Julie Bykowicz, *Documents Detail Cross Keys Shooting*, Balt. Sun (Mar. 21, 2006), https://www.baltimoresun.com/2006/03/21/documents-detail-cross-keys-shooting/ ("gas station owner" defended himself and his business with his "9 mm Glock semiautomatic pistol" by firing "at his [three] assailants 16 times"); *Gun Shop Owner Shoots, Kills Man During Attempted Robbery*, WIS TV (Aug. 9, 2012), https://www.wistv.com/story/19236842/gun-shop-owner-shoots-kills-man-during-attempted-robbery/ (dealer defended himself and his property with AR-15 by "empt[ying] a 30 round magazine before retreating … to get more ammunition"); *Jewelry Store Burglarized, Scene of Deadly 1994 Robbery Attempt*, nbc12.com (2012), https://tinyurl.com/257d39hv (describing "hail of bullets from employees and owners of [a] store" that were used in defense of self and property); Glenn Puit, *DA: Fatal Shooting In Parking Lot Was "Clear Case of Self-Defense*," Las Vegas Review-Journal (May 4, 2020), https://tinyurl.com/mr45fyh6 (describing altercation where victim "fired 11 times" in self-defense); Jacob Sullum, *The Threat Posed by Gun Magazine Limits*, Reason (Jan. 13, 2016), https://tinyurl.com/ybhrsb29 (noting "there are various scenarios, including riots, home invasions, and public attacks by multiple aggressors, in which so-called large-capacity magazines can make a crucial difference," and highlighting the "shopkeepers in Koreatown" during the LA riots who had "'large-capacity' magazines to defend themselves and their property against rampaging mobs").

151. Civilians would be worse off if they needed to reload their firearms more often in self-defense encounters, which is what would happen if the magazines that PICA outlaws remained prohibited. *See, e.g.*, Dkt.240 (9/18/2024 Trial Tr., Watt) at 501:17-502:3 (discussing stress of self-defense scenarios that make it difficult to reload quickly and thus support the self-defense need for larger magazines).

152. Magazines of the capacities that PICA outlaws can be a vital component of self-defense.

## III.   The Common Arms PICA Bans Are Not Exclusively Or Predominantly Used By The Military Or Exclusively Or Predominantly Useful For Military Purposes.

Under *Bevis*, weapons that are "exclusively or predominantly useful in military service" do not qualify as "Arms." 85 F.4th at 1194. While *Bevis* preliminarily opined that the firearms

35

and ammunition feeding devices PICA bans likely fall into that category, it emphasized that

"[b]etter data on" features like their construction, function, application, modification and "firing

rates" "might change the analysis." *Id*.  Plaintiffs have proven the following facts relevant to that

inquiry.

### A.   The Firearms That PICA Bans Lack Automatic-Fire Capability.

153. As explained, PICA addresses only semiautomatic firearms.  "A *semi-automatic* firearm fires only one round of ammunition with each press of the trigger." Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1984 (3d ed. 2021) (2024 Supp.); *accord id.* at 1968; *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 228:4-18.

154. *Semiautomatic* firing is different from *automatic* firing.  Whereas a *semiautomatic* firearm will expel only one round per trigger pull, "an *automatic* firearm fires multiple times with a single press of the trigger."  Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1984 (3d ed. 2021) (2024 Supp.); *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 228:4-18 (noting that with semiautomatic fire, "it's one shot per trigger pull … So you pull the trigger, you'll get one shot, you have to release the trigger, implode again in order to get a second shot to fire"); *see also id.* at 231:16-25 (describing the "[t]otally different build" of the two types of firearms).

155. Mechanically speaking, in a semiautomatic rifle, the gas released by the gunpowder explosion when the arm is fired is harnessed to eject the empty case, and then move a fresh cartridge from the magazine into the firing chamber.  *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 228:7-229:18.  During that process, the rifle's hammer is "held" by what is called a "disconnector" mechanism so that the weapon will not fire again until the trigger is fully "released" and depressed "again to fire." Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 229:11-18. While the user must still pull the trigger to fire each bullet, the chamber reloads automatically, making the firearm "semiautomatic."  *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403, 463 (2d ed. 2018); *see also id.* at 1984 (3d ed. 2021) (2024 Supp.).

156. Automatic firearms work differently.  "An automatic firearm automatically strikes the freshly loaded cartridge with the firing pin, which fires the gun again and starts over the whole cycle of ejection and feeding described above, so long as the user keeps the trigger pressed and there is ammunition in the magazine.  Once the trigger is pressed, the automatic gun will continue to fire until the trigger is released or all the ammunition is expended." Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1984 (3d ed. 2021) (2024 Supp.); *see also* 720 ILCS 5/24-1)(a)(7) (defining "machine gun" as "any weapon, which shoots ... automatically more than one shot without manually reloading by a single function of the trigger...."); 26 U.S.C. §5845(b) (defining "machinegun" the same).  But, again, that is not how semiautomatic firing works.  "A semi-automatic firearm simply loads the fresh round and stops: the trigger must be pressed again to fire the gun." Nicholas J. Johnson et al., *Firearms Law*

*and the Second Amendment: Regulation, Rights, and Policy* 1984 (3d ed. 2021) (2024 Supp.); *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 228:4-18, 231:16-25.

157. Some firearms—but none that PICA addresses—also have what is known as "select fire" capability, which is the capability to toggle between semiautomatic firing and either full-automatic or burst firing. Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1996 (3d ed. 2021) (2024 Supp.) (discussing "'select' or 'selective' fire weapons"); *see also* Dkt.232-17 (Eby & Musselman Rep.) at 5 (explaining that "burst fire" is automatic fire that fires a fixed number of shots (usually three) with each pull of the trigger).

158. The select-fire rifle is a "[t]otally different build" from the kinds of semiautomatic-only rifles that PICA bans. Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 231:16-25. With a select fire rifle, the user can toggle between modes, including semiautomatic and automatic fire. Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 231:9-13. Once the user selects the automatic mode, and depresses the trigger, the arm is fired and "the bolt" automatically trips a component called "the auto sear," which is "not present in … semiautomatic [rifles]," and which in turn "release[es] the hammer" from the disconnector, allowing it to strike the firing pin and repeatedly fire the loaded cartridges without ever depressing the trigger again. Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 230:6-25; *see also* Lombardo Video 1 at 5:49-6:05 (providing demonstration). The "pocketing" or placement of "the receiver" is a "primary difference[]" between the semiautomatic-only and the select-fire, as is the "auto sear … mentioned [above]," "the auto sear spring," the "hammer configuration" and the "selector" function. Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 231:3-13. A "receiver" of a rifle is the "basic unit of [the] firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled." Receiver, Glossary, Sporting Arms & Ammunition Mfg. Inst., https://perma.cc/WC22-6KMP; Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1970 (3d ed. 2021) (2024 Supp.). The receiver of a semiautomatic rifle is different in kind from the receiver of an automatic rifle, and the receiver of a semiautomatic rifle cannot readily or easily accommodate the parts necessary for automatic fire. *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 249:5-250:7.

## B. No Military in the World Is Known to Use Any Of The Firearms PICA Bans for Combat—Or Any Semiautomatic-Only Rifle.

159. The U.S. military does not issue any of the rifles PICA bans to its general infantry. It instead issues only select-fire rifles that can fire automatically, either fully or in bursts, in addition to semiautomatically. *See, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Eby) at 109:21-110:23 (discussing "technical" requirements for "service rifles," including that "all" such military-grade arms have "a select lever of safe, semi, auto"); Dkt.234 (9/16/2024 Trial Tr., Eby) at 111:24-25 (noting that semi-automatic-only rifles "would not meet the key performance parameter of select fire"); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 301:13-17 (Q … Were military-grade firearms that you built all select fire? A. Yes. Q Are those the same as commercial MSRs? A. No, they're not."); Dkt.232-12 (Ronkainen Dep.) at 178:10-13 ("[T]he military in all the specifications I've ever seen for individual carbine and other weapon systems has been for select-fire capability."); Dkt.232-17 (Eby & Musselman Rep.) at 3-6.

37

160. No U.S. infantryman today is equipped with the kinds of semiautomatic-only rifles PICA bans. *See, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Eby) at 115:15 ("Zero US Forces have a semi-auto only service rifle."); *accord id.* at 114:19-22 ("Q… Does any military, US Military branch currently issue to infantry members semi-automatic only rifles? A. None that I'm familiar with."); *id.* at 109:21-110:23 (discussing "technical" requirements for "service rifles," including that "all" such military-grade arms have "a select lever of safe, semi, auto"); *id.* at 111:24-25 (noting that semi-automatic weapons "would not meet the key performance parameter of select fire"); Dkt.232-17 (Eby & Musselman Rep.) at 3 ("[W]e are unaware of a single military in the world, let alone any branch of the U.S. military that uses semiautomatic-only rifles for general combat purposes"); *see also* Dkt.232-22 (Ronkainen Rep.) at 6 (noting that in his nearly four decades of experience in the firearms industry, "the [U.S.] military did not solicit commercial MSRs, which are semiautomatic," but instead sought "select fire" rifles for military use).

161. That has been the state of affairs for more than half a century—and before AR-platform rifles came onto the civilian market in the 1960s. "The last general purpose issued semi-automatic only rifle for U.S. forces[,]" the M1 Garand, "ceased service in 1957 when it was replaced by the select fire M14 rifle." Dkt.232-17 (Eby & Musselman Rep.) at 4; *accord* Dkt.234 (9/16/2024 Trial Tr., Eby) at 121:3-6. More recently, the United States Marine Corps has issued *select-fire* (automatic, no burst fire) M27 rifles to "all infantryman," and the U.S. Army has authorized use of the *select-fire* M4 series rifle generally and the select-fire XM7 (automatic, no burst fire) rifle to certain "front-line units." Dkt.232-17 (Eby & Musselman Rep.) at 6.

162. The U.S. military conducted "[m]any studies … during the 1950s and 1960s to determine if semi-automatic firing rifles were sufficient for future ground combat" or if select fire rifles were needed for military use. "In all instances," the automatic fire capabilities of select fire rifles outperformed the semiautomatic rifle for military purposes. Dkt.232-17 (Eby & Musselman Rep.) at 5. Accordingly, after "two decades of studies and experiments," the U.S. military "eliminat[ed] … semiautomatic rifles [from] … future military service" and adopted the "select-fire M16 variant weapons" for military use. Dkt.232-17 (Eby & Musselman Rep.) at 5 (explaining military adoption of both burst-fire and fully automatic fire variants).

163. No military in the world is known to use a semiautomatic-only rifle as its general service infantry weapon. *See, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Eby) at 115:9-11 ("I've served with quite a few different countries, and all of them will have select fire capabilities."); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 240:5-7 ("Q. Did any foreign military ever come to you and Remington and say, we just want a semiautomatic-only rifle? A. Nobody ever came to us and asked for a semiautomatic rifle. Q. Did all the foreign militaries come to Remington and say, we want a fully automatic M-4-like rifle? A. For the solicitations that I recall, it was always – fully automatic was, you know, key part of the specification."); Dkt.240 (9/18/2024 Trial Tr., Watt) at 390:1-17 (Q. And were those [foreign military] rifles ever semiautomatic only? A. I don't recall any service weapons that were ever semi-auto only. Q. So they were all select fire? A. Correct."); Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 623:21-23 ("Q. You're not aware of any military anywhere in the world that issues semiautomatic only rifles to its infantry? A. No, I'm not."). This point is not disputed (or disputable). *See, e.g.*, Pltfs' Tr. Ex. 139, Tucker Dep. at 38:1-4 ("In my experience and observation of other foreign militaries, I have not seen an infantry combat rifle, in other words a large-issue combat rifle, that did not have both semiautomatic and

38

automatic selectors."); E. Gregory Wallace, *"Assault Weapons" Myths*, 43 S. Ill. L.J. 193, 205 (2018) ("No military in the world uses a service rifle that is semiautomatic only.").

164. To be sure, the original design for the rifle known as the AR-15, which later became the M-16, was a select-fire weapon that allowed soldiers to fire automatically. *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 286:7-19. But that select-fire rifle was never commonly available to the civilian population. *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 286:7-19. The only "AR-15," "AR-platform," or "AR-style rifle" ever to be widely sold to (and purchased by) civilians in this country is a semiautomatic-only rifle. E. Gregory Wallace, *"Assault Weapons" Myths*, 43 S. Ill. L.J. 193, 203-04 (2018).

165. Confusion has sometimes arisen because of the acronym "AR," which some mistakenly believe stands for "assault rifle." In fact, "AR" stands for ArmaLite Rifle, after the original manufacturer of the rifle. Dkt.232-23 (Lombardo Rep.) at 2. The term "assault rifle" (which is different from the term "assault *weapon*"[9]) refers to a rifle firing an intermediate power cartridge that has a selector switch enabling it to fire multiple rounds automatically (either fully automatically or in bursts). *See* Dkt.69-2 (Hlebinsky Rep.) at ¶9 (explaining that "assault rifle" was "defined by the Defense Intelligence Agency (1970) to mean a machine gun that is single soldier portable, selective fire (meaning it has both automatic and semi-automatic functions) and chambers an intermediate cartridge from a detachable magazine"); *see also* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403, 1136 (2d ed. 2018); Lombardo Video 1 at 5:49-6:05. A semiautomatic AR-style rifle is not an "assault rifle," and the military has never used one.

166. Illinois claims that the U.S. military has for years sought after the M16 because of its "semi-automatic capabilities, not the automatic capabilities." Dkt.185-2 (Andrew Rep.) at ¶¶34-35; *see also* Dkt.185-1 (Yurgealitis Rep.) at ¶51. But the updated version of the report that the state relies on *does not include* the material the state cites. *See* Dkt.232-20 (Eby Rebuttal Rep.) at 4 (citing TC 3-22.9 Rifle and Carbine dtd May 2016). In all events, the report the state cites was "concern[ed with] marksmanship skills," and was "*not* designed nor intended to teach tactical combat applications." Dkt.232-20 (Eby Rebuttal Rep.) at 5-6; *see also* Pltfs' Tr. Ex. 139, Tucker Dep. at 30:10-12 ("Q. Is there a difference between marksmanship training and combat training? A. There is."); Dkt.234 (9/16/2024 Trial Tr., Eby) at 101:17-102:5, 183:10-13 (same); Dkt.240 (9/18/2024 Trial Tr., Tucker) at 520:4-10 (same); Dkt.232-3 (Eby Dep.) at 58:14-59:5 (noting that the marksmanship manual "is the beginning stages of instruction … in sterile controlled environments"). Moreover, the report the state relies on cites no "source, military or otherwise, to support" its conclusion regarding combat training. Dkt.232-20 (Eby Rebuttal Rep.) at 6; *see also* Dkt.234 (9/16/2024 Trial Tr., Eby) at 103:4-8 ("[Q.] So auto-fire has been removed from the Marine Corps from the *marksmanship* program? A. Correct, correct. Q. But it's still taught in a *combat* program? A. Yes, it will be taught in tactical training events." (emphases added)).

---

[9] "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotations omitted).

167. In fact, the very field test report that the state's witnesses cite confirms that the M16 rifle was developed and chosen after testing of a select-fire version of the AR-15 showed that the platform was a suitable weapon for smaller soldiers, that it required less training, and that its *automatic* fire mode had greater accuracy than the sub-machine gun. *See* Dkt.232-18 (Boone Rebuttal Rep.) at 2-3 (citing Field Test Report, AR-15 Armalite Rifle, pp.2, 4 & ¶b.2 (Aug 20, 1962)); *see also* Dkt.232-20 (Eby Rebuttal Rep.) at 2-6 (debunking state's account of M16 development and adoption). While the U.S. military initially tested the AR-15 for combat purposes, it ultimately rejected the firearm in its semiautomatic form, and adopted the select-fire M16 rifle instead. *See* Dkt.185-1 (Yurgealitis Rep.) at ¶¶34, 38; Dkt.232-12 (Ronkainen Dep.) at 24:6-25:3.

168. In all events, to the extent Illinois suggests that a military genesis indicates that a product is military-grade today, *see, e.g.* Dkt.236 (9/17/2024 Trial Tr., State Cross) at 337:7-19, it is mistaken. Innumerable products—from cargo pants and duct tape to microwave ovens and GPS navigation, to pencils and wristwatches, and even the internet—were first developed and tested by the military before being adjusted for and commonly adopted in the civilian market. *See North Atlantic Treaty Organization, The Cold War: Science And Innovation* https://tinyurl.com/yme6d4zr (last visited Oct. 16, 2024).

169. As for pistols, "no general-purpose force in the U.S. Army or Marine Corps has a tactical task against an enemy that requires a pistol as a solution." Dkt.232-17 (Eby & Musselman Rep.) at 6; *see also* Dkt.232-17 (Eby & Musselman Rep.) at 3 ("We are unaware of a single military in the world, let alone any branch of the U.S. military, that uses pistols that meet [PICA's] description."). Semiautomatic pistols like the ones PICA bans "lack sufficient velocity to ensure bullet penetration and expansion required to stop an attacker in a military context, where assailants are often wearing body armor or are far away before the attacker can cause harm." Dkt.232-17 (Eby & Musselman Rep.) at 7; *see* Br. of State of Illinois as Amicus Curie at 7, *Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. Sept. 2024), Dkt.27 (conceding that a semiautomatic pistol has a far lower effective range and penetration rate than military firearms like the M16).

170. "The pistols that are used by military personnel do not serve any combat purpose; rather they are a last-line of self-defense for certain limited personnel." Dkt.232-17 (Eby & Musselman Rep.) at 3. They are primarily "issued to Staff Non-Commissioned Officers … and Officers" who "have the primary task of leadership and management of forces, not directly engaging [the] enemy." Dkt.232-17 (Eby & Musselman Rep.) at 6-7. The state's own expert confirms that handguns in the military are used for the same purposes as in the civilian world: self-defense. Dkt.222-3 (Dempsey Rebuttal Rep.) at ¶35.

171. The U.S. military does not issue any shotguns that accept detachable magazines. *See* Dkt.232-17 (Eby & Musselman Rep.) at 7-8.

172. Shotguns equipped with a pistol grip, thumbhole stock, or a fixed magazine with the capacity of more than 5 rounds are "rare[ly] … used in theater" by the military; if they are, they "are generally limited to use by special operations forces for ballistic breaching methods" such as "shooting off hinges or doorknobs for urban entry." Dkt.232-17 (Eby & Musselman Rep.) at 7. Such "shotguns have no significant combat tasks to perform" in the military context.

40

Dkt.232-17 (Eby & Musselman Rep.) at 3; *see also* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403, 2004-05 (3d ed. 2021) (2024 Supp.) (shotguns have only a "limited role in military operations" for "security duty" and "fighting" in "close quarters").

173. While the military primarily uses "large capacity ammunition feeding devices, as Illinois defines them," HB5471 also bans "magazines with capacities significantly lower than anything the military would use." Dkt.232-17 (Eby & Musselman Rep.) at 7. For example, virtually "all box magazines for M16/M4 rifles in the military use 30-round magazines," and will rarely use 20-round magazines, but PICA bans any rifle magazines with a capacity over 10. Dkt.232-17 (Eby & Musselman Rep.) at 7.

174. Neither "the U.S. military," nor "any military in the world, uses fixed magazines of any capacity." Dkt.232-17 (Eby & Musselman Rep.) at 8.

## C.    Automatic Fire Serves a Critical Military Purpose.

175. No military uses semiautomatic-only firearms because select-fire rifles with automatic capabilities serve important military needs in certain combat settings that semiautomatic-only rifles cannot.

176. The most important of those military needs is suppression. "[S]uppressive fire is used to fix enemy forces in place." Dkt.240 (9/18/2024 Trial Tr., Watt) at 385:8-15. The military uses automatic firing, whether full-auto or burst, for suppression. *See, e.g.*, Dkt.240 (9/18/2024 Trial Tr., Watt) at 385:8-15 (defining suppressive fire as "firing on full auto, designated areas, fields of fire to keep them pinned down to a specific position so you can maneuver").

177. For instance, the Army training publication that Lt. Colonel Dempsey relied on makes clear that the standard-issue, select-fire M4 and M16 rifles—and not just the heavy artillery M249 ("SAW"), which has been replaced by the M27—are expected to fire in automatic mode in certain tactical situations for suppression. *See, e.g.*, Pltfs' Tr. Ex. 15, ATP 3-21.8, 1-57 ("The grenadier is currently equipped with an … M16-series or M4-series" to, *inter alia*, provide "suppress[ive]" fire and should be "prepared to assume the duties of the automatic weapons gunner" if necessary); Dkt.232-17 (Eby & Musselman Rep.) at 6 (same); *see also* Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 628:130-630:15 (citing Defense Exhibit 263, "Infantry Rifle Platoon and Squad," which calls for use of "all available automatic weapons," including service select-fire rifles); Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 635:10-637:22 (similar).

178. Select-fire rifles are particularly useful when engaging with a peer threat. "Fighting against a peer opponent requires a choreographed response during an engagement," that often requires "suppression" fire—to "prevent the enemy from rising out of prepared positions to shoot at US forces"—as well as "precision aimed fires." Dkt.232-17 (Eby & Musselman Rep.) at 4. The *automatic* mode on approved military select-fire rifles provides the "extremely high volume of sufficiently accurate shots" for that choreographed response. Dkt.232-17 (Eby & Musselman Rep.) at 4-5. Having a weapon that can fire in automatic mode is accordingly "critical" in military combat situations involving peer enemies. Dkt.232-17 (Eby & Musselman Rep.) at 6; *see also* Dkt.232-17 (Eby & Musselman Rep.) at 5 ("Automatic,

41

unaimed fire to suppress enemies' defensive position became the normal engagement behavior during training against the more dangerous peer level threats.").

179. Engaging with a peer threat is not the only reason why automatic-firing capability is a critical military asset, but merely an example. When the military is engaged "in urban terrain," as was often the case in Iraq and Afghanistan, soldiers and marines use "automatic fire on entering … room[s]," if the soldiers "were responding to near ambush, there would be automatic fire response immediately to the near ambush," and if servicemembers "were conducting a night attack, automatic fire would be the first magazine out of [the] rifle before switching back over to semi-auto to finish the attack." Dkt.234 (9/16/2024 Trial Tr., Eby) at 92:19-93:7. On "room" entry, if an infantryman does not "know where the target is at," he may use automatic fire "to make [the target] afraid that he's about to get hit" so the infantryman can enter safely. Dkt.234 (9/16/2024 Trial Tr., Eby) at 182:3-11. A "night ambush" is another example. *See* Dkt.240 (9/18/2024 Trial Tr., Tucker) at 530:21-532:15; *see also* Dkt.232-3 (Eby Dep.) at 117:3-8 (further discussing "[t]rench warfare" and "urban warfare" as well).

180. In those and other cases, automatic fire is critical for combat purposes, because soldiers "don't see the enemy, and a volume fire into a specific area where [they] believe the enemy to be under experimentation led to more hits." Dkt.234 (9/16/2024 Trial Tr., Eby) at 138:18-139:9.

181. Gunner Eby witnessed such "critical" tactics firsthand in Iraq. Dkt.234 (9/16/2024 Trial Tr., Eby) at 182:3-1182:12-183:6. So did Colonel Tucker. *See* Dkt.240 (9/18/2024 Trial Tr., Tucker) at 530:21-532:15 (confirming that "automatic fire was used" per instruction by Marines under his command when performing room entries). Automatic fire was employed in such scenarios during "intense" combat in Iraq, for example, before 2005, but after the war and the U.S. mission "evolved" and less "or no combat" was had, automatic fire was understandably curbed. *See* Dkt.232-3 (Eby Dep.) at 62:5-66:1 (noting shift from offensive combat to defensive and security detail).

182. The state's witnesses claimed that Gunners Eby and Musselman attribute to the M4 and M16 the suppression-fire tactic reserved for the much larger M249 ("SAW"). *See* Dkt.222-3 (Dempsey Rebuttal Rep.) at ¶¶23, 26; *see also* Dkt.222-2 (Tucker Rebuttal Rep.) at ¶¶10-13. That is wrong. What Gunners Eby and Musselman actually explained is that the military relies on the automatic fire capabilities of the M4 and M16 in combat. *See* Dkt.232-17 (Eby & Musselman Rep.) at 4.

183. That explains why U.S. armed forces train to fire in fully automatic or burst-fire mode. *See, e.g.*, Dkt.240 (9/18/2024 Trial Tr., Watt) at 380:25-381:23, 383:8-11 ("Firing a military [rifle] … the M16s, the M-4 on full auto is a basic soldier skill, and it is contained within specific tactics sets that an infantryman or Special Forces soldier would use. So it's not an uncommon training event."). Even one of the state's own witnesses agrees. *See, e.g.*, Dkt.222-2 (Tucker Rebuttal Rep.) at ¶¶10, 13 (conceding, *contra* Lt. Colonel Dempsey, that Marines do "fire on automatic in training to familiarize themselves with handling the weapon on automatic"); Dkt.236 (9/17/2024 Trial Tr., Tucker) at 519:2-5 (acknowledging that 10 percent of training with select-fire rifles is done in automatic mode).

184. That also explains why both the U.S. Marine Corps and U.S. Army have each adopted a new (but different) infantry service rifle having full-automatic capability, rather than burst fire.  *See* Dkt.232-17 (Eby & Musselman Rep.) at 6; Dkt.234 (9/16/2024 Trial Tr., Eby) at 118:119:23.

185. To be sure, servicemembers often use semiautomatic fire.  For instance, "[s]emiauto fire engagements made sense in those situations where we were not facing well trained, well-armed opponents, but instead outnumbered our opponents at the point of contact, and the opponents lacked training, equipment, aerial support, or reinforcements, making fully-automatic fire unnecessary."  Dkt.232-17 (Eby & Musselman Rep.) at 6.  But semiautomatic fire alone is not sufficient for all military purposes, which is why the kinds of firearms used exclusively by the military have a select-fire option.  Dkt.232-17 (Eby & Musselman Rep.) at 6; Dkt.234 (9/16/2024 Trial Tr., Eby) at 152:24-153:1; *see also* Dkt.234 (9/16/2024 Trial Tr., Eby) at 123:17-20 ("Q. Did you experience anybody use burst fire or automatic fire in the battle of Fallujah with their general purpose rifle?  A. Absolutely."); Dkt.234 (9/16/2024 Trial Tr., Eby) at 138:18-139:9 (discussing "all the stress of the combat, the adrenaline hitting your body," and the need to just put "a bunch of bullets at" "the target"); Dkt.240 (9/18/2024 Trial Tr., Watt) at 384:12-18 (noting firsthand use of "full auto" in combat scenario to "mark targets for air support"). Also, infantrymen are virtually never alone in combat, but in groups. 9/16/2024 Trial Tr. at 144:2-18 (Eby) (noting infantrymen are not trained to perform combat alone and doing so would be "suicide"); Dempsey Rep. ¶27 (citing Army doctrine that has infantrymen act in groups of at least four). Thus, when infantrymen are using semiautomatic fire, there are virtually always multiple rifles being fired or available to be fired. In addition to their multiple select-fire rifles, they also generally have a machine-gunner with a SAW for every four infantrymen. Dempsey Dep. at 40:10-41:1-7. Private individuals engaged in a self-defense situation do not typically enjoy that sort of backup.

186. Lt. Colonel Dempsey testified that automatic firing is not a military attribute and that servicemembers should never use their rifles on full-automatic or burst-fire mode.  *See, e.g.*, Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 611:4-14.

187. But Lt. Colonel Dempsey's opinion was strongly contradicted by the state's other military witness, Colonel Tucker.  *See, e.g.*, Pltfs' Tr. Ex. 139, Tucker Dep. at 61:16-21 ("Q. Colonel, would you advocate removing select fire capability from military infantry rifles and replacing them with semiautomatic-only rifles? … A. No."); *accord* Dkt.240 (9/18/2024 Trial Tr., Tucker) at 545:1-13; *see also* Pltfs' Tr. Ex. 139, Tucker Dep. at 19:21-21:19 (noting that, while he was in combat, "there was a lot of use of unaimed automatic fire"; agreeing that there were and are "appropriate" circumstances in which soldiers must "use that selective switch on automatic or burst"; discussing the "tactical decision" to employ "automatic versus semiautomatic" fire "based on a requirement for suppression versus the requirement for aimed fire."); Pltfs' Tr. Ex. 139, Tucker Dep. at 24:3-5 ("Strict tactical guidance would provide circumstances when automatic fire would be appropriate …."). As Colonel Tucker explained, "in combat, options are life," and a commanding officer "would not want to take the [automatic] option away from either th[e] fire team leader, th[e] squad leader, or th[e] young Marine." Dkt.240 (9/18/2024 Trial Tr., Tucker) at 545:1-13; *accord* Pltfs' Tr. Ex. 139, Tucker Dep. at 61:16-62:4.

43

188. Lt. Colonel Dempsey's opinion was also strongly contradicted by both Marine Gunners who offered testimony in this case. *See, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Eby) at 193:5-9 ("Q. Okay. Now when you're under fire, do you want any limitation on your ability to defend yourself and your men? A. None. Q. What do limitations do? A. Hinder my speed of engagement and reaction."); *see also* Dkt.234 (9/16/2024 Trial Tr., Eby) at 90:21-22 (describing a "Marine gunner" as a "tactics and weapons expert"); Dkt.234 (Trial Tr., Eby) at 92:6-8 ("Q. And in preparing this training, are you the one who is in charge of explaining how best to use these weapons? A. Absolutely.").

189. Lt. Colonel Dempsey's opinion is further contradicted by the armed forces' own judgments over the past many decades, as the U.S. military has issued only rifles with select-fire capability since 1957. Dkt.232-17 (Eby & Musselman Rep.) at 4; *accord* Dkt.234 (9/16/2024 Trial Tr., Eby) at 121:3-6.

190. No official military publication endorses Lt. Colonel's Dempsey's opinion. *See* Dkt.234 (9/16/2024 Trial Tr., Eby) at 143:17-20 ("Q. Have you reviewed any military materials that call for the elimination of auto fire capabilities from rifles, from infantry rifles? A. Not at all.").

191. Lt. Colonel Dempsey also testified that servicemembers have never used, and never trained to use, automatic fire. *See, e.g.*, Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 618:10-25. But that claim is refuted by other record evidence. As noted, with the notable exception of Lt. Colonel Dempsey, both parties' experts agree that U.S. armed forces train to fire in fully automatic or burst-fire mode. *See, e.g.*, Dkt.240 (9/18/2024 Trial Tr., Watt) at 380:25-381:23, 383:8-11; Dkt.222-2 (Tucker Rebuttal Rep.) at ¶¶10, 13; Eby & Musselman Rep. p.6 (noting that "fully automatic fire is critical. It is rehearsed repeatedly.). They also agree, as noted, that they witnessed use of automatic fire in combat. *See, e.g.*, Pltfs' Tr. Ex. 139, Tucker Dep. at 19:21-21:19; Dkt.234 (9/16/2024 Trial Tr., Eby) at 92:19-93:7.

192. Lt. Colonel Dempsey sits on the Veterans Advisory Council of the organization Everytown for Gun Safety. *See* Dkt.241 (9/19/2024 Trial Tr., Dempsey) 602:2-23. Everytown is an organization that promotes gun control measures, including PICA. *See Everytown, Giffords, Brady Applaud Illinois Senate for Passing Gun Safety Package, the Protect Illinois Communities Act*, Everytown (Jan. 10, 2023), https://tinyurl.com/3nnfvtvt.

D.   **The Firearms And Feeding Devices PICA Bans Are Distinguishable From Military-Grade Weapons In Several Important Respects.**

In its "preliminary" analysis, *Bevis* posited that "the AR-15 is almost the same gun as the M16 machinegun." *Bevis*, 85 F.4th at 1195. On closer examination, that is incorrect. And the dissimilarities between (on the one hand) the pistols and shotguns PICA bans and (on the other) fully automatic rifles like the M16 are, if anything, even more pronounced.

44

*- MSRs Are Not Remotely Equivalent to Machineguns or Other Military Arms.*

193. "[C]ivilian MSRs and military rifles may cosmetically appear similar," Dkt.232-22 (Ronkainen Rep.) at 5, as they share features like a detachable box magazine, ergonomics, sights, and some others. But so do a whole host of firearms that Illinois has not banned.

194. MSRs and military rifles do not share what is most "critical": select-fire capability. Dkt.234 (9/16/2024 Trial Tr., Eby) at 187:14-25; Dkt.232-3 (Eby Dep.) at 61:9-20.

195. The select-fire M16 rifle is nowhere near "functionally identical" to the semiautomatic AR-15 or other MSRs. *Contra* Dkt.185-2 (Andrew Rep.) at ¶34. That is evident from the U.S. military's consistent choice for more than 70 years to utilize only the former. *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 289:13-290:4 ("Q. Are AR-15 semiautomatic fundamentally different from military-grade rifles? A. Yes. Q. Are they manufactured differently? A. Yes. Q. Are they manufactured in different areas of the company? A. Yes. Q. Are they tested differently? A. Yes. Q. Are the materials different? A. Yes. Q. Do they perform differently? A. Yes. Q. Are AR-15s semiautomatic [rifles] … identical copies of military firearms? A. No.").

196. At no point could an individual simply substitute a civilian semiautomatic rifle for a military-grade select-fire rifle. Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 241:5-8. The military "specifications" for weapons of war are normally "60-70 pages long" and "discuss the particular materials" that must be used "for the bolt, the barrel, the upper and lower receivers, all the componentry, any of the surface finishes and surface treatments, coatings and other things that are done. They describe what the durability requirements are, the environmental operating requirements in terms of environmental extremes, 20 below zero, 40 below zero, all the way up to 140 degrees, operating in mud, operating in rain, operating in dusty environments." Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 240:14-241:4; *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 242:24-243:6 (further discussing trigger-pull specifications).

197. As Gunners Eby and Musselman put it: "To say that semiautomatic-only rifles" are "the same as a select-fire M-16 using ammunition designed for combat, merely because they share external features designed to facilitate their safe, ergonomic, and effective use, would be like saying a street-legal, civilian Hummer is the same as a military High Mobility Multi-purpose Wheeled Vehicle … merely because they look similar and both have adjustable seats, headlights, and power-steering." Dkt.232-17 (Eby & Musselman Rep.) at 11.

198. There are also "significant mechanical differences between the platforms." Dkt.232-22 (Ronkainen Rep.) at 5; *see also, e.g.*, Dkt.232-12 (Ronkainen Dep.) at 185:22-189:14 (discussing various differences in specifications and their purposes); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 229:19-230:2 ("The machining that takes place between the semi-auto and a full auto receiver is different, and it's pretty markedly different"). *Compare* Dkt.232-12 (Ronkainen Dep.) at 70:19-71:5 (describing the "extremely lengthy description of specifications that [military] firearm[s] need[] to meet as well as production [and] testing requirements"), *with* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 291:10-292:24 ("Those are not requirements [for] a … civilian MSR.").

45

199. Because of those technical and mechanical differences, gun manufacturers often have "an entirely separate division devoted to military firearms development and production to meet the distinct needs of the separate military market." Dkt.232-22 (Ronkainen Rep.) at 6. That kind of "military development and production" which involves "select fire" rifles, not semiautomatics also often takes "place in a secure area of the manufacturing facility … separated from commercial production." Dkt.232-22 (Ronkainen Rep.) at 6. The same is true for "testing." Dkt.232-22 (Ronkainen Rep.) at 6; *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 252:7-255:14 (describing the "segregated" and protected nature of the military-grade rifle production and "testing"); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 343:14-345:4 (noting that to the extent manufacturing of certain component parts or testing used overlapping facilities, the military arms were produced and tested "with special controls" not applicable to "MSR commercial or civilian MSR component" parts).

200. Nor is modifying a semiautomatic firearm to a select-fire variant necessarily a simple task. *Contra* Dkt.185-1 (Yurgealitis Rep.) at ¶40. One would have to "very accurately drill holes in the lower receiver in both sides," which is "not something that's easily done by … an average Joe." Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 249:5-13. And on many models there is a "substantial amount of material that" would need "to be removed in order to accommodate the trigger mechanism," in addition to a "modification to the pocket width," and other items that would need to be accomplished with exacting precision for successful modification. Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 250:8-25. This cannot be accomplished with conventional tools; one would need "to have a mill and a very skilled machinist or a CNC mill with a very skilled programmer and good manufacturing engineers." Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 249:23-250:7. Doing so would also violate already existing state and federal law. *See* 7/20 ILCS 5/24-1(a)(7) (banning sale, manufacture, purchase, possession, and carry of "any combination of parts designed or intended for use in converting any weapon into a machine gun … or any combination of parts from which a machine gun can be assembled"); 18 U.S.C. §922(*o*)(1) (banning possession of the same); 26 U.S.C. §5845(b) (same).

201. To the extent Illinois takes issue with the availability of after-market devices that increase a semiautomatic rifle's rate of fire to match that of a machine gun, *see, e.g.*, Dkt.194-1 (Schreiber Rep.) at ¶26 (highlighting "bump stocks"); Dkt.185-1 (Yurgealitis Rep.) at ¶¶116-18 (arguing that "select-fire is not even a significant difference" because "devices are readily available to firearms [sic] owners to enable increased rates of fire"), that is not what PICA bans. In all events, as the Supreme Court recently made clear, aftermarket devices like "bump stock[s] do[] not convert a semiautomatic rifle into a machinegun" because the "firing cycle remains the same," and "[b]etween every shot, the shooter must [still] release pressure from the trigger and allow it to reset before reengaging the trigger for another shot." *Garland v. Cargill*, 602 U.S. 406, 421 (2024).

202. A host of evidence looking at a number of different metrics bears out the critical differences between MSRs and the firearms that the military chooses to use.

46

- **Firing Rate**

203. A fully automatic rifle, like the M16 or M27, has a "cycle rate"—defined as "the theoretical maximum rate of fire achievable by the weapon"—between 700 and 900 rounds per minute. Dkt.232-17 (Eby & Musselman Rep.) at 9 (referencing the M27's cyclic rate, which is identical to the M16s in fully automatic mode); Dkt.240 (9/18/2024 Trial Tr., Tucker) at 541:5-25 (noting that servicemembers could even get through "210 rounds" in "[t]en or 15 seconds" on burst or automatic mode, "if you can get the magazines in fast enough"); *see also Garland v. Cargill*, 602 U.S. 406, 432 (2024) (Sotomayor, J., dissenting) ("With an M16 in automatic mode, the shooter pulls the trigger once to achieve a fire rate of 700 to 950 rounds per minute." (citing Dept. of Defense, Defense Logistics Agency, Small Arms, https://www.dla.mil/Disposition-Services/Offers/Law-Enforcement/Weapons/)); Br. of State of Illinois as Amicus Curie at 8, *Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. Sept. 2024), Dkt.27 (conceding cyclic rate of "700 rounds per minute" for an M16 in automatic mode).

204. Semiautomatic firearms cannot fire anywhere near that rapidly. A semiautomatic modern sporting rifle or other semiautomatic rifle or pistol could be said to have an accurate "sustained rate of fire"—which takes into account some but not all practical limitations—of between 5 and 60 rounds per minute, depending on variable such as the distance at which the shooter is firing. Dkt.232-17 (Eby & Musselman Rep.) at 9; *see also* Nicholas J. Johnson, et al., Firearms Law and the Second Amendment 403, 1999 (3d ed. 2021) (2024 Supp.) ("The AR-15's actual rate of fire is similar to modern semi-automatic pistols rather than the military's fully automatic weapons."); *cf. Garland v. Cargill*, 602 U.S. 406, 432 (2024) (Sotomayor, J., dissenting) (citing oral argument statements estimating that "[a] regular person with an AR-15 can achieve a fire rate of around 60 rounds per minute, with one pull of the trigger per second").

205. Firing rates are admittedly not an exact science, and true weapons experts often resist categorizing firearms that way, given the disparity in rates that accompany differing users and circumstances. *See, e.g.*, Dkt.232-17 (Eby & Musselman Rep.) at 9-10 ("Determining the cyclic rate for a semiautomatic rifle of any type is essentially an unachievable myth," because "unlike a fully automatic rifle where the trigger can just be depressed once and rounds will discharge at a set, uniform pace (mechanically speaking), semiautomatic fire is influenced" to a greater degree by "how fast" the user "can function the trigger" and how well they can resist "fatigue," among other factors). One alternative tool includes the measurement of "split times" which simply calculates the expected "time between shots." Based on that tool, "the M16 in fully automatic mode has a split time of approximately .07 seconds," whereas the AR-15 as fired by "the fastest shooter to have ever lived" is ".13 seconds," which is nearly a 90% difference in "firing capacity." Dkt.232-18 (Boone Rep.) at ¶77. The rates for the "majority of shooters with the AR-15 would be even less than half that of the M16, representing a significant difference between the two firearms." Dkt.232-18 (Boone Rep.) at ¶77.

206. The state proffers different numbers based on the "maximum effective rate"—which considers the capability of the operator to fire effective aimed shots—but those numbers confirm that the M16 is vastly different from the AR-15 when it comes to rate of fire. According to Illinois, the U.S. Army has clocked semiautomatic effective fire at "45 to 65 rounds per minute" effective burst fire at "90 rounds per minute," and automatic effective fire at "150 to 200 rounds per minute." Dkt.185-1 (Yurgealitis Rep.) at ¶50; Br. of State of Illinois as Amicus Curie at 8-9,

47

*Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. Sept. 2024), Dkt.27.  Those estimates are conservative.  *See supra*.  But even by those estimates, the M16's maximum firing rate is still more than 200% higher than the AR-15's (and its burst firing rate is about 100% higher than the AR-15's).

207. Illinois has claimed in other cases, as it is likely to assert here, that many M16 variants (and M4s) "cannot" even "fire in fully automatic mode" but instead fire in "three-round bursts" and that "shooters will experience" firing-rate "delays due to the need to manage recoil between each burst by bringing the weapon back on target."  *See* Br. of State of Illinois as Amicus Curie at 8-9, *Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. Sept. 2024), Dkt.27.  But delays due to "[p]ost-shot … [r]ecoil management" apply "regardless of the weapon employed," including fully automatic weapons.  Dep't of the Army, TC 3-22.9, Rifle and Carbine at 5-2 (May 2016), https://bit.ly/4dZT0ws.  And so, whatever reduction in firing rate recoil might have on the M4 or M16, the same would be true for the AR-15, thereby reducing the AR-15's firing rate in equal or similar amounts.  *See* Dkt.232-3 (Eby Dep.) at 107:12-21.

208. Illinois has suggested in other cases that M16s "are not designed to fire on automatic for extended periods" and are limited by reload time and "the number of rounds that a shoot can fire in a minute."  Br. of State of Illinois as Amicus Curie at 8-9, *Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. Sept. 2024), Dkt.27.  But, again, the AR-15 suffers from the same limitations, much like every firearm ever manufactured and sold.  *See, e.g.*, Dkt.232-17 (Eby & Musselman Rep.) at 9 (highlighting "external factors affecting" rate of fire for all firearms, "such as fatigue of the shooter, degradation of the barrel due to heat, wear, or ammunition/magazine limitations" among others).  The firing rate disparity thus remains even by that metric.

- **Caliber**

209. While commercial MSRs can be chambered to fire many different caliber cartridges, ranging from the small rimfire ".22 Long Rifle" to the larger ".450 Bushmaster," military rifles like the M16 are capable of chambering only .223 or 5.56 mm NATO caliber ammunition.  *See* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 260:24-261:8; *see also id.* at 277:18-278:18, 279:7-15 (discussing "use of other calibers" to meet civilian consumer demand); *id* at 280:16-24 (highlighting "more caliber offerings"); Dkt.232-13 (Watt Dep.) at 18:8-18 (similar); Dkt.232-18 (Boone Rebuttal Rep.) at 6 (unlike M16s, "AR-15 type rifles can be chambered in a wide variety of cartridges").[10]

210. That is a conscious choice by the military.  The AR platform is designed to "allow[] users to choose a rifle that is best for their intended application: self-defense, target shooting, hunting (small or large game), [or] competition," to name just a few.  Dkt.232-13 (Watt Dep.) at 18:8-18; *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 260:24-261:8 (discussing various calibers that can be used in an MSR); Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 277:18-278:18, 279:7-15 (discussing "use of other calibers" to meet civilian consumer demand).

---

[10] "The U.S. Army has" also "recently made the decision to move from 5.5.6mm in favor of a larger caliber," namely the "6.8mm ammunition."  Dkt.232-18 (Boone Rep.) at ¶57; *see also* Dkt.232-18 (Boone Rebuttal Rep.) at 15.

- **Range and Penetration**

211. Range and penetration are influenced more by the bullet chambered and barrel-length used than the actual category of firearm. *See* Dkt.232-18 (Boone Rebuttal Rep.) at 5-6. A weightier bullet and longer barrel will normally result in longer range and greater penetration, whereas a lighter bullet and shorter barrel will result in the opposite. *See* Dkt.232-18 (Boone Rep.) at ¶¶38-44, 57 (highlighting the U.S. military's recent move "away from 5.56mm to 6.8mm ammunition … enabling greater range and increased lethality").

212. Illinois seems to believe that MSRs and M16 rifles are all restricted to the same ammunition and configurations. *See, e.g.*, Dkt.241 (9/19/2024 Trial Tr., State's Closing) at 668:3-8; Br. of State of Illinois as Amicus Curie at 7, *Viramontes v. Cook Cnty.*, No. 24-1437, (7th Cir. Sept. 2024), Dkt.27 (citing U.S. Army report focused on performance details of standard barrel M16 rifle chambered in 5.56 mm NATO). That is incorrect. The state does not, for example, consider that the 11.5" barreled AR-platform pistol, which weapons experts deem "[t]he best designed home defense weapon" in America, would have a lower range and penetration rate than both its longer barreled sibling and the M16 rifle. *See* Dkt.232-17 (Eby & Musselman Rep.) at 11. Nor does the state mention that MSRs that fire smaller rimfire cartridges have a "range of less than 100 [feet per pounds]," which is far less than the M16's range. *See* Br. of State of Illinois as Amicus Curie at 7, *Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. Sept. 2024), Dkt.27.

- **Muzzle Velocity and Energy**

213. "The only part of the firearm that significantly influences the performance of the projectile is the barrel." Dkt.232-18 (Boone Rep.) at ¶47; Dkt.234 (9/16/2024 Trial Tr., Eby) at 173:3-19. Accordingly, "[i]t is an undisputable fact that two rifles with the same barrel dimensions (chamber, bore, length) will produce substantial identical velocity." Dkt.232-18 (Boone Rebuttal Rep.) at 6-7; *see also* Dkt.232-12 (Ronkainen Dep.) at 165:10-22 (describing further how a heavier bullet will be "slower" and have a "lower velocity"); Dkt.234 (9/16/2024 Trial Tr., Ronkainen) at 169:20-170:1. So, as to muzzle velocity, which measures the speed of the bullet in feet per second when leaving the barrel of a firearm, MSRs (chambered in .223/5.56) and M16s will have similar ranges.

214. The same is true as to the kinetic (or muzzle) energy of a bullet—which measures the wounding capability of a particular shot—that too depends mostly, if not exclusively, on "barrel characteristics or the projectile it launches." Dkt.232-18 (Boone Rebuttal Rep.) at 5. Consequently, even a "non-'assault weapon' rifle … having an identical barrel to and firing the identical cartridge as an 'assault weapon' will exhibit virtually the same projectile effect on a target at impact." Dkt.232-18 (Boone Rebuttal Rep.) at 5. Indeed, "a common .223 cartridge … has almost exactly the same terminal performance if fired from a 16.5" [barrel] AR-15 as if from a 16.5" [barrel] bolt action rifle, so long as the chambers and rifling profiles match." Dkt.232-18 (Boone Rebuttal Rep.) at 6; *see also* Dkt.232-12 (Ronkainen Dep.) at 150:13-151:2 (explaining caliber impact on "muzzle velocity").

215. While Defendants claim that muzzle velocity and energy put the AR-15 and M16 in a military class of their own, they have not put forward any weapons expert to support that assertion. Instead, they rely primarily on the opinion of two medical doctors. *See* Dkt.194-1

49

(Schreiber Rep.) at ¶36; Dkt.185-3 (Hargarten Rep.) at ¶20. But those doctors miss the mark in their weapons evaluation. *See, e.g.*, Dkt.232-18 (Boone Rebuttal Rep.) at 7-11 (listing various technical shortcomings, including a shocking lack of information concerning testing cited).

216. For example, weapons expert Mr. Boone explained, "Dr. Hargarten's report contains data which contradicts" the claim that weapons like the AR-15 "release projectiles at a relatively high velocity." Dkt.232-18 (Boone Rebuttal Rep.) at 7. "He cites testing wherein a Thompson Machine Gun … chambered in .45 Auto, produced a velocity of approximately 960 feet per second" ("fps"), but when chambered in 5.56 NATO, "produced a velocity of approximately 2,704 fps." Dkt.232-18 (Boone Rebuttal Rep.) at 7. Clearly, it is the chambering that matters most, not the weapon. In claiming that "assault weapons cause extreme damage" given their high kinetic output and muzzle energy, "Dr. Hargarten, again, falsely assigns wounding capability to a type of firearm instead of the projectile launched by it" or even the "barrel length" used. Dkt.232-18 (Boone Rebuttal Rep.) at 9. As Mr. Watt explained at trial, "[h]eavier bullets tend to carry more … terminal velocity" and "tend to penetrate more and further than the lighter bullets." Dkt.240 (9/18/2024 Trial Tr., Watt) at 465:14-21. Yet neither Dr. Hargarten, nor any of the state's other witnesses considered the weight of the projectile (or any other feature of the projectile) in their militaristic analysis and comparison.

217. To be sure, Dr. Hargarten does later in his report concede that "energy available to deliver to the target increases incrementally with increased in mass of the projectile." Dkt.185-3 (Hargarten Rep.) at ¶16. But he goes on to state, incorrectly, that "velocity" as determined by the type of firearm is a "more significant" factor when it comes to "wounding capability than changes" to a bullet's "mass." Dkt.185-3 (Hargarten Rep.) at ¶16. In fact, the very testing Dr. Hargarten cites refutes that claim. *See* Dkt.232-18 (Boone Rebuttal Rep.) at 8-9 (describing testing where a firearm firing a bullet with twice the mass but less velocity than another "transferred almost twice the amount of energy into the gelatin block").

218. The field reporting that the state's experts cite for the purportedly harrowing lethality of the M16's fire of 5.56 in combat during testing in the Vietnam War is likewise suspect. *See* Dkt.185-2 (Andrew Rep.) at ¶¶27-33 (describing abdominal cavity and chest explosions, split and severed legs, and decapitations supposedly caused by rifle fire in .223/5.56 NATO). Not only is that reporting based on "anecdotal statements" made by medically untrained soldiers in the field of battle, rather than "controlled experiment[s]," but its findings "have not been replicated" even once. Dkt.232-20 (Eby Rebuttal Rep.) at 3-4; *see also* Dkt.232-18 (Boone Rebuttal Rep.) at 14 ("[T]hat level of performance has never been reported before or since so, even if it was true, it would be an anomaly and not data on which to base laws."); *see also* David Kopel, *How powerful are AR rifles?*, Reason Mag. (Feb. 27, 2023) (noting that the Army tried and failed to replicate the types of wounds described by precursor testing of the M16 using 5.56).

219. There is no scientific support for the state's claim of devastating wounds from .223/5.556 ammunition. In fact, "the claims are so ridiculous that they … cast doubt on the credibility of the report and those that present it as factual." Dkt.232-18 (Boone Rebuttal Rep.) at 13-14.

220. That is all the more true when one considers that it is illegal to hunt deer with a rifle chambered in .223/5.56 NATO in several states, including Illinois, because the "wounding

50

potential, when compared to larger, commercially available cartridges, is limited." Dkt.232-18 (Boone Rebuttal Rep.) at 13-14.

> *- The Pistols and Shotguns PICA Bans Are Not Remotely Equivalent to Machineguns or Other Military Arms*

221. None of the pistols and shotguns that PICA bans share what is the most "critical" military feature: select-fire capability. *See, e.g.*, Dkt.234 (9/16/2024 Trial Tr., Eby) at 187:14-25; Dkt.232-3 (Eby Dep.) at 61:9-20.

222. None of the pistols that PICA bans can fire rounds anywhere near as quickly as an M16, M27, or other automatic-fire-capable rifle. *See* ¶¶203-08, *supra* (discussing the differences in rate of fire between semiautomatic firearms, including pistols, and automatic-fire-capable rifles like the M16 and M27); Dkt.234 (9/16/2024 Trial Tr., Eby) at 199:12-21 (discussing difficulty of managing conventional pistol in high stress situations which could further reduce rate of fire); Dkt.232-17 (Eby & Musselman Rep.) at 10 ("One thing is for certain, however, the rate of semiautomatic fire is significantly less than that of automatic fire.").

223. None of the shotguns that PICA bans can fire rounds anywhere near as quickly as an M16, M27, or other automatic-fire-capable rifles. *See* ¶¶203-08, *supra*; Dkt.232-18 (Boone Rep.) at 12 (noting that rate of fire for shotguns will naturally be lower because they "typically, have more recoil"); Dkt.234 (9/16/2024 Trial Tr., Eby) at 199:12-21 (similar); Dkt.232-17 (Eby & Musselman Rep.) at 10.

224. None of the pistols that PICA bans can fire rounds at velocities anywhere near the velocities that M16s, M27s, or other automatic-fire-capable rifles reach. *See* Dkt.234 (9/16/2024 Trial Tr., Eby) at 178:2-4 ("Q. Pistols lack sufficient velocity to stop an assailant wearing body armor? A. Yes, sir, in most body armor that I'm aware of, it would stop a pistol, 9-millimeter."); Dkt.232-17 (Eby & Musselman Rep.) at 7 (noting that semiautomatic pistols "lack sufficient velocity to ensure bullet penetration and expansion required to stop an attacker in a military context, where assailants are often wearing body armor or are far away before the attacker can cause harm"); *see also* Br. of State of Illinois as Amicus Curie at 7, *Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. Sept. 2024), Dkt.27 (conceding that a semiautomatic pistol has a far lower effective penetration rate than military firearms like the M16).

225. None of the pistols that PICA bans has an effective range of anything close to that of the M16, M27, or other automatic-fire-capable rifles reach. *See* Dkt.234 (9/16/2024 Trial Tr., Eby) at 178:10-179:5 (discussing smaller effective range of semiautomatic "pistols" verses "an M4 or M16 rifle"); Dkt.232-17 (Eby & Musselman Rep.) at 7; *see also* Br. of State of Illinois as Amicus Curie at 7, *Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. Sept. 2024), Dkt.27.

226. None of the shotguns that PICA bans has an effective range of anything close to that of the M16, M27, or other automatic-fire-capable rifles reach. None of the shotguns that PICA bans can fire rounds at velocities anywhere near the velocities that M16s, M27s, or other automatic-fire-capable rifles reach. *See* David Kopel, *AR Rifle Ammunition Is Less Powerful Than Most Other Rifle Ammunition*, The Volokh Conspiracy (last visited Oct. 19, 2024), https://tinyurl.com/2z697kne (referencing chart from *Cartridges of the World* (17th ed. 2022)

detailing muzzle velocity of 12-guage shotgun slug at 1,610 and .223/5.56 ammunition at 3,200 and 3,100 respectively).  That is, of course, no surprise, as velocity is determined in large part by the ammunition used and none of the shotguns that PICA bans uses the same (or even similar) ammunition as is used in an M16, M27, or other automatic-fire-capable rifle.  *See* Dkt.232-18 (Boone Rep.) at ¶53 (discussing the 5.56mm NATO cartridges … intended to be used in the M16 family of firearms" none of which could be fired from a semiautomatic shotgun); *see also* Dkt.232-17 (Eby & Musselman Rep.) at 8 (same).

227. No branch of the U.S. military issues any of the types of pistols enumerated in 720 ILCS 5/24-1.9(K) for combat.  *See* Dkt.232-17 (Eby & Musselman Rep.) at 3, 6-7 ("We are unaware of a single military in the world, let alone any branch of the U.S. military, that uses pistols that meet the above description").  The pistols the U.S. military now issues standard are Sig Sauer M17 pistols, which are a military-customized version of SIG Sauer's civilian-available P320, a semiautomatic pistol with the capacity to accept a detachable magazine, which ironically is not itself restricted by PICA.  *Id.* at 7.

228. No branch of the U.S. military issues any of the types of shotguns enumerated in 720 ILCS 5/24-1.9(L) for combat.  *See* Dkt.232-17 (Eby & Musselman Rep.) at 3, 7 ("While the military does employ shotguns, including semiautomatic ones that have a pistol grip and a fixed magazine with the capacity of more than 5 rounds (We are unaware of any shotgun used by the military that has the capacity to accept a detachable magazine), shotguns have no significant combat tasks to perform.").

### *- The Features PICA Singles Out Have No Relevance to the "Militaristic" Metrics the Seventh Circuit Discussed.*

229. The ability to fire semiautomatically does not affect the power of the projectile discharged.  *See* Dkt.232-18 (Boone Rep.) at ¶¶45, 47, 84.

230. The ability to accept a detachable magazine does not affect the power of the projectile discharged.  *See* Dkt.232-18 (Boone Rep.) at ¶¶45, 47, 84.

231. Neither a pistol grip nor a forward or protruding grip mechanically affects a firearm's rate of fire, its capacity to accept ammunition, or the power of the projectile discharged.  *See* Dkt.232-21 (Little Rep.) at ¶19; Dkt.232-18 (Boone Rep.) at ¶¶45, 47, 84; Lombardo Video 1 at 13:19-13:38.

232. A thumbhole stock does not mechanically affect a firearm's rate of fire, its capacity to accept ammunition, or the power of the projectile discharged.  *See* Dkt.232-18 (Boone Rep.) at ¶¶45, 47, 84.

233. A folding, telescoping, detachable, or otherwise adjustable stock does not mechanically affect a firearm's rate of fire, its capacity to accept ammunition, or the power of the projectile discharged.  *See* Dkt.232-18 (Boone Rep.) at ¶¶45, 47, 84.

234. A flash suppressor does not mechanically affect a firearm's rate of fire, its capacity to accept ammunition, or the power of the projectile discharged.  *See* Dkt.232-18 (Boone Rep.) at ¶¶45, 47, 84.

235. A barrel shroud does not mechanically affect a firearm's rate of fire, its capacity to accept ammunition, or the power of the projectile discharged.  *See* Dkt.232-18 (Boone Rep.) at ¶¶45, 47, 84.

236. A buffer tube, brace, or other horizontal protrusion behind the pistol grip does not mechanically affect a firearm's rate of fire, its capacity to accept ammunition, or the power of the projectile discharged.  *See* Dkt.232-18 (Boone Rep.) at ¶¶45, 47. 84.

237. A threaded barrel does not mechanically affect a firearm's rate of fire, its capacity to accept ammunition, or the power of the projectile discharged.  *See* Dkt.232-18 (Boone Rep.) at ¶¶45, 47, 84.

**E.    Semiautomatic Firing is the Quintessential Dual-Use Capability, And The Other Features PICA Singles Out Are Also Dual Use Functions.**

238. To the extent Defendants claim that semiautomatic fire is exclusively or predominantly useful in military service, that claim is refuted by the record evidence.

239. To be sure, servicemembers' weapons have both automatic and semiautomatic capabilities.  But that is because the two functions serve different purposes.  Whereas automatic fire is designed for "spray fire," semiautomatic fire is designed to be aimed carefully.  Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1999 (3d ed. 2021) (2024 Supp.); *see also* Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 654:10-22 (discussing "well-aimed fire" of semiautomatic mode and "spray[]" fire with automatic mode); Dkt.222-2 (Tucker Rebuttal Rep.) at ¶16 (discussing "aimed fire" from semiautomatic rifles and "volume fire" from select-fire rifles); Dkt.232-17 (Eby & Musselman Rep.) at 10 ("[A]utomatic fire is not aimed fire for the purpose of hitting a specific target but rather is for suppressive fire to pin down the enemy where hits and near misses.").  And some circumstances call for the kind of suppression fire that automatic capability offers, others call for careful aim at a known target. *See* Dkt.222-2 (Tucker Rebuttal Rep.) at ¶16 (noting that while "aimed fire" from semiautomatic rifles is an "important part in [military] defense," "volume fire" with a select fire rifle, is more important in "offensive" military combat (quoting U.S. Army, *Technical Memorandum OROT-160 Operational Requirements for an Infantry Hand Weapon by Norman A. Hitchman, entered into the Library Army War College*, Carlisle Barracks, PA on 19 June 1952 with the Operations Research Office conducted by the 10 of 111 (pdf))); Dkt.232-20 (Eby Rebuttal Rep.) at 4-6 (quoting various military studies indicating that "Rifle squads equipped with … automatic rifles appear superior to all other squads evaluated in overall effectiveness" and that while "semiautomatic fire is superior" in some contexts, "automatic fire" is superior in others)); Dkt.232-17 (Eby & Musselman Rep.) at 6 (similar); Dkt.240 (9/18/2024 Trial Tr., Watt) at 380:25-381:23, 383:8-11, 385:8-15(discussing automatic-fire tactics); Dkt.234 (9/16/2024 Trial Tr., Eby) at 128:9-131:20, 133:10-134:12, 138:20-139:2, 140:14-143:16 (discussing military studies, including the SALVO report, the Vaughn report, and the Whittenburg report, showing

that "[v]olume has a strength of its own," as to "hit ratio" and the "psychological deterrent for the target," which is why the military requires "a select fire capability" in all service rifles).

240. That explains why servicemembers primarily use semiautomatic rifle fire, not automatic fire, when trying to hit a specific target:  Semiautomatic fire is more accurate and efficient. *See, e.g.*, Dkt.236 (9/17/2024 Trial Tr., Dempsey) at 606:12-607:1; Dkt.222-2 (Tucker Rebuttal Rep.) at ¶10; Pltfs' Tr. Ex. 140, Dempsey Dep. at 43:4-7; *see also* Dkt.241 (9/19/2024 Trial Tr., State's Closing) at 666:17-667:5.  But that does not demonstrate that semiautomatic fire is exclusively, or even predominantly, useful in military services, as aiming carefully can be the difference between life and death in civilian and military settings alike.  *See* Dkt.234 (9/16/2024 Trial Tr., Eby) at 199:5-23 (recommending civilian semiautomatic AR-style pistols or rifles for "home defense" because conventional pistols and shotguns can "be very difficult to aim correctly under stress" or to "maneuver" in comparison); Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 654:10-20 ("Q. All right.  It seems to me the takeaway from what you're trying to tell us is that in confrontation, you want to place well-armed rounds -- or well-aimed fire on who you're confronting; right?  A. That is correct.  Q. And in your own experience, you found that rifles in semiautomatic mode were the most useful and most accurate?  A. That is correct, Your Honor."); Dkt.222-3 (Dempsey Rebuttal Rep.) at ¶19 (discussing efficiency and accuracy of semiautomatic fire of "M4/M16 service rifle").

241. The features that make semiautomatic fire particularly useful for the military in some situations are the same ones that make it particularly useful for civilians in self-defense situations.  Indeed, those features can be especially important when the user is a civilian with less training than a member of the military.  *See, e.g.*, Dkt.232-17 (Eby & Musselman Rep.) at 11 (AR-platform rifle could be considered one of the "best designed home defense weapon[s]" ever); Dkt.234 (9/16/2024 Trial Tr., Eby) at 177:4-8 ("Q. You agree that pistols are used for self-defense in civilian life; right?  A. Yes, sir.  Q. And pistols are used for the same purpose in the military?  A. Self-defense."); Dkt.234 (9/16/2024 Trial Tr., Eby) at 189:6-8 ("Q. Would you recommend an AR-type rifle, a semi-automatic rifle with a detachable magazine [for self-defense]?  A. That would be my primary recommendation."); Dkt.234 (9/16/2024 Trial Tr., Eby) at 199:12-200:24 (noting that the AR-style firearm "[a]djusts to [the] body, has capacity … is more reliable than a pistol" and "absolutely" the firearm to choose for home defense); Dkt.232-18 (Boone Rep.) at ¶¶38-41 (AR-15 "rifles are extremely well suited for self-defense").

242. Notably, neither of Defendants' military experts has any training in firearm self-defense, and they did not proffer any opinion on the matter of dual use.  *See, e.g.*, Dkt.241 (9/19/2024 Trial Tr., Dempsey) at 616:10-12 ("Q. Okay.  So you're not suggesting self-defense with a firearm; correct?  A. No."); Pltfs' Tr. Ex. 139, Tucker Dep. at 52:13-53:16 (similar); Pltfs' Tr. Ex. 139, Tucker Dep. at 58:10-59:10 ("Q. … did you form any opinions on the restriction on … pistol[s]?  A. No, I did not. I was only asked to look at the M4 and M16 and the AR-15.  Q. What about shotguns?  Are you aware that Illinois law restricts certain shotguns?  A. I was not aware of that.  Q. Did you form any opinions on the restrictions on shotguns?  A. I did not."); Pltfs' Tr. Ex. 140, Dempsey Dep. at 79:20-80:5 ("Q. Does your report purport to address the military use of any pistols that Illinois restricts? …  A. No …  Q. Does your report purport to address the military use of any shotguns that Illinois restricts?  A. No.").

54

243. That said, even Defendants' military expert "agree[d] that, with rare exceptions, pistols in the military are primarily used for the same purpose they are in civilian life: self-defense." Dkt.222-3 (Dempsey Rebuttal Rep.) at ¶35 (citing Dkt.232-17 (Eby & Musselman Rep.) at 7)).

244. The federal government has recognized that semiautomatic firearms are useful for civilians, as it sold hundreds of thousands of its surplus semiautomatic M1 carbines (sometimes with 15- or 30-round magazines) to civilians shortly after moving to select-fire rifles. *See* David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849, 859 n.88 (2015); *see also* Dkt.232-16 (Helsley Rep.) at 9 (discussing sale of M1 carbines to civilian population). From 1958 to 1967 alone, the government sold 207,000 M1 carbines to civilians. Stephen P. Halbrook, *America's Rifle* 198 (2002).

245. The other features PICA singles out—including pistol or protruding grips, folding, telescoping, thumbhole, or detachable stocks, flash suppressors, barrel shrouds, buffer tubes and arm braces, and threaded barrels—have never been reserved to the military and "do not serve any unique military purpose." Dkt.232-17 (Eby & Musselman Rep.) at 11.

246. Those features also make little difference to the firearm's mechanical function, such as rate of fire or ammunition capacity. *See, e.g.*, Dkt.232-18 (Boone Rebuttal Rep.) at 5 ("The features used by Illinois to classify a firearm as an 'assault weapon' have absolutely no effect on either the linear nor rotational velocity produced."); Dkt.232-21 (Little Rep.) at ¶19 ("These features … do not, however, mechanically affect a rifle's rate of fire, capacity to accept ammunition, or the power of the projectile a rifle discharges."). *See generally* Lombardo Video 1 (stating the same). Instead, they "facilitate the comfortable and thus safe and effective use" of whatever firearm they are attached to, which is just as important for civilians as it is for servicemembers. Dkt.232-21 (Little Rep.) at ¶19; *see also* Dkt.236 (9/17/2024 Trial Tr., Ronkainen) at 280:16-24 ("Q. These examples that we've been talking about, more caliber offerings, more features, more variability, more adaptability, would you consider them all to be examples of innovations that added to Remington's ability to meet the surging demand for MSR platforms? A. Yes. Q. And as a part of that, was self-defense and home defense included? A. That was one of the considerations along with the other ones we've discussed before.").

247. In defining the prohibited "assault weapons" to which it applies, PICA does not distinguish between those that use centerfire ammunition and those that use rimfire ammunition (like a small .22LR rifle often used to hunt vermin). *See* 720 ILCS 5/24-1.9(a)(1); Dkt.232-18 (Boone Rebuttal Rep.) at 5 (noting that "the Illinois law considers firearms chambered for rimfire ammunition, like the S&W M&P 15-22, chambered in … .22LR, to be 'assault weapons,' despite .22 rimfire ammunition being significantly lighter and lower velocity than typical .22 caliber centerfire ammunition."). While firearms that use rimfire ammunition are available to the general public, they are "not used in the [U.S.] military"—or "any military" in fact—"for any purpose, let alone combat." Dkt.232-17 (Eby & Musselman Rep.) at 3; *see also* Dkt.232-18 (Boone Rep.) at ¶49 ("To my knowledge, Illinois is the only state that treats rifles chambered for rimfire ammunition the same as rifles chambered for centerfire ammunition."). The state's military experts did not dispute any of that.

55

248. While "[a]ll box magazines for" the standard-issued "Sig Sauer M17" pistols in the U.S. military "have a capacity of either 17-rounds or 21-rounds," that is "the same capacity magazines that come standard with the Sig Sauer M17 pistol when sold to the general public." Dkt.232-17 (Eby & Musselman Rep.) at 7.

249. Finally, while "all box magazines for M16/M4 rifles in the military use 30-round magazines," that is not because that number is particularly dangerous, destructive, or lethal in war.  It is because "decades of testing showed that magazines over that capacity were not sufficiently reliable … because they were too susceptible to feeding issues."  Dkt.232-17 (Eby & Musselman Rep.) at 7; *see also* Dkt.232-17 (Eby & Musselman Rep.) at 7 (noting that "but for that limitation, the military would use much larger box magazines for M16/M4 rifles"); *accord* Dkt.232-24 (Watt Rep.) at ¶7 ("[T]he amount of ammunition increases a firearm's weight, which can in turn diminish the self-defense benefits.  But the amount of ammunition required to result in such diminishing returns is far above 15 rounds.").  Reliability is not a quality sought after only by the military.

56

## PROPOSED CONCLUSIONS OF LAW

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Amendment protects "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008); *accord N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20-21 (2022) (emphasizing that the Second Amendment protects "an individual right to armed self-defense"); *see McDonald v. City of Chicago*, 561 U.S. 742 (2010) (incorporating the Amendment against the states). That right is presumptively shared by "'all Americans,'" and is "subject" only "to certain reasonable, well-defined restrictions" entrenched in our Nation's historical tradition. *Bruen*, 597 U.S. at 70.

Before *Bruen*, many courts subjected the right to keep and bear arms to a "judge-empowering 'interest-balancing inquiry' that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id.* at 22 (quoting *Heller*, 554 U.S. at 634). That is no longer a valid approach to Second Amendment analysis. *Bruen* made clear that Second Amendment claims are subject to a burden-shifting test that "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26. There is no longer any room for tiers of scrutiny or rights-diluting interest-balancing; under *Bruen*, "the traditions of the American people" carry the day. *Id.* at 24

After *Bruen*, the constitutional inquiry proceeds as follows. The threshold question is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. *Id.* at 17, 24. If the answer to that question is yes—i.e., if the government has "regulate[d] arms-bearing conduct"—then "the Constitution presumptively protects that

57

conduct," and the government "bears the burden to 'justify its regulation.'"  *United States v. Rahimi*, 144 S.Ct. 1889, 1897 (2024).  "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Bruen*, 597 U.S. at 17.  The government, not the citizen, bears the burden of persuasion at this stage of the inquiry.  *Id.* at 33-34; *see also id.* at 19 (the government must "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms").

In *Bevis*, the Seventh Circuit held that "weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes," do not qualify as "Arms" within the meaning of the Second Amendment.  *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023).  And it preliminarily opined that the firearms and feeding devices that PICA bans likely fall into that category.  *Id.* at 1195-97.  But the court did not "rule out the possibility that the plaintiffs will find other evidence" that demonstrates that its preliminary views on that question were mistaken.  *Id.* at 1197.  And this is just what has happened as this case has progressed:  The now-complete record conclusively demonstrates that the firearms and feeding devices banned by PICA "are Arms that ordinary people would keep at home for purposes of self-defense," as opposed to "weapons that are not possessed for lawful purposes"; and are  "not … exclusively or predominantly useful in military service."  *Id.* at 1194.  Those firearms and feeding devices are therefore "Arms" within the meaning of the Second Amendment, so it falls to Defendants to prove that PICA "is consistent with the principles that underpin our regulatory tradition."  *Rahimi*, 144 S.Ct. at 1898.  Defendants have failed to do so.

## I.      The Firearms And Feeding Devices That PICA Outlaws Are "Arms."

Defendants do not dispute that Plaintiffs are among the "people" "whom the Second Amendment protects." *See Bruen*, 597 U.S. at 31.  Nor do they question that PICA implicates the right to "keep and bear"—which makes sense, given that a (near-)total prohibition on the purchase, sale, transfer, or ownership of any class of firearms obviously restricts a citizen's ability to "possess and carry" the prohibited arms. *See id.*  The critical threshold question on remand from *Bevis*, then, is whether the relevant firearms and feeding devices are "Arms" under the Seventh Circuit's and Supreme Court's understandings of that term.  The answer to that question is yes.

**1.** As *Heller* explained and *Bruen* reiterated, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582); *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (per curiam).  That includes "'any thing that a man … takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581 (quoting Founding-era dictionary).  A rifle, pistol, or shotgun certainly satisfies that definition, no matter what features it has.  So does an ammunition feeding device.  As their name connotes, feeding devices are not passive holders of ammunition, like a cardboard cartridge box.  They are integral to the design of semiautomatic firearms and the mechanism that makes them work, actively feeding ammunition into the firing chamber. *See, e.g.*, Dkt.69-2 (Hlebinsky Rep.) ¶9 ("A magazine is a vital part of the firearm[.]").  And the universe of bearable arms includes component parts that play a functional role in the firing mechanism of firearms, for example, by feeding ammunition to the firing chamber—which is ultimately what allows modern handguns (the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629) to work as intended.  A semiautomatic rifle, pistol, or shotgun equipped with a

<div align="center">59</div>

detachable feeding device containing the ammunition necessary for it to function is thus indisputably a "bearable" instrument that "facilitate[s] armed self-defense." *Bruen*, 597 U.S. at 28. After all, "without bullets, the right to bear arms would be meaningless," and the central purpose of the Second Amendment—self-defense—eviscerated. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

Plaintiffs maintain that that should be the end of the matter. But the Seventh Circuit has read *Heller* and *Bruen* to require more. Under *Bevis*, only those weapons "that ordinary people would keep at home for purposes of self-defense," as opposed to those "that are not possessed for lawful purposes" and those that are "exclusively or predominantly useful in military service," qualify as "Arms" under the Second Amendment. 85 F.4th at 1194. Thus, under *Bevis*, to demonstrate that the firearms and feeding devices PICA bans are "Arms," a plaintiff must show that "ordinary pe[ople] would keep [them] at home for purposes of self-defense," i.e., that they are suitable for that purpose; that they are in fact "possessed for lawful purposes"; and that they are not "exclusively or predominantly useful in military service." Dkt.166 (Order) at 6-7. That analysis focuses on differentiating between civilian and military weapons—the former of which, per *Bevis*, are covered by the Second Amendment, and the latter of which, per *Bevis*, are not.

Of course, "many weapons are 'dual use,'" meaning that "private parties have a constitutionally protected right to 'keep and bear' them" even if "the military provides them to its forces." *Bevis*, 85 F.4th at 1195 n.8. This Court has emphasized the import of the "dual use" category, noting that this "exceptionally important clarification resolves any confusion that an Arm can *never* enter the gravitational pull of the Second Amendment simply by virtue of the fact that the military may provide that Arm or a similar Arm to its forces or that they would be useful in a military or law enforcement setting." Dkt.166 (Order) at 7-10. So "[e]ven if [arms] are used

60

by the military or by law enforcement, dual use may still be demonstrated." *Id.* at 10. And "if

the Plaintiffs establish that [the prohibited firearms and feeding devices] are in common use and

are dual purposed, then the Plaintiffs satisfy both *Bevis* and *Bruen* and the court may treat [those

arms] as protected dual-use Arms covered by the Second Amendment." *Id.* at 12.

Evidence and argument concerning the similarities and differences between civilian and

military-grade weapons can be probative as to whether a weapon is "essentially reserved to the

military," and thus excluded from Second Amendment protection under *Bevis*. For example,

*Bevis* observed that evidence regarding the construction, function, application, and modification

of civilian versus military-grade weapons could establish a constitutionally significant

distinction, and stated in particular that "[b]etter data on" the different "firing rates" between

banned arms and military-grade arms might draw a "sharper distinction" and indeed "change the

analysis" altogether. 85 F.4th at 1197; *see also id.* at 1196 (preliminarily evaluating similarities

and differences in, e.g., "kinetic energy," "muzzle velocity," and "effective range").

Moreover, "sorting between military use and civilian use is an exercise in understanding

the complex dynamics of self-defense in which lethal force may be required to repel a rapist, a

murderer, an arsonist, a kidnapper, a stalker, an armed burglar, or multiple attackers at once."

Dkt.166 (Order) at 11. The analysis may thus not always be as simple as examining the

functioning of two arms. Additional considerations include whether the weapon might "expand

the civilian's options for offensive or defensive strategy and/or tactics for the protection of an

individual or others in confronting one or more armed assailants; improve accuracy, safety,

comfort, or ease of operation; protect against hearing damage, flash blindness, or personal injury;

reduce recoil; reduce or eliminate downtime (because of reloading, cycling, or lack of

ammunition before the threat is neutralized); or accommodate a disability, handicap, or physical

infirmity." *Id.* at 12.

At bottom, if the record and argument demonstrate that the prohibited firearms fall on the

civilian side of the line, rather than the military side, or that they are "dual use" weapons that

both civilians and the military lawfully use, *Bevis*, 85 F.4th at 1195 n.7, then they are "Arms" that

the Second Amendment presumptively bars the government from prohibiting, *id.* at 1194.

**2.** While the Seventh Circuit reached the preliminary conclusion that firearms and feeding

devices PICA bans do not qualify as "Arms," it repeatedly "stress[ed]" that that determination

was "just a preliminary look at the subject," and it refused to "rule out the possibility that the

plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s

(and each one's relatives) than the present record reveals." *Id.* at 1197.  Now that the record is

complete, it is plain that the firearms and feeding devices PICA bans fall on the protected side of

the line.

First, the record conclusively demonstrates that the firearms and feeding devices PICA

bans not only "are Arms that ordinary people *would* keep at home for purposes of self-defense,"

but are *in fact* "possessed for lawful purposes" by millions of Americans.  *Id.* at 1194 (emphasis

added).

Firearms equipped with the features that, under PICA, transform an otherwise-lawful

rifle, pistol, or shotgun into an unlawful "assault weapon" are useful for self-defense (i.e., are

arms that ordinary people *would* keep at home for purposes of self-defense) and are *in fact*

commonly owned for that and other lawful purposes.  *See* **Proposed Findings of Fact 79-103,

103-10**, *supra*.  Indeed, semiautomatic modern sporting rifles, such as AR-platform rifles, are

more popular than the most popular vehicle in the country, and all the evidence before this Court

confirms that they are commonly owned for lawful purposes including self-defense. *See, e.g.*, **Proposed Findings of Fact 79-102, 104-11**, *supra*. That should not be surprising; the features that, under PICA, transform an otherwise-lawful arm into an unlawful "assault weapon" aid in civilian self-defense:

- A firearm's capacity to fire semiautomatically is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 35-42**, *supra*.

- A firearm's capacity to accept a detachable magazine is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 43-45**, **79-80**, *supra*.

- A pistol grip on a firearm is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 46-51**, **79-80**, **118**, *supra*.

- A forward grip on a rifle or shotgun is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 49, 52-55, 74, 79-80, 115,** *supra*.

- A thumbhole stock on a rifle or shotgun is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 56-58**, **79-80**, *supra*.

- A folding, telescoping, detachable, or otherwise adjustable stock on a rifle or shotgun is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 56**, **59-65**, **79-80**, *supra*.

- A flash suppressor on a firearm is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 66-70, 117**, *supra*.

- A barrel shroud on a firearm is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 71-74, 116**, *supra*.

- A buffer tube, brace, or other part that protrudes horizontally behind the pistol grip is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 49, 75-76, 119**, *supra*.

- A threaded barrel on a pistol is useful for purposes of civilian self-defense, and ordinary people keep firearms equipped with them for that purpose. *See* **Proposed Findings of Fact 77-78**, *supra*.

Magazines capable of holding more than 10 or 15 rounds are even more popular still. Even a conservative estimate based on the evidence before this Court puts the number in the hundreds of millions. *See* **Proposed Findings of Fact 141-44**, *supra*. And all the evidence once again confirms that they are commonly owned for lawful purposes, including self-defense. *See* **Proposed Findings of Fact 130-34, 145-52**, *supra*.

Second, the record conclusively demonstrates that the firearms and feeding devices PICA bans are *not* "exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194. All of the rifles PICA bans are semiautomatic-only; all of the pistols PICA bans are semiautomatic-only; and all of the shotguns PICA bans are either semiautomatic-only or use a revolving cylinder. *See* **Proposed Findings of Fact 153-58**, *supra*. Neither the U.S. military nor any other known military in the world uses as their general service rifle rifles capable of firing only semiautomatically. *See* **Proposed Findings of Fact 159-74**, *supra*. The U.S Military instead uses only select-fire rifles that can fire either semiautomatically or automatically, either fully or in bursts. *See* **Proposed Findings of Fact 159-74**, *supra*. That is not a recent trend. When AR-style rifles were first manufactured, the military extensively studied whether semiautomatic-only rifles could suit its needs. And it concluded that they could not. The military has never wavered from that position since. *See* **Proposed Findings of Fact 162-64, 189**, *supra*. And the record demonstrates why, as the military has critical needs for automatic fire. *See* **Proposed Findings of Fact 175-92**, *supra*. The U.S. military does not issue any of the pistols or shotguns that PICA bans for combat purposes, either. *See* **Proposed Findings of Fact 169-74**, *supra*.

64

While *Bevis* posited that "the AR-15 is almost the same gun as the M16 machinegun," 85 F.4th at 1195, the more complete record before this Court has refuted that conclusion. The firearms that PICA bans, including the AR-15 and other modern sporting rifles, are in fact different from M16s in many critical respects. *See* **Proposed Findings of Fact 195**, *supra*. First, of course, the former can fire only semiautomatically (or via a revolving cylinder). *See* **Proposed Findings of Fact 193-201, 221-28** *supra*. That is no small difference, given that automatic fire, alone among the features of the M16, can perform critical military functions. *See* **Proposed Findings of Fact 175-192**, *supra*. Second, the firearms that PICA bans, including the AR-15 and other modern sporting rifles, have substantially lower rates of fire than M16s and other automatic-capable rifles. *See* **Proposed Findings of Fact 203-08**, *supra*. Third, many of the firearms that PICA bans (particularly all of the shotgun and handguns, but also many rifles) have substantially lower range and penetration than automatic-capable firearms like the M16. *See* **Proposed Findings of Fact 211-12**, *supra*. What is more, the firearms that PICA bans cannot as a class be easily modified to approximate automatic-capable firearms like the M16. *See* **Proposed Findings of Fact 193-202**, *supra*. And while the military may often use select-fire rifles in semiautomatic mode, that alone does not show that semiautomatic rifles are "exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194. To the contrary, the record evidence shows that the military mostly uses semiautomatic (as opposed to suppressive automatic) fire in situations where accuracy is paramount, *see* **Proposed Findings of Fact 240-41, 179-85**, *supra*—which, of course, is a quality equally important to civilian self-defense. The manner in which the military uses semiautomatic rifle fire thus just underscores that firearms with that capability at the very least fall into the protected dual-use category.

65

Finally, while the military uses magazines capable of holding more rounds than PICA permits, PICA's limits are far lower than what the military uses. *See* **Proposed Findings of Fact 173**, *supra*. And the record evidence conclusively refutes any claim that the magazines the military does use are exclusively or predominantly used by the military, or that they serve some uniquely militaristic purpose. *See* **Proposed Findings of Fact 147-52, 248-49**, *supra*. The military instead uses them because they reduce the need to reload without being so large as to create reliability issues—which is precisely why millions of law-abiding citizens use them too.

## II.      No Historical Tradition Justifies PICA.

Because the firearms and feeding devices that PICA bans are "Arms" within the meaning of the Second Amendment, Defendants bear the burden to prove that PICA fits within the Nation's historical tradition of firearm regulation. Defendants have not satisfied that burden.

To be sure, the Seventh Circuit concluded "at the preliminary injunction stage" that Plaintiffs "ha[d] not shown the necessary likelihood of success on the merits" as to historical tradition. *Bevis*, 85 F.4th at 1197-98. But that was based on the Court's conclusion that there is a historical tradition that supports prohibiting "weapons used exclusively by the military." *Id.* at 1199; *see also id.* at 1202 (finding "a long tradition … supporting a distinction between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use"). And for the same reasons that the firearms and feeding devices PICA bans do not fall within *Bevis*'s militaristic exclusion from the definition of "Arms," *see supra*, PICA's broad prohibition of those firearms and feeding devices does not fall within that historical tradition.

Nor does it fall within any other historical tradition, as there is no enduring tradition of prohibiting the general public from keeping and bearing common arms based on the danger that a small number of bad actors will put those arms to unlawful (or even awful) ends. Rather, our

Nation's historical tradition is one of welcoming technological advancements that make firearms safer, easier to use, and more effective.  PICA is out of step with that longstanding historical tradition.

### A.  The Historical Tradition Framework

To satisfy its historical burden, the state must provide historical analogues that show that its modern regulation is consistent with an American tradition of regulating firearms.  *See Bruen*, 597 U.S. at 28 ("When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy.").  For a historical law to serve as a "proper analogue" to a modern regulation, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 28-29.  "Whether modern and historical regulations impose a comparable burden on the right of armed self-defense" (the how) "and whether that burden is comparably justified" (the why) "are 'central' considerations when engaging in an analogical inquiry."  *Id.* at 29 (emphasis added).

*The How.*  Under *Bruen*'s "how" inquiry, courts compare the mechanics of historical and modern laws, i.e., *how* they regulate; they do not evaluate where laws might fall on some overarching "burdensomeness" spectrum.  *Id.* at 29 & n.7.  The Supreme Court's instruction that courts must evaluate "comparable burden[s]," *id.* at 29, thus is not an invitation to interest-balance.

*Bevis* posited that "a broader restriction burdens the Second Amendment right more, and thus requires a closer analogical fit between the modern regulation and traditional ones," whereas "a narrower restriction with less impact on the constitutional right might survive with a looser fit."  85 F.4th at 1199.  But the Supreme Court's subsequent decision in *Rahimi* casts serious doubt on that proposition, as *Rahimi* emphasized that the "how" question turns on the *mechanics*

of how a law burdens the right, not the degree to which it does so.  When analyzing whether 18

U.S.C. §922(g)(8) is consistent with historical tradition, the Court did not start by situating the

law in a substantial, meaningful, or minimal burden category.  It examined how the law actually

works—i.e., by authorizing state actors to disarm someone only after a "judicial determination[]"

that the person "likely would threaten or had threatened another with a weapon," and even then

only for a "limited duration"—and compared that to how the government's proffered historical

analogues worked.  144 S.Ct. at 1902.  That makes sense, as the point of embracing a historical-

tradition mode of analysis is to get courts out of the business of making subjective assessment of

whether a burden on Second Amendment rights is "meaningful."

 ***The Why.***  The "why" inquiry is likewise not an avenue by which courts can smuggle in

means-end scrutiny.  Much like the "how" inquiry, the "why" inquiry is mechanical; it asks

whether the modern regulation and the proposed historical analogue have comparable

justifications for burdening the right to bear arms.  *Bruen*, 597 U.S. at 29.  It is thus not enough

for the government to "simply posit that the regulation promotes an important interest."  *Id.*  at

17.  The government must demonstrate that its justification is consistent with our Nation's

historical tradition.  *Id.*; *see id*. at 48-50.  And, under *Bevis*, the only justifications that matter are

those found in the text of the relevant law.  *See Bevis*, 85 F.4th at 1200-01 (deeming it "not …

appropriate" for the state to cite "extratextual considerations to answer the 'why' question," such

as the prevalence of "mass-shooting[s]" or particularly harrowing episodes of gun violence in

America); *id.* at 1200 (rejecting "any test that requires the court to divine legislative purpose from

anything but the words that wound up in the statute").

 In short, the government does not satisfy its "burden" by simply "pointing to the gravity

of the harms the legislation was designed to avert and the appropriateness of the mechanism" that

the government has chosen to "adopt." *Bevis*, 85 F.4th at 1200.  It must show that both its chosen means and its reasons for choosing them are "comparabl[e]" to historical analogues.  *Id.*

*       *       *

Notably, the government's task is not done if it is able to identify a historical analogue with a comparable "how" and "why" to its modern regulation.  Even relevantly similar historical analogues must be "well-established and representative." *Bruen*, 597 U.S. at 30.  Accordingly, a court may not uphold a restriction just because a state manages to locate a few similar laws in the past, as doing so would "risk[] endorsing outliers that our ancestors would never have accepted." *Id.*; *see, e.g.*, *Antonyuk v. Hochul*, 639 F.Supp.3d 232, 301 (N.D.N.Y 2022) (purported analogues governing less than 6% of U.S. neither sufficiently representative nor sufficiently well-established); *Koons v. Platkin*, 673 F.Supp.3d 515, 615-22 (D.N.J. 2023) (purported analogues spanning only five states over 250 years insufficient to show historical tradition).

Moreover, *Bruen* did not provide courts with a "blank check" to draw analogies from *any* historical law.  597 U.S. at 30.  "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34-35.  For instance, in *Bruen*, the Court rejected reliance on "a handful of late-19th-century [laws]" allegedly similar to the challenged restriction, because laws first enacted long after ratification "come too late to provide insight into the meaning of [the Constitution]." *Id.* at 36-37, 38 (first alteration added) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)).  Indeed, few and late-breaking firearm laws do not an enduring tradition make.  *See id.* at 36 ("[T]o the extent later history contradicts what the texts says, the text controls.").  The same is true for "[h]istorical evidence that long predates" the Second Amendment's adoption in 1791 or its incorporation

69

against the states in 1868. *Id.* at 34. "[A]ncient" and unkept regulatory practices too do not an enduring tradition make.

### B.   The Arms PICA Bans Are Not Dangerous And Unusual.

**1.** The Supreme Court has provided some specific and explicit guidance regarding whether and when arms bans may be "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 47. Drawing from the historical record, the Court has identified a historical tradition of protecting the people's right to keep and bear arms that are in common use today. *Id.* at 47. By contrast, the Court has identified a historical tradition permitting the government to prohibit the *carrying* of arms that are "highly unusual in society at large," or "dangerous and unusual." *Id.* Whether an arm fits into the "common" category or the "dangerous and unusual" category is assessed by modern-day standards; what matters is whether arms are common *today*, not whether they were at the Founding. *See id.* ("[E]ven if … colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."). If they are, then it does not matter if the state thinks "[t]here are other more suitable firearm choices for personal defense," Dkt.185-2 (Andrew Rep.) ¶61, as *Heller* flatly forecloses the argument that the government may ban one common arm so long as it is permits possession of another. 554 U.S. at 629.

Importantly, the "dangerous and unusual" test is "conjunctive": "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment); *see also Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21, 47. A state could not, for instance, ban a common arm just because it is dangerous. Indeed, a common arm *cannot be* dangerous in a constitutionally relevant sense. After all, all firearms are dangerous, so the

70

question of whether one is so dangerous it may be banned requires asking, "dangerous compared to what?"—and the most apt comparator would be the arms that are in common use, as it would make no sense to say that arms that are comparable to those in common use are *unusually* dangerous. Nor could a state ban an uncommon arm without demonstrating that it is dangerous in some way that meaningfully differentiates it from common ones. Otherwise, states could outlaw arms with advancements that make them *safer*, limiting the people to older models that are already common. Such bizarre measures have never been part of this Nation's historical tradition.

In determining whether an arm is "in common use," the primary question is whether it is "typically possessed by law-abiding citizens for lawful purposes," including self-defense. *Heller*, 554 U.S. at 625. Courts thus need not ask how frequently people fire an arm to ward off an attack. *See id.* All that matters is whether they typically keep and bear that arm for lawful purposes like self-defense. In fact, *Bruen* never even mentioned how often people fire handguns in self-defense situations when determining whether they have a right to carry them. It sufficed there, just as it did in *Heller*, that "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629; *see also Bruen*, 597 U.S. at 47. How frequently law-abiding citizens keep versus carry firearms, or fire them at ranges versus at attackers, is therefore legally irrelevant, as an individual lawfully "uses" her firearm every time she does *any* of those things.

**2.** For the reasons set forth above, PICA does not fit within the historical tradition of banning "dangerous and unusual" arms.

First, for all the reasons set forth above, nothing about any of the firearms or feeding devices that PICA bans makes them unusually or distinctly "dangerous" in some way that

71

meaningfully differentiates them from common firearms that all agree fall on the civilian or "dual use" side of the Seventh Circuit's line. With the glaring exception of a grenade launcher, the prohibition of which Plaintiffs do not challenge, none of the features that transforms an otherwise-lawful rifle, pistol, or shotgun into a banned "assault weapon" under PICA has any meaningful impact on firing rate, muzzle velocity, penetrative capacity, or any of the other metrics the Seventh Circuit invoked in *Bevis* as placing a firearm on the verboten militaristic side of the line. In short, the firearms PICA addresses are not among "the especially dangerous weapons of the time" akin to "explosives, Bowie knives, or other like devices," *Bevis*, 85 F.4th at 1199. *See* **Proposed Findings of Fact parts II.B., II.C, & Part III**, *supra*. And the same is true of the feeding devices PICA restricts. *See* **Proposed Findings of Fact Part II.D. & part III**, *supra*.

Second, the firearms and feeding devices PICA restricts are the furthest thing from "unusual." Most semiautomatic rifles today come standard from the manufacturer with the capacity to accept a detachable magazine as well as one or more of the features PICA singles out, *viz.* a thumbhole stock; a pistol grip; a folding, telescoping, detachable, or otherwise detachable stocks; a flash suppressor; and/or a barrel shroud. Millions of Americans collectively own tens of millions of these rifles, known colloquially as "modern sporting rifles," for self-defense and other lawful purposes. *See* **Proposed Findings of Fact 79-81, 85-102**, *supra*. The semiautomatic pistols and shotguns PICA bans are only slightly less common. *See* **Proposed Findings of Fact 111-29**, *supra*. And the feeding devices PICA bans are far more common than even MSRs are. *See* **Proposed Findings of Fact 130-52**, *supra*. Countless law-abiding Americans own these long-lawful arms for the Second Amendment's *ne plus ultra* purpose of individual self-defense.

72

**C.** **Defendants Have Identified No American Historical Tradition Of Banning Semiautomatic Firearms Or Feeding Devices That Law-Abiding Citizens Own For Lawful Purposes.**

To the extent *Heller*, *Bruen*, and *Bevis* leave room for any other historical tradition that might justify banning common arms that are not exclusively or predominantly useful in military service, Defendants have not identified one. To the contrary, the historical record reveals a long tradition of *welcoming* technological advancements aimed at enhancing law-abiding citizens' ability to safely possess and accurately fire repeatedly. By contrast, the earliest historical support for bans on arms commonly kept and borne for lawful purposes dates back only to the George H.W. Bush Administration, as even Defendants' historians concede—and even that ban was limited to the importation of firearms that did not meet the "sporting" criteria of 18 U.S.C. §925(d)(3).

**1.** Broad bans on the ownership and use of firearms by colonists and early Americans were exceedingly rare in the early Republic. *See, e.g.*, Dkt.185-6 (Roth Rep.) ¶¶22-23 (confirming that "there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels," but some such laws "in a number of slave states"). There was, of course, one glaring exception: disarmament laws directed toward unfavored groups, which were plentiful. *See, e.g.*, *id.* ¶14 (referencing bans on possession and use of firearms by Native Americans and African Americans). But to the extent such invidious laws could even evince a constitutionally valid historical tradition of firearm regulation, *see, e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96, 104 (3d Cir. 2023) (en banc) (doubting that proposition), *judgment vacated*, *Garland v. Range*, 144 S.Ct. 2706 (2024) (Mem.), they do not begin to justify a blanket ban on common firearms, *see* Tr. of Oral Argument at 53:16-19, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023) (Solicitor General Prelogar: Those laws "were [a]n

73

application[] of a separate principle under the Second Amendment, which is that those who are not considered among the people can be disarmed.").

The near-total absence of broad bans on the ownership and use of common firearms with the kinds of features PICA singles out extended through nearly all of America's history. All the way until "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds." *Miller v. Bonta*, 542 F.Supp.3d 1009, 1024 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *see also Rhode v. Bonta*, No. 3:18-cv-00802-BEN-JLB (S.D. Cal. Jan. 11, 2023), Dkt.79-3 (cataloging gun restrictions from before the Founding to the mid-1900s, none of which restricted firearm possession because they were multi-shot arms or because they were equipped with larger capacity magazines or certain other accessories); *cf.* Dkt.69-2 (Hlebinsky Rep.) ¶36 ("Pistol grips appear on long arms dating to at least the 1700s."). No state banned so-called "assault weapons" until 1989. *See* Dkt.185-5 (Spitzer Rep.) ¶10; *see also Miller*, 542 F.Supp.3d at 1024 (highlighting California's "1989 ban").

The same is true for restrictions on ammunition feeding devices and magazine capacity. *See* Maxine Bernstein, *From Bowie Knives to Muskets and Machine Guns, Historians Testify in Measure 114 Trial about America's Gun History, Regulations*, The Oregonian (June 8, 2023), bit.ly/3p4qvdi (noting that one of the state's historians conceded that "he knew of no law" pre-1990 "that prohibited someone from acquiring an ammunition-feeding device"); *see also, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany L.

74

Rev. 849, 864 (2015) (noting that, when the Second Amendment and the Fourteenth Amendment were adopted, "there were no laws restricting ammunition capacity").

**2.** Defendants have pointed to various types of restrictions that they claim are relevantly similar to PICA.  Defendants are wrong.

***Restrictions on Bowie Knives.***  The state and its experts rely heavily on regulations of Bowie Knives in the 1800s, but they misstate what those laws did.  Plaintiffs are not aware of *any* antebellum statute that completely banned the sale or possession of Bowie knives.  Nearly all nineteenth-century Bowie-knife laws were instead limited to restricting *concealed carry*.  *See, e.g.*, Dkt.185-5 (Spitzer Rep.) ¶¶66-69, 72-73.  And most of the restrictions the state's experts cite merely escalated punishments for crimes committed with Bowie knives, *see id.* ¶70; 1837 Ala. Acts 7; 1853 Comp. L. Cal. §127, or targeted concealed carry or open carry *with intent to do harm*, *see* 1859 Ind. Acts 129, while leaving intact citizens' right to keep and openly bear such weapons.[11]  Moreover, even the most sweeping laws were short-lived:  By 1900, "no state prohibited possession of Bowie knives."  David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022), bit.ly/3RNRpQD.  And the most onerous laws were contemporaneously deemed *unconstitutional* unless they were construed more narrowly.  *See, e.g.*, *Nunn v. State*, 1 Ga. 243 (1846); *see also Bruen*, 597 U.S. at 54 (singling out *Nunn* as

---

[11] *See also* David B. Kopel et al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 187 (2013) (noting, in the context of an 1859 Texas case, that "the judicial and legislative fear of Bowie knives may have come from concerns about poor people or people of color").

"particularly instructive" regarding the Second Amendment's meaning); Dkt.185-5 (Spitzer Rep.

¶69 (discussing *Nunn*).

   ***Restrictions on Clubs, Blunt Weapons, and Pistols.***   Defendants invoke laws regulating

"various types of clubs and other blunt weapons," and "pistols."   *See* Dkt.185-5 (Spitzer Rep.)

¶¶75-83.  According to Defendants' expert, "every state in the nation had a statewide or local law

restricting one or more types of clubs," and those laws often "encompassed pistols and specific

types of knives."  *Id.* ¶75.  But Defendants and their expert provide little information about those

laws.

   The reason for that omission is not hard to discern.  Several targeted groups who were

not, at the time, understood to have *any* constitutional rights—namely, enslaved people and other

racial minorities.  *See, e.g.*, 1797 Del. Laws 104 (quoted at Dkt.185-5 (Spitzer Rep.) Ex. E at 17)

("[I]f any Negro or Mulatto slave shall presume to carry any guns … clubs, or other arms and

weapons whatsoever, without his master's special license … he shall be whipped with twenty-

one lashes, upon his bare back."); 1798 Ky. Acts 106 (quoted at Dkt.185-5 (Spitzer Rep.) Ex. E

at 45-46) (similar).  Again, racist and unconstitutional laws that governed only those who were

not at the time considered to be part of the political community—i.e., "the people" protected by

the Second Amendment—do not tell this Court anything about the rights of those who are.

   Moreover, as Defendants' expert Professor Spitzer admits, the anti-club regulations levied

against disfavored groups were "anti-carry laws," Dkt.185-5 (Spitzer Rep.) ¶75, so they flunk the

"relevantly similar" test for yet another reason:  Laws that restrict only the carrying of certain

types of arms (and primarily *concealed* carrying at that) are not remotely similar in *how* they

regulate to a law that bans possession.  After all, the question is "how … the regulations burden

a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 29, and a law that restricts

76

only one type of carrying but leaves the right to keep arms in the home untouched obviously imposes a far different burden than a law that bans both carrying *and keeping*.[12]  Indeed, *Bruen* did not even consider such laws proper analogues for a ban on carrying, let alone keeping.  597 U.S. at 47-49.

The same is true for the laws that purportedly restricted pistol and gun carrying more broadly.  *See* Dkt.185-5 (Spitzer Rep.) ¶84.  For support, Professor Spitzer cites a "1686 New Jersey" law "against wearing weapons because they induced 'great Fear and Quarrels.'"  *Id.* Setting aside that that law applied only to "dangerous or unusual weapons," *see* 1686 N.J. 289, 289-90, ch. 9, the New Jersey law (like all the others Professor Spitzer references in this category) restricted *only concealed carry*.  *See* Dkt.185-5 (Spitzer Rep.) ¶84 (admitting that all the laws referenced restricted "concealed weapons carrying").  Indeed, his citation to the New Jersey law is striking given that *Bruen* explicitly rejected that same law as "not meaningfully support" for New York's public-carry ban since it "restricted only concealed carry."  597 U.S. at 47-49.

At any rate, whatever laws may have existed regarding unusual or unlawful weapons, no colony or state in the early Republic prohibited people from carrying *firearms*, either openly or concealed.  To the contrary, some state and local laws affirmatively encouraged or even required it.  *See, e.g.*, *Proceedings of the Virginia Assembly, 1619*, in *Narratives of Early Virginia*, 1606-1625, at 273 (Lyon Gardiner Tyler ed., 1907); *see also* Act of May 8, 1792, ch. 33, §1, 1 Stat. 271, 271 (requiring "every free able-bodied white male citizen" between the ages of 18 and 45 to "provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints,

---

[12] Professor Spitzer claims "some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime," Dkt.185-5 (Spitzer Rep.) ¶75 n.175 (citing two twentieth century laws in a footnote), but no law he cites actually prohibited club possession generally—and one even exempted ammunition from its ambit, *see* 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

and … a pouch with a box therein to contain not less than twenty-four cartridges … or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder"); *see also* Dkt.185-4 (DeLay Rep.) ¶35 (noting that "colonial authorities mandated gun ownership" in "places where the violence of slavery and settler colonialism, and/or the threat of nearby imperial rivals inevitably resulted in security concerns").

Early regulations either prohibited concealed carry while allowing open carry or merely "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50.  And as *Bruen* explained in painstaking detail, those laws were never understood to cover commonly owned arms.  They are thus not relevantly similar to PICA.

***Restrictions on Trap Guns.***  Regulations on so-called "trap guns" and clubs, *see* Dkt.185-5 (Spitzer Rep.) ¶¶85-88, are even less apposite.  Trap guns are not bearable arms; they fire a projectile automatically when a trap (i.e., a trip wire) is triggered.  *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 365-66 (2024) (discussing trap-gun laws).  Laws prohibiting setting traps thus do not impose *any* "burden [on] a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 29; they criminalize the rigging of a device to expel a projectile without a human pulling the trigger.  PICA's ban on arms that individuals commonly keep and bear for self-defense and other lawful purposes does not fall within the so-called historical tradition of regulations concerning traps.

***Restrictions on Fully Automatic Weapons.***  Ultimately, the state is left trying to analogize PICA's broad ban on common arms to restrictions on *fully* automatic firearms. Professor Spitzer, for example, contends that "twentieth-century" "restrictions related to fully automatic firearms" provide "[a] clear example of th[e] historical pattern" of regulation supporting PICA.  Dkt.185-5 (Spitzer Rep.) ¶13.  But the American tradition of regulating dangerous, unusual, and uncommon

arms does not support PICA's ban on some of the most widely used and possessed arms in America.

Fully automatic technology developed at roughly the same time as semiautomatic technology.  Dkt.185-4 (DeLay Rep.) ¶70.  Yet whereas Congress quickly began to severely restrict automatic firearms early on, it did not restrict semiautomatic firearms; likewise, while 36 states enacted bans on automatic firearms between 1925 and 1935, the vast majority of states continued to impose no restrictions on by-then-common *semi*automatic firearms.  Dkt.185-5 (Spitzer Rep.) ¶¶23, 26.  Indeed, no state banned the sale or possession of magazines separately from the firearm itself.  *Id.* ¶32; *see also* Kopel, *supra*, 78 Albany L. Rev. at 866 ("[W]hen Congress enacted the National Firearms Act of 1934 to impose stringent regulations on machine guns, it chose to impose no restrictions on magazines."); Dkt.69-2 (Hlebinsky Rep.) ¶54 ("Laws specifically regulating detachable magazines date even later [than 1934] to the last decade of the twentieth century, with the ten round magazine limit only imposed through federal law for the first time in 1994").[13]  The dearth of laws restricting semiautomatic firearms over decades, contrasted with the relatively common laws restricting fully automatic firearms at the same time confirms that there is no longstanding tradition of restricting the former.

***Restrictions on Semiautomatic Weapons.***  Finally, Defendants pivot to a handful of restrictions on semiautomatic firearms enacted alongside the Prohibition Era restrictions on fully automatic firearms.  But *at most* only seven to ten states and the District of Columbia restricted semiautomatic firearms at all during that period.  Defendants' efforts to inflate those numbers are misleading in the extreme.  For example, one of the laws their historians cite applied only to fully

---

[13] Notably, the congressional regulation that prohibited fully automatic weapons initially included a prohibition on semiautomatic firearms, but that restriction was later removed from the statute.  *See* Dkt.185-5 (Spitzer Rep.) ¶29.

79

automatic weapons from which multiple shots could be discharged "by a single function of the firing device," 1933 S.D. Sess. Laws 245-47, ch. 206, §§1-8; another applied to semiautomatics only to the extent they were "altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers," 1933 Minn. Laws ch. 190, §1(b); and still another merely required a special license, without ever prohibiting sale or possession, *see* 1933 Ohio Laws 189.

Professor Spitzer concedes that "[t]he language" of three other laws cited is "ambiguous regarding whether they applied to semi-automatic weapons." Dkt.185-5 (Spitzer Rep.) ¶30 n.42. He also acknowledges that at least one of the laws cited as regulating semiautomatics actually "regulated fully automatic weapons only." *Id.* ¶33. Three of the remaining five—all extreme outliers—did not categorically prohibit the sale or possession of semiautomatic firearms. *See* 1927 Mich. Pub. Acts 887, 888; 1927 R.I. Acts & Resolves 256, 256-57; 1934 Va. Acts ch. 96, §§1(a), 4(d) (applying only to use of a 16-round automatic weapon in a "crime of violence" or "for offensive or aggressive purpose"). And *all* of those laws, including the few that banned acquisition of certain semiautomatics, were either repealed entirely, replaced with laws regulating only fully automatic weapons within a few decades, or invalided by the Supreme Court. *See, e.g.*, 1927 Mass. Acts 413, 413-14, ch. 326, §1; 1957 Mass. Acts 596, 597-98, ch. 688, §4; *see also Heller*, 554 U.S. at 628-36 (invalidating D.C. law).

There is thus no historical evidence that states broadly prohibited the general public from acquiring semiautomatic firearms, regardless of what features or firing capacity they had. Indeed, restrictions on semiautomatic firearms remain rare even today. No state prohibits semiautomatic

firearms entirely, and the semiautomatic firearms Illinois has banned are legal in (at least) 40 states.[14]

*Restrictions on Firearm Magazines.*  With respect to magazine-specific restrictions, the best the state can do is again point to restrictions on *fully* automatic firearms and the now-repealed or invalidated Prohibition era laws regulating semiautomatic firearms.  *See, e.g.*, Dkt.185-5 (Spitzer Rep.) ¶33.  But again, none of those laws supports PICA's ban on semiautomatic weapons, much less its ban on ammunition feeding devices capable of holding more than 10 rounds.  At the time the Second Amendment was adopted, and even during the time the Fourteenth Amendment was adopted, "there were no laws restricting ammunition capacity."  Kopel, *supra*, 78 Albany L. Rev. at 864.

The first state law actually restricting magazine capacity did not come until 1990—two centuries after the founding and well over a century after the ratification of the Fourteenth Amendment.  *See* 1990 N.J. Laws 217, 221, 235 (codified at N.J. Stat. Ann. §2C:39-1(y), -3(j)); *see also* Bernstein, *supra* (one of the state's historians conceded that "he knew of no law" pre-1990 "that prohibited someone from acquiring an ammunition-feeding device"); Dkt.69-2 (Hlebinsky Rep.) ¶54 (same).  That is so even though feeding devices capable of holding more than 10 or 15 rounds had by then been marketed to civilians for the better part of a century.  *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 974 F.3d 237, 258 (3d Cir. 2020) (Matey, C.J., dissenting) ("[H]istory reveals a long gap between the development and commercial distribution of magazines, on the one hand, and limiting regulations, on the other hand."), *cert*

---

[14] Illinois' ban is so aggressive that it reaches many arms that even some of the states that do have "assault weapon" bans do not prohibit.  *See, e.g.*, Haw. Rev. Stat. Ann. §134-1 (defining "assault pistol" as a semiautomatic firearm that "accepts a detachable magazine and has two or more" additional features).

*granted, vacated*, 142 S.Ct. 2894 (2022).  And the vast majority of states still today allow law-abiding citizens to decide for themselves what magazines best suits their needs.  *Cf. Heller*, 554 U.S. at 628 (stressing the Second Amendment's protection of arms "overwhelmingly *chosen* by American society" for self-defense (emphasis added)).

Before 1990, only D.C. restricted magazines themselves—and even that restriction dates back to only 1975.  In 1932, Congress passed a local D.C. law prohibiting the possession of firearms that "shoot[] automatically or semiautomatically more than twelve shots without reloading."  Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 654 (1932), (repealed 1934) (codified as amended at 26 U.S.C. §§5801-72).  At the time, the law was not understood to sweep up ammunition feeding devices; indeed, when Congress enacted the National Firearms Act just two years later, it imposed no restrictions on magazines.  *See* Pub. L. No. 73-474, 48 Stat. 1236 (1934).  But after the District achieved home rule in 1975, the new D.C. government interpreted the 1932 law to "outlaw[] all detachable magazines and all semiautomatic handguns."  Kopel, *supra*, 78 Albany L. Rev. at 866.  (*Heller*, of course, invalidated the latter portion.)

As for the federal government, it did not regulate magazine capacity until 1994, when Congress temporarily banned the sale of newly manufactured ammunition feeding devices with a capacity of more than ten rounds, though it permitted the possession and sale of such magazines already in circulation.  *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)); *see also* Dkt.69-2 (Hlebinsky Rep.) ¶54.  But Congress let the law expire in 2004 after a study by the Department of Justice revealed that it had produced "no discernible reduction" in violence with firearms across the country.  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*,

*1994-2003*, at 96 (2004), https://bit.ly/3wUdGRE; *see also* Kopel, *supra*, 78 Albany L. Rev. at 866-67.

  ***Restrictions with Military Exemptions.*** Last and least, historical laws that regulated weapons use but provided for military and/or law enforcement exemptions do not demonstrate any tradition of prohibiting law-abiding citizens from possessing common arms.  Illinois and its experts point to "nineteen states and three territories that incorporated explicit exemptions for law enforcement and/or military personnel into laws regulating firearms."  Dkt.185-4 (Delay Rep.) ¶92.  But, by the state expert's own admission, none of those laws imposed a ban on the sale and possession of common arms.  One regulated only "brandishing," three "concerned" only "sensitive places," and "all the other laws concerned concealed carry," not sale, possession, or even open carry.  *Id.* ¶92 n.127.  As to the territorial laws, one "concerned brandishing," and the other two regulated only the "carry of weapons," not their sale or possession.  *Id.* ¶92 n.128.  The various municipal laws cited likewise did not ban sale or possession.  *Id.* ¶93 (listing ordinances "punishing the carrying of concealed weapons").

  **3.** Finally, *Bevis* drew from seven categories of historical laws a tradition "supporting a distinction between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use."  85 F.4th at 1202.  But those laws provide no support for banning weapons that fit into the "personal use" category, as the firearms banned by PICA do.

  The first—a 1746 Boston ordinance—"outlawed" only "the discharging" of certain firearms "within city limits"; it did not (like PICA) outlaw firearm sales, possession, or even the carry of common arms.  *Id.* at 1201 (quoting Chapter 11—An Act to Prevent the Firing of Guns Charged with Shot[t] or Ball in the Town of Boston, §§1-3, in 3 *The Acts and Resolves of the Province of the Massachusetts Bay 1742-1756*, at 309 (1878)).  Under those historical laws,

people retained the right to keep and carry arms for self-defense and other lawful uses; they just could not fire them wantonly.  A law like PICA that bans manufacturing, sales, and unregistered possession of a class of arms outright, by contrast, deprives citizens of the entire "right to armed self-defense" with respect to those arms.  *Bruen*, 597 U.S. at 21.  The former cannot begin to justify the latter.  After all, if the mere existence of historical laws prohibiting the indiscriminate firing of guns on city streets sufficed to justify a modern law banning an entire class of arms, then *Heller* should have come out the other way.  *See Heller*, 554 U.S. at 632 (concluding that same Boston ordinance *Bevis* cited "provide[s] no support for" restricting citizens' ability to possess *any* types of arms, especially for self-defense).

*Bevis*' reference to other similar laws is unavailing for the same reasons.  *See* 85 F.4th at 1201 (citing Chapter 33—Fire Arms, §§417-423, *in Ordinances of the City of Cleveland* 136-37 (H.L. Vail & L.M. Snyder, eds., 1890)).  Indeed, the Cleveland law to which *Bevis* alluded explicitly exempted from its ambit "the use of firearms in the lawful defense of the person, family, or property of any person, … or to regular shooting galleries, or rifle or sporting clubs, having a permit from the Mayor to operate such galleries or erect targets for rifle practice."  Chapter 33—Fire Arms, §§417-423, *in Ordinances of the City of Cleveland* 136–37.  Far from justifying PICA, those laws demonstrate a historical tradition of *permitting* the exact type of Second Amendment conduct that Illinois has banned.

The third and fourth category involve the nineteenth-century Bowie knife regulations discussed above, *Bevis*, 85 F.4th at 1201 (referencing "dozens of … Bowie knife regulations"), and "[s]everal city ordinances in the late 1800s" that restricted the carry of various other dangerous and unusual weapons of the time, *id.* (referencing regulations concerning "slingshots,

84

metal knuckles, Bowie knives, daggers, pistols, and clubs"). For the reasons already discussed, those historical laws cannot justify PICA's flat ban on possessing common arms.

Finally, the fifth, sixth, and seventh examples involve twentieth-century restrictions on "destructive device[s] … defined as an explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device" and "machine guns." *Id.* at 1202. Illinois has never tried to claim that any of those weapons has ever been commonly owned "by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. It has simply and repeatedly pointed to the fact that their possession and use have long been restricted.

With respect to machine guns in particular, Illinois' (mis)characterization of the history overlooks that when bearable, fully automatic submachineguns first hit the civilian markets in the 1920s (after the military showed little interest in them), for whatever reason, the people did not respond by clamoring to buy them en masse like the public did with semiautomatics. Early machineguns also faced significant legal restrictions that semiautomatics never did. And while those restrictions could have been repealed at any time, most never have been, which ought to suffice to debunk the suggestion that the only thing that stopped machineguns from replacing the handgun as "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629, is the fact that they have long been so highly restricted.

In the end, prohibitions on machine guns, poison gas bombs, rockets, and the like do not burden the right to individual self-defense in even a remotely similar fashion or for a remotely similar reason as PICA's ban on common arms.

## A. PICA Is Not Justified by "Unprecedented Societal Concerns" or "Dramatic Technological Changes."

The lack of well-established historical analogues for PICA is not owing to "unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27. The concerns PICA

85

addresses are unfortunately nothing new, and the types of firearms and magazines it bans have been commonly used by law-abiding citizens for more than a century.

**1.** The state claims that gun violence and mass shootings (defined by the state and its experts as shootings where four or more people were killed in a public place in one incident) are an unprecedented societal concern. *See* Dkt.234 (9/16/2024 Trial Tr., State's Opening) at 15:2-8 (highlighting unlawful gun violence with very first statements at trial); Dkt.185-8 (Allen Rep.) ¶37 ("It is my understanding that the State of Illinois was concerned about public mass shootings and enacted the challenged law, in part, to address the problem of public mass shootings."); *see also, e.g.*, Dkt.185-2 (Andrew Rep.) ¶¶42-53 (similar); Dkt.185-9 (Ludwig Rep.) ¶6 (devoting entire expert report to issues of gun violence and magazines). But gun violence and mass shootings have unfortunately been an ugly part of life in the United States for a very long time. *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 105-06 (2008); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023). As Dr. Roth explained, "[m]ass murder has been a fact of life in the United States since the mid-nineteenth century." Dkt.185-6 (Roth Rep.) ¶41; *see also id.* ¶¶42-43 (highlighting examples of mass murders in the early to mid-to-late 1800s, one taking "sixty-nine lives," another "twenty-two" and another "nineteen"). Gun violence likewise was "common" even in the "mid-seventeenth century," and "homicides committed with firearms was at that time 40 percent and rose even higher in contested areas of the frontier." *Id.* ¶18; *see also id.* ¶¶28-29 (noting "explo[sion]" of homicide rates in Revolutionary and Civil War eras, through the Mexican War and Reconstruction).

Illinois tries to paint this Nation's history as one in which gun violence and mass shootings were "rare" until the innovation of the arms it bans, but it does so only by discounting the

atrocities committed against unfavored groups. *See id.* ¶41 ("Mass killings of this type were rare in the colonial, Revolutionary, and [e]arly National eras, *outside of massacres of Native Americans,* irregular warfare among citizens seeking political power, or public demonstrations that turned deadly." (emphasis added)); *see also id.* ¶11 (arguing that "*apart from the slave South,*" the United States "was perhaps the least homicidal society in the Western world in the early nineteenth century" (emphasis added)); *id.* ¶18 (contending that "firearms had a modest impact on homicide rates" after discounting "hostile encounters with Native Americans," or "slaves"); Dkt.185-7 (Klarevas Rep.) pp.34, 37 (overlooking all atrocities against disfavored groups in claiming that "there is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948" and that mass killings occur more often now than ever before). Illinois also discounts mass killings that came about in the context of political unrest in early America. Dkt.185-6 (Roth Rep.) ¶18 (noting that gun violence was "common" in the "mid-seventeenth century" when "colonists went armed to political or interpersonal disputes" and that "homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier"); *see also id.* ¶¶23-24 (noting uptick in gun violence in Revolutionary era).

Against all of that, the state's pleas for deference in the name of public safety fall flat. *See United States v. Williams*, 113 F.4th 637, 660-61 (6th Cir. 2024) (Thapar, J.) ("[C]omplete deference to legislative line-drawing would allow legislatures to define away a fundamental right.… The very premise of constitutional rights is that they don't spring into being at the legislature's grace."). As this Court has already explained, the state gets the history all wrong, and once again ignores the matter of self-defense, while glossing over the tragedies that have befallen historically unfavored and minority populations throughout history whose fate could

87

have been different if they were better able to defend themselves from mass murder. Although

the state may not want to acknowledge those realities, they are "part of our history too." Dkt.241

(9/19/2024 Trial Tr., McGlynn, J.) at 672:23-673:8, 677:14.

That history looms large in East St. Louis, Illinois—the very home of this trial. And it

includes real people, like "Otto Nelson … the only black detective on the East St. Louis Police

Department" in "1917" who "watched as a mob burned his house down because he was black."

*Id.* at 672:23-673:8. Would things have been different if he had a capable, efficient, and effective

firearm with a large capacity magazine to defend hearth and home? The same could be asked of

"the old Broadway Opera House" that the "mob" also burned down because "they saw black men,

women, and children going in … to hide"—"nobody escaped" alive. *Id.* at 673:9-14. And for

"Scott and Iva Clark[]" who had their home set ablaze alongside much of "the South End" where

rioters burned every house occupied by black families, and eventually strangled a defenseless

Scott to death by "dragg[ing] him through the streets" with a "noose around his neck." *Id.* at

674:13-675:4; *see also id.* at 675:5-676:11. Those who were able to flee the blaze "tried to make

a stand," but were "poorly armed" and eventually "slaughtered." *Id.* at 676:12-23. If they too

"had some of the[] weapons" that PICA bans today, their fate could have been much different.

*Id.* Other, more current examples abound, including the riots in Tulsa, Oklahoma that resulted in

the murder of numerous defenseless citizens, and the "international gangster[]" raids in Colorado,

where "well-armed" "terrorists" went "door to door, attacking people." *See id.* at 676:24-677:8.

In all events, even assuming the state identified some "unprecedented social concern," it

fails to connect that concern to the firearms that PICA bans. The firearms that Illinois has chosen

to ban are used in only a small minority (not a majority) of mass shootings. *See* Dkt.185-8 (Allen

Rep.) ¶¶42-43 (noting that 20% of mass shootings selected and reviewed involved "[a]ssault

88

[w]eapons" and 41% involved "large capacity magazines").  And public data from the FBI shows that the numbers are even lower for some of those firearms when it comes to homicide in general—lower even than the handguns *Heller* deemed to be the country's "quintessential self-defense weapon."  554 U.S. at 629.  Nationally, in 2019 (the latest complete data available from the FBI's Uniform Crime Reporting Program) only about 2.6% of murders (364 out of 13,927) were confirmed to have been committed with any type of rifle, which is below murders using knives (1,476), blunt objects (397), and "hands, fists, and feet" (600), and far below murders using the very handguns that *Heller* and *Bruen* have already deemed protected (6,368).  *See* FBI, *2019 Crime in the United States* (2019), https://tinyurl.com/2tnwa5yu (further reporting about 1.4% of homicides are committed with a shotgun of any kind); FBI, *Crime Data Explorer: Expanded Homicide Offenses Characteristics in the United States*, https://bit.ly/3IF5A (confirming the same based on updated data); *see also* Dkt.185-7 (Klarevas Rep.) p.32 (confirming the low rates of recorded crime committed with "assault weapons," ranging, for example, "from a low of 2.4% in Baltimore, Maryland, to a high of 8.5% in Syracuse, New York," and "5% … nationwide"); Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 2000-01, 2005 (3d ed. 2021) (2024 Supp.) (discussing FBI Crime statistics and noting that the "[h]andguns" deemed protected under *Heller* and *Bruen*, not the firearms banned by PICA, "are the most common firearm used in mass shootings, accounting for over 50 percent").  Even if the Court assumes that every rifle homicide was committed with a different AR-15 or similar semiautomatic rifle, that would mean that over 99.99% of those rifles *are not* used in a homicide every year.

Moreover, Illinois has provided little to no support for the proposition that there is a causal link between any recent rise in mass shootings and the availability of arms that have been lawfully

89

possessed by civilians for the better part of a century.  *See* Dkt.185-8 (Allen Rep.) ¶¶37-38.  For example, Illinois offers the opinion of Lucy Allen, who contends that, "since 1982 … the number of public mass shootings per year has been increasing," but Allen offers no reason for that purported increase.  *See id.* ¶¶37-38, 51-54.  The state also offers Louis Klarevas, who conveniently modifies the accepted definition of mass shootings to arrive at his conclusion that "Assault Weapons and LCMs Are Major Factors in the Rise of Mass Shooting Violence," but fails to wrestle with the fact that so-called "assault weapons" have been on the market long before he claims the that increase began.  *See* Dkt.185-7 (Klarevas Rep.) pp.39-42.  As Dr. Roth explained, the better explanation for the alleged uptick is more likely some combination of "political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy."  Dkt.185-6 (Roth Rep.) ¶¶11-12, 20.

The state's inability to demonstrate a causal link between its weapons ban and reducing gun violence is striking given that PICA "defines 'assault weapon' using language that is largely borrowed from the expired Federal Assault Weapons Ban."  *Bevis*, 85 F.4th at 1183.  Yet, as noted, Congress declined to renew that federal ban in 2004 after the Department of Justice found that it led to "no discernible reduction" in firearms violence nationally.  Koper, *supra*, at 96.

**2.** Finally, to the extent Illinois seeks "a more nuanced approach" due to an alleged "dramatic technological change," that argument fails too.

First, whatever room there may be for "a more nuanced approach" when it comes to new technology, *Bruen* made clear that no such nuance is necessary when it comes to bans on arms, for the "dangerous and unusual" and "common use" tests that this Court must apply already account for technological changes and the nature of modern arms.  *See* 597 U.S. at 47; *see also*

90

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *In Arms-Ban Cases—Again*, Harv. J.L. & Pub. Pol'y Per Curiam (Sept. 27, 2023), https://tinyurl.com/2mn2mznc.  But even putting that aside, semiautomatic firearms with the features PICA singles out are not dramatic modern innovations, and neither are ammunition feeding devices that hold more than 10 or 15 rounds.  That is true as a matter of fact, as explained below.  It also *must* be true as a matter of law.  Advancements in firearm accuracy and capacity that are welcomed by law-abiding citizens are not the sort of "dramatic technological changes" with which *Bruen* was concerned—as evidenced by the Court's emphatic focus on whether arms are "in common use *today*," 597 U.S. at 47 (emphasis added), and its recognition that the Second Amendment protects "modern instruments that facilitate armed self-defense," *id.* at 27-28 (noting that the right is not focused on the arms or technology "in existence at the time of the founding" but that it must "apply to circumstances beyond those the Founders specifically anticipated").

**a.)** Firearms technology is constantly evolving, but one thing has never changed:  Law-abiding citizens who wish to possess and carry firearms for self-defense have consistently welcomed features that enhance the accuracy, efficiency, and speed with which they can fire them.  *See, e.g.*, **Proposed Findings of Fact 35-78**; *see also, e.g.*, David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 395-96 (1994); *Factoring Criteria for Firearms with Attached "Stabilizing Braces"*, 86 Fed. Reg. 30,826, 30,827 (June 10, 2021)Technological advancements thus unsurprisingly have focused on exactly that.

One of the first major advancements was the development of the multi-shot, or repeating, firearm—which happened long before the Founding.  "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such handguns and long guns "pre-date[] the American Revolution," some by "nearly one hundred years."  *Duncan*

*v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020); *accord* Dkt.69-2 (Hlebinksy Rep.) ¶¶19-23

(discussing examples of such firearms from the sixteenth century to the Second Amendment's

ratification); *Ass'n of N.J. Rifle & Pistol Clubs*, 974 F.3d at 255-60 (Matey, C.J., dissenting)

(citing various articles); *see also* Kopel, *supra*, 78 Albany L. Rev. at 864-70; Lewis Winant,

*Firearms Curiosa* 168-70 (2009).

For example, the Pepperbox-style pistol could "shoot 18 or 24 shots before reloading

individual cylinders," and the Girandoni air rifle, which "had a 22-round capacity," "was

famously carried on the Lewis and Clark expedition." *Duncan*, 970 F.3d at 1147; *see, e.g.*, Kopel,

*supra*, 78 Albany L. Rev. at 853-54; Dkt.69-2 (Hlebinsky Rep.) ¶¶21, 25; *see also* Joseph G.S.

Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 69-70 (2023)

(describing Meriwether Lewis' Girandoni air rifle as "the most consequential weapon" of the

expedition); Dkt.185-5 (Spitzer Rep.) ¶42 (mentioning the Girandoni air rifle's appearance on

the expedition); *id.* ¶43 (noting that the "pepperbox" "found some civilian market popularity in

the early 1800s").[15]

**b.)** Defendants do not deny these historical facts (because they cannot).  *See* Dkt.185-4

(DeLay Rep.) ¶52.  They instead focus on the fact that, while multi-shot firearms were not novel

or unforeseen inventions to the Founders, most people could not access or afford them in early

---

[15] In 1777, the Continental Congress ordered 100 rifles that could "discharge sixteen, or twenty [rounds]" in as little as "five seconds," Letter from Joseph Belton to the Continental Congress (Apr. 11, 1777), *in* 1 A-B *Papers of the Continental Congress, Compiled 1774-1789*, at 139 (1904), though the deal ultimately fell through when the creator demanded an "extraordinary allowance," 7 *Journals of the Continental Congress 1774-1789*, at 324, 361 (1907). *See also* Dkt.69-2 (Hlebinsky Rep.) ¶21 (discussing Belton's invention and surviving examples).

92

America, and were forced to make do with less advanced arms that were "slow and difficult to load." *Id.* ¶55. That is true—but like so many things, it changed as America changed.

As relevant here, firearm technology evolved considerably once the Industrial Revolution kicked into gear. Indeed, as Defendants' own historian explains, "[n]ew innovations built on one another, such that the period from the 1820s through the 1860s became one of the most productive and dynamic in the history of firearms technology." *Id.* ¶45. Advances in "metallurgical techniques and … machine precision," as well as "the adoption of percussion-cap ignition in the 1830s and metallic cartridges in the 1850s," allowed "repeating firearms [to] become practical weapons of mass production, widespread military adoption, and commercial popularity." *Id.* ¶18. Hence "high-capacity firearms became reliable consumer items prior to the ratification of the Fourteenth Amendment." *Id.* sec.II (capitalization altered).

And that trend accelerated over the following decades. "[I]n 1860," "Oliver Winchester's New Haven Arms Company" came out "with the world's first reliable firearm with a greater than ten-shot capacity." *Id.* ¶57. "The 'Henry,' named after Winchester's brilliant gunmaker, Benjamin Tyler Henry, was an ingenious breech-loading, lever-action rifle that could fire sixteen rounds without reloading (one in the chamber and fifteen from an attached, tubular magazine)." *Id.*; *see also* Kopel, *supra*, 78 Albany L. Rev. at 854 (discussing breakthrough in modern firearms around the time of the Civil War, when a combination of new technologies produced rifles that could be fed self-contained metallic cartridges, which contained both powder and bullet, from a magazine); Kopel & Greenlee, *supra*, 50 J. Legis. at 278 (discussing the same); Harold F. Williamson, *Winchester: The Gun That Won The West* 28-31 (1952) (same). The Henry repeating rifle enabled users to fire as fast as their hands could work the lever and pull the trigger—one test recorded that "187 shots were fired in three minutes and thirty-six seconds" and "one full fifteen-

93

shot magazine was fired in only 10.8 seconds" with accuracy.  Kopel & Greenlee, *supra*, 50 J.

Legis. at 278.  The Henry company manufactured approximately about 14,000 of those multi-

shot rifles between 1860 and 1866, fewer than 2,000 of which were purchased by the U.S.

Ordinance Department for the military; the other 8,000 were purchased by U.S. soldiers "for

personal use." *Id.*  "Refinements to the Henry resulted in an even better gun: the Winchester

Model 1866," Dkt.185-4 (DeLay Rep.) ¶57, which "could fire 18 rounds in half as many

seconds," *Duncan*, 970 F.3d at 1148.  *See also* Nicholas J. Johnson, et al., *Firearms Law and the*

*Second Amendment* 403, 1148 (2d ed. 2018) ("*Firearms Law* 2d ed.") (Winchester 66 had a 17-

round magazine and could fire all 17 rounds, plus the one in the chamber, in under nine seconds);

Louis A. Garavaglia & Charles G. Worman, *Firearms of the American West 1866-1894*, at 128

(1984) (same); Kopel & Greenlee, *supra*, 50 J. Legis. at 279 (same); Kopel, *supra*, 78 Albany L.

Rev. at 869 (same).

Between 1861 and 1877, a total of 164,466 Henrys and all models of Winchesters were

made.  These were personal-defense and hunting weapons, not military weapons.  The U.S.

military did not adopt Henrys or Winchesters during this period.  And while some foreign

governments purchased these rifles, the majority were sold to civilians in the United States.  *See*

John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* 48, 85, 88, 103,

116, 123  (1955) (total number of Henrys and Winchesters manufactured in 1861-1877 was

164,466); Dkt.185-4 (DeLay Rep.) ¶59 (noting 64,906 being sold to foreign armies); Dkt.69-2

(Hlebinsky Rep.) ¶27 ("While Winchester would provide the United States smaller runs of their

firearms designs modified for military service around the turn of the twentieth century,

Winchester would not truly be seen as a military manufacturer until their involvement in World

War I[.]").  Of note, Oliver Winchester referred to the Model 66 as "one of [the company's] best

94

sporting guns" in a letter, dating 1871, to prominent gunmaker R.S. Lawrence.  Letter from Oliver

F. Winchester to R.S. Lawrence (Feb. 10, 1871), https://tinyurl.com/6zny7psz.  Later models,

including the famed Winchester 73 (also known as "the gun that won the West"), had magazines

that held more than 10 rounds and were also huge commercial successes, selling "over 1.7 million

total copies between 1873 and 1941."  *Duncan*, 970 F.3d at 1148.

By the end of the Civil War—i.e., before the Fourteenth Amendment was ratified—

"repeating, cartridge-fed firearms" were ubiquitous, and many of the most popular models had

magazines that held more than 10 rounds.  *Firearms Law* 2d ed. 403, 1148; *accord* Dkt.185-4

(DeLay Rep.) ¶¶62-63; *see also, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs*, 974 F.3d at 256 (Matey,

C.J., dissenting) (citing articles supporting the proposition that firearms capable of firing more

than 10 to 15 rounds have been marketed to and purchased by civilians in the United States for

centuries); Kopel, *supra*, 78 Albany L. Rev. at 862 ("[M]agazines of more than ten rounds ha[ve]

been well established in the mainstream of American gun ownership" for a very long time.).

**c.)** The Reconstruction era saw much of the same.  The Evans company began selling a

repeating rifle in the 1870s that "incorporated a novel, rotating internal magazine that held

twenty-eight or thirty-four rounds."  Dkt.185-4 (DeLay Rep.) ¶62 ("12,000" Evans rifles

"produced between 1873-1879").  Colt was not far behind:  It started selling its "popular

Lightning Slide Action Rifle," which "had a twelve- or fifteen-round tube magazine and used a

pump-action to cycle rounds into the chamber," in the 1880s.  *Id.* (estimating "around 126,000"

Colt Lightnings "produced between 1884-1904"); *see also* Dkt.69-2 (Hlebinsky Rep.) ¶31

("[B]etween 1887 and 1904, Colt manufactured an estimated 186,185 Colt Lightning slide action

rifles.").  These rifles, as well as "[n]umerous" other firearms that came standard with "capacities

exceeding ten" rounds, were quite common in "the late nineteenth century" among civilians.

95

Dkt.185-4 (DeLay Rep.) ¶66; *see also* Dkt.185-5 (Spitzer Rep.) ¶49 ("the repeating rifle assert[ed] its dominance" in "the 1880s"); Dkt.69-2 (Hlebinksy Rep.) ¶31 ("[T]here were over one hundred manufacturers or makers in the United States alone producing some type of repeating firearm leading up to and … after the Civil War.").

For example, in 1896, Mauser began selling a semiautomatic, recoil-operated pistol which used a box magazine with between 6 and 20 round capacity. *See* Kopel, *supra*, 78 Albany L. Rev. at 857. Other, similar firearms hit the market around the same time. *See Firearms Law* 2d ed. 403, 520; *accord* Dkt.69-2 (Hlebinsky Rep.) ¶33 ("[T]he earliest versions of semi-automatic pistols such as the Borchardt C-93 contained eight rounds from a detachable magazine (1893)…. By the end of the nineteenth century … the Mauser C-96 had a ten-round magazine (1895) but also came in configurations as high as twenty rounds."). And in 1911, Colt began selling its Model 1911 semiautomatic handgun, which uses a detachable box magazine. *See* Dkt.185-4 (Delay Rep.) ¶74; Kopel, *supra*, 78 Albany L. Rev. at 858. Variants of the Model 1911 are still in production and sold to this day. *See* Dkt.185-4 (Delay Rep.) ¶74; *see also, e.g.*, *1911 Models for Sale*, GunBroker.com, https://tinyurl.com/y8c8dt6m (last visited Oct. 21, 2021).

Such firearms were quite common in the early twentieth century. And they undoubtedly would be even more common today but for the advent of semiautomatic and detachable-magazine technology, which Defendants' own historian describes as the "great innovation" in firearms technology. Dkt.185-4 (Delay Rep.) ¶69. That description is quite apt. Whereas "[l]ever-action or pump-action rifles require energy transferred from human muscle through an internal mechanism to eject a spent casing and chamber a new round," "semi-automatic firearms don't rely on human muscle [for reloading]. Instead, [they] enlist some of the energy released by the

96

first round to eject the spent casing and chamber the next round." *Id.*; *see also* James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 Cardozo L. Rev. 681, 685-87 (2015).

As the twentieth century wore on, many citizens purchased semiautomatic rifles and handguns with box magazines capable of holding more than 10 rounds, such as Auto Ordnance Company's semiautomatic rifle (1927, 30 rounds) and the Browning Hi-Power pistol (1935, 13 rounds). *Firearms Law* 2d ed. 403, 518; *see also* Dkt.69-2 (Hlebinsky Rep.) ¶31 ("In fact, between 1887 and 1904, Colt manufactured an estimated 186,185 Colt Lightning slide action rifles, in small, medium, and large frames. While they came in several calibers, they also had fixed tubular magazines greater than ten rounds."). And in 1963, the federal government sold hundreds of thousands of surplus semiautomatic carbines, many with 15- and 30-round magazines, to civilians at a steep discount, chiefly through the congressionally established Civilian Marksmanship Program. Kopel, *supra*, 78 Albany L. Rev. at 859 n.88 (discussing federal government sale of surplus carbines to civilians); *see also Duncan*, 970 F.3d at 1148; **Proposed Findings of Fact 244**, *supra*. That same year, the first AR-15 rifle, known as the Colt Sporter, was released commercially. *See* **Proposed Findings of Fact 83**, *supra*.

<p style="text-align:center">*     *     *</p>

It is worth underscoring two points. First, the "great innovation" was not the advent of pistol grips, or adjustable stocks, or threaded barrels, or flash suppressors, or any of the other (non-mechanical) features that PICA singles out for opprobrium. It was the development of semiautomatic technology and the accompanying development of box magazines. Second, that "great innovation" happened *well over a century ago*. "By the early 1890s, … gunmakers had at their disposal a trio of potent new design features that would become characteristic of most modern automatic and semi-automatic firearms—self-loading mechanisms, smokeless powder

<p style="text-align:center">97</p>

ammunition, and detachable magazines." Dkt.185-4 (DeLay Rep.) ¶74; *see also id.* ¶70 ("[S]emi-automatic firearms first started coming on the market in the 1890s."); *id.* ¶72 ("Like self-loading mechanisms and smokeless powder, detachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century."); *Firearms Law* 2d ed. 403, 520 (discussing detachable magazine development); Kopel, *supra*, 78 Albany L. Rev. at 854-62 (discussing mid-19th-century advances in technology that transformed ammunition to metallic cartridges that contained primer, powder, and bullet).

What would become characteristic of most modern semiautomatic firearms, *including the ones PICA bans*, thus came around before Henry Ford sold his first Model A, the Wright Brothers took their first flight at Kitty Hawk, or Albert Einstein realized that energy and mass are equivalent. *See* Ford, *Company Timeline*, https://tinyurl.com/ymb9rn6t (last visited Oct. 16, 2024) (highlighting first sale of "Model A on July 23, 1903"); John Uri, *120 Years Ago: The First Powered Flight at Kitty Hawk*, NASA (Dec. 14, 2023), https://tinyurl.com/385htnv4 (discussing Wright brothers' first flight on December 17, 1903); Albert Einstein, *Ist die Traghet eines Korpers von seinem Energieinhalt abhangig?* (*Does the Inertia of a Body Depend Upon Its Energy Content?*) ,18 Annalen der Physik 639-41 (1905) (introducing concept of $E = mc^2$). Yet there is not even a tradition of banning that technology today, let alone one that stretches back to its inception. The state's plea for a more nuanced approach is therefore unavailing, but in all events would not help its cause anyway, since it has not identified anything close to a historical tradition of banning arms that are commonly kept and borne for lawful purposes like self-defense.

## CONCLUSION

The Court should enter judgment for Plaintiffs.

Date: October 21, 2024,                                                   Respectfully submitted,

<div style="columns:2">

PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN*
NICHOLAS A. AQUART *
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900


* *pro hac vice*

_s/ Andrew A. Lothson (with permission)_
ANDREW A. LOTHSON (*pro hac vice*)
SWANSON, MARTIN & BELL, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611
alothson@smbtrials.com

GARY C. PINTER
SWANSON, MARTIN & BELL, LLP
103 W. Vandalia Street
Suite 215
Edwardsville, IL 62025
(618) 655-3131
gpinter@smbtrials.com

*Counsel for Plaintiffs Caleb Barnett, Brian Norman, Hood's Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc.*

DAVID H. THOMPSON*
PETER A. PATTERSON*
WILLIAM V. BERGSTROM*
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com


* *pro hac vice*

_s/ David G. Sigale (with permission)_
DAVID G. SIGALE (ATTY. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

*Counsel for Plaintiffs Dane Harrel, C4 Gun Store, LLC, Marengo Guns, Inc., Illinois State Rifle Association, Firearms Policy Coalition, Inc., and Second Amendment Foundation*

</div>

99

|  | s/ Sean A. Brady |
|---|---|
| MARK L. SHAW, Esq. | SEAN A. BRADY, Esq.* |
| JENNIFER CRAIGMILE NEUBAUER, Esq. | C.D. MICHEL, Esq.* |
| MICHAEL A. DANFORTH, Esq. | KONSTADINOS T. MOROS, Esq.* |
| SHAW LAW LTD. | MICHEL & ASSOCIATES, P.C. |
| 33 North County Street, Suite 300 | 180 East Ocean Blvd., Suite 200 |
| Waukegan, Illinois 60085 | Long Beach, CA 90802 |
| (T): (847) 244-4696 | |
| (F): (847) 244-4673 | * *pro hac vice* |
| (E-1): mlshaw@shawlawltd.com | |
| (E-2): jcneubauer@shawlawltd.com | *Counsel for Plaintiffs Federal Firearms* |
| (E-3): michael@danforthlawgroup.com | *Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, Piasa Armory, Jasmine Young, and Chris Moore* |

100

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a copy of the foregoing was served upon counsel of record for the Defendants by e-mail on October 21, 2024.

*s/ Sean A. Brady*
Sean A. Brady