# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CALEB BARNETT, et al., | ) | Case No. 3:23-cv-209-SPM |
|     Plaintiffs, | ) | **designated Lead Case |
| | ) | |
| v. | ) | |
| | ) | |
| KWAME RAOUL, et al., | ) | |
|     Defendants, | ) | |
| | ) | |
| DANE HARREL, et al., | ) | Case No. 3:23-cv-141-SPM |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KWAME RAOUL, et al., | ) | |
|     Defendants, | ) | |
| | ) | |
| JEREMY W. LANGLEY, et al., | ) | Case No. 3:23-cv-192-SPM |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRENDAN KELLY, et al., | ) | |
|     Defendants, | ) | |
| | ) | |
| **FEDERAL FIREARMS LICENSEES OF ILLINOIS, et al.,** | ) | **Case No. 3:23-cv-215-SPM** |
|     **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JAY ROBERT "J.B." PRITZKER, et al.,** | ) | |
|     **Defendants.** | ) | |

## FEDERAL FIREARMS LICENSEES OF ILLINOIS PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

## INTRODUCTION

Plaintiffs FEDERAL FIREARMS LICENSEES OF ILLINOIS, GUNS SAVE LIFE , GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, PIASA ARMORY, JASMINE YOUNG, and CHRIS MOORE (together "FFL-Plaintiffs") submit this separate Proposed Findings of Fact and Conclusions of Law in addition to the one submitted jointly by all Plaintiffs to address their additional claims and arguments that the other Plaintiffs did not assert; namely their challenges to the constitutionality of provisions of the Protect Illinois Communities Act ("PICA") (1) requiring registration to maintain lawful possession of the firearms, ammunition, and parts it restricts; and (2) restricting the right to keep firearms in working order and suitable for the specific user by banning certain parts. To avoid redundancy from the Plaintiffs' joint Proposed Findings of Fact and Conclusions of Law, FFL-Plaintiffs incorporate it by reference herein and note that they omit content that they otherwise would have included.

PICA violates the Second Amendment for at least two additional reasons from those addressed in Plaintiff's joint filing. First, PICA's registration scheme violates the Second Amendment because there is no historical tradition of requiring individuals to register with the government all firearms, ammunition, or parts of a certain (protected) type that they own merely to maintain their lawful possession. Second, PICA's restriction on parts violates Illinoisans' Second Amendment right to maintain their firearms in working order by repairing or altering them to accommodate their proper and safe use. This Court should thus permanently enjoin enforcement of PICA's unconstitutional registration and parts ban to protect these rights.

## PROPOSED FINDINGS OF FACT

**1. PICA's Registration Requirement and Plaintiffs' Standing to Challenge It.**

   **A. For Illinois Residents to keep items banned by PICA that they owned before January 10, 2023, they were obligated to register them by January 1, 2024.**

   1. Illinois made it "unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon, [and] assault weapon attachment[.]" 720 ILCS 5/24-1.9(b). For those Illinois residents who already possessed such items, to be able to continue to lawfully possess their already-owned "assault weapons," "assault weapon attachments," ".50 caliber rifles," or ".50 caliber cartridges" ("Regulated Items"), they were required to register them by January 1, 2024, according to rules produced by the Illinois State Police. 720 ILCS 5/24-1.9(d).

   2. For any Regulated Item, the owner must have submitted "an endorsement affidavit, prior to January 1, 2024, under oath or affirmation and in the form and manner prescribed by the Illinois State Police, beginning October 1, 2023," (the "registration"). 720 Ill. Comp. Stat. Ann. 5/24-1.9(d). Endorsements are electronically executed through the online FOID/FCCL System and are limited to items owned before January 10, 2023. Dkt. No 57-1 (Michel Decl.), Ex. B at 5. Endorsements must include the affiant's FOID card number; an affirmation that the Regulated Item was acquired before January 10, 2023; the make, model, caliber, and serial number of each firearm; and an affirmation that the affidavit is signed under oath. 720 Ill. Comp. Stat. Ann. 5/24-1.9(d); Dkt. No 57-1 (Michel Decl.), Ex. B at 10-11.

   **B. Plaintiff Moore and Organizational Plaintiffs' Members Are Injured by PICA's Registration Requirement.**

   Before January 10, 2023, Plaintiff Chris Moore possessed, kept, and bore in Illinois at least one firearm that is now classified as an "assault weapon" under PICA (a semiautomatic rifle with a detachable magazine and pistol grip, adjustable stock, barrel shroud, and flash suppressor), which he could no longer lawfully possess in Illinois, unless he had registered it with the state by January 1, 2024, which he refused to do. *See* Moore Decl. ¶5,7. But for PICA, Mr. Moore would lawfully possess that rifle in Illinois, which he is currently prohibited from doing. *Id*. at ¶8(a).

   Organizational Plaintiffs too have individual members who have suffered the same injuries. That includes Mr. Stephen Knutson, a member of Plaintiff Gun Owners of America, Inc. ("GOA"); Mr. Todd Vandermyde, a member of Plaintiff GOA, Plaintiff Guns Save Life ("GSL"), and supporter of Plaintiff Gun Owners Foundation ("GOF"); and Mr. John Boch, a member and Executive Director of Plaintiff GSL. *See* Knutson Decl. ¶¶2-4 (describing former lawful possession in Illinois of an "AR-platform rifle" now restricted by PICA that he refused to register); Vandermyde Decl. ¶¶2-8 (describing former lawful possession of "AR-platform rifle" with various features, "semiautomatic pistol" and "shotgun" now restricted by PICA that he refused to register); Boch Decl. ¶¶4-6 (detailing communications with GSL members concerning PICA's registration requirement precluding them from lawfully possessing in Illinois firearms that they previously possessed prior to PICA taking effect, including Mr. Boch himself, because they refused to

3

register). But for PICA, Messrs. Knutson, Vandermyde, and Boch would lawfully possess those firearms in Illinois, which they are currently prohibited from doing. Knutson Decl. ¶ 6; Vandermyde Decl. ¶ 8; Boch Decl. ¶ 6(b).

1. **PICA's Restriction on Firearm Parts and Plaintiffs' Standing to Challenge It.**

PICA prohibits the manufacturing, acquisition, and unregistered possession of parts it labels "assault weapon attachments." 720 ILCS 5/24-1.9(b). It defines that term to include "any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into any of the firearms listed in paragraph (1) of this subsection (a)." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(3). "Any part or combination of parts designed or intended to convert a firearm into an assault weapon" is itself also an "assault weapon." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(1)(I).

Before PICA took effect, Mr. Vandermyde lawfully owned and possessed in Illinois various parts that PICA restricts as "assault weapon attachments." Vandermyde Decl. ¶¶ 5-7.

But for PICA, Mr. Vandermyde would both resume lawful possession in Illinois of the parts that he owns but cannot lawfully possess in Illinois because of PICA and acquire more parts to use as replacement or alternative parts on his currently owned firearms or for the purpose of building new firearms. ¶¶ 6-8.

## PROPOSED CONCLUSIONS OF LAW

**A. PICA's Registration Requirement Violates the Second Amendment.**

PICA's prohibition on residents keeping or bearing in Illinois Regulated Items that they lawfully owned in Illinois prior to PICA taking effect merely because they did not register them violates the Second Amendment. If this Court rules, as it should, that the Regulated Items are "Arms" within the Second Amendment's text, as urged in the Plaintiffs' joint filing, the rest of the analysis here is "fairly straightforward." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 26 (2022). Indeed, because registration purports to address a problem that has existed since the Founding, criminal misuse of weapons, the State must show that "distinctly similar historical regulations" to its registration existed. *Id*. Of course, the State cannot because no such laws existed during the relevant historical period. The State will thus no doubt urge this Court to apply analogical reasoning instead. But, because the societal ills registration purports to address are

4

nothing new, such a "more nuanced approach" is not appropriate here. *Id.* at 27. Regardless, even if that more liberal approach were appropriate, the State cannot show adequate historical analogues to its registration scheme, nor can it show an underlying historical principle that would support that scheme. *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).

The Second Amendment was written by people who had just revolted against a tyrannical government. They sought to guarantee the People had a final recourse should the new government they were forming also turn tyrannical. Tench Coxe, a delegate to the Constitutional Convention, wrote that "[w]hereas civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, … the people are confirmed by the article in their right to keep and bear their private arms." *Remarks on the First Part of the Amendments to the Federal Constitution*, under the pseudonym "A Pennsylvanian" in the Philadelphia Federal Gazette, June 18, 1789, p. 2 col. 1 (as quoted in the *Federal Gazette*, June 18, 1789). Coxe similarly wrote that "Congress have no power to disarm the militia. Their swords, and every other terrible implement of the soldier, are the birthright of an American." Tench Coxe, Letter to the *Philadelphia Gazette*, 20 February 1788. Coxe reaffirmed this view in 1813, writing that "militia" members "have all the right, even in profound peace, to purchase, keep and use arms of every description." Samuel Whiting, et al., *Second American Edition of the New Edinburgh Encyclopædia*, Volume 1 Part 2, at 652 (1813).

Coxe's view dominated the Founding era and 19th century. And the Second Amendment's original meaning has not changed. In a speech to the House of Representatives, Abolitionist Representative Edward Wade said the "right to 'keep and bear arms,' is thus guaranteed, in order that if the liberties of the people should be assailed, the means for their defence shall be in their own hands."[1] Senator Charles Sumner's "The Crime Against Kansas" speech likewise bristled at

---

[1] Rep. Edward Wade of Ohio, in the House of Representatives, August 2, 1856.

5

the notion that slavery opponents in Kansas should be disarmed of their Sharps rifles by the pro-slavery government: "Never was this efficient weapon more needed in just self defence, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." Charles Sumner, *The Kansas Question, Senator Sumner's Speech, Reviewing the Action of the Federal Administration Upon the Subject of Slavery in Kansas* 22-23 (Cincinnati, G.S. Blanchard, 1856). Thomas Cooley, a longtime Michigan Supreme Court Justice, likewise wrote that "[t]he right declared was meant to be a strong moral check against the usurpation and arbitrary powers of rulers, and as necessary and efficient means of regaining rights when temporarily overturned by usurpation." Thomas M. Cooley, LL.C., *The General Principles of Constitutional Law in the United States of America* 298 (1898).

    Additional examples abound.[2] But there is no need to belabor the point. There can be no historical tradition of registering arms *with* the government when one of the Second Amendment's main purposes was to be a "doomsday provision" for the People to protect themselves *from* a tyrannical government. *See Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc). The state cannot possibly square that circle. The state has previously called this idea, that the Second Amendment is a "doomsday provision"[3] created to guard against tyranny, an "extremist position." Dkt. No 131 (State's Opp. to Second MPI), at 38. It is no surprise that government would object to any check on its power. But the history showing this was the mainstream understanding of the Second Amendment is so overwhelming as to be

---

[2] *See* C.D. Michel & Konstadinos Moros, *Restrictions "Our Ancestors Would Never Have Accepted": The Historical Case Against Assault Weapon Bans*, 24 Wyo. L. Rev. 89, 90 (2024).

[3] This term which the State mocks was used by former Ninth Circuit Chief Judge Alex Kozinski in *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc).

beyond debate—even discussed in schoolbooks of the 19th century.[4] This Court acknowledged that history in its prior ruling. ECF No. 101, pp. 12-13. It is in good company. *See Heller,* 554 U.S. at 599 ("It was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down.").

The state has previously put forth historical laws as supposed "analogues" to PICA's registration that appear to have merit at first glance but fail upon closer scrutiny. First, the State has pointed to "muster" laws, some of which required militia members to present their arms for inspection. Dkt. No 131 (State's Opp. to Second MPI), at 39-40. *See, e.g.*, 1631 Va. Acts 174, Acts of Feb. 24, 1631, Act LVI (required annual accounting of "arms and ammunition"). To be sure, these laws could be seen to share superficial similarities with PICA's registration. But they share neither the "how" nor the "why" with those militia laws. *Bruen*, 597 U.S. at 29. In terms of "how" the militia inspection laws operated, they did not apply to the populace in general, just to militia members. Nor did they require registration of *all* firearms falling within a certain category as

---

[4] *See, e.g.,* HENRY FLANDERS, AN EXPOSITION OF THE CONSTITUTION OF THE UNITED STATES 258 (1860) ("With arms in their hands, the people will not be likely to permit the overthrow of their institutions by the unscrupulous ambition of a civil magistrate or military chieftain. The very fact of their being armed will serve as a check to any arbitrary or forcible invasion of their constitutional rights."); EDWARD D. MANSFIELD, THE POLITICAL MANUAL: BEING A COMPLETE VIEW OF THE THEORY AND PRACTICE OF THE GENERAL AND STATE GOVERNMENTS OF THE UNITED STATES, ADAPTED TO THE USE OF COLLEGES, ACADEMIES, AND SCHOOLS 205 (1861) ("It is scarcely necessary to say, that the right of the people thus to bear arms is the foundation of their liberties; for, without it, they would be without any power of resistance against the existing government."); GEORGE W. PASCHAL, THE CONSTITUTION OF THE UNITED STATES DEFINED AND CAREFULLY ANNOTATED 256 (1868) ("[The Second Amendment] is based on the idea, that the people cannot be oppressed or enslaved, who are not first disarmed."); WILLIAM C. ROBINSON, NOTES ON ELEMENTARY LAW 103 (1875) ("The constitution of the United States secures the right to keep and bear arms, such as are used for purposes of war, in defence of the citizens or the state."); ANDREW W. YOUNG & SALTER S. CLARK, THE GOVERNMENT CLASS BOOK: A YOUTH'S MANUAL OF INSTRUCTION IN THE PRINCIPLES OF CONSTITUTIONAL GOVERNMENT AND LAW 185 (1880) ("Right to Keep Arms—This means the right of every one to own and use, in a peaceful manner, warlike weapons . . . .It was thought that without it, ambitious men might, by the aid of the regular army, overthrow the liberties of the people and usurp the powers of government.")

Illinois's law does. Rather, those laws merely required that each militia member present *one* arm suitable for militia duties. The "why" is also different. The militia inspection laws were not an exception to a categorical ban of common arms, ammunition, and parts like PICA's registration is. Rather, they sought the opposite—to guarantee that enough fighting-age males were *sufficiently armed*. Indeed, as another court recently explained, the state "ignores Founding-era laws that present the best analogue to its present-day magazine law. These are the manifold early militia laws requiring each citizen, not to limit the amount of ammunition he could keep, but to arm himself with *enough* ammunition: at least 20 rounds." *Duncan v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, at *34 (S.D. Cal. Sept. 22, 2023).

This is what the Northern District of Illinois missed in its initial analysis of colonial-era "muster" laws. *See Herrera v. Raoul,* 670 F. Supp. 3d 665, 678 (N.D. Ill.), *aff'd sub nom. Bevis v. City of Naperville, Illinois,* 85 F.4th 1175 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul,* 144 S. Ct. 2491 (2024). That court did not analyze "how" and "why" militia members were inspected but relied solely on the superficial similarity of mandated firearm inspection. Ultimately, there can be no relevant similarity under *Bruen* when the goals and methods of the compared laws are entirely different, as here. Indeed, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar . . .." *Antonyuk v. Hochul,* 635 F. Supp. 3d 111, 131 (N.D.N.Y. 2022), appeal withdrawn, No. 22-2379, 2022 WL 19396512 (2d Cir. Nov. 14, 2022).

Aside from the 1631 colonial Virginia law cited *supra*, the rest of the laws previously cited by the state ranged from 1848 to 1918, with none from the founding era and thus of dubious relevance. Dkt. No 131-1 (Ex. A to State's Opp. to Second MPI), *passim*. Additionally, most were taxes on things like small pistols, bowie knives, and dirks. *Id*., Nos. 2-6.  Two of the taxes only applied when the weapons had been carried within the preceding year. *Id*., Nos. 3-4. Only one of

8

these taxes applied to rifles, and only if the owner had more than three *Id*., No. 5. These handful of laws should be dismissed at the outset as outliers. Regardless, they are not sufficient analogues to establish a tradition of registration. First, taxation is a completely different "how" of operation than PICA's registration. *See Bruen*, 597 U.S. at 49 (rejecting a historical analogy to a regulation that "prohibited the public carry of pistols" because "it did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine"). Second, none of the taxes purported to "grandfather" lawful possession of a thereafter restricted class of arms for those individuals able and willing to meet a registration deadline, to facilitate prohibiting future acquisitions and thus lack the "why."

It is also worth noting that almost every historical law the state has raised came from a southern state. The sordid history of those states passing laws to keep slaves and later freedmen disarmed is well known. For example, an 1893 Florida law that required owners of Winchesters and other repeating rifles to apply for a license from the board of county commissioners required a bond of $100, an exorbitant amount of money in 1893. But as a judge who served in the legislature that passed the law would later confirm, "[t]he statute was never intended to be applied to the white population and in practice has never been so applied." *Watson v. Stone,* 4 So.2d 700, 703 (1941) (Buford, J., concurring).

What's more, none of these few historical laws that the state posits actually banned any weapons at all,[5] let alone any of the most popular firearms in the country. That is because no such

---

[5] In fact, many of the laws cited went out of their way to avoid taxing long arms. An 1848 Mississippi statute applied only to "dueling or pocket pistol[s]," and excepted those "kept for use by military companies." Dkt. No 131-1 (Ex. A to State's Opp. to Second MPI), No. 2. North Carolina's 1856 statute taxed pistols, except those "used exclusively for mustering," and arms like the Bowie knife. *Id.,* No. 3. North Carolina's 1858 statute taxed similarly unusual arms and stated "[a]rms used for mustering shall be exempt from taxation." *Id.,* No. 4. And Alabama's 1867 statute targeted pistols, revolvers, and arms like the Bowie knife, but not rifles. *Id.,* No. 6.

9

bans ever existed prior to the late 20th century. "It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns [prior to the 20th century]. No laws of any kind." *Duncan*, 2023 WL 6180472, at *24. In sum, the state has only cited a few, short-lived historical laws that covered a small minority of the population while in effect. They are insufficient to save PICA's registration now.

Registration laws did not even first appear until the 20th century. Most prominently, the National Firearms Act required registration of certain firearms like machine guns. 26 U.S.C.A. § 5811. The stated goal of that registration, however, was taxation. *United States v. Dalton*, 960 F.2d 121, 124-25 (10th Cir. 1992) (citing *United States v. Rock Island Armory, Inc.*, 773 F. Supp. 117, 120 (C.D. Ill. 1991)); *See also National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. of Ways and Means,* 73rd Cong., at 19 (1934) (then-Attorney General Cummings admitting to Congress that banning machine guns could violate the Second Amendment, but taxing them would be more likely to survive legal challenge). PICA forbids new registrations after January 1, 2024, except for those who move into the state. 720 Ill. Comp. Stat. Ann. 5/24-1.9(d). New NFA arms, by contrast, can still be registered (except machine guns made after 1986, 18 U.S.C.A. § 922(o)). Thus, even if the NFA were from a relevant historical period that could "provide insight into the meaning of the Second Amendment," rather than "contradict[ing] earlier evidence," as it does, *Bruen*, 597 U.S. at 66 n.28, it still fails as an analogue because it operates under a much different "why" and is thus not relevantly similar to PICA's registration.

Indeed, our historical tradition has been to maintain privacy around firearm ownership. Even as recently as the 1980s, the Firearms Owners' Protection Act forbade the federal government from keeping a registry directly linking non-NFA firearms to their owners, a law still in effect today. *See* 18 U.S.C.A. § 926. This reveals a belief among Americans that firearm ownership is a

10

private matter. That's unsurprising. Just as the Fourth Amendment "would be of little practical value if the State's agents could stand on a home's porch or side garden and trawl for evidence with impunity," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), so too would it make little sense for government to have an accounting of individuals' firearms when the genesis of the Second Amendment was in part, as explained above, fear of government tyranny.

At bottom, no historical tradition supports requiring registration with the government classes of commonly owned firearms, ammunition, or firearm parts merely to maintain their lawful possession. As the Regulated Items are "Arms" (including parts, as explained below), PICA's registration thus violates the Second Amendment. To be sure, the Seventh Circuit concluded in its "preliminary assessment" of this case that: "If we are correct in our prediction that the state will prevail in its defense of the Act against the Second Amendment arguments, then the registration requirement will be valid as long as it can withstand rational basis review. At this juncture, we see nothing particularly onerous about it, though as with everything we have said, this is a preliminary assessment." *Bevis v. City of Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023) / *Bevis*, 85 F.4th at 1202. But, as explained in Plaintiffs' joint Proposed Facts and Conclusions of Law, that prediction is incorrect in light of the now fulsome record. The state will *not* prevail. Thus, nothing in *Bevis* precludes this Court's revisiting FFL-Plaintiffs' Second Amendment challenge to PICA's registration requirement.

While the Seventh Circuit passingly mentioned that Illinois's registration is "no more onerous than many found in history," like the state, it cites no relevant historical example nor provides further discussion. *Id.* at *16. Plaintiffs, on the other hand, provide a robust discussion of the relevant historical tradition against registration that the Seventh Circuit did not consider.

Neither the Seventh Circuit nor the state has identified any historical examples for good

11

reason. As then-Judge Kavanaugh explained, the "fundamental problem with [the] gun registration law is that registration of lawfully possessed guns is not 'longstanding.' Registration of all guns lawfully possessed by citizens in the relevant jurisdiction has not been traditionally required in the United States and, indeed, remains highly unusual today." *Heller v. D.C.*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). While a dissenting opinion, the majority acknowledged that registration requirements, at least for long-guns, are not longstanding. *Id*. at 1255-56 ("The requirements that are not longstanding, which include … all the requirements as applied to long guns."). Registration was upheld in that case only because the majority went on to apply intermediate scrutiny, which *Bruen* now forecloses.

This Court's denial of FFL-Plaintiffs' request for a preliminary injunction on PICA's registration requirement for parts and attachments does not affect FFL-Plaintiffs' claim at this stage. *Barnett v. Raoul*, 709 F. Supp. 3d 589 (S.D. Ill. 2023). This Court did not make any determinations about the merits of the Second Amendment claim in that motion. Rather, "given the unique posture of this case," this Court "decline[d] to entertain the request to issue a preliminary injunction on Second Amendment grounds with respect to the required registry of firearms as well as firearm parts and attachments" merely because it read the above-quoted language from *Bevis* "as clearly discouraging any further preliminary determinations about the likely outcome of the challenges to the statute and registration scheme." *Id*. at 609. This Court is thus free to assess these arguments anew and rule in FFL-Plaintiffs' favor, permanently enjoining PICA's registration requirement, 720 ILCS 5/24-1.9(d), for violating the Second Amendment.

### B.  PICA's Restrictions on Firearm Parts Violates the Second Amendment.

The Second Amendment protects the acquisition and possession of firearm parts. And for good reason. Just as "without bullets, the right to bear arms would be meaningless," *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (citing *Ezell v. City of Chicago*,

651 F.3d 684, 704 (7th Cir. 2011)), without certain parts, so too could firearms be rendered useless or significantly neutered. Indeed, if government could restrict firearm parts unchecked, it would have the power to restrict protected *firearms* by targeting their critical *parts*, as Illinois has done with PICA.

Parts must be protected for another practical reason. "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). One obviously cannot maintain proficiency with a firearm that is in disrepair or that does not suit her specific physical needs. The ability to repair, alter, and make firearms to address those practical concerns is thus conduct that the Second Amendment necessarily protects. *See, e.g.*, *VanDerStok v. Garland*, 2023 WL 7403413, at *4 (5th Cir. Nov. 9, 2023) ("The tradition of at-home gun-making predates this nation's founding, extends through the revolution, and reaches modern times."); *Mock v. Garland,* No. 23-cv-00095-O, 2023 WL 6457920, at *11 (N.D. Tex. Oct. 2, 2023) ("The history interwoven with the 'right of the people to keep and bear Arms,' U.S. const. amend. II, indicates that the Second Amendment's text has long incorporated the right of personal gunsmithing, i.e., the right of private individuals to modify or acquire modifications to lawfully bearable firearms so as to increase their accuracy and safety for a more effective exercise of self-defense."). Like virtually all products, firearm parts can wear and need replacement. Also, stock parts may not be conducive to the user's specific needs. Or a conducive part may be absent and need to be added.

Yet, PICA prohibits the sale, acquisition, or un-registered possession of various common parts, including ones that are designed to accommodate people of different statures or who have different physical needs to properly use their firearms and/or the self-defense use of the firearm to

13

which they are affixed (e.g., pistol grips, adjustable stocks, flash suppressors, barrel shrouds, etc.). *See* **Plaintiffs' Proposed Findings of Fact 46-58**, **66-74**, **74**, **76-80**, **117**. By doing so, PICA precludes Illinoisans, including Mr. Vandermyde, from being able to keep their firearms in working order or suited to their needs, so that they can "maintain proficiency in their use . . .." *Ezell*, 651 F.3d at 704. The state has not shown and cannot show that there is a historical tradition of banning any common firearm parts; particularly ones like those that PICA bans. FFL-Plaintiffs are unaware of any such law. PICA's parts ban is thus unconstitutional.

## CONCLUSION

This Court should enter judgment for FFL-Plaintiffs on these two separate claims.

Dated: October 21, 2024

Respectfully submitted,

*s/ Sean A. Brady*

| | |
|---|---|
| Mark L. Shaw, Esq. | Sean A. Brady, Esq. (pro hac vice) |
| Jennifer Craigmile Neubauer, Esq. | C.D. Michel, Esq. (pro hac vice) |
| Michael A. Danforth, Esq. | Konstadinos T. Moros, Esq. (pro hac vice) |
| SHAW LAW LTD. | MICHEL & ASSOCIATES, P.C. |
| 33 North County Street, Suite 300 | 180 East Ocean Blvd., Suite 200 |
| Waukegan, Illinois 60085 | Long Beach, CA 90802 |
| (T): (847) 244-4696 | (T): (562) 216-4444 |
| (F): (847) 244-4673 | (F): (562) 216-4445 |
| (E-1): mlshaw@shawlawltd.com | (E-1): sbrady@michellawyers.com |
| (E-2): jcneubauer@shawlawltd.com | (E-2): cmichel@michellawyers.com |
| (E-3): michael@danforthlawgroup.com | (E-3): kmoros@michellawyers.com |

*Attorneys for Plaintiffs Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, Piasa Armory, Jasmine Young, and Chris Moore*

14

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a copy of the foregoing was served upon counsel of record for the Defendants by e-mail on October 21, 2024.

*s/ Sean A. Brady*
Sean A. Brady
