## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, *et al.*,<br>    Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, *et al.*,<br>    Defendants. | Case No. 23-cv-00209-SPM (Lead Case) |
| DANE HARREL, *et al.*,<br>    Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, *et al.*,<br>    Defendants. | Case No. 23-cv-00141-SPM |
| JEREMY W. LANGLEY, *et al.*,<br>    Plaintiffs,<br><br>v.<br><br>BRENDAN KELLY, *et al.*,<br>    Defendants. | Case No. 23-cv-00192-SPM |
| FEDERAL FIREARMS<br>LICENSEES OF ILLINOIS, *et al.*,<br>    Plaintiffs,<br><br>v.<br><br>JAY ROBERT "J.B." PRITZKER, *et al.*,<br>    Defendants. | Case No. 23-cv-00215-SPM |

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Before the Court are two Motions filed by the Government Defendants in this case seeking to exclude non-expert-provided evidence and expert testimony upon which the Plaintiffs have relied. (*See* Docs. 223, 229). The first is a Motion to Preclude Consideration of survey evidence proffered by the Plaintiffs' experts on September 6, 2024 (Doc. 223) and the second is a Motion to Bar Certain Opinions of Plaintiffs' Experts on September 13, 2024 (Doc. 229). The Plaintiffs filed responses (Docs. 250, 251) to the Government's Motion to Preclude (Doc. 223) and Motion to Bar Certain Opinions (Doc. 229). In order to increase the readability of the Court's disposition of this case, the Court elected to address these two Motions in a separate Order. Each will be addressed in turn.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

In order to minimize duplicative Orders, the Court will reserve full discussion of the procedural posture of this case for its final Order. Relevant to the instant Order is that this case is a constitutional challenge to the Protect Illinois Communities Act, Ill. Pub. Act 102-1116 § 1 (codified at 720 ILL. COMP. STAT. 5/24-1.9–1.10) [hereinafter PICA], a statute that prohibits the knowing possession of various semiautomatic rifles, shotguns, pistols, large-capacity magazines, and firearm attachments. This matter is before the Court for a final adjudication on the merits of the equitable claims[1] brought by the Plaintiffs in *Barnett v. Raoul*, 23-cv-00209-SPM[2]; *Harrel v.*

---

[1] While one group of plaintiffs brought claims for damages pursuant to 42 U.S.C. § 1983 in their amended complaint, those same plaintiffs have since withdrawn those claims.

[2] The named *Barnett* Plaintiffs are Caleb Barnett, Brian Norman, Hoods Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc.

*Raoul*, 23-cv-00141-SPM[3]; *Langley v. Kelly*, 23-cv-00192-SPM[4]; and *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-00215-SPM[5] against various Illinois state and municipal government Defendants.[6] The Plaintiffs in each of the four consolidated cases[7] seek declaratory judgment that PICA is unconstitutional under the Second and Fourteenth Amendments.[8] *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 144 S. Ct. 1889 (2024); *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008).

On the eve of the bench trial in this case, the Illinois State Government Defendants filed the instant Motions challenging the reliability and veracity of evidence and expert testimony on which the Plaintiffs rely. (*See* Docs. 223, 229). The Plaintiffs filed responses (Docs. 250, 251) to the Government's Motions.

---

[6] The named *Harrel* Plaintiffs Dane Harrel; C4 Gun Store, LLC; Marengo Guns, Inc.; the Illinois State Rifle Association; Firearms Policy Coalition, Inc.; and the Second Amendment Foundation.

[4] The *Langley* Plaintiffs are Jeremy W. Langley, Timothy B. Jones, and Matthew Wilson.

[5] The *Federal Firearms Licensees of Illinois* ("*FFL*") Plaintiffs are Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, Piasa Armory, Jasmine Young, Chris Moore. While Debra Clark was originally a named Plaintiff, this Court granted a stipulation of dismissal dismissing all claims against Ms. Clark on August 27, 2024. *See FFL* (Doc. 79).

[6] The Defendants in *Barnett* are Attorney General Kwame Raoul and Illinois State Police Director Brendan F. Kelly. The Defendants in *Harrel* are Attorney General Raoul, Director Kelly, State's Attorney James Gomric of St. Clair County, State's Attorney Jeremy Walker of Randolph County, State's Attorney Patrick D. Kenneally of McHenry County, Sheriff Richard Watson of St. Clair County, Sheriff Jarrod Peters of Randolph County, and Sheriff Robb Tadelman of McHenry County. The Defendants in *Langley* are Director Kelly and State's Attorney Cole Price Shaner of Crawford County. The Defendants in *FFL* are Illinois Governor J.B. Pritzker, Attorney General Raoul, and Director Kelly.

[7] This Court consolidated *Barnett*, *Harrel*, *Langley*, and *FFL* for purposes of discovery and injunctive relief. (*See* Doc. 32). *Barnett* was designated as the lead case. (*See id.*).

[8] While the *Langley* Plaintiffs also alleged Fifth Amendment self-incrimination claims in their Complaint, *see* 23-cv-00192-SPM (Doc. 1), the Court denied their Motion for Partial Summary Judgement (Doc. 133) and granted the Government's Cross-Motion for Partial Summary Judgment (Doc. 151) on this issue on September 10, 2024. (*See* Doc. 226).

## LEGAL STANDARD

To begin, "[a] district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). The standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 141 (1999)).

Federal Rule of Evidence 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, or training or education may testify thereto in the form of an opinion or otherwise.

"In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'" *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Daubert*, 509 U.S. at 589). In determining whether expert testimony is both relevant and reliable, courts in the Seventh Circuit perform a three-step analysis: "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education,' FED. R. EVID. 702; the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592–93, 113 S. Ct. 2786; and the testimony must assist

the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citing FED. R. EVID. 702).

"[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). "If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *Daubert*, 509 U.S. at 596). The district court possesses "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). Lastly, the "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard" by a preponderance of the evidence." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d. 698, 705 (7th Cir. 2009).

An excellent synthesis of the law that followed *Daubert* and animates Rule 702 appears in *Kirk v. Clark Equipment Company,* 991 F. 3d 865 (7th Cir. 2021). The *Kirk* Court started with the *Daubert* standard:

> In *Daubert*, the Supreme Court explained that Rule 702 confides to the district court a gatekeeping responsibility to ensure that the proposed expert testimony "is not only relevant, but reliable." In performing this role, the district court must engage in a three-step analysis, evaluating: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony."

*Kirk,* 991 F. 3d at 872 (citations omitted). The *Kirk* Court then expanded on the reliability of expert methodology:

> When evaluating the reliability of expert testimony, the district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." A court may consider the following non-exhaustive list of factors:

> (1) [W]hether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

> "No one factor is dispositive, however, and 'the Supreme Court has repeatedly emphasized [that] the Rule 702 text is a flexible one.'" In addition, "the correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'"

> A court's determination that an expert possesses the requisite qualifications does not, without more, provide a sufficient basis for admissibility. We have underscored that "[e]ven '[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'"

*Id.* at 873 (citations omitted).

> The *Kirk* Court next stated:

> "The purpose of *Daubert* . . . was to require courts to serve as gatekeepers so that unreliable expert testimony does not carry too much weight with the jury." At the *Daubert* phase, then, "[t]he ultimate question is whether the expert's approach is scientifically valid." "The focus is on the expert's methodology, not his ultimate conclusions."

*Id.* at 877 (citations omitted). The *Kirk* Court said that a "key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Id.* at 877–78 (quoting *Daubert*, 509 U.S. at 593; citing *McCloud ex rel. Hall v. Goodyear Dunlop Tires N. Am., Ltd.,* 479 F. Supp. 2d 882, 892 (C.D. Ill. 2007) ("To meet the testing factor required by *Daubert* an expert does not need to perform the best conceivable test. Instead, the question is whether valid scientific testing was performed.").

## ANALYSIS

## I. Motion to Preclude Consideration of William English and National Shooting Sports Foundation Surveys (Doc. 223)

In its Motion (Doc. 223), the Government argues that survey evidence from a survey conducted by Professor William English and from those conducted by Plaintiff National Shooting Sports Foundation ("NSSF") are "hopelessly unreliable," "not conducted in accordance with the norms of social science[,] and in some cases they cannot even be reproduced or replicated because they are based on 'secret' data unavailable for public inspection." (*Id.*, p. 2). The Government argues that "plaintiffs reason [that] the question whether assault weapons and large capacity magazines are in common use for self-defense turns on 'legislative facts'—and courts engaged in legislative factfinding are not bound by the Rules of Evidence." (*Id.*). The Government notes that other district and circuit courts outside of the Seventh Circuit have relied upon such legislative facts in making their final determinations. (*See id.* (citing *Bianchi v. Brown*, 111 F.4th 438, 461 n.2 (4th Cir. 2024); *Assoc. of N.J. Rifle & Pistol Clubs, Inc. v. Platkin*, No. 18-10507-PGS-JBD, 2024 WL 3585580, at *4–5 (D.N.J.

July 30, 2024))). Legislative facts "have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," yet are separate from the so-called "adjudicative facts" which arise in a particular case. (*See id.* (quoting FED. R. EVID. 201 notes of advisory committee on proposed rules) (citing *Metzl v. Leininger*, 57 F.3d 618, 622 (7th Cir. 1995); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012))). Legislative facts, unlike adjudicative facts, "lie outside the domain of rules of evidence." (*Id.*, p. 3 (quoting *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (citing *Bianchi*, 111 F.4th at 461 n.2); *Platkin*, 2024 WL 3585580, at *4–5)).

The Government points to the Seventh Circuit's reversal of a district court's reliance on a sociology study in *Free v. Peters*, 12 F.3d 700 (7th Cir. 1993) as being analogous to the instant case. (*See* Doc. 223, p. 5 (citing *Free*, 12 F.3d at 706)). In *Free*, the Seventh Circuit identified critical flaws in the sociology study that rendered it unreliable—namely, that the survey method did not adequately replicate the sociological experience in question and because of the absence of a control group. *Free* at 705–06; (*see* Doc. 223, p. 5 (citing the same)). Like in *Free*, the Government argues here that "[t]he number of assault weapons and large capacity magazines in circulation today, and the purposes for which they are used, poses an empirical question—discernable by observation and experiment rather than theory and logic." (Doc. 223, p. 6).

In opposition, the Plaintiffs insist that "Defendants' motion to 'preclude consideration of' various materials Plaintiffs have provided is unknown to the law of

evidence and built on fundamental error." (Doc. 251, p. 6). They state that "Defendants do not dispute that the reports prepared by Professor William English and the [NSSF] concern only legislative facts . . . [a]nd they admit that this means they are not governed by the Federal Rules of Evidence." (*Id.*). They argue, however, that "Defendants nonetheless attempt to superimpose threshold FRE-like admissibility standards on what this Court may consider when engaging in legislative factfinding" and argue that "Defendants' objections to the surveys would not begin to justify refusing to consider them at all, as their accusations of bias and impropriety are baseless, and their methodological critiques reflect fundamental misunderstandings both of how the surveys were conducted and of elementary principles of statistical analysis." (*Id.*). Unlike adjudicative facts, the Plaintiffs argue "legislative facts are not ordinarily 'presented through testimony and other formal evidence subject to rules of evidence developed largely for the control of lay juries,'" but rather are more akin to "facts reported in books and other documents not prepared specially for litigation or refined in its fires." (*Id.*, p. 7 (citing *Metzl v. Leininger*, 57 F.3d 618, 622 (7th Cir. 1995); *Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990); *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1162–63 n.24 (D.C. Cir. 1979) ("The Advisory Committee . . . embraced the general rule [in 1972] that legislative facts need not be developed through evidentiary hearings."))).

The Plaintiffs argue that not only have federal courts "considered materials like those at issue here in adjudicating Second Amendment challenges" in years past,

but "federal courts have routinely considered *these exact materials* in Second Amendment cases, particularly post-*Bruen*—as Defendants themselves acknowledge." (citing Doc. 223, p. 19 (admitting that courts routinely "giv[e] English's study serious, sometimes determinative, treatment"); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 664 F.Supp.3d 584, 594–96 (D. Del. 2023) (relying on the English and NSSF reports in concluding that "the banned assault long guns are indeed 'in common use' for several lawful purposes, including self-defense," "and therefore [are] 'presumptively protect[ed]' by the Second Amendment"); *Duncan v. Bonta*, 695 F.Supp.3d 1206, 1216-17 & nn.27, 30-31 (S.D. Cal. 2023) (same for English's study); *Bianchi v. Brown*, 111 F.4th 438, 518-19 & nn.55-56, 58, 61 (4th Cir. 2024) (Richardson, J., dissenting) (same for both))). They argue that the Defendants "invoke cases dealing with the admission of expert testimony and treatises providing general guidance on legislative factfinding . . . [b]ut those cases are irrelevant, and the treatises ultimately undermine their cause." (Doc. 251, pp. 9–10 (citing *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005); McCormick on Evidence §331; 21B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §5103.2 (2d ed. 2024 update))).

## A. English Survey

William English, a professor of business at Georgetown University generated and disseminated an online survey regarding firearms ownership in late 2021. (*See id.*, p. 7 (citing William English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned at 1 (May 13, 2022) [hereinafter

ENGLISH SURVEY])). The sample size was around 54,000 respondents, 17,000 of which he identified as owning firearms; he extrapolates from these data that "30.2% of firearm owners, or 24.6 million Americans, 'have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total).'" (*Id.*, p. 7 (quoting ENGLISH SURVEY at 2)). He also claims that "48% of firearm owners, or 39 million Americans, 'have owned magazines that hold over 10 rounds (up to 542 million such magazines in total)'" and that "31.1% of firearm owners 'have used a firearm to defend themselves or their property' and 'that guns are used defensively by firearms owners in approximately 1.67 million incidents per year.'" (*Id.*, p. 7 (quoting ENGLISH SURVEY at 1–2)).

The Government argues that this survey is plagued with methodological errors that render it out of compliance with the standards promulgated by the American Association for Public Opinion Research ("AAPOR") according to the Government's expert Louis Klarevas. (*Id.*, p. 7 (quoting Doc. 190, Ex. 1, p. 9 )). Notably, the Government argues that English does not comply with AAPOR disclosure requirements, does not release age and sex-weighted results of the survey, and offered his survey as one on "outdoor recreation activities" while not disclosing its true purpose. (*See id.*, pp. 7–8 (citations omitted)). The Government also argues that many of the questions in the survey were framed negatively toward firearms regulations. (*See id.*, p. 9 ("For example, the survey prompts respondents that '[m]any hunting organizations and shooting organizations have argued that . . . "assault weapon" bans will make states that pass them less attractive destinations for hunters, competitive shooters, and recreational shooters' and asks whether respondents agree "'assault

weapon" bans will have a negative impact' on such states." (quoting WILLIAM
ENGLISH, 2021 NATIONAL FIREARMS SURVEY: RAW DATA at cell BW1, available at
dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/58TXW6))).

Additionally, the Government argues that Professor English's exclusion of the
0.3% of respondents who possessed more than one hundred AR-type weapons
"account for ownership of 37.1% of all AR-15-style rifles." (*Id.*, p. 10 (quoting Doc. 190,
Ex. 1, pp. 10–11)). They also argue that Professor English overrepresented large-
capacity magazines in the framing of his survey questions. (*See id.*, pp. 9–10 (citations
omitted)).

The Plaintiffs argue that "Defendants' attacks on Professor English's survey
are baseless" and that the Defendants' recitation of the AAPOR standards is
unavailing because "[n]o federal court in the Seventh Circuit has ever cited the
AAPOR standards in this or any other like context," because "the AAPOR does not
set ethical standards for all academics in all fields, everywhere," and because "[t]he
standard practice among academics in Professor English's field is to disclose funding
sources 'at the journal submission stage,' not the working paper stage." (*Id.*, p. 12
(citing *id.*, Ex. A, William English, A Response to Critics of the 2021 National
Firearms Survey ("English Response") 24–25 (Working Paper, 2024))). They argue
that this is a moot point because "there has been considerable public reporting on
Professor English's research and funding sources." (*Id.* (citing Mike McIntire & Jodi
Kantor, *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*, N.Y. TIMES
(Jun. 18, 2024), https://tinyurl.com/ymf8k3z3)).

They also argue that the Defendants' attacks on methodology are baseless because "[t]he English survey not only details its methodology at length but includes the weights used in processing the final data." (*Id.* (citing ENGLISH SURVEY at 4–7, appx. B)). They also argue that any concerns about misleading questions are unfounded because English's approach "is entirely consistent with best practices in survey and clinical research, as it is widely recognized that 'incomplete disclosure may be appropriate to promote scientific validity by enabling investigators to obtain unbiased data about attitudes and behavior in circumstances where truthful disclosure is considered likely to produce biased responses by participants.'" (*Id.* at 13 (citing UNIVERSITY OF CALIFORNIA, LOS ANGELES, RESEARCH ADMINISTRATION HUMAN RESEARCH PROTECTION PROGRAM, GUIDANCE AND PROCEDURE: DECEPTION OR INCOMPLETE DISCLOSURE (July 7, 2020), https://tinyurl.com/3d3dbn59 [https://perma.cc/8DNY-BA9W]; AMERICAN PSYCHOLOGICAL ASSOCIATION, ETHICAL PRINCIPLES OF PSYCHOLOGISTS AND CODE OF CONDUCT §8.07)).

Regarding English's exclusion of owners of large numbers of AR-type weapons, the Plaintiffs argue that "Defendants and their expert appear to misunderstand Professor English's methodology" because "[w]hile they seem to think that the survey excluded these respondents only when estimating how many firearms the average person owns, it also excluded them when estimating how many firearms are owned *at all.*" (*Id.* at 14 (citing Doc. 223, p. 9)).

In conclusion, the Plaintiffs argue that "[i]n all events, even if any of Defendants' complaints had any merit, they would not justify refusing to consider the

English survey at all." (*Id.* at 16). "Indeed, some of their complaints do not even speak to the survey's accuracy. And all of them go, at best, to the weight the Court should afford various findings and conclusions it reached.: (*Id.* (citing *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (explaining this liberal standard in the expert-witness context))).

Before continuing on, this Court must discuss the concept of legislative facts. While the Plaintiffs are correct that legislative facts are not subject to the same process for determination of reliability and admissibility as are adjudicative facts and, similarly, are not subject to *Daubert*'s criteria, they are not wholly immune from analysis entirely. *See* Timothy B. Dyk, *The Role of Non-Adjudicative Facts in Judicial Decisionmaking*, 76 STAN. L. REV. ONLINE 10, 18 n.52 (2023) (citing *Sykes v. United States*, 564 U.S. 1, 31 (2011) (Scalia, J., dissenting) (criticizing the opinion of the Court authored by Justice Kennedy and a concurrence authored by Justice Thomas, which both relied on statistics regarding the dangers posed by vehicular flight, because "Supreme Court briefs are an inappropriate place to develop the key facts in a case"); *Lee v. Weisman*, 505 U.S. 577, 636 (1992) (Scalia, J., dissenting) ("But interior decorating is a rock-hard science compared to psychology practiced by amateurs."); *McDonald v. Chicago*, 561 U.S. 742, 903 (2010) (Stevens, J., dissenting) ("[T]his Court lacks both the technical capacity and the localized expertise to assess 'the wisdom, need, and propriety' of most gun-control measures." (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965))); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 196 (1978) (Powell, J., dissenting) ("It is not our province to rectify policy or political

judgments by the Legislative Branch, however egregiously they may disserve the public interest.")). Circuit Judge Dyk continues, stating that "courts should be careful to distinguish between empirical or historical facts and predictive facts and recognize the potential for error." *Id.* at 20. "Empirical or historical facts are statements about current practice or historical events. But theory and reality are not the same. Courts' findings of non-adjudicative empirical facts in practice can be erroneous." *Id.* Circuit Judge Dyk specifically mentions "heated debate about the correctness of the Supreme Court's view of the historical record in both the recent gun control" decisions. *Id.* (footnote omitted). Additionally, "for both empirical and predictive material, courts should pay particular attention to the source of the material. Courts should be wary of untested empirical statements and predictions provided by interested parties." *Id.* at 22. "Courts should consider whether a study was peer reviewed or whether it has been accepted and cited approvingly by experts in the field, considerations analogous to those applied under *Daubert*, the standard that governs the admissibly of scientific evidence at trial." *Id.* at 23. He also states that "process matters [because] [w]ith respect to empirical findings relevant to current and past events, it is important to afford counsel the opportunity to brief and argue issues of reliability. In our adversarial system, the very self-interest of the advocates encourages them to weed out errors." *Id.* at 24. Moreover, he states, "[t]he Committee Notes to Rule 201, though rejecting any formal requirements, acknowledged 'those [procedures] already inherent in affording opportunity to hear and be heard and exchanging briefs.'" *Id.* (citing FED. R. EVID. 201 Committee Notes). While "[c]ourts frequently cite non-legal

sources that they have located on the internet or other sources that have not been peer reviewed or subject to any significant vetting," a process which is permitted by the Notes to Rule 201, Circuit Judge Dyk states that "courts should be careful about engaging in their own empirical research where no opportunity is provided for parties to respond, either in briefing and argument or in a formal factfinding process." *Id.* at 25 (citing FED. R. EVID. 201 Committee Notes).

Considering this persuasive authority, the Court is not convinced by the Plaintiffs' argument that the three surveys in question are entirely immune from *any* analysis of reliability whatsoever, what they call a "pseudo-admissibility test of [the Defendants'] own making." (Doc. 251, p. 10). However, the Plaintiffs are correct that, outside of the presence of a jury and in the realm of legislative facts, this Court has more room to maneuver when it comes to reviewing sources not presented through the adjudicative process of litigation.

That being said, the Court agrees with the Government that the methodological errors and inherent biases raise concerns about the reliability of Professor English's survey relating to his determination that various challenged semiautomatic firearms and large-capacity magazines are in common use. Therefore, this Court elects *not* to rely on the English Survey in resolving any questions of fact in this case.

## B. NSSF Survey of Modern Sporting Rifle Manufacturers

The next two surveys were both conducted by Salam Fatohi, who is employed as NSSF's research director, even though the Government argues that he reports that

everything he learned about statistics "was gleaned from online courses offered by the social media company LinkedIn." (*See* Doc. 223, p. 11 (citing *id.*, Ex. 3, 18–19, 24, 86–94; *id.*, Ex. 6)). The Government argues that Fatohi cross-referenced the Bureau of Alcohol, Tobacco, Firearms & Explosives's ("ATF's") Annual Firearms Manufacturers and Export Report ("AFMER") with informal anecdotal data collected via phone calls and emails with NSSF's firearms manufacturer members and from reviewing their websites. (*See id.*, pp. 12–13 (citing *id.*, Ex. 3, pp. 39–40, 46–50, 71–74, 78–79, 97–109, 122–39, 150–56, 182–83, 187–88, 199–200; *id.*, Ex. 5; *id.*, Ex. 7 (footnote omitted))). The Government contends that "Fatohi then added up these estimates for those manufacturers who responded—trusting their accuracy without undertaking any verification—and then destroyed or redacted the individual estimates to protect their confidentiality." (*See id.*, p. 13–14 (citing *id.*, Ex. 3, pp. 46–50, 100–09, 122–39, 150–56, 182–83, 187–88, 199–200; *id.*, Ex. 5, pp. 6–7; *id.*, Ex. 7)). "The analysis therefore cannot be reproduced or replicated; the critical inputs ('industry estimates' of 'modern sporting rifle' production by NSSF's members) are not available for inspection by anyone outside NSSF." (*Id.*, p. 14 (citing Doc. 190, Ex. 1, pp. 13 & n.27; *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005))).

The Government states that "[t]he Seventh Circuit minces no words: a study that is 'not replicable' bears the 'hallmarks of junk science.'" (*Id.*, p. 15 (citing *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 622 (7th Cir. 2005)). "And NSSF's 'modern sporting rifle' survey plainly is neither reproducible nor replicable because

no one else has access to the underlying data." (*Id*.). The Government also notes that NSSF is not unbiased as a named party in this litigation. (*See id.* ("It follows that NSSF has an incentive to encourage its members to inflate their production figures for 'modern sporting rifles.'")).

Like the English Survey, the Plaintiffs argue that the Government is "impermissibly trying to subject these legislative facts to Federal Rule of Evidence 702." (Doc. 251, p. 17 (citing *id.*, pp. 2–5)). They argue that the Government does "not identify any way in which that purported bias manifested itself in the NSSF report's results. Instead, Defendants just levy wholly unfounded allegations, e.g., that the report's author may have encouraged manufacturers to inflate their numbers." (*Id.* (citing Doc. 223, pp. 13–14)). They argue that, even if bias is present, "'it is well-established' that 'bias is not a proper basis to bar' consideration of evidence." (*Id.* (quoting *Cage v. City of Chicago*, 979 F.Supp.2d 787, 827 (N.D. Ill. 2013) (bias "goes to weight"))). The Plaintiffs argue that NSSF regularly compiles this data in its normal course of business (*see id.*, pp. 17–18 (citations omitted)), argue that the report's author took statistics classes in college and has experience by virtue of his position at NSSF (*see id.*, pp. 18–19 (citations omitted)), and argue that the Government "misrepresents the record" and "ignores Mr. Fatohi's testimony that he has adopted numerous best practices to ensure the soundness of the report." (*Id.*, pp. 19–20 (citations omitted)). The Plaintiffs also argue that the data in the survey was disclosed to the Government during discovery and that the Government "cite[s]

nothing whatsoever to support the claim that Mr. Fatohi's data-collection methodology is outside the norm." (*Id.*, pp. 20–22).

The Court agrees with the Government that the NSSF's purported survey is empirically and statistically unreliable as a means to determine the *exact* number of modern sporting rifles manufactured in the United States and in common use for self-defense. Therefore, like the English Survey, this Court does not rely on this survey in determining the facts and the conclusions of law in this case.

## C. NSSF Survey of Magazine Manufacturers

The Government argues that Fatohi also used anecdotal evidence to estimate the number of large capacity magazines in circulation today. (Doc. 223, p. 17). Similarly to the firearms survey discussed *supra*, "Fatohi started by consulting AFMER to obtain annual pistol and rifle production figures by manufacturer from 1990 through 2021." (*Id.* (citing *id.*, Ex. 3, pp. 237–38, 242–46)). Because "the AFMER figures . . . do not reveal how many of those firearms operate with a detachable magazine or what capacities any such magazines have," the Government states that "Fatohi created and implemented a novel methodology." (*Id.*). "First, he identified the current top fifteen pistol manufacturers by production (comprising about 80 percent of the market) and top fifteen rifle manufacturers by production (comprising about 60 percent of the market)." (*Id.*, p. 17 (quoting *id.*, Ex. 3, pp. 242–46)). The Government states that:

> He then sent a survey to these manufacturers asking them to: (1) estimate the average number of magazines they supplied "in the box" with a new pistol or rifle manufactured in 1990, 2000, 2010, 2020, and 2021; and (2) estimate the proportion of the magazines they supplied in

different capacity categories (e.g., 10 rounds or less or 11 rounds or more for pistols; 10 rounds or less, 11 to 29 rounds, or 30+ rounds for rifles).

(*Id.*, pp. 17–18 (citing *id.*, Ex. 3, pp. 238–39, 254–55, 311–12; *id.*, Ex. 5, pp. 2–6; *id.*, Ex. 17)). "Fatohi used these results to calculate averages for manufacturers that responded to his survey and extrapolated those results to manufacturers that didn't respond." (*Id.*, p. 18 (citing *id.*, Ex. 3, pp. 253–54)). "Fatohi also conducted a similar survey of magazine manufacturers to estimate how many they produced for sale independent of a firearm . . . in different capacity categories for five specific years—1990, 2000, 2010, 2020, and 2021" (*Id.*, p. 18 (citing *id.*, Ex. 3, pp. 239–41, 248–49, 311–12; *id.*, Ex. 17)).

The Government contends that, "[i]n total, Fatohi sent surveys to 40 firearm and magazine manufacturers and received only 13 responses." (*Id.* (citing *id.*, Ex. 3, pp. 248–49)). The Government states that "[a]s before, it appears the 13 responding manufacturers are NSSF members who agreed to share their production figures only if shrouded in secrecy—and Fatohi trusted they would provide accurate information without performing any verification." (*Id.*, p. 18 (citing *id.*, Ex. 3, pp. 299–300, 314-17; *id.*, Ex. 5, pp. 2–6)). Just like his survey of modern sporting rifles, the Government states that "Fatohi supplemented these meager results by conducting his own 'independent research' (meaning '[g]oing to a gun store' and 'asking to see what's in the box,' as well as 'doing web research of some websites' to see 'how many magazines come with' a particular firearm)" and "[i]f that did not pan out, Fatohi simply assumed one magazine was included 'in the box' with every applicable firearm." (*Id.*, p. 18 (quoting Ex. 3, pp. 252–54)). The Government also argues that Fatohi only

collected magazine data "in ten-year increments—1990, 2000, 2010, 2020—and then 'interpolated' data for the intervening years. (*Id.* (quoting Ex. 3, pp. 249–51)).

The Government argues that "Fatohi's methodology yields the absurd result that American firearm and magazine manufacturers purportedly produced more illegal 30-round-plus rifle magazines in 2000 than they did firearms of any kind" and "Fatohi's explanation for this glaring mismatch between NSSF's survey figures and what federal law prohibited between 1994 and 2004 was simply that 'our manufacturers have a vested interest in giving us accurate reporting, based on their records. That's what they produced, and that's the number I have to use.'" (*Id.*, p. 20 (citing Ex. 3, p. 300)). The Government also argues that Fatohi's magazine survey suffers from the same methodological issues (lack of reproducibility, ad hoc methods, etc.) and biases (the fact that NSSF is a plaintiff in this case) as his survey of modern sporting rifles. (*Id.*, p. 21). And, again, "the survey was entirely conceived and conducted by Fatohi, whose training in survey methodologies comes from a social media company." (*Id.*).

Here, too, the Plaintiffs argue that "[t]he process involved simple, reliable statistical methods." (Doc. 251, pp. 22–23 (citations omitted) (describing the process used to generate the magazine report)). They also argue that "[i]n addition to once again improperly relying on the standards for adjudicative facts outlined in the Federal Rules of Evidence, Defendants recycle many of their earlier attacks, claiming that NSSF is biased, that Mr. Fatohi is unqualified, and that the survey is based on "secret" data." (*Id.*, p. 23 (citing *id.*, pp. 2–5; Doc. 223, p. 20)). They argue that "Mr.

Fatohi made clear that his work on this report predated the current litigation. And
he repeatedly stressed that his goal in producing this research has been to obtain an
accurate measure, not to influence judicial outcomes." (*Id.*, p. 24 (citing Doc. 232, Ex.
14 (Fatohi Dep.),232:4–24, 233:7–16)). They also argue that interpolation "is a well-
established statistical method that is accepted by every serious statistician." (Id., pp.
24–25 (citing RICHARD L. BURDEN & J. DOUGLAS FAIRES, NUMERICAL ANALYSIS 105–
72 (9th ed. 2011) (chapters on "Interpolation and Polynomial Approximation")).

Like the preceding two surveys, this Court is concerned that the magazine
survey is methodologically suspect and potentially biased and was not conducted by
a professional with graduate-level expertise in statistics, social science, or survey
design. Therefore, this Court does not rely on this survey, either, in making
determinations of fact and of law in this case.

## II. Motion to Bar Certain Opinions of Plaintiffs' Experts (Doc. 229)

The Court now moves to consider the various experts whose opinions are
offered by both sides. Here, too, the Government argues that methodological issues
and biases have crept into what should be unbiased analyses. In its second Motion,
the Government argues that the testimony from various experts on which the
Plaintiffs rely suffers from various deficiencies sufficient to render their testimony
inadmissible under *Daubert*.

## A. Randy Watt, David Lombardo, and Matthew Little

The Government first takes issues with Randy Watt, David Lombardo, and
Matthew Little, three self-defense instructors offered as experts by the Plaintiffs. (*See*

Doc. 229, p. 5). The Government argues that these experts' testimony about the self-defense market for modern sporting rifles "are not supported with any data or statistical analysis," and that "[n]one of these witnesses conducted or discussed any survey or market research, case studies, or even anecdotes about the preferences of any given set of students[,] [i]nstead . . . bas[ing] their conclusions on their overall experience as self-defense instructors." (*Id.*, pp. 5–6). The Government argues that "[t]he failure to apply reliable methods or cite any underlying data renders these opinions inadmissible under Rule 702" because "[e]xperts relying solely or primarily on their own experience 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" (*Id.*, p. 6 (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment) (citing *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019))). The Government argues that "Watt, Lombardo, and Little take the same flawed approach as the expert in *Zenith Electronics* . . . [because] [e]xperts cannot simply point to their resume and then draw a conclusion that requires statistical evidence." (*Id.*, p. 7 (citing *Zenith*, 395 F.3d at 419; *Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 1195651, at *4 (N.D. Ill. Mar. 22, 2013))).

Moreover, the Government argues that "[e]ven if these experts had systematically collected, analyzed, and reported data, based on their experience and observations, their opinions would still be unreliably based on unrepresentative samples." (*Id.*, p. 8 (citing *Chavez v. Ill. State Police*, 251 F.3d 612, 643 (7th Cir. 2001);

*Allgood v. Gen. Motors Corp.*, No. 102CV1077DFHTAB, 2006 WL 2669337, at *10–11 (S.D. Ind. Sept. 18, 2006))). Specifically, they argue that the students who attend self-defense training courses like those offered by Watt are self-selected, rather than a representative sample. (*Id.*, p. 8 (citing *id.*, Ex. 4 38:3–5; 63:13–23; 74:10–76:6)). The Government also takes issue with, inter alia, Watt saying he "would have no idea of how to collect 40 years of news stories or magazines or all the other books and all the other internet materials that have formed my opinions." (*Id.*, p. 9 (citing *id.*, Ex. 4 128:1–7)).

In opposition, the Plaintiffs argue that the challenged experts "have not testified to anything that 'requires statistical evidence,' like the percentage of customers who might prefer one television service over another; nor have they attempted to estimate the actual size of the firearms market or the share of that market held by the banned firearms and magazines." (Doc. 250, p. 5 (quoting Doc. 229, p. 5)). They argue that "Little, for example, has testified that (1) he is the owner and lead instructor of a company that provides firearms training nationwide, and (2) of the students in the various courses he and his company have offered, 'most, if not all,' use magazines and firearms that are banned by Illinois" and that "[t]his observation is significant, because Little has personally trained or observed the self-defense training of thousands of students" and has "further testified that his experience matches those of other instructors with whom he has discussed these issues." (*Id.*, p. 6 (citing Doc. 229, Ex. 3 (Little Rep.), ¶¶ 1, 6–8, 15)). They argue that the same is true for Lombardo, who "based his conclusion—that many banned

firearms, including AR- and AK-platform rifles, and banned magazines are commonly owned for lawful purposes —on his 'personal knowledge and many years of first-hand experience and observation,'" (*Id.* (quoting Doc. 229, Ex. 2 (Lombardo Rep.), p. 1)), and for Watt, who "testified as to the common and legitimate civilians uses of the banned firearms and magazines, based on broad personal experience consisting of more than three decades in law enforcement, extensive military service (including three tours in Afghanistan and Iraq), and decades of work as a firearms trainer," (*Id.*, pp. 6–7 (citing Doc. 229, Ex. 1 (Watt Rep.), ¶¶ 7–8)). The Plaintiffs argue that these three experts "could all very easily testify based on their significant experience that the firearms banned by Illinois are not rare or unusual weapons, but are instead very common choices of people hoping to be able to successfully defend themselves in the unfortunate event that they are confronted with the need to do so." (*Id.*, pp. 7–8 (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000))). The Plaintiffs also state that "the Defendants' own expert concedes that there are likely at least 14.1 million AR-15 rifle owners in this country, a statistical estimate that is broadly consistent with the experiences of Watt, Little, and Lombardo." (*Id.*, p. 8 (citing Doc. 185, Ex. 7 (Klarevas Rep.), p. 20)).

This Court holds that the issues identified by the Government go to the weight of these experts' testimony, not to the admissibility of the testimony itself. As this is a case in equity with this Court as the factfinder, concerns of prejudicing a jury are not an issue here. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) ("Although we have held that the court in a bench trial need not make

reliability determinations before evidence is presented, the determinations must still be made at some point. . . . However, the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting, and our review must take this factor into consideration." (first citing *In re Salem*, 465 F.3d 767, 776–77 (7th Cir. 2006); then citing *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009))).

Watt noted at trial in relation to the exact number of firearms in the country that it is "'hard to put any type of a hard number on' these things." (Doc. 240 (9/18/2024 Trial Tr. (Watt)), 440:14–15). Especially because of the issues with survey methodology identified for the survey data presented by the Plaintiffs (see *supra*) and because it seems that gun owners are reticent to disclose their possession of various firearms for fear of prosecution under PICA, the Court is concerned that any assessment of the exact number of PICA-prohibited weapons in Illinois is unreliable at best. However, neither *Heller* nor *Bruen* require a firearm to be present in exact numbers or to occupy a specific percentage or proportion of the firearms market in order to be in "common use." For these reasons, this Court will consider all of the testimony of Little, Lombardo, and Watt. All three of these experts teach self-defense classes nationwide and have significant experience in this industry. Therefore, the non-empirical nature of their opinions weighs against the weight of their testimony, and does not require the exclusion of their observations and opinions which are based on firsthand knowledge.

### B. Jeffrey Eby and Michael Musselman

The Government next argues that Plaintiffs' experts Jeffrey Eby and Michael Musselman's "opinions asserting that automatic fire from standard-issue infantry rifles (e.g., M16, M4) is 'critical' in combat are inadmissible because they are not based on sufficient facts and data regarding real-world military conflicts, but rather on hypothetical combat scenarios in which they imagine automatic fire from these rifles would be useful." (*Id.*, p. 10 (citing *id.*, Exs. 6, 7)). The Government argues that "[t]hese suppositions about what tactics might be used in a potential war between the United States and China or Russia are inadmissible under *Daubert* because they are impossible to reliably test." (*Id.*); *see Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887 (7th Cir. 2011)). The Government also seeks to exclude Eby's opinions about semiautomatic fire (*id.*, pp. 11–12), as well as Eby and Musselman's opinions about "the practical sustained rate of fire for automatic and semiautomatic weapons," (*id.*, p. 12 (citing *id.*, Ex. 6, pp. 9–10; *id.*, Ex. 8, 272:24–273:9; 278:19–280:16)); "regarding the types of firearms used by every military in the world (*id.* (citing *id.*, Ex. 6, p. 3; *id.*, Ex. 8, 209:15–211:22)); and that "'[t]he AR-platform rifle has been the most significant design in weaponry for common use among the public over the last 60 years; and that 'an 11.5" AR-platform short-barreled rifle' is 'the best designed home defense weapon,'" (*id.* (citing *id.*, Ex. 6, p. 11; *id.*, Ex. 8, 15:5–22)). They argue that neither Eby nor Musselman has demonstrated that any of their opinions are based on sufficient facts or data and, instead, are wholly based on their anecdotal observations and general military expertise. (*See id.*, pp. 9–13).

The Plaintiffs argue here that "the Defendants fault Eby and Musselman, like
Little, Lombardo, and Watt, for not basing their opinions on 'empirical testing or
validation,'" none of which, they argue, "are valid grounds on which to exclude their
testimony." (Doc. 250, pp. 8–9 (quoting Doc. 229, p. 9)). The Plaintiffs argue that
"[b]oth Eby and Musselman are Marine gunners, weapons and tactics experts, by
training." (*Id.*, p. 9 (citing Doc. 234 (9/16/2024 Trial Tr. (Eby)), 90:20–91:10; 103:23–
104:5)). They argue that "there is nothing hypothetical about Eby and Musselman's
testimony regarding the importance of automatic fire for infantrymen or its use in
combat, and their report and testimony is more than adequately backed up by their
extensive experience." (*Id.*). They argue that the Government's expert Craig Tucker
"generally burnished Eby's expertise," (*id.*, pp. 9–10 (citing Doc. 240 (9/18/2024 Trial
Tr. (Tucker)), 536:10–20 ("Gunner Eby is one of the finest infantrymen that ever wore
the uniform. I have a tremendous amount of respect for the man."); *id.*, 546:25–547:9
(agreeing that Eby "generally has more technical knowledge than [Tucker] would on
an M-4, M-16"); Tucker Dep. at 17:13–14 (noting that as Marine gunners, Eby and
Musselman are the real "expert[s] on the employment of weapon systems"))), and
that:

> Eby and Musselman's statements in their report, about the rates of fire
> they would expect novices to be able to achieve at given distances were
> not intended or presented as an analysis of the technological capabilities
> of any given firearm—as they had already explained, such estimates are
> difficult if not impossible to make reliably—but rather reasonable
> expectations for novice shooters, estimates that their experience in
> training countless individuals to shoot more than qualified them to
> make.

(*Id.*, pp. 10–11). They also argue that Eby and Musselman's testimony about the types of weapons used by other militaries and their testimony about the suitability of the AR-type rifle for home defense use "are directly and clearly related to their experience and admissible as expert testimony." (*Id.*, p. 12; *see also id.*, pp. 11–12).

Here, too, this Court holds that the testimony of these experts is admissible and that the Government's identified issues affect the weight of Eby and Musselman's testimony, not its admissibility. Gunners Eby and Musselman are highly skilled and decorated former Marine Corps warrant officers with a wealth of experience that is directly relevant to the issues at stake in this case. While the Government is correct that neither Eby nor Musselman has direct experience in private, civilian self-defense, this Court holds that their extensive military service and weapons expertise are sufficient grounds for them to opine on the use of various handheld firearms in this litigation. Thus, this Court will consider all of the opinions offered by Eby and Musselman.

## C. James Ronkainen

Regarding former Remington Arms engineer James Ronkainen, who filed a report rebutting the reports of Government experts Lucy Allen and James Klarevas, the Government first argues that "Ronkainen does not 'contradict, impeach or defuse the impact of' any of Allen's analysis, which is the only 'proper function' of rebuttal evidence." (*Id.*, p. 13 (citing *Stanfield v. Dart*, No. 10 C 6569, 2013 WL 589222, at *3 (N.D. Ill. Feb. 14, 2013) (quoting *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008))). The Government also argues that "new arguments and evidence are

not permitted on rebuttal." (*Id.* (citing *McCann v. Ogle County*, No. 11 C 50125, 2016
WL 5807922, at *1 (N.D. Ill. Oct. 5, 2016); *Stanfield*, 2013 WL 589222, at *4)).

The Government also argues that "Ronkainen's opinions on the size of the
market for [modern sporting rifles ("MSRs")] should also be barred under *Daubert*
because they are methodologically unsound" because he "relies on his vague personal
recollections about the size and growth of the MSR market during his time in the
industry, but cites no data that would show the overall size of that market, the
specific proportion of MSRs that are sold to civilians rather than law enforcement, or
the share of the overall firearms market that MSRs represent." (*Id.*, pp. 14–15 (first
citing *id.*, Ex. 10, 138:12–6; then citing *id.*, Ex. 10, 131:22–133:11; then citing *id.*, Ex.
9, pp. 4–5)). They also argue that "Ronkainen claimed that sales data are available
through the references in his report, but he concedes that that data do not directly
show the volume of sales of MSRs. (*Id.*, p. 15 (citing *id.*, Ex. 10, 131:4–15, 132:23–
133:11, 135:21–137:3)).

The Plaintiffs argue that "[t]he whole premise of the Defendants' argument is
wrong" because "Rule 26 does not automatically exclude evidence that an expert could
have included in [an] original report." (Doc. 250, p. 12 (quoting *Bakov v. Consol. World
Travel, Inc.*, No. 1:15-cv-02980, 2019 WL 1294659, at *11 (N.D. Ill. Mar. 21, 2019)
(quotation marks omitted))). They argue that "whether evidence could have been
offered in a case in chief does not mean it cannot properly be rebuttal evidence.
Rather, evidence that … [provides] … additional support to an argument made in a
case in chief' can be offered as rebuttal evidence if it also contradicts, impeaches or

defuses the impact of evidence offered by the adverse party." (*Id.*, pp. 12–13 (citing *Pantaleo v. Hayes*, No. 1:08-cv-6419, 2011 WL 2517265, at *1 (N.D. Ill. June 23, 2011) (cleaned up))). They argue that "a rebuttal expert may refute an adverse expert's report by, among other things, offering a different perspective on the same topic; he is not required to merely quibble with the original expert's method of answering a question" and argue that Ronkainen's report met these requirements. (*Id.*, p. 13). They argue that while "[i]t is true, as the Defendants claim, that the suitability of the banned firearms for lawful purposes like self-defense is part of Plaintiffs' case in chief—and through the expert reports of Watt, Little, and Lombardo (as well as voluminous additional evidence), Plaintiffs presented significant expert testimony on that topic in their case in chief"; however, they argue that "does not, of itself, make the topic inappropriate for rebuttal treatment as well where it is responsive to an opinion offered by an opposing expert." (*Id.* (citing *Pantaleo*, 2011 WL 2517265, at *1)). They argue the same is true for Ronkainen's rebuttals both of Klarevas's report and from Andrew's report. (*Id.*, pp. 14–15 (citations omitted)). Regarding the Government's objections to "Ronkainen's testimony . . . because his assessment of the size of the market for banned rifles was 'methodologically unsound,' resulted from his personal experience as a player in the market rather than statistical analysis, and could not be reduced to specific numbers," (*id.*, p. 16 (quoting Doc. 229, pp. 12–13)), the Plaintiffs argue that "an expert's opinion is not inadmissible under Daubert merely because it is based on experience or because the expert does not speak with the precision that the Defendants would prefer" and that "[h]ere, it would be difficult

to imagine an individual with a better foundation for his assessment of the market for these firearms than Ronkainen." (*Id.*).

Regarding the Government's arguments about statistical and methodological infirmities in estimations of the firearms market in the United States, this Court states again that the fact that such data is difficult to determine precisely does not, somehow, prevent any determination whatsoever of a weapon's prevalence in the country or of trends in firearms manufacturing over time, especially since the expiration of the Federal Assault Weapons Ban in 2004. Ronkainen has testified that he has decades of firearms design and engineering experience at one of the largest firearms manufacturers in the United States. While the Government would prefer different expert testimony, the Court holds that Ronkainen is appropriately qualified as an expert, that his expert testimony is admissible, and that the Government's identified issues affect the weight his testimony, not its admissibility.

### D. Stephen Helsley

The Government next argues that former law enforcement officer Stephen Helsley's report rebutting the Government's historical expert Brian DeLay "should be barred under *Daubert* because [Helsley] is not qualified as a historian and his opinions are not based on sufficient facts and data." (*Id.*). They argue that "Helsley explicitly states that he is relying on this background, including his background as an 'avid shooter,' as part of the basis for his opinions" and that "[t]he only experience as a historian that Helsley discloses is his role as '"Rigby Historian"'/archivist,' but he does not identify his responsibilities in this role or explain how this experience

makes him relevantly qualified." (*Id.*, p. 16 (citing and quoting *id.*, Ex. 11, at 1–2)). They also argue that "Helsley discloses no education or training in historical methods." (*Id.* (citing *Burton v. Am. Cyanamid*, 362 F. Supp. 3d 588, 607 (E.D. Wis. 2019))). The Government argues that "Helsley relies on little or no scholarly history, . . . fails to identify the sources of several of the images he includes[,] . . . [and] relies on personal information, family memorabilia, and anecdotes about Thanksgiving outings." (*Id.*, pp. 16–17 (citing *id.*, Ex. 11, pp. 7, 10–11, 15–16)).

The Plaintiffs state here that "[t]he Defendants move to exclude the testimony of Stephen Helsley on the grounds that he is not qualified to opine on 'the history of firearms regulation' and that, methodologically, he fails to conduct 'a thorough review of the pertinent historical record.'" (*Id.*, p. 16 (quoting Doc. 229, p. 14)); *see Burton v. Am. Cyanamid*, 362 F. Supp. 3d 588, 607 (E.D. Wis. 2019). They argue that "the Defendants suggest he should have performed 'a thorough review of the pertinent historical record,' Helsley's task as a rebuttal expert was a narrow one" and add that "had Helsley's report taken a broader approach to history it is likely the Defendants would have made the same improper rebuttal argument against him as against Plaintiffs' other rebuttal experts." (*Id.*, p. 17). "Helsley's report is narrowly focused on highlighting the existence of significant military surplus sales throughout the twentieth century, which tends to show that, at least insofar as non-automatic firearms are concerned, the line DeLay purports to draw has no basis in reality." (*Id.* (citing Doc. 229, Ex. 11 (Helsley Rep.), p. 2)). They also argue that "an individual can be qualified as expert 'by knowledge, skill, [or] experience'" and that "PhDs are not a

prerequisite." (*Id.* (citing FED. R. EVID. 702)). They argue that Helsey's report itself and his authorship of various books showcases his expertise. (*See id.*, pp. 17–18 (citations omitted)). They also argue that "had Plaintiffs known, prior to the eve of trial, that the Defendants would challenge Helsley's qualifications, they would have offered him for live testimony at trial to establish his expertise beyond dispute." (*Id.*, p. 18).

Here, as well, the Court acknowledges the Government's concerns while also restating that, in a bench trial, none of the concerns about biasing the jury are present. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (citations omitted). Much like their other objections, the Government objects to Helsley's *relative* qualifications (i.e., they argue he should be more qualified) instead of reviewing them in an *absolute* sense (i.e., is he sufficiently qualified as an expert). The fact that Helsley has written multiple books on this topic indicates that he possesses more knowledge than a layperson and that he has engaged with this material in-depth. The Court will consider the opinions of Helsley as an expert in accordance with Federal Rule of Evidence 702 and holds that the Government's objections to bear on the weight of Helsley's testimony, not on its admission entirely.

## E. Daniel Kemp, Michael Dennis, and Paul Leitner-Wise

Like the Ronkainen report discussed *supra*, the Government argues similarly that "[r]ather than responding specifically and concretely to any of the State Defendants' experts, [Plaintiffs' expert Daniel] Kemp offers freewheeling historical musings that, to the extent they are relevant at all, should have been disclosed in full

in an opening report." (*Id.*, p. 17). As an example, the Government argues that " Kemp purports to respond to specific claims about the 20th-century military lineage of certain firearms regulated by PICA, but proceeds to broadly opine on the merits of civilian and military firearms since the 1500s," yet "because State Defendants and their experts have not made any blanket claim that military weapons are generally superior to civilian weapons throughout American history, Kemp's opinions do not engage with Defendants' experts." (*Id.* (citing *id.*, Ex. 12, pp. 2–12, 15)). The Government argues that "[i]n the few instances where Kemp does attempt to engage in passing with the State Defendants' experts, his opinions are not based on sufficient facts and data or derived from a reliable methodology," including when he "criticizes the opinions of Phil Andrew regarding the lethality of assault weapons firing 62-grain 5.56mm projectiles," stating only "that this caliber 'has been criticized for causing wounds like an ice pick,' without any evidentiary support or reasoning." (*Id.*, pp. 17–18 (quoting *id.*, Ex. 12, p. 15)). They also argue that he lacks sufficient qualifications to challenge the medical opinions of Dr. Stephen Hargarten and lacks evidentiary support to challenge the opinions of James Yurgealitis. (*See id.*, p. 18 (citing *id.*, Ex. 12, p. 15)).

The Government similarly argues that "[t]he report of the *Langley* Plaintiffs' rebuttal expert Michael Dennis should be barred as improper rebuttal" because "Dennis offers opinions unconnected to any of Defendants' expert reports; indeed, his only direct reference to any other expert's opinion is a single sentence at the beginning of his report generically mentioning 'certain opinions stated by persons

hired by state parties.'" (*Id.*, (citing *id.*, Ex. 13, p. 1)). The Government also contends that "because Dennis offers substantive opinions intended to bolster Plaintiffs' prima facie case about subjects for which there is virtually no other factual record in this litigation (including opinions related to the weapons preferences of law enforcement agencies, the use of firearms to fight 'tyranny,' and opinions about the functionality of grenade launchers), admitting Dennis's report would pose a unique and substantial risk of unfair prejudice." (*Id.*, pp. 18–19). The Government argues that Dennis "cites virtually no evidence to support his sweeping conclusions" and that:

> A significant number of Dennis's opinions, such as those about the reasons police officers carry firearms, Dennis Rpt., Ex. 13, at 1, the types of firearms chosen by police departments, *id.* at 2, the use of assault weapons to "defend liberty from tyranny," *id.* at 2–3, the process of modifying an AR-15 to enable automatic fire, *id.* at 7, and the willingness of gun owners to unlawfully modify their weapons, *id.*, entirely lack relevant empirical support.

(*Id.*, pp. 18–19). They also argue that "Dennis does not apply a reliable methodology," including when "he uses two handpicked examples to support his claim about the need for large-capacity magazines for self-defense—both involving the unique law enforcement function of executing traffic stops leading to protracted shootouts." (*Id.*, p. 19 (citing *id.*, Ex. 13, pp. 4–5)).

The Government also takes issue with the testimony of Paul Leitner-Wise, contending that his "qualifications are misleading, inaccurate, or even fabricated, leaving him with insufficient expertise." (*Id.*, p. 20). Apparently, "Leitner-Wise admitted at this deposition that his schooling did not include firearms or firearm design, and that he has no certifications in firearms design," (*id.* (citing *id.*, Ex. 15,

23:5–10, 28:21–29:3)) and "[h]e has never been a chartered or licensed engineer, nor was he willing to disclose any information about ever being supervised by engineers," (*id.* (citing *id.*, Ex. 15, 25:19–28:10)). "Both in Leitner-Wise's report and deposition, he claims to have received a B.S. and a Master of Business Administration from 'Stafford University' in the United Kingdom. But unlike Staffordshire University (which is a public research university located in Staffordshire, England), 'Stafford University' was a fraudulent institution that piggybacked on the reputation of Staffordshire University to sell fake degrees until it was shut down by the U.K. government in 2017." (*Id.* (citing *id.*, Ex. 14, p. 1; *id.*, Ex. 15, 20:20–21; Ex. 16)). Allegedly, "he testified that from 2007 through 2020 he did not work anywhere, except during a 'brief period' in 2011–2012." (*Id.*, pp. 20–21 (citing *id.*, Ex. 14, p. 1; *id.*, Ex. 15, 76:9–77:10, 80:9–81:19)). Apparently, he also did not found the company he claims to have founded, which does not actually do business in the jurisdictions he claims. (*See id.*, p. 21 (citing *id.*, Ex. 15, 83:12–13, 82:23–83:11; *id.*, Ex. 17)). Additionally, "Leitner-Wise's general description of his expertise in his report is also unsupported" because "[h]is report claims that he has been '[f]ormally recognized by the United States Government as a leading expert in the field of firearms design,'" yet "this 'recognition' refers to the government's suggestion in immigration proceedings that he could apply for an EB-1 visa (reserved for individuals with 'extraordinary ability')—not that he ever in fact received such a visa or that the United States government recognized him as a 'leading expert' in any field." (*Id.*, p. 21 (citing *id.*, Ex. 14, p. 1; *id.*, Ex. 15, 35:21–36:13; 105:5–24)).

Regarding experts Kemp, Dennis, and Leitner-Wise, the Plaintiffs state that "[i]n the interest in narrowing the issues before the Court, Plaintiffs have not relied upon Kemp, Dennis, or Leitner-Wise's opinions or testimony in their proposed Findings of Fact and Conclusions of Law" but that "[t]he Court, of course, remains free to rely on any verifiable 'legislative facts' contained in any of the expert reports." (Doc. 250, p. 19 (citing *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin*, 2024 WL 3585580, at *5 (D.N.J. July 30, 2024))).

In order to streamline this already arduous process, this Court sustains the Government's objections to these final three experts. This Court does not rely on any of the opinions of Plaintiffs' experts Kemp, Dennis, or Leitner-Wise in making its final determination in this case and holds that these purported experts' opinions are not admissible in accordance with *Daubert*.

## CONCLUSION

For the reasons set forth above, the Government's Motion to Preclude Consideration of survey evidence proffered by the Plaintiffs' experts (Doc. 223) is **GRANTED**. The Court will not consider the English or NSSF surveys in making its final factual determinations in this case. Additionally, the Government's Motion to Bar Certain Opinions of Plaintiffs' Experts (Doc. 229) is **GRANTED in part and DENIED in part**. The Court holds that the Government's objections to Plaintiffs' experts Eby, Musselman, Ronkainen, and Helsley implicate the weight, not the admissibility, of their testimony. However, this Court will not consider the testimony of Plaintiffs' experts Kemp, Dennis, or Leitner-Wise in making its final

determination.

**IT IS SO ORDERED.**

**DATED: November 8, 2024**

                                        **/s/ Stephen P. McGlynn**
                                        **STEPHEN P. McGLYNN**
                                        **U.S. District Judge**